_Translation from Russian_

Michael S. Adler, SBN 190119
  madler@ta-llp.com
Joel M. Tantalo, SBN 206096
  jtantalo@ta-llp.com
**TANTALO & ADLER LLP**
1901 Avenue of the Stars, Ste. 1000
Los Angeles, CA 90067

Telephone:  (310) 734-8695
Fax:           (310) 734-8696

Attorneys for respondent Ashot Yegiazaryan

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VITALY IVANOVICH SMAGIN<br><br>        Petitioner,<br><br>        v.<br><br>ASHOT YEGIAZARYAN,<br><br>        Respondent. | **CASE NO. 14-cv-09764-R (PLAx)**<br><br>Before the Honorable Manuel L. Real<br>United State District Judge<br><br>**DECLARATION OF ASHOT YEGIAZARYAN IN OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT**<br><br>**Hearing Place:**    Courtroom 8<br>**Hearing Date:**    February 17, 2015<br>**Hearing Time:**    10:00 a.m. |

## <u>DECLARATION OF ASHOT YEGIAZARIAN</u>

I, Ashot Yegiazaryan, do hereby declare as follows:

1.    I am the named respondent in this action.  I have personal knowledge of the facts declared herein and could and would competently testify thereto in a Court of Law if necessary.

### Personal Background and Professional Activity as a Legislator Until 2011

2.    I became involved in Russian government and political activities in the second half of the 1990s.  In 1996, I took part in organizing the financing of Boris Yeltsin's presidential campaign.  In 1997 I was was an advisor for the Russian Central Bank (the Russian equivalent of the U.S. Federal Reserve).

3.    I also served as an advisor on a pro bona basis for Yuri Maslyukov, the First Deputy Prime Minister of the Russian Federation.

4.    In 1999, I was elected to the State Duma.  I was reelected to the State Duma in 2003 and 2007. During my time as a Deputy of the State Duma, I was appointed to various positions including deputy chairman of the Committee on Budget and Taxes, deputy chairman of the Commission to Promote a Political Settlement and Adherence to Human Rights in the Chechen Republic and a member of the Commission on the State Debt of the Russian Federation.

5.    I began to fall out of political favor around 2005, largely because I was allied with the former Prime Minister Mikhail Kasyanov and my association with him was perceived as a sign of disloyalty.

### Investments in Russia and Disputes with Connected Individuals

6.    Although I was a legislator by profession between 1999 and 2010, I did make some investments during that time.  Those investments included at least two real estate projects: the Europark Shopping Center and the Moskva Hotel.

7.    Other investors in the Moskva Hotel included the City of Moscow, Vladimir Putin's long-time judo partner Arkady Rotenberg and Vladimir Putin's

former masseuse Konstantin Goloschapov.

8.    After I fell out of favor with the political authorities in Russia, the Russian senator Suleiman Kerimov and my former partners forced me to surrender my investment in the Moskva Hotel.  When I refused to give it up quietly, I was subjected to various forms of official and unofficial pressure.  Ultimately, I filed an claim against Mr. Kerimov at the London Court of International Arbitration and I received a $250 million dollar award (although Mr. Kerimov has challenged that award and there is no information to suggest that he intended to pay the debt in the foreseeable future).

**Departure from Russia in the Face of Death Threats**

9.    I left Russia in the summer of 2010, in large part because I began receiving threats of reprisal if I did not 'stay away' from the Moskva Hotel Project**.**  I reported these threats to the Russian police but they took no serious action.  This was long before I was named as a suspect in respect of any charges and long before the Russian arrest warrant was issued.  These threats included threats against myself and also my family, including threats to behead my children.  Moreover, a family member of mine was murdered in Russia in 2010 and I believe it was done to send me a message.

10.    Attached hereto as Exhibit 1 are true copies of reports of documents from the criminal case concerning threats against me and my family.

**Politically-Motivated Arrest Warrant**

11.    While I was in the United States, and after I filed my claims against Mr Kerimov, in October 2010 the Russian authorities took moves to strip me of my parliamentary immunity, summoned me for questioning and placed me on a wanted list. Placing me on the wanted list was improper, because this may be done only where a person's whereabouts are unknown, whereas I had promptly informed investigators of my address in the United States and my safety concerns about returning to Russia. Investigators dismissed my lawyers' objections out of hand and published a notice

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

through INTERPOL anyway.

12.     Unfortunately, it is my understanding that INTERPOL is little more than a clearing house for arrest and extradition requests from foreign countries, such that it is open to abuse. As noted in the Economist article attached hereto as Exhibit 2, Russia is particularly notorious for this practice.  In any event, an INTERPOL notice is not evidence of guilt and INTERPOL itself emphasizes that persons subject to INTERPOL notices enjoy a presumption of innocence. I note that the United States, where I currently reside, has not acted on Russia's request.

