1   Michael S. Adler, SBN 190119
       madler@ta-llp.com
2   Joel M. Tantalo, SBN 206096
       jtantalo@ta-llp.com
3   **TANTALO & ADLER LLP**
    1901 Avenue of the Stars, Ste. 1000
4   Los Angeles, CA 90067

5   Telephone:  (310) 734-8695
    Fax:          (310) 734-8696
6
    Attorneys for respondent Ashot Yegiazaryan
7

8

9                   **UNITED STATES DISTRICT COURT**

10              **CENTRAL DISTRICT OF CALIFORNIA**

11

12  VITALY IVANOVICH SMAGIN          | **CASE NO. 14-cv-09764-R (PLAx)**

13      Petitioner,                  | Before the Honorable Manuel L. Real
                                       United State District Judge
14      v.
                                       **EXPERT REPORT AND**
15  ASHOT YEGIAZARYAN,               | **SUPPLEMENTAL EXPERT REPORT**
                                       **OF FORENSIC DOCUMENT**
16      Respondent.                  | **EXPERT GUS LESNEVICH IN**
                                       **OPPOSITION TO MOTION FOR**
17                                     **WRIT OF ATTACHMENT**

18
                                       **Hearing Place:**    Courtroom 8
19                                     **Hearing Date:**     February 17, 2015
                                       **Hearing Time:**     10:00 a.m.
20

21

22

23

24

25

26

27

28

---

EXPERT REPORT AND SUPPLEMENTAL EXPERT REPORT OF
FORENSIC DOCUMENT EXPERT GUS LESNEVICH

**REPORT OF EXAMINATION**
GUS R. LESNEVICH
MARCH 23, 2013
RE: "A.G. YEGIAZARYAN"
OUR FILE NO. 2013-001

# GUS R. LESNEVICH, INC.

*Gus R. Lesnevich        Khody R. Detwiler*
*Forensic Document Examiners*

310 Airport Drive, Suite 4                                    Telephone:    (814) 793-2377
Martinsburg, PA 16662                                        Facsimile:    (814) 793-3790

March 23, 2013

Cyrus Benson, Esquire
Gibson, Dunn & Crutcher LLP
Telephone House
2-4 Temple Avenue
London, EC4Y 0HB
United Kingdom

> Re:    Forensic Document Analysis
>        Vitaly Ivanovich Smagin v.
>        Kalken Holdings Limited, et al
>        Our File No. 2013-001

## REPORT OF EXAMINATION

### I.    EXHIBITS EXAMINED

#### Exhibit Q-1

Copy of a purported Agreement bearing one questioned
"A.G. Yegiazaryan" signature.

*Note:        An enlargement of the questioned "A.G.
Yegiazaryan" signature, appearing on the
purported Agreement, was attached to a report
of examination issued by the 9ᵀᴴ Department
of the Expert Criminal Expertise Centre, Main
Directorate of the Ministry of Internal
Affairs of the Russian Federation for the
city of Moscow. This enlargement has been
utilized during my examinations and
comparisons in this matter, and has also been
included on the attached comparison chart
illustrations.*

WWW.LESNEVICH.COM   ~   LESNEVICH@AOL.COM

2

Cyrus Benson, Esquire                                   March 23, 2013
Page 2 of 8

I.   **EXHIBITS EXAMINED** (continued)

**Exhibits K-1 through K-3**

Copies of enlargements of 3 purported known of A.G.
Yegiazaryan signatures attached to a report of
examination issued by the 9TH Department of the Expert
Criminal Expertise Centre, Main Directorate of the
Ministry of Internal Affairs of the Russian Federation
for the city of Moscow.

*Note:*       *The report of examination issued by the 9TH*
              *Department of the Expert Criminal Expertise*
              *Centre, Main Directorate of the Ministry of*
              *Internal Affairs of the Russian Federation*
              *for the city of Moscow contained references*
              *to numerous additional known collect and*
              *voluntary specimens of Egiazaryan, Ashot*
              *Gevorkovich. Copies of these known specimen*
              *signatures were not attached to the various*
              *reports.*

              *Furthermore, I have requested that the above*
              *mentioned collect and voluntary specimens of*
              *Egiazaryan, Ashot Gevorkovich be made*
              *available for examination and comparison*
              *purposes; however, I have been informed by*
              *counsel that neither the original signatures,*
              *photographs of the original signatures and/or*
              *copies of the original signatures could be*
              *obtained for examination and comparison*
              *purposes.*

**Exhibits K-4 through K-15**

Copies of various documents bearing 12 known signatures
of "A.G. Yegiazaryan" submitted for examination and
comparison purposes.

*Note:*       *Images of the documents, and signatures,*
              *listed above have been reproduced on the*
              *comparison chart illustrations attached to*
              *this report.*

3

Cyrus Benson, Esquire                                    March 23, 2013
Page 3 of 8

## II.  PROBLEM

I have been asked, in this case, to determine the authenticity of the questioned "A.G. Yegiazaryan" signature appearing on the Exhibit Q-1 document.

