# Jackson Decl. Exh. B

The London Court of
International Arbitration

The London Court of
International Arbitration, Cases
No. 101689 and 101691

(1) Ashot  Egiazaryan
(2) Artem Egiazaryan
(3) Dmitriy Fitisov
(4) Blidensol Trading & Investments Limited
(5) Hackham Invest & Trade Inc.

Claimants
-and-
(1) Suleyman Kerimov
(2) Denoro Investments Limited

Defendants

Second Witness Statement of Ashot Gevorkovich Egiazaryan on
behalf of claimants

Table of Contents

Page

1.   Introduction ........................................................................................... 2
2. My share interest in the Project ........................................................... 2
3.My investments through Hackham and Blidensol ................................. 4
4.   Possible violations of Investment Agreement. ................................... 8
5    The Commitment of the City and Funding from Deutsche Bank ........ 9
6.   The Loan from Sberbank ................................................................. 14
7.   The awareness of the City about Loans from Deutsche Bank ......... 17
8.   I apply with request for intervention of the Federal Government ..... 21
9.   An organized default ...................................................................... 28
10.  Appeal to Kerimov in October 2008 ............................................... 30
11.  The deal with the Konk Company .................................................. 31
12.  Participatory interests of Goloschapov and Rotenberg .................. 34
13.  The description of the events in 2009 by the Defendants: preliminary observations ........ 36
14.  Meetings in January ........................................................................ 37
15   Framework Agreement .................................................................... 41
16   Relations of Mr. Kerimov with Adam Delimkhanov ....................... 44
17.  Proposal to the City ........................................................................ 47
18.  Increasing of pressure .................................................................... 47
19.  Events from  June 25, 2009 to  June 29, 2009 .............................. 49
20.  Agreements of Longlake/Kamenz from November 2009 and Agreements of Blidensol from January 2010 ............................................................................... 53
21.  Bills ................................................................................................ 54
22.  Visits to ICE .................................................................................. 55
23.  Europark ......................................................................................... 56
24.  Luguyev ......................................................................................... 57
25.  Concluding comments ..................................................................... 57

1.      **Introduction**

1.1     I, Ashot Gevorkovich Egiazaryan, hereby submit this second witness statement in connection with the arbitration process between me, Artem Egiazaryan ("Artem"), Dmitriy Fitisov ("Dmitriy"), Blidensol Trading & Investments Limited ("Blidensol") and Hackham Invest & Trade Inc. ("Hackham") (hereinafter together referred to as "Claimants") and Suleyman Kerimov ("Kerimov") and Denoro Investments Limited ("Denoro") (hereinafter together referred to as "Defendants"). The arbitration process refers to the seizure of my share interest in the reconstruction and construction of Hotel Moskva ("Project" or "Hotel"). I am the first Claimant in the arbitration process.

1.2     This is the second witness statement submitted by me in connection with this proceeding. I was shown the witness statements of Defendants ("Witness statements") and section of the Written objection on Denoro suit dd. October 3, 2011 ("Written objection of Denoro"). I hereby submit this additional statement to review certain notes and claims contained in Written objection and Witness statements. I would like to highlight that large-volume documents submitted by Defendants contain numerous inaccurate or colorable statements. I am not able to review all of them and absence of any comments in regard of any statements thereof should not be considered my consent.

1.3     The facts contained in this witness statement are known to me. In case they are not known personally to me, I will define the grounds of my opinion thereof. If the facts are known personally to me, they are accurate. If they are not known personally to me, they shall be deemed accurate given the knowledge, information and believes I possess.

**2. My share interest in the Project**

2.1.    I would like to note that pursuant to the sections of the written statement of defense, which were shown to me, the Defendants pursue the idea of accusing me in the circumstances wherever it suits them, but then rely on the actions of my companies or my nominees, when they want to distance me from a certain circumstances. I think it would be useful to explain the structure of businesses in Russia and provide the cultural context of the circumstances under review.

2.2.    Corporate raiding is one of the biggest risks when doing business in Russia. The statements of the defendants refer to the dates of agreements, namely June 2009 when it was considered a normal commercial transaction. Corporate raider attacks may be quite sophisticated, however, the main objective is to fake their legitimacy in the eyes of the uninformed third parties. Often the agreements are "signed", the judgments are "received"

and other signs of common commercial transactions are created thereof. This is undertaken in conjunction with the threats of violence and intimidation. That's what happened to me.

2.3. In Russia, it is common to own the share interest in business through nominees and several noncommercial companies. One of the reasons is to avoid the corporate raiding. It appears more complicated for the potential raiders to define the owners of the assets within the different layers of the businesses and share interest. Therefore, it is difficult to identify the object of raiding and the overall possibility of legal appropriation becomes more complicated. Raiders fear the appropriation of assets that are owned by more influential entities than they are. That is why I have established my business in the same way.

2.4. I know that the Defendants claim that I have decided to establish my business in this way because as a Deputy of the State Duma I had no right to own a share interest in the business[1]. This is not true. A member of the State Duma shall be prohibited "to conduct any entrepreneurial activities" but the ownership of shares in any company or the shareholder rights is not considered as "entrepreneurial activities". Thus, I could own the shares in the Project on my own behalf if I wanted to, however I have decided not to given the reasons I have already mentioned. Also, it is well-known that dozens of members of the Russian parliament hold the shares in companies including Kerimov.

2.5. The following individuals owned my share interest and investments in the Project:

2.5.1 My partner and younger brother Artem owned 45% of shares in Limerick (the final owner of the shares in Decmos company);

2.5.2 My partner and former parliamentary assistant Dmitriy owned 5% shares in Limerick;

2.5.3 My partner Vitaliy Gogokhiya ("Vitaliy") on my behalf owned shares in Konk, Blidensol and Hackham as follows: as of June 2009 (1) company Solid Rock was a registered shareholder of Blidensol and Vitaliy was a shareholder in Solid Rock[2]; he was a registered shareholder of Hackham[3] and a registered shareholder of Konk.

2.6. I have been the beneficial owner of these companies. In general, these companies were registered under offshore jurisdictions. The shares were owned by my other companies or registered nominee shareholders appointed by me. I trusted these people and they have always followed my instructions. I did not document the agreements with the nominees. The documents were signed by the directors of the companies that were assigned by me as well. They acted in accordance with my instructions.

---

[1] Line of reasoning of Denoro Defence. 701.
[2] CE-114; CE-201.

[3] CE-113.

2.7. In my statements, I refer to the letters or actions of Vitaliy, Dmitriy or Artem or loans provided for the Project by the companies to Blidensol and Hackham. In fact, these were my actions carried out by nominees appointed by me. Kerimov was aware of this and never doubted it during his raider attack against my share interest in the Project. Now the Defendants refer to this as an attempt to avoid the responsibility for their actions.

**3. My investments through Hackham and Blidensol**

3.1   Witness statement of Dmitriy Garkusha ("Garkusha") contains a number of completely false statements regarding ownership of companies and funds, which, he says, he invested in the Project. Garkusha was employed by me at all corresponding periods. He managed some of my assets on my behalf but he was not my business partner. Garkusha same as Dmitriy, Vitaliy and my brother Artem, was a man whom I trusted and whom I asked to be a nominee shareholder of some of my equity in the business. Garkusha has never been the beneficial owner of Blidensol and Hackham and he did not invest a dime in the Hotel Moskva Project. Instead, I asked him and he accepted by offer to hold the position of the chief executive officer of Decorum and DecMos. He worked very well until I learned that he gets payoffs from different contractors. I had no choice but to eliminate him from further participation in the Project. I explained this in detail below.

3.2   Garkusha claims that he has invested USD 93 million of his own funds in the Hotel Moskva Project through Hackham. He claims that he owned this company. [4] In addition, Garkusha stated that Hackham received the funds as revenue from the sale of assets by Texhut Finance Limited, a company where he, Garkusha, claims he owned 50% of shares. This is a lie.

3.3   It is true that Texhut sold 100% of shares in Primorye-Neftegaz Holding ("PMG Holding") in October 2005. The shares were sold to Annimais Trading Limited at the cost of approximately USD 166 million. Some portion of the revenue from this sale in the amount of USD 93 million was paid to Hackham and later invested in Hotel Moskva Project. PMG Holding owned 760,000 shares in OJSC Primoryeneftegaz, i.e. 76% of its share capital. OJSC Primoryeneftegaz owned rights to the exploitation and development of oil deposits. However, Garkusha did not have any share interest in Texhut as well as the rights to obtain any revenue from the sale of PMG Holding to Annimais Trading Limited. Under no circumstances the revenue from the sale should be considered as "his own

---

[4] Witness statement of Dmitriy Garkusha dd. October 3, 2011 ("Statements of Garkusha"), ¶ 26-27.

funds".

3.4   Sale and purchase agreement of assets dd. October 25, 2005[5] by and between Texhut on behalf of the seller and Annimais Trading Limited on behalf of the buyer was submitted by Garkusha as the evidence to prove the claimed interest in Texhut. Garkusha was one of the two signatories of the agreement acting on behalf of Texhut as the CEO. He was appointed CEO of Texhut in June 2005 in accordance with my instructions.[6] At that time Garkusha was one of two directors of Texhut but he did not own any share interest in the company, and he did not provide any evidence to prove his claimed ownership of 50% of interest thereof.

3.5   In fact, Texhut was owned 50%-50% by Vigues Finance Limited and Alderburg Limited. I hereby attach to the Statement the decision of the directors dd. July 8, 2005 to prove this.[7] I was the final beneficiary owner of Vigues Finance Limited. Gestman SA owned the shares of Vigues Finance Limited based on the trust ownership on behalf of Merucan Arutyunov. Mr. Arutyunov was the nominee owner representing my final share interest as the beneficiary owner.[8] Alderburg was owned by one of my former business partners and Garkusha by no means was not connected with Alderburg.

3.6  As stated in my first statement, Hackham Invest Trade Inc. is also owned by me. Hackham was established in the British Virgin Islands in March 2, 2005.[9] It was not established in November 2000 as claimed by Garkusha. On the contrary, Garkusha was appointed as a registered nominee shareholder and owned shares on my behalf. Later I ordered to transfer them to Vitaliy. During the period when Garkusha was acting as a registered nominee shareholder of Hackham shares he was not the director and was able to act only according to my instructions. At various times, I have ensured that Vitaliy has a general power of attorney to represent Hackham.[10] Any funds were transferred through Hackham by any companies in which Garkusha owned share interest, and besides Texhut, Garkusha has not named any.

3.7  Garkusha made a ridiculous statement that we met this summer in Eldorado restaurant where I was forcing him to sign the agreement for the transfer of the registered ownership

---

[5] DG-4.
[6] CE-178.
[7] CE-139.
[8] CE-174;CE-176.
[9] CE-113
[10] EK-4

of Hackham shares in favor of Vitaliy.[11] It's a lie. Garkusha owned Hackham shares as a nominee owner appointed by me in January 2009. He agreed to transfer the shares to another nominal owner, i.e. Vitaliy. I have never threatened him. Agreement for sale of Hackham shares was signed in January 2009. However, I do not know why but he has never transferred the shares until June 2009 though he has to according to the terms and conditions of the agreement. As I have explained below on June 29, 2009 I was in Kerimov's office while my representatives, Artem, Vitaliy and Dmitriy were in Cyprus. They were busy with the signing of the agreement for the transfer of my share interest in the Project to Kerimov. Hackham was one of the companies involved in the transaction. During the transfer of the claim rights of Hackham lawyers of Kerimov discovered that Hackham shares were not registered in the name of Vitaliy. Then Krotov called and reported this to Kerimov in Moscow. The latter immediately instructed his secretary to invite Garkusha to his office. I remember that Garkusha came to Kerimov's office in 20 or 30 minutes after the call. Kerimov asked him to sign the transfer order for Hackham shares. Garkusha looked at me asking whether he should sign the order or not and I told him to sign it. I do not recognize a signature of the person who witnessed the signing of the transfer order by Garkusha but I can only assume that this is the signature of one of the lawyers of Kerimov who was present there that day.[12]

3.8   Blidensol was one of my other companies. Garkusha owned the shares from time to time as the nominee owner appointed by me. Hamfast had the right to Blidensol shares, the company through which I transferred USD 100 million to the Project after receiving the loan from Deutsche Bank in accordance with the Blidensol Loan. I mentioned Blidensol Loan in my first statement referring to the fact that Europark was stated as the security thereof.  Garkusha did not explain the reason of providing Europark as the security for the loan which was provided to the company he owned. Of course, he did not own it. Garkusha owned shares of Hamfast (and, therefore, shares of Blidensol), as a nominee owner on my behalf and in my favor.

3.9   I saw witness statement of Garkusha where he refers to the fact that our relationship became more complicated in late 2007 due to the financial difficulties with the Project. In addition, he states that in January 2008, we entered into an agreement outlining "our joint obligations in respect of the Implementation of Hotel Moskva Reconstruction Project". Pursuant to this agreement I was obliged to transfer the share interest in Decorum in size

---

[11] Statements of Garkusha, ¶ 63.
[12] CE-149.

of 2.75% and a bonus payment in exchange for Blidensol shares. Garkusha also says that I have not fulfilled the obligations under the agreement and on February 1, 2008 we signed sale and purchase agreement for the transfer of Hamfast shares to Vitaliy that have been already registered in his name. Then Garkusha says that I was the reason of the phone calls he was receiving with the threats and that I have initiated an investigation against him to force him complete the transfer of Hamfast shares.[13] These statements are misleading and false.

3.10 Somewhere in January 2008 I told Garkusha that I plan to take Blidensol shares out of Hamfast. I wanted Vitaliy to own the shares as my nominee holder. Around the same time Garkusha and I also concluded a Statement of mutual obligations. After that we signed an agreement for the sale of Hamfast shares pursuant to which I agreed to pay him USD 3 million but not for the shares as Blidensol was my company, but to repay the bonus payment for his efforts and work on Blidensol Loan as stated in the Statement. As I have already mentioned above, Garkusha claims that I failed to fulfill my obligations thereunder (Statement of mutual obligations) but he has followed his obligations by concluding the sale and purchase agreement for Hamfast shares dd. January 1, 2008. This is a lie.

3.11 In March-April 2008 I was interrogated by prosecutors in connection with the investigation of Garkusha's "payoff" agreements. It was the first time I heard about the investigation. I had nothing to do with it, and the last thing I wanted to put the management of Decorum or DecMos under the investigation for alleged corruption. At that time we were trying to solve our problems with the City (I will explain below). I was unable to influence the course of the investigation and have never told Garkusha that it would continue until he transfers the shares of Blidensol to me. In fact, we have agreed to this transfer (by means of Hamfast shares) prior to the investigation.

3.12 Me and the other shareholders of Decorum believed that Garkusha participated in a serious misconduct and that it could potentially damage the Project if he remains the CEO thereof. That's why he had to leave the Project. Taking into account the severity of his behavior, I decided that he no longer had the rights to minority share interest in the Project and the bonus payment. It was clear and Garkusha agreed to this as well.

3.13 It is quite interesting that Garkusha did not object the fact that Vitaliy was appointed by me as the nominee holder however objects the fact that he (Garkusha) was the one. They

---

[13] Statements of Garkusha, ¶¶54-61.

were performing the same roles in regard of the shares and pursuant to the sale and purchase agreement their offices were located at the same floor at Dayev Plaza. Dayev Plaza is a Moscow business center. Decorum office and majority of my employees were situated there as well.

