Michael S. Adler, SBN 190119
    madler@ta-llp.com
Joel M. Tantalo, SBN 206096
    jtantalo@ta-llp.com
**TANTALO & ADLER LLP**
1901 Avenue of the Stars, Ste. 1000
Los Angeles, CA 90067

Telephone:  (310) 734-8695
Fax:        (310) 734-8696

Attorneys for Respondent
Ashot Yegiazaryan

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VITALY IVANOVICH SMAGIN<br><br>Petitioner,<br><br>v.<br><br>ASHOT YEGIAZARYAN,<br><br>Respondent. | **CASE NO. 14-cv-09764-R (PLAx)**<br><br>Before the Honorable Manuel L. Real<br>United State District Judge<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing Place:** Courtroom 8<br>**Hearing Date:** March 21, 2015<br>**Hearing Time:** 10:00 a.m. |

**P & As in Opposition to Motion for Summary Judgement**

# Table of Contents

I.    INTRODUCTION ........................................................................... 1

II.    FACTUAL BACKGROUND ........................................................... 3

    A.    Mr. Yegiazaryan's Background And the Russian Asset Freeze ............. 3

        1.    Mr. Yegiazaryan Was a Legislator in Russia Between 1999 and 2011 Who Fell Out of Favor with the Regime, Particularly After Disputes With Connected Individuals Trying to Strip Mr. Yegiazaryan of His Property. ......................... 3

        2.    Mr. Yegiazaryan Escaped Russia in the Face of Death Threats. ............................................................................. 4

        3.    After He Continued to Object to the Loss of his Investment, Corrupt Officials on the U.S. Sanctions List Sought Mr. Yegiazaryan's Arrest. ........................................................ 4

        4.    Mr. Smagin Has Already Secured an Asset Freeze In Russia That Would More Than Satisfy the Arbitration Award. ............... 6

    B.    The Disputed Agreement Does Not Provide for Arbitration of this Matter. ......................................................................... 7

        1.    Litigation of the Dispute Started With Two Agreements That Do Not Include Mr. Yegiazaryan as a Party. ...................... 7

        2.    Disputes Arose Relating to Those Agreements After The Escrow Agreement Expired Which Contemplated Arbitration Against Kalken. ................................................................ 8

        3.    The Disputed 2008 Agreement Followed Those Conflicts and Sought, *Inter Alia*, to Extend Mr. Smagin's Rights. ............ 8

        4.    Mr. Smagin Initially Sought Arbitration Under the 2006 and 2007 Agreements, Not the Purported 2008 Agreement, but the Arbitrators Proceeded Under the Purported 2008 Agreement. ............................................................... 10

    C.    Mr. Yegiazaryan Promptly Challenged the Arbitrators' Jurisdiction in England. ................................................................... 11

        1.    Mr. Yegiazaryan Promptly Challenged the Arbitrators' Jurisdiction. ......................................................... 11

        2.    In Connection Therewith, Mr. Yegiazaryan Sought and Received an Order Suspending Enforcement in the Primary Jurisdiction Until Mr. Yegiazaryan's Challenge "Has Been Finally Disposed Of." ................................................ 12

        3.    On July 9, 2015, the English Trial Judge Certified the Case for a Discretionary Appeal Because There Was a "Real Prospect of Success" For the Appeal. ............................... 12

**P & As in Opposition to Motion for Summary Judgement**

III.   Legal Argument ............................................................................... 13

       A.   Standard for Summary Judgment in this Matter. ..................... 13

       B.   Questions of Arbitrability Must Be Decided by the Court. .................. 14

       C.   The English Trial Court Ruling Is Not Sufficiently "Final" To
            Justify Collateral Estoppel or Allow Confirmation at this Stage ........... 16

            1.   The English Stay of Enforcement Should Stay Mr. Smagin's
                 Attempt to Enforce Here ............................................... 19

       D.   The Court Should Decline to Confirm the Arbitration Award
            Pursuant to the Public Policy Against Double Recovery. .................... 20

       E.   The Court Should Reject the Request for Attorney's Fees. ................... 22

IV.    CONCLUSION ........................................................................... 23

**Points and Authorities in Opposition to Motion for Summary Judgment**

# Table of Authorities

## Cases

*Allen v. Zurich Ins. Co.,*
667 F.2d 1162 (4th Cir. 1982) ..............................................................17

*AT&T Tech v. Commc'ns Workers,*
475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ........................16

*C.D. Anderson & Co. v. Lemos,*
832 F.2d 1097 (9th Cir. 1987) ..............................................................17

*Celotex Corp. v. Catrett,*
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ........................17

*Chandler Leasing Division Pepisico Serv. Indus. Leasing Co. v. Florida-Vanderbilt Dev. Corp.,*
464 F.2d 267 (5th Cir. 1972) ................................................................21

*Clark v. Capital Credit & Collection Servs., Inc.,*
460 F.3d 1162 (9th Cir. 2006) ..............................................................15

*Czarina, L.L.C. v. W.F. Poe Syndicate,*
358 F.3d 1286 (11th Cir. 2004) ............................................................14

*Daniel v. Ford Motor Co.,*
806 F.3d 1217 (9th Cir. 2015) ..............................................................14

*Doe v. Princess Cruise Lines, Ltd.,*
657 F.3d 1204 (11th Cir. 2011) ............................................................15

*EDF Internat'l S.A. v. YPF S.A.,*
676 F.Supp.2d 317 (D. Del. 2009) ........................................................20

*EEOC v. Waffle House, Inc.,*
534 U.S. 279, 122 S.Ct. 754, 151 L.Ed.2d. 755 (2002) .....................3, 21

*Eichman v. Fotoman Corp.,*
759 F.2d 1434 (9th Cir. 1985) .......................................................2, 18, 19

*Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.,*
403 F.3d 85 (2d Cir. 2005) ...................................................................13

*Escobar v. Celebration Cruise Operator, Inc.,*
805 F.3d 1279 (11th Cir. 2015) ............................................................20

*Eurocar Italia S.p.A. v. Maiellano Tours, Inc.,*
156 F.3d 310 (2d. Cir. 1998) ...........................................................19, 20

*Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr S.A.,*
377 F.3d 1164 (11th Cir. 2004) ............................................................15

*General Tel. Co. of the Northwest, Inc. v. EEOC,*
446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) ........................21

*Howsam v. Dean Witter Reynolds, Inc.,*
537 U.S. 794, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) ........................16

*James River Ins. Co. v. Hebert Schenk, P.C.,*
523 F.3d 915 (9th Cir. 2008) ................................................................14

*M&C Corp.v. Erwin Behr BmgH & Co.,*
87 F.3d 844 (6th Cir. 1996) ..................................................................11

*Marcus, Stowell & Beye Gov't Sec., Inc. v. Jefferson Invest. Co.*,
   797 F.2d 227 (5th Cir. 1986) ................................................................. 21

*Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Systems*,
   665 F.3d 1091 (9th Cir. 2011) ............................................................... 22

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*,
   210 F.3d 1099 (9th Cir. 2000) ......................................................... 14, 17

