1  Michael S. Adler, SBN 190119
    madler@ta-llp.com
2  Joel M. Tantalo, SBN 206096
    jtantalo@ta-llp.com
3  **TANTALO & ADLER LLP**
  1901 Avenue of the Stars, Ste. 1000
4  Los Angeles, CA 90067

5  Telephone:  (310) 734-8695
  Fax:        (310) 734-8696
6
7  Attorneys for respondent Ashot Yegiazaryan

8

9

10

11

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

12  VITALY IVANOVICH SMAGIN

13       Petitioner,

14       v.

15  ASHOT YEGIAZARYAN,

16       Respondent.

**CASE NO. 14-cv-09764-R (PLAx)**

Before the Honorable Manuel L. Real
United State District Judge

**DECLARATION OF ASHOT
YEGIAZARYAN IN OPPOSITION
TO APPLICATION FOR WRIT OF
ATTACHMENT**

**Hearing Place:**   Courtroom 8
**Hearing Date:**   March 21, 2015
**Hearing Time:**   10:00 a.m.

17

18

19

20

21

22

23

24

25

26

27

28

---

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

## <u>DECLARATION OF ASHOT YEGIAZARIAN</u>

I, Ashot Yegiazaryan, do hereby declare as follows:

1.      I am the named respondent in this action.  I have personal knowledge of the facts declared herein and could and would competently testify thereto in a Court of Law if required to do so.

### Personal Background and Profession as a Legislator Until 2011

2.      I became involved in Russian government and political activities in the second half of the 1990s.  In 1996, I took part in organizing the financing of Boris Yeltsin's ("Yeltsin") presidential campaign.  In 1997, I was an advisor for the Russian Central Bank (the Russian equivalent of the U.S. Federal Reserve).

3.      At the time, I also served as an advisor on a pro bona basis for Yuri Maslyukov, the First Deputy Prime Minister.

4.      In 1999, I was elected to the State Duma.  I was reelected to the State Duma in 2003 and 2007. During my time as a Deputy of the State Duma, I was appointed to various positions including deputy chairman of the Committee on Budget and Taxes, deputy chairman of the Commission to Promote a Political Settlement and Adherence to Human Rights in the Chechen Republic and a member of the Commission on the State Debt of the Russian Federation.

5.      I began to fall out of political favor around 2005, largely because I was allied with the former Prime Minister Mikhail Kasyanov and my association with him was perceived as a sign of disloyalty.

### Investments in Russia and Disputes with Connected Individuals

6.      Although I was a legislator by profession between 1999 and 2010, I did make some investments during that time.  Those investments included at least two real estate projects: the Europark Shopping Center and the Moskva Hotel.

7.      Other investors in the Moskva Hotel included the City of Moscow, Vladimir Putin's long-time judo partner Arkaday Rotenberg and Validimir Putin's

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

former masseuse Konstantin Goloschapov.

8.    After I fell out of political favor with the political authorities in Russia, certain partners pressured me to surrender my investment in the Moskva Hotel.  When I refused to quietly give up my investment, I was subjected to various forms of official and unofficial harassment.  Ultimately, I filed an arbitration award in the London Court of International Arbitration against high-ranking individuals within the Russia government.

**Flight from Russia in the Face of Death Threats**

9.    I left Russia in the summer of 2010, in large part because I began receiving threats of reprisal to 'stay away' from the Moskva Hotel Project. I reported these threats to the Russian police but they took no serious action. This was long before I was named as a suspect in respect of any alleged charges and long before the Russian arrest warrant was issued.  These threats included threats against myself and also my family, such as threats to behead my children.  A family member of mine was killed in Russia in 2010 and I believe it was done to send me a message.

10.    Attached hereto as Exhibit 1 are true and correct copies of reports I filed with the Russian police relating to the threats against myself and my family.

**Politically-Motivated Arrest Warrant**

11.    While I was in the United States, and after I filed my affirmative claims in London, the Russian authorities in October 2010 took moves to strip me of my parliamentary immunity, summoned me for questioning and placed me on a wanted list. Placing me on the wanted list was improper, because this may be done only where a person's whereabouts are unknown, whereas I had promptly informed investigators of my address in the United States and my safety concerns about returning to Russia. Investigators dismissed my lawyers' objections out of hand and published a notice through INTERPOL.

12.    Unfortunately, it is my understanding that INTERPOL is little more than a

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

clearing house for arrest and extradition requests from foreign countries, such that it is open to abuse. As noted in the Economist article attached hereto as Exhibit 2, Russia is particularly notorious for this practice.  In any event, an INTERPOL notice is not evidence of guilt and INTERPOL itself emphasizes that persons subject to INTERPOL notices enjoy a presumption of innocence. I note that the United States (where I currently reside) has not acted on Russia's request.

13.    I wish to inform the court that I have no confidence in the Russian criminal investigation or my safety if I were to return to Russia. The Economist article mentioned above refers to the notorious Russian case of Sergei Magnitsky as a particularly acute example of the abuse of Russian criminal proceedings. That case involves allegations that the Russian officials investigating the case forged documents and stole money from the persons under investigation. After one of the accused's lawyers, Sergei Magnitsky, complained about these abuses, he was thrown in prison where he died; it is alleged that he was subjected to abuse in prison and that is why he died. This case has been the subject of censure by the European Parliament and the United States Congress, the latter of which imposed sanctions on a number of Russian officials involved in the investigation.

14.    In this respect, I also wish to note that no less than seven of the Russian officials involved in my investigation also handled the Magnitsky case, and five of the officials involved in my case (Aleksey Droganov, Victor Grin, Oleg Logunov, Andrei Krechetov and Andrei Strizhov) have been placed under sanctions by the U.S. State Department for their involvement in the Magnitsky case.

**Continuous Objection to the Forged 2008 Agreement**

15.    In 2010, Mr. Smagin initiated an arbitration against me, claiming various grounds for jurisdiction including a claim that I signed a certain 2008 agreement including an arbitration clause.

16.    I did not sign that agreement.  It is forged.  I have consistently objected to

3

the various grounds, including objecting to the forged document.

17.    I have also continually objected that the 2008 Agreement would not provide the arbitrators with jurisdiction over the dispute even if it were genuine. That agreement covers a number of topics that include, but are not limited to, topics addressed in two earlier (undisputed) agreements to which I was not a signatory or party: a 2006 Shareholders' Agreement and a 2007 Escrow Agreement. Of particular importance, Articles 2.1 to 2.4 of the purported 2008 agreement referred to actions supposedly to be taken in furtherance of the 2006 Shareholders' Agreement and the expired 2007 Escrow Agreement. If the agreement had been signed, within the context of the prior agreements, Section 2.10 would only have meant that Mr. Smagin had the right to pursue Kalken Holdings, Ltd. under the pre-existing arbitration agreements in the agreements to which I was not a party.

### Mr. Smagin Initiated the Freezing Order Against Me in Russia

18.    In connection with his claims against me, Mr. Smagin has filed a civil claim within the criminal claim against me. A true and correct copy of that claim (along with an English translation) is attached hereto as Exhibit 3.

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct and that this declaration was executed on February 24, 2016 in Los Angeles County, California.

_____
Ashot Yegiazaryan
(also spelled Ashot Egiazaryan)

4

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

# EXHIBIT
# 1

*231637*

П О С Т А Н О В Л Е Н И Е
о возбуждении уголовного дела и принятии его к производству

г. Москва                                                "_09_" _февраля_ 20__

                                                         в 17 ч. 00 мин.

