Michael S. Adler, SBN 190119
  madler@ta-llp.com
Joel M. Tantalo, SBN 206096
  jtantalo@ta-llp.com
**TANTALO & ADLER LLP**
1801 Century Park East, Ste. 2400
Los Angeles, CA 90067

Telephone:  (310) 734-8695
Fax:          (310) 734-8696

Attorneys for respondent Ashot Yegiazaryan

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VITALY IVANOVICH SMAGIN<br><br>    Petitioner,<br><br>    v.<br><br>ASHOT YEGIAZARYAN,<br><br>    Respondent. | **CASE NO. 14-cv-09764-R (PLAx)**<br><br>Before the Honorable Manuel L. Real<br>United State District Judge<br><br>**DECLARATION OF ASHOT YEGIAZARYAN IN OPPOSITION TO MOTION FOR A TURNOVER ORDER**<br><br>**Hearing Place:**   Courtroom 880<br>**Hearing Date:**   September 16, 2017<br>**Hearing Time:**   10:00 a.m. |

## <u>DECLARATION OF ASHOT YEGIAZARIAN</u>

I, Ashot Yegiazaryan, do hereby declare as follows:

1.     I am the named respondent in this action.  Except as otherwise indicated, I have personal knowledge of the facts declared herein and could and would competently testify thereto in a Court of Law if required to do so.  Although English is not my native language, I have had this declaration translated to me and I believe this to be an accurate statement of the facts set forth herein.

### Personal Background and Profession as a Legislator Until 2011

2.     I became involved in Russian government and political activities in the second half of the 1990s.  In 1996, I took part in organizing the financing of Boris Yeltsin's ("Yeltsin") presidential campaign.  In 1997, I was an advisor for the Russian Central Bank (the Russian equivalent of the U.S. Federal Reserve).

3.     At the time, I also served as an advisor on a pro bono basis for Yuri Maslyukov, the First Deputy Prime Minister.

4.     In 1999, I was elected to the State Duma.  I was reelected to the State Duma in 2003 and 2007. During my time as a Deputy of the State Duma, I was appointed to various positions including deputy chairman of the Committee on Budget and Taxes, deputy chairman of the Commission to Promote a Political Settlement and Adherence to Human Rights in the Chechen Republic and a member of the Commission on the State Debt of the Russian Federation.

5.     I began to fall out of political favor around 2005, largely because I was allied with the former Prime Minister Mikhail Kasyanov and my association with him was perceived as a sign of disloyalty.

**Investments in Russia and Disputes with Connected Individuals**

6.    Although I was a legislator by profession between 1999 and 2010, I did make some investments during that time.  Those investments included at least two real estate projects: the Europark Shopping Center and the Moskva Hotel.

7.    Other investors in the Moskva Hotel included the City of Moscow, Vladimir Putin's long-time judo partner Arkady Rotenberg and Vladimir Putin's former masseuse Konstantin Goloschapov.

8.    After I fell out of political favor with the political authorities in Russia, certain partners pressured me to surrender my investment in the Moskva Hotel.  When I refused to quietly give up my investment, I was subjected to various forms of official and unofficial harassment.  Ultimately, I filed an arbitration award in the London Court of International Arbitration against high-ranking individuals within the Russia government.

**Flight from Russia in the Face of Death Threats**

9.    I left Russia in the summer of 2010, in large part because I began receiving threats of reprisal to 'stay away' from the Moskva Hotel Project. I reported these threats to the Russian police but they took no serious action.  This was long before I was named as a suspect in respect of any alleged charges and long before the Russian arrest warrant was issued.  These threats included threats against myself and also my family, such as threats to behead my children.  A family member of mine was killed in Russia in 2010 and I believe it was done to send me a message.

10.    Attached hereto as Exhibit 1 are true and correct copies of reports I filed with the Russian police relating to the threats against myself and my family.

**Politically-Motivated Arrest Warrant**

11.    While I was in the United States, and after I filed my affirmative claims in London, the Russian authorities in October 2010 took moves to strip me of my

2

parliamentary immunity, summoned me for questioning and placed me on a wanted list.  Placing me on the wanted list was improper, because this may be done only where a person's whereabouts are unknown, whereas I had promptly informed investigators of my address in the United States and my safety concerns about returning to Russia. Investigators dismissed my lawyers' objections out of hand and published a notice through INTERPOL.

12.    Unfortunately, it is my understanding that INTERPOL is little more than a clearing house for arrest and extradition requests from foreign countries, such that it is open to abuse.  As noted in the Economist article attached hereto as Exhibit 2, Russia is particularly notorious for this practice.  In any event, an INTERPOL notice is not evidence of guilt and INTERPOL itself emphasizes that persons subject to INTERPOL notices enjoy a presumption of innocence. I note that the United States has not acted on Russia's request.

13.    I have no confidence in the Russian criminal investigation or my safety if I were to return to Russia.  The Economist article mentioned above refers to the notorious Russian case of Sergei Magnitsky as a particularly acute example of the abuse of Russian criminal proceedings.  That case involves allegations that the Russian officials investigating the case forged documents and stole money from the persons under investigation. After one of the accused's lawyers, Sergei Magnitsky, complained about these abuses, he was thrown in prison where he died; it is alleged that he was subjected to abuse in prison and that is why he died.

14.    The Magnitsky case has been the subject of censure by the European Parliament and the United States Congress, the latter of which imposed sanctions on a number of Russian officials involved in the investigation.

15.    No less than seven of the Russian officials involved in my investigation also handled the Magnitsky case, and five of the officials involved in my case (Aleksey Droganov, Victor Grin, Oleg Logunov, Andrei Krechetov and Andrei Strizhov) have

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO  MOTION FOR A TURNOVER ORDER

been placed under sanctions by the U.S. State Department for their involvement in the Magnitsky case.

16.     In addition to those individuals, other individuals involved in proceedings against me have been identified as connected with the Putin regime in news reports about contacts with the Trump election campaign.  Attached hereto as Exhibit 3 is a true and correct copy of a July 15, 2017 article from the *New York Times* entitled "Soviet Veteran Who Met with Trump Jr. Is a Master of the Dark Arts" reporting on activities of Rinat Akhemtshin on behalf of those connected with the regime.  As reflected in that article, Mr. Akhemtshin assisted others connected with the Putin regime against me.  Likewise, attached hereto as Exhibit 4 is an August 21, 2017 article from the *New York Times* entitled "Lobbyist at Trump Campaign Meeting Has a Web of Russian Connections," explaining that, *inter alia,* Mr. Akhemtshin is suspected in the hacking of my counsel on behalf of Putin-connected parties.

17.     The passport I had at the time I fled from Russia has expired.  Because of my conflict with the current regime in Russia, I have been unable to get a new passport or other similar travel documents.

18.     Moreover, because of the politically-motivated arrest warrant, the listing on Interpol, and my lack of current documents, I am unable to obtain a personal banking account.  For example, I have repeatedly tried to open a simple bank account in Los Angeles and been repeatedly refused.

## Mr. Smagin Initiated a Freezing Order Against Me in Russia that Secures Hundreds of Millions in Assets

19.     In connection with his claims against me, Mr. Smagin has filed a civil claim within the criminal case against me.  A true and correct copy of that claim (along with an English translation) is attached hereto as Exhibit 5.

20.     During the underlying arbitration in this matter, I was shown pleadings by Mr. Smagin's counsel wherein Mr. Smagin asserted that the purpose of the Russian

4

freeze was to secure any possible recovery in the arbitration.  I understand those pleadings have been previously submitted to this Court, and are being again submitted in this motion as part of the Declaration of Cyrus Benson.

21.    The orders attach at least three significant sets of assets.  The first and most significant set of assets relate to Europark, the Moscow shopping center at the heart of the underlying arbitration in this matter.  In his claims, Mr. Smagin asserted that he had been wrongfully deprived of a 20% interest in Europark.  However, with the Russian Freezing Order, Mr. Smagin has frozen 100% of the assets of Europark and of the company that owns Europark.  In other words, Mr. Smagin has secured property worth 5 times the property underlying his original claim.  Technically, my interest in those properties is only a 50% interest, but even just considering my interest in the Europark shopping center, Mr. Smagin has frozen assets in Russia worth 2.5 times his claim.

22.    The most recent valuation of Europark, presented by Mr. Smagin himself, valued Europark at over $360 million dollars.  As such, the most recent valuation of Europark places my 50% interest – frozen for Mr. Smagin under the Russian Freezing Orders – at over $180 million dollars.

23.    In addition to Europark, I own at least two pieces of real estate in Moscow that have been frozen for Mr. Smagin by the Russian Freezing Orders.  One of those pieces of real property is a sizable piece of property available for development in one of the most expensive neighborhoods of Moscow on Rublevskoye Shosse.  The property would be appropriate for an apartment complex.  There has not been any recent valuation of this property, but it is certainly worth well over $10 million dollars and could be worth as much as $50 million dollars or more.  This is in addition to the Europark assets mentioned before.

24.    [Omitted]

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO  MOTION FOR A TURNOVER ORDER

**Mr. Smagin Omits Important Background on the Kerimov Settlement**

25.     The funds referred to in this motion as the "Kerimov Settlement" arose out of an arbitration before the London Court of International Arbitration ("LCIA"). This LCIA claim related to the Moskva Hotel.

26.     Mr. Smagin had no involvement in the Moskva Hotel, and my claims against other parties in the Moskva Hotel were independent of Mr. Smagin.  At no time did Mr. Smagin have any rights with respect to the Moskva Hotel.

27.     My LCIA claims relating to the Moskva Hotel were filed <u>before</u> Mr. Smagin filed the underlying arbitration demand in this matter.

28.     I was not the only claimant in the specific arbitration that lead to the Kerimov Settlement.  The May 26, 2015 cover letter reflected that there were in fact five separate claimants including my brother Artem Yegiazyaran.

29.     That specific LCIA arbitration proceeded entirely in London, where myself and my co-claimants were represented by the <u>London</u> offices of Gibson, Dunn & Crutcher.  That arbitration entirely involved matters that occurred in Russia and Europe.

30.     Moreover, the specific arbitration that led to the Kerimov Settlement was actually one of three LCIA arbitrations that I initiated with various other co-claimants arising out of the Moskva Hotel.  Those arbitrations were brought as separate proceedings because the various respondents were parties to different LCIA arbitration agreements and some of those respondents refused to agree to their consolidation in a single LCIA arbitration, which would have otherwise been possible under the LCIA arbitration rules.  The different arbitrations also involved different claimants. However, from my perspective, all three arbitrations were a collective undertaking to recover the stolen interests in the Moskva Hotel.

31.     I was the lead claimant in all three arbitrations, but I had co-claimants in those arbitrations including not only my brother Artem Yegiazaryan but an individual

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO  MOTION FOR A TURNOVER ORDER

named Vitaly Gogokhiya.

32.     These three LCIA arbitrations over the Moskva Hotel were major undertakings, with legal fees well in excess of ten million dollars.  Given that the Russian government (with the cooperation of Mr. Smagin) issued the Russian Freezing Orders soon after we initiated the LCIA arbitrations, almost the entire amount had to be financed through third-party funding.

33.     As a result, in 2011, I reached agreements with various parties to assist me in funding and prosecuting those arbitrations (as well as paying my living expenses during the interim).  Most significantly, I entered into agreements with two co-claimants (Artem Yegiazaryan and Vitaly Gogokhiya) to help prosecute those arbitrations, as well as an agreement with my cousin Suren Yegiazaryan.

34.     The substance of those agreements was that those parties would assist me in prosecuting the arbitrations and would provide funding for such litigation and for my living expenses.  In return, I would provide them with a share of any recovery from the Moskva Hotel arbitrations.

35.     Attached hereto as Exhibit 6 is true and correct copy of the handwritten 2011 confirmation of the agreement between myself, Artem Yegiazaryan and Suren Yegiazaryan, as well an English translation of the same.

36.     Pursuant to these agreements, I received significantly more than ten million dollars worth of funding for the arbitrations at issue.  As of June 2015, when we received the Kerimov Settlement, Suren alone had provided more than $11,491,000 dollars in support under our 2011 agreement, and Artem had provided more than $10,134,000 million dollars.  Since then, they have paid many millions of additional dollars in reliance on our agreement that they would advance funds in return for an interest in any recovery from the Moskva Hotel.

37.     This was entirely speculative on their part, and I would likely have been unable to repay them if we had not been successful in recovering any money in the

7

arbitration.

38.     Eventually, after an LCIA ruling in our favor, the co-claimants and I were able to negotiate a settlement in the Kerimov arbitration that led to the "Kerimov Settelment."  However, while the payment was made in my name as I was the lead claimant, I was obligated at all times to share those funds with Artem, Suren, and Vitaly Gogokhiya.

39.     As reflected in the settlement agreement itself, the Kerimov Settlement payment was made to the <u>London</u> offices of Gibson, Dunn & Crutcher in mid-2015. Those funds were never received in the United States, but were received by the UK client trust account of the UK office of Gibson, Dunn & Crutcher, the London-based counsel who prosecuted the arbitrations on our behalf.

40.     That settlement was received in London *after* Mr. Smagin had secured his underlying arbitration award, but at a time when the English courts had enjoined any effort by Mr. Smagin to collect on the award in England or Wales.  The settlement was also received before Mr. Smagin had any judgment in this Court, and it was received at a time (as now) when Mr. Smagin had already frozen Europark and other Russian assets sufficient to secure the arbitration award, assuming he was ultimately successful. As a result, there was no limitation on my ability to receive the award on behalf of myself and my co-claimants.

