1  Michael S. Adler, SBN 190119
   madler@ta-llp.com
2  Joel M. Tantalo, SBN 206096
   jtantalo@ta-llp.com
3  **TANTALO & ADLER LLP**
   1801 Century Park East, Ste. 2400
4  Los Angeles, CA 90067

5  Telephone:  (310) 734-8695
   Fax:        (310) 734-8696
6
   Attorneys for respondent Ashot Yegiazaryan
7

8

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11

12  VITALY IVANOVICH SMAGIN        | **CASE NO. 14-cv-09764-R (PLAx)**

13      Petitioner,                | Before the Honorable Manuel L. Real
                                      United State District Judge
14      v.                         | **DECLARATION OF CYRUS**
                                      **BENSON SUBMITTED IN**
15  ASHOT YEGIAZARYAN,             | **OPPOSITION TO MOTION FOR A**
                                      **TURNOVER ORDER**
16      Respondent.

17                                 | **Hearing Place:**  Courtroom 880
18                                   **Hearing Date:**   September 16, 2017
                                     **Hearing Time:**   10:00 a.m.
19

20

21

22

23

24

25

26

27

28

───────────────────────────────────────
DECLARATION OF CYRUS BENSON
SUBMITTED IN OPPOSITION TO MOTION FOR A TURNOVER ORDER

# DECLARATION OF CYRUS BENSON

I, Cyrus Benson, do hereby declare as follows:

1. I am a Partner of Gibson, Dunn & Crutcher, and an attorney admitted to the bar in New York. I am also a Solicitor qualified to practice in England and Wales. My firm and I represented Ashot Yegiazaryan (whose Russian name is also translated into English with the spelling Ashot Egiazaryan) in the underlying arbitration. We currently represent him in the pending English court proceeding challenging that arbitration award on the ground it was made without any arbitral jurisdiction. Except as otherwise indicated, I have personal knowledge of the facts declared herein and could and would competently testify thereto in a Court of law if required to do so.

## Mr. Smagin's Counsel Asserted that the Russian Freeze Order Was Issued to Secure His Recovery from the Arbitration

2. In connection with the arbitration claim brought by Mr. Smagin in the London Court of International Arbitration, my firm and I represented respondent Ashot Yegiazaryan. On his behalf, we consistently objected to the jurisdiction of the arbitrators.

3. Among other objections, we objected that even if there were a binding arbitration agreement (which Mr. Yegiazaryan has consistently denied), Mr. Smagin had waived any right he might have had to arbitration by proceeding in Russia against Mr. Yegiazaryan and Mr. Yegiazaryan's assets there.

4. Among the acts that we believed were inconsistent with any right of Mr. Smagin to arbitrate (if an arbitration agreement ever existed in the first place) was Mr. Smagin's action to secure a freeze of Mr. Yegiazaryan's assets from the courts in Moscow.

BENSON DECLARATION IN OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

5.      In his response, among other things, Mr. Smagin's counsel acknowledged that Mr. Smagin had secured such a freeze, but argued at paragraph 111 of the response that the purpose of the freeze was to secure any recovery in connection with the claims asserted in the arbitration.

6.      Attached hereto as Exhibit 1 are true and correct copies of the relevant portions of the response from Mr. Smagin in which Mr. Smagin's counsel acknowledged that Mr. Smagin secured the asset freeze in Russia to secure recovery of the award he now seeks to enforce.

### Mr. Smagin's Submissions in the Arbitration Demonstrate that the Frozen Properties Far Exceed the Value of the Award

7.      Among other properties, I am informed by Russian counsel that the Russian order freezes the entire shopping center at the heart of this dispute, a shopping center known as Europark.

8.      In the arbitration Mr. Smagin submitted evidence to value the Europark shopping center in excess of $350 million dollars.  Attached hereto as Exhibit 2 are true and correct copies of the relevant portions of documents submitted in the arbitration by Mr. Smagin (which are therefore adopted party admissions) that the value of the real property frozen in Russia exceeds $350 million dollars.

### There Was Expert Testimony in the Arbitration on the Forged Agreement

9.      In the arbitration, the arbitrators heard two experts on the question of the disputed arbitration agreement at the heart of this case.  Mr. Gus Lesnevich testified that the signature that purportedly came from Mr. Yegiazaryan was forged.

2

10.     Mr. Smagin presented testimony from Audrey Giles.  While Mr. Smagin's expert disputed various points of Mr. Lesnevich's conclusions, that expert could not confirm that the document was authentic.

11.     In its award, the panel chose to rely upon a hearsay statement from a purported expert appointed by Russian investigators, who was not from an independent institution but an employee of the Russian Ministry of Internal Affairs with only 5 years' experience.  That person did not testify in the arbitration, and while we had requested that we be given a chance to question her or at least review the materials on which she based her opinion, we were not provided these opportunities and therefore we did not have the chance to fully test her report.  The panel gave no indication before its final award that it would rely upon this hearsay statement and we were deprived of any appropriate opportunity to test the evidence as part of the arbitration (although we hope to have such an opportunity if Mr. Smagin attempts to rely on it again at trial before the English court discussed below).

