EXHIBIT 24

The London Court of
International Arbitration

The London Court of
International Arbitration, Cases
No. 101689 and 101691

(1) Ashot  Egiazaryan
(2) Artem Egiazaryan
(3) Dmitriy Fitisov
(4) Blidensol Trading & Investments Limited
(5) Hackham Invest & Trade Inc.

Claimants
-and-
(1) Suleyman Kerimov
(2) Denoro Investments Limited
Defendants

First witness statement of Ashot Gevorkovich Egiazaryan
on behalf of claimants

## 1.    Introduction

1.1    **I**, Ashot Gevorkovich Egiazaryan, give this witness statement in connection with the arbitration of the dispute between me, Artem Egiazaryan (Artem), Dmitriy Fitisov (**Dmitriy**) and companies Blidensol Trading & Investments Limited (Blidensol) and Hackham Invest & Trade Inc. (Hackham) (hereinafter together referred to as the **Claimants**) and Suleyman Kerimov (**Kerimov**) and Denoro Investments Limited (**Denoro**) (collectively called the **Defendants**). These arbitration proceedings are related to taking possession of my share in reconstruction and construction of Hotel Moskva (hereinafter referred to as the **Project** or the **Hotel**). I am the first claimant in this arbitration proceeding.

1.2    The facts, stated in this witness statement, are known to me personally; in those cases, when they are not known to me personally, I indicate, what is my judgment based on. The facts that are personally known to me are true. The facts that are not personally known to me are true as far as I know and as far as I believe.

1.3    At the present time, I live at 655 Endrino Place, Beverly Hills, California, 90210, USA.

1.4    My native language is Russian, and until the summer of 2010, I have lived in Russia all my life. Although I speak a little bit of English, I don't know it well enough to give statement in English.

## 2.    Personal Background

2.1    I was born in Moscow, Russia, on July 24, 1965. My father was a professor and head of the Economics and Industry Department of the Moscow State University, and my mother worked at the Institute of Chemical Physics of the Russian Academy of Sciences. I graduated from the Economics Department of the Moscow State University in 1988 and received a Ph.D. in Economics from the Higher School of Privatization and Business based in Moscow in 1996. I have published more than 20 research papers in Russia in the field of economics and investments.

2.2    I got married with my wife Natalia Tsagolova in 1986. We have got four children: Anna (born in 1993), George (born in 1994), Stephen (born in 1998) and Anton (born in 2001).

2.3    Currently, I am a deputy of the State Duma, the lower house of the Russian parliament, but I remain an economist by profession.

2.4   After the graduation I started working as an economist at the Moscow's Sverdlov silk plant. From 1989 to 1990 I worked as a senior specialist at Expo Center (Moscow Expo Center), a state-owned enterprise specializing in international trade. From 1990 to 1992 I was a director general of the Foundation for Social and Economic Development of the Moscow Region.

2.5   In 1993 I started working at the Moscow National Bank, having occupied the position of a chairman of the board of directors. My responsibilities included overall management of the bank activities in accordance with its charter. In 1996 I left the Moscow National Bank and bought a commercial bank, which was called Russky Dom and was eventually renamed into Respublikansky Bank. Under my guidance, the bank has evolved from a small institution into a medium-sized bank, which is steadily working to this day. In 1996-1998 I also held a minority stake in Unicombank and was a member of the board of directors on a pro bono basis. At the same time in addition to this, I started working on the creation of the National Information Company (NIC). NIC was intended to finance publishing houses, which took up the modernization of Russian national television network, which used equipment, manufactured in the 1970s.

2.6   In the second half of the 1990s I got involved in the Russian state and political activities. In 1997 I became an adviser to the Central Bank of Russia (the Russian equivalent of the US Federal Reserve System). Before that, in 1996 I was involved in the organization of the election campaign of Boris Yeltsin (**Yeltsin**).

2.7   After the election of Yeltsin, he asked me to assist him in fence-mending between him and the opposition parties, the Communist Party of the Russian Federation and the Liberal Democratic Party of Russia (LDPR). There was tension in the relationship between Yeltsin and these two parties, and due to this conflict in the State Duma there was a significant number of votes in support of the vote of no-confidence. I also advised Yuri Maslyukov, the first deputy prime-minister, on a pro bono basis for a while.

2.8   In 1999, I decided to run for the State Duma and on instruction of the then prime minister Vladimir Putin (**Putin**) I was included into the list of LDPR candidates. A candidate in Russia did not have to join a political party in order to be elected to the State Duma from the party list. However, if the candidate was running from the party list, he had the opportunity to get executive positions in the committees of the State Duma. I was not and am not a member of the LDPR and I did not attend the LDPR conventions. I am the one,

who is called a non-party candidate in Russia, recommended into the parliamentary group of the LDPR. I am not bound by the LDPR program or decisions or by its leadership points of view, which include sometimes controversial and unpleasant points of view of Vladimir Zhirinovsky. In 1999 I was elected, and in 2003 and 2007 re-elected to the State Duma. I was the deputy chairman of the Committee on Budget and Taxes, the deputy chairman of the Commission for Promotion of Political Settlement and Observance of Human Rights in the Chechen Republic and a member of the Commission on the Public Debt of the Russian Federation.

**3.     The Project**

*Introduction*

3.1    The design and construction of the original hotel Moskva were started in the middle of 1930s. At the time of its opening it was the biggest hotel in the country and it continues to have the most prestigious hotel address in Russia, since it is located close to Kremlin, the Russian Parliament and the Bolshoi Theater.

3.2    First I learned about the Project in the spring of 2000, and in 2002, after the U.S. company Decorum Corp. won the tender, I entered into an agreement with the beneficiary owner of Decorum Corp. Vitaliy Milyavskiy (**Milyavskiy**) on acquisition of a majority share in the Project. Milyavskiy worked as one of my deputies, when I was the chairman of the board of directors of the Moscow National Bank during the period between 1993 and 1996. At the time of our work in the bank we became good friends.

3.3    Milyavskiy became director general of the Hotel Moskva OJSC approximately in 1999-2000. At that time the hotel Moskva was fully owned by the city of Moscow (**the City**) through a Russian Open Joint Stock Company Hotel Moskva. Milyavskiy told me that he was appointed to this post by Iosif Ordzhonikidze (**Ordzhonikidze**), who was then the City deputy mayor.

3.4    In the summer of 2002 Milyavskiy invited me to participate in a project of hotel reconstruction. We met with him and finalized our agreement in writing. Back then the hotel Moskva was a three-star hotel. I recall that at that time the City struggled to fulfill the then existing financial obligations in the social sphere and there was no funds provided for in the budget for such an expensive reconstruction as the Project. Given its up-market location – it is situated in the heart of Moscow and is close to the Red Square

and the Kremlin, – I thought that the decision to upgrade the hotel was a political one, but it could provide significant economic benefits in the longer term.

3.5    According to one of the conditions of the invitation to tender, the developer was to buy the majority stake of the Hotel, and the City was to leave itself the minority stake. The terms of the tender also explicitly stipulated that the outside investor can finance the construction with the help of loans, issued on the security of the Hotel, and that upon completion the dividends will be distributed with the benefit for the Investor.[1]

3.6    I confirmed my interest in the Project to Milyavskiy. At that time $300 million according to the estimates was enough for the implementation of the Project, and I was sure that I would be able to get such level of funding by means of combining my own capital and loans from financial institutions in accordance with the terms of the tender.

3.7.   Shortly after, I bought the rights for the Project for $10 million. At that time the Hotel itself was still owned by the City through the Hotel Moskva Company subject to observance of Decorum Corp. rights in the Project (which were to be transferred to me).

*The City*

3.8.   As a result of negotiations held between the City, Milyavskiy and me, it was agreed that the rights of Milyavskiy, obtained by him through the tender, will be transferred to the new Russian company Decorum LLC (soon after reorganized into ZAO "Decorum") (Decorum), which was controlled by me. Decorum was to implement the Project jointly with the City through DecMos OJSC (DecMos), established in order to implement the Project. Decorum was to own 51% of DecMos shares, and the remaining 49% were to be owned by the City. This deal was beneficial for the City, which, as far as I know, received competitive offers, according to which only a 25% share in the Project would be provided to the City. As a matter of fact, at that time the City used to take only 10 to 25% in any reconstruction project. I was satisfied with this deal, since I thought that the share owned by the City was a powerful incentive for the City to ensure a timely implementation of the Project. I always intended to increase my share according to the terms of the tender.[2]

*Arkadiy Rotenberg and Konstantin Goloschapov*

3.9.   At the same time with the negotiations with the City and with an aim to further protect

---

[1] CE-28.
[2] CE-28.

both the Project, and my share in it from political interference and actions of possible competitors I had several meetings with Arkadiy Rotenberg (**Rotenberg**) and Konstantin Goloschapov (**Goloschapov**); both of them were introduced to me by Milyavskiy. Before that I had never met either Rotenberg or Goloschapov, though I know of them as of Putin friends.

3.10   Rothenberg and Goloschapov were well-known to Georgi Poltavchenko (**Poltavchenko**), the Presidential Plenipotentiary Envoy to the Central Federal District, who comprehensively controlled the executive bodies of the City. Moreover, Rotenberg is a childhood friend of Vladimir Putin, the former president and the current prime minister of Russia, and was his judo coach for a long time. Hardly anything important happens in Russia without the approval of Putin or without his guidance. In this case Rotenberg told me that he represents the interests of Putin in the Project. Besides that, Goloschapov told me that he represents the interests of Poltavchenko in the Project. Goloschapov is the former masseuse of prime-minister Putin and one of the Rotenberg's business partners. I believed that Rotenberg and Goloschapov would be able to use their influence in order to help secure the Project politically and to prevent the unwanted interference, of the then Moscow mayor Luzhkov in particular (very powerful and notorious man, who controlled the Moscow real estate market) together with his wife Yelena Baturina (**Baturina**).

3.11   In the fall of 2002 I agreed with Poltavchenko, Rotenberg and Goloschapov at Poltavchenko's country house, that in exchange for their participation they will get $15 million and 30% of my share in Decorum. However, later in 2003 Rotenberg told me that Putin thinks that 30% share is not enough and he wants to get 50% of Decorum shares. Rotenberg said that it is offensive for such important people as Putin and Poltavchenko to own through them (i.e. Rotenberg and Goloschapov) such a small share in the Project, and therefore I am obliged to divide the Decorum shares equally, i.e. 50/50. Moreover, Rotenberg and Goloschapov claimed that Putin and Poltavchenko have already agreed with the City on the buying-out of 49% of DecMos shares, owned by the City, for us after the consummation of the deal, and in return they asked to increase their share up to 50% in advance. Although I was not pleased with such result, I did not want to make enemies and I had a great desire for the Project to be successful. Unfortunately, such agreements are a fact of business life in Russia.