13.     I wish to inform the court that I have no confidence in the Russian criminal investigation or my safety if I were to return to Russia. The Economist article mentioned above refers to the notorious Russian case of Sergei Magnitsky as a particularly acute example of the abuse of Russian criminal proceedings. That case involves allegations that the Russian officials investigating the case forged documents and stole money from the persons under investigation. After one of the accused's lawyers, Sergei Magnitsky, complained about these abuses, he was thrown in prison where he died; it is alleged that he was subjected to abuse in prison and that is why he died. This case has been examined by the European Parliament and the United States Congress, the latter of which imposed sanctions on a number of Russian officials involved in the investigation.

14.     In this respect, I wish to emphasize that no less than seven of the Russian officials involved in my investigation also handled the Magnitsky case, and five of the officials involved in my case (Aleksey Droganov, Victor Grin, Oleg Logunov, Andrei Krechetov and Andrei Strizhov) have been placed under sanctions by the U.S. State Department for their involvement in the Magnitsky case.

**My Continued Objection to the Forged Arbitration Agreement**

15.     In 2010, Mr. Smagin initiated an arbitration against me, claiming various grounds for jurisdiction including a claim that I supposedly signed a certain 2008

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

agreement including an arbitration clause.

16.    I did not sign that agreement.  It is forged.  I have consistently objected to the jurisdiction of the arbitral tribunal on various grounds, including on the basis that that document is a forgery.

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct and that this declaration was executed on January 28, 2015 in Los Angeles, California.

[signature]
Ashot Yegiazaryan

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

1  Майкл С. Адлер, SBN 190119
     madler@ta-llp.com
2  Джоэль М. Тантало, SBN 206096
     jtantalo@ta-llp.com
3  **ТОО «ТАНТАЛО И АДЛЕР»**
   1901 Авеню оф зи Старз, оф. 1000
4  Лос-Анджелес, Калифорния 90067

5  Телефон:    (310) 734-8695
   Факс:       (310) 734-8696
6
   Адвокаты ответчика Ашота Егиазаряна
7

8

9

10              **РАЙОННЫЙ СУД СОЕДИНЕННЫХ ШТАТОВ**

11              **ЦЕНТРАЛЬНЫЙ РАЙОН КАЛИФОРНИИ**

12
   ВИТАЛИЙ ИВАНОВИЧ СМАГИН          **ДЕЛО №. 14-cv-09764-R (PLAx)**
13
            Истец,                 Перед Уважаемым районным судьей
14                                 Соединенных Штатов Мануэлем Л.
            против                 Реаль
15
   АШОТА ЕГИАЗАРЯНА,               **ДЕКЛАРАЦИЯ АШОТА**
16                                 **ЕГИАЗАРЯНА ПО ВОЗРАЖЕНИЮ**
            Ответчика.            **НА ЗАЯВЛЕНИЕ О ВЫДАЧЕ**
17                                 **ЛИСТА ОБ ОБРЕМЕНЕНИИ**
                                   **ИМУЩЕСТВА**
18

19
                                   **Место слушания:** Зал № 8
20                                 **Дата слушания:**  17 февраля 2015 г.
                                   **Время слушания:** 10.00
21

22

23

24

25

26

27

28

---

## ДЕКЛАРАЦИЯ АШОТА ЕГИАЗАРЯНА

Я, Ашот Егиазарян, настоящим заявляю о следующем:

1.      Я – названный ответчик по вышеуказанному делу.  Факты, изложенные в настоящей декларации, находятся в пределах моей личной осведомленности и я могу и готов давать компетентные показания о них перед судом в случае необходимости.

### Личная биография и профессиональная деятельность
### в качестве законодателя до 2011 года

2.      Я стал заниматься правительственной и политической деятельностью в России во второй половине 1990-х годов.  В 1996 году, я принимал участие в организации финансирования президентской кампании Бориса Ельцина.  В 1997 году я был советником Центрального банка Российской Федерации (российский эквивалент Федеральной резервной системы США).

3.      Я также работал в качестве консультанта на безвозмездной основе на Юрия Маслюкова, Первого заместителя Премьер-министра Российской Федерации.

4.      В 1999 году я был избран депутатом Государственной Думы.  Я был вновь избран депутатом Государственной Думы в 2003 и 2007 годах. Во время моего пребывания на посту депутата Государственной Думы, я был назначен на различные должности, в том числе заместителя председателя Комитета по бюджету и налогам, заместителем председателя Комиссии по содействию политическому урегулированию и соблюдению прав человека в Чеченской Республике и члена Комиссии по государственному долгу Российской Федерации.