### HANDWRITING AND SIGNATURE ANALYSIS

From the time a person first begins to learn how to write, he or she begins to develop hand-eye coordination and form perception (how one sees formations as well as one's ability to duplicate those formations).  In addition, the various nerves and muscles in a person's fingers, wrist, elbow and shoulder are developed and trained.  It is through this developmental process that a person's highly individualized handwriting and signature can emerge.

One of the identifiable features of a signature or writing is letter formation, or the design of the letters. Additionally, while the design of the letters may be the eye catching feature, the execution (speed and fluidity) of a signature or writing is just as important. If someone tries to simulate, or imitate, someone else's signature, he or she may attempt to "draw" the letters so that the signature is pictorially similar to the genuine signature(s) of a particular individual.  In such cases, the questioned signature would lack the speed and fluidity (execution) that is exhibited in the genuine signature(s), which could be detected by a qualified forensic document examiner.  Thus, a qualified forensic document examiner can sometimes detect a forgery, even when the forged signature is pictorially similar to the genuine signature(s).

Conversely, if a forger attempts to write a signature with the same speed and fluidity (execution), then he or she will make mistakes in the letter formation, or the design of the letters.

When examining a questioned signature of a particular individual to determine its authenticity, the above mentioned types of comparisons are just some of the factors that a qualified forensic document examiner considers when comparing a questioned signature to an individuals genuine signature(s).

4

Cyrus Benson, Esquire                          March 23, 2013
Page 4 of 8

### III. RESULTS OF EXAMINATION

1. There is evidence to suggest that the questioned "A.G. Yegiazaryan" signature appearing on the Exhibit Q-1 document may not be an originally written genuine signature of the writer of the Exhibit K-1 through K-15 documents, A.G. Yegiazaryan.

2. However, if the 15 known signatures of A.G. Yegiazaryan are indicative of his complete, normal and natural handwriting habits and abilities, and are representative of how he always writes his name, or signs his signature, then the questioned "A.G. Yegiazaryan" signature appearing on the Exhibit Q-1 document would not be a genuine signature of A.G. Yegiazaryan.

   *Note:    The conclusions rendered above were based upon the copies submitted being true and accurate reproductions of the original exhibits, and the known signatures having been naturally written.*

### IV. REMARKS

The nature of a signature forgery is to make the questioned signature appear pictorially similar to a genuine signature. Therefore, a copy of a questioned signature, that is pictorially similar to a genuine signature, can not be identified as being a genuine signature.

In this case, due to the poor reproduction quality of the submitted evidence, it was not possible to determine the individual letter formations (design of the letters) or the execution (speed and fluidity) of the writing movements found within the questioned "A. G. Yegiazaryan" signature.

It is obvious that there is a pictorial similarity between the questioned and known A.G. Yegiazaryan signatures. However, due to the poor reproduction quality, of both the questioned and known signatures submitted for examination and comparison; and the lack of numerous additional known collect and voluntary specimens of Egiazaryan, Ashot Gevorkovich (as listed in the report

5

Cyrus Benson, Esquire                                    March 23, 2013
Page 5 of 8

#### IV.  REMARKS (continued)

issued by the 9ᵀᴹ Department of the Expert Criminal
Expertise Centre, Main Directorate of the Ministry of
Internal Affairs of the Russian Federation for the city of
Moscow), it is not possible to render a more definitive
conclusion in this case.

If the 15 known signatures of A.G. Yegiazaryan,
submitted for examination and comparison purposes, are
representative of his complete, normal and natural,
handwriting habits and abilities; and are indicative of how
he always writes his name, or signs his signature, then
based upon what appears to be two significant
dissimilarities that exist between the questioned and known
A.G. Yegiazaryan signatures, it can be concluded that the
questioned "A.G. Yegiazaryan" signature appearing on the
Exhibit Q-1 document is not a genuine signature of A.G.
Yegiazaryan.

One of the identifiable features of a signature or
writing is letter formation or the design of the letters.
Some of the elements that define letter formation are as
follows:

1.    The general design of letters. (The uniqueness,
      position and sequence of the strokes in letter
      formation.)

2.    The relative size of letters in respect to other
      letters.

3.    The relative size of letter projections below the
      baseline.

4.    The relative size of letters projecting above the
      height of the other letters.

5.    Embellishments, ornamentations and flourishes.

6.    Habitual abbreviation of letter formation due to speed.

7.    Inter-word or intra-word spacing and the overall
      balance of the signature.

Cyrus Benson, Esquire                                    March 23, 2013
Page 6 of 8

IV.   REMARKS (continued)

        While the design of the letters may be the eye catching
feature, the execution of a signature or writing is just as
important.  Some of the elements that define the execution
of a signature or writing are as follows:

1.    Intra-word connections. The lack of a continuous
      writing movement.

2.    Pen emphasis or pressure applied on particular strokes,
      often called shading.

3.    The direction of strokes in letter formation.

4.    The speed of execution as evident by line quality.

5.    Smoothly rounded, sharply curving or elliptical or
      angular connecting strokes between letters.

6.    The starting of the initial writing movement before or
      after the pen contacts the paper.

7.    Finishing the final writing movement before or after
      the pen leaves the paper.

8.    Habitual retouching or lack of it.

        If a questioned signature agrees with the known
signatures in both letter formation (writing similarity) and
execution, then the questioned signature can be identified
as being genuine.  However, in this case the questioned
"A.G. Yegiazaryan" signature, and known signatures of A.G.
Yegiazaryan, contain both, dissimilar letter formation,
(slant of signature) and dissimilar writing execution
(placement of the signature on a document).  Therefore, the
questioned "A.G. Yegiazaryan" signature can not be
identified as having been written by the author of the known
A.G. Yegiazaryan signatures.