**4.      Possible violations of Investment Agreement.**

4.1     I know that the essence of the Defendant's side consists in the fact that I was managing the Project so bad that by June 2009 I gave up and decided to sell my share to Kerimov. It's not true. The Defendants also state that I have violated Investment agreement as the Project has not been completed by the date specified in the Investment Agreement. I know that they also claim that since the City has agreed to postpone the date of completion, it confirms that they did not try to get rid of me. [14] This is so untrue. Delays were caused by the circumstances beyond my force and the City knew it. On January 30, 2007 Ordzhonikidze, the Deputy Mayor of Moscow, explained the reasons of delay to Resin, the first deputy mayor of Moscow:

> *"I think that the investor Decorum CJSC fulfills its obligations in terms of the organization and financing of the Project in good faith and the delays in completion of the works was caused by objective factors and issues, including the following:*
>
> *-   works on demolition of Hotel Moskva were suspended for few months due to the explosive substances dating back to 1941 found in the underground part of the building;*
>
> *-   commencement of the construction was postponed for more than six months due to the long-term discussions regarding the disposal of land within the territory of old Hotel Moskva;*
>
> *-the works were suspended for several months in the course of construction due to the detection of karst rocks in the underlying layer of the soil of the future building. It was required to make the necessary revisions in the design of the foundation;*
>
> *Currently, there are a number of unresolved issues including utility connections and financing of these works which can also disrupt the schedule of commissioning of the construction project of multi-purpose complex Hotel Moskva.*
>
> ***Therefore, I hereby kindly request to issue a relevant decree to*** *expedite the preparation of the conclusion by the Department of Urban Policy, Development and Reconstruction of Moscow,* ***in terms of the promotion of the implementation of the investment project of Hotel Moskva reconstruction*** *and define more realistic term for the completion of all*

---

[14] Line of reasoning of Denoro Defendants ¶¶ 136-137.

*works at the object and its commissioning date.*[15]

4.2    The situation was complicated because the City denied the financing I have agreed for. I do not deny the fact that it was impossible to continue the Project implementation without the financing. Garik Kotangyan ("Kotangyan") described in paragraphs 17-25 of his statement that the Project was in "critical" condition since 2009. I agree that the situation was "critical" but not for the reasons mentioned by Kotangyan.

4.2.1    She states that DecMos had a large debt and owed USD 66 million to Strabag and other contractors. As I have already stated, I do not deny the fact that without Deutsche Bank loan the Project would need a funding,

4.2.2    She has also mentioned that "*the lack of funds at the project was caused by bad management of the limited resources of DecMos*". It is not true. The examples she mentioned are insignificant: she refers to the revision of terms of the contractor agreement with ABK LLC in part of the contract amount, namely the change from Euro 3 million to Euro 750,000 and one lease agreement with legal company White and Case as an agreement with a price lower than the market price. The agreement with legal company was concluded when the market prices were lower. She did not provide any other significant examples and that's because there are none.

4.2.3    She claims that the payments to Strabag were "higher than market prices". She has also mentioned that she was able to negotiate again and reduce the payments although she did not say for how much. I would like to bring your attention to the fact that these repeated negotiations took place in February 2009 with the support of Alexander Ilyichev ("Ilyichev"), Kerimov's employee. At that time Kerimov had no property rights in the Project. In any case, Strabag was an experienced construction company with a good reputation and image and of course corresponding rates. Even if Strabag reduced its rates then I believe it was due to the major pressure from Kerimov. The chairman of the board of Strabag confirmed this in his letter to Prime Minister Vladimir Putin.[16]

4.3    Given the approval of Deutsche Bank loans I have agreed for, the Project would not be in a "critical condition" in 2009. I will explain this later.

**5        The Commitment of the City and Funding from Deutsche Bank**

5.1    I have been presented some sections of the Written Statement of Denoro Defense and

---

[15] CE- 140 (highlighted in the original).
[16] CE-27

some of the Witness Statements which confirm that: (i) City of Moscow was not obliged
to approve a mortgage loans on the property of the Project as a condition of the Project
financing; (ii) we knew that, but continued to arrange for financing, which - as we knew –
the City was not obliged to approve and did not approve, and (iii) we hid the existence of
the financing, which we agreed with Deutsche Bank, for the City would not get to know
about it before the event of default at the end of 2008. These allegations are false, and I'm
surprised that the Defendants have stated them. To explain where the Defendants are
wrong, I need to consider a number of events occurred at the beginning of the Project.

5.2 The responsibilities of Decorum Company - the investor, DecMos - the project
(engineering) company and the City had been identified during the period of 2000-2003,
before the witness of the Defendants Igor Ignatov ("**Ignatov**") was in any way involved in
the Project. The starting point is the Conditions of the Tender dated August 1, 2000 issued
under the guidance of I. N. Ordzhonikidze, who was the Deputy Mayor of Moscow that
time[17]. As it was stipulated in the Tender, the Project had to be divided into two stages.
During the first stage the existing buildings with facades facing the Manege Square and
Okhotny Ryad Street had to be demolished and reconstructed. After the reconstruction the
total area of these buildings had to be 60,005 square meters. During the second stage the
buildings facing the Theatre Square and the Revolution Square had to be demolished and
rebuilt. After the reconstruction the total area of these buildings of the second stage had to
be 83,495 square meters.

5.3 The Tender stipulated that the Investor would have to provide financing for the first stage
of reconstruction that according to the preliminary estimates would be approximately
$ 100 million, and would receive 51% of shares in the Project after its completion. The
Tender provided that the second stage of the construction would be financed by bank loans
the security for which would be the building, rebuilt during stage 1 (i.e. the pledge for the
part of the Project fully completed in Stage 1). Thus, from the very beginning of the
Project the idea was that the Investor would be required to finance the work for
approximately $ 100 million, and the rest of the construction would be funded under the
normal procedure on the account of bank loans arranged by the Investor and the security
of which would be the Project's assets. I have seen the statements of the Defendants and
Ignatov, which doubt the economic sense of the given agreement. That time it was not
unusual. The City had a shortage of funds, and it was looking for ways to privatize the
building, which was very shabby, but it was a place of interest in the very center of the

---

[17] CE-28.

city. Very few people were interested in this deal, and the tender was prepared in order to stimulate private investments and the management of the Project in compliance with its conditions.

5.4    Although I did not take part in the preparation of the tender bid of Decorum Corp., in accordance with the tender it was stated in the bid that the financing of the project would include bank loans, and (or) the loans offered by major construction companies.[18]

5.5    On April 29, 2003 the City issued Decree No. 311-ПП ("**Decree**")[19], according to which Hotel Moskva Project was officially awarded to Decorum Corp. and it was approved to transfer the Project from Decorum Corp. to the Russian company Decorum LLC which I owned. The Decree stated that Decorum undertook obligations "*to organize and to finance*" the demolition of the existing buildings and the construction of a new facility. The Decree said nothing about how Decorum Company had been allowed to arrange financing, and of course, I knew that its goal was not to change the Tender conditions, as far as it concerned the ability to provide the appropriate security for bank financing. If I had thought otherwise, I would not have started the implementation of the Project. This Decree assigned the responsibility for the Project control on behalf of the City to the Deputies Mayor O.M. Tolkachev, V.I. Resin and I.N. Ordzhonikidze.

5.6    The first meeting of DecMos shareholders - Decorum (51%) and the City (49%) - took place in June 2003. It was reflected in the Protocol that the City was represented by G.L. Petrov, the Deputy Director of Moscow Property Department. It was indicated that Decorum was represented by Garkusha, who under my instructions had been appointed beforehand as CEO of Decorum. It is true – as it has been pointed by Garkusha in his Statement - that there was no physical meeting between him and Petrov[20]. The issues reflected in the Protocol had been previously discussed and agreed upon at the meeting between Ordzhonikidze, Tolkachev (Deputies Mayor) and me. I believe that during this meeting a draft of the Protocol could also be presented. After that, Mr. Petrov and Garkusha memorialized our agreements in the signed Protocol.

5.7    As reflected in the Protocol, the City agreed that the completion of the Project would need

---

[18] R2-33.
[19] CE-29.
[20] As I was explained, in paragraph 3.15 of the English translation of my First Witness Statement the words "at which I was present, along with the representatives of the City" were given in brackets. There are no such words in the Russian text, which I have signed, and apparently, their appearance in the English version was just a technical mistake.

bank financing, that DecMos would act as the borrower and that such financing would require the pledge of the property, which it owned. Therefore, DecMos shareholders, including the City, in a unanimous vote decided:

> --*" To agree with the need for DecMos OJSC to make a major transaction during the search for credit resources from UBS, EFG banks with the participation of  Decorum LLC or monetary assets from Decorum LLC on the following conditions: the total amount of credit funds should be up to $ 300 million with interest rate on credit in an amount of 6-10%.".*

> --*"To declare that it is necessary to use the pledge of property owned by DecMos Company including the right to lease the land, as well as shares of DecMos, owned by its founders, to secure the obligations under the credit agreement".[21]*

5.8   I have seen the Witness Statement of Garkusha stating  the following:

> *"However, this part of the Protocol did not represent the City's approval of any financing transaction, neither generally nor specifically. It contained just one possible way to obtain financing in the future".*

> *"Indeed, nothing in the Protocol did not change the fact that, in accordance with the Russian law, any major transaction, the value of which exceeds 50% of the company's assets, as reflected in its balance sheet, had to be approved by the shareholders who held not less than 75% of the company's shares. This meant that, in accordance with the Russian legislation the City had the right to block a major transaction if it wanted to do it ...*
> *On the base of my comprehensive business relations with Ashot I can confirm that at that time he was also aware of these requirements"[22]*

5.9   This is incorrect and misleading. In accordance with the shareholders' meeting in June 2003, the City provided a general approval of the need of significant bank financing for the Project completion, with DecMos as a borrower, as well as the need to provide adequate security to obtain such financing, including a pledge of rights for land lease.[23] Despite the fact that the City as a shareholder retained the right to approve specific proposals for major funding, which we could give, it could not break the basic conditions of the Tender which it had approved at the shareholders meeting in June 2003. In other words, the City had no right to refuse in the appropriate pledge of the Project's assets as a security to obtain the required project financing.

5.10 Consequently, there was nothing surprising in the approval of the City. It was consistent

---

[21] CE-1.
[22] The Witness Statement of Garkysha. ¶¶22-23.
[23] I note that the Charter of DecMos states that  DecMos will participate in activity, including "usage of real estate as a pledge to borrow funds".

with the fundamental understanding of the Parties, which was originally the basis of the Tender and of the entire Project. The idea that any investor would have agreed to take up the project without any ability to obtain an appropriate security for the project financing is absurd. No bank would have financed this Project without the right to take possession of the property / assets of the Project.

5.11 The members of the Board of Directors of DecMos were also elected at the first meeting of the shareholders. The City elected two its representatives - Mr. Ordzhonikidze and Yuri Baturkin - to the Board of Directors consisting of five members. Consequently, Mr. Ordzhonikidze held key roles both as a member of the Board of Directors of DecMos and as one of the three officials from the City assigned as responsible people for the Project in accordance with Decree 311- ПП. Mr. Ordzhonikidze also represented the City at meetings of the shareholders.

5.12 The context I have explained above was the context in which the Investment Agreement was signed on October 2, 2003 between Decorum, DecMos and the City. I remember that it had been prepared by a lawyer named Maxim Viktorov, the managing partner of the Moscow law firm named Legal Intelligence Group. The first page of the Investment Agreement states that the city was represented by Mr. Tolkachev and Mr. Ordzhonikidze. As it was mentioned, Ordzhonikidze was a member of the Board of Directors of DecMos, he was responsible for the Tender and was fully involved in all the questions related to the Tender; together with Tolkachov he negotiated and agreed with me upon the decisions made at the shareholders' meeting in June 2003. In addition they were two of the three members appointed by the City to monitor the Project in accordance with Decree 311-ПП. I can say with certainty that none of them meant that the Investment agreement should significantly change the arrangements concerning the project financing, which as it was known to everyone were required to complete the Project, if necessary. Again, at this moment in time Ignatov was not involved in the Project.

5.13 The context, the previous discussions and agreements that I have described, are necessary for understanding of what the Parties meant in the Investment Agreement, when they stated that Decorum "*undertook obligations to organize and to finance the implementation of the project*" and that the reconstruction should "*be performed by using both the own and the borrowed funds of the Investor*." It was always understood that the "borrowed" funds would be received in a bank by providing an appropriate security for funding of the project (i.e. a pledge for assets / property of the project) . The Investment Agreement did

13

not contain anything different from that, and even if it had contained something different, this would have directly been in conflict with the terms of the Tender, on the base of which Decorum had agreed to implement the Project, and with the decisions dated June, 2003 made by the shareholders of DecMos, including the City. I think that it is very important for me to say that the Defendants and Ignatov take the text of the Investment Agreement and "over twist" it into something that had never been meant and it could not have been meant if the City had a desire to complete the Project.

5.14 After the Investment Agreement had been concluded, we focused on the promotion of the Project. I consider these questions in my first statement in paragraphs 3.8-3.21. We had completed the demolition before the end of August 2004.

## 6.     The Loan from Sberbank

6.1 In autumn 2005, I came to agreement with Sberbank on financing for the completion of the Project. Around the same time, the situation began to acquire a political character, as the Mayor Luzhkov decided that the cost of the Project had significantly been increased, and he was looking for an opportunity to participate in it or to gain benefit from it. The Defendants and Ignatov state that the City made it clear that no funding would never have been approved if the borrower had been DecMos or if the Project assets would have been transferred as a pledge to secure the loan. It creates the wrong impression about the things that really happened. The situation was not clear, but overly politicized, and we received from the City absolutely different messages. I'll explain this below.

6.2 Prior to give my explanations, I would like to emphasize, however, that in our opinion, the City had to approve funding, which we had agreed. The City never stated that funding from Sberbank or later funding from Deutsche Bank had been implemented on unreasonable commercial conditions. Similarly, the City did not claim that our pre-defined amount of funding needed to complete the project, had been unreasonable. The City either said nothing or rejected the proposed funding schemes on the grounds that DecMos could not be the borrower and (or) that the assets of the project could not be pledged. We believe that there were no grounds for such a position.

6.3 The first episode of the conflicting reports occurred in connection with the financing from Sberbank, which we had agreed in 2005. We did everything needed for the implementation of this funding, and the only condition remained unfulfilled was the consent of the City as a shareholder. The City, however, postponed the consideration of

this matter, and DecMos eventually applied directly to Mayor Luzhkov for him *«to give instructions to the structural units of Moscow Government to make the decisions necessary at the moment for DecMos to raise funding ...»* [24]

6.4 Following the requirement of Moscow Property Department DecMos presented comprehensive information about the alleged funding, budgets for the construction and other related issues, despite the fact that the City had already had this information as Mr. Ordzhonikidze and Mr. Baturkin were the members of the Board of Directors of DecMos.[25] The response received from the Property Department in the form of a letter dated November 25, 2005, signed by the Deputy Mayor Yu.V. Roslyak who had not been previously involved in the project was that the funding extended to DecMos as a borrower, which used its property as a pledge, including the right to lease the land, did not comply with the terms of the Investment Agreement.[26]

6.5 It was the first time when the City took the position that such funding was not acceptable. As I have explained above, this position violated the terms of the Tender, the decision of shareholders of DecMos dated June 2003, and the whole history of the Project. This was completely contrary to what had been agreed earlier, and I knew that the City took such a position for political purposes.