*Parsons and Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RATKA)*,
   508 F.2d 969 (2d Cir. 1974) .................................................................. 20

*Pirito v. Penn Eng'g World Holdings*,
   947 F.Supp.2d 489 (E.D. Pa. 2013) ............................................... 2, 18, 19

*Polimaster Ltd. v. RAE Sys., Inc.*,
   623 F.3d 832 (9th Cir. 2010) ..................................................... 13, 14, 17

*Seetransport Wiking Trader Shiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Nalava*,
   989 F.2d 572 (2nd Cir. 1993) .......................................................... 2, 18

*Southern Cal. Fed. Sav. & Loan Ass'n v. U.S.*,
   422 F.3d 1319 (Fed. Cir. 2005) ........................................................ 3, 21

*Tolan v. Cotton*, -- U.S. ---,
   134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) ................................................ 14

*Turquoise Prop. Gulf, Inc. v. Overymyer*,
   81 So.3d 1250 (Ala. 2011) ................................................................... 21

*United States v. Rutland*,
   372 F.3d 543 (3rd Cir. 2004) ................................................................. 9

*Volt Inform. Sciences Inc. v. Board of Trustees of Leland Stanford Junior Univ.*,
   489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ............................. 15

*VRG Linhas Aereas S.A. v. MatlinPatterson Global Partners L.P.*,
   717 F.3d 322 (2nd Cir. 2013) ........................................................ 15, 17

*Walter E. Heller Western Inc. v. Bloxham*,
   176 Cal.App.3d 266 (1985) ................................................................. 21

**Statutes**

9 U.S.C. § 207 ........................................................................................ 13

Pub. L. No. 112-208, 126 Stat. 1496, §§401-407 ...................................... 5

**Other Authorities**

English Arbitration Act 1996 §§ 4(1), 67, 70, 73 and Schedule 1 ......... 11, 14

London Court of International Arbitration Rules 26.8 ........................... 11, 14

New York Convention Article V ................................................ 13, 19, 20

**Points and Authorities in Opposition to Motion for Summary Judgment**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Points and Authorities in Opposition to Motion for Summary Judgment**

# I.    INTRODUCTION

With this motion, Petitioner seeks to short-circuit a pending appeal in England, addressing issues of English law, about whether or not a valid arbitration agreement covers the dispute in question.  The trial court in England initially found that the agreement does cover the dispute, ***but*** the trial court also believed the issue sufficiently uncertain under English law that the **trial court took the rare step of certifying a discretionary appeal on the subject**.  That appeal is fully briefed before the English appellate court, and it was originally anticipated that the appeal would be heard and decided in May of this year.  That schedule has slipped a bit based on docket congestion, but the case is still on track to be resolved in England a bit later this year. In the meantime, **the English courts have stayed enforcement of the Arbitration Award** until Mr. Yegiazaryan's challenge to the award has been "finally disposed of."

As Petitioner Vitaly Smagin admits in his brief, his motion rests upon the claim that this Court should apply issue preclusion to avoid the Court having to make any findings on the relevant issues.  Under the New York Convention (as under English and American law), the courts otherwise determine for themselves the "gateway" questions of whether (a) an arbitration agreement exists, and (b) whether the arbitration agreement covers the dispute at issue.  Here, when it granted Mr. Yegiazaryan a discretionary appeal, even the English trial court conceded that the purported agreement is, at best, ambiguous about whether any arbitration language in the agreement applies to this dispute.  Mr. Yegiazayran has specifically pled that the agreement does *not* apply, and Mr. Smagin has not even attempted to show that it actually applies.  Indeed, Mr. Smagin has not so much as attempted to introduce the purported arbitration agreement, much less cited any relevant evidence or English authority on the subject to show that it covers the dispute at issue.

Instead, Mr. Smagin argues that Mr. Yegiazaryan is estopped from raising these defenses because of the English trial court order, which was certified for appeal and effectively stayed.  However, Mr. Smagin ignores the only case he cites for

**P & As in Opposition to Motion for Summary Judgement**

enforcement of a foreign award pending appeal, which held that the recognition and enforcement of foreign judgments is determined by the state law of the forum state. [Smagin P&A's 12:26-28 citing *Pirito v. Penn Eng'g World Holdings,* 947 F.Supp.2d 489, 504 (E.D. Pa. 2013); *see also Seetransport Wiking Trader Shiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Nalava,* 989 F.2d 572, 582 (2d Cir. 1993).] Here, of course, the forum state is California and it is well established that – unlike federal law – California law does not apply res judicata or collateral estoppel to a judgment pending appeal. *Eichman v. Fotoman Corp.*, 759 F.2d 1434, 1437 (9th Cir. 1985) (federal law on finality of judgments irrelevant to California state judgment which is not final pending appeal.) Under these circumstances, the English order is *not* sufficiently "final" to be given collateral estoppel effect and absent such collateral estoppel, there remain disputed issues of fact that would preclude summary judgment.

Lastly, even if the English order were sufficiently final and even if enforcement were not stayed in England, the evidence in this case shows that Mr. Smagin is trying to set himself up for a double recovery against Mr. Yegiazaryan. Although he has repeatedly avoided mentioning this fact in his pleadings here and elsewhere,[1] Mr. Smagin has secured an asset freeze against Mr. Yegiazaryan in Russia over assets that Mr. Smagin himself has valued at many times the amount in dispute here. That asset freeze was part of proceedings involving some of the most notoriously corrupt Russian officials, a number of whom have been identified by the U.S. Government on the Magnitsky sanctions list. Mr. Smagin admitted to the arbitration panel that the asset freeze is specifically intended to secure his recovery in this case. Russia is a signatory to the New York Convention, and Mr. Smagin could attempt to enforce the Arbitration

---

[1] As noted in Mr. Yegiazaryan's opposition to the Application for a Writ of Attachment filed in January, Mr. Smagin previously secured an asset freeze in Cyprus without mentioning the Russian asset freeze, and the Cyprus court released the asset freeze and chastised Mr. Smagin for failing to demonstrate the "good faith and honesty" expected of litigants before the Cyprus courts. [Declaration of Andreas Havarias in Opposition to the Writ of Attachment ¶6, Dkt #21-4.]

**Points and Authorities in Opposition to Motion for Summary Judgment**

Award in Russia. Mr. Smagin attempts to sidestep this issue by simply saying that he has not tried to confirm the award in Russia (although he notes he reserves the right do so). But the question is: why has he not done so? If the award were confirmable, why not confirm the award where there are already assets frozen? "'[I]t goes without saying that the courts can and should preclude double recovery by an individual.'" *Southern Cal. Fed. Sav. & Loan Ass'n v. U.S.*, 422 F.3d 1319, 1333 (Fed. Cir. 2005) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297, 122 S.Ct. 754, 151 L.Ed.2d. 755 (2002)). Even if collateral estoppel and the New York Convention otherwise permitted it, this Court should require Mr. Smagin either to release his freeze in Russia or delay any proceedings here until he has tried to enforce there. This Court should not facilitate Mr. Smagin's attempt at a double recovery.