      Следователь (дознаватель) _ОД ОВД по Тверскому району г. Москвы_
капитан милиции _Гуляева Н.Ю._

      рассмотрев сообщение о преступлении _КУС- 2406 от 09.02.2010 г._

поступившее _по заявлению_

                         УСТАНОВИЛ:

      20 января 2010 года примерно в 15 часов 00 минут, неустановленное
дознанием лицо, имея умысел на совершение угрозы убийством в отношении
депутата Государственной Думы РФ Егиазаряна А.Г., осуществило звонок на
абонентский номер рабочего кабинета последнего, расположенного по адресу: г.
Москва, Охотный ряд, д.1, кааб №718, и высказало в адрес Егиазаряна А.Г.
угрозы убийством словами «что если он будет лезть в гостиницу «Москва» то
отрежут голову ему и его семье», после этого продолжая свой преступный
умысел, направленный на совершение угрозы убийством, осуществило звонки на
вышеуказанный номер 21.01.2010 года и 22.01.2010 года, с угрозами убийства в
адрес последнего словами «что оторвут голову ему и членам его семьи», в связи
с чем данные угрозы Егиазаряном А.Г., были восприняты реально, таким образом
в действиях неустановленного лица усматривается состав преступления
предусмотренный ч.1 ст.119 УК РФ.

      Принимая во внимание, что имеются достаточные данные, указывающие
на признаки преступления__, предусмотренные _____ ч.1 ст.119 ___ УК РФ,
руководствуясь ст. 140, 145, 146 (147), частью первой ст. 156 и частью первой
ст. 157 УПК РФ,

                         ПОСТАНОВИЛ:

      1. Возбудить уголовное дело по признакам преступления,
предусмотренного _____ ч.1 ст.119 _____ УК РФ

      2. Возбудить уголовное дело в отношении ___ деяниях которого усматривается
признаки преступления, предусмотренного __ ч.1 ст.119 УК РФ__

      3. Уголовное дело принять к своему производству и приступить к его
расследованию.

      4. Копию настоящего постановления направить прокурору Тверского р-на
г. Москвы

      Следователь (дознаватель)
Копия настоящего постановления направлена прокурору Тверского р-на г. Москвы

      "_09_" _февраля_ 20_10_ г.     в _17_ ч _10_ мин

О принятом решении сообщено заявителю и лицу, в отношении которого возбуждено уголовное
дело

      Следователь (дознаватель)

*231037*

## ORDER

#### to commence a criminal investigation and allow it to proceed

City of Moscow                                                                09 February 2010

                                                                                  17 hours 00 mins

    Police captain N.Yu. Gulyayeva, investigator (interrogating officer) of the Investigations Office of the Tverskoy District Department of Internal Affairs of the City of Moscow,
    having examined notification of crime KUS-2406 dated 9/2/2010, which was received according to statements

### HAS ESTABLISHED THAT:

    On 20 January 2010 at about 15:00, an individual unknown to the investigation, having the intent to make a threat of murder with respect to A. G. Egiazaryan, member of the RF State Duma, made a call to the subscriber number in the latter's office, which is located at: 1 Okhotny Ryad, office 718, Moscow, and threatened A. G. Egiazaryan with murder, saying "if he tries to get involved with the Hotel Moscow, they will cut off his and his family's heads," after which, continuing his criminal intent aimed at making a threat of murder, he made calls to the above-mentioned number on 21.01.2010 and 22.01.2010 with threats of murder to the latter, saying "they will tear off his and his family's heads", as a result of which A. G. Yegiazaryan took these threats seriously, and therefore the actions of the undetermined individual have the attributes of the crime specified by art. 119(1) of the RF Criminal Code.
    Considering that there is sufficient data pointing toward attributes of crime stipulated by Art. 119 Section 1 of the Criminal Code of the Russian Federation, and taking guidance from Articles 140, 145, 146 (147), Art. 156(1) and Art. 157(1) of the RF Criminal Procedural Code,

### HAS ORDERED THAT:

    1. A criminal investigation into the indications of a criminal offence under Art. 119(1) of the Criminal Code of the Russian Federation be commenced.
    2. A criminal investigation of the actions which exhibit attributes of a criminal offence under Art. 119(1) of the Criminal Code of the Russian Federation be commenced.
    3. The criminal case proceeds and commences its investigation.
    4. A copy of this order is forwarded to the Prosecutor General of the Tverskoy District of the City of Moscow.

Investigator (interrogating officer)                                        [signature]

    A copy of this order was forwarded to the prosecutor of the Tverskoy district of the City of Moscow on 9 February 2010  at 17:10.

    The applicant and the individual with respect to whom the criminal case is commenced have been notified of the decision made.

Investigator (interrogating officer)                                        [signature]

Приложение 3

**Постановление**
**о признании потерпевшим**

г. Москва                                          « 18 » февраля 2010 г.
(место составления)

Следователь (дознаватель) ОД ОВД Тверского р-на г. Москвы
(наименование органа предварительного следствия или дознания,
капитан юстиции Гулчева Н.Ю.
классный чин или звание, фамилия, инициалы следователя (дознавателя)
рассмотрев материалы уголовного дела N 231037,

**установил:**

20 января 2010 года примерно в 15 часов 00 минут, неустановленное дознанием лицо, имея умысел на совершение угрозы убийством в отношении депутата Государственной Думы РФ Егиазаряна А.Г., осуществило звонок на мобильный номер рабочего кабинета последнего, расположенного по адресу: г. Москва, Охотный ряд, д.1, каб #718, и высказывало в адрес Егиазаряна А.Г. угрозы убийством словами «что если он будет лезть в гостиницу «Москва» то отрежут голову ему и его семье», после этого продолжая свой преступный умысел, направленный на совершение угрозы убийством осуществило звонки на вышеуказанный номер 21.01.2010 года и 22.01.2010 года, с угрозами убийства в адрес последнего словами «что оторвут голову ему и членам его семьи», в связи с чем данные угрозы Егиазаряном А.Г., были восприняты реально, таким образом в действиях неустановленного лица усматривается состав преступления предусмотренный ч.1 ст.119 УК РФ.
(излагаются основания признания лица потерпевш__)

На основании изложенного и учитывая, что Егиазаряну Ашоту Геворковичу.
(фамилия, имя, отчество физического лица
или наименование юридического лица, признаваемого потерпевш__)
причинен моральный ущерб

руководствуясь ст.42 УПК РФ,

**постановил:**

Признать потерпевшим. Егиазаряна Ашота Геворковича
(фамилия, имя, отчество физического лица
либо наименование юридического лица)
по уголовному делу N 231037    о чем объявить ему (ей) под расписку.