**The Liechtenstein Trust Was Created to House the Funds and Share with The Others Entitled to Share in Funds from the Moskva Hotel**

41.     At the time they received the initial settlement payment, our London arbitration counsel informed me that the sum was too large for them to maintain in their client trust account for any extended period of time.  I was told that we needed to find a place to receive such funds within days or London counsel might return the funds back to the respondents in the arbitration.

42.     I tried very hard to find a bank account that would accept these funds in

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO  MOTION FOR A TURNOVER ORDER

my own name.  However, as noted above, my lack of a passport and the fact that Russia had published a red notice against me through Interpol prevented me from being able to open a bank account in the United States.  I made various efforts to try to find a bank that would open an account for me, but these were rebuffed by numerous banks throughout the world.

43.     Eventually, CTX Treuhand AG, a law firm in Liechtenstein that also provides professional trustees services, proposed a solution.  Although they were unable to open a bank account in my name (as they initially sought to do), they found a bank that was willing to take on the funds if the account was under the ultimate control of a trust that would own the funds.

44.     At the time we set up the Alpha Trust, I explained to the trustees that I was not the only person with an interest in the funds.  In particular, at that time, Artem, Suren, and Vitaly Gogokhiya all had participation interests in those funds.

45.     The representatives of CTX Treuhand explained to me that, given the need to set up the documents immediately, we should use a standard form of trust agreement they already had on hand, but that they could promptly amend the trust agreement to reflect the fact that Artem, Suren, and Vitaly Gogokhiya were entitled to benefit from those funds.

46.     Therefore, given the urgency of setting up the Alpha Trust to receive funds from the Gibson, Dunn & Crutcher client trust account in London, that is what we did.  First, we signed the basic document to set up the Alpha Trust and allow it to receive the funds from the London trust account, and shortly thereafter CTX Truehand amended the Alpha Trust to reflect the fact that Artem, Suren, and Vitaly Gogokhiya were all intended beneficiaries.

47.     This trust structure met two key goals for me.  First, it allowed us to receive the funds from the London client-trust account so they could not be sent back to the respondents in the Kerimov arbitration.  Second, it allowed the parties with an

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO  MOTION FOR A TURNOVER ORDER

interest in the funds from the Moskva Hotel arbitrations to receive their interests.

48.     I did not set up the Alpha Trust to hide anything from Mr. Smagin.  I fully disclosed the existence of the Alpha Trust to Mr. Smagin in my first set of responses to interrogatories as to assets outside of California.

### Facts About the Alpha Trust

49.     The Alpha Trust is a Liechtenstein Trust, which provides for administration of the trust in the country of Liechtenstein.  True and correct copies of the relevant provisions of the Alpha Trust are attached hereto as Exhibit 7.

50.     Even before Mr. Smagin secured his orders in Liechtenstein attaching my rights there, I did not possess or control the funds in the Alpha Trust.  The terms of the Alpha Trust require the trustees to consider any request from myself or any of the other beneficiaries, but they do not require those trustees to grant such requests merely because I seek them.

51.     I understand that Mr. Smagin points to the fact that I and my wife signed a joint direction seeking a $3 million distribution from the Alpha Trust in the summer of 2016 as evidence that I can direct the trustees to do anything I want.  That is incorrect. It was my wife's divorce attorneys who insisted on that text, and although I knew I could not compel the trustees, I agreed to sign it in that form to show that I was acting in good faith. The trustees refused, however and the payment was not made.  I have reviewed the trust statements from that period (and produced the same to Mr. Smagin) and no such $3 million dollar payment was ever made.[1]

52.     Before my rights to the Alpha Trust were frozen by Mr. Smagin in Liechtenstein, I was an investment advisor to the Alpha Trust.  However,

_____

[1] I have reviewed all trust statements through the late fall of 2016, at which time Mr. Smagin secured an order in Liechtenstein precluding the trustees from recognizing any right I might have with respect to the Alpha Trust.  I have not seen any statements since that time because the trustees have refused to provide them to me.

10

there was (and is) a difference between an investment advisor and the investment manager of the Trust.  As an investment advisor, I was allowed to review and comment on the Trust's investments.  In effect, I advised on it.  However, I did not have control over any of the accounts, nor did I have final say about what investment decisions were actually made.  Those rights and responsibilities belonged to the investment advisor to the trust, which I understand to be Alpenrose Wealth Management.

53.   At the moment, pursuant to Liechtenstein orders attaching those rights in favor of Mr. Smagin, I understand that I do not have any ability to receive funds from the Alpha Trust.  In other words, if I were to request a disbursement of nearly $93 million dollars, I understand that the Trustees would be forbidden by Liechtenstein court order from even considering that request.

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct and that this declaration was executed on August 28, 2017 in Los Angeles County, California.

_____
Ashot Yegiazaryan
(also spelled Ashot Egiazaryan)

15

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO MOTION FOR A TURNOVER ORDER

# Declaration of Ashot Yegiazaryan Exhibit 1

*231637*

ПОСТАНОВЛЕНИЕ
о возбуждении уголовного дела и принятии его к производству

г. Москва                                          "__09__" __февраля____ 20__

                                                   в __17__ ч. __00__ мин.

    Следователь (дознаватель) __ОД ОВД по Тверскому району г. Москвы__
капитан милиции  Гуляева Я.Ю.

    рассмотрев сообщение о преступлении __КУС- 2406 от 09.02.2010 г.__

поступившее __по заявлению__

                        УСТАНОВИЛ:

    20 января 2010 года примерно в 15 часов 00 минут, неустановленным
дознанием лицо, имея умысел на совершение угрозы убийством в отношении
депутата Государственной Думы РФ Егиазаряна А.Г., осуществило звонок на
абонентский номер рабочего кабинета последнего, расположенного по адресу: г.
Москва, Охотный ряд, д.1, каб №718, и высказало в адрес Егиазаряна А.Г.
угрозы убийством словами «что если он будет лезть в гостиницу «Москва» то
отрежут голову ему и его семье», после этого продолжая свой преступный
умысел, направленный на совершение угрозы убийством осуществило звонки на
вышеуказанный номер 21.01.2010 года и 22.01.2010 года, с угрозами убийства в
адрес последнего словами «что оторвут голову ему и членам его семьи», в связи
с чем данные угрозы Егиазаряном А.Г., были восприняты реально, таким образом
в  действиях  неустановленного  лица  усматривается  состав  преступления
предусмотренный ч.1 ст.119 УК РФ.

    Принимая во внимание,  что имеются достаточные данные, указывающие
на  признаки преступления__,  предусмотренные ___ч.1  ст.119___ УК РФ,
руководствуясь ст. 140, 145, 146 (147), частью первой ст. 156 и частью первой
ст. 157 УПК РФ,

                        ПОСТАНОВИЛ:

    1. Возбудить  уголовное  дело  по  признакам  преступления,
предусмотренного ____ч.1 ст.119____ УК РФ

    2.Возбудить уголовное дело в отношении __ действиях которого усматриваются__
признаки преступления, предусмотренного __ч.1 ст.119__ УК РФ.

    3.  Уголовное  дело принять  к  своему производству  и приступить к его
расследованию.

    4.  Копию настоящего  постановления  направить  прокурору  Тверского р-на
г.Москвы

    Следователь (дознаватель)
Копия настоящего постановления направлена прокурору Тверского р-на г. Москвы

    "_09_" __февраля__ 20_10_ г.   в __17__ ч __10__ мин

О принятом решении сообщено заявителю и лицу, в отношении которого возбуждено уголовное
дело

    Следователь (дознаватель)

*231037*

### ORDER

**to commence a criminal investigation and allow it to proceed**

City of Moscow

<u>09 February</u> 20<u>10</u>

<u>17</u> hours <u>00</u> mins

<u>Police captain N.Yu. Gulyayeva,</u> investigator (<u>interrogating officer</u>) of the Investigations Office <u>of the Tverskoy District Department of Internal Affairs of the City of Moscow,</u>
having examined notification of crime <u>KUS-2406 dated 9/2/2010,</u> which was received <u>according to statements</u>

### HAS ESTABLISHED THAT:

<u>On 20 January 2010 at about 15:00, an individual unknown to the investigation, having the intent to make a threat of murder with respect to A. G. Egiazaryan, member of the RF State Duma, made a call to the subscriber number in the latter's office, which is located at: 1 Okhotny Ryad, office 718, Moscow, and threatened A. G. Egiazaryan with murder, saying   "if he tries to get involved with the Hotel Moscow, they will cut off his and his family's heads," after which, continuing his criminal intent aimed at making a threat of murder, he made calls to the above-mentioned number on 21.01.2010 and 22.01.2010 with threats of murder to the latter, saying "they will tear off his and his family's heads", as a result of which A. G. Yegiazaryan took these threats seriously, and therefore the actions of the undetermined individual have the attributes of the crime specified by art. 119(1) of the RF Criminal Code.</u>
Considering that there is sufficient data pointing toward attributes of crime stipulated by Art. <u>119 Section 1</u> of the Criminal Code of the Russian Federation, and taking guidance from Articles 140, 145, 146 (147), Art. 156(1) and Art. 157(1) of the RF Criminal Procedural Code,

### HAS ORDERED THAT:

1. A criminal investigation into the indications of a criminal offence under <u>Art. 119(1)</u> of the Criminal Code of the Russian Federation be commenced.
2. A criminal investigation of the actions which exhibit attributes of a criminal offence under <u>Art. 119(1)</u> of the Criminal Code of the Russian Federation be commenced.
3. The criminal case proceeds and commences its investigation.
4. A copy of this order is forwarded to the Prosecutor General of the Tverskoy District of the City of Moscow.

Investigator (<u>interrogating officer</u>)                                                              [signature]

A copy of this order was forwarded to the prosecutor of the Tverskoy district of the City of Moscow on 9 February 2010  at <u>17:10.</u>

The applicant and the individual with respect to whom the criminal case is commenced have been notified of the decision made.

Investigator (interrogating officer)                                                              [signature]

Приложение 53

### Постановление
### о признании потерпевшим

г. Москва                                         « 18 » февраля 2010 г.
(место составления)

Следователь (дознаватель) ОД ОВД Тверского р-на г. Москвы
                          (наименование органа предварительного следствия или дознания,
капитан полиции Гулчева Н.Ю.
классный чин или звание, фамилия, инициалы следователя (дознавателя)
рассмотрев материалы уголовного дела N 231037,

#### установил:

20 января 2010 года примерно в 15 часов 00 минут, неустановленное дознанием лицо, имея умысел на совершение угрозы убийством в отношении депутата Государственной Думы РФ Егиазаряна А.Г., осуществило звонок на абонентский номер рабочего кабинета последнего, расположенного по адресу: г. Москва, Охотный ряд, д.1, каб №718, и высказывало в адрес Егиазаряна А.Г. угрозы убийством словами «что если он будет лезть в гостиницу «Москва» то отрежут голову ему и его семье», после этого продолжая свой преступный умысел, направленный на совершение угрозы убийством осуществило звонки на вышеуказанный номер 21.01.2010 года и 22.01.2010 года, с угрозами убийства в адрес последнего словами «что оторвут голову ему и членам его семьи», в связи с чем данные угрозы Егиазаряном А.Г., были восприняты реально, таким образом в действиях неустановленного лица усматривается состав преступления предусмотренный ч.1 ст.119 УК РФ.
                          (излагаются основания признания лица потерпевш__)

на основании изложенного и учитывая, что Егиазаряну Ашоту Геворковичу,
                          (фамилия, имя, отчество физического лица

или наименование юридического лица, признаваемого потерпевш__)
причинен моральный ущерб
руководствуясь ст.42 УПК РФ,

#### постановил:

Признать потерпевшим Егиазаряна Ашота Геворковича
                          (фамилия, имя, отчество физического лица
                              либо наименование юридического лица)

по уголовному делу N 231037     о чем объявить ему (ей) под расписку.

Следователь (дознаватель)                    _____
                                                (подпись)

настоящее постановление мне объявлено " 18 " февраля  2010  г. и одновременно разъяснены права потерпевшего, предусмотренные частью второй ст.42 УПК РФ.

1) знать о предъявленном обвиняемому обвинении;

2) давать показания;

3) отказаться свидетельствовать против самого себя,  своего супруга (своей супруги) и других близких родственников,  круг которых определен п.4 ст.5 УПК РФ. При согласии дать показания я предупрежден__ о том, что мои показания могут быть  использованы в качестве доказательств по уголовному делу, в том числе и в случае моего последующего отказа от этих показаний;

4) представлять доказательства;

5) заявлять ходатайства и отводы;

6) давать показания на родном языке или языке, которым я владею;

7) пользоваться помощью переводчика бесплатно;

8) иметь представителя;

9) участвовать  с  разрешения  следователя  или  дознавателя  в следственных  действиях,  производимых  по  моему  ходатайству  либо ходатайству моего представителя;

10) знакомиться с протоколами следственных действий, произведенных с моим участием, и подавать на них замечания;

11) знакомиться  с постановлением о назначении судебной экспертизы и заключением эксперта в случаях,  предусмотренных частью второй ст.198 УПК РФ;

12) знакомиться по окончании предварительного расследования со всеми материалами уголовного дела, выписывать из уголовного дела любые  сведения и в любом объеме,  снимать копии с материалов уголовного дела, в том числе с помощью технических средств. В случае, если в уголовном деле участвует несколько потерпевших, я вправе знакомиться с теми материалами уголовного дела, которые касаются вреда, причиненного лично мне;

13) получать копии  постановлений  о  возбуждении  уголовного  дела, признании меня потерпевш__  или об отказе в этом, о прекращении уголовного дела,  приостановлении производства по уголовному делу,  а также  копии приговора  суда  первой  инстанции,  решений судов апелляционной  и кассационной инстанций;

14) участвовать в судебном разбирательстве уголовного дела  в  судах первой, второй и надзорной инстанций;

15) выступать в судебных прениях;

16) поддерживать обвинение;

17) знакомиться с протоколом судебного заседания и подавать на  него замечания;

18) приносить жалобы  на  действия  (бездействие)  и  решения дознавателя, следователя, прокурора и суда;

19) обжаловать приговор, определение, постановление суда;

20) знать о принесенных по уголовному делу жалобах и  представлениях и подавать на них возражения;

21) ходатайствовать о применении мер безопасности в  соответствии  с частью третьей ст.11 УПК РФ;

22) осуществлять иные полномочия, предусмотренные УПК РФ.