**Mr. Yegiazaryan Has Challenged the Jurisdiction of the Arbitrators in England Pursuant to Section 67 of the Arbitration Act of 1996**

12.     As noted above, I am qualified to practice in England and Wales, and the principal focus of my practice is international arbitration in London.  I am co-chair of Gibson, Dunn & Crutcher's International Arbitration Practice Group.  As such, I regularly address and advise upon issues of English law involving international arbitration.

///

///

///

3

BENSON DECLARATION IN OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

13.     Section 67 of the Arbitration Act 1996 provides that a party who has previously objected to an arbitrator's jurisdiction may challenge a subsequent award in Court on the grounds that the award was outside of the substantive jurisdiction of the arbitrators and/or that the arbitrators never had any jurisdiction at all.  Attached hereto as Exhibit 3 is a true and correct copy of Section 67, reflecting the right to have the award set aside where the arbitrators did not have jurisdiction.  I have also included copies of Sections 70 and 73 so the court can see that the only requirement to preserve the objection is that the party assert the objection (which Mr. Yegiazaryan consistently did).  It may also interest the court to know that, pursuant to Section 4(1) and Schedule 1 of the Arbitration Act 1996 (also included in Exhibit 3), the right to challenge an award under Section 67 is a mandatory provision of law that cannot be waived, even by agreement of the parties.

14.     Under English law, proceedings to determine the applicability and scope of an arbitrator's jurisdiction are *de novo* and involve the taking of evidence by the Court in the first instance.  The court does not defer to the decision of the arbitrator on the existence of an agreement that would have given the arbitrator jurisdiction or on the interpretation of the meaning or scope of that agreement.

15.     Because the arbitration was conducted in London, the English Courts are the courts deemed by the New York Convention as the Courts with "primary jurisdiction" to review the award.  Consistent with the New York Convention and Section 67 of the Arbitration Act 1996, Mr. Yegiazaryan on December 9, 2014 filed a challenge to the award asserting both that (a) the arbitration agreement at issue was forged and therefore the arbitrators were without any jurisdiction and (b) even if the agreement was not forged, the agreement could not be construed to apply to the dispute at issue and therefore the award would still be invalid.

///

///

4

16.     Attached hereto as Exhibit 4 is a true and correct copy of the witness statement of my colleague Doug Watson submitted in connection with Mr. Yegiazaryan's challenge, reflecting the nature of the challenge and the fact that it is consistent with the rights reserved by Section 67 of the Arbitration Act 1996.

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct and that this declaration was executed on January 27, 2015 in London, England.

_____
Cyrus Benson

5

# EXHIBIT 1

LONDON COURT OF INTERNATIONAL ARBITRATION
_____

LCIA ARBITRATION NO. 101721

**VITALY IVANOVICH SMAGIN**

**Claimant**

- v -

**KALKEN HOLDINGS LIMITED**

**1ST Respondent**

**ASHOT YEGIAZARYAN**

**2ND Respondent**

_____

**CLAIMANT'S RESPONSE TO THE SECOND
RESPONDENT'S OBJECTION TO JURISDICTION**
_____

28 October 2011

Eversheds LLP
One Wood Street
London
EC2V 7WS
United Kingdom

Counsel to the Claimant

201

Cy Benson Decl., Exhibit 1
Page 6

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | **INTRODUCTION** | 4 |
| II. | **CLAIMS IN ARBITRATION AND RUSSIA ARE NOT IDENTICAL** | 5 |
| | (A) The Criminal Case Against Mr. Yeglazaryan | 6 |
| | (B) Mr. Smagin Is Recognised As A Victim Of Mr. Yeglazaryan's Crime | 7 |
| | (C) As A Recognised Victim, Mr. Smagin Is Entitled To Request The Russian Criminal Court To Order Mr. Yeglazaryan to Pay the Statutory Compensation Available To Victims Of Crime | 7 |
| | (D) Mr. Smagin's Russian Criminal Claim Is Part Of and Entirely Dependent Upon The Existence Of The Criminal Case Against Mr. Yeglazaryan | 8 |
| | (E) Mr. Smagin's Russian Criminal Claim Will Be Determined On The Criminal Standard Of Proof | 9 |
| | (F) The Russian Criminal Claim Is Not A Civil Compensation Claim In Civil Court Proceedings | 9 |
| | (G) The Preliminary Status Of The Criminal Proceedings Against Mr. Yeglazaryan | 10 |
| | (H) The Russian Criminal Claim and the Claims In the London Arbitration Are Not Identical | 10 |
| III. | **RUSSIAN CRIMINAL CLAIM COULD NOT BE REFERRED TO ARBITRATION** | 12 |
| | (A) The Russian Criminal Claim Does Not Fall Within The Scope Of The Arbitration Agreement | 12 |
| | (B) The Russian Criminal Court Is The Exclusive Venue To Determine The Russian Criminal Claim | 14 |
| | (C) The Russian Criminal Claim Is Part Of The Russian Criminal Justice System | 17 |

Cy Benson Decl., Exhibit 1
Page 7

IV.   **MR. SMAGIN HAS NOT REPUDIATED THE ARBITRATION AGREEMENT**   **19**

(A) Pursuing The Russian Criminal Claim Does Not Constitute Repudiation of the Arbitration Agreement   **21**