3.12.   According to the agreement I first transferred the 45% share in Decorum to Rotenberg and Goloschapov, with the right to buy out the remaining 5% in the future. They

exercised this right in 2007.[3] Since Decorum owned 51% of DecMos (and hence the Project), I actually remained with 25.5% share in the Project after I transferred these shares to Rotenberg and Goloschapov.

*Decree No. 311*

3.13   One of the necessary documents in order to get started with the work on the Project implementation was the Decree through which the City would approve the closing down of OJSC Hotel Moskva and the transfer of Project to Decorum. When this Decree was delayed, I resorted to help of the deputy mayor Ordzhonikidze. Ordzhonikidze was the most active representative of the City in the Project prior to the time when he was replaced as the Deputy Mayor by Vladimir Resin.

3.14   On **April 29, 2003** the City issued the Decree, necessary to get started with construction works (**Decree No. 311**); I think it was a direct result of the personal intervention of Ordzhonikidze.[4] This Decree approved the transfer of the rights according to the tender to Decorum, which, in its turn, agreed to carry out the Project jointly with the City through a joint venture DecMos. Decorum received 51% share in DecMos and the City got 49% share.

3.15   At the first meeting of DecMos shareholders, held in June 2003, it was decided, among other things, that the City would agree to mortgage the property of DecMos, including the rights to the land under the Hotel, and DecMos shares belonging to the shareholders, in order to get the funding for the Project.[5] This decision was made taken into account possible funding options, which were discussed at that time. In accordance with the terms of the tender the City did not express concern over security, necessary to attract funding, required for the project implementation.

3.16   Aside from the issuance of the necessary permits for the construction and obtaining other approvals, including those associated with the corporate procedures, the City was to play the role of a passive beneficiary. Since that moment on, Decorum arranged everything – we started fundraising, designs for the new hotel were prepared, and one company was entrusted with demolishing the old hotel. I arranged the funding, but left the decision of the current logistics issues of the Project to Dmitriy Garkusha, who at that time was the

---

[3] CE-79 ; CE-80.
[4] CE-29.
[5] CE-1.

7

director general of DecMos.

3.17    On October 2, 2003 the City, Decorum and DecMos signed the Agreement on the Mutual Obligations of the Parties with a View to Implement the Investment Project of the Hotel Moskva Reconstruction (**the Investment Agreement**)[6] in order to fulfill the aforementioned. The responsibility for funding and implementation of the Project was entirely placed on Decorum (and hence on me), which, according to the Investment Agreement, was allowed to provide direct funding through investment of its own funds and/or by obtaining loans to implement the Project. The obligations of the City were limited to providing timely issuance of administrative permits and documents, required for implementation and completion of the Project (i.e. *"rendering the necessary assistance to Investor in implementation of the Project, including… at the request of Investor and/or DecMos OJSC all the permits, agreements and other documents, necessary for implementation of the Investment Project).* As it was stipulated by the terms of the tender and the Investment Agreement, my plans of the Project funding provided for a combination of self-funding by my other assets and bank financing.

*Work on the Project*

3.18    Following the adoption of Decree No. 311 I allocated the first $50 million in the form of funding and Ingeokom was hired to demolish the old hotel. This work was started in 2004 and took about 6-7 months. After that, Strabag was hired for the construction of the hotel. Strabag is one of the Europe's leading construction groups and has extensive experience in handling major projects.

3.19    The demolition of the old hotel Moskva was completed in late 2004, after which the excavation works started.[7] Ordzhonikidze was appointed the Chairman of the DecMos Board of Directors approximately at this time. DecMos entered into agreement with Four Seasons in 2005 in order to create a five-star hotel within the Project. The excavation works were completed, a new building was constructed and waterproofed and an underground garage was constructed by the end of 2007. This also included complex foundation works, necessary in order to protect the surrounding infrastructure, including metro line that runs under the project site.

3.21.   The construction works, completed in 2003-2007, were funded in the amount of approximately $200 million through loans, provided to the Project by the companies,

---

[6] CE-2.
[7] CE-46.

which belonged to me de facto. By the time of the hostile takeover in 2009, which I will describe further, these loans with the interest accrued amounted to approximately $300 million.

*Political problems and Sberbank funding*

3.22.   The price of oil and the price of real estate in Moscow were soaring by the end of 2004. As a result, the Project acquired a much higher cost (and, as a consequence, became much more attractive for the City and other entrepreneurs), but it also became much more expensive (because of rising construction costs, for example, fuel costs). As a result, the Project budget grew from $500 million (in **2005**) to $800 million (in **2007**). We received a preliminary approval for a loan in the amount of approximately $600 million from Sberbank, the largest bank in Russia, at the end of 2005. The City rejected this offer, with reference to the fact that the loan was offered to DecMos, and not Decorum. We did not agree, since other funding was provided, and continued to be provided to DecMos with the City's approval, and approximately on July 24, 2006 I arranged a loan to DecMos provided by Sberbank in the amount of $525 million.[8] One of the conditions, insisted on by Sberbank, was that the loan had to be approved by DecMos shareholders and that the hotel had to be mortgaged in favor of Sberbank. As noted above, the latter condition was one of the terms of the initial tender and was adopted by the City at a shareholders meeting, held in June 2003.[9] Therefore this loan was unanimously approved by the DecMos Board of Directors, including representatives of the City, chaired by the deputy mayor Ordzhonikidze.[10] However, subsequently the City did not approve the loan in spite of the fact that we repeatedly addressed it with a request to do so (both orally and twice in writing).[11] It actually crumbed the raising of Sberbank loan.

3.23   I believe that the City rejected the loan from Sberbank for political reasons, caused by some events that occurred in 2004 and 2005.

3.24   In the first place, Ordzhonikidze told me in early 2004 that Mayor Luzhkov wants my share in the Project to be transferred to Baturina. I was informed of this at the meeting, held in a Moscow restaurant Usad'ba. Luzhkov told me through Ordzhonikidze that he wants to give me another project and in return I have to back off from the hotel Moskva.

---

[8] CE-81.
[9] CE-1; CE-28.
[10] CE-30.
[11] CE-82; CE-83.

Ordzhonikidze told me that Luzhkov wants to gain control of the Project and I have to name my price. I believe that this offer was made to me due to the growing economic attractiveness of the Project.

3.25   I declined this offer and asked Ordzhonikidze to let Luzhkov know that I will not leave the Project behind. In response, Mayor Luzhkov claimed in October 2004 that the Project will be closed. In particular, he officially announced that no new hotel will be built and that a public park will be laid out in place of the old hotel. At that moment I threatened to sue, and Luzhkov revised his decision, but looking back, I realize that it led to his political intention to remove me from the Project.

3.26   After the failure to obtain a loan from Sberbank I called on Deutsche Bank with a request to grant another loan, which I obtained on October 6, 2006. I intended to continue working on the Project, based on the fact that as the Project would be coming along and will become real, the political problems will disappear and the City will start acting properly and in the best interests of the Project. The amount of the loan amounted to $100 million, and it was granted to Blidensol, of which I am a beneficiary owner (**Blidensol loan**).  Another project – a multi-functional shopping complex Europark (**Europark**), was used as a security for this loan. $90 million of the obtained Blidensol loan were used to buy the bills of exchange, issued by DecMos for Strabag in payment for construction works within the Project. As a result, Strabag received payment and Blidensol became the creditor of DecMos.

3.27   On June 26, 2007 the City adopted a resolution extending the deadline for the completion of the Project from the fourth quarter of 2006 to December 31, 2008.[12]

3.28   In July 2007, I arranged for the further funding of the next stage of the Project by Deutsche Bank. In this business transaction I was represented by the Moscow office of White & Case. Deutsche Bank insisted that Decorum shares must belong to an offshore company as a part of the requested security. In order to fulfill this condition Rothenberg, Goloschapov and I transferred the shares of Decorum, owned by us, to a Cypriot company Tribalin Trading Ltd. (**Tribalin**), 99.9% of which was owned by Limerick Business Holding S.A. (**Limerick**) (incorporated in the British Virgin Islands). Back then I owned 50% of Limerick (of which my brothers Artem and Dmitriy were the nominees), and Rothenberg and Goloschapov owned 25% each. After this the Deutsche Bank loan was

---

[12] CE-3.

structured as follows:

3.28.1  The first loan was to be a credit line amounting to $392 million, and it was to be provided to Falmiro Trading Limited (**Falmiro loan**)[13], a Cypriot company 50 % of which actually belonged to me through Vitaliy Gogokhiya (**Gogokhiya**) at that time, 25% belonged to Boris Rotenberg (the brother of Rotenberg) and 25% belonged to Yelena Pavlyuchenko, who represented Goloschapov. Among other things, the loan was secured by (i) DecMos shares, owned by Decorum, (ii) Decorum shares, owned by Tribalin, and (iii) Tribalin shares, owned by Limerick.

3.28.2  The second credit line was to be $792 million and was to be granted to DecMos, hereinafter referred to as (**DecMos Loan**)[14] (hereinafter this loan and Falmiro loan are collectively referred to as **Deutsche Bank Loans**). The purpose of the DecMos Loan was refinancing of Falmiro Loan and other debts within the Project, and the remainder was to be used to finance the construction of the Project. The security for this second loan was to include the Hotel mortgage.

3.29  I thought that DecMos Loan was the best funding, existing in the market, and that it would be sufficient to fully implement the Project.

3.30  One of the conditions for granting of Falmiro Loan was its approval by DecMos shareholders, and Deutsche Bank gave one year from July 6, 2007 thereto.

3.31.  Falmiro several times received money totaling to $75 million from Falmiro Loan. Falmiro used these funds to purchase bills of exchange, issued by DecMos for Strabag as a part of payment for operating expenses for the Project construction. After that DecMos became Falmiro debtor in the amount equal to the total value of the purchased bills of exchange.