5.      Примерно в 2005 году я стал терять свой политический капитал, в основном из-за моей связи с бывшим премьер-министром Михаилом Касьяновым, что воспринималось как признак моей нелояльности.

1

ДЕКЛАРАЦИЯ АШОТА ЕГИАЗАРЯНА ПО ВОЗРАЖЕНИЮ НА ЗАЯВЛЕНИЕ О ВЫДАЧЕ ЛИСТА ОБ ОБРЕМЕНЕНИИ ИМУЩЕСТВА

### Инвестиции в России и споры со связанными с ними лицами

6.      Хотя я был законодателем по профессии с 1999 года по 2010 год, в этот период я также делал некоторые инвестиции.  Эти инвестиции в том числе включали в себя два проекта по недвижимости: торговый центр «Европарк» и гостиница «Москва».

7.      Среди других инвесторов в гостинце «Москва» также значились город Москва, давний партнер Владимира Путина по джюдо Аркадий Ротенберг и бывший массажист Владимира Путина Константин Голощапов.

8.      После того, как я стал терять благорасположение политических властей в России, российский сенатор Сулейман Керимов и мои бывшие партнеры заставили меня отдать свою инвестицию в гостинице «Москва». Когда я отказался его спокойно отдать, меня подвергали различным средствам официального и неофициального давления. В итоге, я подал иск против Сулеймана Керимова в Лондонский Международный Третейский Суд и получил решение о присуждении мне 250 миллионов долларов США (хотя г-н Керимов подал заявление об оспаривании данного решения и нет никаких сведений о том, что он собирается уплатить его долг в обозримом будущем).

### Выезд из России после угроз моей жизни

9.      Я уехал из России летом 2010 года, в основном, из-за того, что в мой адрес стали поступать угрозы расправы, если я не буду держаться подальше от Проекта "Гостиница "Москва". Я сообщил об этих угрозах в полицию в России, но они не предприняли никаких серьезных мер. Это произошло задолго до того, как я был привлечен в качестве обвиняемого по каким-либо обвинениям и задолго до выдачи ордера на мой арест в России. Эти угрозы включали в себя угрозы моей жизни и жизни моей семьи, в том числе угрозы отрезать головы моих детей.  Кроме того, член моей семьи был убит в 2010 году и я считаю, что это было сделано для того, чтобы послать мне сигнал.

2

ДЕКЛАРАЦИЯ АШОТА ЕГИАЗАРЯНА ПО ВОЗРАЖЕНИЮ НА ЗАЯВЛЕНИЕ О ВЫДАЧЕ ЛИСТА ОБ ОБРЕМЕНЕНИИ ИМУЩЕСТВА

10.    Прилагаю под Приложением № 1 верные копии документов из уголовного дела, касающихся угроз против меня и моей семьи.

**Ордер на арест мотивирован политическими соображениями**

11.    Пока я находился в США и после того, как я подал иск против г-на Керимова, в октябре 2010 года российские власти приняли меры к лишению меня депутатской неприкосновенности, вызвали меня на допрос и объявили меня в розыск. Объявление меня в розыск не имело под собой никаких правовых оснований, так как это делается только в том случае, если место нахождение разыскиваемого лица не известно, в то время как я своевременно сообщил следователям свой адрес в США и уведомил их об опасениях за мою безопасность в случае возвращения в Россию. Следователи сразу же отвергли возражения моих адвокатов и все равно объявили меня в международный розыск через Интерпол.

12.    К сожалению, насколько я понимаю, Интерпол является не более чем сортировочным центром, в который из других стран поступают запросы на арест и требования о выдаче разыскиваемых лиц, и как таковой он не застрахован от нарушений и злоупотреблений. Как было отмечено в статье из «Экономиста», приложенной мной под Приложением № 2, Россия имеет в этом отношении особенно печальную репутацию. Так или иначе, уведомление Интерпола не является доказательством вины, и сам Интерпол подчеркивает, что на лиц, объявленных в розыск Интерполом, пользуются презумпцией невиновности. Обращаю внимание на то, что США, где я в данное время проживаю, не предпринимали никаких мер в ответ на запрос российских властей.

13.    Я хочу сообщить суду о том, что у меня нет ни доверия к уголовному следствию в России, ни уверенности в моей безопасности, если я должен буду вернуться в Росси. В статье из журнала «Экономист», упомянутой мной выше, говорится о печально известном случае Сергея Магницкого как о ярчайшем

3

примере злоупотреблений, характерных для уголовного производства в России. Следователи, занимавшиеся расследованием этого дела, обвиняются в подделке документов и краже денег у лиц, находящихся под следствием. Сергей Магницкий, адвокат одного из обвиняемых обратившийся с жалобой на злоупотребления был брошен в тюрьму, где впоследствии скончался; по одной из версий, в тюрьме он подвергался издевательствам, что и стало причиной его смерти. Этот случай рассматривался и в Европейском Парламенте, и в Конгрессе Соединенных Штатов Америки, и последний ввел санкции в отношении ряда российских чиновников, причастных к расследованию этого дела.