        "A simulated writing is one in which the attempt is
        made to copy or imitate the writing of another as is
        done in an ordinary signature forgery.  To be entirely
        successful it is obvious that writing of this class by
        one who knows how to write involves a double process
        and must not only contain the features of the writing

7

Cyrus Benson, Esquire                                    March 23, 2013
Page 7 of 8

## IV. REMARKS (continued)

imitated but must also exclude the writer's own
personal writing characteristics."
(Questioned Documents, Second Edition, Osborn 1929, p.
17)

"The simulating, or imitating, process has a tendency
to produce formal, stiff writing, and a fraudulent
signature of this class will frequently diverge from
the genuine writing imitated by being written with less
slant.  This may be one of the numerous features, each
not necessarily very pronounced but all together of
great force, that may lead to the conclusion that a
signature is not genuine."
(Questioned Documents, Second Edition, Osborn 1929, p.
146)

"The conclusion that a writing is not genuine is only
properly reached when it contains divergences in the
amount and quality beyond the range of variation in the
standard writing that cannot reasonably be accounted
for by changed conditions in the writer or surrounding
the writer."
(Questioned Documents, Second Edition, Osborn 1929, p. 205)

"In identifying a person, for example, scars,
deformities, fingerprints, or a series of accurate
measurements, must be depended upon and finally, if the
conclusion of identity is reached, either in a person
or a handwriting, there must not remain significant
differences that cannot reasonably be explained."
(Questioned Documents, Second Edition, Osborn 1929, p. 245)

"It also needs to be emphasized that two writings are
identified as being by the same writer by the absence
of fundamental divergences as well as by a combination
of sufficient number of similarities.  The process is
always a double operation, positive and negative, and
if error is to be avoided neither part of the process
should be overlooked.  In order to reach the conclusion
of identity of two sets of writings there must not be
present significant and unexplained divergences.  These
divergences must, however, be something more than mere
trivial variations that can be found in almost any
handwriting."
(Questioned Documents, Second Edition, Osborn 1929, p. 262)

Cyrus Benson, Esquire                                    March 23, 2013
Page 8 of 8

IV.  REMARKS (continued)

The attached Comparison Chart illustrates the two
significant dissimilarities[1] that exist between the
questioned "A.G. Yegiazaryan" signature when compared to the
15 known "A.G. Yegiazaryan" signatures.  It should be
obvious from this Comparison Chart illustration that if the
15 known signatures of A.G. Yegiazaryan are indicative of
his complete, normal and natural, handwriting habits and
abilities, and representative of how he always writes his
name or signs his signature; then the dissimilarities are in
the amount and quality necessary to support the conclusion
that questioned "A.G. Yegiazaryan" signature is not a
genuine signature of A.G. Yegiazaryan.

I reserve the right to supplement this report upon
examination and inspection of the original questioned
document.

I have also attached, as Exhibit A, a copy of my
current CV.

GUS R. LESNEVICH
Forensic Document Examiner


PEER REVIEWED AND VERIFIED BY:


KHODY R. DETWILER
Forensic Document Examiner


---

[1]"**Significant difference** – An individualizing characteristic that is divergent
between items, whether they be handwritten, typed, stamped, etc." – Scientific
Examination of Questioned Documents, Second Edition, Kelly et al. 2006, p. 420.

9

# EXHIBIT A



Curriculum Vitae

of

Gus R. Lesnevich
*Forensic Document Examiner*

Altoona-Blair County Airport
310 Airport Drive
Martinsburg, Pennsylvania 16662
(814) 793-2377
(814) 793 -3790 Fax
lesnevich@aol.com
WWW.LESNEVICH.COM

## QUALIFICATIONS
## OF
## GUS R. LESNEVICH

After four years as a CID Agent (Criminal Investigator), I began my training in the field of Questioned Document Examination at the United States Military Crime Laboratory, Fort Gordon, Georgia. Upon completion of my training (1968 to 1970), I was certified by the Department of Defense, U.S. Army, as Examiner of Questioned Documents. During my military service, I served as Examiner, both in the United States, and as Chief, Questioned Document Section, U.S. Military Crime Laboratory (Provisional) South Vietnam.

Upon leaving military service, I entered private practice in Atlanta, Georgia. During this time, I worked as a Handwriting Expert for some of the leading law firms in the South, as well as handling civil disputes for private corporations and individual claimants and plaintiffs.

In 1974, I was recruited by the United States Secret Service. In 1976, I was promoted to Senior Document Examiner, at the Secret Service Identification Branch, a division of Special Investigations. During my tenure with the Secret Service, I was responsible for the training of junior examiners, and assuming individual responsibility for the examination of U.S. Treasury Checks, Saving Bonds, Banking Documents, etc., as well as the examination of threatening correspondence directed at the President of the United States, and other persons under the protection of the Secret Service.