6.6 I also knew that a political solution had to be found. First of all, the solution had to be looked for within the City Government. Mr. Ordzhonikidze was still a member of the Board of Directors of DecMos, and I knew that he understood the City's commitments in relation to the Project in terms of authorized funding and wanted the City to fulfill its obligation to complete the Project. I also knew that he worked in the City government to achieve this goal. I discussed these issues with Ordzhonikidze, who also criticized the behavior of Mayor Luzhkov.

6.7 As long as the "inner struggle" continued in the City, we did two things in an attempt to prevent the stoppage of the Project. First, I took steps for my companies to provide further funds to Decorum, which had to be transferred to DecMos on a return basis for the financing of the construction works. I'll discuss the statements of the Defendants in respect of that funding below. Second, we came to an arrangement with Sberbank on new

---

[24] II-1.
[25] II-2.
[26] II-3.

financing in the amount of $ 600 million to complete the project. [27] At my suggestion, we seized the City's shares in DecMos from the security package proposed for funding, and Sberbank agreed upon that. Appropriately new funding from Sberbank had to be secured by the property rights of DecMos and by the block of shares of Decorum, amounting 51% in DecMos (however, not by shares of the City amounting 49%).

6.8   Both of these issues were proposed for discussion at the meeting of the Board of Directors of DecMos, which was held on May 29, 2006, and which I spoke about in my first statement. Two representatives of the City, which were the members of the Board of Directors of DecMos Mr. Ordzhonikidze and Mr. Baturkin attended the meeting and participated in it. In fact, the Deputy Mayor of Moscow Ordzhonikidze was then the Chairman of the Board of Directors of DecMos and he presented the agenda of the meeting to the members of the Board for approval. According to the records in the Protocol of the meeting, the Board of Directors of DecMos made a decision:

> --" To approve the need of obtaining the loan financing from [Sberbank] ...."
>
> --" To approve the provision of securing obligations for the loan agreement to be conducted between DecMos OJSC and [Sberbank] in the form of the following types of security: a pledge of both lease rights for a plot of land and property rights for the reconstructed building of Hotel Moskva (a new multifunctional complex), and the pledge of 51% of the shares of DecMos belonging under the ownership to Decorum CJSC."
>
> --" To recommend the General Meeting of Shareholders of DecMos OJSC to make a decision on a major transaction required to finance the investment projects concerning the reconstruction of Hotel Moskva, according to the proposal made by[Sberbank]."[28]

6.9   These decisions were made by the Board of Directors of DecMos in a unanimous vote, including the vote of the Deputies Mayor Ordzhonikidze and Baturkin. As I have explained above, Ordzhonikidze was responsible for implementation of the Tender procedure and he was among those three people who according to Decree of the City Government No. 311 - ПП were responsible for monitoring of the project performance on behalf of the City. He was a representative of the City on matters related to the Investment Agreement, and he knew better than anyone what were the legal obligations of the City, he also knew (as everyone else) that the project could not get the financing and could not be completed without the standard securing of the project financing in the form of the property of the Project. As I also have explained above, the City had already voted in

---

[27] CE-81.
[28] CE-30.

favor of a legally binding decision to do so at the first meeting of the shareholders of DecMos.

6.10  The meeting of the Board of Directors of DecMos held in May 2006 is also important because the Board was informed that Decorum had provided some funding to DecMos in the form of loans and the Board made a decision (again unanimously, including the votes of Ordzhonikidze and Baturkin) to accept these loans and in addition "*to approve funding from Decorum CJSC in amount of $ 240 million. . .*" The statement of Ignatov that the City did not know that Decorum had provided funds to DecMos on a return basis is false. All this was fully known to the City and was approved by it through the participation of its representatives on the Board of Directors of DecMos. I'll discuss this issue further in connection with the "Explanatory agreement" proposed by the City later.

6.11  Despite the efforts of Mr. Ordzhonikidze and Mr. Baturkin, the City did not respond on issue of the loan from Sberbank in 2006. DecMos sent further written requests for approval in September and October 2006[29], but we did not receive any response to them. I was showed the internal documents of the City, attached by Ignatov, which suggested that the opinion of Ordzhonikidze had not been the opinion of the majority, and that "*he had been properly informed on this matter.*"[30]

## 7.    The awareness of the City about Loans from Deutsche Bank

7.1  By 2007, the project costs continued to rise. We did not want the activity to stop, so simultaneously we applied to Deutsche Bank for financing that would allow us to get some money for the time, while we still attempted to resolve the political situation so that the City would fulfill its obligations under the Project and approve the relevant security for the project financing. The financing from Deutsche Bank was organized by two parts: Falmiro loan and DecMos loan. I explained this financing in detail in paragraphs 3.28-3.31 of my first statement. In summary: Falmiro loan was provided to the company owned by me and by my partners on the Project that time, Rothenberg and Goloshchapov. We could get access to this loan, and did so in order to provide DecMos with $ 75 million for current construction costs. DecMos loan should have been provided in order to refinance Falmiro loan and should have been sufficient to complete the Project. As well as Sberbank loan in 2006, DecMos loan from Deutsche Bank was granted against the loan security in the form of pledge of the property of DecMos and 51% of shares of DecMos belonging to Decorum

---

[29] CE-82;CE-83.
[30] R2-8.

under the ownership. The share of the City in the amount of 49% was not included in the security package.

7.2   Denoro and Ignatov state that funding from Deutsche Bank was hidden from the City and that the City did not know about it until the fact of default on obligations at the end of 2008. This is not true. Garkusha says - we knew that the City would not approve the funding, which we had agreed with only one purpose - to gain time so that I could sell my share in the Project. This is also not true.

7.3   Several witnesses of the Defendant claim that I was a short-term investor and was always looking for an opportunity to sell my block of shares in the Project to get a quick profit. For example, in paragraph 42 of his statement, Garkusha says: "*Although both Ashot and me knew that there was a high probability of the default on obligations and of the fact that Ashot would lose his share in the Project, we still believed that these loans gave us the opportunity to gain some time. The loans gave us a year, during which we could use those funds obtained under Falmiro Loan, and look for new investors, whom we could sell the Project.*" That is not true. In fact, if to believe Garkusha, I would have done everything possible to sell my shares during the year I had before the inevitably approaching default on obligations. However, I did not make any effort in that direction, because I had no intention to leave the Project before its completion.

7.4   The Defendants refer to the alleged attempt to sell my share to Mr. Kerimov at the end of 2007.  As far as I know, there were no documentation provided to support this statement, and it is not true. On the contrary, as I indicated in my first statement, and as it is well known to Mr. Kerimov, it was my partners Rotenberg and Goloshchapov, who tried to sell their shares to Mr. Kerimov[31]. I remember that time I received a request from the representatives of Mr. Kerimov to provide some specific information on the Project, so that they could evaluate the proposal of Rotenberg and Goloshchapov better. This was all my participation. Despite the statements to the contrary, Kerimov and Nafta knew exactly that Goloshchapov and Rothenberg were my partners in the Project, in view of these discussions, and for other reasons.

7.5 The Defendants suggest that I tried *to sell [my] share to Coalco LLC* and refer to the letter from Vasily Vasilievich Anisimov ("**Anisimov**"), in which Coalco offered to purchase the shares of the City. [32] This is not true. Goloshchapov, Rothenberg and me had

---

[31] First Witness Statement of Ashot Egiazaryan  dated May 13, 2011 ("First Statement"), ¶4.3.
[32] Line of reasoning of  Denoro Defence ¶ 149.3: R2-19.

negotiations with Coalco / Anisimov as with a potential co-investor. I tried not to leave the Project but to arrange a repurchase of the shares of the City in connection with the fact that the City had obstructed in the Project implementation. In April 2007, Rothenberg, Goloshchapov and me signed a preliminary agreement with Vaisily Vasilievich Anisimov.[33] Anisimov is the owner of Coalco. In this agreement, each of us agreed to buy out the shares of the City through the newly created Cypriot company at a public auction. So I had to remain not only the investor of the project, but as well as to get additional 12.25% of shares in the Project, i.e. I would have increased my total block of shares to 37.75%. In the end, we did not conclude this agreement because the City did not accept the proposal of Coalco.

7.6   The Defendants also state about the potential sale to Mikhail Yuriev and Mikhail Abyzov. This also concerned the attempts of the sale at the hands of Rothenberg and Goloshchapov, but not me. As recorded in the "plan of capture", made up in August 2008:

> *"The Purchasers [Yuriev and Abyzov] put forward the additional written requirements concerning the written confirmation of the intention of Mr. A.G. Egiazaryan to sell his block of shares, which he refused to give. This shareholder is not interested in the given transaction, but he is under the pressure of other shareholders (hereinafter - Other shareholders) who wish to leave the project of the hotel construction."[34]*

7.7   Garkusha refers to my attempt to sell the project to "Arab investors" in the "middle of 2007". [35] It was the only time when I was considering the possibility to sell my shares in the Project, and I remember that Goloshchapov and Rothenberg told me about the potential purchaser who had offered a total purchase price of approximately $ 1.6 billion. In addition to the price for my shares, I would have been compensated for my expenses, and so I had to get about $ 1 billion. Ultimately the deal failed.

7.8   Except that case when I thought I could get $ 1 billion for my shares, I never thought about selling, but I stayed in the Project at a long date. The allegation that I arranged the financing from Deutsche Bank, knowing that it would be ended by default, and in order to sell the project, is simply not true, and I believe that it has been invented by the Defendants and their witnesses for the purposes of this arbitration proceedings.

7.9   I also had no reason to hide the existence of financing from Deutsche Bank, and we did

---

[33] CE-135.
[34] CE-138.
[35] The Witness Statement of Garkusha, ¶ 4.5.

not hide it. My goal was the same as it had been since the beginning of the political struggle in the City in 2005 - to find a political way to resolve the situation so that the funding could be approved, and the project could be completed. Here I have to make one additional comment. It is true that we could turn to the court to try to force the City to fulfill its obligations and to adopt an appropriate security, required to obtain the Project financing. However, even though I threatened by such actions from time to time, I did not know anybody who had ever won a case in the courts against Moscow Mayor Luzhkov for the last decades, when he was in power, and I was convinced that the reality of the situation demanded a political decision, but not judicial.

7.10 As it was demonstrated in the article from the press dated March 06, 2007, attached to the statement of Garkusha, the financing from Deutsche Bank was widely known before its signing. [36] The existence of this funding was not hidden, moreover, Garkusha on behalf of DecMos and Decorum and Victor Makshantsev, who was at that time the director of the real estate and infrastructural projects management department of the Moscow branch of Deutsche Bank, gave interviews to the press, in which they declared this funding. Garkusha and Makshantsev confirmed that "the Bank had started to finance the reconstruction of Hotel Moskva [in the amount of $ 600 million]" and " DecMos OJSC had been able to make agreement with Deutsche Bank and to get the necessary funding from it." Later in the article it is noted that the journalist could not contact the "Vice-Mayor of Moscow, Iosif Ordzhonikidze, who oversaw the project", but Mr. Ordzhonikidze, of course, knew the details of this financing, as well as of all previous efforts. I think he did not want to make official statements, considering the development of the internal policy of the City.

7.11 Meanwhile, the political situation did not become better and the circumstances became even worse. The City not only refused to fulfill its obligations to finance the project, it also refused to attend the meeting on approval of construction contracts and the budget held with Strabag Company, the contractor of the Project. I remember in autumn 2007 Luzhkov removed Ordzhonikidze from the post of the Deputy Mayor. He was also suspended from the project - it seems to me it was in the summer of 2008.

7.12 In accordance with Clause 3.1.5 of the Investment Agreement Decorum had to conduct a contract for the construction work within two months after the completion of the

---

[36] DG-8.

demolition works. The demolition was completed by the end of August 2004. [37] The contract for the construction work with Strabag was approved by the Board of Directors of DecMos on June 29, 2004 (including, of course, the representatives of the City) and was signed on August 11, 2004. Thus we complied with the schedule and the provisions of the Investment Agreement.

7.13 The date of the General Meeting of the shareholders of DecMos was set for August 31, 2007 to approve the contract with Strabag Company. Although previously the agreements had been conducted with Strabag in a staged manner as and when necessary, Deutsche Bank required the approval of the agreement for the full amount of the planned construction work. Prior to the meeting, Decorum had written to the City in an attempt to draw its attention to this issue. However, the representatives of the City did not attend the shareholders meeting. Ignatov explained it as follows: "*the representatives of the City therefore did not attend the meeting because they did not have sufficient information in order to participate in the voting on the matter of the contract with Strabag Company*"[38]. This statement is not correct. As it is confirmed in the letter of Decorum dated September 4, 2007:

> "*The date of the General Meeting of the Shareholders of DecMos OJSC was set for August 31, 2007, and it was agreed with the representatives of the Moscow Property Department that the meeting would be held at the offices of the Moscow Property Department because of the high importance of this issue.*
>
> *However, although all the documents related to the approval of major transactions (the Contract for construction work), including those relating to the construction of Hotel Moskva, had been provided timely, the Moscow Property Department refused to make decision*"[39]

7.14 The Board of Directors held one more meeting in October 2007 for the approval of the contract with Strabag Company (for the third time) and called another meeting of shareholders on December 19, 2007 for approval of the contract. [40]

**8.     I apply with request for intervention of the Federal Government**

8.1 Considering the fact that the harm to the Project is caused by the actions of the City, we understood that we have the only choice to apply to the persons standing above Mayor

---

[37] R2-13.
[38] The Witness Statement of Igor Ignatov dated September 30, 2011, ("Statement of Ignatov"), ¶ 53.
[39] R2-17.
[40] CE-140.

Luzhkov with our request on intervention at the level of the Federal Government. I am subjected to criticism on the part of the Defendants with respect to my actions, but it was not a business but a political process. I acted in a manner which I considered to be the most suitable alternative to achieve the results, considering the Russian political realias and the huge power which mayor Luzhkov possessed. The result of these efforts was the meetings with the apparatus of the Plenipotentiary Representative of the President of Russia and the City which were held on September 26, 2007 and December 24, 2007.  In the period between the meetings, the City proposed entering into the "Explanatory Agreement", which we rejected.

8.2   Before telling of these meetings, I would like to note that I learnt the Defendants' pleas with respect to DecMos to then-President Putin dated August 31, 2007.   The Defendants cited the following extract from the letter: "*We appreciate the personal assistance of the Moscow Mayor Mr. Yu. M. Luzhkov expressed in his positive attitude and attention towards the implementation of the Hotel Moskva reconstruction project*".[41] This was represented as something "*strange*" considering my declarations with respect to this case.[42] There was nothing strange about it. I wanted to attract the City's attention and obtain the President's support, but I did not want it to appear as if I attacked one of the most  powerful persons in Moscow.