## II.    FACTUAL BACKGROUND

### A.    Mr. Yegiazaryan's Background And the Russian Asset Freeze

1.    Mr. Yegiazaryan Was a Legislator in Russia Between 1999 and 2011 Who Fell Out of Favor with the Regime, Particularly After Disputes With Connected Individuals Trying to Strip Mr. Yegiazaryan of His Property.

In the late 1990s, Mr. Yegiazaryan became involved in Russian government and political activities, serving among other things as an advisor to the Russian Central Bank (the Russian equivalent of the U.S. Federal Reserve). [Declaration of Ashot Yegiazaryan in Opposition to Summary Judgment ("YD") ¶¶ 2-3.] In 1999, Mr. Yegiazaryan was elected to the Russian legislature known as the Duma. [*Id.* ¶ 4.] He initially served as deputy chairman of the Committee on Budget and Taxes and held other similar positions. [*Id.*] Mr. Yegiazaryan was twice re-elected to the Duma and served a total of 12 years. [*Id.*]

During the time he served as a legislator, Mr. Yegiazaryan also had some investments which included at least two real estate projects. [YD ¶ 6.] One of the investments was in the Moskva Hotel renovation, where other investors included Vladimir Putin's long-time judo partner, Arkady Rotenberg (an individual now subject

**Points and Authorities in Opposition to Motion for Summary Judgment**

to both U.S. and European Union sanctions).  [YD ¶ 7.]

Around 2005, Mr. Yegiazaryan began to fall out of political favor, largely because he was allied with a former Prime Minster fired by Vladimir Putin.  [YD ¶ 5.] After Mr. Yegiazaryan began to fall out of political favor, he was pressured by various individuals in the Russian government to give up his investment in the Moskva Hotel. [*Id.* ¶ 8.]  When Mr. Yegiazaryan refused to acquiesce in surrendering his investment, he was subjected to various forms of official and unofficial harassment.  [*Id.*]

### 2.  Mr. Yegiazaryan Escaped Russia in the Face of Death Threats.

Mr. Yegiazaryan left Russia in the summer of 2010, in large part because he began receiving threats of reprisal to 'stay away' from the Moskva Hotel Project**.**  [YD ¶ 9.]  Mr. Yegiazaryan reported the threats to the Russian police in February of 2010 but they took no serious action.   [*Id.*]  These threats were made against Mr. Yegiazaryan and his family, including threats to behead his children.  [*Id.* and Ex. 1 thereto.]  One of Mr. Yegiazaryan's family members was killed in Russia in 2010, and he understood that murder was intended to send him a message. [*Id.* ¶ 9.]

Mr. Yegiazaryan departed from Russia before the Russian regime decided to name him a "suspect" on alleged criminal charges.  [YD ¶ 11.]  Mr. Yegiazaryan has been living openly in the United States since his escape from Russia.  [YD ¶ 12.]

### 3.  After He Continued to Object to the Loss of his Investment, Corrupt Officials on the U.S. Sanctions List Sought Mr. Yegiazaryan's Arrest.

In the fall of 2010, Mr. Yegiazaryan filed formal claims arising from the Moskva Hotel.  [YD ¶ 11.]  The Kremlin retaliated by seeking to arrest Mr. Yegiazaryan.  [*Id.*]  In that regard, they used a complaint filed by Mr. Smagin as a vehicle. [Declaration of Dmitry Stanislavovich Barannikov ("Barannikov Dec.") ¶ 3.] Discovery in other actions has demonstrated that Mr. Smagin collaborated with Russian officials to bring the claims in the arbitration (and the criminal complaint) against Mr. Yegiazaryan.  [Declaration of Jason T. Cohen in Opposition to Writ of

4

**Points and Authorities in Opposition to Motion for Summary Judgment**

Attachment ¶¶ 5, 8-9 and Exs. 1-2 thereto (Dkt #21-3).]

While the Russian regime purported to conduct an independent "investigation" of Mr. Yegiazaryan, the individuals assigned by the Kremlin to conduct the matter are specifically considered by the United States government to be politically motivated and corrupt. [Barannikov Dec. ¶¶ 7-10 and Exs. 4-7 (reflecting the involvement (a) Aleksey Droganov, (b) Viktor Grin, (c) Andrei Alexandrovich Krechetov, (d) Oleg Lugunov, and (e) Andrei Alexandrovich Strizhov in the Kremlin's "investigation" of Mr. Yegiazaryan); YD ¶ 14 (same); Request for Judicial Notice in Opposition to Summary Judgment ("RJN") and Exhibits 1-3 thereto (reflecting U.S. identification of those individuals as subject to sanctions for involvement in the politically motivated Magnitsky prosecution).]

As the Court may be aware, the United States government passed a special law in 2012 called the "Sergei Magnitsky Rule of Law Accountability Act of 2012" ("Magnitsky Act") after various politically-motivated prosecutions in Russia, including the jail-house death of a lawyer named Sergei Magnitsky who challenged corrupt individuals in the Russia government. [Pub. L. No. 112-208, 126 Stat. 1496, §§401-407, attached as RJN Exhibit 1.] Following the passage of the Magnitsky Act, the U.S. government identified 18 officials responsible for the detention, abuse, and death of Sergei Magnitsky who are specifically subject to U.S. sanctions. [RJN and Ex. 3.] At least five of those listed individuals played prominent roles in the "investigation" of Mr. Yegiazaryan. [Barannikov Dec. ¶¶ 7-10 and Exs. 4-7; YD ¶¶ 13-14.]

To further pressure Mr. Yegiazaryan, the Russian regime also submitted an arrest request to Interpol. Interpol merely acts as a clearinghouse for requests from various member nations (including Russia). [YD ¶ 12 and Ex. 2.] Whereas Interpol may "list" individuals because of member requests from governments like Russia as a matter of routine, the United States does not automatically arrest individuals merely because Russian political interests want an individual arrested. [YD ¶ 12.] Although the U.S. government will not publicly comment on extradition requests, it is clear the

**Points and Authorities in Opposition to Motion for Summary Judgment**

government has rejected Russia's request because Mr. Yegiazaryan has been living
openly in the United States for more nearly six years without issue.

### 4.    Mr. Smagin Has Already Secured an Asset Freeze In Russia That Would More Than Satisfy the Arbitration Award.

In connection with the Russian criminal proceedings, Mr. Smagin filed a request
for an asset freeze on various assets in Russia.  [Barannikov Dec. ¶¶ 4-6 and Exs. 1-3.]
Not surprisingly, the Russian regime supported the asset freeze, and issued a freeze
order in Russia.  [*Id.* and Ex. 2-3.]  Mr. Smagin did not disclose this freeze order when
he applied to this Court in this matter for a writ of attachment, nor did he disclose it in
connection with his motion for an expanded preliminary injunction.  As noted above,
this is not the first time that Mr. Smagin has withheld this information from a court
when applying for ex parte relief, in breach of his duty of full and frank disclosure.[2]

Among other assets, the Russian order froze all assets of Europark, the
development project at the heart of the arbitration.  [Barannikov Dec. ¶5 and Ex. 2;
Declaration of Cyrus Benson ("Benson Dec.") ¶ 7.]  Mr. Smagin has consistently
insisted that those assets alone are worth more than $300 million. [Benson Dec. ¶ 8
and Exhibit 2 (Relevant portions of Smagin's expert report valuating Europark in
excess of $300 million dollars.)]