Следователь (дознаватель)  _____
(подпись)

Настоящее постановление мне объявлено " 18 " февраля  2010  г. и одновременно разъяснены права потерпевшего, предусмотренные частью второй ст.42 УПК РФ:

1) знать о предъявленном обвиняемому обвинении;

2) давать показания;

3) отказаться свидетельствовать против самого себя, своего супруга (своей супруги) и других близких родственников, круг которых определен п.4 ст.5 УПК РФ. При согласии дать показания я предупрежден_ о том, что мои показания могут быть использованы в качестве доказательств по уголовному делу, в том числе и в случае моего последующего отказа от этих показаний;

4) представлять доказательства;

5) заявлять ходатайства и отводы;

6) давать показания на родном языке или языке, которым я владею;

7) пользоваться помощью переводчика бесплатно;

8) иметь представителя;

9) участвовать с разрешения следователя или дознавателя в следственных действиях, производимых по моему ходатайству либо ходатайству моего представителя;

10) знакомиться с протоколами следственных действий, произведенных с моим участием, и подавать на них замечания;

11) знакомиться  с постановлением о назначении судебной экспертизы и заключением эксперта в случаях,  предусмотренных частью второй ст.198 УПК РФ;

12) знакомиться по окончании предварительного расследования со всеми материалами уголовного дела, выписывать из уголовного дела любые сведения и в любом объеме, снимать копии с материалов уголовного дела, в том числе с помощью технических средств. В случае, если в уголовном деле участвует несколько потерпевших, я вправе знакомиться с теми материалами уголовного дела, которые касаются вреда, причиненного лично мне;

13) получать копии постановлений о возбуждении уголовного дела, признании меня потерпевш__ или об отказе в этом, о прекращении уголовного дела, приостановлении производства по уголовному делу, а также копии приговора суда первой инстанции, решений судов апелляционной и кассационной инстанций;

14) участвовать в судебном разбирательстве уголовного дела в судах первой, второй и надзорной инстанций;

15) выступать в судебных прениях;

16) поддерживать обвинение;

17) знакомиться с протоколом судебного заседания и подавать на него замечания;

18) приносить жалобы на действия (бездействие) и решения дознавателя, следователя, прокурора и суда;

19) обжаловать приговор, определение, постановление суда;

20) знать о принесенных по уголовному делу жалобах и представлениях и подавать на них возражения;

21) ходатайствовать о применении мер безопасности в соответствии с частью третьей ст.11 УПК РФ;

22) осуществлять иные полномочия, предусмотренные УПК РФ.

Потерпевш___ _____ (подпись)

Постановление объявил и права разъяснил
следователь (дознаватель) _____ (подпись)

Копию настоящего постановления получил__ " 18 " февраля 2010 г.

_____ (подпись потерпевшего)

Appendix 53

Order to
Acknowledge an Aggrieved Party

<u>Moscow</u>                                                                           18 February 2010
(prepared at)

        <u>Police Captain N. Yu. Gulyayeva</u>, investigator (interrogating officer) of the Investigations
Office of the Tverskoy District Internal Affairs Department, City of Moscow,
_____
                    (classification or title, last name, and initials of investigator (interrogating officer))

having reviewed the files of criminal case No. 231037,

**established that**

        On 20 January 2010 at about 3:00 p.m., an individual unknown to the investigation, having the intent to make a threat of murder with respect to A. G. Egiazaryan, member of the RF State Duma, made a call to the subscriber number in the latter's office, which is located at: 1 Okhotny Ryad, office 718, Moscow, and threatened A. G. Egiazaryan with murder, saying "if he tries to get involved with the Hotel Moscow, they will cut off his and his family's heads," after which, continuing his criminal intent aimed at making a threat of murder, he made calls to the aforenamed number on 21/01/2010 and 22/01/2010 with threats of murder to the latter, saying "they will tear off his and his family's heads," as a result of which A. G. Yegiazaryan took these threats seriously, and therefore the actions of the undetermined individual have the attributes of the crime specified by art. 119(1) of the RF Criminal Code.
                            (state the basis for deeming the person an aggrieved party)

On the basis of the above and given that <u>Ashot Gevorkovich Egiazaryan</u>
                                    (last name, first name, patronymic of the individual)
_____
                        or name of the legal entity deemed the aggrieved party)

suffered emotional distress,

taking guidance from art. 42 of the RF Code of Criminal Procedure,

**ordered that:**

        <u>Ashot Gevorkovich Egiazaryan</u> be deemed an aggrieved party
                (last name, first name, patronymic of the individual or name of the legal entity)

under criminal case No. 231037, of which he (she) shall be notified and sign the notification form.


Investigator (Interrogating Officer)                      [signature] _____
                                                                    (signature)

This order was announced to me on 18 February 2010 and the rights of the aggrieved party specified by art. 42(2) of the RF Code of Criminal Procedure were explained at the same time as follows:

      1) know the indictment against the accused;

      2) give testimony;

      3) refuse to testify against myself, my wife (husband), and other close relatives as defined by art. 5(4) of the RF Code of Criminal Procedure. If I agree to testify, I have been warned that my testimony may be used as evidence in a criminal case, including if I later repudiate that testimony;

      4) enter evidence;

      5) enter motions and challenges;

      6) testify in my native language or a language in which I am proficient;

      7) use the services of an interpreter at no charge;

      8) have counsel;

      9) participate, with the permission of the investigator or interrogating officer, in investigative actions carried out on the basis of my motion or the motion of my counsel;

      10) review the records of investigative actions taken with my participation and comment those;

      11) review the order requesting forensic review and expert opinion in cases specified by art. 198 of the RF Code of Criminal Procedure;

      12) review all criminal case files upon conclusion of the preliminary investigation, copy out any information in any amount from the criminal case, and make copies of criminal case files, including using equipment. If several aggrieved parties are involved in the criminal case, I am entitled to review the criminal case files that pertain to the harm done to me personally;

      13) obtain copies of orders initiating a criminal case, deeming me aggrieved or refusing to do so, closing the criminal case, and suspending the criminal case, and copies of the lower court's verdict and of rulings of appeal and cassation courts;

      14) participate in the trial of the criminal case in courts of the first, second and supervisory levels;

      15) present pleadings;

      16) support the indictment;

      17) review the transcript of the court session and comment on it;

      18) appeal the actions (inaction) and decisions of the interrogating officer, investigator, prosecutor or court;

      19) appeal a verdict, judgment or determination of a court;

      20) learn of appeals and propositions entered in the criminal case and make objections to those;

      21) petition for protection pursuant to art. 11(3) of the RF Code of Criminal Procedure;

      22) exercise other authority specified by the RF Code of Criminal Procedure.

| | |
|---|---|
| Aggrieved party | ✓[signature] _____ |
| | (signature) |
| The investigator (interrogating officer) who read the order and explained the rights | ✓[signature] _____ |
| | (signature) |
| I have received a copy of this order | 18 February 2010 |
| | ✓[signature] _____ |
| | (signature of the aggrieved party) |

# EXHIBIT

# 2



**Abusing Interpol**

# Rogue states

**Cross-border policing can be political**

Nov 16th 2013 | From the print edition

FOUR years ago this week the whistle-blowing accountant Sergei Magnitsky died in jail from beatings and abuse, having uncovered a $230m fraud against the Russian state. His client Bill Browder, a London-based financier, has been campaigning to punish those responsible with visa bans and asset freezes. But the Russian authorities have retaliated and are trying to extradite him on fraud charges, using Interpol, the world police co-operation body.

No Western country is likely to send Mr Browder to Moscow. But his travel plans are stymied by the risk of arrest . He had to cancel a visit to Sweden last month to talk to a parliamentary committee. Only after weeks of lobbying did the country's police remove Mr Browder from their database. Germany, France and Britain have also publicly snubbed Russia's request.

Interpol notes that its constitution prohibits "activities of a political, military, religious or racial character"; governments are not supposed to use it to settle scores with their opponents. Nevertheless its "Red Notices", which seek the discovery and arrest of wanted persons for extradition, are open to abuse. Once issued, a Red Notice encourages—though it does not oblige—190 countries to detain the person named. 8,136 were given out last year, an increase of 160% since 2008. Interpol insists that it is not a judicial body: "queries" concerning allegations are "a matter for the relevant national authorities to address".

But Mr Browder's case is just one of many arousing controversy. Three years ago Algeria issued a Red Notice against Henk Tepper, a Canadian potato farmer, in a row involving export paperwork and suspect spuds. He was released in March after a year in a Lebanese jail and wants to sue the Canadian government for not protecting his rights. Interpol took 18 months to accept that the Red Notice issued against Patricia Poleo, a Venezuelan investigative journalist, by her government was politically motivated. Indonesia pursued Benny Wenda, a West Papuan tribal leader who ended up marooned in Britain; Belarus hounded an opposition leader, Ales Michalevic, when he fled to Poland.