Потерпевш__

_____ (подпись)

Постановление объявил и права разъяснил
следователь (дознаватель) _____ (подпись)

Копию настоящего постановления получил__  "18 " февраля 2010 г.

_____ (подпись потерпевшего)

Appendix 53

Order to
Acknowledge an Aggrieved Party

<u>Moscow</u>                                                          18 February 2010
(prepared at)

     <u>Police Captain N. Yu. Gulyayeva</u>, investigator (interrogating officer) of the Investigations Office of the Tverskoy District Internal Affairs Department, City of Moscow,

(classification or title, last name, and initials of investigator (interrogating officer))

having reviewed the files of criminal case No. 231037,

**established that**

    <u>On 20 January 2010 at about 3:00 p.m., an individual unknown to the investigation, having the intent to make a threat of murder with respect to A. G. Egiazaryan, member of the RF State Duma, made a call to the subscriber number in the latter's office, which is located at: 1 Okhotny Ryad, office 718, Moscow, and threatened A. G. Egiazaryan with murder, saying "if he tries to get involved with the Hotel Moscow, they will cut off his and his family's heads," after which, continuing his criminal intent aimed at making a threat of murder, he made calls to the aforenamed number on 21/01/2010 and 22/01/2010 with threats of murder to the latter, saying "they will tear off his and his family's heads," as a result of which A. G. Yegiazaryan took these threats seriously, and therefore the actions of the undetermined individual have the attributes of the crime specified by art. 119(1) of the RF Criminal Code.</u>

(state the basis for deeming the person an aggrieved party)

On the basis of the above and given that <u>Ashot Gevorkovich Egiazaryan</u>
(last name, first name, patronymic of the individual

or name of the legal entity deemed the aggrieved party)

suffered emotional distress,

taking guidance from art. 42 of the RF Code of Criminal Procedure,

**ordered that:**

    <u>Ashot Gevorkovich Egiazaryan</u> be deemed an aggrieved party
(last name, first name, patronymic of the individual or name of the legal entity)

under criminal case No. 231037, of which he (she) shall be notified and sign the notification form.

Investigator (Interrogating Officer)                [signature] _____
(signature)

This order was announced to me on 18 February 2010 and the rights of the aggrieved party specified by art. 42(2) of the RF Code of Criminal Procedure were explained at the same time as follows:

1) know the indictment against the accused;

2) give testimony;

3) refuse to testify against myself, my wife (husband), and other close relatives as defined by art. 5(4) of the RF Code of Criminal Procedure. If I agree to testify, I have been warned that my testimony may be used as evidence in a criminal case, including if I later repudiate that testimony;

4) enter evidence;

5) enter motions and challenges;

6) testify in my native language or a language in which I am proficient;

7) use the services of an interpreter at no charge;

8) have counsel;

9) participate, with the permission of the investigator or interrogating officer, in investigative actions carried out on the basis of my motion or the motion of my counsel;

10) review the records of investigative actions taken with my participation and comment those;

11) review the order requesting forensic review and expert opinion in cases specified by art. 198 of the RF Code of Criminal Procedure;

12) review all criminal case files upon conclusion of the preliminary investigation, copy out any information in any amount from the criminal case, and make copies of criminal case files, including using equipment. If several aggrieved parties are involved in the criminal case, I am entitled to review the criminal case files that pertain to the harm done to me personally;

13) obtain copies of orders initiating a criminal case, deeming me aggrieved or refusing to do so, closing the criminal case, and suspending the criminal case, and copies of the lower court's verdict and of rulings of appeal and cassation courts;

14) participate in the trial of the criminal case in courts of the first, second and supervisory levels;

15) present pleadings;

16) support the indictment;

17) review the transcript of the court session and comment on it;

18) appeal the actions (inaction) and decisions of the interrogating officer, investigator, prosecutor or court;

19) appeal a verdict, judgment or determination of a court;

20) learn of appeals and propositions entered in the criminal case and make objections to those;

21) petition for protection pursuant to art. 11(3) of the RF Code of Criminal Procedure;

22) exercise other authority specified by the RF Code of Criminal Procedure.

| | |
|---|---|
| Aggrieved party | ✓[signature] _____ |
| | (signature) |
| The investigator (interrogating officer) who read the order and explained the rights | ✓[signature] _____ |
| | (signature) |
| I have received a copy of this order | 18 February 2010 |
| | ✓[signature] _____ |
| | (signature of the aggrieved party) |

# Declaration of Ashot Yegiazaryan Exhibit 2



**Abusing Interpol**

# Rogue states

**Cross-border policing can be political**

Nov 16th 2013 | From the print edition

FOUR years ago this week the whistle-blowing accountant Sergei Magnitsky died in jail from beatings and abuse, having uncovered a $230m fraud against the Russian state. His client Bill Browder, a London-based financier, has been campaigning to punish those responsible with visa bans and asset freezes. But the Russian authorities have retaliated and are trying to extradite him on fraud charges, using Interpol, the world police co-operation body.

No Western country is likely to send Mr Browder to Moscow. But his travel plans are stymied by the risk of arrest . He had to cancel a visit to Sweden last month to talk to a parliamentary committee. Only after weeks of lobbying did the country's police remove Mr Browder from their database. Germany, France and Britain have also publicly snubbed Russia's request.

Interpol notes that its constitution prohibits "activities of a political, military, religious or racial character"; governments are not supposed to use it to settle scores with their opponents. Nevertheless its "Red Notices", which seek the discovery and arrest of wanted persons for extradition, are open to abuse. Once issued, a Red Notice encourages—though it does not oblige—190 countries to detain the person named. 8,136 were given out last year, an increase of 160% since 2008. Interpol insists that it is not a judicial body: "queries" concerning allegations are "a matter for the relevant national authorities to address".

But Mr Browder's case is just one of many arousing controversy. Three years ago Algeria issued a Red Notice against Henk Tepper, a Canadian potato farmer, in a row involving export paperwork and suspect spuds. He was released in March after a year in a Lebanese jail and wants to sue the Canadian government for not protecting his rights. Interpol took 18 months to accept that the Red Notice issued against Patricia Poleo, a Venezuelan investigative journalist, by her government was politically motivated. Indonesia pursued Benny Wenda, a West Papuan tribal leader who ended up marooned in Britain; Belarus hounded an opposition leader, Ales Michalevic, when he fled to Poland.

Russia seems particularly fond of the tactic. It has targeted political refugees, such as Petr Silaev, an environmental protester, and Anastasia Rybachenko, a student activist now stranded in Estonia. She says Interpol is being used to "undermine democracy". During

recent elections in Estonia, Russia also reissued a Red Notice for Eerik-Niiles Kross, a politician and former spymaster who has long been a Kremlin bugbear.

Fair Trials International, a campaigning group, wants Interpol to have greater powers to vet "abusive, incomplete or inaccurate" arrest requests before they are sent to police forces around the globe. Though all Red Notices are issued to law-enforcement agencies, fewer than half are then made public. That makes it hard to challenge them in advance, or to prepare a defence in the event of a surprise arrest at a foreign airport. Fair Trials also wants an independent body to hear appeals instead of the Commission for the Control of Interpol's Files, which it says is too secretive.

Billy Hawkes, the commission's chairman, says its decisions in individual cases are formally only recommendations to Interpol's General Secretariat. He admits that aspects of its activities are "unsatisfactory", but argues that for a possible innocent person, having a Red Notice spread over the internet would be worse than issuing it in secret.

Dominic Raab, a British MP, worries that diplomatic expediency is compromising citizens' rights. Ken-Marti Vaher, Estonia's interior minister, decries requests of "a dubious nature" made to Interpol, and points out that Russia has failed to accept any of his country's offers to help investigations concerning Mr Kross. Mark Stephens, a British lawyer, says few governments are protesting about abuse because no one wants to be seen taking the side of criminals. At present, he says, challenging Red Notices is like a "game of battleships": the defence is shooting in the dark, unaware of the size and scope of the target.

 From the print edition: International

## Notices

INTERPOL Notices are international requests for cooperation or alerts allowing police in member countries to share critical crime-related information.

Notices are published by INTERPOL's General Secretariat at the request of National Central Bureaus (NCBs) and authorized entities, and can be published in any of the Organization's official languages: Arabic, English, French and Spanish.

In the case of Red Notices, the persons concerned are wanted by national jurisdictions for prosecution or to serve a sentence based on an arrest warrant or court decision. INTERPOL's role is to assist the national police forces in identifying and locating these persons with a view to their arrest and extradition or similar lawful action.

In addition, Notices are used by the United Nations, International Criminal Tribunals and the International Criminal Court to seek persons wanted for committing crimes within their jurisdiction, notably genocide, war crimes, and crimes against humanity.

### Types of Notice



**Red Notice**
To seek the location and arrest of wanted persons with a view to extradition or similar lawful action.



**Yellow Notice**
To help locate missing persons, often minors, or to help identify persons who are unable to identify themselves.



**Blue Notice**
To collect additional information about a person's identity, location or activities in relation to a crime.



**Black Notice**
To seek information on unidentified bodies.



**Green Notice**
To provide warnings and intelligence about persons who have committed criminal offences and are likely to repeat these crimes in other countries.



**Orange Notice**
To warn of an event, a person, an object or a process representing a serious and imminent threat to public safety.



**INTERPOL–United Nations Security Council Special Notice**
Issued for groups and individuals who are the targets of UN Security Council Sanctions Committees.



**Purple Notice**
To seek or provide information on modi operandi, objects, devices and concealment methods used by criminals.

### Publication

Only those notices approved for public dissemination appear on this website (the full list of Notices is available to authorized users via INTERPOL's Information System).

Any individual who is subject to an INTERPOL Notice should be considered innocent until proven guilty.

Any unauthorized alteration of any portion of any INTERPOL Notice is considered as a violation and subject to legal prosecution.

### Legal basis

A Notice is published only if it fulfils all conditions for processing the information. For example, a Notice will not be published if it violates Article 3 of the INTERPOL Constitution, which forbids the Organization from undertaking any intervention or activities of a political, military, religious or racial character.

Notices are processed in line with INTERPOL's Rules on the Processing of Data, which ensure the legality and quality of information, and the protection of personal data.

The legal basis for a Red Notice is an arrest warrant or court order issued by the judicial authorities in the country concerned. Many of INTERPOL's member countries consider a Red Notice to be a valid request for provisional arrest.

Furthermore, INTERPOL is recognized as an official channel for transmitting requests for provisional arrest in a number of bilateral and multilateral extradition treaties, including the European Convention on Extradition, the Economic Community of West African States (ECOWAS) Convention on Extradition, and the United Nations Model Treaty on Extradition.

### Diffusions

Similar to the Notice is another request for cooperation or alert mechanism known as a 'diffusion'. This is less formal than a notice but is also used to request the arrest or location of an individual or additional information in relation to a police investigation. A diffusion is circulated directly by an NCB to the member countries of their choice, or to the entire INTERPOL membership and is simultaneously recorded in INTERPOL's Information System.

© INTERPOL 2015. All rights reserved.

# Declaration of
# Ashot Yegiazaryan
# Exhibit 3

Case 2:14-cv-09764-RGK-PLA  Document 187-2  Filed 08/28/17  Page 25 of 68   Page ID
#:3945

**The New York Times** | https://nyti.ms/2umhfmj

EUROPE

# Soviet Veteran Who Met With Trump Jr. Is a Master of the Dark Arts

By ANDREW HIGGINS and ANDREW E. KRAMER    JULY 15, 2017

MOSCOW — Rinat Akhmetshin, the Russian-American lobbyist who met with Donald Trump Jr. at Trump Tower in June 2016, had one consistent message for the journalists who met him over the years at the luxury hotels where he stayed in Moscow, London and Paris, or at his home on a leafy street in Washington: Never use email to convey information that needed to be kept secret.

While not, he insisted, an expert in the technical aspects of hacking nor, a spy, Mr. Akhmetshin talked openly about how he had worked with a counterintelligence unit while serving with the Red Army after its 1979 invasion of Afghanistan and how easy it was to find tech-savvy professionals ready and able to plunder just about any email account.

A journalist who visited his home was given a thumb drive containing emails that had apparently been stolen by hackers working for one of his clients.

On another occasion, at a meeting with a New York Times reporter at the Ararat Park Hyatt hotel in Moscow, Mr. Akhmetshin, by then an American citizen, informed the journalist he had recently been reading one of his emails: a note sent by the reporter to a Russian-American defense lawyer who had once worked for Mikhail Khodorkovsky, the anti-Kremlin oligarch.