(B) Mr. Yegiazaryan Has Failed To Show A Clear And Unequivocal Intention On The Part Of Mr. Smagin To Repudiate the Arbitration Agreement   **23**

(C) There Is Some Other Reason For Pursuing The Russian Criminal Claim   **24**

(D) Conclusion   **26**

V.   **MR. YEGIAZARYAN'S OBJECTION IS PREMATURE**   **27**

VI.   **CONCLUSION**   **29**

Cy Benson Decl., Exhibit 1
Page 8

110.    The Russian Criminal Claim is an integral part of the criminal proceedings being
        pursued by the Russian state against Mr. Yegiazaryan, which concerns
        compensation ordered by the Russian criminal courts to be paid to those who
        have suffered damage as a result of crime as part of the Russian criminal justice
        system. The Russian state initiated the proceedings, and Mr. Smagin's request
        that the court include in its sentence his claim as a victim of Mr. Yegiazaryan's
        crime is a normal response to such criminal proceedings (cf *The Golden Anne*).

111.    Furthermore, Mr. Smagin is legitimately concerned over future enforcement of
        an arbitral award in Russia (where, he believes, the majority of Mr.
        Yegiazaryan's assets are located). The Russian Criminal Claim has therefore
        been commenced to enable freezing orders to be obtained from the Russian
        court. These freezing orders protect assets that may satisfy an arbitral award. It
        is not inconsistent with the arbitration proceedings to have these freezing orders
        in place (cf *Dubai Islamic Bank*).

112.    Accordingly, no intention not to arbitrate can be inferred from Mr. Smagin's
        pursuit of the Russian Criminal Claim.

        **(D)  Conclusion**

113.    Mr. Yegiazaryan has failed to prove that the mere fact of pursuing the Russian
        Criminal Claim demonstrates a clear and unequivocal intention on the part of Mr.
        Smagin to repudiate the arbitration agreement.

114.    Indeed, in circumstances where:

        (a)    Mr. Smagin commenced these arbitration proceedings, indicating his clear
               and unequivocal intention to comply with the arbitration agreement and to
               refer those claims that fall within the scope of that agreement to
               arbitration;

        (b)    this arbitration was commenced before the Russian Criminal Claim;

        (c)    subsequent to commencing the Russian Criminal Claim, Mr. Smagin has
               fully participated in this arbitration in, *inter alia*, filing a lengthy Statement
               of Claim, filing this response, and participating in communications to date,
               thus clearly demonstrating his intention to proceed with the arbitration;

        (d)    the Russian Criminal Claim is part of the Russian criminal justice system
               and will be determined as part of the sentence on the criminal conviction of
               Mr. Yegiazaryan (if and when that occurs);

        (e)    the Russian Criminal Claim has not even yet reached any court in Russia,
               and is still only at the investigative stage;

Cy Benson Decl., Exhibit 1
Page 9

# EXHIBIT

# 2

www.pwc.ru

# LCIA ARBITRATION №101721

## *Vitaly Ivanovich Smagin*
## *vs.*
## *Kalken Holdings Limited*
## *and Ashot Yegiazaryan*

Second expert report of Irina Novikova

**16 June 2013**



1

Cy Benson Decl., Exhibit 2
Page 10

Vitaly Ivanovich Smagin vs. Kalken Holdings Limited and Ashot Yegiazaryan
Second expert report of Irina Novikova                                               16 June 2013