**4.    Corporate raiding**

*First signs*

4.1.    By the end of 2007 I began to think that Luzhkov has tightened his position. In December 2007 the City has stated that the loan of DecMos "conflicts with the interests of the City" and demanded that the Decorum company should sign "an explanatory agreement" stating that the Investment Agreement of 2003 demanded from Decorum to provide all the funding for the Project without compensation (i.e. the Project could not

---

[13] CE-5.

be financed with bank loans), and that Decorum should terminate - with an immediate effect - all credit agreements concluded with DecMos and at the same time to waive any claim for the outstanding sums on these loans.[15]

4.2   In order to round out rough corners I requested the Deutsche Bank to confirm in writing that 49% of shares of the City in DecMos Company will not constitute a part of security for the Deutsche Bank credits[16], and then the City has ceased insisting on the signing of "an explanatory agreement".

4.3   Around the same time Kerimov first came to the Project. In late 2007 Rotenberg was trying to sell his shares in the Limerick Company to Kerimov. Kerimov contacted me to find out whether I would mind it, and explained that maybe Rotenberg wants to make such a deal because he owes to Kerimov USD 160 million of credit granted to him in connection with the acquisition of Stroygazmontazh, gas and construction company. I told Kerimov that I would not mind if he acquires the share of Rotenberg, provided that he will assume all the stipulated obligations of Rotenberg and preserve my right to control the management of the company including the right to appoint the director general of DecMos. It is my understanding that Kerimov has performed a comprehensive survey of the Project, but no agreement was reached.

4.4.   May 14, 2008 the City has sent a letter to Decorum in which it threatened to terminate the Investment Agreement.[17] In addition, this letter provided for transfer of 51% of the Decorum shares in DecMos Company to the City. According to the City the termination was based on the breach of paragraph 3.1.1. of the Investment Agreement. Pursuant to this paragraph Decorum has committed to open a new hotel by the end of 2006. This letter was sent May 14, 2008 in spite of the fact that on June 26, 2007 the City has adopted a resolution extending the date for opening of the Hotel up to 31 December 2008.[18] I believed the City had sent this letter because it knew that the letter itself could cause the Falmiro Loan default. I considered it as an attempt of the City to drive me out of the Project. I have invested in the Project more than USD 200 million by that time and I told a representative of the city I. Ordzhonikidze that I will defend myself by taking legal action if the City will continue to threaten me. They left me alone once again.

---

[14] CE-4.
[15] CE-31.
[16] CE-84.
[17] CE-7.
[18] CE-3.

*Pseudo-default*

4.5   As noted above the Deutsche Bank demanded that shareholders of DecMos company approve a series of financial instruments including - most importantly - the documents of the DecMos Loan. It was therefore convened a meeting of shareholders of DecMos company in order to obtain their approval. Although the City was properly notified it has deliberately disrupted the meeting by ensuring that no representative of the City comes to it. As a result, no discussion has been held and no decision has been made. This resulted in the default of the Falmiro Loan since an approval of the City should have been confirmed no later than July 2008 (ie within 12 months from the date of signing of Credits of DecMos and Falmiro).

4.6   Now I know that actions of the City were part of a coordinated plan to drive me out of the Project. The memorandum of August 29, 2008 addressed by Luzhkov to the deputy mayor Vladimir Silkin described few possible ways to achieve it.[19] These included:

4.6.1. the use of powers to give permission to stop the construction of Europark that would cause a default on the Loan provided to Blidensol by Deutsche Bank in the amount of USD 100 million and would result in a cross-default of the Falmiro Loan;

4.6.2. refusal to extend the date of completion of the Project under the Investment Agreement or refusal to issue a permit to lay the land and the Project; both would cause a default of the Falmiro Loan the same way.

4.7   Now it is clear to me that Luzhkov has chosen the second option. As subsequently Kerimov told me in June 2009 (at the time of the Project transfer to Kerimov) it was he who prepared this plan of raiding for Luzhkov.

4.8   During the meeting with the Deutsche Bank representatives held on September 19, 2008 Elena Pavlyuchenko (who represented Goloschapov and Rotenberg in the Board of Directors of the DecMos Company) has announced to the Deutsche Bank without prior notice or consultation with Gogokhiya, my representative in the Falmiro Company, that the conditions on the Falmiro Loan will not be met and, as a result, the Falmiro Company failed to meet its obligations.

4.9   October 6, 2008 the Deutsche Bank provided a notice of default (the **"Notice of**

---

[19] CE-8.

**default")[20]** stating that if the Falmiro loan will not be approved by the DecMos Company shareholders by October 21, 2008 it will exercise its right to demand immediately the return of USD 75 million granted under the Falmiro Loan, and in case of failure to perform such a refund it will levy execution upon the Tribalin shares.

4.10   After the receipt of the Notice of default I instructed Vladimir Lapshov **("Lapshov")**, the CEO of DecMos being my representative in the Board of Directors, to convene a meeting of the Board of Directors on October 7, 2008 in order to resolve the problem, but no representative of the City has come to the meeting. It is consistent with the previous refusals of the City to participate in the duly announced meetings of the DecMos company shareholders for the same purpose.

4.11.  The very next day the DecMos company has sent a letter to the City in which it asked the City to address the Deutsche Bank with a request to give the Falmiro company another six months for the fulfillment of conditions under which the City would approve the loan. October 28, 2008, after the expiry of the fixed deadline (ie after 21 October 2008), the City sent a letter of reply in which stating that it had "no reason" to address the Deutsche Bank with a request for such an extension.[21]

4.12   Around the same time I was informed by Igor Lozhevsky **("Lozhevsky")**, the Chief Executive Officer of Deutsche Bank Russia, that the City is negotiating with a view to buy out the Falmiro Loan. Lozhevsky told me that if I will not get the necessary amount of money by 20 November 2008 to do it myself, the loan will be sold to the City... I did not know about it earlier. This meant that the City was trying to arrange a default of the Falmiro loan negotiating at the same time with Deutsche Bank to buy out the rights of the loan. On hearing this I told the representative of the City Igor Ignatov **("Ignatov")** that, if the City buys out the Falmiro loan I will bring legal action in order to protect my share in the Project.

4.13   I had one more separate agreement with the Deutsche Bank (through one of my offshore companies called Hamfast Investment Limited)[22] wherein I was granted with option to purchase the loan in case of default within two weeks from the date of receipt of the notice of default. I failed to get necessary USD 87 million myself in such a short period. I tried to arrange a buy out together with Rotenberg and Goloschapov, and although

---

[20] CE-9.
[21] CE-9;CE-10;CE-11.
[22] CE-85.

Rotenberg consented to participate in the mobilization of USD 87 million at first, he did not do anything eventually.

4.14   I thought showing a favour to Rotenberg and Goloschapov by discussing this situation with them. In case of foreclosure of the Tribalin shares they would lose their shares in the Project. I proposed them to preserve their share of 25.5% in the Project by providing USD 87 million required to repay the Falmiro Loan (and thereby preventing the default) or alternatively I could create a separate company with a view to refinance the Project and they could preserve their share by providing a half of the amount that I has already spent for the Project by that time.

4.15   I thought Rotenberg will agree since it was in his interest, but Rotenberg and Goloschapov did nothing for any of the two proposals. I was surprised by such a lack of desire at that time. For example, Rotenberg (among other things) is the co-owner of OJSC SMP Bank and has acquired a large fortune.

4.16   I had a series of discussions with several other potential purchasers of the Loan including Alfa Bank, Mikhail Prokhorov, Mezhprombank and, strange as it seems considering the results, Kerimov. I went to London to discuss the possibilities to save the Project with Deutsche Bank. While each person contacted by me has shown his interest initially, none of them showed willingness to make investments. They knew that the Project will not get off the ground without the approval of the City.

*Transaction involving the Konk Company*

4.17   After I threatened to take legal action the City "relented" and alternatively "offered" that the City and me should buy out the Loans of the Deutsche Bank which amount has grown to USD 87 million including penalties for default by that time. Buyout was to be carried through a structure owned by us jointly and funded by the City. In particular Konk Select Partners Inc. (**"Konk"**), the company which will be owned by the City through its wholly-owned subsidiary OEK-Finance and by me through the nominal holder Gogokhiya, had to repay the Falmiro loan and get the rights arising from it. In case of such a buyout I had to sign an agreement with the shareholders of Konk (**"DA KONK"**) which granted the City a right to manage the Konk company up to the return of the loan in the amount of USD 87 million.[23]

---

[23] CE-13.

4.18   The end result of accepting the offer of the City to use the Konk company as a tool for assuming the debt of the Deutsche Bank and foreclosure of the Tribalin company would be that the City, which previously owned 49% interest in the Project, would get 74.5% share and the right to appoint both directors of Konk up to repayment of the Loan. In fact, this would provide the City with full control over the Project.

4.19   At that time I knew that the transaction involving the Konk company would adversely affect my share in the Project but I had no choice. The City has arranged a default on the Falmiro Loan, and I had no time to raise USD 87 million required to buy out the loan myself for a limited period of time available. OEK-Finance company has become a lender instead of Deutsche Bank providing the Konk company with the required loan of USD 87 million dollars for three years. I did not know the source of money for the loan redemption.

*Events that led to signing of the Framework Agreement*

4.20   In January 2009 I began to understand an impact of Kerimov behind the scenes and the role he played at that. Kerimov invited me to a meeting in which he told me that the transactions involving the Konk company carried out in 2008 were arranged in his (Kerimov) interests and that he intends to buy a stake of the City in the Konk company. Kerimov told me that he was talking with the mayor Luzhkov and his wife Baturina wife (because they were business partners with Baturina), and that they both wanted him to take part in the Project.

4.21   I thought Kerimov is confident friend and colleague before, since we have had good relations on individual investment projects previously. Although the rumors began to circulate about his activity as a "raider" in 2005, I did not pay much attention to it, as I was not personally aware of those cases and knew that "black PR" campaigns are often carried out in Russian mass media as a way of corporate control. I was shocked by the situation seriousness in this meeting and I felt to be betrayed. I tried not to lose my temper and went home after leaving to think about how I could resolve this situation.

4.22   Around this time we found out that December 31, 2008 the deputy mayor Silkin has written to the mayor Luzhkov about ongoing   negotiations with the "City-friendly structures" about an acquisition of shares owned by OEK-Finance company in the Konk company (and thus acquiring the possibility to levy execution upon the Tribalin

company)[24]. Although I do not understand why Luzhkov and Silkin needed to use ambiguities in their correspondence, the "structure" certainly meant Kerimov.

4.23   From talking with Igor Yusufov (**"Yusufov"**), advisor to the President Dmitriy Medvedev, I also learned about the conversation he had with Kerimov a few months before. According to Yusufov he wanted to contact me with a proposal to buy out the Falmiro loan in order to avoid a default. However, Kerimov persuaded him not to do this by saying that he (Kerimov) will get the Project for "free".