14.    В этом отношении, я хотел бы подчеркнуть, что по крайней мере семеро должностных лиц российского следствия, занимающегося моим делом, вели и дело Магницкого, а против пятерых из тех, кто ведет мое дело (Алексей Дроганов, Виктор Грин, Олег Логунов, Андрей Кречетов и Андрей Стрижов), Государственным Департаментом США объявлены санкции за их участие в деле Магницкого.

## Мое последовательное возражение против поддельного третейского соглашения

15.    В 2010 года, г-н Смагин подал иск против меня в третейский суд, утверждая по различным основаниям о том, что я нахожусь под его юрисдикцией, в том числе со ссылкой на то, что я якобы подписал соглашение от 2008 года, в котором имелась третейская оговорка.

16.    Я не подписывал указанного соглашения.  Она является подделкой. Я последовательно возражал против юрисдикции третейского суда по различным основаниям, в том числе и потому, что документ является подделкой.

Настоящим заявляю, осознавая ответственность за дачу ложных показаний по законам Штата Калифорнии и Соединенных Штатов Америки, что

4

вышеизложенное является правдивым и достоверным, и что настоящая

декларация была исполнена мной 27 января 2015 г. в Калифорнии в городе Лос-

Анджелесе.

Ашот Егиазарян

ДЕКЛАРАЦИЯ АШОТА ЕГИАЗАРЯНА ПО ВОЗРАЖЕНИЮ НА ЗАЯВЛЕНИЕ О ВЫДАЧЕ
ЛИСТА ОБ ОБРЕМЕНЕНИИ ИМУЩЕСТВА

# EXHIBIT

# 1

*231037*

ПОСТАНОВЛЕНИЕ
о возбуждении уголовного дела и принятии его к производству

г. Москва                                    "_09_" _февраля_ 20__ г.

в 17 ч. 00 мин.

Следователь (дознаватель) _ОД ОВД по Тверскому району г. Москвы_
капитан милиции _Гуляева Н.Ю._

рассмотрев сообщение о преступлении _КУС- 2406 от 09.02.2010 г._

поступившее _по заявлению_

УСТАНОВИЛ:

20 января 2010 года примерно в 15 часов 00 минут, неустановленное дознанием лицо, имея умысел на совершение угрозы убийством в отношении депутата Государственной Думы РФ Егиазаряна А.Г., осуществило звонок на абонентский номер рабочего кабинета последнего, расположенного по адресу: г. Москва, Охотный ряд, д.1, каб №718, и высказало в адрес Егиазаряна А.Г. угрозы убийством словами «что если он будет лезть в гостиницу «Москва» то отрежут голову ему и его семье», после этого продолжая свой преступный умысел, направленный на совершение угрозы убийством осуществило звонки на вышеуказанный номер 21.01.2010 года и 22.01.2010 года, с угрозами убийства в адрес последнего словами «что оторвут голову ему и членам его семьи», в связи с чем данные угрозы Егиазаряном А.Г., были восприняты реально, таким образом в действиях неустановленного лица усматривается состав преступления предусмотренный ч.1 ст.119 УК РФ.

Принимая во внимание, что имеются достаточные данные, указывающие на признаки преступления _, предусмотренные ___ ч.1 ст.119___ УК РФ,
руководствуясь ст. 140, 145, 146 (147), частью первой ст. 156 и частью первой ст. 157 УПК РФ,

ПОСТАНОВИЛ:

1. Возбудить уголовное дело по признакам преступления,
предусмотренного _____ ч.1 ст.119 _____ УК РФ

2. Возбудить уголовное дело в отношении ___ деяниях которого усматриваются признаки преступления, предусмотренного ___ ч.1 ст.119 УК РФ

3. Уголовное дело принять к своему производству и приступить к его расследованию.