In August of 1981, I left the United States Secret Service and re-entered private practice. Although I continue to work for the U.S. Attorneys, Federal, and State Law Enforcement Agencies, Legal Aid and Public Defenders, the predominance of my work is in the private sector.

I have qualified and testified as an Expert Witness in all Courts of the United States Armed Forces, State Courts along the East Coast of the United States and Federal Courts throughout the United States.

NOTE: For additional information please visit
2004 U.S. App.Lexis 12432
www.ca3.uscourts.gov/opinarch/033915p.pdf

## CURRICULUM VITAE
## GUS R. LESNEVICH

June 1962 to March 1965

>   Military Policeman, United States Army, Korea and Brooklyn, New York

April 1965 to March 1968

>   United States Army Certified Criminal Investigator, (CID Agent), Nuremberg,
>   Bavaria,Germany

April 1968 to June 1970

>   Resident Trainee (full-time student) in the field of Questioned Documents –
>   United States Army Criminal Investigation Laboratory, Fort Gordon, Georgia

July 1970 to April 1972

>   Examiner of Questioned Documents - United States Army Criminal
>   Investigation Laboratory, Fort Gordon, Georgia, and United States Army
>   Criminal Investigation Laboratory, (Provisional) South Vietnam

May 1972 to August 1974

>   Private practice, Examiner of Questioned Documents - Atlanta, Georgia

August 1974 to July 1981

>   Examiner of Questioned Documents, Senior Examiner of Questioned Document -
>   Identification Laboratory, United States Secret Service, Washington, District of
>   Columbia

August 1981 to August 2005

>   Private practice, Forensic Document Examiner - outside of Philadelphia,
>   Pennsylvania

September 2005

>   Relocated to south central Pennsylvania

## ADDENDUM TO
## CURRICULUM VITAE
## GUS R. LESNEVICH

July 1970 to April 1972

> Instructor, Questioned Documents - United States Army Criminal Investigation
> School, Fort Gordon, Georgia

August 1970 to March 1971

> Specialized Training in Printing, Forgery and Counterfeiting - United States
> Mint, Treasury Department, Washington, District of Columbia and United
> States Military Printing Facilities, Japan

August 1974 to July 1981

> Instructor, Questioned Documents Course - United States Secret Service,
> Washington, District of Columbia

April 1977 to July 1981

> Training of Examiners undergoing Resident Training in the Field of Forensic
> Document Examination - United States Secret Service Identification Laboratory,
> Washington, District of Columbia

July 1981 to Present

> Since entering private practice, I have continued training individuals undergoing
> Resident Training in the field of Forensic Document Examination.

Certifications:

> Department of Defense, U.S. Army (1970)
> American Board of Forensic Document Examiners (1980)
> – Re-certified for 5 year periods (1985, 1990, 1995 and 2000)
> – Relinquished certification in August, 2005
> (September, 2005 - limited practice)

14

## GUS R. LESNEVICH HAS BEEN RETAINED
## AS A GOVERNMENT EXPERT
## IN THE FOLLOWING HIGHLY PUBLICIZED CASES

U.S. vs. Eddie Antar
(Crazy Eddie)

U.S. vs. Don King
(1985, 1995 and 1998)

U.S. vs. Giovanni Gambino

U.S. vs. Leona Helmsley

U.S. vs. Autumn Jackson
(Bill Cosby)

U.S. vs. Imelda Marcos

U.S. vs. Bess Myerson

U.S. vs. Darryl Strawberry

U.S. vs. Lawrence Cusack
(President Kennedy Papers)

U.S. vs. Rutland
(see attached 3rd Circuit Court Opinion)

U.S. vs. Osama Bin Laden
(U.S. Embassy Bombing in Africa)

U.S. vs. Mokhtar Haouari and
Abdelghani Meskini
(Y2K Millennium Bomb Plot of LAX)

U.S. vs. Wesley Snipes

*Kenneth Starr, Independent Counsel*
Vincent Foster Suicide

*Lawrence E. Walsh, Independent Counsel*
*Iran-Contra Affair*

U.S. vs. Thomas Clines
U.S. vs. Albert Hakim
U.S. vs. Lt. Col. Oliver North
U.S. vs. Admiral John Poindexter
U.S. vs. General Richard Secord
U.S. vs. Caspar Weinberger

*Insider Trading*
U.S. vs. Ivan Boesky
U.S. vs. GAF Corporation
U.S. vs. Boyd L. Jefferies
U.S. vs. Dennis B. Levine
U.S. vs. Michael Milken

*Federal Prosecution*
Medellin, Cali and Bogota Cartels

People vs. Edward Leary
(N.Y.C. Subway Firebombing)

People vs. Abraham Hirschfeld

People vs. Chuck Jones
(Marla Maples' Publicist)
1994 and 1999

People vs. Anthony D. Marshall and
Francis X. Morrissey, Jr.
(Brooke Astor)

# COMPARISON CHART ILLUSTRATIONS

# "A.G. YEGIAZARYAN"

GUS R. LESNEVICH, INC.
FORENSIC DOCUMENT EXAMINERS
(OUR FILE NO. 2013-001)

EXHIBIT Q-1 DOCUMENT (PAGE 4)                                    2008



EXHIBIT Q-1                                                      2008

СМАГИН В.И.                                    Егиазарян А.Г.