8.3   Also, I did not attempt to "*force*" the City *out*.  The true fact is that I was searching for a new partner because I understood that the City had departed from former agreements and started creating obstacles to the Project. There was nothing hidden in our actions. We knew and fully relied on the fact that the City would receive that letter. Its purpose was speeding up holding of the reasonably necessary negotiations with the President's mediation. I do not understand the importance paid by the Defendants to our proposed "*starting price of the auction*" amounting to USD 250 million as the City's share in this Project. It was only a *starting price* and we, undoubtedly intended to attract other partner to the Project.

8.4   I was subjected to criticism for the fact of not referencing to this letter  in my first witness statement. The illegal takeover of my share in the Project took place late in 2008 and in the first half of 2009.   I did not suppose that my previous efforts on ensuring performance by the City of its obligations would be paid so much attention to, it was

---

[41] R2-18.
[42] Line of reasoning of Denoro defence, ¶ 147.

namely the Defendants who did this and later gave the false definition to what happened.
.

8.5    I learnt the Ignatov's statement where he acknowledged that he saw the letter of DecMos
as of August 31, 2007 addressed to Mr.Putin[43] despite of his declaration that he did not
know anything about financing on the part of Deutsche Bank. In the letter, there was a
particular mentioning of the financing provided by Deutsche Bank:

> *OJSC DecMos fully implements the assumed obligations. For the purpose*
> *of implementing this investment project, Deutsche Bank shall provide*
> *financing amounting to USD 600 million. For the first time in Russia, such*
> *a huge loan has been issued by the top-class international bank for the*
> *implementation of a real estate project, which will undoubtedly become a*
> *milestone event for the Russian economy and will improve the investment*
> *attractiveness of Russian projects for foreign investors"[44]*

8.6    I did not attend the meetings with the representatives of the Presidential Plenipotentiary
Representative's apparatus. The first meeting was attended by Mr. Goloschapov and Mr.
Rotenberg's representative - Ms. Pavlyuchenko, who represented Decorum and DecMos.
As far as I remember, based on the Minutes, the City was made claims that they did not
attend the meeting established for the purpose of approving the contract with Strabag and
they were requested to submit the proposal on the penalties for responsible parties. The
City was also instructed not to interfere into the issues of limiting the investment project
implementation cost which is determined according to the established procedure by the
approved project estimate documents, credit and contractual obligations of OJSC DecMos
".[45] On the other hand, we were criticized for our proposal to then-President Mr. Putin to
consider the issue of selling the City's share in the Project. Nevertheless, I considered our
position as reasonable under the given conditions.

8.7    The Defendants state that the City, when being present at those meetings, tried to settle the
issues having occurred in the Project. It is not true. In fact, no constructive reaction
followed from this first meeting.  Instead of striving to improve cooperation with us, they
made an appointment to the beginning of December 2007, where we were requested to
sign the agreement "*for the purpose of uniform interpretation of the parties' rights and*
*obligations when implementing the investment project...*"[46]

---

[43] Ignatov's statment, ¶ 28,
[44] R2-18.
[45] R2-20.
[46] II-6.

8.8  This agreement represented the draft Explanatory Agreement which I discussed in my first witness statement. In this agreement and in similar statements it was expressed that its purpose was "*eliminating the discretionary interpretation of the terms and conditions of the Agreement dated February 10, 2003 concerning mutual obligations on the implementation of the Moskva Hotel reconstruction investment project*" . . ."[47] This is the acknowledgement of  discretionary interpretation: we and other persons from the Moscow Government, including Deputy Mayor of Moscow Mr. Ordzhonikidze adhered to one interpretation, and the other one was later developed by the City on the basis of political motivations, this interpretation was followed by Mr. Luzhkov, Mr. Silkin and (probably) Mr. Ignatov, none of whom participated in the Bidding or attended the shareholders' meeting in June 2003 or in negotiations on the discussion of the Investment Agreement.

8.9  In the Explanatory Agreement, the City demanded our consent that any advance Project financing provided by us shall be effected on a "*non-repayable basis*" and that "*upon completion of the construction, the Investor shall not have any rights to make any demands to OJSC DecMos with respect to indemnification of monetary funds transferred…*". This proposal represented the direct violation of conditions  of the Bidding and the Investment contract as well as the affirmations issued by the Board of Directors of DecMos chaired by Deputy Mayor of Moscow Mr. Ordzhonikidze. As I declare in my first witness statement, we rejected this "Explanatory" agreement and   threatened to file a suit, whereat the City stopped any further actions on this issue.  The illegitimacy of the City's proposal was subsequently confirmed by the Moscow court in its court decision dated November 20, 2009 on suits filed against us by the City within the framework of corporate raiding.[48] This decision was made only when my share in the Project was taken from me and given to Kerimov and, of course, the City had already lost their interest in the "fight" with the investor by that time.

8.10  The City also continued rejecting duly consideration and approval of the agreement with Strabag. The meeting of the Board of Directors was called on December 19, 2007 but  the City did not attend this meeting again.[49] Having no alternative, DecMos declared the meeting duly constituted and approved the Agreement.

8.11  Considering the City's actions I made an order to Mr. Garkusha on submitting another

---

[47] CE-31.
[48] CE-46.
[49] CE-137.

letter to the Presidential Plenipotentiary Representative apparatus:

> *"It was proposed at the meeting [with the City's participation] of the project investor CJSC Decorum to sign a new contract within 10 days; its conditions were at variance with the terms and conditions of the Agreement on mutual obligations of the parties dated October 2, 2003; Decree of the Government of Moscow No.311-IIII dated April 29, 2003 "On the activities for the implementation of the investment project for the reconstruction of the Moskva Hotel as well as the terms and conditions of Minutes No.1 of the Meeting of Shareholders of OJSC DecMos dated June 18, 2003. The investor was produced a threat that in case of refusal to sign this contract he will be deprived of the right to implement the Investment Agreement".[50]*

8.12 I am aware of the Defendants' statement that the Explanatory Agreement had no concern to the issue of the Project collateral, but referred to the problem if OJSC DecMos could be the borrower."[51] This is not true. We submitted the list of our controversies to the Presidential Plenipotentiary Representative's apparatus with the provisions of the Explanatory Agreement, including the following:

> *"For the purpose securing of the Investor's obligations with collateral as well as fulfillment of obligations of OJSC DecMos on the return of monetary funds raised by them for the Investment Project implementation, OJSC DecMos shall be obliged to pledge the right for long-term lease of the land lot located at the address: 2 Okhotny Ryad, Moscow and shall undertake to conclude a mortgage agreement with respect to the asset under construction and, subsequently, the constructed Complex or any its part".[52]*

8.13 In fact, the issue of OJSC DecMos act as the borrower in the project  financing organized by us was the second important one. The key issue lied in the capability to provide duly collateral for the given financing, but not in the selection of company level to solve the issue of technical obligations on the return of the obtained monetary funds, namely the level of DecMos or Decorum. Especially this is confirmed by the fact that Decorum pledged all its shares in  DecMos within the integrated collateral, however the City did not make any similar operation with their shares.

8.14 As a result of our letter, there was organized the second meeting with the Presidential Plenipotentiary Representative's apparatus on December 24, 2007. As far as I remember as I was informed and as it was stated in the Minutes, Mr. Garkusha and Ms. Pavlyuchenko represented DecMos at the meeting, and Mr. Garkusha informed on an

---

[50] CE-143.
[51] Line of reasoning of Denoro defence ¶162
[52] CE-184.

attempt to sign the Explanatory Agreement. Mr. Silkin, Mr. Ignatov and others represented the City and Mr.Silkin expressed the City's opinion that the project assets could not be used as the financing collateral.

8.15 The City was made a remark with indicating that their representatives should visit the meetings of DecMos shareholders and that *"the parties participating in the project should come to a compromise for the purpose of the successful project completion within the agreed term"*[53] . The parties were instructed to hold meeting with Mayor Mr. Luzhkov on December 27, 2007 on "*the issue of the investment project implementation"*.

8.16 We supposed that as a result of these meetings the City was instructed on the part of the Presidential Plenipotentiary Representative's apparatus to discharge their duties on the Project financing and, particularly on a duly collateral. We hoped that it would solve the main problem which prevented from the Project completion. As a result, we renewed our efforts to obtain the City's approval with respect to the Project financing by Deutsche Bank. Subject to my resolution, Mr. Garkusha sent the letter to Mayor Mr. Luzhkov on January 21, 2008, informing in the respective parts of the following:

> *«For the purpose of the subsequent successful implementation of this investment project we ask your approval for the issue of a resolution to the Property Department of Moscow on approval of a major transaction in which Open Joint Stock Company DecMos shall provide the collateral to Deutsche Bank with transferring the right for a long-term lease of the land lot located at the address: 2 Okhotniy Ryad, Moscow as well as the mortgage for the asset under construction and, subsequently, the completed complex or any its part pursuant to the resolutions adopted at the Meeting of Shareholders of OJSC DecMos (Minutes No.1 dated June 18, 200[3], the terms and conditions of the open investment bidding (competitive bidding) for the reconstruction of the building of the Moskva Hotel and the Agreement on mutual obligations of the parties dated October 2, 2003.*
>
> *Also we would like to draw your attention to the fact that 49% of OJSC DecMos shares, which belong to the City of Moscow will not be encumbered in connection with the search for the sources of this financing."*[54]

8.17 We attached the Minutes of Shareholders meeting in June 2003, the Bidding conditions, the Investment Agreement and letter dated November 14, 2007, to Mr. Grkusha's letter sent to Deutsche Bank, confirming as follows:

> *"During the year Deutsche Bank was cooperating with OJSC DecMos on*

---

[53] II-5.
[54] CE-132.

> *the issue of financing for Moskva Hotel reconstruction project, which is being implemented at the moment. We hereby confirm that according to the terms and conditions of the Credit Agreement to the amount of USD 600 million concluded with OJSC DecMos, the property of the City of Moscow in the form of 49% of OJSC DecMos shares belonging to the Moscow Government is not envisaged to be used as the collateral. Deutsche Bank plans long-term and extensive cooperation with OJSC DecMos in socially and politically relevant projects such as the reconstruction of the Moskva Hotel and is ready to provide the necessary financing and make the required financial solutions within short time periods in future"* [55]

8.18 At our request, approximately at the same period, Deutsche Bank sent a similar letter to Mayor Mr. Luzhkov directly.   This letter left no doubts in our capability to provide guaranteed project financing in accordance with the terms and conditions of the Investment Agreement. Thus, Deutsche Bank confirmed the following:

> *"within the framework of our cooperation, several credit agreements were entered into pursuant to which Deutsche Bank shall provide the project financing thus ensuring the availability of all the monetary funds with the investor for the successful construction of this real estate object within the Moskva Hotel reconstruction project".* [56]

8.19 Considering these and other messages, active participation of Moscow Deputy Mayor Mr. Ordzhonikidze in the DecMos Board of Directors and the materials in mass media mentioned by me above, I do not understand why Mr. Ignatov stated that the City was not aware of the financing provided by Deutsche Bank. Their witness statement on this issue is obviously false; we did not try to conceal anything from the City with respect to financing provided by Deutsche Bank and we could not hide this information even if we wanted to do so.

8.20 Despite our renewed efforts aimed at achieving the cooperation with the City, we did not obtain any reaction.  Instead, the City (Deputy Mayor Mr. Silkin) sent a letter to us dated May 14, 2008 which contained the charge against Decorum with respect to their violation of the Investment Agreement along with the proposition to terminate it. I referred to this letter in my first witness statement. As I noted, the only violation charged was that Decorum failed to complete the Project to the end of 2006. This was evidently not a violation because the City had preliminarily agreed to prolong the completion term until the end of 2008. In this letter, Mr. Silkin threatened that if we disagree to terminate this Investment Agreement in exchange for the documented expenses according to Section 9.2

---

[55] CE-84.
[56] CE-133.

of the Agreement, "*The Moscow Government would file a claim to the commercial [arbitrary] court of Moscow with the requirement to terminate the agreement and force CJSC Decorum to transfer the ownership right for 51% of shares of OJSC Decorum to the city of Moscow.*"

**9.      An organized default**

9.1    As I say in the first Witness Statement of mine, the accusations of the City in violation were not grounded, and the City failed to carry out its threat[57]. Instead, unequivocally, the following took place: the City jointly with Mr Kerimov developed a plan of a raider attack for my participatory interest in the Project and the takeover of it. I described that in details in my previous statement, and do not want to repeat it now, but I only want to summarize the following facts to have led to a deal with Konk Company, which Defendants and Mr Ignatov misrepresented.

9.2    As Ignatov says in his Witness Statement, having failed to receive a reply for our previous requests to the City concerning its approval of financing by Deutsche Bank, in the beginning of July 2008 we provided the City with a revised version of this financing, according to which the City would be provided with certain property rights if default[58]. Ignatov did not deny this offer at once, as it could be supposed basing on his Witness Statements, but asked to provide a legal analysis and the Draft Agreement for the City to consider. On July 25 this material was provided to the City, including the Draft Agreement confirming (again) that the loan from Deutsche Bank had been already provided[59]. As far as I remember, we did not receive a reply.

9.3    The second letter was sent immediately to Major Luzhkov on September 19, 2008, but as far as I remember it was left without a reply, too. I was informed that according to the Defendants' statements it was the first attempt of the Decorum Company to receive the approval for Deutsche Bank financing[60] from the City. It is incorrect with regard to the reasons I specified, and an idea that I could hide the loan existence and did not ask for the approval of the City, knowing that it would lead to default, does not have any sense. I spent many months of work searching for a political solution, which would specify for the City the fulfillment of its obligations with respect to the appropriate collateral. In

---

[57] First Witness Statement, ¶ 4.4.
[58] II-7 (Minutes of the Meeting of the Property Department for the City of Moscow).
[59] R2-24.
[60] II-8; Line of reasoning of Denoro defence, ¶ 233.

hindsight, I think that the City's strategy was to say nothing, waiting for a default. And that is what it did.

9.3    When the situation became serious for us in the light of default, announced by Deutsche Bank, the DecMos Company informed about the Shareholder Meeting on October 7, 2008 with the purpose to approve Deutsche Bank financing[61]. However, the City did not come since the City had not been informed about the loan and was trying to develop an action plan[62]. Again, it was false. As I said earlier, the City had been informed about the loan in full. Even if it was not like that, it would be right to attend the Meeting and to discuss the matters, but not to make a simple strike, like the City chose.

9.4    To gain time for making one more attempt to find a solution in the conditions of City's misconduct, we asked the City to send a letter to Deutsche Bank with a request to prolong the period for completing financing conditions of Deutsche Bank (i.e. the reception of the approval from the City) by six months[63]. I think that if the City had made this request, Deutsche Bank would agree. The City refused to do it, having chosen the default under the loan instead; despite Ignatov says about a concern regarding what could have happened if Deutsche Bank had started acting within the framework of this default and levied execution upon the project property.

9.6    In my opinion, it is important to take into account that the only reason for the default was non-provision of the Shareholders' approval by the DecMos Company. It did not happen due to a failure to effect a payment. This default could have been easily avoided if the City approved the provision of the appropriate collateral to Deutsche Bank as it was prescribed to do and as it had already been done at the very first Shareholders' Meeting of the DecMos Company. I was surprised that the City did not make even the slightest attempt to gain time. Deutsche Bank did not accelerate a debt even in the conditions of the financial crisis. They only asked for the approval of the Shareholders.