Moreover, Mr. Smagin's counsel has previously admitted that the Russian asset
freeze was undertaken to secure his recovery in the disputed arbitration.  [Benson Dec.
¶ 5 and Ex. 1.]  Specifically, Mr. Smagin's counsel represented that:

The Russian Criminal Claim has therefore been commenced to enable

_____

[2] In connection with the Russian asset freeze, the Court should also be aware that Mr.
Smagin applied in 2012 for an *ex parte* asset freeze in Cyprus.  [Declaration of
Andreas Haviaras in Opposition to the Writ of Attachment ("Haviaras Dec.") ¶¶ 2-3
(Dkt #21-4).]  An order initially issued in Mr. Smagin's favor, but the Cyprus court
dissolved the Cyprus freeze after learning of the Russian order which Mr. Smagin
neglected to mention in his *ex parte* application.  [*Id.* ¶¶ 4-6 and Ex. 1.]  In that
action, the Cyprus court found the Cyprus freeze unnecessary in light of the prior
Russian freeze order and chastised Mr. Smagin for not mentioning the Russian
freeze order, observing that Mr. Smagin's litigation conduct did not "reflect on . . .
the level of good faith and honesty which is expected" of litigants. [*Id.*]

6

**Points and Authorities in Opposition to Motion for Summary Judgment**

freezing orders to be obtained from the Russian court.  <u>These freezing orders protect assets that may satisfy an arbitral award.</u>

[Benson Dec. Ex. 1 (Brief from Mr. Smagin, ¶ 111) (emphasis added).]  Mr. Smagin has also disingenuously claimed that the assets frozen in Russia might be used to pay other claimants, but he has never produced any evidence of such claims in the Russian action.  The truth is the Russian asset freeze was obtained on the application of Mr. Smagin and it benefits Mr. Smagin.  [Expert Opinion of Galina Anatolyevna Krylova ¶¶ 8-11.]  To the extent there is *any* recovery due – it would more than satisfy any amount owed by Mr. Yegiazaryan to Mr. Smagin.

**B.    The Disputed Agreement Does Not Provide for Arbitration of this Matter.**

1.    <u>Litigation of the Dispute Started With Two Agreements That Do Not Include Mr. Yegiazaryan as a Party.</u>

As noted in the arbitration award, this matter arose from Mr. Smagin's investment in a Moscow real estate development called "Europark."  [Declaration of Edward Elcoat Poulton ("PD") Ex. A at ¶ 69.]  After Mr. Smagin's prior partners left the project around 2002, Mr. Smagin then partnered with certain entities.  [*Id.*]

Around 2006, Mr. Smagin agreed to reorganize the corporate structure of Europark.  [PD Ex. A at ¶ 72-74.]  In connection therewith, Mr. Smagin entered into two separate agreements: a 2006 Shareholders' Agreement and a 2007 Escrow agreement.  [PD Ex A at ¶5; *see also* PD Ex. B at 2-3.]  Mr. Yegiazaryan did not sign either agreement, and he was not a party to either agreement.  [*Id.*]  Both the 2006 Shareholders' Agreement and the 2007 Escrow agreement were signed instead by Mr. Smagin, Mr. Dimitri Garkusha, and Kalken Holdings, Ltd. (and the Escrow Agreement included Deutsche Bank as a party as well).  [*Id.*]  In addition, both the 2006 Shareholders' Agreement and the 2007 Escrow Agreement provided for arbitration before the London Court of International Arbitration, under English law.  [PD Ex. A at ¶¶ 5-6.]

7

2.    Disputes Arose Relating to Those Agreements After The Escrow
Agreement Expired Which Contemplated Arbitration Against Kalken.

Pursuant to Clause 9.1.5, the Escrow Agreement expired in January 2007.
[Declaration of Bruce H. Jackson ("JD") in Support of Petition to Confirm Foreign
Arbitral Award (Dkt #1-2) at Ex. 2-B, Page 72 (Internal Page 11).]  After the Escrow
Agreement expired, Mr. Smagin asserted that Kalken had not complied with the terms
of the Escrow Agreement and Mr. Smagin's counsel sent Deutsche Bank a letter on
February 19, 2008 indicating that Mr. Smagin was contemplating an arbitration against
Kalken Holdings under the Escrow Agreement.  [Declaration of Douglas James
Watson ("WD") Ex. 1 ("Mr. Smagin intends to enforce his rights under the
Shareholders' Agreement against [Kalken Holdings, Ltd.] at the London Court of
International Arbitration.").]

Mr. Smagin asserted that, subsequent to the letter, he had discussions with Mr.
Yegiazaryan about how the parties to the 2006 Shareholders' Agreement and the 2007
Escrow Agreement would proceed.  Mr. Smagin has asserted that such discussions
involved Mr. Yegiazaryan acting in his personal capacity, but Mr. Smagin's
subsequent March 4, 2008 letter to Deutsche Bank specifically identified the express
parties to that agreement and stated that that those "**parties to the Shareholders'
Agreement** have negotiated and intend to perform actions and execute documents."
[WD Ex. 2 (emphasis added)].  Kalken was a party to the 2006 Shareholders'
Agreement; Mr. Yegiazaryan was not.  [*Id.*; *see also* PD Ex. A at ¶5.]

3.    The Disputed 2008 Agreement Followed Those Conflicts and
Sought, *Inter Alia*, to Extend Mr. Smagin's Rights.

Mr. Smagin has asserted that Mr. Yegiazaryan thereafter signed a 2008
Agreement allegedly between Party 1 (identified as Mr. Smagin) and Party 2
(identified as "Mr. Yegiazaryan, of whom Kalken Holdings Limited is a controlled
affiliate that in its turn is a holder of 73% of shares in TUFTS INVEST & TRADE
INC.")  [JD Ex. 2-C at Page 100.]

8

**Points and Authorities in Opposition to Motion for Summary Judgment**

As an initial matter, Mr. Yegiazaryan has consistently asserted that the purported 2008 agreement is a forgery.  [YD ¶ 15 ("I did not sign the agreement.  It is forged."); *see also* PD Ex. A ¶ 159 ("It is a forged signature").]  One of the world's preeminent forensic analysts concluded that Mr. Yegiazaryan's signature on the 2008 agreement was forged.  [Benson Dec. ¶ 9; Expert Report of Gus Lensevich at 5-10 (Sections II-IV); *see also United States v. Rutland*, 372 F.3d 543, 545 (3rd Cir. 2004) (discussing the "exceptionally impressive credentials" and "extraordinary experience" of Mr. Lesnevich.)]  Unlike the other two agreements (which were translated into English, with those translation formally initialed and signed by the parties), the purported 2008 agreement is on its face merely a draft in Russian with various terms left to fill in.  [Compare JD Exs 2-A and 2-B with 2-C.]  Mr. Yegiazaryan continues to assert that the purported 2008 agreement is a forgery and submits his own declaration and the Lesnevich expert report in opposition to any summary judgment on this issue.