Russia seems particularly fond of the tactic. It has targeted political refugees, such as Petr Silaev, an environmental protester, and Anastasia Rybachenko, a student activist now stranded in Estonia. She says Interpol is being used to "undermine democracy". During

Ashot Yegiazaryan Decl., Exhibit 2, Page 12

recent elections in Estonia, Russia also reissued a Red Notice for Eerik-Niiles Kross, a politician and former spymaster who has long been a Kremlin bugbear.

Fair Trials International, a campaigning group, wants Interpol to have greater powers to vet "abusive, incomplete or inaccurate" arrest requests before they are sent to police forces around the globe. Though all Red Notices are issued to law-enforcement agencies, fewer than half are then made public. That makes it hard to challenge them in advance, or to prepare a defence in the event of a surprise arrest at a foreign airport. Fair Trials also wants an independent body to hear appeals instead of the Commission for the Control of Interpol's Files, which it says is too secretive.

Billy Hawkes, the commission's chairman, says its decisions in individual cases are formally only recommendations to Interpol's General Secretariat. He admits that aspects of its activities are "unsatisfactory", but argues that for a possible innocent person, having a Red Notice spread over the internet would be worse than issuing it in secret.

Dominic Raab, a British MP, worries that diplomatic expediency is compromising citizens' rights. Ken-Marti Vaher, Estonia's interior minister, decries requests of "a dubious nature" made to Interpol, and points out that Russia has failed to accept any of his country's offers to help investigations concerning Mr Kross. Mark Stephens, a British lawyer, says few governments are protesting about abuse because no one wants to be seen taking the side of criminals. At present, he says, challenging Red Notices is like a "game of battleships": the defence is shooting in the dark, unaware of the size and scope of the target.

 From the print edition: International

Ashot Yegiazaryan Decl., Exhibit 2, Page 13

## Notices

INTERPOL Notices are international requests for cooperation or alerts allowing police in member countries to share critical crime-related information.

Notices are published by INTERPOL's General Secretariat at the request of National Central Bureaus (NCBs) and authorized entities, and can be published in any of the Organization's official languages: Arabic, English, French and Spanish.

In the case of Red Notices, the persons concerned are wanted by national jurisdictions for prosecution or to serve a sentence based on an arrest warrant or court decision. INTERPOL's role is to assist the national police forces in identifying and locating these persons with a view to their arrest and extradition or similar lawful action.

In addition, Notices are used by the United Nations, International Criminal Tribunals and the International Criminal Court to seek persons wanted for committing crimes within their jurisdiction, notably genocide, war crimes, and crimes against humanity.

### Types of Notice



**Red Notice**
To seek the location and arrest of wanted persons with a view to extradition or similar lawful action.



**Yellow Notice**
To help locate missing persons, often minors, or to help identify persons who are unable to identify themselves.



**Blue Notice**
To collect additional information about a person's identity, location or activities in relation to a crime.



**Black Notice**
To seek information on unidentified bodies.



**Green Notice**
To provide warnings and intelligence about persons who have committed criminal offences and are likely to repeat these crimes in other countries.



**Orange Notice**
To warn of an event, a person, an object or a process representing a serious and imminent threat to public safety.



**INTERPOL–United Nations Security Council Special Notice**
Issued for groups and individuals who are the targets of UN Security Council Sanctions Committees.



**Purple Notice**
To seek or provide information on modi operandi, objects, devices and concealment methods used by criminals.

### Publication

Only those notices approved for public dissemination appear on this website (the full list of Notices is available to authorized users via INTERPOL's Information System).

Any individual who is subject to an INTERPOL Notice should be considered innocent until proven guilty.

Any unauthorized alteration of any portion of any INTERPOL Notice is considered as a violation and subject to legal prosecution.

### Legal basis

A Notice is published only if it fulfils all conditions for processing the information. For example, a Notice will not be published if it violates Article 3 of the INTERPOL Constitution, which forbids the Organization from undertaking any intervention or activities of a political, military, religious or racial character.

Notices are processed in line with INTERPOL's Rules on the Processing of Data, which ensure the legality and quality of information, and the protection of personal data.

The legal basis for a Red Notice is an arrest warrant or court order issued by the judicial authorities in the country concerned. Many of INTERPOL's member countries consider a Red Notice to be a valid request for provisional arrest.

Furthermore, INTERPOL is recognized as an official channel for transmitting requests for provisional arrest in a number of bilateral and multilateral extradition treaties, including the European Convention on Extradition, the Economic Community of West African States (ECOWAS) Convention on Extradition, and the United Nations Model Treaty on Extradition.

### Diffusions

Similar to the Notice is another request for cooperation or alert mechanism known as a 'diffusion'. This is less formal than a notice but is also used to request the arrest or location of an individual or additional information in relation to a police investigation. A diffusion is circulated directly by an NCB to the member countries of their choice, or to the entire INTERPOL membership and is simultaneously recorded in INTERPOL's Information System.

© INTERPOL 2015. All rights reserved.

Ashot Yegiazaryan Decl., Exhibit 2,
Page 14

# EXHIBIT

# 3

Следователю по особо важным делам
первого            отдела            управления
по расследованию особо важных дел о
преступлениях против государственной
власти и в сфере экономики
ГСУ СК при Прокуратуре РФ
советнику юстиции Габдулину Р.Р.

от Смагина Виталия Ивановича
проживающего: г.Москва, ул.
Берзарина, д.19,  к.1, кв. 103.

по уголовному делу №201/355137-10

## ХОДАТАЙСТВО

Учитывая, что  своими противоправными действиями Егиазарян А.Г., совершил хищение моего имущества – 20% акций ЗАО «Центурион Альянс», номинальной стоимостью 4 600 000 рублей, рыночная стоимость которых на сегодняшний момент составляет 1 575 500 000 рублей ( один миллиард пятьсот семьдесят пять миллионов пятьсот тысяч рублей), то есть своими противоправными деяниями причинил мне имущественный ущерб, прошу Вас принять и приобщить к материалам уголовного дела мой  гражданский иск (исковое заявление).

Приложение: гражданский иск на 6 листах.

_____ Смагин В.И.

12 ноября 2010 года

1

Следователю по особо важным делам
первого отдела управления
по расследованию особо важных дел о
преступлениях против государственной
власти и в сфере экономики
ГСУ СК при Прокуратуре РФ
советнику юстиции Габдулин Р.Р.

от Смагина Виталия Ивановича
проживающего: г.Москва, ул.
Берзарина, д.19, к.1, кв. 103.

по уголовному делу №201/355137-10

Гражданский иск
о возмещении имущественного вреда,
причиненного совершенным преступлением

Мне, Смагину Виталию Ивановичу в Закрытом акционерном обществе «Центурион Альянс» принадлежали на праве собственности 460 (четыреста шестьдесят) штук обыкновенных именных акций ЗАО «Центурион Альянс» номинальной стоимостью 10.000 (десять тысяч) рублей каждая, что составляет 20% акций. Подконтрольные Егиазаряну А.Г. структуры ЗАО «Титул», ТД «Уникомимпекс», ООО «Милеа», ООО «Мерхав» владели в ЗАО «Центурион Альянс» 73% акций. Еще 7% акций владел партнер Егиазаряна А.Г. по бизнесу Дмитрий Гаркуша, который в 2006 году являлся управляющим ООО «Даев Плаза», генеральным директором ООО «Декмос».