In that instance, the reporter's email had become public as part of a lawsuit. But the episode suggests Mr. Akhmetshin's professional focus in the decades since he immigrated to the United States — and the experience that he brought to a meeting last June in New York with President Trump's oldest son, Donald Trump Jr., his son-in-law, Jared Kushner, and the then-head of the Trump presidential campaign, Paul J. Manafort.

The meeting was arranged on the claim that a Russian lawyer, Natalia Veselnitskaya, would provide dirt on Hillary Clinton, though in the end, Mr. Trump and his son have insisted, neither Mr. Akhmetshin nor Ms. Veselnitskaya provided anything of value.

But Mr. Akhmetshin, a gregarious, fast-talking man with a sharp sense of humor, was a skilled practitioner in the muscular Russian version of what in American politics is known as opposition research. From his base in Washington, Mr. Akhmetshin has been hired by an ever-changing roster of clients, often Russians, to burnish their image and blacken those of their rivals. Some clients were close to the Kremlin. Others were its bitter foes.

Mr. Akhmetshin often warned his friends and contacts: "Nothing is secure." It was a conviction that emerged from the chaotic and often violent corporate battles that convulsed Russia in the 1990s, when "chyorny P.R." or "black public relations" based on stolen or fabricated documents became a powerful weapon for businessmen seeking to damage their rivals without resorting to physical threats, another frequently used tool.

The practice was rooted in the Soviet techniques of "kompromat," the collection of compromising information by the K.G.B. against foes of the Communist Party, but reached its full flowering after the 1991 collapse of Communism and the privatization of the dark arts formerly dominated by the K.G.B.

Instead of simply examining old media reports, court records and other public documents to try to dig up dirt or embarrassing gossip, Russian-style "chyorny P.R." has often focused on pilfering private information through hacking and physical intrusion into offices and filing cabinets.

Case 2:14-cv-09764-RGK-PLA Document 187-2 Filed 08/28/17 Page 27 of 68 Page ID #:3947

In his own investigations over the years, Mr. Akhmetshin has acquired a reputation for obtaining email records, information from spyware and other data that appeared to be drawn from Russian hackers.

He has denied that, insisting that he conducted research for his clients and relayed accurate information to the press. A 2011 case illustrates his style.

Andrey Vavilov, a former Russian deputy finance minister and owner of an oil company, hired him to discredit a longtime adversary, a former Russian lawmaker named Ashot Egiazaryan. Mr. Vavilov had learned that Mr. Egiazaryan was seeking political asylum in the United States, and was "disgusted by this," Mr. Akhmetshin later said in a court deposition.

At the time, Mr. Akhmetshin was described as the Washington director of a pro-democracy think tank called the International Eurasian Institute, although United States corporation records show it had been dissolved two years earlier for failure to pay taxes. He was also lobbying against the Magnitsky Act, the law which bars Russian officials suspected of human rights abuses from entering the United States.

In a defamation lawsuit later brought by Mr. Egiazaryan in a New York federal court, Mr. Akhmetshin testified that Mr. Vavilov invited him to his home in Moscow to discuss how to derail his enemy's asylum application. "He had some cash around the house," Mr. Akhmetshin testified. "I remember there was money in like $100 bills bags."

He said Mr. Vavilov, who had been dogged for years in Russia by accusations of corruption, handed him a total of $70,000 to $80,000 in cash. That was the start of a concerted campaign to portray Mr. Egiazaryan as an anti-Semite in the news media and to Jewish organizations that then opposed his asylum application. "I met with people in Russia. I met with people in Washington D.C.," Mr. Akhmetshin testified. Mr. Egiazaryan remains in the United States, but his lawyer would not comment on his asylum status.

There is no evidence that Mr. Akhmetshin's efforts on behalf of any of his clients, whether they had close or hostile relations with the Kremlin, were illegal. Nor is there evidence that he personally engaged in the technical aspects of hacking

himself. But a 2015 lawsuit filed in a New York State court put forward detailed allegations.

An international mining company controlled by a trio of flamboyant millionaires from Kazakhstan sued in a New York State court, accusing Mr. Akhmetshin of orchestrating a hacking campaign against their company to benefit a rival Russian tycoon, Andrey Melnichenko. Each side of the dispute is known for aggressive business practices and lavish excesses.

Court papers filed in November 2015 on behalf of the Kazakhs' company, International Mineral Resources, or I.M.R., described Mr. Akhmetshin as "a former Soviet military counterintelligence officer who moved to Washington, D.C. to become a lobbyist" and "developed a special expertise in running negative public relations campaigns."

Mr. Akhmetshin has called this characterization misleading. He was, he said, drafted as a young man to serve in a military unit performing counterintelligence functions during the Soviet-Afghan war. As an enlisted man, he said, he never received any training in "negative public relations."

The suit alleged that Mr. Akhmetshin was retained by EuroChem VolgaKaliy, a Russian potassium mining company controlled by Mr. Melnichenko, which was involved in a $1 billion litigation with I.M.R. The suit also names as a defendant Salisbury & Ryan, a New York law firm representing EuroChem.

The lawsuit alleged that Mr. Akhmetshin was hired to hack into the computer systems of I.M.R. and had stolen about 28,000 files, or about 50 gigabytes of data. It said the sensitive material was then distributed to journalists and others in an effort to harm the company's reputation.

The suit claims that Mr. Akhmetshin stole passport information, emails and personal contact lists for executives within I.M.R., along with bank account information; loan agreements; business strategy documents; board meeting minutes; drafts of market-sensitive documents; and financial forecasts and projections for the company.

An investigator for I.M.R. reported personally witnessing and overhearing a conversation at a London coffee shop during which Mr. Akhmetshin handed someone an external hard drive that Mr. Akhmetshin described as containing files obtained from I.M.R. computers, according to the lawsuit.

The lawsuit was withdrawn in 2016, and Mr. Melnichenko denied all the allegations in it.

Mr. Akhmetshin has denied that he hacked the company's computers.

An early client of Mr. Akhmetshin's was an opposition leader from Kazakhstan who, from self-imposed exile in the West, was waging a lonely campaign against one of Mr. Putin's closest allies, the president of Kazakhstan, Nursultan Nazarbayev.

And in neighboring Kyrgyzstan, he helped to unravel a brazen corruption scheme by a former pro-Kremlin leader and his family that had been cheating the population, poor already, out of millions of dollars.

On other occasions, however, Mr. Akhmetshin worked on causes that clearly benefited the Kremlin, like a long-running campaign by Ms. Veselnitskaya to get Congress to repeal legislation imposing sanctions on Russian officials suspected of corruption and involvement in the death of Sergei L. Magnitsky, a Russian accountant who died in a Moscow jail in 2009.

Mr. Akhmetshin had also at times been in touch with Russian government officials, court records show.

In 2010, he submitted an op-ed column to The Washington Times on behalf of Viktor Ivanov, then the director of Russia's anti-narcotics police, according to one of Mr. Akhmetshin's own emails, subpoenaed as evidence in a case in the Southern District of New York. Mr. Ivanov is a longtime veteran of Russia's security services.

Mr. Akhmetshin has spoken openly about his service in the Soviet military in Afghanistan, and his current work throughout Russia and Central Asia.

Once, a reporter arrived for a meeting at a coffee shop in Moscow with Mr. Akhmetshin and peered around the room, trying to see where he was sitting.

Mr. Akhmetshin had come in with what amounted to a disguise: He sat smiling at a table, wearing a hat resembling a skull cap and his beard grown to an impressive length. He was headed next, he said, on an assignment to Afghanistan and had assumed the appearance of an Afghan elder.

David D. Kirkpatrick contributed reporting from Cambridge, Britain, Sharon LaFraniere from Washington and Bryant Rousseau from New York.

A version of this article appears in print on July 16, 2017, on Page A1 of the New York edition with the headline: In the Room, A Practitioner In Dark Arts.

© 2017 The New York Times Company

# Declaration of Ashot Yegiazaryan Exhibit 4

Case 2:14-cv-09764-RGK-PLA   Document 187-2   Filed 08/28/17   Page 32 of 68   Page ID
#:3952

$\mathfrak{The}$ $\mathfrak{New}$ $\mathfrak{York}$ $\mathfrak{Times}$ | https://nyti.ms/2vgaNd2

U.S.

# Lobbyist at Trump Campaign Meeting Has a Web of Russian Connections

By SHARON LaFRANIERE, DAVID D. KIRKPATRICK and KENNETH P. VOGEL    AUG. 21, 2017

WASHINGTON — Rinat Akhmetshin, a Russian immigrant who met last summer with senior Trump campaign officials, has often struck colleagues as a classic Washington mercenary — loyal to his wife, his daughter and his bank account. He avoided work that would antagonize Moscow, they suggested, only because he profited from his reputation as a man with valuable connections there.

But interviews with his associates and documents reviewed by The New York Times indicate that Mr. Akhmetshin, who is under scrutiny by the special counsel Robert S. Mueller III, has much deeper ties to the Russian government and Kremlin-backed oligarchs than previously known.

He has an association with a former deputy head of a Russian spy service, the F.S.B., and a history of working for close allies of President Vladimir V. Putin. Twice, he has worked on legal battles for Russian tycoons whose opponents suffered sophisticated hacking attacks, arousing allegations of computer espionage. He helped federal prosecutors bring corruption charges against an American businessman in the former Soviet Union who turned out to be working for the C.I.A.

Case 2:14-cv-09764-RGK-PLA   Document 187   Filed 08/28/17   Page 33 of 68   Page ID #:3953

He also helped expose possible corruption in government contracting that complicated American efforts to keep troops at an air base in Kyrgyzstan — an American presence that the Russians fiercely opposed.

In short, Mr. Akhmetshin's projects over two decades in Washington routinely advanced the Kremlin's interests, especially after he became an American citizen in 2009. American counterintelligence agents took notice of his activities, but drew no conclusions about where his allegiances lay, according to a former law enforcement official who spoke on condition of anonymity, citing government secrecy rules.

Mr. Akhmetshin's meeting with Trump campaign officials is of keen interest to Mr. Mueller, who is investigating the Kremlin's efforts to interfere in the 2016 election. Of all the visitors who attended the June 2016 session at the Trump Tower, he appears to have the most direct ties to Russian intelligence. The session was arranged by a Russian businessman close to Mr. Putin whose emissary promised damaging information about Hillary Clinton as "part of Russia and its government's support for Mr. Trump."

Mr. Akhmetshin, who did not respond to repeated requests to be interviewed for this article, has said he was a last-minute guest at an inconsequential get-together. Trump campaign officials have dismissed the meeting as part of an effort to amend an American law that placed sanctions on Russians for human rights abuses. The 2012 law, known as the Magnitsky Act, infuriated Mr. Putin, whose government retaliated by restricting adoptions of Russian children by Americans.

Ronald J. McNamara, a former staff member of the United States Commission on Security and Cooperation in Europe who met with Mr. Akhmetshin about Central Asian issues, said Mr. Akhmetshin openly alluded to involvement with Russian intelligence. "My understanding was that he had come from the security agencies in the Soviet Union-Russian Federation," Mr. McNamara said. "He did not make it a secret."

Mr. Akhmetshin, 49, said he is no Russian spy. "I am the target of a well-coordinated and financed smear campaign," he said last month in a text message to The Times.

Keenly intelligent, relentlessly charming and assiduously opaque about his work, Mr. Akhmetshin sometimes referred to his contacts by pseudonyms and collected his salary in stacks of hundred-dollar bills. A trained biochemist who speaks four languages, he described himself on one official document as a "househusband. " He identified himself as the head of a Washington think tank for years after it was officially dissolved.

"I think he works for us. I don't think he works for them," said Lanny Wiles, a veteran Republican political operative who has worked with Mr. Akhmetshin for more than 15 years. "But I don't know what he really does."

## Rise of an Influence Peddler

Born in Kazan, Russia, about 500 miles east of Moscow, Rinat Rafkatovitch Akhmetshin was drafted at age 18 into the Soviet army's war against Afghanistan. He served from 1986 to 1988 and again in 1991. He described himself on his visa application for the United States as a sergeant who rose to the rank of lieutenant in the military police, specializing in communications. He told some journalists that he worked with a military counterintelligence unit, but said he never joined Russian intelligence services — unlike his father, sister and godfather.

In 1992 he graduated with honors from Kazan Federal University, and two years later arrived in Washington as a graduate student in chemistry at the Catholic University of America. He married a fellow Russian chemistry student and received his Ph.D. But he immediately abandoned his esoteric study of mechanistic enzymes and burrowed into Washington's foreign lobbying scene, promoting clients from Russia and former Soviet states.

He never formally studied English, he said, or owned a car: He pedaled about Washington on a bright orange bicycle. But he was witty and erudite, a lover of literature, opera and snowboarding. Matthew Bryza, a former staff member in charge of Central Asia issues at the National Security Council under President George W. Bush, remembers Mr. Akhmetshin as "very smart, slick guy" serving as "the paid drone of unsavory, out-of-fashion former Soviet leaders looking to launder their reputations."

Case 2:14-cv-09764-RGK-PLA   Document 137   Filed 08/28/17   Page 35 of 68   Page ID #:3955

"He would boast about ties and experience in Soviet intelligence and counterintelligence to give himself some cachet and make himself a mystery man," he said.

Mr. Akhmetshin's gateway to Washington was Edward Lieberman, a lawyer with corporate and political clients in former Soviet countries who was married to President Bill Clinton's former deputy chief of staff, Evelyn S. Lieberman, who died in 2015. He called Mr. Lieberman, who could not be reached for comment, a personal adviser.