# *Contents*

| | | |
|---|---|---|
| I. | Introduction ................................................................................................................ | 7 |
| | Background  9 | |
| II. | Summary of my conclusions ...................................................................................... | 11 |
| | Key points of disagreement in relation to profit entitlement ................................. | 12 |
| | Mr Smagin's profit entitlement is not to regular dividends ............................ | 12 |
| | EBIT is an appropriate basis for the profit entitlement ................................. | 13 |
| | Treatment of 2005 loss .................................................................................... | 14 |
| | My revised calculation of the Claimant's profit entitlement (EBIT) ............. | 15 |
| | Alternative calculations of profit entitlement ................................................ | 15 |
| | Key points of disagreement in relation to Centurion valuation ........................... | 16 |
| | Europark valuation assumptions ..................................................................... | 16 |
| | Sales adjustments ............................................................................................. | 18 |
| | Adjustment for Mr Smagin's dividend entitlement ......................................... | 19 |
| | My revised valuation of Centurion ................................................................. | 19 |
| | My revised estimation of the Claimant's total loss ............................................... | 20 |
| III. | Profit entitlement ....................................................................................................... | 21 |
| | Introduction  21 | |
| | My comments on the key areas of disagreement ................................................... | 23 |
| | Traditional dividend or variable compensation .............................................. | 23 |
| | Appropriate basis for Mr Smagin's profit entitlement ................................... | 27 |
| | Treatment of 2005 loss .................................................................................... | 32 |
| | My revised estimate of Mr Smagin's profit entitlement ....................................... | 33 |
| | Alternative estimates of Mr Smagin's profit entitlement ..................................... | 35 |
| IV. | Valuation of Centurion ............................................................................................... | 36 |
| | Introduction  36 | |
| | Assumptions to Europark valuation ....................................................................... | 37 |
| | Gross profits are not an appropriate basis for NOI ........................................ | 38 |
| | Vacancy rate ..................................................................................................... | 40 |
| | Yield rate .......................................................................................................... | 41 |
| | C&W valuation of Europark is realistic and supported by market data on comparable transactions...... | 45 |
| | Sales adjustments to Europark (Centurion) valuation ........................................... | 46 |
| | Discount on foreclosure ................................................................................... | 47 |
| | Corporate income tax effect ............................................................................ | 48 |
| | Adjustment for the cost of disposal ................................................................ | 51 |
| | Adjustment for Mr Smagin's "dividend entitlement" ........................................... | 52 |
| | My revised valuation of Centurion and the Claimant's 20% share ....................... | 54 |
| V. | My revised assessment of the Claimant's total loss .................................................. | 55 |
| VI. | Expert's declaration .................................................................................................... | 56 |
| | Appendices ................................................................................................................... | 57 |
| | Appendix 1 – List of additional documents relied on by the expert ..................... | 58 |
| | Appendix 2 – Market statistics in relation to deal values for retail real estate in Moscow in 2012 ...... | 59 |
| | Appendix 3 – Adjusted net assets of Centurion ................................................... | 60 |
| | Appendix 4 – Sensitivity analysis of the Europark valuation ............................... | 61 |
| | Appendix 5 –Alternative estimation of profit entitlement based on net profits after tax but before interest expense ...... | 62 |
| | Appendix 6 –Alternative estimation of profit entitlement based on net profits (without adjustment for 2005 loss)...... | 64 |
| | Appendix 7 –My estimation of Centurion's loan principal repayments ................. | 65 |
| | Appendix 8 – My further comments to yield calculations in the Prosecutors' Report ..... | 66 |
| | Appendix 9 – Exchange rates and deposit interest rates applied in the calculations ...... | 68 |
| | Appendix 10 – Summary of Financial Statements of Centurion, 2005 – 2012 ........... | 69 |

Cy Benson Decl., Exhibit 2
Page 11

Vitaly Ivanovich Smagin vs. Kalken Holdings Limited and Ashot Yegiazaryan
Second expert report of Irina Novikova                                          16 June 2013

Appendix 10 – Summary of Financial Statements of Centurion, 2005 – 2012 (continued) .......................... 70
Appendix 11 – Interest expense summary ........................................................................................... 71

Cy Benson Decl., Exhibit 2
Page 12

Vitaly Ivanovich Smagin vs. Kalken Holdings Limited and Ashot Yegiazaryan
Second expert report of Irina Novikova                                                16 June 2013

# *Glossary of terms and abbreviations*

| Term / abbreviation | Definition |
|---|---|
| 2003 Agreement | Agreement in connection with the project for construction of Ekaterinovka trade centre located at 62 Rublevskoe Highway dated 29 August 2003 |
| Agreement to Buy-back Shares | Agreement to Buy-back Shares dated 12 February 2002 between Anatoly G. Loktionov, Nikolay N. Kaplun and Vitaly I. Smagin |
| C&W | Cushman and Wakefield |
| C&W 2008 Report | Report and valuation of the "Europark" shopping centre located at 62 Rublevskoe Highway, Moscow, Russia issued 24 December 2008,  prepared by Cushman & Wakefield |
| C&W 2011 Report | Report and valuation of the "Europark" shopping centre located at 62 Rublevskoe Highway, Moscow, Russia issued 24 October 2011, prepared by Cushman & Wakefield |
| C&W 2013 Report or C&W Report | Valuation report # II-MOSC-900234 of Europark Shopping Centre located at: 62 Rublevskoe Highway, Moscow, Russia issued 22 January 2013, prepared by Cushman & Wakefield |
| C&W Supplemental Report | Expert Supplemental Report in Respect of "Europark" Shopping Centre, located at: 62 Rublevskoe Hw., Moscow, Russia" prepared by Cushman & Wakefield ("C&W") and dated 24 May 2013 |
| CBRE | CBRE Inc, real estate consulting and valuation company |
| Centurion | Closed Joint Stock Company "Centurion Alliance" |
| Centurion valuation | Business valuation of 100% shareholding in Centurion |
| Claimant or Mr Smagin | Vitaly Ivanovich Smagin |
| Claimant's Counsel | Eversheds LLP |
| Colliers | Colliers International, real estate consulting and valuation company |
| Company | Centurion |
| Doug Hall Report | Expert Accountant's Report of Doug Hall, Smith & Williamson, dated 19 April 2013 |
| EBIT | Earnings Before Interest and Taxes |
| Erpulev Report or Prosecutors' | "Opinion of the Forensic Expertise of ZAO Centurion Alliance Shares " prepared by a |