4.24   Trying to find a solution of this situation I turned to the City through my lawyers stating that if it no longer wants to participate in the Project I have an option to purchase the share of the City in the Konk company in accordance with the DA KONK. This statement was made in the letters of 21 January 2009, 24 February 2009[25] and April 16, 2009. These letters requested the City to remain a holder of shares of the Konk company and stated that in case of failure of the City to satisfy this request I certify my readiness to buy the shares of the Konk company under the conditions specified by the City. My lawyers have sent to the City a draft agreement for the redemption of shares owned by OEK-Finance company in the Konk company, but it ignored my proposal, and "raider attacks" continued.

4.25   About 20 January 2009 I was invited to the office of DLA Piper company, which provides legal services to the Konk Company, to a workshop on foreclosure upon the shares of the Tribalin Company, and I was surprised to see two lawyers of Kerimov together with Ignatov. Ignatov said that the City is transferring its interest in the Konk Company to Kerimov and that they have already handed over all relevant documentation. When I objected that this violates my priority right and conditions of confidentiality guarantees provided for DA Konk Ignatov said "there's nothing I can do, as these are instructions of Luzhkov and (his wife) Baturina".

4.26   About 23 January 2009 I was invited to the office of Nafta Moskva, the investment structure owned by Kerimov. This meeting was supposed to involve only Kerimov, but in fact it was attended also by Goloschapov, Rotenberg and Ignatov. I was informed that persons present have organized removal of my representative Lapshov from the position of director of DecMos and replaced him with Goarik Kotandzhan (**"Kotandzhan"**), an

---

[24] CE-34.
[25] CE-16; CE-37; CE-40.

employee of Nafta Moskva company owned by Kerimov. This removal was unlawful as there was not convened a meeting of the Board or Directors of the DecMos company with a view to removing Lapshov from his position or appointment of his replacement. Representative of the City Ignatov admonished me against preventing the transfer of shares in the Project to Kerimov and demanded that I should refuse my pre-emptive right to purchase the shares of the City in accordance with DA KONK.

4.27  At this meeting I realized that Rotenberg and Goloschapov helped the City and Kerimov, and acted against my own interests. Goloschapov told me that if I don't agree with Kerimov, Kerimov and the mayor Luzhkov will initiate a criminal case against me. Goloschapov admitted that he has signed the forged minutes of meeting of the Board of Directors of the DecMos Company with the decision to remove Lapshov from his position, and said that he did it to prevent the City and Kerimov "to throw me into prison". Goloschapov told me that Rotenberg had ordered him to sign the minutes of meeting of the Board of Directors of the DecMos Company, so he did it.[26]

4.28  Shortly after this I met Lapshov. Lapshov told me that he was visited by Kotandzhan, an imaginary new CEO of DecMos Company, and several lawyers of Nafta-Moskva Company required him to sign a protocol related to the meeting of the Board of Directors of DecMos Company and stating that he was replaced by Kotandzhan. Lapshov was not informed of the meeting of the Board of Directors and was not present in it as a result (even if it was carried out).

4.29  Lapshov also told me that January 26, 2009 he was contacted by Nazir Khapsirokov, a senior Kremlin official who warned him that if he does not agree with his dismissal and transfer control of the DecMos company to Kerimov, there will be initiated a criminal case against him (Lapshov), Gogokhiya, me and others.

4.30  Once Lapshov was removed from his position as CEO of the DecMos Company, at a meeting held on February 10, 2009 Kerimov demanded me to transfer also the debts to the company implementing the project for free, and said that something will be returned me some day in the future. This meeting was also attended by Yusufov. I asked Yusufov to attend it since I needed some political counterweight.

4.31  Kerimov dictated me a short document at this meeting which terms basically coincided with the terms of the Framework Agreement signed later (see below). Kerimov told me

that everything will be done now this way only. He did not give me a copy of the document dictated by him. My lawyers informed me that Kerimov provided a copy of this document during the proceedings in Cyprus associated with this arbitration.[27]

4.32. Soon after that on February 17, 2009 Kerimov called me to his office again where Yusufov was present too, but he left early. I was with Marina Ris, my lawyer from the company Lovells. After the departure of Yusufov Kerimov told me that he will not allow the participation of Yusufov. Then he gave me a pre-arranged agreement that I should sign **("Framework Agreement").[28]** Framework agreement provided not only for the replacement of OEK-Finance company with Kerimov as my business partner, but also the assignment of all my shares in the Project. The Framework Agreement required that I:

4.32.1  waive my pre-emptive right under DA KONK for the purchase of shares owned by OEK-Finance company in the Konk company and thereby agree to their acquisition by Kerimov;

4.32.2  transfer my 25.5% stake in the DecMos Company to Kerimov;

4.32.3  transfer to the Konk Company the debt on each of the loans provided by my companies to DecMos and Decorum whereupon these companies owed to me more than USD **253** million (together with interest accrued at the time).

4.33. The Framework Agreement stated that I am entitled to purchase 25.5% stake in the DecMos Company and, as a consequence, in the Project sometime in the future. In fact I was asked to give up everything relevant to the Project for the opportunity to get back the 25.5% stake at some unspecified time in the future. But I did not believe that Kerimov intends to do so.

4.34. Marina told me not to sign the Framework Agreement, but Kerimov told her "mind your own affairs, it will be all your fault, you will be in charge" and stated in plain language, that if I do not sign this document and give up my share in the Project, he (together with Luzhkov) will brought a criminal case against me and my family. If one has money and political resources it is very easy to order a criminal case against someone in Russia. Kerimov is certainly a very powerful person, and I knew it was not a blind threat. Once I made some changes allowed by Kerimov, I signed the agreement feeling that I had no

---

[26] CE-86.
[27] CE-87.
[28] CE-17.

choice. There are some handwritten changes in my copy.[29] All of these changes were included in the final agreement held by Kerimov. As far as I know, Yusufov indicated as Investor 3 did not sign this agreement.

4.35 I think that after the meeting held on 17 February the lawyers have sent final papers to the company Lovells at the direction of Kerimov in order that I should signed them. However I refused to do so and started to look for ways of protecting my share in the Project instead of this.

*Game over of corporate raider attack*

4.36 At the end of February 2009 we applied to the court of Cyprus in order to prevent attempts of Kerimov and of the Moscow City Government to take control over Konk by appointing their own directors. Gogokhiya has achieved an adoption by the court of Cyprus of interlocutory injunction prohibiting the removal of our director Demetrios Demetriades from his position in the Board of Directors of Konk[30]. In response to these actions OEK-Finance appealed to the court of London in order to speed up the appointment of its Director.[31] Consideration of both statements was finally discontinued in the light of the recent series of raider attacks on the Project in June 2009 which I will address later. When applying to the Court of Cyprus for an adoption of interlocutory injunction I was hoping to gain time to solve my problem in this way.

4.37 Around the same time I was contacted by Ruslan Baysarov presented to me as representative of Ramzan Kadyrov (**"Kadyrov"**), the President of the Chechen Republic. Kadyrov offered me to buy out the City's shares with him on a partnership basis. I reacted to the proposal of Kadyrov with suspicion but then he told me personally that has ensured the support of Putin, so being in such circumstances I have in principle agreed to accept his offer and to nominate candidates proposed by him to the Board of Directors of the DecMos Company. But later I found out that this scheme was planned by Kerimov and withdrawn promptly those candidates in favor of other candidates.

4.38 At the end of April 2009 the City submitted its proposals for the Directors of the Company, which was another sign of coordination of its actions with Kerimov. Except for Ignatov the City proposed to appoint Kotandzhan, an employee of the Nafta Moskva

---

[29] CE-17.
[30] CE-88.
[31] CE-89.

company linked with Kerimov, who has fraudulently replaced Lapshov in January, along with Irina Pavlikova, the head of the legal department of the Nafta Moskva company[32]. If this had happened it would actually provide Kerimov with full control over the DecMos company and thus over the Project. In addition, Kotandzhan has implemented moving of the DecMos Company and transportation of all its documents to the office of Nafta Moskva located at the Bolshaya Ordynka str. against my will.

4.39   In May 2009 the Moscow City Government applied to the court in order to take control over the share in the Project owned by Decorum (and therefore by me). Charges made by the Moscow City Government consist in the fact that I have violated the provisions of the investment agreement, as the reconstruction of the hotel was not completed in 2006 and Decorum funded the works through loans. These charges are trumped up, as the Moscow City Government was aware of the fact that it had previously approved the later date of the Project completion and, as already indicated above, the conditions of the initial tender and of the investment agreement of 2003 have allowed debt financing. The reason for going to court is the desire to bring pressure on me. In fact, after a raider attack on my share in the Project the court dismissed the charges made by the Moscow City Government as groundless and not conforming to the law.[33]

4.40   In light of these events I knew by the end of May that the raider campaign is nearing completion. Therefore, May 20, 2009 I instructed the director of Decorum Gogokhiya to write a letter to the Chairman of the Investigative Committee of Russia and to let them know that we suffered a corporate raider attack and need their help. I have also written letters to a few other law enforcement agencies. No measure was taken in reply, confirming that an attack had been sanctioned at the highest level.

4.41   The letter of Gogokhiya which we have prepared together says the following (emphasis mine):

> *I think that "unhealthy" and sometimes even criminal situation that is currently developing around an extremely attractive facility in the center of Moscow, the Decorum Company headed by me and around me personally, requires your competent intervention.*
>
> *All the occurring events give me a reason to believe that unscrupulous officials of the Moscow City Government, being in collusion with the owner and employees of commercial company NAFTA-MOSKVA are performing a*

---

[32] CE-109.
[33] CE-46.