4. Копию настоящего постановления направить прокурору Тверского р-на г.Москвы

Следователь (дознаватель)
Копия настоящего постановления направлена прокурору Тверского р-на г. Москвы

"_09_" _февраля_ 20_10_ г.    в _17_ ч _10_ мин

О принятом решении сообщено заявителю и лицу, в отношении которого возбуждено уголовное дело

Следователь (дознаватель)

*231037*

## ORDER

### to commence a criminal investigation and allow it to proceed

City of Moscow                                                          09 February 2010

                                                                       17 hours 00 mins

Police captain N.Yu. Gulyayeva, investigator (interrogating officer) of the Investigations Office of the Tverskoy District Department of Internal Affairs of the City of Moscow,

having examined notification of crime KUS-2406 dated 9/2/2010, which was received according to statements

### HAS ESTABLISHED THAT:

On 20 January 2010 at about 15:00, an individual unknown to the investigation, having the intent to make a threat of murder with respect to A. G. Egiazaryan, member of the RF State Duma, made a call to the subscriber number in the latter's office, which is located at: 1 Okhotny Ryad, office 718, Moscow, and threatened A. G. Egiazaryan with murder, saying    "if he tries to get involved with the Hotel Moscow, they will cut off his and his family's heads," after which, continuing his criminal intent aimed at making a threat of murder, he made calls to the above-mentioned number on 21.01.2010 and 22.01.2010 with threats of murder to the latter, saying "they will tear off his and his family's heads", as a result of which A. G. Yegiazaryan took these threats seriously, and therefore the actions of the undetermined individual have the attributes of the crime specified by art. 119(1) of the RF Criminal Code.

Considering that there is sufficient data pointing toward attributes of crime stipulated by Art. 119 Section 1 of the Criminal Code of the Russian Federation, and taking guidance from Articles 140, 145, 146 (147), Art. 156(1) and Art. 157(1) of the RF Criminal Procedural Code,

### HAS ORDERED THAT:

1. A criminal investigation into the indications of a criminal offence under Art. 119(1) of the Criminal Code of the Russian Federation be commenced.

2. A criminal investigation of the actions which exhibit attributes of a criminal offence under Art. 119(1) of the Criminal Code of the Russian Federation be commenced.

3. The criminal case proceeds and commences its investigation.

4. A copy of this order is forwarded to the Prosecutor General of the Tverskoy District of the City of Moscow.

Investigator (interrogating officer)                                    [signature]

A copy of this order was forwarded to the prosecutor of the Tverskoy district of the City of Moscow on 9 February 2010  at 17:10.

The applicant and the individual with respect to whom the criminal case is commenced have been notified of the decision made.

Investigator (interrogating officer)                                    [signature]

Ashot Yegiazaryan Decl., Exhibit 1,
Page 7

Приложение 53

Постановление
о признании потерпевшим

г. Москва                                          « 18 » февраля 2010 г.
(место составления)

Следователь (дознаватель) ОД ОВД Тверского р-на г. Москвы
                          (наименование органа предварительного следствия или дознания,
капитан милиции Гулчева Н.Ю.
классный чин или звание, фамилия, инициалы следователя (дознавателя)
рассмотрев материалы уголовного дела N 231037,

установил:

20 января 2010 года примерно в 15 часов 00 минут, неустановленное
дознанием лицо, имея умысел на совершение угрозы убийством в отношении
депутата Государственной Думы РФ Егиазаряна А.Г., осуществило звонок на
мобильный номер рабочего кабинета последнего, расположенного по адресу:
г. Москва, Охотный ряд, д.1, каб #718, и высказывало в адрес Егиазаряна
А.Г. угрозы убийством словами «что если он будет лезть в гостиницу
«Москва» то отрежут голову ему и его семье», после этого продолжая свой
преступный умысел, направленный на совершение угрозы убийством осуществило
звонки на вышеуказанный номер 21.01.2010 года и 22.01.2010 года, с
угрозами убийства в адрес последнего словами «что оторвут голову ему и
членам его семьи», в связи с чем данные угрозы Егиазаряном А.Г., были
восприняты реально, таким образом в действиях неустановленного лица
усматривается состав преступления предусмотренный ч.1 ст.119 УК РФ.
          (излагаются основания признания лица потерпевш___)

На основании изложенного и учитывая, что Егиазаряну Ашоту Геворковичу.
                                         (фамилия, имя, отчество физического лица
или наименование юридического лица, признаваемого потерпевш___)
причинен моральный ущерб
руководствуясь ст.42 УПК РФ,

постановил:

Признать потерпевшим. Егиазаряна Ашота Геворковича
          (фамилия, имя, отчество физического лица
               либо наименование юридического лица)
по уголовному делу N 231037    о чем объявить ему (ей) под расписку.