EXHIBIT Q-1                2008



EXHIBIT Q-1        2008



(ABOVE IMAGES IS FROM THE RUSSIAN REPORT)

80% REPRODUCTION

PLEASE NOTE THAT SOME OF THE OVERWRITING HAS BEEN REMOVED FROM THE ABOVE QUESTIONED SIGNATURE SO THAT A CLEAN VIEW OF THE SIGNATURE CAN BE OBSERVED. NO PART(S) OF THE ACTUAL SIGNATURE HAVE BEEN ALTERED IN ANY MANNER.

PAGE 1

17

18

KNOWN
A.G. YEGIAZARYAN
SIGNATURES

**K-1 RUSSIAN REPORT    UNKNOWN DATE**



**K-2 RUSSIAN REPORT    UNKNOWN DATE**



**K-3 RUSSIAN REPORT UNKNOWN DATE**



PLEASE NOTE THAT SOME OF THE OVERWRITING HAS BEEN REMOVED FROM THE ABOVE IMAGES SO THAT A CLEAR VIEW OF THE SIGNATURES CAN BE OBSERVED. NO PART(S) OF THE ACTUAL SIGNATURES HAVE BEEN ALTERED IN ANY MANNER.

PAGE 2

QUESTIONED
"A.G. YEGIAZARYAN"
SIGNATURE





THE RED DOTTED LINES ILLUSTRATE THE SIGNIFICANT SLANT DISSIMILARITIES THAT EXIST BETWEEN THE QUESTIONED AND KNOWN SIGNATURES OF A.G. YEGIAZARIAN.

KNOWN
A.G. YEGIAZARYAN
SIGNATURES









K-4 DOCUMENT (PAGE 2)                                           APRIL 4, 2007

EXHIBIT Q-1                                                     2008

Егиазарян А.

EXHIBIT Q-1                                                     2008

Егиазарян А.Г.

THE RED DOTTED LINES ILLUSTRATE THE SIGNIFICANT SLANT DISSIMILARITIES THAT EXIST BETWEEN THE QUESTIONED AND KNOWN SIGNATURES OF A.G. YEGIAZARIAN.

K-4                                                            APRIL 4, 2007

/Егиазарян Ашот Геворкович/

80% REPRODUCTION



80% REPRODUCTION

22



80% REPRODUCTION



80% REPRODUCTION

24



K-8 DOCUMENT (PAGE 3)                                                        JUNE 8, 2009

80% REPRODUCTION



K-9 DOCUMENT · FEBRUARY 10, 2011

EXHIBIT Q-1 · 2008

EXHIBIT Q-1 · 2008

THE RED DOTTED LINES ILLUSTRATE THE
SIGNIFICANT SLANT DISSIMILARITIES THAT EXIST
BETWEEN THE QUESTIONED AND KNOWN
SIGNATURES OF A.G. YEGIAZARIAN.

K-9 · FEBRUARY 10, 2011

80% REPRODUCTION

25

PAGE 9



80% REPRODUCTION



K-11 DOCUMENT                                          FEBRUARY 17, 2011

This Power of Attorney is governed by the Power of Attorney Law of the State of California and shall not be affected by any subsequent incapacity of the principal.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 17 day of February 2011.

ASHOT EGIAZARYAN

EXHIBIT Q-1                    2008

Егиазарян А.

EXHIBIT Q-1                    2008

Егиазарян А.Г.

THE RED DOTTED LINES ILLUSTRATE THE SIGNIFICANT SLANT DISSIMILARITIES THAT EXIST BETWEEN THE QUESTIONED AND KNOWN SIGNATURES OF A.G. YEGIAZARIAN.

K-11                                    FEBRUARY 17, 2011

has caused this Power of Attorney to ex

ASHOT EGIAZARYAN

80% REPRODUCTION

27

PAGE 11







80% REPRODUCTION





THE RED DOTTED LINES ILLUSTRATE THE
SIGNIFICANT SLANT DISSIMILARITIES THAT EXIST
BETWEEN THE QUESTIONED AND KNOWN
SIGNATURES OF A.G. YEGIAZARIAN.

QUESTIONED
"A.G. YEGIAZARYAN"
SIGNATURE



THE RED ARROWS ILLUSTRATE THE
SIGNIFICANT PLACEMENT DISSIMILARITIES THAT
EXIST BETWEEN THE QUESTIONED AND KNOWN
SIGNATURES OF A.G. YEGIAZARIAN.

KNOWN
A.G. YEGIAZARYAN
SIGNATURES









80% REPRODUCTION





36



80% REPRODUCTION



80% REPRODUCTION

3
8



80% REPRODUCTION



80% Reproduction

40





K-12 DOCUMENT (PAGE 2)

MARCH 9, 2011

80% REPRODUCTION

EXHIBIT Q-1

2008

Егиазаряи А.

EXHIBIT Q-1

2008

Егиазарян А.Г.