9.7    In this context I did not have another choice but to make a deal with the Konk Company. This deal was not a result of non-performance of obligations by the Decorum Company under the Investment Agreement, but it resulted from permanent violation by the City of its obligations concerning the permit and approval of the appropriate collateral for financing, which was necessary to complete the Project. The Defendants' reasons for these

---

[61] CE-134.
[62] Ignatov's Witness Statement, ¶ 55.
[63] CE-10.

matters, particularly, including Ignatov's Witness Statement, are false and misleading.

**10.    Appeal to Kerimov in October 2008**

10.1 In the First Witness Statement of mine, I mentioned that I had appealed to Kerimov (and other potential investors) shortly before the deal with the Konk Company. I read the description of these meetings provided in the Witness Statements of Tatiana Bashmakova (**Bashmakova**) and Irina Pavlikova (**Pavlikova**) and Ilyichev and have the following comments:

10.1.1 Despite I really could not find required USD 87 mln within short time for the Deutsche Bank loan, it is wrong that I would not be able to refinance the debt in general or to pay the debt with respect to the Project. It was a short-term problem of searching monetary funds, which would place me in a difficult position in the light of City's failure to perform its obligations.

10.1.2  I definitely came under a big pressure but I did not phone Bashmakova ten times a day, including at off-hour. I  was mostly negotiating with Mr Kerimov.

10.1.3 I recollect the organization of a meeting between the lawyers of Kerimov and White and Case Law Firm, but I do not think that there were "several meetings" as Bashmakova states.

10.1.4 Bashmakova asserts that at that time she learnt for the first time that Goloschapov and Rotenberg were my partners at that time. It is wrong. Kerimov knew about the participatory interest of Goloschapov and Rotenberg in the Project since they appealed to him in 2007 concerning the sale of their participatory interests to him.

10.1.5 Kerimov refused to participate in the Project and I recollect that Bashmakova informed me that it had happened because Kerimov had not had funds due to the economic crisis. It was not by the reason that the Project could bring "*legal and economic risks*".

10.1.6 I did not make a deal with the City while I was negotiating with Mr Kerimov[64]. Kerimov had already refused from participation by the time when the deal with Konk Company was made. As I am explaining below, of course, I was not "*very happy*" about the deal with the Konk Company.

---

[64] The Witness Statement of Tatiana Bashmakova dated October 30, 2011 ("Bashmakova's Witness Statement")¶ 48.

**11.    The deal with the Konk Company.**

11.1  As I explained in the first Witness Statement of mine, I acquired a right to buy out the loan of Deutsche Bank through my company of Hamfast Investment Limited. This right was later transferred to my company of Konk Select Partners Inc (Konk)[65]. It seems that the Defendants suppose that this means in some way, that the deal with Konk was not a part of measures taken under the raider attack and that I was preparing a default. It is incorrect. I envisaged the preference of buying out the loan to protect my interests. However, there are no doubts that the City organized the default by non-provision of the approval for appropriate collateral for the financing we envisaged. The absence of this approval was the reason for the default since the City knew where it would lead, and in compliance with the information specified in the Memorandum on a raider attack[66] dated August 2008, activity or total inactivity of the City meant that I did not have another choice but to make a deal with the Konk Company. The City did not "give a helping hand to me"[67]. To give a helping hand would mean to approve the financing of Deutsche Bank and to fulfill its obligations.

11.2  The company of White and Case prepared the documents for the deal with the Konk Company. The City's legal advisors were also present at the meetings.[68]

11.3  Under the deal with Konk Company the City acquired 50% shares of the Konk Company and 50% shares of Falmiro Company (the first borrower under the loan agreement of Deutsche Bank). At the time when the deal with Konk Company was made, the following persons were the shareholders of Falmiro: (1) Vitaliy, who held 50% shares as my nominal holder; (2) Boris Rotenberg (a brother of Rotenberg) who held 25% shares; and (3) Pavlyuchenko, who held 25% shares on behalf of Goloschapov[69]. I recollect that in several days after signing the agreements between the Konk Company and the City, both Pavlyuchenko (on behalf of Goloschapov) and Boris Rotenberg signed some documents confirming their agreement on buying Vitaliy's shares in Falmiro by the City[70].

11.4  According to the conditions of the deal with the Konk Company I had to transfer all my investments in the Project (i.e. about USD 250 mln) to the Konk Company. As I

---

[65] First Witness Statement ¶ 4.13; CE-85.
[66] CE-138.
[67] Line of reasoning of Denoro defence¶ 277.
[68] CE-12; CE-13; CE-15.
[69] CE-160.
[70] CE-145.

mentioned in the first Witness Statement of mine, the conditions of the deal with the Konk Company also specified that Konk could levy execution on the Falmiro collateral (i.e. on the shares of Limerik and Tribalin Companies) and hence, receive proprietary rights for the Decorum Company and take control of it. In practice, as a result of this, the City received the participation interest in the amount of 74.5% in the Project (25.5% through the ownership of the Decorum/Konk Companies jointly with initial participatory interest of 49% in the DecMos Company). I had 25.5% left through the Konk/Decorum. Additionally, after the payment of the loan provided by Obyedinyonnaya Energeticheskaya Kompania to the Konk Company, the City controlled that at its discretion, the City would receive a full administrative management of the Konk Company, and consequently, of the Project. I would have become a passive investor.

11.5 I concerned a lot about the deal with the Konk Company taking into account the control to be received by the City and my previous relations with it due to the Project. That was the last of what I would like for the Project. However, I aimed at using the situation in the best way hoping to assure a full completion of the Project.

11.6 Since under the conditions of the deal with the Konk Company I did not have the rights of management, the City controlled the financing of the Project. I thought that in the end it could encourage the City to fulfill its obligations in compliance with the Tender, by the Decision of the Shareholders' Meeting dated June 2003 and the Investment Agreement, which were signed to approve the appropriate collateral for project financing. Ignatov informed me that the City had enough money to invest. I also recollect that the Shareholder Agreement of the Konk Company specified that financing can be received as loans provided by the internationally recognized banks.

11.7 I know paragraph 81 of Bashmakova's Witness Statement where she states that "*Ignatov also explained [at the meeting in January] that while negotiating on the deal with the Konk Company Ashot asked him if the City had funds to finance the construction and Ignatov answered that in general, the City's Budget had the funds, which could be used for these purposes. Nevertheless, Ignatov confirmed that he had not promised that the City would provide any similar loans for the Project*". It does not meet the information Ignatov told me while making the deal with the Konk Company (although he did it later, for example, in January, when I learnt about the raider attack).

11.8 This Witness Statement of Bashmakova shows how the Deal with the Konk Company became the first step in the raider attack. In the period of making the Deal with the Konk

Company Ignatov told me that the City had funds to invest into the Project. In practice, it had to be so, since otherwise the Shareholder Agreement of the Konk Company would lose any sense. The fact that only several weeks later Ignatov denied the availability of the funds for the City shows that the City did not intend to fulfill its obligations under the Deal with the Konk Company. Taking into account that the City announced the absence of the funds to invest into the Project, as well as it refused from the loan of Deutsche Bank I organized, and deprived me of control over the management, it becomes clear that the City had to have an investor who had been waiting for their time to come.

11.9 The Defendants made many assumptions concerning my motivation and intentions regarding the deal with the Konk Company. I have two comments about them:

11.9.1 Paragraphs 50-51 of Bashmakova's Witness Statement she is trying to explain my motifs to make the deal with the Konk Company. I do not understand why she thinks that she is competent to provide her opinion about it: she does not know how I run business and does not have grounds to state that "I was not thinking strategically or for a long-term perspective."

11.9.2 Ignatov, Bashmakova, Elena Korovina (Korovina) and others state that I did not have an intention to fulfill the conditions of the deal with the Konk Company. It is incorrect. As I said above, it was the City that did not have an intention to fulfill the conditions of the deal with the Konk Company. When I understood how the things were going, and that I had suffered a raider attack, I made some steps to defend my interests in the Project.

11.10 The Defendants refer to the letter Vitaliy sent to the President of Russia, which informed that loan to Deutsche Bank was withdrawn due to the financial crisis[71]. The default was announced for the Falmiro Company owing to the non-fulfillment of some resultant conditions. Deutsche Bank did not accelerate the loan and did not demand to pay it. However, at that time, in compliance with the Federal Law[72] adopted with regard to the financial crisis, Vneshekonombank carried out a special state program on provision of the financial aid to the companies that wanted to buy out receivables from their foreign creditors. Since we believed that if there were no financial crisis, Deutsche Bank could agree to provide extra time to settle the situation with the City, we thought it was fair to refer to this circumstance and to increase the chances to meet our request in this way. At that time nothing could be done with regard to Deutsche Bank loan and that is why I did

---

[71] R2-35.
[72] Federal Law No. 173-FZ dated 13.10.2008 *On Additional Measures for Supporting the Financial System of the Russian Federation*

not see a need to tell about the details of what had happened; moreover, Putin knew about them well. As a result, Vneshekonombank denied our request.

11.11 In the written objection under the suit, the Defendants cite a quotation from the letter sent by Mr Lapshov and Ms Pavlyuchenko, and assume that it certifies about "disastrous" state of the Project[73]. I am not sure that there are big discrepancies concerning this. By that time the Project had almost been stopped and in a bad state until new financing was provided. As the letter clarifies: "*the absence of financing made DecMos CJSC cease all payments related to...construction from August (in practice from June), including the purchase of all required materials and equipment, as well as the payment for the materials and equipment delivered and suspend design works for interiors of the facility, payment of salaries etc*". However, I could not do more about this, and all the blame for what had happened is fairly laid on the City, as I explained before.

## 12.    Participatory interests of Goloschapov and Rotenberg

12.1 The Defendants state that I, by false pretences, made Goloschapov and Rotenberg lose their participatory interests in the Project[74]. They suppose that I did the same with regard to Vitaliy Smagin, Garkusha, the City and Mr Luguev[75]. It is wrong. I did not deceive my business partners.

12.2 In the First Witness Statement of mine I already informed about my appeals to Rotenberg and Goloschapov asking for help to buy out the Deutsche Bank loan[76]. Their refusal to help surprised me, since if we had not bought out the loan and it had been sold to other persons who would afterwards have levied execution on the collateral, we would have lost our participatory interests in the Project. Along with the fact that they were free to make such a decision – now I know that there had been reached alternative agreements in order to assure their further participation, - there was nothing illegal about the deal I made with other persons concerning buying out the loan and saving my interests. This is what I implemented in the deal with the Konk Company. The City accommodated the Konk Company with the funds to buy out the loan, and I transferred my debt under the Project in compliance with the conditions specified in the agreements. I did not have obligations on the transfer of a participatory interest of the Konk Company to Rotenberg and

---

[73] R2-21.
[74] Statement of Denoro defence, ¶ 298-302
[75] Statement of Denoro defence,300
[76] First Witness Statement ¶¶ 4.13-4.15.

Goloscahpov, taking into account that they refused to invest and in practice did not make any financial investments into the Project.

12.3  That is why in the context of my deal with the Konk Company, Rotenberg and Goloschapov do not have any complains with regard to the Project. It seems that White and Case Law Firm accepted the same notion and informed Ignatov of that[77]. Anyway, it is incredible for the City not to discuss the deal with the Konk Company with Rotenberg and Goloschapov. Goloschapov was the Director at the Decorum Company and present at all numerous meetings with the City. The City was aware that he played such an active role due to his investment activity in the Project. In a similar way, according to Ignatov's statement in clause 18 of his Witness Statement, his main contact person in the DecMos Company was Pavlyuchenko (the representative of Rotenberg and Goloscahpov), that is why he, certainly, communicated with her too.

12.4  Concerning the statement that I deceived my partners:

12.4.1  Above I provided an ungrounded statement of Garkusha. In practice, he is obliged to my generosity by all what he has, and now he is criticizing me to help Kerimov.

12.4.2  I have never tried to deceive the City in any way. As I explained above and in the first Witness Statement of mine, the City was the party that violated its obligations with regard to Project financing, and made me make a deal with the Konk Company and then informed immediately that it had been done for Kerimov and that the Konk Company would be transferred to him. The only thing I did, taking into account this news, is the initiation of a legal proceeding on Cyprus with the purpose to prohibit the City to undertake the management of the Konk Company, which the City contested judicially in the Commercial Court; it was entitled to do that. However, at the same time, the City announced that the fact that I had received securing measures in the Cyprus Court a was a crime and initiated a contrived criminal case and armed raids to complete the corporate raider attack.

12.4.3  Luguev is a fraud. The Defendants refer to the content of civil suits he initiated against me in the courts of British Virgin Islands, where he states groundlessly his right for the participatory interest in Hackham Company. Luguev does not intend to ground his accusations, and his lawyers submitted an application on their release from the obligation to represent his interests, most probably because they found out all the lie of

---

[77] Ignatov's Witness Statement, ¶ 69.

his accusations. A fake letter from my lawyer from Gibson Dunn Law Firm as if it were addressed to him as the "investor" of Hotel Moskva Project, attached as a ground for the suit, proves the grade of his suit shamelessness. This letter was falsified roughly with a computer program for the optical recognition of the symbols, basing on one of pre-trial letters of Gibson Dunn Law Firm, sent to different Defendants, including Mr. Kerimov. I do not know how Luguev had been able to acquire one of these letters. If there is something interesting with regard to Luguev, that is a fact that Kerimov admits the his involvedness into negotiations and Luguev himself admits that I had never assigned him to do it. In my opinion, the level of Kerimov's awareness of Luguev's accusations speak for itself.

12.4.4 As I mentioned in the first Witness Statement of mine, the accusations of Smagin were put into the basis for the criminal suit initiated against me, and for scrapping my parliamentary immunity, which has happened only 4 times during the whole history of the Russian State Duma. Undoubtedly, it was made to press on me and for me to withdraw my suits for this and other arbitration proceedings concerning Hotel Moskva. Mr Smagin has already submitted the suit on the subject of the statements specified in his Witness Statements, that is why I do not intend to dispute with him before this Justice –Seat as well, that is why I limit my comments.

**13.    The description of the events in 2009 by the Defendants: preliminary observations**

13.1 As  far as I understand, the "Story of 2009" by the Defendants is as follows: (1) I took numerous attempts to sell my participatory interest in the Project to Mr Kerimov in 2006, 2007 and 2008. I appealed to him again in January 2009; (2) in February 2009, Mr Kerimov and I reached gentlemen's agreement but I refused from this agreement; (3) further, I deceived the City having refused from the Konk deal and having applied to the court on Cyprus to receive judicial interim measure; (4) in March I sold my participatory interest to investors from Chechnya but refused from my contract with them; (4) In April I asked the City to acquire my shares in consideration for my investment into the Project; (5) the City initiated criminal proceedings against Vitaliy due to the commitment of a "very serious" crime; (6) large –scale raider attacks by the Police towards my offices, houses of my younger brother Artem and partner Dmitriy, as well as towards the law firms representing my interests, the same as appeals to the Prosecutor's Office demanding to scrap my parliamentary immunity were an integral part and were proportionate to the nature of "serious crime" to have committed against the City; (7) in a day after the house

of my younger brother was searched I understood that only Mr Kerimov could save me from a financial collapse and that is why I met him and offered to sell my participatory interest in the Project asking about immediate completion of the deal; (8) the deal was simple, that is why the negotiations could be completed within several days and I did not need a legal support; (9) I agreed that my participatory interest was of no value and all what I was entitled for was the return of my investments by bills of exchange with the payment term in 5 and 6 years; (10) nevertheless, I persistently refused to accept these bills of exchange in return; (12) instead, I escaped from Russia and decided pursue Kerimov in court under contrived grounds, (13) after that a criminal case was initiated, I was regularly spied, a black PR campaign started with the purpose to achieve my exclusion from the USA, as well as hacker attacks for the computers of my lawyers and the members of my family, but all these did not concern Mr Kerimov at all, but it had to be organized either by me myself or by other unknown enemies.