However, even if the purported 2008 agreement were legitimate, it would not provide for arbitration of the dispute at issue here.  That agreement covers a number of topics that include, but are not limited to, topics addressed in the 2006 Shareholders' Agreement and the 2007 Escrow Agreement [YD ¶ 17.].  Of particular importance, Articles 2.1 to 2.4 of the purported 2008 agreement referred to actions supposedly to be taken in furtherance of the 2006 Shareholders' Agreement and the expired 2007 Escrow Agreement.  [YD ¶ 17.]

Following those provisions in Article 2.1 to 2.4, there is language in the purported 2008 agreement with the following wording:

> If Partner 2 fails to perform his obligations set forth in clauses 2.1-2.4,
> Partner 1 will seek to enforce his rights under the Shareholders'
> Agreement by filing a claim against Partner 2 with the London Court
> of International Arbitration and require, among other things,
> enforcement of Clause 9.1.5 of the [2006] Shareholders' Agreement,
> limitation of restrictions on use of his property (shares in TUFTS,

**Points and Authorities in Opposition to Motion for Summary Judgment**

MTC, Europark), and indemnification for losses.[3]

[*See* PD Ex. A at ¶ 170 (quoting Article 2.10 of the purported 2008 agreement).]

As the English trial court recognized, "Article 2.10 refers to enforcement of rights under the Shareholders' Agreement" rather than any independent right to arbitrate.  [PD Ex. E at ¶ 50.]  Article 2.10 speaks of specific provisions of the Shareholders' Agreement that could be enforced, notwithstanding any expiration of the Escrow Agreement.  Moreover, the Shareholders' Agreement *had* a pre-existing LCIA arbitration clause providing for arbitration between the parties to that Agreement (which did not include Mr. Yegiazaryan, a non-party to that agreement).  [PD Ex. A at ¶¶ 5-6.]

4.    Mr. Smagin Initially Sought Arbitration Under the 2006 and 2007 Agreements, Not the Purported 2008 Agreement, but the Arbitrators Proceeded Under the Purported 2008 Agreement.

When Mr. Smagin initiated the arbitration at issue, he asserted only that the arbitrators allegedly had jurisdiction over Mr. Yegiazaryan personally under the 2006 Shareholders' Agreement and the 2007 Escrow Agreement, despite the fact that Mr. Yegiazaryan was not a party to either such agreement.  [PD Ex. A at ¶ 5, PD Ex. B at Pages 2-3.]

However, the arbitration panel did not accept Mr. Smagin's claims that the 2006 Shareholders' Agreement or the 2007 Escrow Agreement provided for jurisdiction. [PD Ex. A at ¶¶ 164, 174-176.]  Instead, the arbitrators relied upon Mr. Yegaizaryan's apparent signature on the purported 2008 agreement, and decided that Mr. Yegiazaryan had not proven that the signature was forged.  [*Id.* at ¶ 164 (asserting that Mr. Yegiazaryan did not meet burden to show forgery).]  The arbitrators construed Article

---

[3] The second and third clause (restrictions on the use of the shares and indemnification referred to two specific additional provisions of the 2006 Shareholders Agreement (Article 6 thereof and Article 9.2 thereof, respectively).  [*See generally* Declaration of Bruce H. Jackson Bruce H. Jackson ("JD") in Support of Petition to Confirm Foreign Arbitral Award (Dkt #1-2) at Ex. 2-A at Page 70-71 and 73 thereof.]

10

**Points and Authorities in Opposition to Motion for Summary Judgment**

2.10 of the purported 2008 agreement as if it were a "broad" arbitration clause
covering any claims for breach of that agreement. [PD Ex. A ¶ 174.] However,
nothing in the language of Article 2.10 states that it covers all aspects of the
relationship or even that it covers any claims for breach of the 2008 agreement itself.
Instead, by its plain language, Article 2.10 addresses solely the failure of the parties to
comply with articles 2.1 to 2.4. [PD Ex. A ¶ 170.] It specifically states that, if the
parties fail to comply with specific provisions to further the concepts of the 2006/2007
agreements, then Mr. Smagin may attempt to proceed "to enforce his rights under the
[2006] Shareholders' Agreement." [*Id.*]

**C.    Mr. Yegiazaryan Promptly Challenged the Arbitrators' Jurisdiction
in England.**

The arbitration was conducted in England under the laws of England, which
makes England the "primary jurisdiction" for interpretation and review of the
arbitration award. [PD Ex. A at Page 55; *M&C Corp.v. Erwin Behr BmgH & Co.,* 87
F.3d 844, 848 (6th Cir. 1996).] The award was issued on November 11, 2014. [PD Ex.
A.]

1.    Mr. Yegiazaryan Promptly Challenged the Arbitrators' Jurisdiction.

The rules of the London Court of International Arbitration provides that parties
waive any right to appeal "insofar as such waiver shall not be prohibited under any
applicable law." [LCIA Rules 26.8.] However, the applicable law to this case is
English law, and English arbitration law expressly provides that a party cannot waive
any right to appeal relating to the arbitrator's jurisdiction. [English Arbitration Act
1996 §§ 4(1), 67, 70, 73 and Schedule 1 (listing jurisdiction objection as not subject to
waiver).] Rather, the party is entitled to a *de novo* review by the judicial system to
determine whether the arbitrators had jurisdiction over the dispute in controversy. [*Id.*;
*see also* PD Ex. E ¶ 1 (tribunal's findings do not help Mr. Smagin because "a
challenge pursuant to section 67 is a re-hearing.")]

Mr. Yegaizaryan filed the challenge on December 9, 2014, almost two weeks *before* Mr. Smagin had taken any effort to attempt to enforce the arbitration award. [PD Ex. C at Pages 3-23; *contrast* Mr. Smagin's December 22, 2014 Petition to Confirm at Dkt #1 here.]

   2.    <u>In Connection Therewith, Mr. Yegiazaryan Sought and Received an</u> <u>Order Suspending Enforcement in the Primary Jurisdiction Until Mr.</u> <u>Yegiazaryan's Challenge "Has Been Finally Disposed Of."</u>

In connection with his challenge to the arbitrators' jurisdiction, Mr. Yegiazaryan sought an order suspending enforcement in the primary jurisdiction (*i.e.* England). [PD Ex. C at Page 22 (17 in the original) ¶ 53 ("AY respectfully asks the court to order that any enforcement of the Award by stayed pending the account of the court's decision on the section 67 challenge").]

The English trial court, through Judge Eder, granted an order that precluded any enforcement of the arbitration award in his jurisdiction until Mr. Yegiazaryan's challenge "has been finally disposed of."  [Declaration of Jeremy Brier in Opposition to Motion for Summary Judgment ("Brier Dec.") Ex. 1 at ¶4.]