Мои акции были учтенные на лицевом счете № 013700 в реестре акционеров, ведение которого осуществлялось регистратором - ЗАО «Регистраторское общество «СТАТУС».

В 2006 году Егиазарян Ашот Геворкович также осуществлял реализацию других коммерческих проектов в иных сферах деятельности, в частности, через подконтрольные ему фирмы ЗАО «Декорум», ОАО «Декмос» осуществлял строительство гостиницы «Москва» и нуждался в средствах, для чего привлекал кредиты.

На одной из наших встреч в бизнес центре «Даев плаза», расположенном по адресу: г. Москва, Даев переулок, д.20 в ноябре 2006 года Егиазарян А.Г. предложил мне продать ему мои 20% акций. Я отказал, так как предложенная Егиазаряном А.Г. цена была на порядок ниже реальной. В этот период у нас были хорошие предложения от сторонних лиц о продаже акций, но Егиазарян А.Г. не хотел продавать свои акции, а наоборот хотел получить мой пакет. Егиазарян А.Г. сообщил мне, что ему нужны все акции ЗАО «Центурион Альянс» на залога в «Дойче банке», где, якобы, его фирма

1

должна получить кредит в размере 100 миллионов долларов США на реконструкцию гостиницы «Москва».

Впоследствии, Егиазарян А.Г. и Дмитрий Гаркуша на одной из встреч со мной, состоявшейся в г. Москве в «Даев Плаза», примерно в конце ноября – начале декабря 2006 года сообщили, что «Дойче банк» готов выдать кредит не строго на строительство гостиницы «Москва», но под поручительство «Европарка», как ликвидного объекта. Хотя эти деньги будут использованы ими именно на проект реконструкции гостиницы «Москва».

В процессе нашего общения Егиазарян А.Г. меня долго уговаривал поучаствовать в схеме, якобы предложенной «Дойче банком», путем хотя бы временной (на один год) передачи моих 20% акций в ЗАО «Центурион Альянс» в обеспечение возврата кредита, ни рубля из которого сам ЗАО «Центурион Альянс» не должен был получить. Я, естественно, отказался. Егиазарян А.Г. продолжал настаивать, говоря, что моему имуществу ничто не угрожает, что всем рискует лично он, и что я могу рассчитывать на участие в его бизнесе по строительству гостиницы «Москва» и на получение дополнительного пакета акций ЗАО «Центурион Альянс», если соглашусь на временную передачу моих акций в депозитарий «Дойче банка» в обеспечение возврата кредита. Я после долгих уговоров выразил свое предварительное согласие, но настаивал на обязательном письменном оформлении всех документов и договоренностей с привлечением хороших юристов.

На очередной встрече между мной, Егиазаряном А.Г. и Дмитрием Гаркушей, состоявшейся примерно в ноябре 2006 года в г. Москве Егиазарян А.Г. сообщил, что его партнер Дмитрий Гаркуша является владельцем компании «Блиденсол Трейдинг энд Инвестментс Лтд (Кипр) – получателя кредита в размере 100 млн. долларов США от «Дойче банка». Егиазарян А.Г. сообщил, что по схеме, одобренной «Дойче банком», банк хочет получить в залог акции ЗАО «Центурион альянс» и все имущество «Европарка», где у меня были 20%, но банк, якобы, не желает, чтобы эти 20% на момент залога принадлежали лично мне или иным Российским юридическим или физическим лицам. Для чего Егиазарян А.Г. рассказал, что схема должна выглядеть следующим образом: я, как и остальные акционеры, должен был продать свои акции кипрской компании «Доралин Трейдинг энд Инвестментс» (далее – «Доралин») по номинальной стоимости. Данная компания также является акционерным обществом. Данную компанию создали граждане Кипра, а генеральной доверенностью на управление данной компанией до октября 2009 года владел Гаркуша. В свою очередь 100% акций самой компании «Доралин» приобретает компания «Тафтс Инвест энд Трейд Инк.» (Британские Виргинские острова, далее – «Тафтс»). В самой компании «Тафтс» акции должны быть распределены также, как а в самой компании «Тафтс» акции должны быть распределены также, как а в ЗАО «Центурион Альянс», то есть 73% у Егиазаряна А.Г., 7% у Дмитрия Гаркуши, а 20% у меня.

Егиазарян А.Г. сказал, что войдет в компанию «Тафтс» подконтрольной ему фирмой «Калкен Холдингс Лтд» (Кипр) (далее Калкен). Калкен также является кипрской компанией, директорами которой являются

113

2

114

граждане Кипра, но кто является учредителем я не знаю. Но генеральная доверенность на управление данной компанией выдана на Егиазаряна Артема.

Я, так как не участвовал никак в пользовании кредитом «Дойче банка», был против участия в какой-либо схеме, настаивал на жестком регулировании всех отношений в письменной форме.

В итоге после долгих переговоров Егиазарян А.Г. пообещал выполнить следующие обязательные условия – я передавал свои акции компании «Доралин» только с условием, что я смогу контролировать это имущество через участие в компании «Тафтс», и обязательно на срок не более года, чтобы все документы подписывались одновременно, и чтобы мы – акционеры подписали соглашение между собой с участием «Дойче банка», который смог бы явиться гарантом его исполнения. Егиазарян А.Г. сказал, что понимает мою обеспокоенность рисковать правом на мои 20% в проекте «Европарк», но заверил меня, что моему имуществу ничто не угрожает, что в любом случае 20% у меня остаются, так как в случае дефолта компании «Блиденсол» (заемщик по кредиту «Дойче банка») он – Егиазарян А.Г. предоставляет мне и только мне право продать его (Егиазаряна А.Г.) пакет акций 73%, стоимость которого согласно произведенной официальной оценке превышала стоимость кредитных обязательств. Кроме того, Егиазарян А.Г. заверил меня, что в компании «Тафтс» ни один документ не будет иметь юридической силы, без моей подписи, для чего мы оформим необходимые документы.

Также, Егиазарян А.Г. предложил мне принять участие в действенном контроле за деятельностью ЗАО «Центурион Альянс», чего я был лишен ранее и не мог рассчитывать на справедливое распределение дивидендов. Для чего Егиазарян А.Г. предложил изменить Устав ЗАО «Центурион Альянс», сделать меня Председателем Совета директоров, и ввести должность первого заместителя генерального директора, который будет назначаться не Генеральным директором, а Советом директоров, то есть фактически будет моим человеком. Также он согласился на мое предложение ограничить уставом право генерального директора на заключение сделок на сумму свыше 5 млн. рублей, введя обязательное наличие второй подписи первого заместителя генерального директора для одобрения таких сделок.

Достигнутые договоренности все акционеры закрепили 26 декабря 2006 года в подписанном Соглашении акционеров, оформление которого осуществлялось с участием «Дойче банка» на основании договора Эскроу, по которому «Дойче банк» должен был выступать гарантом исполнения обязательств акционерами друг перед другом.

По условиям договоров между акционерами в обеспечение возврата кредита, выданного «Дойче Банком» компании «Блиденсол», «Дойче банку» должны были быть переданы все обеспечительные документы для обращения внесудебного взыскания на акции «Доралин», ЗАО «Центурион Альянс» и имущественного комплекса «Европарк». В частности, «Дойче

3

115

банку» должны были быть переданы на хранение передаточные распоряжения на акции «Доралин» от компании «Тафтс».

Также по соглашению между акционерами от 26.12.2006 года и договору Эскроу, Егиазарян А.Г. должен был передать «Дойче банку» на временное хранение, как независимому агенту, акции «Тафтс», принадлежащие формально компании «Калкен» в размере 73%.