Together the two started the Eurasian Institute for Economic and Political Research. Supposedly set up to promote democratic reforms in former Soviet states, it was essentially a vehicle to burnish the reputation of one client, Akezhan Kazhegeldin, an ex-K.G.B. officer and the former prime minister of Kazakhstan. Mr. Kazhegeldin had fled under a cloud of corruption charges and was seeking Washington's support to challenge his rival, Kazakhstan's president, Nursultan Nazarbayev.

Mr. Akhmetshin worked to undercut his client's rival by funneling information to American prosecutors pursuing bribery charges against James Giffen, an American businessman close to the Kazakh president, according to people involved with the case. The prosecutors discovered only belatedly that Mr. Giffen had worked for the C.I.A. in the former Soviet Union.

By 2005 the government of another former Soviet republic, Kyrgyzstan, had hired Mr. Akhmetshin to investigate whether Washington had bribed the family of the country's former president to keep an American air base there. The Manas base, established as a staging ground for American forces in Afghanistan, was a major source of friction with the Russians.

The Kyrgyz ambassador to Washington at the time, Zamira Sydykova, said Mr. Akhmetshin arranged an interview with a Times reporter and escorted her to it. The resulting article helped set off a Washington controversy and ultimately, a congressional investigation. Kyrgyzstan finally forced the United States to abandon the base in 2014.

In an affidavit that year, Mr. Akhmetshin said he worked closely with the American government about the location of the base. But Thomas Graham, the National Security Council's Russia specialist from 2002 to 2007, said the controversy put Washington on the defensive. "Looking into allegations of fraud or bribery — anything that would complicate our presence at that air base — was in Russia's interests," he said.

Mr. Akhmetshin's work took him back and forth to Europe more than once a month, on trips lasting a few days each. Senator Charles E. Grassley, the Iowa Republican who is now chairman of the Senate Judiciary Committee, has sought to determine whether his travel pattern raised concerns among immigration officials who approved Mr. Akhmetshin's application for American citizenship in 2009.

Once naturalized, Mr. Akhmetshin began traveling regularly to Moscow and taking on more overtly pro-Russian projects. The new work led him into legal entanglements, the halls of Congress and eventually Trump Tower.

## The Hacking Campaigns

Few episodes from Mr. Akhmetshin's past seem more relevant to Mr. Mueller's investigation than his work for two Russian billionaires accused of infiltrating their adversaries' computers during nasty legal battles.

The Trump Tower meeting in June 2016 took place less than a week before revelations that hackers had penetrated the Democratic National Committee's computers and obtained a trove of emails. Investigators have traced digital espionage to Russian spy agencies. There is no public evidence that Mr. Akhmetshin played any role in the D.N.C. hack.

The first hacking case, which has not previously been reported, began when Mr. Akhmetshin served an alliance of businessmen led by Suleiman Kerimov — a financier close to Mr. Putin in a commercial and political dispute with a Russian competitor, Ashot Egiazaryan.

In early 2011, two London lawyers on Mr. Egiazaryan's team separately received suspicious emails and hired forensic experts to scrutinize them, according to people

8/28/2017 How Russia Often Benefits When Julian Assange Reveals the West's Secrets - The New York Times
Case 2:14-cv-09764-RGK-PLA Document 137-2 Filed 08/28/17 Page 37 of 68 Page ID
#:3957

involved in a Scotland Yard investigation. The experts found that the messages concealed spyware meant to infiltrate their computers, and they fed traceable documents into the spyware that were then opened by computers registered at the Moscow office park of one of Mr. Kerimov's companies.

After an inquiry of more than 18 months, Scotland Yard investigators concluded in January 2013 that they lacked sufficient evidence to bring any charges, a spokesman said. Representatives of the lawyers targeted declined to comment.

Mr. Akhmetshin has said in court papers that he was paid only by one businessman in the alliance with Mr. Kerimov, but coordinated with Mr. Kerimov's team.

Two years later, hacking accusations arose in another case, this time lodged directly against Mr. Akhmetshin. He worked as a consultant to a law firm representing EuroChem, a fertilizer and mining company controlled by another Russian billionaire close to Mr. Putin — Andrey Melnichenko. Mr. Akhmetshin's target was a rival mining company, International Mineral Resources.

Within months, documents stored in International Mineral Resources's computer systems began surfacing outside the company, leaked to journalists and others. The company concluded that its computers had been hacked, and replaced its servers. In lawsuits filed in federal court in Washington and state court in New York, the company accused EuroChem and Mr. Akhmetshin of computer espionage.

EuroChem's information technology chief, Vladimir Chibisov, previously worked in the Russian government. He had written a book promoted as "a hacker's Bible," which he described as a book "about us — about Russian programmers, men of the '80s and '90s" who "had done programming, and even a bit of hacking."

Mr. Akhmetshin personally handed a thumb drive containing stolen documents to a lawyer engaged in another matter potentially damaging to the rival company, according to a person familiar with the matter. The same thumb drive was later obtained by investigators, and someone using the initials "R.A." had gained access to its contents, according to court papers.

A spokesman for Mr. Melnichenko said in a statement that he has never condoned hacking or other illegal activity, nor had he ever met or known Mr. Akhmetshin. The spokesman said Mr. Chibisov's book was "tongue in cheek" and "cannot possibly be taken seriously."

An investigator for the targeted company also testified that he had followed Mr. Akhmetshin in January 2014 to a meeting at London's Cafe Royal and watched him hand over an external hard drive to another individual. He said he had overheard Mr. Akhmetshin claim that he had paid a team of Russian hackers "a lot of money" for the records.

Mr. Akhmetshin acknowledged in a deposition that he had turned over a hard drive with information about the firm's owners. But he said he had obtained the data from a Kazakh contact through a loose network he called the "London Information Bazaar." Asked about computer hacking, he replied, "I do not know a single person who could do that."

International Mineral Resources dropped the lawsuits without explanation in early 2016, withdrawing all allegations before they could be adjudicated. The company said in a statement Friday that it dropped the charges "after careful consideration."

## A Key Kremlin Contact

During the same period that Mr. Akhmetshin was accused of being involved in various hacking schemes, he appears to have been nurturing a relationship with Viktor Ivanov, once the deputy head of Russia's intelligence service, the F.S.B., and until last year a top aide to Mr. Putin.

From 2009 to 2014, Mr. Ivanov led the Russian side of a joint effort with the Americans to combat drug trafficking in Afghanistan, part of an early Obama administration initiative to improve relations between Moscow and Washington.

When Mr. Ivanov traveled to Washington to promote the effort in October 2010, Mr. Akhmetshin helped shepherd him around town. In a deposition filed in one of

the hacking cases, Mr. Akhmetshin testified that he helped facilitate the Washington visit with one of Mr. Ivanov's aides, with whom he had served in the Red Army.

In an affidavit in that same case, Mr. Akhmetshin said he had been in email contact with Mr. Ivanov on matters ranging "from narco-trafficking and terrorism in Afghanistan to surveillance of undercover agents, suspected undercover agents and their identities."

Reporters who encountered Mr. Akhmetshin during his travels to Afghanistan said he grew a beard and wore a skullcap to blend in with the local population. He never identified whom he worked for, but two former American officials involved with the counternarcotics program said the American side did not hire him.

Mr. Ivanov, who retired early last year, could not be reached for comment about whether Mr. Akhmetshin was on the Russian government's payroll.

Russia ended the counternarcotics cooperation in 2014 after the United States imposed sanctions on Mr. Ivanov and other Putin allies in retaliation for Russia's invasion and seizure of Ukraine's Crimea region.

There, too, Mr. Akhmetshin had tried to ally with Ukraine's pro-Moscow elements. Before the 2014 invasion, he told reporters, he unsuccessfully sought consulting work with the political party dominated by the nation's pro-Putin president, Viktor F. Yanukovych. A popular revolt forced Mr. Yanukovych to flee to Russia.

Mr. Akhmetshin told journalists that he was a longtime acquaintance of Paul J. Manafort, who served as a high-paid consultant to Mr. Yanukovych for years before becoming chairman of the Trump campaign. Jason Maloni, a spokesman for Mr. Manafort, said, "Paul doesn't know and hasn't worked with the man."

Last year, Mr. Akhmetshin took on a new project high on the Kremlin's agenda: a $240,000 lobbying campaign to amend the Magnitsky Act, which imposes sanctions on Russians for human rights abuses. The law was named after Sergei L. Magnitsky, a Russian tax lawyer who died in custody after he uncovered a $230 million tax fraud allegedly tied to Russian officials. Several wealthy Russian

8/28/2017    Case 2:14-cv-09764-RGK-PLA   Document 187-2   Filed 08/28/17   Page 40 of 68   Page ID
Guest at Trump/Campaign Meeting Has Web of Russian Connections - The New York Times
#:3960

businessmen financed a nonprofit group to spearhead the campaign, which was represented by Mr. Akhmetshin and a Russian lawyer named Natalia Veselnitskaya.

Donald J. Trump Jr. has said the promise of damaging information about Hillary Clinton was just an excuse for Ms. Veselnitskaya to get into Trump Tower to talk about why the law should be changed. Mr. Akhmetshin, a Washington resident, has told reporters that he just happened to be lunching with Ms. Veselnitskaya in Manhattan that day when she spontaneously invited him to the meeting with the president's son, son-in-law Jared Kushner and Mr. Manafort. He did not explain why she wanted him there.

After Mr. Akhmetshin's presence came to light, a spokesman for Mr. Putin, Dmitry Peskov, told reporters: "We don't know anything about this person."

### Correction: August 23, 2017

An article on Monday about a Russian immigrant who met last summer with senior Trump campaign officials referred incorrectly to the location of Kazan, Russia. It is 500 miles east of Moscow, not west.

Sharon LaFraniere and Kenneth P. Vogel reported from Washington, and David D. Kirkpatrick from London. Andrew E. Kramer and Sophia Kishkovsky contributed reporting from Moscow, and Michael S. Schmidt and Eileen Sullivan from Washington. Susan Beachy contributed research.

A version of this article appears in print on August 21, 2017, on Page A1 of the New York edition with the headline: Guest at Trump Tower Meeting Has Aided Close Allies of Putin.

© 2017 The New York Times Company

# Declaration of Ashot Yegiazaryan Exhibit 5

Следователю по особо важным делам
первого отдела управления
по расследованию особо важных дел о
преступлениях против государственной
власти и в сфере экономики
ГСУ СК при Прокуратуре РФ
советнику юстиции Габдулину Р.Р.

от Смагина Виталия Ивановича
проживающего: г.Москва, ул.
Берзарина, д.19, к.1, кв. 103.

по уголовному делу №201/355137-10

# ХОДАТАЙСТВО

Учитывая, что своими противоправными действиями Егиазарян А.Г., совершил хищение моего имущества – 20% акций ЗАО «Центурион Альянс», номинальной стоимостью 4 600 000 рублей, рыночная стоимость которых на сегодняшний момент составляет 1 575 500 000 рублей ( один миллиард пятьсот семьдесят пять миллионов пятьсот тысяч рублей), то есть своими противоправными деяниями причинил мне имущественный ущерб, прошу Вас принять и приобщить к материалам уголовного дела мой гражданский иск (исковое заявление).

Приложение: гражданский иск на 6 листах.

Смагин В.И.

12 ноября 2010 года

Маркарьян Р.В.
адвокат

КОПИЯ ВЕРНА
Главное следственное управление
Следственного комитета при
Прокуратуре РФ
Следователь

Для пакетов
№ 4

1

Следователю по особо важным делам первого отдела управления по расследованию особо важных дел о преступлениях против государственной власти и в сфере экономики ГСУ СК при Прокуратуре РФ советнику юстиции Габдулин Р.Р.

от Смагина Виталия Ивановича проживающего: г.Москва, ул. Берзарина, д.19, к.1, кв. 103.

по уголовному делу №201/355137-10

Гражданский иск
о возмещении имущественного вреда,
причиненного совершенным преступлением

Мне, Смагину Виталию Ивановичу в Закрытом акционерном обществе «Центурион Альянс» принадлежали на праве собственности 460 (четыреста шестьдесят) штук обыкновенных именных акций ЗАО «Центурион Альянс» номинальной стоимостью 10.000 (десять тысяч) рублей каждая, что составляет 20% акций. Подконтрольные Егиазаряну А.Г. структуры ЗАО «Титул», ТД «Уникомимпекс», ООО «Милеа», ООО «Мерхав» владели в ЗАО «Центурион Альянс» 73% акций. Еще 7% акций владел партнер Егиазаряна А.Г. по бизнесу Дмитрий Гаркуша, который в 2006 году являлся управляющим ООО «Даев Плаза», генеральным директором ООО «Декмос».

Мои акции были учтенные на лицевом счете № 013700 в реестре акционеров, ведение которого осуществлялось регистратором - ЗАО «Регистраторское общество «СТАТУС».

В 2006 году Егиазарян Ашот Геворкович также осуществлял реализацию других коммерческих проектов в иных сферах деятельности, в частности, через подконтрольные ему фирмы ЗАО «Декорум», ОАО «Декмос» осуществлял строительство гостиницы «Москва» и нуждался в средствах, для чего привлекал кредиты.

На одной из наших встреч в бизнес центре «Даев плаза», расположенном по адресу: г. Москва, Даев переулок, д.20 в ноябре 2006 года Егиазарян А.Г. предложил мне продать ему мои 20% акций. Я отказал, так как предложенная Егиазаряном А.Г. цена была на порядок ниже реальной. В этот период у нас были хорошие предложения от сторонних лиц о продаже акций, но Егиазарян А.Г. не хотел продавать свои акции, а наоборот хотел получить мой пакет. Егиазарян А.Г. сообщил мне, что ему нужны все акции ЗАО «Центурион Альянс» для залога в «Дойче банке», где, якобы, его фирма

1

должна получить кредит в размере 100 миллионов долларов США на реконструкцию гостиницы «Москва».