Cy Benson Decl., Exhibit 2
Page 13

Vitaly Ivanovich Smagin vs. Kalken Holdings Limited and Ashot Yegiazaryan
Second expert report of Irina Novikova                                                                16 June 2013

| Term / abbreviation | Definition |
| --- | --- |
| Report | private appraiser Victor Petrovich Erpulev and dated November-December 2010 |
| ERV | Estimated Rental Value |
| Escrow Agreement | Agreement dated 13 November 2007 between Kalken, Mr Garkusha, Deutsche Bank AG ("Deutsche Bank") and Mr Smagin |
| Europark | Shopping centre located at: 62 Rublevskoe Highway, Moscow, Russia |
| Europark valuation | Asset valuation of Europark |
| First Report | Expert report of Irina Novikova dated 11 February 2013 |
| Kalken | Kalken Holdings Limited, the Respondent |
| Knight Frank | Knight Frank LLP, real estate consulting and valuation company |
| LaSalle | Jones Lang LaSalle Inc, real estate consulting and valuation company |
| Mr Erpulev | Victor Petrovich Erpulev, private appraiser |
| Mr Garkusha | Dmitry Vladimirovich Garkusha |
| Mr Hall | Doug Hall of Smith & Williamson |
| Mr Yegiazaryan | Ashot Yegiazaryan, the Respondent |
| NOI | Net Operating Income |
| OPEX | Operating Expenditure |
| Parties | Respondents and Claimant referred to jointly, unless specified otherwise |
| Profit entitlement / Dividend entitlement / Revenue entitlement / Variable compensation | Estimate of Mr Smagin's entitlement to 20% of Centurion profits. Terms used interchangeably. |
| PwC | PricewaterhouseCoopers Russia B.V. |
| Respondents | Kalken Holdings Limited ("Kalken") and Ashot Yegiazaryan ("Mr Yegiazaryan") |
| RUR or RUB | Russian Rubles |
| Russian GAAP | Russian Generally Accepted Accounting Principles |
| Russian Joint Stock Company Law | Russian Federal Law No 208-FZ of 26 December 1995 on Joint-stock companies |

Cy Benson Decl., Exhibit 2
Page 14

Vitaly Ivanovich Smagin vs. Kalken Holdings Limited and Ashot Yegiazaryan
Second expert report of Irina Novikova                                                    16 June 2013

| Term / abbreviation | Definition |
| --- | --- |
| Shareholders' Agreement | Shareholders' agreement between Mr Vitaly Ivanovich Smagin, Mr Dmitry Vladimirovich Garkusha and Kalken dated 26 December 2006 |
| Statement of Claim | Statement of Claim filed by the Claimant against Kalken Holding Limited and Ashot Yegiazaryan dated 24 August 2011 |
| USD | United States Dollars |

Cy Benson Decl., Exhibit 2
Page 15

# I.  Introduction

1.1     My full name is Irina Nikolaevna Novikova. I am a partner in the Moscow office of PricewaterhouseCoopers Russia B.V. ("PwC Russia B.V." or "PwC"). I submitted an expert report in these proceedings on 11 February 2013 (my "First Report"). My qualifications and experience are set out at Appendix 1 to my First Report.

1.2     I have been instructed by Eversheds LLP ("Claimant's Counsel") in relation to a dispute between Mr Vitaly Ivanovich Smagin ("Mr Smagin" or "Claimant"), Kalken Holdings Limited ("Kalken") and Ashot Yegiazaryan ("Mr Yegiazaryan") (together, the "Respondents").

1.3     The full background of this matter is well known to the parties involved and I do not repeat it in this Second Report.

1.4     In my First Report I was instructed to provide expert evidence on:

   a.   Calculation of profits generated by ZAO Centurion Alliance ("Centurion") to date and the amount that ought to have been paid to Mr Smagin out of the profits generated by Centurion, pursuant to the agreement of the owners of Centurion and in the absence of Mr Yegiazaryan's alleged illegal actions as explained in the Statement of Claim; and

   b.   My valuation of the business of Centurion as of 15 January 2013 and losses incurred by Mr Smagin as a result of the alleged misappropriation of his 20% shareholding interest in Centurion.

1.5     Since the submission of my First Report on 11 February 2013, I have received new documents, including, but not limited to:

   a.   "*Expert Accountant's Report*" prepared by Mr Hall of Smith & Williamson dated 19 April 2013, including Appendices A – C ("Doug Hall Report"), which addresses my First Report;

   b.   "*Expert Supplemental Report in Respect of "Europark" Shopping Centre, located at: 62 Rublevskoe Hw., Moscow, Russia*" prepared by Cushman & Wakefield ("C&W") and dated 24 May 2012 ("C&W Supplemental Report");

   c.   "*Opinion of the Forensic Expertise of ZAO Centurion Alliance Shares*" prepared by a private appraiser Victor Petrovich Erpulev and dated January 2011 ("Erpulev Report" or "Prosecutors' Report");

   d.   Financial statements of Centurion for the year ending 31 December 2012 prepared under Russian Generally Accepted Accounting Principles ("Russian GAAP");

   e.   Third Witness Statement of Mr Garkusha dated 5 June 2013; and

Cy Benson Decl., Exhibit 2
Page 16

  f.  Third Witness Statement of Mr Smagin dated 5 June 2013.

  g.  "Agreement to Buy-back Shares" dated 12 February 2002 between Anatoly G. Loktionov, Nikolay N. Kaplun and Vitaly I. Smagin ("Agreement to Buy-back Shares")[1].