*"raider" attack in which preparation the latter are not too nice about the powers and means up to the commission of crimes.*

*From the very beginning of the project the company has constantly faced and is facing problems impeding the construction. For the successful and timely completion of the construction the Deutsche Bank loan funds have been involved. Conditions of raising the loan required a series of standard approvals of the shareholders of DecMos. Planned actions of the officials of the Moscow City Government and systematic breakdown of the Shareholders' Meeting resulted in the announcement of default of the loan granted to DecMos OJSC and early withdrawal of funds by Deutsche Bank.*

*The Moscow City Government has transferred USD 87 million dollars to Deutsche Bank through the controlled city structures by performing this operation as a special-purpose loan of an offshore company "Konk SP Inc." for a period of 3 years (i.e. until 2011).*

*I apply to my statement a copy of "Plan of further implementation of the investment project for reconstruction of hotel "Moscow" which was made available to me, with resolution of Y. M. Luzhkov of August 29, 2008. This is the plan of "raiding" attack, of unscrupulous seizure of another's property designed by NAFTA-MOSKVA and implemented in this January.*

*And thus a series of financial transactions using the budget of the city of Moscow was committed within the implementation of this plan (as I know already) in order to transfer control over implementation of the project for reconstruction of hotel "Moscow" to the "City-friendly structures". Having not received the desired result at the present day, the officials of the Moscow City Government and the owners of NAFTA-MOSKVA initiated pressure on me and my family with the use of corrupt relations in law enforcement agencies.*

*January 23, 2009 at 4:00 p.m. a meeting of the "raider headquarters" was held with the participation of Ignatov, Kotandzhan and others, during which it was announced that DecMos OJSC is completely under their control. It was deemed as meeting of the Board of Directors (which actually was not held actually) for the purpose to change the director.*

*In confirmation of my words I can say that in January 2009 the owners of NAFTA-MOSKVA in collusion with the same officials violating all applicable laws have substituted the CEO of DecMos V. Lapshov with a new director being an employee of NAFTA-MOSKVA Mrs. Kotandzhan G.K. It was she who threatened Lapshov with death from the "paid out" law enforcement agencies. "Raiders" demanded the signing of all documents about changing the director by the latest. Feeling SUCH a pressure not everybody will be able to resist it.*

*In February and April 2009, I have instructed the lawyers to enter into negotiations for the settlement of controversial issues for the Decorum*

22

*Company. Letters (attached) with a proposal to return USD 87 million dollars to the Moscow City Government or to recover the costs of OJSC Decorum (in accordance with the Moscow City Government Decree of 29/04/2003 No. 311-ПП) have been sent. It was done due to the fact that I did not find it possible to continue any partnership relations with these people in this situation. No reply to my proposal was followed, and I appealed to the court to stop cooperation with the Moscow City Government.*

*I have nothing to fear as I have neither stolen anything nor acquired the rights to the property of others. Let be afraid those illegally using the budgets and predatory practices in "raider" takeovers.*

*I will not hold your attention to the detailed descriptions of financial transactions. They are well known to the officials of the Moscow City Government Silkin and Ignatov who have committed this scam.*

*Based on the above I ask for your instructions to make enquiry in accordance with articles 144-145 of the RF CCP and to institute criminal case on the fact of existing crime components under Art. 159 of the RF Criminal Code …"[34]*

4.42   Then Decorum has convened a meeting of shareholders of DecMos on my order for the purpose to replace the board of directors of DecMos. At the shareholders' meeting held on June 3, 2009 the representatives of the City were accompanied by the new registrar of DecMos illegally appointed by an employee of Kerimov Kotandzhan. We refused to accept the "new" registrar and the representatives of the City refused to participate in the meeting. As a result, the meeting was held without the participation of the City and three new candidates have been nominated. After that the Moscow City Government turned to the court with injunction application which was granted and the Court ordered temporary postponement of the appointment of candidates up to examination of the case on its merits.

4.43   June 1, 2009 the Moscow City Government has achieved initiation of criminal case on trumped-up charges that the temporary injunction obtained by Gogokhiya on my order in Cyprus was "an attempt to take over illegally" USD 87 million dollars invested by the Government of Moscow in Konk.[35] *The order on institution of criminal proceedings* states:

*"In fact, Gogokhiya V.G. did not plan to return the money to the Moscow City Government represented by OEK-Finance. The above three contracts have been concluded in order to sale by Gogokhiya V.G. of 50% shares of the Konk Company and, accordingly, of 25.5% shares of DecMos OJSC...*

---

[34] CE-41.
[35] CE-18.

\* \* \*

> *Thus, unidentified persons have misled with fraudulent intent the management of JSC OEK-Finance and the Moscow City Government regarding the sale of 25.5% of shares of DecMos OJSC for USD 87 million dollars and have achieved transferring this amount of money in the Deutsche Bank thus repaying their debt under the loan agreement. 2 shares of the Konk Company have been transferred to a new owner by e-mail and deprived of the right to dispose of these assets within the achieved agreement by challenging shareholders' agreement in the Cyprian court and thus causing the material damage to the Moscow City Government represented by JSC OEK-Finance in the amount of more than USD 87.5 5 million".*

4.44   I have never planned to sale my shares in Konk Company. Even if this had happened, their sale would have no impact on the right OEK-Finance and of the Moscow City Government to get back USD 87.5 million borrowed by the Konk Company (i.e. OEK-Finance would anyway continue to remain a lender of the Konk Company). Nobody has a reason to infer that the decision of the court of Cyprus court has caused *"material damage to the Government of Moscow ... amounting to more than USD 87.5 million".*

4.45   Shortly after the criminal case was initiated Kerimov told me that the investigation was initiated by him and by the City in order to let me understand what they can do. I have no doubt that these charges are the result of manipulation of the criminal justice system by Kerimov, Rotenberg and Luzhkov in their own interests. These false charges were a new attempt to put pressure on my assets in this Project.

4.46   Around the same then I knew that Putin has blessed Kerimov to do everything he deems necessary in order to take over my shares in the hotel. Andrey V. Kisin (**"Kisin"**), an investigator of the Investigative Committee under the Ministry of the Interior (who was investigating the criminal case), told me that the criminal case was opened under the command of Putin.

4.47   Following these events June 8, 2009 I re-wrote Rashid Nurgaliyev, the Minister of the Interior of Russia, regarding our request to respond to ongoing raider capture [36]. In particular, I wrote the following:

> *"June 4, 2009 an electronic version of the newspaper "RBC Daily" has published information about initiation of a criminal case for fraud allegedly associated with financial transactions in the construction of the hotel "Moscow" by the Investigative Committee (IC) under the Ministry of the Interior of the RF this June 1. Thus, with reference to a confidential source in*

*the Ministry of the Interior, the newspaper set forth in detail the merits of the criminal case and mentioned my name.*

*At the same time I was called by a member of the Federation Council (being the owner of Nafta-Moskva) S. Kerimov who has openly announced during this conversation the paid-for character of the criminal case initiated by the Ministry of the Interior and their (his and of the officials of the Moscow City Government) firm intention to take possession of hotel "Moscow".*

***He handed me over a copy of the decision to institute a criminal case and committal for trial warning me at the same time warned that I "should stand aside" from this subject, otherwise I "will be torn by the investigation" which will make searches and other investigative actions in order to compromise me through the mass media.***

*Having read this ruling of June 1, 2009 made by the senior investigator for particularly important cases of the Department for Investigation of organized criminal activities against public safety and interests of civil service of the IC under the Ministry of the Interior of Russia, the Lieutenant Colonel of Justice Kisin A.V., against persons unidentified by investigation which have illegally took possession of USD 87.5 million, I realized that the statement of S. Kerimov is not an "empty phrase" and everything is exactly as he said in a conversation with me.*

*As for the inquiry of deputy and materials of Gogokhiya V.G. shedding light on the subject matter sent to you, these have been not considered at all and of course were not taken into account in deciding whether to initiate the criminal case and determining the subjects of criminal prosecution. I would not be surprised if it turns out in the end that these documents are missed in action.*

***By submitting additional materials published in mass media and received under the indicated circumstances from S. Kerimov I ask you to take investigation of this criminal case under your personal control and at the same time to carry out an official investigation on how the decision to initiate a criminal case by the IC under the Ministry of the Interior of June 1, 2009 could come into the hands of S. Kerimov.***

*Please inform me in detail about the results of the official investigation and, in particular, about verification of the involvement of members of the IC under the Ministry of the Interior in this corrupt transaction for the paid-for initiation of criminal proceedings in the interest of the "raiders".* (bold print as in the original).

4.48 After that, in between June 16 and 23, 2009, Kerimov carried into effect his threats and armed raids were made at "Daev-Plaza", large nine-floor office building, where my office

---

[36] CE-112.

is located[37]. About 10 minibuses with special police squads arrived to the place to do a search: people armed cap-á-pie wearing masks. Dmitriy's, Decorum's, and many other tenants' offices were situated in the building. The offices of private and legal entities, with whom I had no other relations, were also subjected to the search. I was told, that during the search some of my employees, including secretaries, were locked in a cellar. The search purposes were stalking and threat. One of my employees told me, that when the police wanted to open a safe, one of the office workers offered them keys, but a police officer refused to take keys and used a sledge hammer instead. It is not surprising that after these events many of my employees started worrying for their safety.

4.49 On the same day the same raids concerning American law firm White & Case, British law firms DLA Piper and Lovells, which rendered me legal services in connection with the Project were made. The vast number of people, including, the lawyers working in these offices were summoned for questioning to the Investigative Committee. In the course of the search numerous files, including files from computer servers belonging to other clients of the law firms and not having any relation to us were withdrawn. Dmitriy and my brother Artyem were subjected to the most humiliating searches. People broke into their homes despite the protests of their families at 7 o'clock in the morning. All these aimed at one thing - to force me to give up on my share in the Project. It is well-known tactics of corporate raids in Russia. Where rumors and fabricated consequences do not take due effect, frank demonstration of brute force and political power comes.

4.50 On June 24, 2009 mayor Luzhkov approached with personal letter the Prosecutor General of the Russian Federation, in which he raised the question about deprivation me of deputy immunity and institution a criminal case against me on grounds of fabricated data. Among other things mayor Luzhkov writes the following:[38]

> As it turned out from mass media, searches in a number of commercial structures at various objects in Moscow including at "Daev-Plaza" business center were conducted within criminal investigation. According to some mass media, A.G. Egiazaryan, the Deputy of the State Duma of the Russian Federation is the owner of this business center. Separate sources concede that Decorum JSC and Europark Shopping Mall belong to him too. The negotiations with the staff of the Department of property of the city of Moscow concerning repayment of Falmiro company debt were conducted directly by A.G. Egiazaryan.
>
> We consider that already now there are grounds to believe in committing

---

[37] CE-91; CE-92; CE-93; CE-94.
[38] CE-45.