Следователь (дознаватель)                    _____
                                                 (подпись)

настоящее постановление мне объявлено " 18 " февраля  2010  г. и
одновременно разъяснены права потерпевшего, предусмотренные частью второй
ст.42 УПК РФ

1) знать о предъявленном обвиняемому обвинении;
2) давать показания;
3) отказаться свидетельствовать против самого себя,  своего супруга
(своей супруги) и других близких родственников,  круг которых определен
п.4 ст.5 УПК РФ. При согласии дать показания я предупрежден_  о том, что
мои показания могут быть использованы в качестве доказательств по
уголовному делу, в том числе и в случае моего последующего отказа от этих
показаний;
4) представлять доказательства;
5) заявлять ходатайства и отводы;
6) давать показания на родном языке или языке, которым я владею;
7) пользоваться помощью переводчика бесплатно;
8) иметь представителя;
9) участвовать   с   разрешения   следователя   или   дознавателя   в
следственных   действиях,   производимых   по   моему   ходатайству   либо
ходатайству моего представителя;
10) знакомиться с протоколами следственных действий, произведенных с
моим участием, и подавать на них замечания;
11) знакомиться  с постановлением о назначении судебной экспертизы и
заключением эксперта в случаях,  предусмотренных частью второй ст.198 УПК
РФ;
12) знакомиться по окончании предварительного расследования со всеми
материалами уголовного дела, выписывать из уголовного дела любые сведения
и в любом объеме,  снимать копии с материалов уголовного дела, в том числе
с помощью технических средств.  В случае, если в уголовном деле участвует
несколько потерпевших, я вправе знакомиться с теми материалами уголовного
дела, которые касаются вреда, причиненного лично мне;
13) получать  копии  постановлений  о  возбуждении  уголовного  дела,
признании меня потерпевш__  или об отказе в этом, о прекращении уголовного
дела,  приостановлении производства по уголовному делу, а  также  копии
приговора  суда  первой  инстанции,  решений судов апелляционной  и
кассационной инстанций;
14) участвовать в судебном разбирательстве уголовного дела  в  судах
первой, второй и надзорной инстанций;
15) выступать в судебных прениях;
16) поддерживать обвинение;
17) знакомиться с протоколом судебного заседания и подавать на  него
замечания;
18) приносить  жалобы  на  действия  (бездействие)  и  решения
дознавателя, следователя, прокурора и суда;
19) обжаловать приговор, определение, постановление суда;
20) знать о принесенных по уголовному делу жалобах и  представлениях
и подавать на них возражения;
21) ходатайствовать о применении мер безопасности в  соответствии  с
частью третьей ст.11 УПК РФ;
22) осуществлять иные полномочия, предусмотренные УПК РФ.

Потерпевший _____                  _____ (подпись)

Постановление объявил и права разъяснил
следователь (дознаватель) _____    _____ (подпись)

Копию настоящего постановления получил___ " 18 " февраля 2010 г.

                                                    _____ (подпись потерпевшего)

Appendix 53

Order to
Acknowledge an Aggrieved Party

<u>Moscow</u>
(prepared at)

18 February 2010

<u>Police Captain N. Yu. Gulyayeva</u>, investigator (interrogating officer) of the Investigations
Office of the Tverskoy District Internal Affairs Department, City of Moscow,
<span style="font-size:smaller">(classification or title, last name, and initials of investigator (interrogating officer))</span>

having reviewed the files of criminal case No. 231037,

### established that

On 20 January 2010 at about 3:00 p.m., an individual unknown to the investigation, having the
intent to make a threat of murder with respect to A. G. Egiazaryan, member of the RF State Duma,
made a call to the subscriber number in the latter's office, which is located at: 1 Okhotny Ryad, office
718, Moscow, and threatened A. G. Egiazaryan with murder, saying "if he tries to get involved with
the Hotel Moscow, they will cut off his and his family's heads," after which, continuing his criminal
intent aimed at making a threat of murder, he made calls to the aforenamed number on 21/01/2010
and 22/01/2010 with threats of murder to the latter, saying "they will tear off his and his family's
heads," as a result of which A. G. Yegiazaryan took these threats seriously, and therefore the actions
of the undetermined individual have the attributes of the crime specified by art. 119(1) of the RF
Criminal Code.
<span style="font-size:smaller">(state the basis for deeming the person an aggrieved party)</span>

On the basis of the above and given that <u>Ashot Gevorkovich Egiazaryan</u>
<span style="font-size:smaller">(last name, first name, patronymic of the individual</span>

<span style="font-size:smaller">or name of the legal entity deemed the aggrieved party)</span>

suffered emotional distress,

taking guidance from art. 42 of the RF Code of Criminal Procedure,

### ordered that:

<u>Ashot Gevorkovich Egiazaryan</u> be deemed an aggrieved party
<span style="font-size:smaller">(last name, first name, patronymic of the individual or name of the legal entity)</span>

under criminal case No. 231037, of which he (she) shall be notified and sign the notification form.