THROUGH THE PRINTED TEXT

K-12

MARCH 9, 2011

А.Г. Егиазарян

TO THE LEFT OF THE PRINTED TEXT

41

PAGE 25



K-13 DOCUMENT (PAGE 2)                    MARCH 9, 2011

EXHIBIT Q-1                    2008

EXHIBIT Q-1                    2008

THROUGH THE PRINTED TEXT

K-13                    MARCH 9, 2011

TO THE LEFT OF THE PRINTED TEXT

80% REPRODUCTION



44





EXHIBIT Q-1

22 млн $ → + компенсация 1-го Заявителя

15,9 + 7 = 22,9 млн $

СОГЛАШЕНИЕ

г. Москва «   » ____________ 2008 г.

**НАСТОЯЩЕЕ СОГЛАШЕНИЕ** («Соглашение») заключено «___» ____________ 2008года
МЕЖДУ:

(1) **СМАГИНЫМ ВИТАЛИЕМ ИВАНОВИЧЕМ** (далее - «Партнер 1»);
(2) **ЕГИАЗАРЯНОМ АШОТОМ ГЕОРГИЕВИЧЕМ** (далее - «Партнер 2»)
(аффилированно контролирующим компанию Kalken Holdings Limited, являющуюся акционером 73 % акций TUFTS INVEST & TRADE INC.)

Партнер 1 и Партнер 2 совместно именуются «Партнеры»

*Статья 1. Исходные данные*

> Партнер 1 является собственником 20 % (двадцати процентов) всех выпущенных и обращающихся обыкновенных акций TUFTS INVEST & TRADE INC., компании, зарегистрированной и существующей в соответствии с законодательством Британских Виргинских Островов (регистрационный номер 1051766) с зарегистрированным офисом по адресу: Pasea Estate, Road Town, Tortola, British Virgin Islands («ТАФТС»). Выпущенные и обращающиеся обыкновенные акции ТАФТС далее именуются «Акции ТАФТС».

> Партнер 2 контролирует 73 % (семьдесят три процента) всех Акций ТАФТС.

> Кроме того, акционером ТАФТС является Гаркуша Дмитрий Владимирович, владеющий 7 % (семь процентов) всех Акций ТАФТС.

> ТАФТС является собственником 100 % (сто процентов) всех выпущенных и обращающихся обыкновенных акций DORALIN TRADING & INVESTMENTS, компании, зарегистрированной и существующей в соответствии с законодательством Республики Кипр, с зарегистрированным офисом по адресу: Thasou 3, Dadlaw House P.C. 1520, Nicosia, Cyprus («Доралин»).

> Доралин является собственником 100 % (сто процентов) всех зарегистрированных и размещенных обыкновенных акций Закрытого акционерного общества «Центурион Альянс», зарегистрированного и существующего в соответствии с законодательством Российской Федерации, с местонахождением по адресу: Российская Федерация, 121170, г. Москва, Кутузовский проспект, дом 39 («ЗАО ЦА»).

> ЗАО ЦА является собственником многофункционального торгового комплекса «ЕвроПарк», площадью 83 154,6 (восемьдесят три тысячи сто пятьдесят четыре целых шесть десятых) квадратных метров, расположенного по адресу: Российская Федерация, г. Москва, Рублевское шоссе, дом 62, что подтверждается свидетельством серии 77АГ № 0263769, выданным Главным управлением Федеральной регистрационной службы по г. Москве 31 октября 2005 года («Комплекс»),

> BLIDENSOL TRADING & INVESTMENTS LTD., компания, зарегистрированная и существующая в соответствии с законодательством Республики Кипр, с зарегистрированным офисом по адресу: Thasou 3, Dadlaw House P.C. 1520, Nicosia, Cyprus («Заемщик») привлек кредит в размере 100 000 000 (сто миллионов) Долларов США («Кредит») от DEUTSCHE BANK AG («Кредитор») в соответствии с кредитным договором от 6 октября 2006 года между Заемщиком и Кредитором («Кредитный Договор»).

Партнеры обеспечивают исполнение обстоятельств Заемщика по Кредиту в пользу Кредитора путем залога акций ЗАО ЦА; Доралин, ТАФТС и ипотеки Комплекса в пользу Кредитора,

### Статья 2. Договоренности Партнеров в отношении акций и управления

2.1 Партнеры (уполномоченные ими акционеры) заключат дополнительное соглашение к Договору акционеров ТАФТС б/н от 26.12.06., в котором урегулируют порядок распределения доходов ЗАО ЦА.

2.2 В связи с неисполнением и прекращением действия Договора Эскроу б/н от 13.11.07 Партнеры заключат аналогичный договор эскроу, где эскроу агентом выступит Дойче БанкАГ, и обеспечат его исполнение всеми сторонами, а также при заключении такого договора устранят существовавшие ранее несоответствия. Партнер 2 (уполномоченные или акционеры) также обязан подписать и передать Дойче Банку АГ передаточные распоряжения на все принадлежащие (подконтрольные) ему акции ТАФТС.

2.3 В учредительные документы компаний Блайденсол, Доралин и ТАФТС необходимо внести изменения о том, что любой документ, любой из вышеуказанных компаний считается надлежаще оформленным и имеющим юридическую силу только после подписания его двумя уполномоченными лицами, а именно Партнером 1 и Партнером 2.