13.2 The version of the Defendants is untrue and exaggerated.

## 14.    Meetings in January

14.1 To start with, until 2009 I did not make numerous offers to sell my participatory interest to Mr Kerimov, that is why the events of 2009 were not the continuation of these "negotiations". I did not offer to sell my participatory interest in 2006 and the description of these events by the Defendants is a complete fabrication[78]. I have already said that in 2007 my partners, Mr Goloschapov and Mr Rotenberg appealed to Mr Kerimov but I did not sell my shares. I appealed to Mr Kerimov only in 2008 but not with the purpose to sell my participatory interest but asking to assist me to acquire Falmiro loan in the light of the default caused by deliberate inactivity of the City.

14.2 I also did not appeal to Mr Kerimov with an offer to acquire my participatory interest in January 2009. I did not participate in "several meetings" with Ms Bashmakova, and the description of the events in cl.66-72 of her statement is untrue. As I said in the first statement of mine in January, Mr Kerimov called for me and the true events are described in the First statements in cl.4.20-4.29.

*Meeting at DLA.*

14.3 As I stated in the First Witness Statements of mine, I was present at the meeting in the DLA office with the purpose of discussing a procedure for levying execution under the

---

[78] First Witness Statement, ¶ 4.3

loan specified by the Konk deal. At that time I took steps to fulfill my obligations under the Konk deal[79]. However, this meeting was used to tell me about the transfer of the City's participatory interest in Konk to Mr Kerimov without my agreement and I, of course, minded it. The statement that I agreed to send the documents of Konk to Ms Bashmakova or other representatives of Mr Kerimov is untrue[80].

14.3 Ignatov denies his presence at this meeting with the lawyers of Mr Kerimov in the offices of DLA Piper[81]. He might not be present exactly when they were participating in the meeting but he was present with me at DLA Piper; he admits that himself. However, undoubtedly, I was informed that the City was going to transfer its shares in the Konk Company to Mr Kerimov and I remember that DLA asked for a permission to transfer the documents to legal advisors of Mr Kerimov and that I refused to give them. In order to prevent this transfer I gave Vitaliy an instruction to write a letter to the address of the City dated January 21, 2009 and again, on February 24 to persuade the City not to transfer its participatory interest in the Konk Company to Mr Kerimov, or to sell it to me[82]. With this regard I had preference. I sent the following letters in April and May, which I am explaining below.

   *"A meeting with participation of all parties".*

14.5 In cl.85 of her Witness Statement Ms Bashmakova says: "*The purpose of this meeting was to reach a preliminary verbal arrangement based on the principles of our participation in the Project. All who were present there, including Ashot, agreed with these principles as well as they agreed that Nafta would have to organize a detailed consideration with him, then. We agreed on the creation of a new structure, which could be implemented by particular steps.*" It is a lie. As I stated in the First Witness Statements of mine, I was called for this meeting. I expected a meeting with the participation of Mr Kerimov only, but there Mr Goloschapov, Mr Rotenberg and Mr Ignatov, as well as Ms Bashmakova were present. I was told that the City would transfer its participatory interest in the Konk Company to Mr Kerimov and that I had to do what they told me[83]. At this meeting I also learnt about dismissal of Mr Lapshov from office.

14.6 The Defendants state that my letters to the address of the City where I am persuading them

---

[79] First Witness Statement, ¶ 4.25.
[80] Bashmakova's Witness Statement, ¶ 70.
[81] Ignatov's Witness Statement ¶ 90.
[82] CE-35; CE-37
[83] First Witness Statement¶ 4.26-27.

not to sell their shares do not have any sense if I found out about secret conspiracy of the City with Mr Kerimov and about my exclusion[84]. It is wrong. They were one of the few lawful funds I used to prevent my exclusion. There was no point in the position of the City not giving a reply, after that there was a letter stating that the City could not "*connect you during a long time… to start implementation of the Shareholder Agreement*"[85]. I gave an instruction to Vitaliy to remind the City immediately that: "*Joint-Stock Group created no obstacles in any way, but there was no reply received for our numerous requests. I confirm again my wish with regard to the solution for the problems arisen and for the purposes of their solution I offer to hold a working meeting with your representatives…*"[86] After that I was immediately called for to the office of Mr Kerimov where I was dictated the conditions for further Framework Agreement.

*Dismissal of Mr Lapshov from office*

14.7   Mr Lapshov was dismissed from office behind my back and I learnt about it only at the meeting held in January, which the Defendants call "the meeting of all parties." Ms Bashmakova says that I agreed to sell my participatory interest in the Project and that is why I agreed on replacement of Mr Lapshov by a representative of Mr Kerimov. It is incorrect.

14.8   In clause 91 of his statement, Mr Ignatov is trying to explain a reason for the appointment of a new General Director. The first reason was the fact that the City learnt about the loans of Deutsche Bank only a year later after their making. It is incorrect. I explained it above. The City knew very well about Deutsche Bank financing. Mr Ignatov also says that the City wanted clearity with regard to the debts of the DecMos. The City had representatives in the Board of Directors body of DecMos, was a shareholder of the company, and according to the confirmation of Mr Ignatov in his statement, Mr Resin, a representative of the City, was present at the weekly meetings on the Project. We, at no circumstances, impeded the City to receive the information on the Project. Also there was no need to replace the General Director for this purpose.

14.9   I read the Witness Statements as well as line of defence argument of Denoro, which say about the dismissal of Mr Lapshov from office. With this regard I want to give the following comments[87]:

---

[84] Line of reasoning of Denoro defence, ¶ 442.
[85] R2-43.
[86] R2-44.
[87] Goarik Kotandzhan dated September 29, 2011 ("Kotandzhan's Witness Statement"), ¶¶ 8-16;

14.9.1 Mr Ignatov states that he made sure that MS Bashmakova did not object the appointment of Ms Kotandzhan since they were "regularly in touch"[88]. I did not participate in this communication, however, I had to participate since I was the investor of the Project but not Mr Kerimov. I did not give my consent to sell my participatory interest to Mr Kerimov. Moreover, Ms Bashmakova was not entitled to intervene into the management of DecMos.

14.9.2 Ms Bashmakova did not introduce me to Ms Kotandzhan in the office of Mr Kerimov before her appointment and I did not say the words about Mr Lapshov, which she puts into my mouth[89].

14.9.3 I did not meet Ms Pavlikova in my office in the evening on January 22, 2009 and she did not show me the Minutes of the Board of Directors signed. I did not introduce Ms Kotandzhan to a management group of DecMos on January 23, 2009[90] . This statement is knowingly false[91].

14.9.4 I did not know that Mr Lapshov had signed other documents (apart from the Minutes of the Board of Directors) but if he had done it, it had happened at similar circumstances of necessity, at which he, as he told me, signed the Minutes of Board of Directors[92].

14.10 Ms Kotandzhan makes a range of mere assertions regarding my intentions concerning the Project. She says that I told her that I "*want to leave the Project and am negotiating with Nafta and Mr Kerimov*".[93] It is untrue. I extremely rarely communicated with Ms Kotandzhan. And I, undoubtedly, did not hold "*regular meetings*" with her. As far as I know, she was an employee at Nafta and I was forced to communicate with her. I would not inform her about my "*plans for the future*" concerning the Project.

14.11 In practice, I lost the control with regard to project management when Ms Kotandzhan became the General Director. For example, I did not know that she and Mr Ilyichev (another representative of Mr Kerimov) were negotiating with Strabag in Vienne in February 2009. Ms Kotandzhan refers to a "preliminary" audit made in March 2009[94]. I

---

Bashmakova's Statement¶¶ 73-77; Irina Pavlikova's Witness Statement dated October 3, 2011 r. (Pavlikova's Witness Statement) ¶¶ 39-45.
[88] Ignatov's Witness Statement, ¶ 93.
[89] Bashmakova's Witness Statement, ¶ 76.
[90] Pavlikova's Witness Statement, ¶ 43.
[91] First Witness Statement, ¶14.28-14.30; Pavlikova's Witness Statement, ¶ 42.
[92] Pavlikova's Witness Statement, ¶ 44.
[93] Kotandzhan's Witness Statement, ¶ 31.
[94] Kotandzhan's Witness Statement, ¶ 25.

did not see it as of that time. Mr Ilyichev refers to the audit made by the company of MANE LLC with the purposes of investments into the Hotel Company[95]. The Hotel Company was founded in March 2009 and it was to own several hotels. I did not see him as of that time and did not know that my investment Project was considered for the Hotel Company. Ms Kotandzhan moved DecMos office to the same business centre where there were offices of Nafta and Kerimov. She asserts that she accelerated this process because she was afraid of working with Adam Delimkhanov (I shall explain it below). It is not true – I did not communicate with her about Mr Delimkhanov and, anyway, Mr Delimkhanov did with Mr Kerimov. According to the data provided by Kotandzhan in paragraph 37 of her Witness Statement, we did not communicate after DecMos move. I lost administrative management over the Project.

## 15      Framework Agreement

*Meeting on February, 10.*

15.1 At the time when the City was making steps to exercise its rights with regard to Konk, I was under the pressure on the part of Kerimov, for me to give my participatory interest in the Project. This pressure was during the meeting on February 10, 2009. Bashmakova says that this meeting was a simple meeting "*to discuss the Project*". It is not true.

15.2 Ms Bashmakova asserts that Mr Yusufov was present at the meeting because there was an opportunity to raise the capital by issuing further shares in DecMos, as well as because I worried that it would decrease the cost of my participatory interest[96]. In fact, the following happened: Mr Kerimov threatened that if I did not cooperate he would organize the issue of the DecMos shares through the City, which had to receive the control over Konk that would decrease the cost of my shares to zero. As I specified in the First Witness Statements of mine, I asked Mr Yusufov to be present because I needed a political counterbalance[97].

15.3 Ms Bashmakova says: "*However, we worried that Ashot continued introducing the amendments into the investment structure agreed upon and that our attempts to reach the detailed agreement would not get ahead due to his vague negotiating style which had always believed to be difficult and tiresome.*" It is untrue, and anyway, they were not negotiations.

---

[95] Alexander Ilyichev's Witness Statement dated October 2, 2011("Ilyichev's Witness Statement"). ¶ 65
[96] Bashmakova's Witness Statement, ¶ 92.
[97] First Witness Statement ¶4.30.

15.4 I did not make any proposals during the meeting in February. I did not offer the partnership on the equal basis (50/50), and I insist that these conditions were dictated to me. The Defendants ask why it took 4 months to complete the deal, while in the course of this "meeting" there was an "agreement" to complete the deal within 10 days. It took 4 months to complete the "deal" because I was trying to escape it in all possible ways. The question must be asked in a different way: if I was happy to negotiate with Mr Kerimov and sold him my participatory interest voluntarily, why did it take 4 months to complete the "deal", why did I appeal to police and mass–media during that time with several declarations of the raid on the part of Mr Kerimov?

*Meeting on February 17*

15.5 The Defendants notice three main points with regard to that meeting: (1) it continued the meeting dated February 10; (2) Mr Kerimov offered me to bring my lawyer with me to the meeting; as well as (3) since I brought my lawyer to the meeting, this meeting cannot be called voluntary[98]. It is incorrect: (1) I was called for this meeting; (2) I brought the lawyer because I wanted to have a kind of protection from Mr Kerimov but not because Mr Kerimov advised me to do that; (3) the conditions themselves which were dictated to me, demonstrate the fact that I was forced to agree with them against my will.

15.6 The Defendants also assert that since there were some amendments allowed, during that meeting there were held open negotiations. There were no open negotiations held. I introduced some amendments allowed by Mr Kerimov. And Mr Kerimov insisted on a complete approval and signature of the Framework Agreement on that day during my presence there.

15.7 Bashmakova states that Ms Ries was skeptic about signing the document by me because there are restrictions for the Duma Members related to running business projects[99]. It is not true due to the reasons I specified above. And if this statement was true it would also refer to Mr Kerimov who was the Russian Senate Member. Ms Korovina asserts that she explained Ms Ries that *"the Framework Agreement was a private instrument which could not be used as a basis for enacting the required legal documentation"*[100]. I do not know what she means by "a private instrument". Mr Kerimov insisted on its signature and we

---

[98] Bashmakova's Witness Statement, ¶¶ 96-104; The line of reasoning of Denoro defence, ¶¶ 347-348
[99] Bashmakova's Witness Statement, ¶ 100
[100] Elena Korovina's Witness Statement dated October 3, 2011 г. ("Korovina's Witness Statement"), ¶ 32.

signed it this way. As I told in the First Witness Statements of mine, I did it against my lawyer's advice[101].

15.8 Ms Korovina in clause 31 is trying to describe this meeting as an ordinary business meeting with food and drinks. It is not true. I was under extreme pressure to refuse from my participatory interest in the Project and I knew that I would have nothing in return.

15.9 The conditions of the Framework Agreement were enslaving. I understand that the Defendants assert that I was giving away only 25.5% of the participatory interest in the Project and reserved 25.5%[102]. It is not true. There was a structural diagram attached to the Framework Agreement (Annex 1) describing "current ownership right" with regard to the Project.It demonstrates that I owned only 25% of the Project and that Mr Rotenberg and Mr Goloschapov (through his spouse, Ms Gilutdinova) owned 25.5% of the Project. That is why, having given away 25.5%, I gave away my participatory interest in the Project completely, and Mr Rotenberg and Mr Goloschapov remained shareholders with Mr Kerimov.

15.10 I understand that the Defendants also assert that because Mr Kerimov agreed that in the future I would be able to acquire my participatory interest back, it meant that the Agreement could not be enslaving. They also assert that if Mr Kerimov wanted to deprive me of my participatory interest there would not be a need for Framework Agreement or for any other agreement[103] . It is not true. I explained that the corporate raider attacks can be quite elegant, and to instill them with a legal aspect the agreements are signed. The addition of a vague clause that in the future I shall be entitled to acquire a participatory interest is one more example of the fact that the raider is trying to protect himself if the person with respect to whom a raider attack was used, takes legal actions in order to recover his/her participatory interest (what I am trying to do now). Meanwhile, the raider transfers the assets captured in favour of second or third parties, creating in this way the obstacles for their return (that is what Mr Kerimov has done).

15.11 I read Annexes R2-41 and IP-3, representing electronic correspondence between Ms Pavlikova and Ms Ries. As I stated in the First Witness Statements of mine, Mr Kerimov was trying to implement the Framework Agreement and to send further agreements to sign[104]. Although I did not want to come into a deal with Kerimov, taking into account

---

[101] First Witness Statement, 4.34
[102] Line of reasoning of Denoro defence , ¶ 355
[103] Line of reasoning of Denoro defence , ¶ 357.
[104] First statement, ¶ 4.35.

his threats I allowed Ms Ries to gain time while I was looking for the ways to counteract the deprival of my participatory interest in the Project.