   3.    <u>On July 9, 2015, the English Trial Judge Certified the Case for a</u> <u>Discretionary Appeal Because There Was a "Real Prospect of Success"</u> <u>For the Appeal.</u>

Pursuant to English law, the English trial court conducted a trial *de novo* of two questions: whether the 2008 agreement was authentic, and whether the 2008 agreement contained an arbitration clause that would cover the dispute at issue.  [PD Ex. F ¶1.] On July 9, 2015, the English trial court found in favor of Mr. Smagin on both points. ***However***, as to the applicability of the alleged arbitration clause, the English trial court expressly noted that it was a "difficult clause to construe" and that it constituted an "odd, unsatisfactory, and unclear clause."  [PD Ex. F at Page 15 (internal page 12) line 17 and Page 16 (internal page 13) at line 7.]

In English law, there is no automatic right to appeal a ruling challenging the jurisdiction of an arbitration panel.  [English Arbitration Act of 1996 §67(4) ("[L]eave

of the court is required from any appeal from a decision of the court under this section.")]  It is rare in England that a trial court voluntarily concludes that it may have erred and itself grants permission for appeal.  [Brier Dec. ¶ 11.]  However, in this case, the English trial court found that there was a "real prospect of success" on the appeal and granted permission to appeal.  [PD Ex. F. at Page 16 (internal page 13), Lines 7-10; *see also* PD Ex. G at ¶ 5 (Mr. Yegiazaryan "shall have permission to appeal on the ground that the Judge erred in construing Article 2.10 of the 2008 Agreement as an arbitration agreement conferring jurisdiction on the Tribunal as against [Mr. Yegiazaryan.]").]

As a result, the English proceedings are still on-going and those proceedings have not yet been "finally disposed of."  [Brier Dec. ¶¶ 6-8, 13-15 and Ex. 1.]

### III.    Legal Argument

### A.    Standard for Summary Judgment in this Matter.

While Mr. Smagin quotes numerous cases for the proposition that a foreign arbitration award should be enforced once final and that there is a general pro-enforcement bias, it is clear and unambiguous that the New York Convention establishes seven enumerated grounds on which to delay or deny enforcement.  New York Convention Articles V & VI.  *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 91 (2d Cir. 2005) (policy in favor of enforcement cannot enforce an arbitration outside the scope of the parties' agreement).  Put differently, the rule simply restates the relevant statute: the "court shall confirm the award <u>unless</u> it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.  When interpreting the defenses under the New York Convention, the Court may look to authority under the Federal Arbitration Act.  *Polimaster Ltd. v. RAE Sys., Inc.,* 623 F.3d 832, 836 (9th Cir. 2010).  As discussed herein, the facts demonstrate at least four different possible grounds within the New York Convention that may defer or preclude enforcement.

13

**Points and Authorities in Opposition to Motion for Summary Judgment**

Because this is a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party (*i.e.* Mr. Yegiazaryan). *Daniel v. Ford Motor Co.*, 806 F.2d 1217, 1221 (9th Cir. 2015).  To move for summary judgment on a claim where the non-moving party will bear the burden of proof, the moving party must present evidence from which the court can conclude that the nonmoving party does not have enough evidence to carry its ultimate burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  To move for summary judgment on a matter where the moving party bears the burden of proof (*e.g.* collateral estoppel), the moving party must show that there is no issue of material fact and that the party is necessarily entitled to judgment as a matter of law.  *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).  The Court does not weigh the evidence on summary judgment.  *Tolan v. Cotton*, -- U.S. ---, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014).

## B.    Questions of Arbitrability Must Be Decided by the Court.

The threshold question in confirming an arbitration award is whether there was a valid and binding agreement to arbitrate covering the dispute at issue.  *Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286, 1291 (11th Cir. 2004); *Polimaster,* 623 F.3d at 836-37 ("[I]n the context of an arbitrability decision, the court reviews the contract de novo").  Mr. Smagin cites London Court of Arbitration Rule 26.8 that states that parties waive any challenge to a final award, but he ignores the provision that such waivers exist unless "prohibited under any applicable law."  LCIA Rule 28.6.  Here, the arbitration took place in London under English arbitration law, and English arbitration law provides that the parties preserve any objection to arbitral jurisdiction notwithstanding any participation in the arbitration.  English Arbitration Act 1996 §§ 4(1), 67, 70, 73 and Schedule 1 (listing jurisdiction and scope objections as not subject to waiver); *see also Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr S.A.,* 377

F.3d 1164, (11th Cir. 2004) (participation in arbitration does not waive challenge to jurisdiction).[4]

In this regard, English law is substantively consistent with U.S. federal law.  In both countries, the starting point is that arbitration is a creature of contract only.  *See Volt Inform. Sciences Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (Arbitration is favored but courts cannot "require parties to arbitrate when they have not agreed to do so.")  The Second Circuit recently engaged in an extended discussion of the point in a similar action to confirm an international arbitration award, and the Second Circuit explained:

> The [most] basic issue, however, of whether the parties agreed to arbitrate in the first place is one only a court can answer, since in the absence of any arbitration agreement at all, "questions of arbitrability" could hardly have been clearly and unmistakably given to the arbitrators.

*VRG Linhas Aereas S.A. v. MatlinPatterson Global Partners L.P.*, 717 F.3d 322, 325 n. 2 (2nd Cir. 2013).  The *VRG* court went on to explain that if the trial court determined that the defendant "did *not* agree to the terms" of the contract, then "no further analysis would be necessary."  *Id.* at 327 (emphasis in the original).  Under those facts:

> [s]uch a finding would compel the denial of VRG's petition to confirm the award on the grounds that [defendant] never consent to submit disputes . . .  to arbitration.

*Id.; see generally Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1213 n.9 (11th Cir. 2011) ("first task" in addressing arbitration is for the court to determine whether the parties agreed to arbitration.)  In other words, under both English and U.S. federal

---

[4] Waiver is the knowing relinquishment of a known right.  *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1171 (9th Cir. 2006).  Here, far from waiving his rights, Mr. Yegiazaryan clearly has preserved the issue.

law, the court decides *de novo* whether there is an arbitration agreement in the first place and does not accept the arbitrators' conclusions.

In addition to the question of whether the defendant agreed to the terms of the contract, "a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy **is for the court**." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (emphasis added); *see also* New York Convention Article V(1)(c) (defense to enforcement that award deals with matters not within arbitration agreement). This is a "gateway question" to determine if the arbitrators have jurisdiction over the dispute. *Howsam*, 537 U.S. at 84. Moreover, although parties may sometimes entrust this second gateway question to the arbitrators, they may only do so when they have "clearly and unmistakably" agreed to be bound by the arbitrator's determination of the subject. *AT&T Tech v. Commc'ns Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). To the extent that the parties agreed to arbitration in England under English law, English law provides that this gateway question is reserved for the courts and cannot be given to the arbitrators. English Arbitration Act 1996 §§ 4(1), 67, 70, 73 and Schedule 1.

## C.    The English Trial Court Ruling Is Not Sufficiently "Final" To Justify Collateral Estoppel Or Allow Confirmation at this Stage.