После оформления всех документов и получения кредита, Егиазарян А.Г. нарушил достигнутые договоренности и отказался передавать «Дойче банку» свои 73% акций в компании «Тафтс».

Примерно в марте-апреле 2008 года по моему настоянию, между мной и Егиазаряном А.Г. было подписано соглашение о выполнении с его стороны условий договоренностей 2006 года о передаче 73% акций «Тафтс» на хранение «Дойче банку», заключении нового договора Эскроу с «Дойче банком». Кроме того, Егиазарян А.Г., обещал, ввести в компании «Тафтс» и «Блиденсол» обязательную мою вторую подпись для распорядительных документов, а также обещал дать указание своим структурам и адвокатам оформить на меня по номиналу 50% акций в компании «Блиденсол». Из обещанного, на меня было оформлено право второй подписи от имени компании «Тафтс» по распоряжению имуществом (акциями) компании «Доралин» наряду с Артемом Егиазаряном. Остальные договоренности исполнены не были.

Свои обязательства по возврату кредита компания «Блиденсол» перед «Дойче банком» не исполнила, в связи с чем «Дойче банк» предложил мне выкупить этот кредит, найти покупателя на этот кредит и получить права, соответственно, на заложенное имущество, как было предусмотрено достигнутыми договоренностями. Но, поскольку из «Дойче банка» исчезла часть обеспечительной документации, дающей право «Дойче Банку» на наложение внесудебного взыскания на акции компании «Доралин», приобретатель прав по кредиту терял право на получение акций «Доралин» во внесудебном порядке в случае не возврата кредита фирмой «Блиденсол».

Также 08 декабря 2006 года между ЗАО «Центурион Альянс» и компанией «Блиденсол» был заключен договор займа на сумму около 1,5 миллиарда рублей, однако, кредитных денег «Дойче банка» там не было, это были аккумулированные займы прошлых периодов. Компания «Кхэкхем» (принадлежащая Дмитрию Гаркуше) и другие иностранные кредиторы ЗАО «Центурион Альянс» за 1 доллар продали право требования по договорам займа компании «Блиденсол», также принадлежащей Дмитрию Гаркуше. После чего, как указывалось выше, между ЗАО «Центурион Альянс» и компанией Бледенсоль был заключен договор займа (новации) на общую сумму по всем ранее заключенным договорам займа в размере 1,5 млрд. рублей. Сделано это было для того, чтобы ЗАО «Центурион Альянс» возвращал заем не компании «Кхэкхем», а компании «Блиденсол», которая являлась получателем кредита «Дойче банка», и полученные от ЗАО «Центурион Альянс» деньги должна была пускать на погашение процентов по этому кредиту.

4

В дальнейшем между Егиазаряном А.Г. и Гаркушей Д.В. произошел конфликт, после которого Егиазарян А.Г., пользуясь возможностью управлять компанией ЗАО «Центурион Альянс» и компанией «Блиденсол» через «подчиненных» ему людей, без моего согласия сменил валюту вышеуказанного договора займа с рублей на доллары и увеличил процентную ставку с 1% на 12%, а затем и до 22% годовых. Таким образом, была искусственно увеличена кредиторская задолженность ЗАО «Центурион Альянс» перед компанией «Блиденсол». Кроме того, ЗАО «Центурион Альянс» также было должно по договору займа подконтрольной Егиазаряну компании ООО «Даев плаза» 160 миллионов рублей. Именно ООО «Даев Плаза» в мае 2009 года подало заявление о банкротстве ЗАО «Центурион Альянс» в Арбитражный суд г. Москвы, что, видимо, и повлияло на решение «Дойче банка» как можно быстрее уступить права по кредиту любому желающему лицу. Однако по состоянию на май 2009 года ТК «Европарк», принадлежащий ЗАО «Центурион Альянс» приносил прибыль, достаточной для погашения всей имеющейся кредиторской задолженности.

Поскольку Егиазаряном А.Г. передаточные распоряжения в отношении акций компании «Доралин» «Дойче банку» переданы не были, указанные передаточные распоряжения были подготовлены и мной направлены в сентябре 2009 года на электронную почту Егиазаряну А.Г. для подписания. Никакой реакции со стороны Егиазаряна А.Г. не последовало. Не подписал такие передаточные распоряжения и Артем Егиазарян, второй директор компании «Тафтс», чья подпись в соответствии с правилами управления компании «Тафтс» требовалась для легитимности передаточного распоряжения, поскольку не получил об этом указаний от своего брата – Егиазаряна А.Г.

В середине 2009 года я стал обращать внимание, что в ЗАО «Центурион Альянс» заключаются сомнительные сделки, без моего ведома осуществляются платежи на суммы выше 5 миллионов рублей, происходит давление на персонал, лояльный ко мне. А после подачи в милицию заявления о хищении имущества ЗАО «Центурион Альянс» мне был запрещен доступ на территорию офисной части ТК «Европарк», и всему персоналу было объявлено, что я больше в компании «никто». Ни одного моего распоряжения и распоряжения первого заместителя генерального директора не выполнялось, а в последствии несколько человек были незаконно уволены, включая главного бухгалтера и первого заместителя генерального директора. Незаконно уволенные сотрудники были восстановлены на работе судом, но к работе допущены не были.

Заподозрив попытку хищения моего имущества, весной 2010 года я направил запрос на Кипр в Бюро регистрации независимых акционерных компаний Кипра с просьбой предоставить мне сведения, касающиеся акционеров и директоров компании «Доралин». Именно эти компании и декабре 2006 года я по настоянию Егиазаряна А.Г. номинально «продал» свои акции в ЗАО «Центурион Альянс», с тем чтобы владеть ими в том же соотношении через компанию «Тафтс». В 2006-2007 году мне передавались

117

подтверждающие документы, что компания «Тафтс» является акционером компании «Доралин» на 100%, соответственно, владея 20% акций компании «Тафтс» я опосредованно владел 20% акций в компании «Доралин», и как следствие, 20% акций ЗАО «Центурион Альянс», то есть на 20% владел имущественным комплексом «Европарк», так как это был единственный актив указанных компаний.

Получив официальные ответы из Республики Кипр я обнаружил, что компанией «Доралин» владеет теперь не компания «Тафтс», как мы договаривались с Егиазаряном А.Г. в 2006 году и где я владел 20% акций, а две компании – «Мастеро Инвестмент Лимитед» (Кипр) и «Фамукатос Лимитед» (Кипр) в соотношении 50/50.

Также из представленного отчета следовало, что в компании «Доралин» были сменены директора компании – ими стали компания «Нью Дженерэйшн Сервисес Лтд» (Британские Виргинские острова) и гражданка России Елена Демина, зарегистрированная по адресу: г.Калуга, Грабцевское шоссе, д. 90, кв. 22.

Однако я никаких подписей на документах, касающихся продажи компанией «Тафтс» акций компании «Доралин» не ставил, своего согласия на распоряжение моим имуществом ни Ашоту Егиазаряну, ни Самвелу Карапетяну, ни их представителям или фирмам, не давал.

Таким образом, полагаю, что по вышеизложенной схеме, Егиазарян А.Г., совершил хищение моего имущества – 20% акций ЗАО «Центурион Альянс», номинальной стоимостью 4 600 000 рублей, рыночная стоимость которых на сегодняшний момент составляет 1 575 500 000 рублей ( один миллиард пятьсот семьдесят пять миллионов пятьсот тысяч рублей), то есть своими противоправными деяниями причинил мне имущественный ущерб.