Впоследствии, Егиазарян А.Г. и Дмитрий Гаркуша на одной из встреч со мной, состоявшейся в г. Москве в «Даев Плаза», примерно в конце ноября – начале декабря 2006 года сообщили, что «Дойче банк» готов выдать кредит не строго на строительство гостиницы «Москва», но под поручительство «Европарка», как ликвидного объекта. Хотя эти деньги будут использованы ими именно на проект реконструкции гостиницы «Москва».

В процессе нашего общения Егиазарян А.Г. меня долго уговаривал поучаствовать в схеме, якобы предложенной «Дойче банком», путем хотя бы временной (на один год) передачи моих 20% акций в ЗАО «Центурион Альянс» в обеспечение возврата кредита, ни рубля из которого сам ЗАО «Центурион Альянс» не должен был получить. Я, естественно, отказался. Егиазарян А.Г. продолжал настаивать, говоря, что моему имуществу ничто не угрожает, что всем рискует лично он, и что я могу рассчитывать на участие в его бизнесе по строительству гостиницы «Москва» и на получение дополнительного пакета акций ЗАО «Центурион Альянс», если соглашусь на временную передачу моих акций в депозитарий «Дойче банка» в обеспечение возврата кредита. Я после долгих уговоров выразил свое предварительное согласие, но настаивал на обязательном письменном оформлении всех документов и договоренностей с привлечением хороших юристов.

На очередной встрече между мной, Егиазаряном А.Г. и Дмитрием Гаркушей, состоявшейся примерно в ноябре 2006 года в г. Москве Егиазарян А.Г. сообщил, что его партнер Дмитрий Гаркуша является владельцем компании «Блиденсол Трейдинг энд Инвестментс Лтд (Кипр) – получателя кредита в размере 100 млн. долларов США от «Дойче банка». Егиазарян А.Г. сообщил, что по схеме, одобренной «Дойче банком», банк хочет получить в залог акции ЗАО «Центурион альянс» и все имущество «Европарка», где у меня были 20%, но банк, якобы, не желает, чтобы эти 20% на момент залога принадлежали лично мне или иным Российским юридическим или физическим лицам. Для чего Егиазарян А.Г. рассказал, что схема должна выглядеть следующим образом: я, как и остальные акционеры, должен был продать свои акции кипрской компании «Доралин Трейдинг энд Инвестментс» (далее – «Доралин») по номинальной стоимости. Данная компания также является акционерным обществом. Данную компанию создали граждане Кипра, а генеральной доверенностью на управление данной компанией до октября 2009 года владел Гаркуша. В свою очередь 100% акций самой компании «Доралин» приобретает компания «Тафтс Инвест энд Трейд Инк.» (Британские Виргинские острова, далее – «Тафтс»). В самой компании «Тафтс» акции должны быть распределены также, как и в самой компании «Тафтс» акции должны быть распределены также, как а в самой ЗАО «Центурион Альянс», то есть 73% у Егиазаряна А.Г., 7% у Дмитрия Гаркуши, а 20% у меня.

Егиазарян А.Г. сказал, что [...] войдет в компанию «Тафтс» подконтрольной ему фирмой «Калкен Холдингс Лтд» (Кипр) (далее Калкен). Калкен также является кипрской компанией, директорами которой являются

2

114

граждане Кипра, но кто является учредителем я не знаю. Но генеральная доверенность на управление данной компанией выдана на Егиазаряна Артема.

Я, так как не участвовал никак в пользовании кредитом «Дойче банка», был против участия в какой-либо схеме, настаивал на жестком регулировании всех отношений в письменной форме.

В итоге после долгих переговоров Егиазарян А.Г. пообещал выполнить следующие обязательные условия – я передавал свои акции компании «Доралин» только с условием, что я смогу контролировать это имущество через участие в компании «Тафтс», и обязательно на срок не более года, чтобы все документы подписывались одновременно, и чтобы мы – акционеры подписали соглашение между собой с участием «Дойче банка», который смог бы явиться гарантом его исполнения. Егиазарян А.Г. сказал, что понимает мою обеспокоенность рисковать правом на мои 20% в проекте «Европарк», но заверил меня, что моему имуществу ничто не угрожает, что в любом случае 20% у меня остаются, так как в случае дефолта компании «Блиденсол» (заемщик по кредиту «Дойче банка») он – Егиазарян А.Г. предоставляет мне и только мне право продать его (Егиазаряна А.Г.) пакет акций 73%, стоимость которого согласно произведенной официальной оценке превышала стоимость кредитных обязательств. Кроме того, Егиазарян А.Г. заверил меня, что в компании «Тафтс» ни один документ не будет иметь юридической силы, без моей подписи, для чего мы оформим необходимые документы.

Также, Егиазарян А.Г. предложил мне принять участие в действенном контроле за деятельностью ЗАО «Центурион Альянс», чего я был лишен ранее и не мог рассчитывать на справедливое распределение дивидендов. Для чего Егиазарян А.Г. предложил изменить Устав ЗАО «Центурион Альянс», сделать меня Председателем Совета директоров, и ввести должность первого заместителя генерального директора, который будет назначаться не Генеральным директором, а Советом директоров, то есть фактически будет моим человеком. Также он согласился на мое предложение ограничить уставом право генерального директора на заключение сделок на сумму свыше 5 млн. рублей, введя обязательное наличие второй подписи первого заместителя генерального директора для одобрения таких сделок.

Достигнутые договоренности все акционеры закрепили 26 декабря 2006 года в подписанном Соглашении акционеров, оформление которого осуществлялось с участием «Дойче банка» на основании договора Эскроу, по которому «Дойче банк» должен был выступать гарантом исполнения обязательств акционерами друг перед другом.

По условиям договоров между акционерами в обеспечение возврата кредита, выданного «Дойче Банком» компании «Блиденсол», «Дойче банку» должны были быть переданы все обеспечительные документы для обращения внесудебного взыскания на акции «Доралин», ЗАО «Центурион Альянс» и имущественного комплекса «Европарк». В частности, «Дойче

3

115

банку» должны были быть переданы на хранение передаточные распоряжения на акции «Доралин» от компании «Тафтс».

Также по соглашению между акционерами от 26.12.2006 года и договору Эскроу, Егиазарян А.Г. должен был передать «Дойче банку» на временное хранение, как независимому агенту, акции «Тафтс», принадлежащие формально компании «Калкен» в размере 73%.

После оформления всех документов и получения кредита, Егиазарян А.Г. нарушил достигнутые договоренности и отказался передавать «Дойче банку» свои 73% акций в компании «Тафтс».

Примерно в марте-апреле 2008 года по моему настоянию, между мной и Егиазаряном А.Г. было подписано соглашение о выполнении с его стороны условий договоренностей 2006 года о передаче 73% акций «Тафтс» на хранение «Дойче банку», заключении нового договора Эскроу с «Дойче банком». Кроме того, Егиазарян А.Г., обещал, ввести в компании «Тафтс» и «Блиденсол» обязательную мою вторую подпись для распорядительных документов, а также обещал дать указание своим структурам и адвокатам оформить на меня по номиналу 50% акций в компании «Блиденсол». Из обещанного, на меня было оформлено право второй подписи от имени компании «Тафтс» по распоряжению имуществом (акциями) компании «Доралин» наряду с Артемом Егиазаряном. Остальные договоренности исполнены не были.

Свои обязательства по возврату кредита компания «Блиденсол» перед «Дойче банком» не исполнила, в связи с чем «Дойче банк» предложил мне выкупить этот кредит, найти покупателя на этот кредит и получить права, соответственно, на заложенное имущество, как было предусмотрено достигнутыми договоренностями. Но, поскольку из «Дойче банка» исчезла часть обеспечительной документации, дающей право «Дойче Банку» на наложение внесудебного взыскания на акции компании «Доралин», приобретатель прав по кредиту терял право на получение акций «Доралин» во внесудебном порядке в случае не возврата кредита фирмой «Блиденсол».

Также 08 декабря 2006 года между ЗАО «Центурион Альянс» и компанией «Блиденсол» был заключен договор займа на сумму около 1,5 миллиарда рублей, однако, кредитных денег «Дойче банка» там не было, это были аккумулированные займы прошлых периодов. Компания «Кхэкхем» (принадлежащая Дмитрию Гаркуше) и другие иностранные кредиторы ЗАО «Центурион Альянс» за 1 доллар продали право требования по договорам займа компании «Блиденсол», также принадлежащей Дмитрию Гаркуше. После чего, как указывалось выше, между ЗАО «Центурион Альянс» и компанией Бледенсоль был заключен договор займа (новации) на общую сумму по всем ранее заключенным договорам займа в размере 1,5 млрд. рублей. Сделано это было для того, чтобы ЗАО «Центурион Альянс» возвращал заем не компании «Кхэкхем», а компании «Блиденсол», которая являлась получателем кредита «Дойче банка», и полученные от ЗАО «Центурион Альянс» деньги должна была пускать на погашение процентов по этому кредиту.

4

116

В дальнейшем между Егиазаряном А.Г. и Гаркушей Д.В. произошел конфликт, после которого Егиазарян А.Г., пользуясь возможностью управлять компанией ЗАО «Центурион Альянс» и компанией «Блиденсол» через «подчиненных» ему людей, без моего согласия сменил валюту вышеуказанного договора займа с рублей на доллары и увеличил процентную ставку с 1% на 12%, а затем и до 22% годовых. Таким образом, была искусственно увеличена кредиторская задолженность ЗАО «Центурион Альянс» перед компанией «Блиденсол». Кроме того, ЗАО «Центурион Альянс» также было должно по договору займа подконтрольной Егиазаряну компании ООО «Даев плаза» 160 миллионов рублей. Именно ООО «Даев Плаза» в мае 2009 года подало заявление о банкротстве ЗАО «Центурион Альянс» в Арбитражный суд г. Москвы, что, видимо, и повлияло на решение «Дойче банка» как можно быстрее уступить права по кредиту любому желающему лицу. Однако по состоянию на май 2009 года ТК «Европарк», принадлежащий ЗАО «Центурион Альянс» приносил прибыль, достаточной для погашения всей имеющейся кредиторской задолженности.

Поскольку Егиазаряном А.Г. передаточные распоряжения в отношении акций компании «Доралин» «Дойче банку» переданы не были, указанные передаточные распоряжения были подготовлены и мной направлены в сентябре 2009 года на электронную почту Егиазаряну А.Г. для подписания. Никакой реакции со стороны Егиазаряна А.Г. не последовало. Не подписал такие передаточные распоряжения и Артем Егиазарян, второй директор компании «Тафтс», чья подпись в соответствии с правилами управления компании «Тафтс» требовалась для легитимности передаточного распоряжения, поскольку не получил об этом указаний от своего брата – Егиазаряна А.Г.

В середине 2009 года я стал обращать внимание, что в ЗАО «Центурион Альянс» заключаются сомнительные сделки, без моего ведома осуществляются платежи на суммы выше 5 миллионов рублей, происходит давление на персонал, лояльный ко мне. А после подачи в милицию заявления о хищении имущества ЗАО «Центурион Альянс» мне был запрещен доступ на территорию офисной части ТК «Европарк», и всему персоналу было объявлено, что я больше в компании «никто». Ни одного моего распоряжения и распоряжения первого заместителя генерального директора не выполнялось, а в последствии несколько человек были незаконно уволены, включая главного бухгалтера и первого заместителя генерального директора. Незаконно уволенные сотрудники были восстановлены на работе судом, но к работе допущены не были.

Заподозрив попытку хищения моего имущества, весной 2010 года я направил запрос на Кипр в Бюро регистрации независимых акционерных компаний Кипра с просьбой предоставить мне сведения, касающиеся акционеров и директоров компании «Доралин». Именно этой компании в декабре 2006 года я по настоянию Егиазаряна А.Г. номинально «продал» свои акции в ЗАО «Центурион Альянс», с тем чтобы владеть ими в том же соотношении через компанию «Тафтс». В 2006-2007 году мне передавались

5

117

подтверждающие документы, что компания «Тафтс» является акционером компании «Доралин» на 100%, соответственно, владея 20% акций компании «Тафтс» я опосредованно владел 20% акций ЗАО «Центурион Альянс» в компании «Доралин», то есть на 20% владел следствие, 20% акций ЗАО «Центурион Альянс» в компании «Доралин», и как имущественным комплексом «Европарк», так как это был единственный актив указанных компаний.

Получив официальные ответы из Республики Кипр я обнаружил, что компанией «Доралин» владеет теперь не компания «Тафтс», как мы договаривались с Егиазаряном А.Г. в 2006 году и где я владел 20% акций, а две компании – «Мастеро Инвестмент Лимитед» (Кипр) и «Фамукатос Лимитед» (Кипр) в соотношении 50/50.

Также из представленного отчета следовало, что в компании «Доралин» были сменены директора компании – ими стали компания «Нью Дженерэйшн Сервисес Лтд» (Британские Виргинские острова) и гражданка России Елена Демина, зарегистрированная по адресу: г.Калуга, Грабцевское шоссе, д. 90, кв. 22.

Однако я никаких подписей на документах, касающихся продажи компанией «Тафтс» акций компании «Доралин» не ставил, своего согласия на распоряжение моим имуществом ни Ашоту Егиазаряну, ни Самвелу Карапетяну, ни их представителям или фирмам, не давал.