1.6 In this Second Report, I am instructed to comment on the Doug Hall Report, in the context of the new evidence referred to above and made available to me after the date of my First Report. I set out the list of documents I relied on for the purposes of my First Report in the Appendices to my First Report. In Appendix 1 hereto I set out a list of additional documents I rely on in my Second Report, including those recently disclosed by both the Claimant and the Respondents and relevant information available from public sources I have examined. The documents I rely on are identified in the text of my First and Second Report.

1.7 Mr Hall and I disagree on certain key areas relevant to these proceedings. This Second Report is not intended to produce an exhaustive list of all areas of differences of opinion between myself and Mr Hall. Rather, it focuses on my key comments relating to the Doug Hall Report. Accordingly, where I make no comment on any particular matter in the Doug Hall Report, this should not be interpreted as an agreement with the Doug Hall Report.

1.8 I am instructed to act as an expert witness and not a witness of fact. Neither my First nor Second Report are to be construed as expressing opinions on matters of law, which are outside my expertise.

1.9 I have been assisted in my work by my firm's staff, whose work I have supervised personally. The opinions expressed are my own.

1.10 I understand this Second Report will be used in these proceedings and will be provided to the parties of these proceedings, their respective legal advisers and to the Arbitral Tribunal. In all other respects, my First and Second Reports are confidential. They should not be used, reproduced, or circulated for any other purposes, in whole or in part, without my prior written consent. Neither PwC nor I accept any responsibility to third parties, whether for breaches of this obligation or for any opinions expressed or information included within my First or Second Reports, or otherwise.

1.11 Claimant's Counsel has informed me that there are no formal requirements issued by the Arbitral Tribunal in respect of either form or content of my First and Second Reports.

1.12 I set out the remainder of my Second Report under the following headings:

  a.  Summary of my conclusions

---

[1] Exhibit C-162 to the Statement of Claim.

Vitaly Ivanovich Smagin vs. Kalken Holdings Limited and Ashot Yegiazaryan
Second expert report of Irina Novikova

16 June 2013

    b.    Profit entitlement

    c.    Valuation of Centurion

    d.    My revised assessment of the Claimant's total loss

    e.    Expert's declaration

## *Background*

1.13    Before I start setting out my critique of, and comments on, the matters raised by Mr Hall in his report, I would like to comment on one of the key reasons for the disagreement between Mr Hall and me as to the value of the Claimant's 20% shareholding in Centurion. The disagreement arises out of the legal background to the case and is therefore outside my area of expertise and is explained below.

1.14    For the purposes of my First Report, I was instructed to perform my assessment of Claimant's loss on the basis of the fair market value of a 20% stake in Centurion, calculated as at the present date[2].

1.15    Having reviewed the Doug Hall Report, I understand that Mr Hall has performed his assessment of the Claimant's loss on the basis of the value of 20% of sales proceeds, net of all sale-related expenses, that the Claimant would have received, had they effected a "fire" or "foreclosure" sale of the 100% stake. This was the basis of Mr Hall's instructions[3].

1.16    After submitting my First Report, Claimant's Counsel have clarified the three principal scenarios I should address while assessing the Claimant's loss:

    a.    Assuming Mr Smagin still owned 20% in Centurion (or in companies through which Centurion is, or should be, owned), and did not intend to sell his shareholding ("Continuous holding" scenario)[4];

---

[2] The effective date of my valuation was 15 January 2013, being the date of the C&W 2013 Report valuing Europark, the key asset of Centurion.

[3] Mr Hall explains this at para 4.4.1 of his report: "*I am instructed that a sale of shares under the Shareholders' Agreement would take place only in the context where the lender is enforcing against the security. Under these circumstances, it is possible that Centurion's assets ... would be subject to a foreclosure sale*".

[4] I am instructed by the Claimant's Counsel that if Mr Yegiazaryan had not breached the Shareholders' Agreement and the Escrow Agreement, Mr Smagin would still be the owner of 20% of Centurion (via shares in Centurion or the companies through which Centurion was owned).

Cy Benson Decl., Exhibit 2
Page 18

Vitaly Ivanovich Smagin vs. Kalken Holdings Limited and Ashot Yegiazaryan
Second expert report of Irina Novikova                                        16 June 2013

## My revised valuation of Centurion and the Claimant's 20% share

4.89   My recalculation of Centurion's net assets based on the latest available financial statements of Centurion at 31 December 2012 is provided in Appendix 3[106]:

4.90   Below I provide my revised valuation of Centurion under Continuous holding scenario, Fire sale scenario and Best effort sale scenario:

### Table 14. My revised valuation of Centurion

| USD '000 | | My First Report | Continuous holding | "Best effort" sale | "Fire" sale | Doug Hall Report max* | Doug Hall Report min** |
|---|---|---|---|---|---|---|---|
| | | USD/RUR @ 15 Jan 2013 | USD/RUR @ 15 Jan 2013 | USD/RUR @ 15 Jan 2013 | USD/RUR @ 15 Jan 2013 | USD/RUR @ 30 Sep 2013 | USD/RUR @ 30 Sep 2013 |
| Centurion's Net Assets at 31 Dec 2012 | | 51 851 | 57 056 | 57 056 | 57 056 | 50 745 | 50 745 |
| Add | Europark re-valuation adjustment | 303 807 | 304 158 | 304 158 | 304 158 | 278 286 | 102 566 |
| | market value of Europark | 348 700 | 348 700 | 348 700 | 348 700 | 322 220 | 146 500 |
| | less book value of Europark | (44 893) | (44 542) | (44 542) | (44 542) | (43 934) | (43 934) |
| Less | Discount on foreclosure @ 20% | - | - | - | (69 740) | (64 444) | (29 300) |
| | Selling costs @ 1% | - | - | (3 487) | (2 790) | (2 578) | (1 172) |
| | Capital gain tax @ 20% | - | - | - | - | (42 253) | (14 419) |
| | Claimant's "dividend entitlement" up to 30 Sep 2012 | - | - | - | - | (9 573) | (9 573) |
| Centurion valuation at 15 Jan 2013 | | 355 658 | 361 214 | 357 727 | 288 684 | 210 183 | 98 847 |
| Value of 20% share in Centurion | | 71 132 | 72 243 | 71 545 | 57 737 | 42 037 | 19 769 |

\* 10% yield, gross profits of Centurion per 2012 Financial Statements, adjusted for profit entitlement
\*\* 14% yield, gross profits of Centurion per 2009 Financial Statements, adjusted for profit entitlement

Source: Financial Statements of Centurion as of 31 December 2012; Doug Hall Report

---

[106] Values in the balance sheet of Centurion at 31 December 2012 have been translated from RUR into USD using the USD/RUR exchange rate at 15 January 2013, the date of the C&W Report estimating the value of Europark.

# EXHIBIT

# 3

*Changes to legislation: There are outstanding changes not yet made by the legislation.gov.uk editorial team to Arbitration Act 1996. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*



# Arbitration Act 1996

### 1996 CHAPTER 23

### PART I

ARBITRATION PURSUANT TO AN ARBITRATION AGREEMENT

*Powers of the court in relation to award*

**67      Challenging the award: substantive jurisdiction.**

(1) A party to arbitral proceedings may (upon notice to the other parties and to the tribunal) apply to the court—

  (a)   challenging any award of the arbitral tribunal as to its substantive jurisdiction; or

  (b)   for an order declaring an award made by the tribunal on the merits to be of no effect, in whole or in part, because the tribunal did not have substantive jurisdiction.

A party may lose the right to object (see section 73) and the right to apply is subject to the restrictions in section 70(2) and (3).

(2) The arbitral tribunal may continue the arbitral proceedings and make a further award while an application to the court under this section is pending in relation to an award as to jurisdiction.

(3) On an application under this section challenging an award of the arbitral tribunal as to its substantive jurisdiction, the court may by order—

  (a)   confirm the award,

  (b)   vary the award, or

  (c)   set aside the award in whole or in part.

(4) The leave of the court is required for any appeal from a decision of the court under this section.

*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial team to Arbitration Act 1996. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)



# Arbitration Act 1996

### 1996 CHAPTER 23

### Part I

ARBITRATION PURSUANT TO AN ARBITRATION AGREEMENT

*Powers of the court in relation to award*

**70    Challenge or appeal: supplementary provisions.**

(1) The following provisions apply to an application or appeal under section 67, 68 or 69.

(2) An application or appeal may not be brought if the applicant or appellant has not first exhausted—

    (a)   any available arbitral process of appeal or review, and

    (b)   any available recourse under section 57 (correction of award or additional award).

(3) Any application or appeal must be brought within 28 days of the date of the award or, if there has been any arbitral process of appeal or review, of the date when the applicant or appellant was notified of the result of that process.

(4) If on an application or appeal it appears to the court that the award—

    (a)   does not contain the tribunal's reasons, or

    (b)   does not set out the tribunal's reasons in sufficient detail to enable the court properly to consider the application or appeal,

the court may order the tribunal to state the reasons for its award in sufficient detail for that purpose.

(5) Where the court makes an order under subsection (4), it may make such further order as it thinks fit with respect to any additional costs of the arbitration resulting from its order.

2

*Arbitration Act 1996 (c. 23)*
*Part I – Arbitration pursuant to an arbitration agreement*
*Document Generated: 2014-11-04*

*Changes to legislation: There are outstanding changes not yet made by the legislation.gov.uk editorial team to Arbitration Act 1996. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*

(6) The court may order the applicant or appellant to provide security for the costs of the application or appeal, and may direct that the application or appeal be dismissed if the order is not complied with.

The power to order security for costs shall not be exercised on the ground that the applicant or appellant is—

   (a) an individual ordinarily resident outside the United Kingdom, or

   (b) a corporation or association incorporated or formed under the law of a country outside the United Kingdom, or whose central management and control is exercised outside the United Kingdom.

(7) The court may order that any money payable under the award shall be brought into court or otherwise secured pending the determination of the application or appeal, and may direct that the application or appeal be dismissed if the order is not complied with.

(8) The court may grant leave to appeal subject to conditions to the same or similar effect as an order under subsection (6) or (7).

This does not affect the general discretion of the court to grant leave subject to conditions.