26

*fraud and causing damage to the city by Decorum JSC owner.*

*Therefore, dear Yuriy Yakovlevich, considering the facts of wasting state monetary fund in an especially large amount , its big public uproar, and also the circumstance that the Deputy of the State Duma of the Russian Federation may be implicated in a crime , I would ask you to resolve an issue of submission this case in a criminal proceeding at the Investigative Committee at the Prosecutor General's Office of Russia and to raise a question about deprivation A.G. Egiazaryan of deputy immunity".*

4.51  Approximately at the same time, soon after the searches, Adam Delimkhanov (**"Delimkhanov"**) called me and told that he is going to send his representative Pavel Krotov (**"Krotov"**) to a meeting with me and that I have to do everything that Krotov would tell me. Delimkhanov is the Deputy of the State Duma, but, besides, the United Arab Emirates put him on the international wanted list on charges of contract murder in Dubai shortly before it. [39]

4.52  On June 24, 2009. Krotov told me that Kerimov wants to see me. On the following day Krotov came to me to drive me by his car to the State Duma. Magomed Gadzhiev, the Member of the State Duma and Kerimov's junior business partner waited for us in the street. As well as Delimkhanov, Gadzhiev is a known criminal, who, according to the press, is related to a murder in Dagestan.

4.53  Gadzhiev told us, that the meeting had been moved to the other place. One of four men wearing militia uniform armed with a machine gun ordered me to get into a black armored "Mercedes" with police signal lights on its roof. Krotov got into the car together with me. In response to my question where are we going, he told me, "You will get to know it, when you arrive".

4.54  Eventually, we arrived to Kerimov's office. They took away my watch and telephone. I was searched by armed people. They checked my footwear and applied a liquid unknown to me on my hands and clothes. I still do not know what liquid it was, and I was afraid that they could apply some toxic solution on my hands. I was horrified, but tried to maintain equilibrium. They spoke in a gross manner with me and offended me with humiliating treatment. I had been locked for 12 hours in a tiny room (about 12 sq.m.) under supervision of one person. I was allowed to call nobody. I was not allowed to stand up. I had to ask permission to use the toilet. I started worrying for the safety of my family. I did not know what was going on, I was frightened and afraid that the worst might

happen.

4.54 Kerimov came to the "meeting". He was relentless. The conversation was sharp and aggressive. He told me, that he had gained Putin's approval; and that, in fact, if I did not give up on everything, I would be imprisoned. Kerimov also told that it was not too late to surrender on his conditions, and criminal case would be cleared as soon as I handed over my shares.

4.55 I repeated that it was illegal, and the whole plan was an abuse of power. He told me, that if I did not make Hotel Moscow over to him, sad times would come for my family or for that is left from my family. Kerimov told that if I refused, "they could do with me, Artem, and Dmitriy the same as with Tagirbekov". Kazibek Tagirbekov became famous in business circles by the reason that he refused to give his assets to Kerimov. He was dragged out of hospital bed and imprisoned. Kerimov and Gadzhiev told me that he was raped, and that he eventually agreed to give up his shares to Kerimov. He was "allowed to live" after the imprisonment.

4.57 Kerimov also told that Putin personally approved his actions. Kerimov told that if I give everything to him, he would give me 25% in the Project within the next six months. At that moment I realized I had no choice. I had to accept his conditions and hand over my share in the Project to him. My main goal was to leave that place safe and sound.

4.58 After I agreed, Kerimov asked me, whether someone owed me money relative to this Project. He wanted to receive all the documents concerning Hotel Moscow personally in his hands, every single document. I cautiously stored some of the documents in Italy, and he demanded that my wife Natalia took a flight there to take them away. Kerimov made so that she went there by plane belonging to Baturina, Luzhkov's wife.

4.59 I gave up everything, as I was told, all the companies' corporate documents connected with the Project. Kerimov also demanded that I gave instructions to lift an injunction in Cyprus and gave up to him all the claims under the debt contracts of "Decorum" and "DecMos" before the companies controlled by me. In reply to my protests, that as a result of it I would lose not only the whole Project, but also the funds invested into it, Kerimov wrote by hand a receipt with his initials, but without date, which said that in exchange he would issue a bill to me on behalf of his own companies "till Tuesday".[40]

---

[39] CE-60.
[40] CE-96.

4.60 Kerimov ordered me to come to his office on the next day (i.e. on June 26) while Natalia was in Italy on my assignment. Krotov the authorized representative of Delimkhanov brought me this time. When I arrived, I was forced to take off my shoes. They took away my watch and telephone again. This time I was told that it was made to make sure that I had no microphone and I could not contact anybody. Kerimov came quickly and told me to call using his telephone to my brother Artem, Dmitriy Fitisov, and Gogokhiya and tell them that they had to go to Cyprus to complete transfer of my share in Hotel Moscow Project. He told that if I refused or made any changes, I would be imprisoned less than in a week. Kerimov was in evil mood and was nervous. I did as I was told. Artem and Dmitriy already knew about the situation and were ready to do everything that was necessary. They also were afraid for their safety. I felt it was my fault, but I was bound hand and foot, because Kerimov did not want me to go to Cyprus. After several hours I was told to go home and come back on the next day. Artem and Dmitriy were told to be ready at call. Fortunately, on the next day Natalia safely came back from Italy.

4.61 Kerimov sent Artem and Dmitriy by plane to Cyprus. At the end of the day on June 28 they met Kerimov's lawyers and employees Andrey Romanenko (the City representative) and Artem Obolensky (Rotenberg's and Goloschapov's representative) at the airport; at the same place they got to know that they would go by Baturina's plane. Krotov was sent to Georgia by another plane in order to bring Gogokhiya to Cyprus.

4.62 On Next day, on June 29 before Kerimov learned by phone that transfer took place. I was kept under convoy of armed guards at Kerimov's office at the address B. Ordynka, 40 in Moscow. I was brought there "accompanied" by Gadzhiev under convoy of police armed with machine guns. After Kerimov had received a phone call, I was released and brought home accompanied by a patrol-car and police officers armed with machine guns.

4.63 Later Artem and Dmitriy told me that after arrival to Cyprus at the end of the day on June 28, 2009 all of them were brought to Hilton Hotel in Nicosia according to Kerimov's order. On the next day (i.e. on June 29, 2009) Artem, Dmitriy and Gogokhiya were brought to Demetrios Demetriades's law office, where they were given several legal documents. They were told that the documents had been prepared by Kerimov's lawyers. These documents were signed according to their instruction.

4.64. The following agreements were signed on June 29, 2009:

4.64.1. First of all, I have transferred the ownership rights to 25.5% of shares of the Project to

Kerimov for EUR 5,000. The transfer was based on the sale and purchase agreement of shares of Limerick by and between Dmitriy and Artem on my behalf and Denoro, a shell company, that was controlled by Kerimov as far as I understand. However, even this money in the amount of EUR 5,000 was not paid though Artem and Dmitriy were forced to sign the acknowledgement of receipt of this amount.[41]

4.64.2. Secondly, I have transferred the ownership rights to 50% of shares of Konk to Sparklon Holdings Ltd. ("Sparklon"), a shell company of Rotenberg. The transfer was based on the sale and purchase agreement of shares of Konk dd. June 29, 2009 by and between Gogokhiya on my behalf and Dadlaw Nominees Limited and Sparklon.[42]  As far as I understand, Olpon Investments Limited, the Cyprus company, is the sole shareholder of Sparklon. Olpon Investments Limited belongs to Rotenberg[43]. The "price" of Konk shares amounted to USD 2 but the money was never paid.

4.64.3 Thirdly, I transferred to Kerimov practically all the claims to "Decorum" and "DecMos"[44]. It was reached by signing several assignment agreements of claim under credit contracts, in which the companies belonging to me (i.e. Blidensol and Hackham) acted as alienators in favor of "Denoro".  Long-term bills on behalf of Kerimov's false company Kamenz Trading INC (**"Kamenz"**) were offered in the quality of "compensation". I think these bills are costless.

## 5. Course of events after corporate raid

5.1 In summer 2009, Kerimov invited me several times to different meetings on his yacht. In the shadow of threats and pressure I underwent during raider attack on the Project, and also taking into account that the criminal case was not cleared despite the Project transfer, I did not think I could reject his invitations.

5.2 The first time, along the continuum between July 4 and 9, 2009 Kerimov demanded my appearance at the meeting with the representatives of Strabag Company, the construction contractor. There I had to confirm that I transferred Hotel Moscow Project to Kerimov. It seemed to me that the meeting was arranged by Kerimov to subject Strabag to additional pressure.  Strabag was the creditor of the Project due to unpaid construction works.

---

[41] CE-19; CE-110.
[42] CE-25.
[43] CE-72.
[44] CE-20-CE-24; CE-97; CE-98.

Kerimov's employees, Alexander Ilyichev and Pavel Grachev were also present at that meeting.

5.3 The second time, either on July 20 or 21, 2009 Kerimov tried to arrange a meeting with one more Russian businessman Shalva Chigirinsky (hereinafter **"Chigirinsky"),** with whom he had a conflict. Kerimov demanded my presence thereby to convince Chigirinsky to come to the meeting as far as we are acquaintances. Chigirinsky, nevertheless, did not come, and I left.

5.4 The third time, along the continuum between August 14 and 16, 2009 Kerimov demanded that I came to his yacht to discuss the "conditions" of his participation in "Europark". I thought it would be safer not to refuse to Kerimov and participated in the conversation in hope to play for time.

5.5 During one of these meetings on Kerimov's yacht, he told me that he paid Delimkhanov USD 75 million so that he subjected me to pressure during raider attack on the Project. He also boasted that he paid USD 25 million for police participation in different raids and other actions aimed at stalking. It seemed to me, Kerimov told me that to show the width of the sphere of his influence. The same year some time later, I heard the same from Krotov.

5.6 At the end of summer I continued demanding from Kerimov to give my share in the Project back to me and to clear criminal case against Gogokhiya. In reply Kerimov suggested me to take "Kamenz" bills, which had been specified in the documents signed in Cyprus. After that it became clear to me that the results of raid had been irreversible and I had no chance to restore a single share I was deprived of. But still I continued to insist, as a result, a new series of threats and blackmail began.

5.7 In October, 2009 I was called to criminal investigator Kisin, who told me that in order that criminal case against me and my employees was closed, someone had to take the blame upon him/her, so that it did not look as if the consequence was used only as coercion tool. He suggested making Gogokhiya a whipping boy in exchange for what he would receive conditional sentence. I refused his offer, because Gogokhiya was innocent. Despite my repeated demands that Kerimov kept his promise and cleared criminal case against Gogokhiya the latter was put on the wanted list and the case was simply suspended.