Investigator (Interrogating Officer)                    [signature] _____
                                                                        (signature)

This order was announced to me on 18 February 2010 and the rights of the aggrieved party specified by art. 42(2) of the RF Code of Criminal Procedure were explained at the same time as follows:

1) know the indictment against the accused;

2) give testimony;

3) refuse to testify against myself, my wife (husband), and other close relatives as defined by art. 5(4) of the RF Code of Criminal Procedure. If I agree to testify, I have been warned that my testimony may be used as evidence in a criminal case, including if I later repudiate that testimony;

4) enter evidence;

5) enter motions and challenges;

6) testify in my native language or a language in which I am proficient;

7) use the services of an interpreter at no charge;

8) have counsel;

9) participate, with the permission of the investigator or interrogating officer, in investigative actions carried out on the basis of my motion or the motion of my counsel;

10) review the records of investigative actions taken with my participation and comment those;

11) review the order requesting forensic review and expert opinion in cases specified by art. 198 of the RF Code of Criminal Procedure;

12) review all criminal case files upon conclusion of the preliminary investigation, copy out any information in any amount from the criminal case, and make copies of criminal case files, including using equipment. If several aggrieved parties are involved in the criminal case, I am entitled to review the criminal case files that pertain to the harm done to me personally;

13) obtain copies of orders initiating a criminal case, deeming me aggrieved or refusing to do so, closing the criminal case, and suspending the criminal case, and copies of the lower court's verdict and of rulings of appeal and cassation courts;

14) participate in the trial of the criminal case in courts of the first, second and supervisory levels;

15) present pleadings;

16) support the indictment;

17) review the transcript of the court session and comment on it;

18) appeal the actions (inaction) and decisions of the interrogating officer, investigator, prosecutor or court;

19) appeal a verdict, judgment or determination of a court;

20) learn of appeals and propositions entered in the criminal case and make objections to those;

21) petition for protection pursuant to art. 11(3) of the RF Code of Criminal Procedure;

22) exercise other authority specified by the RF Code of Criminal Procedure.

| | |
|---|---|
| Aggrieved party | ✓[signature] _____ |
| | (signature) |
| The investigator (interrogating officer) who read the order and explained the rights | ✓[signature] _____ |
| | (signature) |
| I have received a copy of this order | 18 February 2010 |
| | ✓[signature] _____ |
| | (signature of the aggrieved party) |

# EXHIBIT

# 2



**Abusing Interpol**

# Rogue states

**Cross-border policing can be political**

Nov 16th 2013 |  From the print edition

FOUR years ago this week the whistle-blowing accountant Sergei Magnitsky died in jail from beatings and abuse, having uncovered a $230m fraud against the Russian state. His client Bill Browder, a London-based financier, has been campaigning to punish those responsible with visa bans and asset freezes. But the Russian authorities have retaliated and are trying to extradite him on fraud charges, using Interpol, the world police co-operation body.

No Western country is likely to send Mr Browder to Moscow. But his travel plans are stymied by the risk of arrest . He had to cancel a visit to Sweden last month to talk to a parliamentary committee. Only after weeks of lobbying did the country's police remove Mr Browder from their database. Germany, France and Britain have also publicly snubbed Russia's request.

Interpol notes that its constitution prohibits "activities of a political, military, religious or racial character"; governments are not supposed to use it to settle scores with their opponents. Nevertheless its "Red Notices", which seek the discovery and arrest of wanted persons for extradition, are open to abuse. Once issued, a Red Notice encourages—though it does not oblige—190 countries to detain the person named. 8,136 were given out last year, an increase of 160% since 2008. Interpol insists that it is not a judicial body: "queries" concerning allegations are "a matter for the relevant national authorities to address".

But Mr Browder's case is just one of many arousing controversy. Three years ago Algeria issued a Red Notice against Henk Tepper, a Canadian potato farmer, in a row involving export paperwork and suspect spuds. He was released in March after a year in a Lebanese jail and wants to sue the Canadian government for not protecting his rights. Interpol took 18 months to accept that the Red Notice issued against Patricia Poleo, a Venezuelan investigative journalist, by her government was politically motivated. Indonesia pursued Benny Wenda, a West Papuan tribal leader who ended up marooned in Britain; Belarus hounded an opposition leader, Ales Michalevic, when he fled to Poland.

Russia seems particularly fond of the tactic. It has targeted political refugees, such as Petr Silaev, an environmental protester, and Anastasia Rybachenko, a student activist now stranded in Estonia. She says Interpol is being used to "undermine democracy". During

Ashot Yegiazaryan Decl., Exhibit 2,
Page 12

recent elections in Estonia, Russia also reissued a Red Notice for Eerik-Niiles Kross, a politician and former spymaster who has long been a Kremlin bugbear.