2.4 В ЗАО ЦА Партнер 2 назначает Генерального директора, а Партнер 1 назначает главного бухгалтера и контролирует финансового директора (любые другие старшие финансовые должности).

2.5 Указанные в п. 2.1. - 2,4, действия Партнеры осуществят в срок не позднее ... При этом Партнер 2 обязуется дать поручения о подготовке соответствующих документов и осуществлении необходимых действий своему юридическому консультанту компании White &Case.

2.6 Партнер 1 приобретает у Гаркуши Д.В. 2 % Акций ТАФТС по номинальной стоимости.

2.7 Партнер 1 приобретает 50 % акций компании Блайденсол по номинальной стоимости.

2.8 Партнер 1 приобретает у Партнера 2 (уполномоченного им акционера) 23 % Акций ТАФТС по цене 575 $

Из указанной в настоящем пункте цены подлежит вычету сумма в размере $ 5 000 000, необходимая Партнеру2 для выкупа у Гаркуши Д.В. 5 % Акций ТАФТС, начало которого осуществляется не позднее первого квартала 2009 года.

2.9 Порядок оплаты Акций ТАФТС Партнером 1 устанавливается Партнерами далее в главе 4 настоящего Соглашения.

2.10 В случае если Партнер 2 не исполнит свои обязательства, предусмотренные п. 2.1. - 2,4, Партнер 1 будет добиваться соблюдения своих прав в соответствии о Договором Акционеров, заявив иск против Партнера 2 в Лондонский Международный Арбитражный Суд и потребовать, помимо прочего, принудительного исполнения огатьи 9.1.5 Договора Акционеров, снятия ограничения



использования своего имущества (акций ТАФТС, МТК, "Европарк") помещения понесенных убытков.

### Статья 3. Финансовая ситуация ЗАО ЦА и Комплекса.

На дату заключения настоящего Соглашения ЗАО ЦА имеет следующую задолженность второй очереди:

Итого:     1 560 378 170 руб.        64 835 088 $

Сумма в долларах США определена исходя из курса ЦБ РФ на 03.03.08, который составил 24,0023 рубля 1 доллар США.

Кроме того:

А) 100 000 000 $ кредиторской задолженности первой очереди по состоянию на январь 2007 года.

Б) 145 000 000 $ штрафные санкции в случае досрочного возврата Кредита Заемщиком по состоянию на январь 2008 года.

В) Оценочная стоимость Комплекса на дату подписания Кредитного Договора составляла 150 000 000 $.

### Статья 4. Договоренности Партнеров в отношении оплаты

### Акций ТАФТС и распределения доходов ЗАО ЦА.

4.1 Партнеры подтверждают, что в соответствии с ранее достигнутыми договоренностями и Соглашением о реализации проекта строительства торгового комплекса "Екатериновка" по адресу: Рублевское шоссе, вл. 62; от 29 августа 2003 г. обязанность Партнера 2 по финансированию затрат по реализации проекта в размере $ 52 500 000 выполнена в полном объеме.

4.2 Партнеры подтверждают, что в процессе строительства Комплекса произошло его удорожание сверх $ 52 500 000. Расходы, связанные с удорожанием строительства, нес Партнер 2.

4.3 Партнеры подтверждают, что Партнер 1 участвует в возмещении расходов Партнеру 2 понесенных Партнером 2 сверх $ 52 500 000

4.4 По соглашению Партнеров стоимость 23 % Акций ТАФТС, приобретаемых Партнером 1 у Партнера 2 (уполномоченного им акционера) составляет _____ $(за вычетом $ 5 000 000), К данной сумме Партнер 1 подтверждает право Партнера 2 на компенсацию своих затрат на строительство комплекса в размере ($ 12 335 088, рассчитанном как разница задолженности ЦА второй очереди $ 64 835 088 и обязанности Партнера 2 по реализации проекта в размере $ 52 500 000. В счет оплаты этой суммы, подлежит зачету сумма в размере _____ за право Партнера 2 использовать в качестве залога акций Партнера 1.

4.5 После полной выплаты Партнером 1 Партнеру 2, Партнеры договорились о следующем порядке распределения доходов от деятельности ЗАО ЦА:

4.5.1.Партнер 1 получает 50 % от ВСЕХ доходов от деятельности ЗАО ЦА и самостоятельно без предварительного согласования с кем-либо распоряжается ими.



4.5.2 Партнер 2 получает 50 % всех доходов от деятельности ЗАО ЦА и направляет их на погашение Кредита и выплату процентов за его использование (если таковые к этому моменту не выплачены), а после полного погашения Кредита самостоятельно без предварительного согласования с кем-либо распоряжается ими.

4.5.3 В случае если доли Партнера 2 (50 %) в доходах ЗАО ЦА не достаточно для выплаты очередного транша Кредита или процентов за его использование, Партнер1 предоставляет Партнеру 2 из своей доли в доходах ЗАО ЦА заем с выплатой процентов за его использование в размере, определяемой Партнерами дополнительно.

Статья 5. Договоренности о развитии ЗАО ЦА и Комплекс п.

Для целей капитализации Комплекса Партнеры намереваются обеспечить приобретение ЗАО ЦА дополнительного имущества - лыжной базы.
Расходы по развитию проекта Партнеры несут в пропорции 50 % / 50 % и зачитывают их в счет своих доходов ЗАО ЦА или направляют из других источников.