**16      Relations of Mr. Kerimov with Adam Delimkhanov**

16.1    Witnesses for the Defendants (Bashmakova, Kotandzan, Gadzhiev, Korovina, Pavlikova and Ilyichev) incorrectly presented the events that took place in March - April. I explained in my first statement (paragraph 4.37) that Ruslan Baysarov, a representative of Ramzan Kadyrov, the President of Chechnya, addressed me in relation to the possibility of investing in the Project. It happened at the end of February 2009. They offered to provide assistance in relation to the financing of the Project and to help with the solution of problems with the City. Next, I met with Adam Delimkhanov (hereinafter "Delimkhanov") and we flew to Chechnya to meet with Ramzan Kadyrov, the President of Chechnya, to discuss this proposal. Pavel Krotov ("Krotov") lies when he claims that Mr. Delimkhanov is my "partner"[105]. As for the trip to Syria, according to Mr. Krotov, its aim was to search for other investors. It is not true. The trip to Syria was associated with a program of political and cultural exchange, and although I naturally discussed the Project with Delimkhanov during the trip, in itself it had nothing to do with the Project, and we did not meet, and were not going to meet with some mythical investors in Syria.

16.2    I cautiously reacted to the proposal, in view of the reputation of President Kadyrov. However, I hoped that his political influence could help me in the prevention of forced seizure of my share by Mr. Kerimov. I was in a very difficult situation and sought help.

16.3    Mr. Delimkhanov advised me to restore control over the Project, appointing new members of the Board of Directors. As noted, Ms. Kotandzan displaced me from management discussions. I agreed to do it and, in March 2009, I sent a notice stating the names of my candidates for the Board of Directors.[106] Although I was not personally acquainted with the candidates, I realized that they were persons close to Mr. Delimkhanov and Mr. Kadyrov. I agreed to propose these persons for the candidates of the Board of Directors at the request of Delimkhanov as a sign of goodwill, although I knew that I could withdraw them at any time, if Kadyrov did not fulfill his promises. That exactly happened.

16.4    I was not present at the meetings in April. Mr. Delimkhanov told me that he had met Mr.

---

[105] Statement of Krotov, ¶ 16.
[106] R2-53; R2-54.

Kerimov at the President Hotel in Bolshaya Yakimanka Street; however, I was not aware of any meetings between them in the offices of Mr. Kerimov. I was not present at these meetings. I recall that the meeting was held in the office of the law firm Lovells in April 2009, but once again, these events occurred not so, as they are described by witnesses for the Defendants. And, although I don't remember all of the participants of this meeting, Mr. Delimkhanov was not present at it.

16.5    The Defendants assert that they received the draft agreement just before the meeting with Lovells. I gave instructions to Lovells to prepare an agreement to which the new investor could join the Project on the terms acceptable for me. Thus, I tried to defend my position in a legal way. As I said, I used every opportunity that would have prevented the seizure of my share in favour of Mr. Kerimov. I don't remember, whether the draft agreement, which Ms. Pavlikova includes under number IP-5, is precisely this agreement. I was under great pressure then and, ultimately, this agreement was replaced by more important events. I do not understand, what witnesses for the Defendants want to say about the meaning and purpose of the document. Ms. Bashmakova asserts that she received "a draft of main terms and conditions of the transaction" from Mr. Melkumov (ostensibly to specify how Kadyrov and Delimkhanov were going to invest in the Project), and that she gave it to Ms. Pavlikova for consideration.[107] Ms. Pavlikova describes this document as "a draft agreement", which (as she says) was the revision of the Framework agreement.[108] This contract was neither draft nor revision. If it had been a proposal in relation to a trilateral investment between Kadyrov, Kerimov and me, it would have been referred to the three shareholders, and it refers only to the two. Also it cannot be called "main conditions of the transaction" between Mr. Kadyrov and Mr. Kerimov, as, thus, the document would not assign a part to me. And, thus, it would not be necessary to attract my lawyers. And also, this document was not a "revision" of the Framework agreement, but a completely different document under completely different conditions with equal rights for both parties.

16.6    When describing the events of March – April 2009, the Defendants deliberately confuse and mislead, because they try to disguise what actually happened. Namely, that, as it became later known to me, Mr. Kerimov himself arranged the entire affair with Chechens as a way of my removal from the Project. Moreover, Mr. Kerimov eventually said to me himself, that it had been organized by him. First, I did not believe him,

---

[107] Statement of Bashmakova, ¶ 112.
[108] Statement of Pavlikova, ¶ 59.

because it sounded highly implausible. But, when in April 2009, the City sent a letter to the General Prosecutor's office with a request for investigation of my actions, I realized that, obviously, Kadyrov and Delimkhanov had not helped in the relationship with the City.[109] Approximately at the same time, I also learned that Delimkhanov and Ruslan Baysarov worked with Mr. Kerimov on removal of Sibir Energy from Shalva Chigirinsky.

16.7    After learning about the facts, I immediately withdrew from the negotiations with Chechens, took off the powers from their candidates and proposed other candidates to the Board of Directors of DecMos.[110] Meanwhile, the City proposed a list of its own candidates, who were mainly employees of Mr. Kerimov (despite the fact that the witnesses for the Defendants assert that Mr. Kerimov at that time did not have a share in the Project).[111] This action was explicit continuation of the raider attack.

16.8    The Defendants assert that I couldn't be under pressure from the side of the City, when I tried to "overthrow" DecMos Board of Directors.[112] It is not true. My attempt to call a shareholders' meeting and replace the Board of Directors was yet another desperate step I took in order to prevent the loss of the Project. I did everything I could to achieve this goal.

16.9    Ignatov and Kotandzan said that I had illegally prevented the City and the Accounts Committee in attendance of the shareholders' meeting of DecMos, which was held on June 3, 2009 and was convened for the election of DecMos Board of Directors.[113] It is not true, and I have already outlined the events in my first witness statement.[114] I would like to note that although we decided to hold the meeting in the absence of the City, nevertheless, we appointed two of the five proposed candidates, i.e. Mr. Resin and Mr. Ignatov, which was in proportion to their shares in the Project. Therefore any overturn is out of the question. Kotandzan asserts that on June 23, 2009 another meeting was convened, and Resin, Ignatov, Goloshchapov, she and Pavlikova were elected in the Board of Directors.  Pavlikova is a representative of Kerimov, and it turns out that any of my representatives were not appointed in the Board. As far as I remember, we didn't even get a notification about the meeting. This is yet another proof that Kerimov already

---

[109] CE-90.
[110] R2-56.
[111] CE-109.
[112] Statement of Denoro defence, ¶¶ 449 and 452.
[113] Statement of Kotandzan, ¶¶ 42-44; Statement of Ignatov, ¶ 98.
[114] First statement, ¶4.42

had full control over the Project.

**17.    Proposal to the City**

17.1    As the pressure was increasing, in April – May 2009, I tried again to redeem the share of the City in Konk. I also offered to withdraw from the Project for financial reimbursement of the amounts, invested by me, in accordance with the proposal of the City in May 2008, in its letter "of termination". I made that proposal, because I saw that as a result of the final phase of the raider attack I had nothing left.[115] The Defendants assert that it is contrary to my position. However, by that time, taking into consideration pressure and threats, under which I was, I would accept financial compensation in the amount of 250 million US dollars, despite the fact that this amount was much lower than the value of my share and even my real expenses for the Project. It does not contradict the fact of being in the epicenter of the corporate raider attack, and on the contrary reflects simple factual reality. Lack of accusations against the City in the letters also does not contradict my position; after all, it would eliminate all chances of getting a constructive response. I pushed my claim after a while in my complaints to law enforcement authorities, when the raider attack was already approaching to its completion.[116]

17.2    The Defendants assert that the events, which happened in June, were just what I had asked in my letter to the City.[117] It is not true. In June (as I explained in my First statement and in my comments below), Mr. Kerimov did not intend to pay me anything for my share in the Project.

**18.    Increasing of pressure**

18.1    As I indicated in paragraphs 4.36-4.50 of my First witness statement, in May and in June 2009, the pressure upon me significantly increased: (1) the City initiated a trial in May 2009; (2) the City initiated a criminal case in June 2009; (3) armed raider attacks were conducted in the offices and homes of my relatives and partners, as well as in the offices of my lawyers; and (4) Mr. Luzhkov requested for my parliamentary immunity to be scrapped. The Defendants assert that these actions did not pursue the goals of putting pressure upon me. It is not true.

---

[115] CE-40; R2-58.
[116] CE-41; CE-112.
[117] Statement of Denoro defence, ¶ 426.8.

18.2   As I stated in my First witness statement, in light of the growing pressure, I gave instruction to Vitaly to prepare a letter addressed to the Chairman of the Investigative Committee of Russia.[118] The Defendants assert that the letter was sent in connection with the fact that he knew that a criminal case would be opened against him. It is not true. Although we knew that Kerimov and the City threatened to imprison all of us, we wanted to draw attention of the law-enforcement authorities to the real situation, hoping that they would investigate it. This letter was a call for help.

18.3   The Defendants also assert that the criminal case, opened on the initiative of the City, was the consequence of the Cyprus court solution on the application of the security measures. It is not true. As I assert in my statement, Mr. Kerimov said to me that the case had been initiated by him and the City to put pressure upon me and force me to refuse my share in the Project. He said that if I did not refuse, my situation would further deteriorate. Afterwards I reported about this talk to the Russian authorities. In addition, the City knew well that I didn't try to take its funds fraudulently – as just 10 days before the City initiated a criminal case, my layers wrote a letter addressed to the City with a proposal to buy shares of the City in Konk and to repay debt.[119] A few weeks before that, I also (through my lawyers) wrote a letter to the City with a proposal to sell my shares in return for payment of the debt on the Project, which I gave in favour of Konk.[120] These actions were not the actions of the person, who tried to cheat and hide from the City. I asked the City for help. In response, the City initiated the criminal case.

18.4   The Defendants hint that I falsified my letter dated June 8, 2009 addressed to Rashid Nurgaliev (Ministry of Internal Affairs of Russia) for the purposes of these arbitration proceedings. I deny this accusation. I prepared and sent this letter exactly then, that is confirmed by the article, which was published in Novaya Gazeta in the same period, i.e. June 17, 2009.[121]

18.5   As for intensive raider attacks and interrogations that took place between 16-25 June 2009, the Defendants assert that these raider attacks correspond to a committed "very serious" crime. I have already described that this accusation was fabricated. Moreover, the power and scale of the raid (which I described in my first statement) were extraordinary and previously applied only in such situations as the Yukos affair. There is

---

[118] CE-41.
[119] R2-58.
[120] CE-40.
[121] CE-112.

48

no doubt that they were organized with the purpose to put pressure upon me.

18.6   Once the criminal case and police raids started, I realized that I would have to give Mr. Kerimov everything he wanted. That time was very difficult for me. It's difficult to describe, what a depressing feeling is experienced by a person, who has spent years for development of the project, which he is then forced to give away for free. But even more difficult is the realization that no one can help me. Mr. Kerimov knew it and fully took advantage of this situation.

**19.    Events from June 25, 2009 to June 29, 2009.**

19.1   The version of the Defendants concerning the events taking place in June cannot be more distant from the truth. As I explain below: (1) the witness statement of Krotov concerning how the "meetings" in June were held is false; (2) the statements of Gadzhiev and Pavlikova concerning the "meeting" on June 25, 2009 are false; (3) the statement of Pavlikova that she carried out "negotiations" during the "meeting" in Moscow, is not only false, but also represents an attempt to underestimate the role of Kerimov in these events; (4) the statement of Ilyichev regarding how much I was supposed to be "paid" is misleading.

19.2   The context of the meeting in June corresponds to my description above (i.e. criminal case, raider attacks, my letter of June, etc). Therefore, when Krotov asserts that I asked him to address to Kerimov on my behalf or to act as my "intermediary", because I was too embarrassed to do it myself due to the fact that I had not fulfilled promises, given to Kerimov or because I thought that with participation of Kerimov "*my serious financial problems with the Project would be resolved*", he is obviously lying.[122]

19.3   The assumption of the Defendants that my motivation for granting consent to transactions in June 2009 was that I risked to lose my share participation in the Project, which was of no value, and that I had very little chance to recover my investments, is false. The risk that I could lose my share participation in the Project was created by Kerimov. It was the whole purpose of the raider attack, which was planned by him and the City. If they had not acted illegally and - in the case of the City - in violation of previous agreements, the Project would have been successfully completed. My shares had (and have) a great value. There was no "transaction" with Kerimov. He was not going to pay me for my share participation in the Project.

---

[122] Witness statement of Pavel Krotov dated September 30, 2011 ("Statement of Krotov"), ¶¶ 9-12.

19.4    I described in my First witness statement how Krotov and Gadzhiev accompanied me to the office of Kerimov. The statements of Gadzhiev and Krotov in this respect are false. I give the following further observations in respect of their witness statements:

19.4.1 I first met Krotov in May 2009, but not in 2007, and I was introduced to him by Delimkhanov, rather than Andrey Melkumov. Delimkhanov introduced Krotov to me as his "assistant". I don't think that Melkumov and Krotov were acquainted with each other to that moment.[123]

19.4.2 Krotov is a representative of Delimkhanov. It was clear that his role in June was to make sure that I (and later, when he went to Cyprus, my partners) acted in accordance with instructions, given to us. I hardly knew Krotov, and although he claims that I addressed to him to find access to my "close friend" Kerimov, I did not seek such assistance, on the contrary, I tried in every way to get rid of Kerimov, whereof I said out loud in my complaints to the law-enforcement authorities and the media.

19.4.3 I did not ask Krotov to lend me money for the Project.

19.4.4 I did not meet with Krotov in the State Duma on June 25, 2009. [124] Krotov took me away from the World Class Sports centre in Zhukovka and took me first to the State Duma, and then to the office of Kerimov.

19.4.5 I did not agree to pay Krotov 10 million US dollars for him to act as my intermediary. I saw the "receipt", which Krotov attaches to his statement in proof of this.[125] Delimkhanov gave me an instruction to sign it without any explanation, and I signed it without questions, as by this time I was afraid for my life.

19.4.6 The witness statement of Krotov in paragraph 49 is entirely false. I did not tell him that Kerimov and I were "again close friends". Kerimov did not pay me any money to pay to Krotov.

19.4.7 I did not ask Krotov to pay Vitaly 30,000 euros, and Krotov did not pay the money out of his own pockets. It was paid by Kerimov at my request, because I told him that Vitaly had no money to pay his expenses on the Cyprus trip.

---

[123] Statement of Krotov, ¶ 6.
[124] Statement of Krotov, ¶ 17.
[125] Statement of Krotov, ¶ 12.

19.4.8 I was not "satisfied" by the proposal of Pavlikova for Krotov to be my representative in the case of debt bills of Blidensol, which remained in Moscow by Kerimov. [126] I had no choice in this matter. Kerimov wanted to have full control over the process of endorsement of bills by appointing his own representative. It also shows that at that time Krotov represented Kerimov, but not me.