Notwithstanding Mr. Yegiazaryan's defenses that (a) the purported 2008 agreement was forged and (b) that it does not provide for arbitral jurisdiction of this dispute in any event, Mr. Smagin does not even attempt to present any *evidence* for the court to resolve on those subjects. He does not submit any forensic analysis. He does not submit any declaration about how the arbitration clause should be interpreted or the relationship of the purported 2008 agreements with any of the other agreements. Indeed, he does not even authenticate the purported agreement but attaches it to the declaration of a California attorney who had no role in the underlying events (or even the English proceedings) and is entirely incompetent to authenticate the purported

16

**Points and Authorities in Opposition to Motion for Summary Judgment**

document much less explain it.  To the extent that Mr. Smagin seeks summary judgment on the merits, he would have failed to meet his burden even if Mr. Yegiazaryan had not introduced relevant evidence to the contrary.  *Nissan Fire & Marine*, 210 F.3d at 1102.  Moreover, Mr. Yegiazaryan has introduced evidence that – construed in the light most favorable to him – would establish a defense to the recognition or enforcement of the arbitration award.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In an effort to finesse the factual disputes at issue here, Mr. Smagin relies *solely* on collateral estoppel based on the findings by the arbitrators and the English trial court against Mr. Yegizaryan.  It is the burden of the party asserting collateral estoppel to show that it applies to the current case.  *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982).  Mr. Smagin does not meet that burden.

As discussed above, the arbitrators' rulings on arbitrabilty are irrelevant.  The gateway issues of whether there was a valid and binding agreement to arbitration the dispute at issue must be evaluated *de novo* in this Court, without deference to the arbitrators' findings.  *VRG*, 717 F.3d at 327.  Mr. Smagin cites *C.D. Anderson & Co. v. Lemos*, 832 F.2d 1097, 1100 (9th Cir. 1987) for the general proposition that *some* arbitration decisions can have some collateral estoppel effect, but that case had nothing to do with the gateway questions of arbitrability at issue here.  *Id.* (discussing res judicata for substantive claims that could have been brought in a prior arbitration but were not).  Mr. Smagin's argument would upend the entire structure of the New York Convention, the English Arbitration Act, and the repeated holdings of the U.S. Supreme Court if a party could avoid court determination of gateway issues by asserting collateral estoppel based on the arbitrators' own assertion of jurisdiction. *Polimaster,* 623 F.3d at 837-38 (interpreting arbitration contract *de novo* despite arbitrator's conclusion that arbitration was authorized by contract).

As to the English trial court findings, Mr. Smagin cites a plethora of irrelevant authority but ignores the key issue, identified in the only case he cites addressing the

**Points and Authorities in Opposition to Motion for Summary Judgment**

effect of a foreign judgment pending appeal:  *Pirito v. Penn Eng'g World Holdings,* 947 F.Supp.2d 489, 504 (E.D.Pa. 2013).  Per *Pirito,* the law of the <u>forum state</u> applies to determine the effect of such a judgment pending appeal.  *Pirito*, 947 F.Supp.2d at 504 (citing the Pennsylvania Supreme Court on the finality under Pennsylvania law of a judgment pending appeal).[5]  This is consistent with the general rule that "unlike the recognition of arbitration awards, which is governed by federal law, the recognition of foreign judgments is governed by state law."  *Seetransport Wiking Trader Shiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Nalava,* 989 F.2d 572, 582 (2nd Cir. 1993) (applying New York state law on res judicata to determine effect of foreign judgment).  Here, Mr. Smagin is asking the Court to apply collateral estoppel to an English trial court ruling, which is an attempt to have the Court recognize the foreign judgment and its effects on the underlying matter.  However, as noted above, the forum state in this action is California.  Although Pennsylvania law may provide that a judgment in <u>*Pennsylvania*</u> is final on appeal, California law provides the contrary: a California judgment is ***not*** final while it is on appeal.  *Eichman v. Fotoman Corp.*, 759 F.2d 1434, 1437 (9th Cir. 1985).  Under California law, the English trial court ruling would not be entitled to collateral estoppel effect.

As such, Mr. Smagin's argument that some foreign awards *can* – in general – be accorded collateral estoppel effect if final does not address the question of *this* award, which is pending a discretionary appeal on application of English law.  Likewise, Mr. Smagin is disingenuous when he argues that a pending appeal does not preclude the application of collateral estoppel as if this were a uniform rule applicable to all judgments from all courts.  As Mr. Smagin is well aware, the effect of a pending appeal depends on the *specific* law that applies to that *specific* judgment.  *Eichman*,

---

[5] Other than the issue of which law to apply, *Pirito* is otherwise inapposite.  It did not involve a pending appeal (much less a discretionary one), but only one that the defendant was considering whether to bring.  *Pirito*, 947 F.Supp.2d at 503.  It also involved entirely different jurisdictions than the present case.

**Points and Authorities in Opposition to Motion for Summary Judgment**

759 F.2d at 1437 (federal law on finality of judgments irrelevant to California state judgment which is not final pending appeal.)  In the context of Mr. Smagin's motion, the law which applies is California state law.[6]  *Pirito*, 947 F.Supp.2d at 503.  Under California law, a judgment is not final pending appeal, and not entitled to res judicata effect.  *Eichman*, 759 F.2d at 1437.

Moreover, even if *Pirito* did not resolve the matter (and it should), Mr. Smagin himself admits that the English trial court findings are only relevant if the other action "is determined to be sufficiently firm to be accorded conclusive effect."  [Smagin P&As 12:2-4 (quoting the Rest. 2d Judgments § 13 (1982).]  In this case, given the facts that (a) the underlying contract dispute must be decided as a mixed question of fact and English law, (b) enforcement is suspended in England until the matter is "finally disposed of," and (c) the English trial court *itself* recognized that the matter was a difficult one and appropriate for review, it is impossible to say that the other action is sufficiently firm or final to be accorded conclusive effect.

1.    The English Stay of Enforcement Should Stay Mr. Smagin's Attempt to Enforce Here

In addition, Article V(1)(e) of the New York Convention provides that recognition or enforcement of an award may be refused if the award "has been set aside or suspended by a competent authority of the country in which, or under the laws of which, that award was made.  New York Convention Article V(1)(e); *Eurocar Italia S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 318 (2d. Cir. 1998) ("[U]nder Article V of the Convention, an award should not be enforced if it is set aside or suspended in

---

[6] The decisions of English courts are not entitled to the same "full faith and credit" that would apply to State courts within the United States.  However, even if they were, it would be Mr. Smagin's burden to have demonstrated that English law would apply *collateral estoppel* here in light of the pending discretionary appeal and the stay of enforcement of the award.  Not only did Mr. Smagin avoid any mention of English law addressing the effect of a discretionary appeal, but in fact, the record shows that the English courts have suspended any enforcement of the arbitration award in England until Mr. Yegiazaryan's challenge is "finally disposed of."  [Brier Dec. ¶¶ 6-8, 13-15 and Ex. 1.]  Under these facts, the evidence shows a lack of finality of the sort that would support collateral estoppel.

the originating country.")  Since the arbitration award at issue was made in England, under the laws of England, this provision applies if the English courts have set aside or suspended the arbitration.