На основании изложенного, руководствуясь ст. 44 УПК РФ, прошу взыскать с виновных лиц имущественный вред, причиненный непосредственно преступлением в мою пользу в размере 1 575 500 000 рублей ( одного миллиарда пятьсот семидесяти пяти миллионов пятьсот тысяч рублей).

_____ Смагин В.И.

12 ноября 2010 года

6

*111*

To: R.R. Gabdulin, Counsellor in Justice,
Major Cases Investigator, First Section,
Major Economic Crimes Investigation
Department, Central Investigations
Department, RF Investigations
Committee

Fm: Vitaliy Ivanovich Smagin
19 Berzarin St., Bldg. 1, Apt. 103
Moscow

For Criminal Case No. 201/355137-10

APPLICATION

    Considering that by his illegal actions A.G. Yegiazaryan committed a theft of my property – 20% of the shares in Centurion Alliance CJSC, with a nominal value of RUB 4,600,000, the market value of which is presently RUB 1,575,500,000 (one billion five hundred seventy five million five hundred thousand rubles), i.e., by his illegal acts inflicted property damage on me, I request that you accept and include my civil claim (statement of claim) in the criminal case file.

Attachment: Civil claim on 6 pages

_____[signature]_____   V.I. Smagin

12 November 2010

[signature]

[signature]  *R.V. Markaryan, Attorney*

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator

[signature]

1

To:
R.R. Gabdulin,
Counsellor in Justice,
Major Cases Investigator,
First Section,
Major Economic Crimes Investigation Department,
Central Investigations Department,
RF Investigations Committee

From:

Vitaliy Ivanovich Smagin,
Moscow, ul. Berzarina 19, Bldg. 1, Appt. 103

Criminal Case No. 201/355137-10

Civil Claim
for restitution of property
lost as a result of an offence

  I, Vitaliy Ivanovich Smagin, was the owner of 460 (four hundred and sixty) ordinary registered shares in Centurion Alliance Closed Joint Stock Company, with a nominal value of RUB 10,000 (ten thousand) each, representing 20% of the company's stock. Entities controlled by A.G. Egiazaryan, Titul CJSC, TD Unikompleks, Milea LLC and Merkhav LLC held 73% of Centurion Alliance CJSC shares. A further 7% was owned by A.G. Egiazaryan's business partner, Dmitri Garkusha, who in 2006 was the manager of Daev Plaza LLC and the CEO of Dekmos LLC.

  My shares were registered in Personal Account No. 013700 in the Shareholder Register maintained by the Registrars, STATUS Registration Company CJSC.

  In 2006, Ashot Gevorkovich Egiazaryan was also involved in the implementation of commercial projects in other business areas, and in particular, acting through the companies under his control, Decorum CJSC and Dekmos OJSC, in the construction of the Hotel Moskva, and was therefore in need of funds, and consequently engaged in raising loans.

  At one of our meetings held at the Daev Plaza Business Centre, Moscow, Daev Pereulok 20, in November 2006, A.G. Egiazaryan suggested that I sell him my 20% shareholding. I refused, because the price offered by A.G. Egiazaryan was a whole order of magnitude below a realistic price. At that time, we had good offers for the shares from third parties, but A.G. Egiazaryan did not want to sell his own shares, but wanted to acquire my shareholding instead. A.G. Egiazaryan told me that he needed all Centurion Alliance CJSC shares, to offer as security to Deutsche Bank from which his company was allegedly to obtain

[seal:] RF Investigations Committee; For Blocks No. 4
  [stamp:] True Copy, Central Investigations Department, RF Investigations Committee,
Investigator [signature]

a loan of USD 100 million for the renovation of Hotel Moskva.

Subsequently A.G. Egiazaryan and Dmitri Garkusha told me at one of our meetings held at the Daev Plaza in Moscow around the end of November or early December 2006 that Deutsche Bank was willing to grant a loan not strictly for the construction of Hotel Moskva, but against a guarantee of Europark as a liquid asset.  This was in spite of the fact that they would in reality use the money to renovate Hotel Moskva.

During our association, A.G. Egiazaryan spent a long time persuading me to join the scheme, allegedly proposed by Deutsche Bank, at least by transferring my 20% shareholding in Centurion Alliance CJSC temporarily (for one year) as security for the loan, none of which would be received by Centurion Alliance CJSC itself.  I, naturally, refused.  A.G. Egiazaryan continued to insist, saying that my property would not be endangered in any way, that he personally would be assuming all the risk and that I could count on participating in his Hotel Moskva project and on receiving an additional shareholding in Centurion Alliance CJSC if I agreed to transfer my shares on a temporary basis to the Deutsche Bank depository as security for the loan.  After much persuasion, I expressed my tentative agreement, but insisted on all documents and agreements being made in writing, and on involving good lawyers.

At my next meeting with A.G. Egiazaryan and Dmitri Garkusha, which took place approximately in November 2006 in Moscow, A.G. Egiazaryan told me that his partner, Dmitri Garkusha, owned a Cypriot company, Blidensol Trading and Investment Ltd, which had obtained a loan of USD 100 million from Deutsche Bank.  A.G. Egiazaryan said that under a scheme approved by Deutsche Bank the latter wanted to receive as security the shares of Centurion Alliance CJSC and all the assets of Europark, of which I held a 20% share, but that the bank allegedly did not want the 20% to be held either by me personally or by any Russian legal entity or individual at the time of their pledge.  To achieve this, according to A.G. Egiazaryan, the package would be structured in the following way:  I, as well as the other shareholders, would sell my shares to the Cypriot company, Doralin Trading and Investments ("Doralin") at their nominal value.  This company too was a Joint Stock Company established by Cypriot citizens, with Garkusha holding an unlimited power of attorney to act as its manager until October 2009.  100% of Doralin shares would in turn be acquired by Tufts Invest and Trade Inc. (incorporated in British Virgin Islands, "Tufts"), whereupon shares in Tufts would be distributed exactly as in the case of Centurion Alliance CJSC, i.e. A.G. Egiazaryan would hold 73%, Dmitri Garkusha 7%, and I would hold 20%.

A.G. Egiazaryan said that he would inject a Cypriot company which he controlled, Kalken Holdings Ltd ("Kalken") into Tufts.  Kalken too is a Cypriot company whose directors are Cypriot citizens, but I don't know who the founders are.  However, unlimited

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

power of attorney to act as manager of this company has been issued in the name of Artem Egiazaryan.

Since I had in no way participated in the use of the Deutsche Bank loan, I was against participating in any scheme and insisted on all relationships being strictly regulated by written documents.

Ultimately, after protracted negotiations, A.G. Egiazaryan promised that he would comply with the following mandatory requirements:  I would transfer my shares to Doralin only on the condition that I would be able to control those assets through my participation in Tufts, and in any case would do so for not longer than one year, that all documents would be signed simultaneously and that we, the shareholders, would sign an agreement with one another and with the participation of Deutsche Bank, which would act as performance guarantor.  A.G. Egiazaryan said that he understood my concern about risking my right to my 20% holding in the Europark project, but assured me that nothing threatened my property, that in any case I would retain the 20%, since if Blidensol (the borrower under the Deutsche Bank loan) defaulted, he, A.G. Egiazaryan, granted me and me alone the right to sell his (A.G. Egiazaryan's) 73% shareholding, which, according to an official valuation, was worth more than the loan commitment.  In addition, A.G. Egiazaryan assured me that in Tufts no document would have legal validity without my signature, and that we would draw up the necessary documents to ensure that this would be the case.