Таким образом, полагаю, что по вышеизложенной схеме, Егиазарян А.Г., совершил хищение моего имущества – 20% акций ЗАО «Центурион Альянс», номинальной стоимостью 4 600 000 рублей, рыночная стоимость которых на сегодняшний момент составляет 1 575 500 000 рублей ( один миллиард пятьсот семьдесят пять миллионов пятьсот тысяч рублей), то есть своими противоправными деяниями причинил мне имущественный ущерб.

На основании изложенного, руководствуясь ст. 44 УПК РФ, прошу взыскать с виновных лиц имущественный вред, причиненный непосредственно преступлением в мою пользу в размере 1 575 500 000 рублей ( одного миллиарда пятьсот семидесяти пяти миллионов пятьсот тысяч рублей).

_____ Смагин В.И.

12 ноября 2010 года

6

*111*

To: R.R. Gabdulin, Counsellor in Justice,
Major Cases Investigator, First Section,
Major Economic Crimes Investigation
Department, Central Investigations
Department, RF Investigations
Committee

Fm: Vitaliy Ivanovich Smagin
19 Berzarin St., Bldg. 1, Apt. 103
Moscow

For Criminal Case No. 201/355137-10

APPLICATION

Considering that by his illegal actions A.G. Yegiazaryan committed a theft of my property – 20% of the shares in Centurion Alliance CJSC, with a nominal value of RUB 4,600,000, the market value of which is presently RUB 1,575,500,000 (one billion five hundred seventy five million five hundred thousand rubles), i.e., by his illegal acts inflicted property damage on me, I request that you accept and include my civil claim (statement of claim) in the criminal case file.

Attachment: Civil claim on 6 pages

_____[signature]_____ V.I. Smagin

12 November 2010

[signature]

[signature] *R.V. Markaryan, Attorney*

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator

[signature]

1

To:
R.R. Gabdulin,
Counsellor in Justice,
Major Cases Investigator,
First Section,
Major Economic Crimes Investigation Department,
Central Investigations Department,
RF Investigations Committee

From:

Vitaliy Ivanovich Smagin,
Moscow, ul. Berzarina 19, Bldg. 1, Appt. 103

Criminal Case No. 201/355137-10

Civil Claim
for restitution of property
lost as a result of an offence

I, Vitaliy Ivanovich Smagin, was the owner of 460 (four hundred and sixty) ordinary registered shares in Centurion Alliance Closed Joint Stock Company, with a nominal value of RUB 10,000 (ten thousand) each, representing 20% of the company's stock. Entities controlled by A.G. Egiazaryan, Titul CJSC, TD Unikompleks, Milea LLC and Merkhav LLC held 73% of Centurion Alliance CJSC shares. A further 7% was owned by A.G. Egiazaryan's business partner, Dmitri Garkusha, who in 2006 was the manager of Daev Plaza LLC and the CEO of Dekmos LLC.

My shares were registered in Personal Account No. 013700 in the Shareholder Register maintained by the Registrars, STATUS Registration Company CJSC.

In 2006, Ashot Gevorkovich Egiazaryan was also involved in the implementation of commercial projects in other business areas, and in particular, acting through the companies under his control, Decorum CJSC and Dekmos OJSC, in the construction of the Hotel Moskva, and was therefore in need of funds, and consequently engaged in raising loans.

At one of our meetings held at the Daev Plaza Business Centre, Moscow, Daev Pereulok 20, in November 2006, A.G. Egiazaryan suggested that I sell him my 20% shareholding. I refused, because the price offered by A.G. Egiazaryan was a whole order of magnitude below a realistic price. At that time, we had good offers for the shares from third parties, but A.G. Egiazaryan did not want to sell his own shares, but wanted to acquire my shareholding instead. A.G. Egiazaryan told me that he needed all Centurion Alliance CJSC shares, to offer as security to Deutsche Bank from which his company was allegedly to obtain

[seal:] RF Investigations Committee; For Blocks No. 4
    [stamp:] True Copy, Central Investigations Department, RF Investigations Committee,
Investigator [signature]

1

a loan of USD 100 million for the renovation of Hotel Moskva.

Subsequently A.G. Egiazaryan and Dmitri Garkusha told me at one of our meetings held at the Daev Plaza in Moscow around the end of November or early December 2006 that Deutsche Bank was willing to grant a loan not strictly for the construction of Hotel Moskva, but against a guarantee of Europark as a liquid asset.  This was in spite of the fact that they would in reality use the money to renovate Hotel Moskva.

During our association, A.G. Egiazaryan spent a long time persuading me to join the scheme, allegedly proposed by Deutsche Bank, at least by transferring my 20% shareholding in Centurion Alliance CJSC temporarily (for one year) as security for the loan, none of which would be received by Centurion Alliance CJSC itself.  I, naturally, refused.  A.G. Egiazaryan continued to insist, saying that my property would not be endangered in any way, that he personally would be assuming all the risk and that I could count on participating in his Hotel Moskva project and on receiving an additional shareholding in Centurion Alliance CJSC if I agreed to transfer my shares on a temporary basis to the Deutsche Bank depository as security for the loan.  After much persuasion, I expressed my tentative agreement, but insisted on all documents and agreements being made in writing, and on involving good lawyers.

At my next meeting with A.G. Egiazaryan and Dmitri Garkusha, which took place approximately in November 2006 in Moscow, A.G. Egiazaryan told me that his partner, Dmitri Garkusha, owned a Cypriot company, Blidensol Trading and Investment Ltd, which had obtained a loan of USD 100 million from Deutsche Bank.  A.G. Egiazaryan said that under a scheme approved by Deutsche Bank the latter wanted to receive as security the shares of Centurion Alliance CJSC and all the assets of Europark, of which I held a 20% share, but that the bank allegedly did not want the 20% to be held either by me personally or by any Russian legal entity or individual at the time of their pledge.  To achieve this, according to A.G. Egiazaryan, the package would be structured in the following way:  I, as well as the other shareholders, would sell my shares to the Cypriot company, Doralin Trading and Investments ("Doralin") at their nominal value.  This company too was a Joint Stock Company established by Cypriot citizens, with Garkusha holding an unlimited power of attorney to act as its manager until October 2009.  100% of Doralin shares would in turn be acquired by Tufts Invest and Trade Inc. (incorporated in British Virgin Islands, "Tufts"), whereupon shares in Tufts would be distributed exactly as in the case of Centurion Alliance CJSC, i.e. A.G. Egiazaryan would hold 73%, Dmitri Garkusha 7%, and I would hold 20%.

A.G. Egiazaryan said that he would inject a Cypriot company which he controlled, Kalken Holdings Ltd ("Kalken") into Tufts.  Kalken too is a Cypriot company whose directors are Cypriot citizens, but I don't know who the founders are.  However, unlimited

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

2

power of attorney to act as manager of this company has been issued in the name of Artem Egiazaryan.

Since I had in no way participated in the use of the Deutsche Bank loan, I was against participating in any scheme and insisted on all relationships being strictly regulated by written documents.

Ultimately, after protracted negotiations, A.G. Egiazaryan promised that he would comply with the following mandatory requirements:  I would transfer my shares to Doralin only on the condition that I would be able to control those assets through my participation in Tufts, and in any case would do so for not longer than one year, that all documents would be signed simultaneously and that we, the shareholders, would sign an agreement with one another and with the participation of Deutsche Bank, which would act as performance guarantor.  A.G. Egiazaryan said that he understood my concern about risking my right to my 20% holding in the Europark project, but assured me that nothing threatened my property, that in any case I would retain the 20%, since if Blidensol (the borrower under the Deutsche Bank loan) defaulted, he, A.G. Egiazaryan, granted me and me alone the right to sell his (A.G. Egiazaryan's) 73% shareholding, which, according to an official valuation, was worth more than the loan commitment.  In addition, A.G. Egiazaryan assured me that in Tufts no document would have legal validity without my signature, and that we would draw up the necessary documents to ensure that this would be the case.

In addition, A.G. Egiazaryan suggested that I should take part in the actual control of the operations of Centurion Alliance CJSC, which was something I did not have before, and could therefore not count on a fair distribution of dividends.  For this purpose, A.G. Egiazaryan proposed amending the Charter of Centurion Alliance CJSC, making me Chairman of the Board and introducing the position of a First Deputy CEO, who would be appointed not by the CEO but by the Board of Directors and would therefore in fact be my own man.  He also agreed to my suggestion that the Charter should limit the CEO's right to enter into transactions for amounts exceeding RUB 5 million, requiring a second signature, that of the First Deputy CEO, for transactions of this size.

The shareholders included the agreements they had reached in a Shareholder Agreement signed on 26 December 2006, executed with the participation of Deutsche Bank on the basis of an Escrow Agreement whereby Deutsche Bank acted as guarantor of the shareholders' performance of their obligations under the Agreement.

Under the terms of the shareholder agreements, the loan granted by Deutsche Bank to Blidensol was to be secured on all documents enabling the bank to have non-judicial recourse against the shares of Doralin, Centurion Alliance CJSC and the Europark property portfolio.

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

In particular, Deutsche Bank was to be given custody of Tufts transfer orders relating to Doralin shares.

Further, under the terms of the Shareholder Agreement of 26.12.2006 and of the Escrow Agreement, A.G. Egiazaryan was required to transfer to Deutsche Bank for temporary custody in its capacity as an independent agent the 73% of Tufts shares formally held by Kalken.

Having drawn up all the documents and obtained the loan, A.G. Egiazaryan violated the agreement and refused to transfer his 73% of Tufts shares to Deutsche Bank.

In approximately March or April 2008 at my insistence A.G. Egiazaryan and I signed an agreement concerning his compliance with the 2006 agreements on the transfer of 73% of the Tufts shares into the custody of Deutsche Bank and the signature of a new Escrow Agreement with Deutsche Bank.  In addition, A.G. Egiazaryan promised to require Tufts and Blidensol to include my signature on all order documents as a second signature and to instruct his business units and lawyers to transfer 50% of Blidensol shares into my name at their nominal value.  Of these promises, I was granted the right of second signature on behalf of Tufts on the disposal of the assets (shares) of Doralin, alongside Artem Egiazaryan.  None of the other promises were kept.

Blidensol did not fulfil its obligation to repay the loan to Deutsche Bank, and the latter therefore suggested to me that I buy out the loan, find a buyer for it and obtain a claim on the pledged assets, as set out in the shareholder agreements.  However, since Deutsche Bank lost some of the security documentation giving it the right to extrajudicial recourse against Doralin shares, the purchaser of the claim would lose the right to acquire Doralin shares in an extrajudicial procedure if Blidensol defaulted.

On 8 December 2006, Centurion Alliance CJSC also signed a loan agreement for approximately RUB 1.5 billion with Blidensol, but this sum did not involve Deutsche Bank money, instead representing the accumulated pre-existing loans.  Chechem, a company owned by Dmitri Garkusha, and other foreign creditors of Centurion Alliance CJSC sold their right of recourse under loan agreements signed by Blidensol, also owned by Dmitri Garkusha, for 1 USD.  Thereafter, as noted above, Centurion Alliance CJSC and Blidensol signed a loan (novation) agreement for the sum total of the existing loan agreements, amounting to RUB 1.5 billion.  This was done to ensure that Centurion Alliance CJSC would repay the loan not to Chechem, but to Blidensol, which was the recipient of the Deutsche Bank loan and should have used the money received from Centurion Alliance CJSC to repay the interest on that loan.

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

4

Subsequently, A.G. Egiazaryan and D.V. Garkusha came to blows, and A.G. Egiazaryan, taking advantage of the fact that he could manage Centurion Alliance CJSC and Blidensol through his own people, acted without my consent and changed the currency of the loan agreement from RUB to USD and the interest rate from 1% first to 12% and then to 22% p.a. In this way, the debt owed by Centurion Alliance CJSC to Blidensol was artificially inflated. In addition, according to the agreement Centurion Alliance CJSC owed RUB 160 million to Daev Plaza LLC, a company controlled by Egiazaryan. It was Daev Plaza LLC which petitioned the Moscow Arbitration Court in May 2009 to declare Centurion Alliance CJSC bankrupt, which clearly influenced Deutsche Bank's decision to assign its rights under the loan agreement to any willing buyer as soon as possible. However, in May 2009 the Europark Shopping Centre, owned by Centurion Alliance CJSC, was making a profit sufficient to repay all outstanding debt.

Since A.G. Egiazaryan did not hand over the Doralin share transfer orders to Deutsche Bank, I myself prepared the transfer orders and forwarded them in September 2009 to A.G. Egiazaryan's e-mail address for his signature. I received absolutely no response from A.G. Egiazaryan. The transfer orders were also not signed by Artem Egiazaryan, who was the second director of Tufts and whose signature was required to ensure the validity of transfer orders under the Tufts management procedures. He did not sign, not having been instructed to do so by his brother, A.G. Egiazaryan.

In mid-2009, I began to notice that Centurion Alliance CJSC was involving itself in shady deals, that payments of over RUB 5 million were being made without my knowledge and that pressure was being exerted on personnel loyal to me. After I had filed a report on the misappropriation of Centurion Alliance CJSC assets with the militia, I was forbidden access to the offices of the Europark Shopping Centre, and everyone was told that I no longer had any standing in the company. None of my orders or the orders of the First Deputy CEO were carried out, and subsequently a number of people were wrongly dismissed, including the Chief Accountant and the First Deputy CEO. The wrongly dismissed employees were reinstated by the court, but were not allowed to work.