**Annotations:**

**Modifications etc. (not altering text)**

C1   S. 70 applied (with modifications) (E.W.) (21.5.2001) by S.I. 2001/1185, arts. 2, 3, Sch. para. 165(1) (which amending S.I. was revoked (6.4.2004) by S.I. 2004/753, art. 3 (subject to art. 8))

C2   S. 70 applied (with modifications) (E.W.) (6.4.2003) by The ACAS (Flexible Working) Arbitration Scheme (England and Wales) Order 2003 (S.I. 2003/694), art. 2, Sch. para. 116 (which amending S.I. was revoked (1.10.2004) by S.I. 2004/2333, art. 3 (subject to art. 6))

C3   S. 70 applied (with modifictaions) (E.W.) (6.4.2004) by The ACAS Arbitration Scheme (Great Britain) Order 2004 (S.I. 2004/753), art. 1, **Sch. para. 205EW**

C4   S. 70 applied (with modifications) (E.W.) (1.10.2004) by The ACAS (Flexible Working) Arbitration Scheme (Great Britain) Order 2004 (S.I. 2004/2333), art. 4, **Sch. para. 156EW (with art. 6)**

C5   s. 70(3) modified (E.W.) (25.3.2002) by S.I. 2001/4015, Rule 29, Sch. Rule 62.9

---

*Changes to legislation: There are currently no known outstanding effects for the Arbitration Act 1996, Section 73. (See end of Document for details)*

---



# Arbitration Act 1996

## 1996 CHAPTER 23

### PART I

ARBITRATION PURSUANT TO AN ARBITRATION AGREEMENT

*Miscellaneous*

**73      Loss of right to object.**

(1) If a party to arbitral proceedings takes part, or continues to take part, in the proceedings without making, either forthwith or within such time as is allowed by the arbitration agreement or the tribunal or by any provision of this Part, any objection—

    (a)   that the tribunal lacks substantive jurisdiction,

    (b)   that the proceedings have been improperly conducted,

    (c)   that there has been a failure to comply with the arbitration agreement or with any provision of this Part, or

    (d)   that there has been any other irregularity affecting the tribunal or the proceedings,

he may not raise that objection later, before the tribunal or the court, unless he shows that, at the time he took part or continued to take part in the proceedings, he did not know and could not with reasonable diligence have discovered the grounds for the objection.

(2) Where the arbitral tribunal rules that it has substantive jurisdiction and a party to arbitral proceedings who could have questioned that ruling—

    (a)   by any available arbitral process of appeal or review, or

    (b)   by challenging the award,

does not do so, or does not do so within the time allowed by the arbitration agreement or any provision of this Part, he may not object later to the tribunal's substantive jurisdiction on any ground which was the subject of that ruling.

*Changes to legislation:* There are currently no known outstanding effects for the Arbitration Act 1996, Section 4. (See end of Document for details)



# Arbitration Act 1996

### 1996 CHAPTER 23

### PART I

ARBITRATION PURSUANT TO AN ARBITRATION AGREEMENT

*Introductory*

**4        Mandatory and non-mandatory provisions.**

(1) The mandatory provisions of this Part are listed in Schedule 1 and have effect notwithstanding any agreement to the contrary.

(2) The other provisions of this Part (the "non-mandatory provisions") allow the parties to make their own arrangements by agreement but provide rules which apply in the absence of such agreement.

(3) The parties may make such arrangements by agreeing to the application of institutional rules or providing any other means by which a matter may be decided.

(4) It is immaterial whether or not the law applicable to the parties' agreement is the law of England and Wales or, as the case may be, Northern Ireland.

(5) The choice of a law other than the law of England and Wales or Northern Ireland as the applicable law in respect of a matter provided for by a non-mandatory provision of this Part is equivalent to an agreement making provision about that matter.

For this purpose an applicable law determined in accordance with the parties' agreement, or which is objectively determined in the absence of any express or implied choice, shall be treated as chosen by the parties.

***Changes to legislation:*** *There are currently no known outstanding effects for*
*the Arbitration Act 1996, SCHEDULE 1. (See end of Document for details)*

# SCHEDULES

## SCHEDULE 1                                                Section 4(1)

### Mandatory provisions of Part I

sections 9 to 11 (stay of legal proceedings);

section 12 (power of court to extend agreed time limits);

section 13 (application of Limitation Acts);

section 24 (power of court to remove arbitrator);

section 26(1) (effect of death of arbitrator);

section 28 (liability of parties for fees and expenses of arbitrators);

section 29 (immunity of arbitrator);

section 31 (objection to substantive jurisdiction of tribunal);

section 32 (determination of preliminary point of jurisdiction);

section 33 (general duty of tribunal);

section 37(2) (items to be treated as expenses of arbitrators);

section 40 (general duty of parties);

section 43 (securing the attendance of witnesses);

section 56 (power to withhold award in case of non-payment);

section 60 (effectiveness of agreement for payment of costs in any event);

section 66 (enforcement of award);

sections 67 and 68 (challenging the award: substantive jurisdiction and serious irregularity), and sections 70 and 71 (supplementary provisions; effect of order of court) so far as relating to those sections;

section 72 (saving for rights of person who takes no part in proceedings);

section 73 (loss of right to object);

section 74 (immunity of arbitral institutions, &c.);

section 75 (charge to secure payment of solicitors' costs).