5.8 In November, 2009 Kerimov's lawyers found out that a part of the debt, in which my

companies acted as creditors, was not issued properly at the "transfer", which took place in Cyprus on June 29, 2009 (in a hurry Kerimov's lawyers made a mistake and specified wrong company as the assignor). Kerimov demanded to redraft the agreements and to specify my other company Longlake Holdings Limited as the assignor in the assignment agreements of claim under credit contracts in favor of "Kamenz". Dmitriy and Gogokhiya took the plane to Cyprus again, where the demanded documents of November 17, 2009 were signed. [45]

5.9 In January, 2010 Kerimov's lawyers found one more credit of USD 23 million, which had been missed during the meeting on June 29, 2009, and Kerimov demanded to issue the assignment agreement of claim under that credit contract in favor of one of his companies Monora Limited (**"Monora"**). The cession of these rights was finally drafted on January 28, 2010 by signing assignment agreements between Blidensol and "Monora"[46].

5.10 At the beginning of December 2009, Delimkhanov told me that he wanted to meet me in the Duma. When I came to his office, he called Kerimov and told that we were going to him. We went to Kerimov's office by Delimkhanov's car (armored Mercedes with a flasher) accompanied by a jeep with armed guards. When we arrived, Kerimov told that if refused to accept "Kamenz's" bills, Delimkhanov would do everything that he, Kerimov, would tell him to do. Delimkhanov confirmed it. When I once again refused, Kerimov told that instead of bills or 25% of shares, he would give me USD 50 million. Kerimov told then that 25 million of them would go to him, 10 million - to Krotov, and 8 million more - to police as recovery of expenses connected with initiation and clearing of criminal case. I was told "to think about it". Then we left.

5.11 In January 2010, I started receiving threats of homicide. I received at least three phone calls, one of which I managed to record with the help of my assistant. The first threat was made by telephone. The call came to my cell phone, but at that moment the calls, coming to my cell phone, were readdressed to my secretary, who was in my community liaison office. She took the call and later told me that the one, who had called, demanded that she told me that I removed readdressing and received calls myself. During the second call, my secretary was told to tell me that if I did not leave the Project, I would be taken away to Chechnya, where from I would never come back. There also were other calls with threats to my reception in the State Duma, which were recorded and transferred to the police. I do not know who called, but, knowing the history of my relations with Kerimov and

---

[45] CE-99.
[46] CE-48; CE-49.

Rotenberg, I believe that they stand behind it. I treated those threats very seriously. I took measures to tighten my personal security and the security of my family.

5.12 Once a person with Chechen accent called and cried out to my secretary that if I "do not forget" about Hotel Moscow, they would cut off my head and the heads of the members of my family. I immediately addressed to police, where my evidences were written down and criminal investigation was started on February 9, 2010.[47] The experts involved into the investigation analyzed the telephone conversation record and established authenticity of the audio records and the threat containing in it. The investigation established the fact that there were threats of homicide against me. Among the people, whom I suspected of involvement in threats, I called Kerimov, Delimkhanov, and some other, but the crime investigator advised me not to specify their names in the application and reminded me of businessman Alexander Antonov, who having specified Delimkhanov in similar application, almost died of the assassination attempt made after that.

5.13 At the beginning of February 2010, shortly after I filed the application to police Kerimov asked me about a meeting. Having entered his office, I noticed in amazement the act of the initiation of case proceedings and my application to police at his table. Kerimov used his contacts and received these confidential documents from law enforcement authorities. He told me only one thing: "It is simply that you knew that it would not help you". I have not seen Kerimov any more since that day. Soon after that, the investigation was postponed indefinitely.[48]

5.14 In May 2010, I addressed for legal aid concerning the possibility of filing a suit into the International Courts of Justice. After that I decided to address with injunction application into the court of Cyprus and along with that to file a suit to London Court of International Arbitration . Dmitriy and Artem took a plain to Cyprus to assist with suits preparation. My lawyers told me that Kerimov affirmed that my "delay" with reference to the court testifies that the transfer of my share in the Project to him was implemented lawfully. There is no truth to it at all. As I have already explained, my share passed to Kerimov and Rotenberg as a result of raider attack. The delay, about which he speaks, is the result of that I needed to consider very carefully all the questions, which threatened my wellbeing and the wellbeing of my family before opting for that plan of action, which I have eventually chosen. As it becomes clear thereof, I will touch further, I had to pay dearly for

---

[47] CE-50; CE-52.
[48] CE-100.

the decision to fight for my rights.

5.15 On July 7, 2010 I went to Europe. While I was there, it seemed to me I was watched. After at the end of July, 2010 Kerimov received the letter from my lawyers, in which he was recommended to refrain from alienation of any shares of Hotel Moscow[49] black PR campaign against me began in Russian mass media, including, among other things, the publication of photos, received in the course of surveillance over me while I was on vacation in France.

5.16 On September 1, 2010 a website for black PR http://www.ashotEgiazaryan.com was opened. This website contains slanderous information and was not approved by me. It is obvious that the website content aims at causing damage to my reputation and putting pressure in order to compel me to refuse my claims concerning the Project. Typical examples of "articles" posted on the site include: *"The Deputy of the Duma is suspected of trading in prostitution", "The criminal past of the Deputy of the State Duma Ashot Egiazaryan", "The Deputy of the State Duma hides that he has green card and real estate in the USA", "Trickster with experience", "The Deputy of the State Duma Egiazaryan taints the image of his party: without five minutes American, financial frauds, prostitutes".*[50]

5.17 The growing wave of slanderous messages discrediting me in press and on television is a heavy emotional experience for my wife and children. My children stopped going to school and leaving home, because they were constantly exposed to attacks and were derided by other children. My wife started receiving messages with links to the websites containing slanderous and humiliating materials about me. Unfortunately, the worst might still be ahead.

*Revenge*

5.18 In the shadow of these and other events I decided to go to the USA to spend time with my cousin in Los Angeles and arrived to Los Angeles on September 7, 2010. On September 13 my lawyers in London filed five lawsuits against Kerimov, Rotenberg, the City, and others to the arbitration court. Two days later, on September 15, 2010, my lawyers in Cyprus filed statement about taking urgent provisional measures. The court sustained my

---

[49] CE-101.

statement and rendered prohibition on alienation. The following revenge was violent and cruel.

5.19 First, my 17 years old daughter Anna studied in one class with Kamila Baysarova (**"Kamila"**)**,** the daughter of Ruslan Baysarov (**"Baysarov"**), Delimkhanov's and Kerimov's close friend and partner. Once Kamila came home to us and told that she needs to talk to Anna urgently. Anna agreed to go with her to the restaurant nearby, and Kamila told her that '*I was a bad person'* and that my wife must meet Baysarov *"to solve your father's problems with Kerimov"* till September 22. Later on the same day, my wife went to the Head of the Department of Moscow Police and filed an application, in which she described the event. The investigator wrote down my wife's and daughter's evidences and gave that application to my wife; she brought it home, reprinted, signed and brought printed application back to the investigator[51]. The investigator warned her that it was dangerous for her to leave home.

5.20 I also found out that Kerimov offered my two old friends and business partners Vitaly Smagin and Mikhail Ananyev to work against me. Later they filed applications to police, charging me of multimillion fraud. After that, it became clear to me that sooner or later Kerimov would take measures using these applications and do so that prosecutor's office deprived me of deputy immunity. Then they would be able to bring charges against and arrest me.

5.21 Then Mikhail Prokhorov addressed to one of my lawyers Timophey Gridnev (**"Gridnev"**)**,** the Head of the Moscow College of Advocates Gridnev & Partners. Mikhail Prokhorov, who on an equal basis with Kerimov is the majority shareholder of Polyus Gold, on which, among other, extends the prohibition on alienation, rendered by Cyprian court. Gridnev was told that Kerimov insists on that he refused to render legal services to me. Gridnev apologized, told that he would not be able to represent my interests any more, and advised me another lawyer.

5.22 On October 1 or 2, 2010 I received a phone call from Valery Eponishnikov, alias Walter Weber (**"Weber"**). Weber is close to Prime Minister Putin. Weber told that he needed to meet me to deliver message from Putin. I agreed to meet him in Los Angeles.

5.23 Our meeting took place on October 2, 2010. Weber told me that Putin was concerned that I

---

[50] CE-59.
[51] CE-105

"tell what I know" and I can "create unnecessary scandal before presidential election campaign in Russia". He also told that Putin was disturbed that I would cooperate with American authorities, and he hinted that I could suffer any time irrespective of where I would be.

5.24 Weber also told that the fact that I specified one of Putin's most close friends Rotenberg as accused, was a problem. It was enough to put Putin out of temper and to expose me to danger in case of coming back to Russia. The only thing I could tell in reply was: "What should I do? I was robbed and I want to achieve justice in those courts, where it exists". Weber told that if I would be silent and would refuse charges against Rotenberg, I would be left alone. I did not believe in his promises and gave him no guarantees.

5.25 My meeting with Weber was photographed by private detective employed by Kerimov. It was not accidental. These photos were subsequently attached to judicial materials connected with Kerimov's suit (through "Denoro"), filed by him to federal court of the USA in California, which had been rejected as an attempt to prevent evidence collection on claims in Cyprus. According to their version supervision over me was conducted in order to make sure that I was in the USA for delivering me judicial documents, but the official report of private detective testifies to something else. [52]

5.26 Firstly, supervision over me began on September 13, 2010, that is before I filed suit documents to the court of Cyprus, and less than in a week after my arrival to Los Angeles. Secondly, in the official report the detective told that he watched over me within one and a half months and saw me 43 times. That was more than enough to establish my place of stay. Thirdly, other people, whom I met during that period were also photographed and identified in the photos. That proves that the supervision was aimed at different things.

5.27 I have no words to describe helplessness and alarm I felt in the face of those events. Fear for safety of our children forced me and my wife to make the decision to take all the family out from Russia. Our family departure from Russia was a big problem, because at that moment I thought I could not leave the USA without subjecting myself to risk. My wife and son Stephane had no American visas and validity of American passport of my son George came to its end. My wife had entry visa to Great Britain and we made a very heavy decision for us to leave Stephane (he was only 13 years old) in Russia in order that he waited for his visa while all the other members of my family left to London. We knew that we had no other choice, but I would wish none of parents to get into a situation,

forcing to make the decision I had to make.