Fair Trials International, a campaigning group, wants Interpol to have greater powers to vet "abusive, incomplete or inaccurate" arrest requests before they are sent to police forces around the globe. Though all Red Notices are issued to law-enforcement agencies, fewer than half are then made public. That makes it hard to challenge them in advance, or to prepare a defence in the event of a surprise arrest at a foreign airport. Fair Trials also wants an independent body to hear appeals instead of the Commission for the Control of Interpol's Files, which it says is too secretive.

Billy Hawkes, the commission's chairman, says its decisions in individual cases are formally only recommendations to Interpol's General Secretariat. He admits that aspects of its activities are "unsatisfactory", but argues that for a possible innocent person, having a Red Notice spread over the internet would be worse than issuing it in secret.

Dominic Raab, a British MP, worries that diplomatic expediency is compromising citizens' rights. Ken-Marti Vaher, Estonia's interior minister, decries requests of "a dubious nature" made to Interpol, and points out that Russia has failed to accept any of his country's offers to help investigations concerning Mr Kross. Mark Stephens, a British lawyer, says few governments are protesting about abuse because no one wants to be seen taking the side of criminals. At present, he says, challenging Red Notices is like a "game of battleships": the defence is shooting in the dark, unaware of the size and scope of the target.

 From the print edition: International

Ashot Yegiazaryan Decl., Exhibit 2, Page 13

## Notices

INTERPOL Notices are international requests for cooperation or alerts allowing police in member countries to share critical crime-related information.

Notices are published by INTERPOL's General Secretariat at the request of National Central Bureaus (NCBs) and authorized entities, and can be published in any of the Organization's official languages: Arabic, English, French and Spanish.

In the case of Red Notices, the persons concerned are wanted by national jurisdictions for prosecution or to serve a sentence based on an arrest warrant or court decision. INTERPOL's role is to assist the national police forces in identifying and locating these persons with a view to their arrest and extradition or similar lawful action.

In addition, Notices are used by the United Nations, International Criminal Tribunals and the International Criminal Court to seek persons wanted for committing crimes within their jurisdiction, notably genocide, war crimes, and crimes against humanity.

### Types of Notice



**Red Notice**
To seek the location and arrest of wanted persons with a view to extradition or similar lawful action.



**Yellow Notice**
To help locate missing persons, often minors, or to help identify persons who are unable to identify themselves.



**Blue Notice**
To collect additional information about a person's identity, location or activities in relation to a crime.



**Black Notice**
To seek information on unidentified bodies.



**Green Notice**
To provide warnings and intelligence about persons who have committed criminal offences and are likely to repeat these crimes in other countries.



**Orange Notice**
To warn of an event, a person, an object or a process representing a serious and imminent threat to public safety.



**INTERPOL–United Nations Security Council Special Notice**
Issued for groups and individuals who are the targets of UN Security Council Sanctions Committees.



**Purple Notice**
To seek or provide information on modi operandi, objects, devices and concealment methods used by criminals.

### Publication

Only those notices approved for public dissemination appear on this website (the full list of Notices is available to authorized users via INTERPOL's Information System).

Any individual who is subject to an INTERPOL Notice should be considered innocent until proven guilty.

Any unauthorized alteration of any portion of any INTERPOL Notice is considered as a violation and subject to legal prosecution.

### Legal basis

A Notice is published only if it fulfils all conditions for processing the information. For example, a Notice will not be published if it violates Article 3 of the INTERPOL Constitution, which forbids the Organization from undertaking any intervention or activities of a political, military, religious or racial character.

Notices are processed in line with INTERPOL's Rules on the Processing of Data, which ensure the legality and quality of information, and the protection of personal data.

The legal basis for a Red Notice is an arrest warrant or court order issued by the judicial authorities in the country concerned. Many of INTERPOL's member countries consider a Red Notice to be a valid request for provisional arrest.

Furthermore, INTERPOL is recognized as an official channel for transmitting requests for provisional arrest in a number of bilateral and multilateral extradition treaties, including the European Convention on Extradition, the Economic Community of West African States (ECOWAS) Convention on Extradition, and the United Nations Model Treaty on Extradition.

### Diffusions

Similar to the Notice is another request for cooperation or alert mechanism known as a 'diffusion'. This is less formal than a notice but is also used to request the arrest or location of an individual or additional information in relation to a police investigation. A diffusion is circulated directly by an NCB to the member countries of their choice, or to the entire INTERPOL membership and is simultaneously recorded in INTERPOL's Information System.

© INTERPOL 2015. All rights reserved.

Ashot Yegiazaryan Decl., Exhibit 2, Page 14