Подписи Партнеров

Снагин В.И.                    Егиазарян А.Г.

+ Ошибка ...

49

# EXHIBIT K-1



Иллюстрация № 2. Увеличенные изображения подлежащей исследованию подписи от имени Егиазаряи А.Г. в разделе «Подписи Партнеров» представленного на экспертизу соглашения между Смагиным В.И. и Егиазаряном А.Г. (с подписями на четвертом листе и с изображениями записей на первом, втором, третьем и четвертом листах) от « » ____2008г.

Иллюстрация № 3. Увеличенные изображения подписей в образцах подписи Егиазаряна Ашота Геворковича.

Примечание: красными веществом красного цвета одноименными цифрами на иллюстрациях № 2 и № 3 отмечены совпадающие частные признаки, красящим веществом синего цвета различающиеся частный признаки.

Эксперт                                                      Е.М. Мымрикова



# EXHIBIT K-2



Иллюстрация № 2. Увеличенные изображения подлежащей исследованию подписи от имени Егиазаряи А.Г. в разделе «Подписи Партнеров» представленного на экспертизу соглашения между Смагиным В.И. и Егиазаряном А.Г. (с подписями на четвертом листе и с изображениями записей на первом, втором, третьем и четвертом листах) от « » _____ 2008г.

Иллюстрация № 3. Увеличенные изображения подписей в образцах подписи Егиазаряна Ашота Геворковича.

Примечание: красящим веществом красного цвета одноименными цифрами на иллюстрациях № 2 и № 3 отмечены совпадающие частные признаки, красящим веществом синего цвета — различающийся частный признак.

Эксперт                                              Е.М. Мымрикова



# EXHIBIT K-3



Иллюстрация № 2. Увеличенные изображения подлежащей исследованию подписи
от имени Егиазаряи А.Г. в разделе «Подписи Партнеров» представленного на
экспертизу соглашения между Смагиным В.И. и Егиазаряном А.Г. (с подписями на
четвертом листе и с изображениями записей на первом, втором, третьем и четвертом
листах) от « » ____2008г.

Иллюстрация № 3. Увеличенные изображения подписей в образцах подписи
Егиазаряна Ашота Геворковича.

Примечание: красящим веществом красного цвета одноименными цифрами на иллюстрациях № 2 и
№ 3 отмечены совпадающие частные признаки, красящим веществом синего цвета —
различающийся частный признаки.

Эксперт                                                           Е.М. Мымрикова



# EXHIBIT K-4

Строго Конфиденциально

Для Ивана Б.

**СОГЛАШЕНИЕ**

г. Москва

«___» _Апрель_ 200__ г.

Егиазарян Ашот Геворкович, именуемый в дальнейшем «Сторона 1», с третьей стороны.



Строго Конфиденциально

Сторона 3 _____ _____ /Енгиаряин Ашот Геворкович/

Strictly Confidential       *For Ivan V.*

AGREEMENT

Moscow                                                    *4 April* 200*7*

Ashot Gevorkovich Yegiazaryan, referred to hereinafter as "Party 3," as the third party;

Party 3_____[signature]_____/Ashot Yegiazaryan Gevorkovich/



# EXHIBIT K-5

ГОСУДАРСТВЕННАЯ ДУМА
ФЕДЕРАЛЬНОГО СОБРАНИЯ РОССИЙСКОЙ ФЕДЕРАЦИИ
ПЯТОГО СОЗЫВА

# ДЕПУТАТ
## ГОСУДАРСТВЕННОЙ ДУМЫ
(2008–2011)

*02 июня 2009 г.* №*02 - ЕНГ 3/22*

Председателю комиссии
По мандатным вопросам
и депутатской этики
Гурову А.И.

с уважением !
Депутат Государственной Думы                    Егиазарян А.Г.



# EXHIBIT K-6



ГОСУДАРСТВЕННАЯ ДУМА
ФЕДЕРАЛЬНОГО СОБРАНИЯ РОССИЙСКОЙ ФЕДЕРАЦИИ
ПЯТОГО СОЗЫВА

## Д Е П У Т А Т
### ГОСУДАРСТВЕННОЙ ДУМЫ
(2008−2011)

27 мая 20 09 г.                    № ЕАГ- 4/5

Министру Внутренних дел
РФ, Генералу армии
Нургалиеву Р.Г. 119049,
г.Москва, ул. Житная, д.16

А.Г. Егиазарян

**65**



# EXHIBIT K-7



ГОСУДАРСТВЕННАЯ ДУМА
ФЕДЕРАЛЬНОГО СОБРАНИЯ РОССИЙСКОЙ ФЕДЕРАЦИИ
ПЯТОГО СОЗЫВА

# ДЕПУТАТ
ГОСУДАРСТВЕННОЙ ДУМЫ
(2008–2011)

*20 мая* 2009.                                        № *ЕАГ-11/7*

Министру юстиции

Российской Федерации

Ю.Я.Чайке, 125993,

ГСП-3, Россия, Москва,

ул.Б.Дмитровка, 15а.

*с уважением !*                                   А.Г. Егиазарян

67