19.5 Once again, the events of June 25 happened exactly, as they were mentioned in my first witness statement, and not, as they are described by Gadzhiev, Krotov and Pavlikova. Their accusations are too numerous to answer them all here, but I will express a few key points. I did not "embraced" Kerimov, when I saw him.[127] I did not apologize to Kerimov for "deceiving" him, and I did not say that only Kerimov could help me. [128] The assumption that Kerimov "*granted to his advisers from Nafta freedom to make decisions regarding whether the* [Project] *was a good investment or not*" [129], is false and is nothing but Kerimov's attempt to distance himself from illegal actions, that he did in respect of me.

19.6 The "meeting" in the offices of Kerimov that day was not divided into the meeting in the afternoon and the meeting "after dinner". It was a 12-hour session, and I was not allowed to leave. Pavlikova says that she "outlined" me "in general terms" "the conditions" of sale.[130] It is not true. Kerimov dictated me the conditions, and I described what he had said in my First witness statement in paragraphs 4.55-4.59.

19.7 As I mentioned in my First statement, Kerimov (not Pavlikova) told me to return the next day and to organize collection and transfer of all documents. I followed these instructions and said to Artem, Dmitriy and Vladimir Zaitsev ("Zaitsev") to do it. Zaitsev was the former Deputy Director of DecMos. The statements of the Defendants suggest that we (namely, Kerimov, me, Krotov, Artem, Dmitriy, etc) all together in the same room negotiated and discussed the transaction. It is not true. When Dmitriy, Artem and Zaitsev came to transfer the documents, I did not see them, and they were in a separate room. Kerimov's lawyers verified all the submitted documents with them. They had no discussions. I was in a separate room with Kerimov, Krotov and Gadzhiev. Kerimov gave me instructions, such as ensuring the presence of Vitaly (who was in

---

[126] Statement of Pavlikova, ¶ 76.
[127] Statement of Gadzhiev, ¶ 23.
[128] Statement of Krotov, ¶ 23.
[129] Witness statement of Magomed Gadzhiev dated October 3, 2011 ("Statement of Gadzhiev") ¶ 28
[130] Statement of Pavlikova, ¶ 67.

Georgia due to the criminal case, instituted against him by the City) in Cyprus for signing of documents with the purpose of implementation of the transfer. Once again, after a long day Kerimov said to me when I could go home and had to return the next day.

19.8    I invested a substantial amount of money in the Project through my companies within a period of almost 6 years. Therefore, it was necessary to collect and transmit a large number of documents. Some documents were missing, and thus I was instructed to return the next day to arrange for the missing documents to be brought. Once again, I followed the instructions and I think that Dmitriy and Zaitsev returned the next day with missing documents.

19.9    Ilyichev and Pavlikova say that that day there was a discussion of the price. As I stated repeatedly, "negotiations" of any kind did not happen at these "meetings". However, in respect of indebtedness Kerimov was interested to make sure it was documented, because he wanted to ensure that I did not have any legal claims to the Project. In this respect, his lawyers spent a lot of time checking documentation.

19.10    The description of Ilyichev regarding the "negotiations" on the "price" in paragraphs 37-38 of his statement is false. The only "discussions" on this issue were held with Kerimov, which I described in my First witness statement in paragraph 4.59. I also enclosed a written promise of Kerimov "by Tuesday in return of the received bills, they will have given our companies for 253 million dollars".[131]

19.11    I give the following additional comments on the witness statements of Ilyichev and Pavlikova:

19.11.1    Pavlikova did not explain that Denoro would become the owner of shares or even the counterparty to the transaction.[132] I was not told such details. Kerimov said simply that my representatives would have to sign what they would be given.

19.11.2    As Pavlikova specifies in paragraph 74 of her Witness statement, the original project documents, including bills, were transferred to the lawyers of Kerimov before signing of the transaction documents. In my practice I do not transfer the original documents before signing of the agreements, and this, in my opinion, shows that the events of June were not normal commercial negotiations.

---

[131] CE-96.
[132] Statement of Pavlikova, ¶ 73.

52

19.11.3     We did not review any documents in Moscow, and Dmitriy and Artem are not my "team".[133] I have already explained the nature of our relationship; they were my representatives acting on my instructions. They did not have any independent functions in relation to the Project.

19.12    The agreements were signed in Cyprus on June 29, 2009. I know that the Defendants say that I did not want to go to Cyprus, because I did not want for anybody to see that I carried out commercial activities. It is false. I did not go to Cyprus, as Kerimov demanded my presence in his office so that he could ensure the completion of the transfer, and ensure that I was not trying to frustrate it.

**20.    Agreements of Longlake/Kamenz from November 2009 and Agreements of Blidensol from January 2010**

20.1    The Defendants describe the agreements signed in 2009 and 2010 (which arose from the events of June 2009) as issues relating to the period "after the completion" of the transaction. It is a wrong description. In June there was no meeting devoted to the "completion" of the transaction. It was found that one of the loans, which was originally granted in June 2009 by my company Hackham, was granted to my other company Longlake. MRH Law is a registered shareholder of Longlake, and I am its final beneficial owner. Thus, it was necessary to conclude a new agreement. This new agreement was signed in July 2009. Some time after the lawyers of Kerimov wanted again to amend the agreement and, accordingly, in November 2009, an alternate agreement was signed.

20.2    Dmitriy oversaw the signing of these agreements. As in June, I asked him to ensure that everything was handed over to Kerimov. I do not want to risk a new confrontation with Kerimov.

20.3    The Defendants assert that they found a mistake in the loan at the time of their due diligence at Europark.[134]  Pavlikova also says in paragraph 96: "*Ashot admitted that he had lied to us.*" This is not true. The events of June 2009 were so rapid that it was not possible for us to check something for ourselves, so I am not surprised that the mistake was made.

20.4    Further agreements were signed in 2010, and in them I gave up my rights to certain

---

[133] Statement of Pavlikova, ¶ 79
[134] Statement of Korovina, ¶ 67.

payments due in connection with Strabag. These were my investments, which I could not confirm to Kerimov in June 2009, because I did not have the original documents. Kerimov did not agree to apply these debts to the documents, which were signed in June 2009. I can only assume that Kerimov was not troubled by the debts, which were not documented, because the risk of legal action against DecMos was very low. However, in January 2010 Kerimov wanted for this investment to be transferred by assignment, most likely, because he later decided that he did not want to assume any risks associated with the fact that I had the right to take legal steps against DecMos.

20.5    As far as I understand, the Defendants criticize me, that I did not consider this issue in detail in my First witness statement, and suggest that these later agreements confirm that what happened in June 2009 was legal. I don't understand it. Agreements from November 2009 and January 2010 were associated with the events of June 2009 and served only as a formality for implementation of what was demanded by Kerimov at the time (i.e. my share in the Project). As in June 2009, I had no choice but to agree on signing of these later agreements. In addition, in the same periods I was constantly "reminded" of my dependent position: in November 2009 Vitaly was announced wanted, despite Kerimov's promises to close the case, Delimkhanov and Krotov were sent to me with the requirements on the return of imaginary "debts", and in January 2010 unknown persons called me on the phone with threats "to leave the Moskva Hotel" otherwise "they will cut off the head of me and my children". The fact of one of these threats was recorded on film in the State Duma and confirmed by the conclusions of the forensic examination.

## 21.    Bills

21.1    The Defendants make a number of statements on Bills of Kamenz. They say that these bills were "valuable"; (2) that they were guaranteed by the Investbank; (3) that the Investbank had the guarantee of Wandle Holdings Limited in respect of its shares in Polyus Gold (which, apparently, made these bills more valuable to me); (3) the Defendants were constantly trying to give these notes, but I always refused to accept them, because I didn't want my creditors to know about them.

21.2    As I said, Kerimov wanted to take my share in the Project free of charge. In the last desperate attempt to get some form of protection we demanded that the bills were guaranteed. As far as I knew, no actions were taken in this respect: for example, I didn't know, whether the guarantor had been found, I did not know, who was contacted about

this, I was not asked to sign any agreements with the guarantor to document my rights in respect of the guarantee. This was not a surprise to me – I always knew that Kerimov did not intend to pay me, so I made no attempts to apply for a guarantee.

21.3    It is not true that the Defendants tried to hand me the bills. Before I go into the specific issues of the witness statements, I must make a general comment: if what happened in June 2009 had been "a normal commercial transaction", bills would have been given at the same time, when agreements were signed. The assumption of the Defendants that I somehow made the change in "the transaction" "at the last minute", asking for the guarantee, is hypocritical. "The transaction" itself was made at the last minute and very swiftly. If Kerimov had intended to pay me, the transaction would have been postponed for a few days to find a guarantor and then to deliver the guaranteed bills at the meeting, dedicated to the "completion", that is, the transaction would have been carried out as "normal business transactions" are usually carried out. As regards the specific accusations of the Defendants on this issue:

21.3.1    I did not speak with Ilyichev "*soon after the completion... about time and order a transfer of the bills*".[135]

21.3.2    Ilyichev says he was not worried about the delivery of the bills, because "*relations between Kerimov and me were very good*".[136] That is not true.

21.3.3    I did not take part in any discussions, alleged by Pavlikova in paragraphs 97-99 of her statement. Ms. Pavlikova refers to "the agreement of bailment", which, according to her, was offered to me. I don't know what an agreement of bailment it is, and Ms. Pavlikova definitely did not offer me any such agreement.

21.3.4    Korovina says that I impeded their attempts to document my refusal of acceptance of the bills.[137] It's not true.

## 22.    Visits to ICE

22.1    Captain Allen Weaver ("Captain Weaver") gives a detailed description of what I ate and drank during my visit to Kerimov's yacht, ICE. He does not give any explanation for what purpose I was there. However, he tries to describe my behaviour during this visit.

---

[135] Statement of Ilyichev, ¶ 44.
[136] Statement of Ilyichev, ¶ 45.
[137] Statement of Korovina, ¶ 75.

Before I get on to a false description of my behaviour, I would like to correct one very important point, which is noted by Captain Weaver in paragraph 44 of his statement. I understand less than 50% of what I hear in English, and I cannot speak English without an interpreter. I don't know, why Captain Weaver thinks I can speak English well. I can only assume that he takes me for someone else. His description of my behaviour, contained in paragraphs 44-50, is wrong. I did not try to "take control' or provide guidance, or "demand" alcohol. I do not remember speaking with Captain Weaver and so I am surprised that he could say that I "*was a man who was used to always get his way*".[138]    In addition, Captain Weaver writes with confidence that I was not at the football match. This is not so. The match was held between teams of the yacht of Kerimov and the yacht of Roman Abramovich, who was also at the match. I vividly remember that the captain himself played in the team, and that Kerimov hired to play professional players from the local football team, posing them as crew members of his yacht. I got to know it from Kerimov, who then bragged about how he had deceived Abramovich.

22.2   I have already explained the reason for my trip on ICE in my First witness statement in paragraphs 5.2-5.4. As for my first trip, I did not "join" Kerimov, as Gadzhiev suggests. I was summoned. I still tried to get back my share in the Project, and that is why I did what Kerimov told me and I did not want to generate enmity with him. In addition, a continuing investigation of the criminal case was still hanging over my head, at the same time as I thought that I had already exhausted all the opportunities for exerting real resistance to his harassment.

**23.    Europark**

23.1   The Defendants suggest that the events about Europark were "normal" negotiations. It is stated that I addressed to Kerimov and asked him for assistance on repayment of loans associated with the company, but Kerimov ultimately made a decision against investments in connection with the conflict with Smagin. The correct version of the events is presented below.

23.2   As I have already explained, I invested in the Project 100 million US dollars through the loan from Deutsche Bank (although the actual borrower was Tudor Investment Fund ("Tudor")), which was granted to my company Blidensol.

---

[138] Waiver, ¶ 48.

23.3    During my third visit to ICE Kerimov told me that at some point in 2009, when he tried to undertake a raider attack on my share in the Project, he appealed to Tudor without informing me about this, and tried to get the right to the loan of Blidensol. He obviously tried to use this as a lever to force me to leave the Project. He said to me that now he wanted Europark as well. I asked Kerimov to leave Europark alone, but my request was left without attention.

23.4    In July 2009 Kerimov's employees presented to us the already signed agreement between Destland (Tudor Fund company) and Limwall Limited (Kerimov's company), which essentially removed me from the Loan and Europark.[139] Not to answer Kerimov with a direct refusal, we presented another draft agreement, which suited our interests more, with the hope to delay time. At that moment he did not take further action because Tudor demanded repayment of the loan of Blidensol in hard cash, which he did not want to do.

23.5    The assertion of Ilyichev, contained in paragraph 54 of his statement, that I convinced Kerimov to place 50 million US dollars on the account in Deutsche Bank so that I could show Tudor Fund that I had the means to repay the loan, is fiction. I suppose that if Kerimov did it, he did it only for himself to implement his own plans for Europark.

**24.    Luguyev**

24.1    In the beginning of 2010, Luguyev appealed to me and offered to help to lobby my interests at the Moskva Hotel from Prime Minister Vladimir Putin. Luguyev said that for this it is necessary to give him a document that would prove his involvement in the Project. So I agreed to make up a declaration for him that he was the beneficial owner of Hackham and canceled it at once. Luguyev never had a property right in Hackham and he never invested anything in it.[140] Then it turned out that he did not have a real possibility to solve the issue with Putin, and I stopped a relationship with him. As for the claim that he recently filed against BVI, I commented it in paragraph 12.4.3 above.

**25.    Concluding comments**

25.1    In paragraphs 64-65 of his statement Ilyichev asserts that I made "very optimistic assumptions" about the cost of the Project. He includes a brief description of estimates, which, according to him, were prepared for the Loan of Sberbank, which state the value

---

[139] CE-150.
[140] EK-10;CE-192.

of the Project of 12.7 million US dollars and 97.5 million US dollars.[141] Along with this the author of the description is not defined, and the estimates are not included, which deprives this document any value. Moreover, it has no meaning. The Sberbank loan (which was not approved by the City) was 600 million US dollars, and Sberbank would never give such amount of the loan for the project, which is estimated 2-16% of the loan. As for the estimates in March 2009, I did not see them at the time, but I note that they were prepared for the purposes of Hotel Company (in which Kerimov and the City were partners), and not for an independent third party.

25.2    Witnesses for the defendants made numerous statements, commenting on my style of conducting of business. For example, Bashmakova says that I had "*an undefined method of negotiation, which always was very hard and exhausting*"[142], Kotandzan says that I "was known for my inclination to absurd statements"[143], Krotov says that I "was a conflicting person and was apt to frequently change my opinion…"[144] Taking into consideration how little I interacted with these people, I do not think that they are able to make such comments.

25.3    I have already described in my First witness statement numerous threats, measures of intimidation and harassment, which Kerimov continues in respect of me and my family to make me withdraw my claim, such as an undisguised surveillance, unleashing a PR campaign to encourage the US authorities to return me to Russia, hacking into computers of my lawyers and my relatives, etc. I understand that the Tribunal has no opportunity to investigate these events in full in the framework of this arbitration dispute. So, I will not describe in detail here all the new cases of persecution that continue to this day.

---

[141] AI-8.
[142] Statement of Bashmakova, ¶ 94.
[143] Statement of Kotandzan, ¶ 33.
[144] Statement of Krotov, ¶ 47,

The facts contained in this statement are true to the best of my knowledge and according to my opinion.

Signed: /signature/

Date: 17.02.2012