Here, as noted above, the English courts have suspended enforcement of the Arbitration Award in England.  In the only case Mr. Yegiazaryan has located addressing the effect a court-ordered stay of enforcement in a foreign country, the district court found that the U.S. action should be stayed pending resolution of the appeal proceedings in the foreign county.  *EDF Internat'l S.A. v. YPF S.A.,* 676 F.Supp.2d 317, 319 (D. Del. 2009).  The reasoning for such a ruling is clear:  if parallel proceedings are ongoing in the originating country and in the district court and there is a possibility that the award will be set aside, "a district court may be acting improvidently by enforcing the award prior to the completion of the foreign proceeding."  *Eurocar Italia S.p.A.*, 156 F.3d at 317.

**D.    The Court Should Decline to Confirm the Arbitration Award Pursuant to the Public Policy Against Double Recovery.**

The New York Convention expressly provides that either recognition *or* enforcement may be denied or deferred where the recognition *or* enforcement of the arbitration award would be against public policy.  New York Convention Article V(2)(b).  The public policy issue is specifically set to be addressed at the award-confirmation and enforcement stage.  *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1287 (11th Cir. 2015).

Although Mr. Smagin argues that public policy is "narrowly defined" for the purposes of New York Convention Article V(2)(b), the standard for such a public policy defense is that the public policy at issue must embody the forum state's most basic notions of morality and justice.  *Parsons and Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RATKA)*, 508 F.2d 969, 976 (2d Cir. 1974).    In determining whether the policy against double recovery is a basic notion of morality and justice, the court should consider the Supreme Court's repeated directive that "'[I]t

20

goes without saying that the courts can and should preclude double recovery by an individual.'" *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) (quoting *General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 333, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)). This directive applies not only to EEOC claims, but also contract cases like the present one. *Southern Cal. Fed. Sav. & Loan Ass'n v. U.S.*, 422 F.3d 1319, 1333 (Fed. Cir. 2005). Mr. Smagin does not cite any authority that even suggesting that the policy against double recovery is not a basic notion of justice of the court system. *See also Walter E. Heller Western Inc. v. Bloxham*, 176 Cal.App.3d 266, 274 (1985) ("the unmistakable policy of California is to prevent excess recoveries by secured creditors."); *Marcus, Stowell & Beye Gov't Sec., Inc. v. Jefferson Invest. Co.*, 797 F.2d 227, 233 (5th Cir. 1986) ("[A]llowing a double recovery is ordinarily against legal policy."); *Chandler Leasing Division Pepisico Serv. Indus. Leasing Co. v. Florida-Vanderbilt Dev. Corp.*, 464 F.2d 267, 270-71 (5th Cir. 1972)(risk of double recovery would violate public policy); *Turquoise Prop. Gulf, Inc. v. Overymyer*, 81 So.3d 1250, 1256 (Ala. 2011) ("Double recovery" is "materially unjust" result which precludes automatic confirmation of arbitration award under FAA.).

In this case, Mr. Yegiazaryan has submitted evidence **from Mr. Smagin himself** showing (a) Mr. Smagin effected the asset freeze in Russia in order to secure assets for his recovery, and (b) that the value of such assets frozen in Russia far exceed the value of the arbitration award. [Barannikov Dec. ¶5 and Ex. 2; Benson Dec. ¶ 7.] Mr. Smagin has consistently insisted that those assets alone are worth more than $300 million. [Benson Dec. ¶ 8 and Exhibit 2 (Relevant portions of Smagin's expert report valuating Europark in excess of $300 million dollars.)] Mr. Smagin admits that he has not attempted to enforce this award yet in Russia, despite his underlined actions in having assets frozen there to secure his recovery. As such, it appears that Mr. Smagin seeks to proceed here for a tactical advantage in order to receive a double recovery.

21

**Points and Authorities in Opposition to Motion for Summary Judgment**

Citing *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Systems*, 665 F.3d 1091, 1098-99 (9th Cir. 2011), Mr. Smagin attempts to distinguish between confirmation of the award and payment of the award. However, *Cubic Systems* depended on the fact that the federal government could step in and prevent payment to Iran if the payment violated public policy. *Id.* Here, the obvious intentions of Mr. Smagin are to collect first outside of Russia (and possibly before the English appellate court can even rule) and only then use corrupt means within Russia to collect on the assets already frozen on his behalf. Given that Mr. Smagin is already secured in Russia, the Court should require that he either (a) release such security there or (b) proceed to attempt to enforce in Russia before attempting to confirm and enforce here.

**E.     The Court Should Reject the Request for Attorney's Fees.**

The record refutes Mr. Smagin's assertion that his petition to confirm the arbitration award was necessary because Mr. Yegiazaryan allegedly acted "in bad faith" in challenging the award. Although Mr. Smagin relies on *Cubic Systems*, the defendant in that case had not taken any effort to set aside the award in the primary jurisdiction but sat back and did nothing until the plaintiff sought to enforce more than a year later. *Cubic Sys.*, 665 F.3d at 1094. Here, by contrast, Mr. Yegiazaryan promptly challenged the award in the primary jurisdiction (as he was entitled to do). While Mr. Smagin does not like the challenge, even the English trial court has conceded that the challenge has a "real prospect of success." Mr. Yegiazaryan's challenge was filed in England nearly two weeks *before* this second action was filed here, and Mr. Yegiazaryan has moved expeditiously to litigate the case in England. If there is unnecessary and duplicative litigation in this Court, it is because Mr. Smagin has attempted to achieve a tactical advantage rather than wait for the English proceeding to be "finally disposed of."

To the extent that Mr. Smagin suggests that Mr. Yegiazaryan's substantive defenses (particularly the arbitrabilty and forgery defenses) were asserted in bad faith,

22

**Points and Authorities in Opposition to Motion for Summary Judgment**

the record again refutes that contention.  As discussed above, both questions must be decided by a court and Mr. Yegiazaryan was and is entitled to pursue his rights on both issues until a *court* has reached an appropriate *final* judgment.  Competent evidence (including forensic evidence) supports Mr. Yegaizaryan's position on both points.  Moreover, the arbitrability question is sufficiently unsettled that the English trial judge specifically certified the issue for appeal and found there was a "real prospect of success" on that appeal.  Mr. Smagin essentially suggests that Mr. Yegiazaryan should have to pay all of Mr. Smagin's fees from the initiation of this action because of a delay resulting from an English trial court finding that Mr. Yegiazaryan's position had a real prospect of success.  The Court should firmly reject any such argument.

## IV.    CONCLUSION

For the reasons discussed above, there is a sufficient factual basis on which a reasonable factfinder could defer or deny confirmation of the award pending conclusion of the fully-brief appeal in England and/or Mr. Smagin's release of his security in Russia.  The summary judgment motion should be denied.


DATED:  February 24, 2016

Tantalo & Adler LLP

By:   /s/ Michael S. Adler
Michael S. Adler
Attorneys for Respondent

**Points and Authorities in Opposition to Motion for Summary Judgment**