In addition, A.G. Egiazaryan suggested that I should take part in the actual control of the operations of Centurion Alliance CJSC, which was something I did not have before, and could therefore not count on a fair distribution of dividends.  For this purpose, A.G. Egiazaryan proposed amending the Charter of Centurion Alliance CJSC, making me Chairman of the Board and introducing the position of a First Deputy CEO, who would be appointed not by the CEO but by the Board of Directors and would therefore in fact be my own man.  He also agreed to my suggestion that the Charter should limit the CEO's right to enter into transactions for amounts exceeding RUB 5 million, requiring a second signature, that of the First Deputy CEO, for transactions of this size.

The shareholders included the agreements they had reached in a Shareholder Agreement signed on 26 December 2006, executed with the participation of Deutsche Bank on the basis of an Escrow Agreement whereby Deutsche Bank acted as guarantor of the shareholders' performance of their obligations under the Agreement.

Under the terms of the shareholder agreements, the loan granted by Deutsche Bank to Blidensol was to be secured on all documents enabling the bank to have non-judicial recourse against the shares of Doralin, Centurion Alliance CJSC and the Europark property portfolio.

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

In particular, Deutsche Bank was to be given custody of Tufts transfer orders relating to Doralin shares.

Further, under the terms of the Shareholder Agreement of 26.12.2006 and of the Escrow Agreement, A.G. Egiazaryan was required to transfer to Deutsche Bank for temporary custody in its capacity as an independent agent the 73% of Tufts shares formally held by Kalken.

Having drawn up all the documents and obtained the loan, A.G. Egiazaryan violated the agreement and refused to transfer his 73% of Tufts shares to Deutsche Bank.

In approximately March or April 2008 at my insistence A.G. Egiazaryan and I signed an agreement concerning his compliance with the 2006 agreements on the transfer of 73% of the Tufts shares into the custody of Deutsche Bank and the signature of a new Escrow Agreement with Deutsche Bank.  In addition, A.G. Egiazaryan promised to require Tufts and Blidensol to include my signature on all order documents as a second signature and to instruct his business units and lawyers to transfer 50% of Blidensol shares into my name at their nominal value.  Of these promises, I was granted the right of second signature on behalf of Tufts on the disposal of the assets (shares) of Doralin, alongside Artem Egiazaryan.  None of the other promises were kept.

Blidensol did not fulfil its obligation to repay the loan to Deutsche Bank, and the latter therefore suggested to me that I buy out the loan, find a buyer for it and obtain a claim on the pledged assets, as set out in the shareholder agreements.  However, since Deutsche Bank lost some of the security documentation giving it the right to extrajudicial recourse against Doralin shares, the purchaser of the claim would lose the right to acquire Doralin shares in an extrajudicial procedure if Blidensol defaulted.

On 8 December 2006, Centurion Alliance CJSC also signed a loan agreement for approximately RUB 1.5 billion with Blidensol, but this sum did not involve Deutsche Bank money, instead representing the accumulated pre-existing loans.  Chechem, a company owned by Dmitri Garkusha, and other foreign creditors of Centurion Alliance CJSC sold their right of recourse under loan agreements signed by Blidensol, also owned by Dmitri Garkusha, for 1 USD.  Thereafter, as noted above, Centurion Alliance CJSC and Blidensol signed a loan (novation) agreement for the sum total of the existing loan agreements, amounting to RUB 1.5 billion.  This was done to ensure that Centurion Alliance CJSC would repay the loan not to Chechem, but to Blidensol, which was the recipient of the Deutsche Bank loan and should have used the money received from Centurion Alliance CJSC to repay the interest on that loan.

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

Subsequently, A.G. Egiazaryan and D.V. Garkusha came to blows, and A.G. Egiazaryan, taking advantage of the fact that he could manage Centurion Alliance CJSC and Blidensol through his own people, acted without my consent and changed the currency of the loan agreement from RUB to USD and the interest rate from 1% first to 12% and then to 22% p.a. In this way, the debt owed by Centurion Alliance CJSC to Blidensol was artificially inflated. In addition, according to the agreement Centurion Alliance CJSC owed RUB 160 million to Daev Plaza LLC, a company controlled by Egiazaryan. It was Daev Plaza LLC which petitioned the Moscow Arbitration Court in May 2009 to declare Centurion Alliance CJSC bankrupt, which clearly influenced Deutsche Bank's decision to assign its rights under the loan agreement to any willing buyer as soon as possible. However, in May 2009 the Europark Shopping Centre, owned by Centurion Alliance CJSC, was making a profit sufficient to repay all outstanding debt.

Since A.G. Egiazaryan did not hand over the Doralin share transfer orders to Deutsche Bank, I myself prepared the transfer orders and forwarded them in September 2009 to A.G. Egiazaryan's e-mail address for his signature. I received absolutely no response from A.G. Egiazaryan. The transfer orders were also not signed by Artem Egiazaryan, who was the second director of Tufts and whose signature was required to ensure the validity of transfer orders under the Tufts management procedures. He did not sign, not having been instructed to do so by his brother, A.G. Egiazaryan.

In mid-2009, I began to notice that Centurion Alliance CJSC was involving itself in shady deals, that payments of over RUB 5 million were being made without my knowledge and that pressure was being exerted on personnel loyal to me. After I had filed a report on the misappropriation of Centurion Alliance CJSC assets with the militia, I was forbidden access to the offices of the Europark Shopping Centre, and everyone was told that I no longer had any standing in the company. None of my orders or the orders of the First Deputy CEO were carried out, and subsequently a number of people were wrongly dismissed, including the Chief Accountant and the First Deputy CEO. The wrongly dismissed employees were reinstated by the court, but were not allowed to work.

Having suspected that an attempt was being made to misappropriate my property, in the spring of 2010 I sent an enquiry to the Cyprus Independent Joint Stock Companies Registration Office asking for information about the shareholders and directors of Doralin. This was the company to which I had nominally "sold" my shares in Centurion Alliance CJSC in December 2006 at the insistence of A.G. Egiazaryan, in order to own them in the same proportion through Tufts. In 2006-2007 I received documents confirming that Tufts

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

owned 100% of Doralin shares, so that as the owner of 20% of Tufts shares I was the indirect owner of 20% of Doralin shares, and thus of 20% of the shares of Centurion Alliance CJSC, i.e. of 20% of the property of Europark, which was the sole asset of these companies.

Having received official responses from Cyprus I discovered that Doralin was no longer owned by Tufts, as we had agreed with A.G. Egiazaryan in 2006, and in which I had a 20% shareholding, but by two other companies – Mastero Investment Limited of Cyprus and Famukatos Limited of Cyprus, each with a 50% holding.

It further followed from the report I received that Doralin now had different directors, which were New Generation Services Ltd, incorporated in the British Virgin Islands, and a Russian national, Elena Demina, registered in Kaluga at Grabtsevskoye shosse 90, Appt. 22.

However, I never signed any documents about the sale of Doralin shares by Tufts, and never gave my consent to the disposal of my assets either to Ashot Egiazaryan or to Samuel Karapetyan, to their representatives or companies.

I therefore believe that the above plan was devised by A.G. Egiazaryan to misappropriate my property consisting of 20% of the shares of Centurion Alliance CJSC with a nominal value of RUB 4,600,000 and a current market value of RUB 1,575,500,000 (one billion five hundred and seventy five million five hundred thousand) rubles, and that his unlawful actions have caused the loss of my property.

Based on the above and guided by Art. 44 of the RF Code of Criminal Procedure, I petition the Court to recover from the guilty parties the sum lost by me as a direct result of their offence and amounting to RUB 1,575,500,000 (one billion five hundred and seventy five million five hundred thousand) rubles.

_____[signature]_____ V.I. Smagin

12 November 2010

[signature]        [illegible] *R.V.*
                          *Attorney*

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]