Having suspected that an attempt was being made to misappropriate my property, in the spring of 2010 I sent an enquiry to the Cyprus Independent Joint Stock Companies Registration Office asking for information about the shareholders and directors of Doralin. This was the company to which I had nominally "sold" my shares in Centurion Alliance CJSC in December 2006 at the insistence of A.G. Egiazaryan, in order to own them in the same proportion through Tufts. In 2006-2007 I received documents confirming that Tufts

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

5

owned 100% of Doralin shares, so that as the owner of 20% of Tufts shares I was the indirect owner of 20% of Doralin shares, and thus of 20% of the shares of Centurion Alliance CJSC, i.e. of 20% of the property of Europark, which was the sole asset of these companies.

Having received official responses from Cyprus I discovered that Doralin was no longer owned by Tufts, as we had agreed with A.G. Egiazaryan in 2006, and in which I had a 20% shareholding, but by two other companies – Mastero Investment Limited of Cyprus and Famukatos Limited of Cyprus, each with a 50% holding.

It further followed from the report I received that Doralin now had different directors, which were New Generation Services Ltd, incorporated in the British Virgin Islands, and a Russian national, Elena Demina, registered in Kaluga at Grabtsevskoye shosse 90, Appt. 22.

However, I never signed any documents about the sale of Doralin shares by Tufts, and never gave my consent to the disposal of my assets either to Ashot Egiazaryan or to Samuel Karapetyan, to their representatives or companies.

I therefore believe that the above plan was devised by A.G. Egiazaryan to misappropriate my property consisting of 20% of the shares of Centurion Alliance CJSC with a nominal value of RUB 4,600,000 and a current market value of RUB 1,575,500,000 (one billion five hundred and seventy five million five hundred thousand) rubles, and that his unlawful actions have caused the loss of my property.

Based on the above and guided by Art. 44 of the RF Code of Criminal Procedure, I petition the Court to recover from the guilty parties the sum lost by me as a direct result of their offence and amounting to RUB 1,575,500,000 (one billion five hundred and seventy five million five hundred thousand) rubles.

_____[signature]_____   V.I. Smagin

12 November 2010

[signature]          [illegible] *R.V.*
                              *Attorney*

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

# Declaration of
# Ashot Yegiazaryan
# Exhibit 6

February 20th, 2011

# AGREEMENT

Party 1 – Ashot Yegiazaryan.
Party 2 – Artem Yegiazaryan.
Party 3 – Suren Yegiazaryan, hereinafter collectively referred to as "the Parties."

Party 1 is engaged in a litigation in LCIA and on Cyprus against Suleyman Karimov, Arkadiy Rotenberg, the government of Moscow (hereinafter "the Respondents") related to the illegal takeover of the Moscow Hotel (Okhotnyy Ryad, bldg 2). The Parties have agreed to take collective action in order to reclaim the "Asset." Party 2 assumes the obligations to finance the necessary legal procedures, as well as, if necessary, to provide any other financial assistance to Party 1. However, the obligations of Party 2 are not to exceed the amount equal to 20 million USD. The expenses already incurred by Party 2 in the amount of 550,000 Eur are to be considered part of total expenses.

Party 3 assumes the obligations to finance the operating costs related to the stay of Party 1 in the USA, as well as, if necessary, to finance the legal expenditures. However, the cumulative obligations of Party 3 are limited to the amount of 20 million USD.

Party 2 and Party 3 assume, if necessary, the obligations to appear at court hearings and to render Party 1 necessary assistance within their abilities.

Party 1 assumes the obligations, in the case of reclamation of the Asset, or any part thereof, or receipt of funds for the Asset, to transfer to Party 2 and Party 3, 33.3% each of the reclaimed Asset or the funds received. Thus, the Parties have agreed to the equal division of the Asset in case of reclamation of the same, and the equal division of any awarded monetary compensation for the Asset. Party 1 assumes the obligation to transfer to Party 2 and Party 3 the funds due them no later than one month from the reclamation of the funds for the Asset, or to divide up shares for the Asset due to Party 2 and Party 3, in case the Asset is returned to Party 1. Party 1 also assumes the obligation to compensate the losses incurred by Party 2 in the Sofiyskaya Naberezhnaya Project, and the losses incurred by Party 3 in the Northern Oil Project.

Ashot Yegiazaryan   *(signature)*

Artem Yegiazaryan   *(signature)*

Suren Yegiazaryan   *(signature)*

CERTIFICATE OF TRANSLATION

I, ALEKSANDR V. FESENKO, HEREBY CERTIFY THAT I TRULY, ACCURATELY AND COMPLETELY, TO THE BEST OF MY ABILITY, TRANSLATED THE ORIGINAL DOCUMENT PROVIDED TO ME FROM RUSSIAN INTO ENGLISH AND THAT AS A CERTIFIED RUSSIAN COURT INTERPRETER IN THE STATE OF CALIFORNIA(I.D. #301101), I AM COMPETENT IN THESE LANGUAGES TO RENDER SUCH TRANSLATION.

Date   11 / 04 / 14   Signature _____

20 Февраля 2011   Соглашение.

Сторона 1 — Ашот Егиазарян.

Сторона 2 — Артем Егиазарян.

Сторона 3 — Сурен Егиазарян, далее совместно именуемые „Стороны".

Сторона 1 ведет судебное разбирательство в LCIA и на Кипре против Сулеймана Керимова, Аркадия Ротенберга, правительства Москвы (далее „ответчики") по вопросу рейдерского захвата госсиницы „Москва" (охотный ряд д.2). Стороны пришли к соглашению совместно учавствовать в возврате „Актива"

Сторона 2 принимает на себя обязательство финансировать необходимое юридическое сопровождение процедуры, а также оказывать при необходимости любую другую финансовую помощь Стороне 1 при этом обязательство стороны 2 ограничиваются суммой эквивалентной 20 млн. USD. Уже произведенные стороной 2 затраты в размере 550 000 Eur рассматриваются как часть общих затрат.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          Respondent 001943

Сторона 3 берет на себя обязательство финансировать текущие затраты на проживание стороны 1 в США, а также, при необходимости, финансировать юридические расходы. При этом, общие обязательства стороны 3 ограничиваются суммой 20 млн. USD.

Сторона 2 и Сторона 3 обязуются, при необходимости, лично принимать участие в судебных заседаниях и оказывать иную посильную помощь стороне 1.

Сторона 1 принимает на себя обязательство, в случае возврата ~~Актива~~, либо его части, либо получения денежных средств за Актив, передать стороне 2 и Стороне 3 по 33,3% каждой от полученного Актива или полученных денежных средств. Таким образом, Стороны договорились о равном делении Актива в случае возврата Актива и равном делении в случае присуждения любых денежных компенсаций за Актив. Сторона 1 обязуется перечислить стороне 2 и стороне 3 причитающиеся денежные суммы не позднее одного месяца с даты возвра-

изения денежных средств за Акоп, чтобы распределить доли причитающиеся стороне 2 и Стороне 3 за Акоп, в случае возврата Акопа стороне 1. Сторона 1 также берет на себя обязательство компенсировать потери Стороны 2 в проекте „Каспийской набережной" и потери Стороны 3 в проекте „Северная Нефть".

Ашот    Егиазарян.

Артем   Егиазарян.

Сурен   Егиазарян

# Declaration of Ashot Yegiazaryan Exhibit 7

Date: 27th May 2015

# DECLARATION
# OF
# TRUST

made by

CTX Treuhand AG

(the Trustees)

Constituting

The

**ALPHA Trust**

# INDEX TO CLAUSES

**Clause**                                                                                   **Page**

1.    Definitions                                                                              6

2.    Proper Law, Forum of Administration, Jurisdiction
      and Change thereof                                                                       7

3.    Power to Terminate                                                                       8

4.    Trust for Sale                                                                           8

5.    Trust of income and capital                                                              8

6.    Payments to Minors                                                                      10

7.    Interests not attachable                                                               10

8.    Power to add and exclude Beneficiaries                                                  11

9.    Remuneration of Trustees                                                                11

10.   Change of Trustees                                                                      12

11.   Power to delegate                                                                       13

12.   Power to alter and revoke                                                               13

13.   Additional powers                                                                       13

14.   The Protector                                                                           13

15.   Duties of the Trustees, liability and indemnity                                         14

16.   Accounts and Information                                                                14

### THE FIRST SCHEDULE                                             15

       Administrative Powers                                15

1.    Power of Investment                                    15

2.    Power to lend and to give guarantees                   16

3.    Power to permit occupation of property and
       enjoyment of chattels                              16

4.    Power to borrow                                        16

5.    Powers in relation to real property                    16

6.    Powers in relation to chattels                         18

7.    Power to trade                                         18

8.    Power to give indemnities                              18

9.    Exclusion of apportionment                             19

10.    Power to deal with insurance policies                 19

11.    Release of powers                                     20

12.    Power of appropriation                                20

13.    Power to vote and to employ nominees and custodians   20

14.    Power to delegate management of investments           20

15.    Power to receive remuneration                         21

16.    Power to promote companies                            21

17.    Trustees not bound to interfere in business of
     company in which the Trust is interested             22

18.    Power to insure property                              22

19.   Power to appoint agents                                            22

20.   Power to permit self-dealing                                       22


**THE SECOND SCHEDULE**                                                  23


**THE THIRD SCHEDULE**                                                   24

-5-

**THIS DECLARATION** OF TRUST is made the 27th day of May Two thousand and fifteen.

<u>BY</u>

      CTX Treuhand AG ("the Trustees" which expression shall where the context so admits include the trustees or trustee for the time being of this Trust)

<u>WHEREAS</u>

(A)    THE Trustees acknowledge having received the property specified in the Second Schedule to be held upon the trusts hereinafter contained concerning the same.

(B)    IT is intended that this Trust shall be irrevocable

(C)    THIS Trust may be referred to as

**" ALPHA TRUST"**

**NOW THIS DEED WITNESSETH** as follows:

1.        **Definitions**

1.1.      IN this Deed where the context so admits

1.1.1.    "the Trust Fund" means
          - the sum specified in the Second Schedule and
          - all money investments or other property paid or transferred by any
            person or persons to or so as to be under the control of and (in either
            case) accepted by the Trustees as additions and
          - all accumulations (if any) of income directed to be held as an accretion
            to capital and
          - the money investments and property from time to time representing the
            said money investments property additions and accumulations;

1.1.2.    "the Beneficiaries" means and includes the persons named or described in
          the Third Schedule hereto:

1.1.3.    "the Trust Period" means the period commencing on the date of this Deed
          and ending on the earlier of the last day of the period of 80 years from the
          date of this Deed or such earlier date as the Trustees shall by virtue of
          their power under clause 3 hereof specify;

1.1.4.    "the Proper Law" of this Trust means the law of the jurisdiction to which the
          rights of all parties and the construction of each and every provision of this
          Trust shall be subject;

1.1.5.    "Minor" means any individual who has not attained the age of 20 years
          notwithstanding that such individual may by the laws of his or her domicile
          be of full age and "full age" shall be construed accordingly;

1.1.6.    "Person" means any individual or body of persons corporate or incorporate;

1.1.7.    "Issue" means children and remoter issue whether legitimate, illegitimate,
          adopted or legitimated and step-children;

1.1.8.    "Protector" means the Person holding for the time being the office of
          Protector pursuant to any appointment made in accordance with Clause 14
          hereof;

1.2.      Words importing the singular shall include the plural and the masculine
          gender shall include the feminine and vice versa.

2.        **Proper Law, Forum of Administration, Jurisdiction**

2.1.      THIS Trust is established under the laws of the Principality of Liechtenstein and in particular Articles 897 to 932 of the Personen- und Gesellschaftsrecht (statute number 4 of 20th January 1926) shall be applicable to this Trust.

2.2.      The forum of administration of this Trust shall be in the Principality of Liechtenstein and the rights of all parties and the construction and effect of each and every provision hereof shall be subject to the exclusive jurisdiction of and construed only according to the laws of the Principality of Liechtenstein.

2.3.      The Trustees may register this Trust with the Oeffentlichkeitsregister of the Principality of Liechtenstein or deposit this Deed and any amendments thereto with the Liechtenstein Princely Court as they think fit.

2.4.      The Trustees may at any time declare in writing that from the date of such declaration the Proper Law of this Trust shall be that of any specified jurisdiction (not being a jurisdiction under the law of which this Trust would be capable of revocation) and that all rights under this Trust and its construction and effect shall be subject to and construed according to the laws of that jurisdiction and so often as any such declaration shall be made the Trustees shall be free to make such alterations and/or additions in or to the trusts powers and provisions of this Trust as they may consider necessary or desirable so that the trusts powers and provisions hereof shall then (mutatis mutandis) be as valid and effective as they were immediately prior to the making of such declaration.

2.5.      In the case that in the country or state of the forum of administration any of the events referred to in sub-clause 2.5.2. hereof shall occur the trustee or trustees resident or having a place of business at the forum of administration shall with immediate effect and without the necessity of filing or signing any documents cease to be trustee or trustees hereof and be divested of the title to the Trust Fund and the trustee or trustees shall have no claim or claims against the Trust Fund in respect of charges or expenses whether or not such claim or claims have accrued at the time the events aforesaid have occurred.

2.5.1.    Immediately following the trustee or trustees ceasing to be trustee or trustees hereof the continuing trustee or continuing trustees shall change the forum of administration and the law applicable to this Trust and appoint a new trustee or new trustees and effect such changes, alterations and/or modifications to this Deed as they consider necessary to ensure that this Deed is as valid under the new law as under the law previously applicable.