5.28 After that decision, at the end of September 2010, my wife and all the children, except Stephane, who stayed in a house near Moscow, left to Great Britain. My son stayed without us for more than a month in the country, which could not ensure 100 percent safety for him and which authorities refused to protect us. We did not sleep at nights, and days passed for me and my wife in constant fear of what could happen. Fortunately, at the end of October 2010, my wife and my son received visas. Natalia came back to Moscow to take Stephane, and other children stayed to wait with my relatives in France. Then all the family took a plane to me to Los Angeles.

*Criminal prosecution*

5.29 During the period between September 24 and October 7, 2010, after less than two weeks after we began the present investigation criminal investigators addressed to me, my brother Artem, Dmitriy, lawyers Ivan Tertychny and Maya Melnikas, the employees of White & Case, and Marina Ris, the employee of Lovells, who rendered me legal assistance in connection with the Project. They have been repeatedly called for "witness testimony" in connection with criminal investigation of the charges against Gogokhiya, which was repeatedly started after more, than a year of silence. During the period between October 8 and 12, 2010 Artem, Dmitriy and me personally received call-up papers for questioning once again.

5.30 Besides, as I expected, in the middle of October 2010, less than in a month after I filed the present suits to the court of arbitration, the Head of Investigative Committee and the representatives of prosecutor's office sent the documents demanding to deprive me of deputy immunity and confirming institution of criminal proceedings against me to the State Duma. [53]

5.31 On November 3, 2010 I was deprived of deputy immunity. In modern history of the State Duma only three persons but me were deprived of deputy immunity. Two of them did not live even a year after that. Delimkhanov searched by the Interpol in connection with murder in the United Arab Emirates[54] is still the deputy of the State Duma. The former employee of KGB Andrey Lugovoy, whom in Great Britain associate with the murder of

---

[52] CE-102.
[53] CE-106; CE-107.
[54] CE-60.

Kremlin opponent Alexander Litvinenko in London, also remains the Deputy of the State Duma and keeps deputy immunity. I have no doubts that the decision to deprive me of deputy immunity could not be made without the personal sanction of Prime Minister Putin, and that his support grows out of Kerimov's and Rotenberg's efforts. It is exclusively politically motivated step aimed at forcing me to refuse from my suits.

5.32 On November 8, 2010, I received the notification that on November 11 I had to come to criminal investigator as "a suspect" for questioning. On the same day, the police armed with machine guns wearing masks broke into my office in Daev-Plaza office center in Moscow and confiscated computers and documents.

5.33 On December 27, 2010, the prosecutor's office issued formal decision about bringing me to responsibility as the accused[55]. All my assets in Russia were seized. I also was put on the federal and international wanted lists in spite of the fact that according to the Russian legislation such measures are allowed only when the location of searched person is unknown (that is not true in my case). The events of the recent period.

5.34 At the beginning of December, 2010 the next series of measures aimed at stalking was taken: searches in eight different places, including my house, the house of Dmitriy's mother, the house of Maksim Klochin's parents (the Director General of Centurion Alliance, which possesses "Europark") were conducted. The search was conducted at Vladimir Kuzmin's (**"Kuzmin"**) place. He is my personal assistant at the State Duma. It happened early in the morning when Kuzmin and his wife were still asleep. Kuzmin and his wife were thrown on the floor under firearms. All this occurred in the face of their child, who was in the same room. The police searched their apartment and confiscated his wife's employee identification. Then Kuzmin was taken away to the investigator for questioning.

5.35 Search was also conducted in the offices in "Europark". The police broke into the building having beaten one of the security guards. I will repeat that the only aim of these searches was stalking and blackmail, instead of aspiration to find any information. A. Krechetov and A. Droganov[56] were in charge of this action. They are infamous with their participation in tax fraud in the matter of "Hermitage" and Sergei Magnitsky's arrest. [57]

---

[55] CE-108
[56] CE-118.
[57] CE-103.

38

5.36 In the course of these events I addressed to American law enforcement agencies to inform
them about the events and to ask their protection. On December 8, 2010, leaving one of
the meetings connected with it, I received text message that the husband of my cousin
Karina *Egiazaryan*, Aslan Aslanbekov (hereinafter **"Aslan"**) was killed. Aslan was a
respectable businessman in the Astrakhan region and held the post of Director General of
one of subsidiaries of Gazprom, the world largest gas holding.

5.37 My relative Suren, who lives in Los Angeles, told me that Aslan talked to him early week
and told about the events in Russia. Aslan called him and told that Kerimov contacted him
on November 28 and suggested "to cooperate" with him against me. Aslan refused and
told Kerimov that he would tell about it to my family. Kerimov told Aslan not to do it. A
week later Aslan's corpse with a gunshot wound of the head was found in his car. [58]

5.38 In the middle of January, 2011 in the shadow of all these events and black PR campaign
launched against me I agreed to give interview to the correspondent of Associated Press
Doug Birch (hereinafter **" Birch "**)[59]. During that interview the correspondent asked,
whether I filed a request on granting political asylum in the USA. Birch addressed for
comments to Kerimov. Less than in a week Birch notified my lawyer that someone named
Petr Zalmayev (hereinafter **"Zalmayev"**) contacted him and told him that two leading
Russian human rights activists Lyudmila Alekseeva (hereinafter **"Alekseeva"**) and Lev
Ponomarev (hereinafter **"Ponomarev"**) sent written request to the Congress of the USA,
in which they asked to influence the State Department and the Department of Public
Safety in view of my deportation from the USA.

5.39 We received the copies of both letters.[60] The letters were written in the purest English
though I was told that neither Ponomarev, nor Alekseeva know English perfectly well.
The letters contain false data about me in spite of the fact that their attributed authors do
not know me personally. They speak about my *"... magnificent life in Beverley-Hills"*,
claim that I have been the business partner of Mayor Luzhkov, hint that my work in the
Committee of the State Duma concerning political regulation of the situation in the
Chechen republic and observance of human rights makes me *"... involved in destructive
events of the second Chechen war"*, try to connect me with *"... Teodoro Nguema Obiang,
the son of the president of Equatorial Guinea infamous with the corruption, who lives in*

---

[58] CE-63.
[59] CE-78.
[60] CE-64; CE-65.

*the neighborhood of Egiazaryan in Beverley-Hills",* and call *"... to pay attention of the representatives of State Department and the Department of Internal Security to the past of Mr. Egiazaryan to check, whether he should continue using the hospitality of the United States".* These letters were written only some days later after Birch tried to contact Kerimov's lawyers to obtain an interview.

5.40 These letters contain false slanderous data, whereas, among other things:

5.40.1 Kerimov was Luzhkov's partner, not me;

5.40.2 The efforts to manage and distribute money for the reconstruction of Chechnya were in the competence of the Ministry of Finance of the Russian Federation, instead of the Committee (in fact, the Commission) of the State Duma mentioned above, and I repeatedly criticized the Ministry for lack of transparency and failures in its work;

5.40.3 I am not acquainted with Teodoro Nguema Obiang and I do not know a house, which might belong to him in Beverley-Hills; and

5.40.4 I have never been involved in human rights violations.

5.41 When Ponomarev and Alekseeva got to know about these discrepancies, their letters had been immediately withdrawn.

5.42 In his second letter Ponomarev wrote that having sent this letter he *"... made a big mistake"* and made *"... apologies for possible deceit".* [61] Alekseeva also withdrew her letter and admitted that she had been misled and she is against my delivery to the Russian authorities, whereas, considering the political status of my opponents, I would not be able to count on non-prejudicial consideration of my case in Russian court. Alekseeva declared that the content of the letter *"... raises her doubts"* and I emphasized that *"the political system in Russia is based upon that all the considerable social and political processes have to be under the control of authorities. As a result, criminal justice system is substantially manipulated, and legal proceedings depend on the authorities".*

## 6. What happened to my share in the Project?

6.1 I know that on December 18, 2009 Goloschapov spoke on behalf of "Decorum" with an official proposal to sell the shares of "DecMos" belonging to "Decorum" to Administrative Department of the President of the Russian Federation approximately for

USD 2 – 2.5 billion. [62]

6.2 As a result of search in the real estate proprietorship register in April, 2010 it was revealed that "DecMos" had eventually approved hotel hypothecation, though earlier Moscow City Government refused to approve hotel use as the subject to mortgage of loans granted by Deutsche Bank. The security interest on the hotel was granted to Kerimov's company "Monora" as the backing of loan agreements, rights to which passed to him from me. Pledge was registered on February 15, 2010. In other words, in the Moscow City Government they rejected the idea of property pledge when I was in the Project, and consented with pleasure to the same proposal from Kerimov. Moreover, they refused to use hotel as the pledge for receiving additional funds for construction, but agreed to pledge it for securing the already obtained loans.

6.3 On May 13, 2010 Federal Antimonopoly Service of the Russian Federation declared that it approved the contemplated sale of 51% of "DecMos" shares belonging to "Decorum" to Lansgrade Holdling Limited (**"Lansgrade"**). According to the data received by our lawyers from the register of Cyprus companies, "Lansgrade's" shareholders are Rotenberg, Gilmutdinova (Goloschapov's wife) and Cyprian company Mebraco Investments Limited, which, as far as I know, is connected with Kerimov[63]. Approximately in August, 2010 the Moscow City Government reported to our lawyers about transferring 49% of the Project shares belonging to the Moscow City Government, OJSC Hotel Company, the Russian company, which 51 percent share is under the control of Kerimov and the Moscow City Government. [64] Both actions prove full implementation of the plan of the Project corporate raid. OJSC Hotel Company is the owner of a number of other expensive hotel complexes, and it is a common knowledge that OJSC Hotel Company bought many of them from the City at the prices much lower than the market.

6.4 My lawyers asked me, what, in my opinion, is the figure of my share in the Project. During the raid attack, I believed and I believe now that when the Project is complete, it quickly and easily will become the most valuable hotel in Russia and one of the most valuable hotels in the world. The history and the world glory of Hotel Moscow, its unique location near Red Square, and the quality, characteristic for five-star Four Seasons hotels, leaves practically no doubts. I do not think that it is possible to make an exact assessment of this

---

[61] CE-68; CE-69.
[62] CE-111.
[63] CE-71.
[64] CE-104.

investment. For someone like me, who intended to be engaged in the Project throughout long time, the cost would be calculated in billions dollars. I think, Goloschapov's proposal mentioned above and one more proposal I know about on hotel purchase for USD 3.8 billion in February, 2009 significantly underestimate its real cost. This is my opinion. If I was not right, I doubt that my share in the Project would have been taken in such a way.

The facts containing in this statement are reliable according to the data available to me and according to my belief.

Signed: /signature/

Date: May 13, 2011