# EXHIBIT 41

Case 2:14-cv-09764-R-PLA Document 229-46 Filed 03/02/20 Page 2 of 106
Case 2:14-cv-09764-R-PLA Document 219-3 Filed 03/11/19 Page 1 of 105 Page ID #:6941
Page ID #:5395

Michael S. Adler, SBN 190119
    madler@ta-llp.com
Joel M. Tantalo, SBN 206096
    jtantalo@ta-llp.com
**TANTALO & ADLER LLP**
1801 Century Park East, Ste. 2400
Los Angeles, CA 90067

Telephone:  (310) 734-8695
Fax:            (310) 734-8696

Attorneys for respondent Ashot Yegiazaryan

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VITALY IVANOVICH SMAGIN<br><br>    Petitioner,<br><br>    v.<br><br>ASHOT YEGIAZARYAN,<br><br>    Respondent. | **CASE NO. 14-cv-09764-R (PLAx)**<br><br>Before the Honorable Manuel L. Real<br>United State District Judge<br><br>**DECLARATION OF ASHOT YEGIAZARYAN IN OPPOSITION TO MOTION FOR A TURNOVER ORDER**<br><br>**Hearing Place:**   Courtroom 880<br>**Hearing Date:**   April 1, 2019<br>**Hearing Time:**   10:00 a.m. |

# <u>DECLARATION OF ASHOT YEGIAZARIAN</u>

I, Ashot Yegiazaryan, do hereby declare as follows:

1.    I am the named respondent in this action. Except as otherwise indicated, I have personal knowledge of the facts declared herein and could and would competently testify thereto in a Court of Law if required to do so. Although English is not my native language, I have had this declaration translated to me and I believe this to be an accurate statement of the facts set forth herein.

## Personal Background and Profession as a Legislator Until 2011

2.    I became involved in Russian government and political activities in the second half of the 1990s. In 1996, I took part in organizing the financing of Boris Yeltsin's ("Yeltsin") presidential campaign. In 1997, I was an advisor for the Russian Central Bank (the Russian equivalent of the U.S. Federal Reserve).

3.    At the time, I also served as an advisor on a pro bono basis for Yuri Maslyukov, the First Deputy Prime Minister.

4.    In 1999, I was elected to the State Duma. I was reelected to the State Duma in 2003 and 2007. During my time as a Deputy of the State Duma, I was appointed to various positions including deputy chairman of the Committee on Budget and Taxes, deputy chairman of the Commission to Promote a Political Settlement and Adherence to Human Rights in the Chechen Republic and a member of the Commission on the State Debt of the Russian Federation.

5.    I began to fall out of political favor around 2005, largely because I was allied with the former Prime Minister Mikhail Kasyanov and my association with him was perceived as a sign of disloyalty.

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO MOTION FOR A TURNOVER ORDER

Case 2:14-cv-09764-RGK-PLA   Document 229-46   Filed 03/02/20   Page 4 of 106
Case 2:14-cv-09764-RGK-PLA   Document 129-3   Filed 03/11/19   Page 3 of 105   Page ID
Page ID #:5943
#:3595

## Investments in Russia and Disputes with Connected Individuals

6.     Although I was a legislator by profession between 1999 and 2010, I did make some investments during that time.  Those investments included at least two real estate projects: the Europark Shopping Center and the Moskva Hotel.

7.     Other investors in the Moskva Hotel included the City of Moscow, Vladimir Putin's long-time judo partner Arkady Rotenberg and Vladimir Putin's former masseuse Konstantin Goloschapov.

8.     After I fell out of political favor with the political authorities in Russia, certain partners pressured me to surrender my investment in the Moskva Hotel.  When I refused to quietly give up my investment, I was subjected to various forms of official and unofficial harassment.  Ultimately, I filed an arbitration award in the London Court of International Arbitration against high-ranking individuals within the Russia government.

## Flight from Russia in the Face of Death Threats

9.     I left Russia in the summer of 2010, in large part because I began receiving threats of reprisal to 'stay away' from the Moskva Hotel Project. I reported these threats to the Russian police but they took no serious action.  This was long before I was named as a suspect in respect to any alleged charges and long before the Russian arrest warrant was issued.  These threats included threats against myself and also my family, such as threats to behead my children.  A family member of mine was killed in Russia in 2010 and I believe it was done to send me a message.

10.     Attached hereto as Exhibit 1 are true and correct copies of reports I filed with the Russian police relating to the threats against myself and my family.

2

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO MOTION FOR A TURNOVER ORDER

Case 2:14-cv-09764-RGK-PLA   Document 229-46   Filed 03/02/20   Page 5 of 106
Case 2:14-cv-09764-RGK-PLA   Document 211-32   Filed 03/11/19   Page 4 of 105   Page ID
Page ID #:6944 #:5366

## Politically-Motivated Arrest Warrant and Trial

11.    While I was in the United States, and after I filed my affirmative claims in London, the Russian authorities in October 2010 took moves to strip me of my parliamentary immunity, summoned me for questioning and placed me on a wanted list.  Placing me on the wanted list was improper, because this may be done only when a person's whereabouts are unknown, whereas I had promptly informed investigators of my address in the United States and my safety concerns about returning to Russia. Investigators dismissed my lawyers' objections out of hand and published a notice through INTERPOL.

12.    Unfortunately, it is my understanding that INTERPOL is little more than a clearing house for arrest and extradition requests from foreign countries, such that it is open to abuse.  As noted in the Economist article attached hereto as Exhibit 2, Russia is particularly notorious for this practice.  In any event, an INTERPOL notice is not evidence of guilt and INTERPOL itself emphasizes that persons subject to INTERPOL notices enjoy a presumption of innocence. I note that the United States has not acted on Russia's request.

13.    I have no confidence in the Russian criminal investigation or my safety if I were to return to Russia.  The Economist article mentioned above refers to the notorious Russian case of Sergei Magnitsky as a particularly acute example of the abuse of Russian criminal proceedings.  That case involves allegations that the Russian officials investigating the case forged documents and stole money from the persons under investigation. After one of the accused's lawyers, Sergei Magnitsky, complained about these abuses, he was thrown in prison where he died; it is alleged that he was subjected to abuse in prison and that is why he died.

14.    The Magnitsky case has been the subject of censure by the European Parliament and the United States Congress, the latter of which imposed sanctions on a number of Russian officials involved in the investigation.

3

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO MOTION FOR A TURNOVER ORDER

15.     No less than seven of the Russian officials involved in my investigation also handled the Magnitsky case, and five of the officials involved in my case (Aleksey Droganov, Victor Grin, Oleg Logunov, Andrei Krechetov and Andrei Strizhov) have been placed under sanctions by the U.S. State Department for their involvement in the Magnitsky case.

16.     In addition to those individuals, other individuals involved in proceedings against me have been identified as connected with the Putin regime in news reports about contacts with the Trump election campaign.  Attached hereto as Exhibit 3 is a true and correct copy of a July 15, 2017 article from the *New York Times* entitled "Soviet Veteran Who Met with Trump Jr. Is a Master of the Dark Arts" reporting on activities of Rinat Akhemtshin on behalf of those connected with the regime.  As reflected in that article, Mr. Akhemtshin assisted others connected with the Putin regime against me.  Likewise, attached hereto as Exhibit 4 is an August 21, 2017 article from the *New York Times* entitled "Lobbyist at Trump Campaign Meeting Has a Web of Russian Connections," explaining that, *inter alia,* Mr. Akhemtshin is suspected in the hacking of my counsel on behalf of Putin-connected parties.

17.     Similarly, attached hereto as Exhibit 8 is an article from the Atlantic Counsel reflecting the Russian government's use of its proceedings to try to manipulate proceedings in the United States.

18.     The passport I had at the time I fled from Russia has expired.  Because of my conflict with the current regime in Russia, I have been unable to get a new passport or other similar travel documents.

19.     Moreover, because of the politically-motivated arrest warrant, the listing on Interpol, and my lack of current documents, I am unable to obtain a personal banking account.  For example, I have tried to open a simple bank account in Los Angeles and been refused on several occasions.

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO  MOTION FOR A TURNOVER ORDER

Case 2:14-cv-09764-R-PLA   Document 229-46   Filed 03/02/20   Page 7 of 106
Case 2:14-cv-09764-R-PLA   Document 213-2   Filed 03/11/19   Page 6 of 105   Page ID
Page ID #:5946
#:5356

## Mr. Smagin Initiated a Freezing Order Against Me in Russia that Secures Hundreds of Millions in Assets

20.     In connection with his claims against me, Mr. Smagin has filed a civil claim within the criminal case against me.  A true and correct copy of that claim (along with an English translation) is attached hereto as Exhibit 5.

21.     During the underlying arbitration in this matter, I was shown pleadings by Mr. Smagin's counsel wherein Mr. Smagin asserted that the purpose of the Russian freeze was to secure any possible recovery in the arbitration.  I understand those pleadings have been previously submitted to this Court, and are being again submitted in this motion as part of the Declaration of Cyrus Benson.

22.     The orders attach at least three significant sets of assets.  The first and most significant set of assets relate to Europark, the Moscow shopping center at the heart of the underlying arbitration in this matter.  In his claims, Mr. Smagin asserted that he had been wrongfully deprived of a 20% interest in Europark.  However, with the Russian Freezing Order, Mr. Smagin has frozen 100% of the assets of Europark and of the company that owns Europark.  In other words, Mr. Smagin has secured property worth 5 times the property underlying his original claim.  Technically, my interest in those properties is only a 50% interest, but even just considering my interest in the Europark shopping center, Mr. Smagin has frozen assets in Russia worth 2.5 times his claim.

23.     The most recent valuation of Europark, presented by Mr. Smagin himself, valued Europark at over $360 million dollars.  As such, the most recent valuation of Europark places my 50% interest – frozen for Mr. Smagin under the Russian Freezing Orders – at over $180 million dollars.

24.     In addition to Europark, I own at least two pieces of real estate in Moscow that have been frozen for Mr. Smagin by the Russian Freezing Orders.  One of those pieces of real property is a sizable piece of property available for development in one

of the most expensive neighborhoods of Moscow on Rublevskoye Shosse.  The property would be appropriate for an apartment complex.  There has not been any recent valuation of this property, but it is certainly worth well over $10 million dollars and could be worth as much as $50 million dollars or more.  This is in addition to the Europark assets mentioned before.

25.    I understand that I have been convicted in absentia by the Russian regime, but that conviction was secured as part of the same politically-motivated process described above.  Moreover, because of the conviction, I have very little expectation that I will ever be able to recover the assets that Mr. Smagin has frozen in Russia.

### Background on the Kerimov Settlement

26.    The funds referred to in this motion as the "Kerimov Settlement" arose out of an arbitration before the London Court of International Arbitration ("LCIA").  This LCIA claim related to the Moskva Hotel.

27.    Mr. Smagin had no involvement in the Moskva Hotel, and my claims against other parties in the Moskva Hotel were independent of Mr. Smagin.  At no time did Mr. Smagin have any rights with respect to the Moskva Hotel.

28.    My LCIA claims relating to the Moskva Hotel were filed before Mr. Smagin filed the underlying arbitration demand in this matter.

29.    I was not the only claimant in the specific arbitration that lead to the Kerimov Settlement.  The May 26, 2015 cover letter reflected that there were in fact five separate claimants including my brother Artem Yegiazaryan.

30.    That specific LCIA arbitration proceeded entirely in London, where myself and my co-claimants were represented by the London offices of Gibson, Dunn & Crutcher.  That arbitration entirely involved matters that occurred in Russia and Europe.

31.    Moreover, the specific arbitration that led to the Kerimov Settlement was actually one of three LCIA arbitrations that I initiated with various other co-claimants

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO MOTION FOR A TURNOVER ORDER

arising out of the Moskva Hotel. Those arbitrations were brought as separate proceedings because the various respondents were parties to different LCIA arbitration agreements and some of those respondents refused to agree to their consolidation in a single LCIA arbitration, which would have otherwise been possible under the LCIA arbitration rules. The different arbitrations also involved different claimants. However, from my perspective, all three arbitrations were a collective undertaking to recover the stolen interests in the Moskva Hotel.

32. I was the lead claimant in all three arbitrations, but I had co-claimants in those arbitrations including not only my brother Artem Yegiazaryan but an individual named Vitaly Gogokhiya.

33. These three LCIA arbitrations over the Moskva Hotel were major undertakings, with legal fees well in excess of ten million dollars. Given that the Russian government (with the cooperation of Mr. Smagin) issued the Russian Freezing Orders soon after we initiated the LCIA arbitrations, almost the entire amount had to be financed through third-party funding.

34. As a result, in 2011, I reached agreements with various parties to assist me in funding and prosecuting those arbitrations (as well as paying my living expenses during the interim). Most significantly, I entered into agreements with two co-claimants (Artem Yegiazaryan and Vitaly Gogokhiya) to help prosecute those arbitrations, as well as an agreement with my cousin Suren Yegiazaryan.

35. The substance of those agreements was that those parties would assist me in prosecuting the arbitrations and would provide funding for such litigation and for my living expenses. In return, I would provide them with a share of any recovery from the Moskva Hotel arbitrations.

36. Attached hereto as Exhibit 6 is true and correct copy of the handwritten 2011 confirmation of the agreement between myself, Artem Yegiazaryan and Suren Yegiazaryan, as well as an English translation of the same.

---

7

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO MOTION FOR A TURNOVER ORDER

37.     Pursuant to these agreements, I received significantly more than ten million dollars worth of funding for the arbitrations at issue.  As of June 2015, when we received the Kerimov Settlement, Suren alone had provided more than $11,491,000 dollars in support under our 2011 agreement, and Artem had provided more than $10,134,000 million dollars.  Since then, they have paid many millions of additional dollars in reliance on our agreement that they would advance funds in return for an interest in any recovery from the Moskva Hotel.

38.     This was entirely speculative on their part, and I would likely have been unable to repay them if we had not been successful in recovering any money in the arbitration.

39.     Eventually, after an LCIA ruling in our favor, the co-claimants and I were able to negotiate a settlement in the Kerimov arbitration that led to the "Kerimov Settlement."  However, while the payment was made in my name as I was the lead claimant, I was obligated at all times to share those funds with Artem, Suren, and Vitaly Gogokhiya.

40.     As reflected in the settlement agreement itself, the Kerimov Settlement payment was made to the London offices of Gibson, Dunn & Crutcher in mid-2015.  Those funds were never received in the United States, but were received by the UK client trust account of the UK office of Gibson, Dunn & Crutcher, the London-based counsel who prosecuted the arbitrations on our behalf.

41.     That settlement was received in London *after* Mr. Smagin had secured his underlying arbitration award, but at a time when the English courts had enjoined any effort by Mr. Smagin to collect on the award in England or Wales.  The settlement was also received before Mr. Smagin had any judgment in this Court, and it was received at a time (as now) when Mr. Smagin had already frozen Europark and other Russian assets sufficient to secure the arbitration award, assuming he was ultimately successful.  As a result, there was no limitation on my ability to receive the award on behalf of

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO  MOTION FOR A TURNOVER ORDER

myself and my co-claimants.

## The Liechtenstein Trust Was Created to House the Funds and Share with The Others Entitled to Share in Funds from the Moskva Hotel

42. At the time they received the initial settlement payment, our London arbitration counsel informed me that the sum was too large for them to maintain in their client trust account for any extended period of time. I was told that we needed to find a place to receive such funds within days or London counsel might return the funds back to the respondents in the arbitration.

43. I tried very hard to find a bank account that would accept these funds in my own name. However, as noted above, my lack of a passport and the fact that Russia had published a red notice against me through Interpol prevented me from being able to open a bank account in the United States. I made various efforts to try to find a bank that would open an account for me, but these were rebuffed by numerous banks throughout the world.

44. Eventually, CTX Treuhand AG, a law firm in Liechtenstein that also provides professional trustees services, proposed a solution. Although they were unable to open a bank account in my name (as they initially sought to do), they found a bank that was willing to take on the funds if the account was under the ultimate control of a trust that would own the funds.

45. At the time we set up the Alpha Trust, I explained to the trustees that I was not the only person with an interest in the funds. In particular, at that time, Artem, Suren, and Vitaly Gogokhiya all had participation interests in those funds.

46. The representatives of CTX Treuhand explained to me that, given the need to set up the documents immediately, we should use a standard form of trust agreement they already had on hand, but that they could promptly amend the trust agreement to reflect the fact that Artem, Suren, and Vitaly Gogokhiya were entitled to benefit from those funds.

47.     Therefore, given the urgency of setting up the Alpha Trust to receive funds from the Gibson, Dunn & Crutcher client trust account in London, that is what we did.  First, we signed the basic document to set up the Alpha Trust and allow it to receive the funds from the London trust account, and shortly thereafter CTX Treuhand amended the Alpha Trust to reflect the fact that Artem, Suren, and Vitaly Gogokhiya were all intended beneficiaries.

48.     This trust structure met two key goals for me.  First, it allowed us to receive the funds from the London client-trust account so they could not be sent back to the respondents in the Kerimov arbitration.  Second, it allowed the parties with an interest in the funds from the Moskva Hotel arbitrations to receive interests.  In fact, payments were made to those parties from the trust in partial consideration of their assistance in the Kerimov litigation.  While Mr. Smagin identifies a number of payments from the Alpha Trust, those payments were all made either (i) to lawyers on the Kerimov litigation, (ii) other counsel for myself in related litigations, (iii) the individuals like those discussed above who had an interest in the Kerimov Award, or (iv) to the trustees or their professionals (*e.g.* their lawyers) for trust expenses.

49.     I did not set up the Alpha Trust to hide anything from Mr. Smagin.  I fully disclosed the existence of the Alpha Trust to Mr. Smagin in my first set of responses to interrogatories as to assets outside of California.

**Facts About the Alpha Trust**

50.     The Alpha Trust is a Liechtenstein Trust, which provides for administration of the trust in the country of Liechtenstein.  True and correct copies of the relevant provisions of the Alpha Trust are attached hereto as Exhibit 7.

51.     Even before Mr. Smagin secured his orders in Liechtenstein attaching my rights there, I did not possess or control the funds in the Alpha Trust.  The terms of the Alpha Trust require the trustees to consider any request from myself or any of the other beneficiaries, but they do not require those trustees to grant such requests merely

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO MOTION FOR A TURNOVER ORDER

because I seek them.

52.     Mr. Smagin previously referred to the fact that I and my wife signed a joint direction seeking a $3 million distribution from the Alpha Trust in the summer of 2016 as evidence that I could direct the trustees to do anything I want.  That is incorrect.  It was my wife's divorce attorneys who insisted on that text, and although I knew I could not compel the trustees, I agreed to sign it in that form to show that I was acting in good faith. The trustees refused to make the payment, however and the payment was not made.  I have reviewed the trust statements from that period (and produced them to Mr. Smagin) and no such $3 million dollar payment was ever made.[1]

53.     Before my rights to the Alpha Trust were frozen by Mr. Smagin in Liechtenstein in November 2016, I was an investment advisor to the Alpha Trust. However, there was a difference between an investment advisor and the investment manager of the Trust.  As an investment advisor, I was allowed to review and comment on the Trust's investments.  In effect, I advised on it.  However, I did not have control over any of the accounts, nor did I have final say about what investment decisions were actually made.  Those rights and responsibilities belonged to the investment advisor to the trust, which I understand to be Alpenrose Wealth Management.

54.     At the moment, pursuant to Liechtenstein orders attaching those rights in favor of Mr. Smagin, I understand that I do not have any ability to receive funds from the Alpha Trust.  I have not requested or received any funds since November 2016. Moreover, if I were to request a disbursement of nearly $93 million dollars, I understand that the Trustees would be forbidden by Liechtenstein court order from

---

[1] I have reviewed all trust statements through the late fall of 2016, at which time Mr. Smagin secured an order in Liechtenstein precluding the trustees from recognizing any right I might have with respect to the Alpha Trust.  I have not seen any statements since that time because the trustees have refused to provide them to me.

11

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO MOTION FOR A TURNOVER ORDER

even considering that request.

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct and that this declaration was executed on March 11, 2019 in Los Angeles County, California.

Ashot Yegiazaryan
(also spelled Ashot Egiazaryan)

DECLARATION OF ASHOT YEGIAZARYAN
IN OPPOSITION TO MOTION FOR A TURNOVER ORDER

Case 2:14-cv-09764-RGK-PLA Document 220-46 Filed 03/02/20 Page 15 of 106
Case 2:14-cv-09764-RGK-PLA Document 2193-22 Filed 03/18/19 Page 14 of 105 Page ID
Page #:5466 #:6954

# Declaration of Ashot Yegiazaryan Exhibit 1

*231037*

П О С Т А Н О В Л Е Н И Е
о возбуждении уголовного дела и принятии его к производству

г. Москва                                      "_09_" _февраля_ 20__

                                                   в _17_ ч. _00_ мин.

        Следователь (дознаватель) _ОД ОВД по Тверскому району г. Москвы_
капитан милиции Гуляева Н.Ю.

        рассмотрев сообщение о преступлении _КУС- 2406 от 09.02.2010 г,_

поступившее _по заявлению,_

                        УСТАНОВИЛ:

        20 января 2010 года примерно в 15 часов 00 минут, неустановленное
дознанием лицо, имея умысел на совершение угрозы убийством в отношении
депутата Государственной Думы РФ Егиазаряна А.Г., осуществило звонок на
абонентский номер рабочего кабинета последнего, расположенного по адресу: г.
Москва, Охотный ряд, д.1, каб №718, и высказало в адрес Егиазаряна А.Г.
угрозы убийством словами «что если он будет лезть в гостиницу «Москва» то
отрежут голову ему и его семье», после этого продолжая свой преступный
умысел, направленный на совершение угрозы убийством осуществило звонки на
вышеуказанный номер 21.01.2010 года и 22.01.2010 года, с угрозами убийства в
адрес последнего словами «что оторвут голову ему и членам его семьи», в связи
с чем данные угрозы Егиазаряном А.Г., были восприняты реально, таким образом
в действиях неустановленного лица усматривается состав преступления
предусмотренный ч.1 ст.119 УК РФ.

        Принимая во внимание, что имеются достаточные данные, указывающие
на признаки преступления_, предусмотренные ____ч.1 ст.119__ УК РФ,
руководствуясь ст. 140, 145, 146 (147), частью первой ст. 156 и частью первой
ст. 157 УПК РФ,

                        ПОСТАНОВИЛ:

        1. Возбудить уголовное дело по признакам преступления,
предусмотренного ____ч.1 ст.119____ УК РФ

        2. Возбудить уголовное дело в отношении _____, в деяниях которого усматриваются
признаки преступления, предусмотренного __ч.1 ст.119__ УК РФ.

        3. Уголовное дело принять к своему производству и приступить к его
расследованию.

        4. Копию настоящего постановления направить прокурору Тверского р-на
г.Москвы

        Следователь (дознаватель)
Копия настоящего постановления направлена прокурору Тверского р-на г. Москвы

        "_09_" _февраля_ 20_10_ г.     в _17_ ч _10_ мин.
О принятом решении сообщено заявителю и лицу, в отношении которого возбуждено уголовное
дело

        Следователь (дознаватель)

*231037*

**ORDER**

**to commence a criminal investigation and allow it to proceed**

City of Moscow                                                          09 February 2010

                                                                                      17 hours 00 mins

     Police captain N.Yu. Gulyayeva, investigator (interrogating officer) of the Investigations Office of the Tverskoy District Department of Internal Affairs of the City of Moscow,
     having examined notification of crime KUS-2406 dated 9/2/2010, which was received according to statements

### HAS ESTABLISHED THAT:

     On 20 January 2010 at about 15:00, an individual unknown to the investigation, having the intent to make a threat of murder with respect to A. G. Egiazaryan, member of the RF State Duma, made a call to the subscriber number in the latter's office, which is located at: 1 Okhotny Ryad, office 718, Moscow, and threatened A. G. Egiazaryan with murder, saying "if he tries to get involved with the Hotel Moscow, they will cut off his and his family's heads," after which, continuing his criminal intent aimed at making a threat of murder, he made calls to the above-mentioned number on 21.01.2010 and 22.01.2010 with threats of murder to the latter, saying "they will tear off his and his family's heads", as a result of which A. G. Yegiazaryan took these threats seriously, and therefore the actions of the undetermined individual have the attributes of the crime specified by art. 119(1) of the RF Criminal Code.
     Considering that there is sufficient data pointing toward attributes of crime stipulated by Art. 119 Section 1 of the Criminal Code of the Russian Federation, and taking guidance from Articles 140, 145, 146 (147), Art. 156(1) and Art. 157(1) of the RF Criminal Procedural Code,

### HAS ORDERED THAT:

     1. A criminal investigation into the indications of a criminal offence under Art. 119(1) of the Criminal Code of the Russian Federation be commenced.
     2. A criminal investigation of the actions which exhibit attributes of a criminal offence under Art. 119(1) of the Criminal Code of the Russian Federation be commenced.
     3. The criminal case proceeds and commences its investigation.
     4. A copy of this order is forwarded to the Prosecutor General of the Tverskoy District of the City of Moscow.

Investigator (interrogating officer)                                    [signature]

     A copy of this order was forwarded to the prosecutor of the Tverskoy district of the City of Moscow on 9 February 2010 at 17:10.

     The applicant and the individual with respect to whom the criminal case is commenced have been notified of the decision made.

Investigator (interrogating officer)                                    [signature]

Приложение 53

**Постановление
о признании потерпевшим**

г. Москва                                                      « 18 » февраля 2010 г.
(место составления)

Следователь (дознаватель) ОД ОВД Тверского р-на г. Москвы
_____ (наименование органа предварительного следствия или дознания,
капитан юстиции Гулчева Н.Ю.
классный чин или звание, фамилия, инициалы следователя (дознавателя)
рассмотрев материалы уголовного дела N 231037,

**установил:**

20 января 2010 года примерно в 15 часов 00 минут, неустановленное
дознанием лицо, имея умысел на совершение угрозы убийством в отношении
депутата Государственной Думы РФ Егиазаряна А.Г., осуществило звонок на
абонентский номер рабочего кабинета последнего, расположенного по адресу:
г. Москва, Охотный ряд, д.1, каб #718, и высказывало в адрес Егиазаряна
А.Г. угрозы убийством словами «что если он будет лезть в гостиницу
«Москва», то отрежут голову ему и его семье», после этого продолжая свой
преступный умысел, направленный на совершение угрозы убийством осуществило
звонки на вышеуказанный номер 21.01.2010 года и 22.01.2010 года, с
угрозами убийства в адрес последнего словами «что оторвут голову ему и
членам его семьи», в связи с чем данные угрозы Егиазаряном А.Г., были
восприняты реально, таким образом в действиях неустановленного лица
усматривается состав преступления предусмотренный ч.1 ст.119 УК РФ.
(излагаются основания признания лица потерпевш__)

На основании изложенного и учитывая, что Егиазаряну Ашоту Геворковичу.
(фамилия, имя, отчество физического лица)

или наименование юридического лица, признаваемого потерпевш__)
причинен моральный ущерб

руководствуясь ст.42 УПК РФ,

**постановил:**

Признать потерпевшим. Егиазаряна Ашота Геворковича
(фамилия, имя, отчество физического лица
либо наименование юридического лица)

по уголовному делу N 231037     о чем объявить ему (ей) под расписку.

Следователь (дознаватель)                    _____
                                                      (подпись)

настоящее постановление мне объявлено " 18 " февраля  2010  г. и одновременно разъяснены права потерпевшего, предусмотренные частью второй ст.42 УПК РФ:

1) знать о предъявленном обвиняемому обвинении;

2) давать показания;

3) отказаться свидетельствовать против самого себя, своего супруга (своей супруги) и других близких родственников, круг которых определен п.4 ст.5 УПК РФ. При согласии дать показания я предупрежден__ о том, что мои показания могут быть использованы в качестве доказательств по уголовному делу, в том числе и в случае моего последующего отказа от этих показаний;

4) представлять доказательства;

5) заявлять ходатайства и отводы;

6) давать показания на родном языке или языке, которым я владею;

7) пользоваться помощью переводчика бесплатно;

8) иметь представителя;

9) участвовать с разрешения следователя или дознавателя в следственных действиях, производимых по моему ходатайству либо ходатайству моего представителя;

10) знакомиться с протоколами следственных действий, произведенных с моим участием, и подавать на них замечания;

11) знакомиться с постановлением о назначении судебной экспертизы и заключением эксперта в случаях, предусмотренных частью второй ст.198 УПК РФ;

12) знакомиться по окончании предварительного расследования со всеми материалами уголовного дела, выписывать из уголовного дела любые сведения и в любом объеме, снимать копии с материалов уголовного дела, в том числе с помощью технических средств. В случае, если в уголовном деле участвует несколько потерпевших, я вправе знакомиться с теми материалами уголовного дела, которые касаются вреда, причиненного лично мне;

13) получать копии постановлений о возбуждении уголовного дела, признании меня потерпевш__ или об отказе в этом, о прекращении уголовного дела, приостановлении производства по уголовному делу, а также копии приговора суда первой инстанции, решений судов апелляционной и кассационной инстанций;

14) участвовать в судебном разбирательстве уголовного дела в судах первой, второй и надзорной инстанций;

15) выступать в судебных прениях;

16) поддерживать обвинение;

17) знакомиться с протоколом судебного заседания и подавать на него замечания;

18) приносить жалобы на действия (бездействие) и решения дознавателя, следователя, прокурора и суда;

19) обжаловать приговор, определение, постановление суда;

20) знать о принесенных по уголовному делу жалобах и представлениях и подавать на них возражения;

21) ходатайствовать о применении мер безопасности в соответствии с частью третьей ст.11 УПК РФ;

22) осуществлять иные полномочия, предусмотренные УПК РФ.

Потерпевший _____  _____ (подпись)

Постановление объявил и права разъяснил
следователь (дознаватель)  _____ (подпись)

Копию настоящего постановления получил__  " 18 " февраля 2010 г.

_____ (подпись потерпевшего)

Appendix 53

Order to
Acknowledge an Aggrieved Party

Moscow                                                                    18 February 2010
(prepared at)

    Police Captain N. Yu. Gulyayeva, investigator (interrogating officer) of the Investigations
Office of the Tverskoy District Internal Affairs Department, City of Moscow,
               (classification or title, last name, and initials of investigator (interrogating officer))

having reviewed the files of criminal case No. 231037,

**established that**

    On 20 January 2010 at about 3:00 p.m., an individual unknown to the investigation, having the
intent to make a threat of murder with respect to A. G. Egiazaryan, member of the RF State Duma,
made a call to the subscriber number in the latter's office, which is located at: 1 Okhotny Ryad, office
718, Moscow, and threatened A. G. Egiazaryan with murder, saying "if he tries to get involved with
the Hotel Moscow, they will cut off his and his family's heads," after which, continuing his criminal
intent aimed at making a threat of murder, he made calls to the aforenamed number on 21/01/2010
and 22/01/2010 with threats of murder to the latter, saying "they will tear off his and his family's
heads," as a result of which A. G. Yegiazaryan took these threats seriously, and therefore the actions
of the undetermined individual have the attributes of the crime specified by art. 119(1) of the RF
Criminal Code.
               (state the basis for deeming the person an aggrieved party)

On the basis of the above and given that Ashot Gevorkovich Egiazaryan
                               (last name, first name, patronymic of the individual

                    or name of the legal entity deemed the aggrieved party)

suffered emotional distress,

taking guidance from art. 42 of the RF Code of Criminal Procedure,

**ordered that:**

    Ashot Gevorkovich Egiazaryan be deemed an aggrieved party
           (last name, first name, patronymic of the individual or name of the legal entity)

under criminal case No. 231037, of which he (she) shall be notified and sign the notification form.

Investigator (Interrogating Officer)                    [signature]
                                                (signature)

This order was announced to me on 18 February 2010 and the rights of the aggrieved party specified by art. 42(2) of the RF Code of Criminal Procedure were explained at the same time as follows:

      1) know the indictment against the accused;

      2) give testimony;

      3) refuse to testify against myself, my wife (husband), and other close relatives as defined by art. 5(4) of the RF Code of Criminal Procedure. If I agree to testify, I have been warned that my testimony may be used as evidence in a criminal case, including if I later repudiate that testimony;

      4) enter evidence;

      5) enter motions and challenges;

      6) testify in my native language or a language in which I am proficient;

      7) use the services of an interpreter at no charge;

      8) have counsel;

      9) participate, with the permission of the investigator or interrogating officer, in investigative actions carried out on the basis of my motion or the motion of my counsel;

      10) review the records of investigative actions taken with my participation and comment those;

      11) review the order requesting forensic review and expert opinion in cases specified by art. 198 of the RF Code of Criminal Procedure;

      12) review all criminal case files upon conclusion of the preliminary investigation, copy out any information in any amount from the criminal case, and make copies of criminal case files, including using equipment. If several aggrieved parties are involved in the criminal case, I am entitled to review the criminal case files that pertain to the harm done to me personally;

      13) obtain copies of orders initiating a criminal case, deeming me aggrieved or refusing to do so, closing the criminal case, and suspending the criminal case, and copies of the lower court's verdict and of rulings of appeal and cassation courts;

      14) participate in the trial of the criminal case in courts of the first, second and supervisory levels;

      15) present pleadings;

      16) support the indictment;

      17) review the transcript of the court session and comment on it;

      18) appeal the actions (inaction) and decisions of the interrogating officer, investigator, prosecutor or court;

      19) appeal a verdict, judgment or determination of a court;

      20) learn of appeals and propositions entered in the criminal case and make objections to those;

      21) petition for protection pursuant to art. 11(3) of the RF Code of Criminal Procedure;

      22) exercise other authority specified by the RF Code of Criminal Procedure.

| | |
|---|---|
| Aggrieved party | ✓[signature] _____ |
| | (signature) |
| The investigator (interrogating officer) who read the order and explained the rights | ✓[signature] _____ |
| | (signature) |
| I have received a copy of this order | 18 February 2010 |
| | ✓[signature] _____ |
| | (signature of the aggrieved party) |

Case 2:14-cv-09764-RGK-PLA Document 226-46 Filed 03/02/20 Page 22 of 106
Case 2:14-cv-09764-RGK-PLA Document 219-3 Filed 03/11/19 Page 21 of 105 Page ID
Page ID #:15961
#:7415

# Declaration of
# Ashot Yegiazaryan
# Exhibit 2



## Abusing Interpol
# Rogue states

### Cross-border policing can be political

Nov 16th 2013 |  From the print edition

FOUR years ago this week the whistle-blowing accountant Sergei Magnitsky died in jail from beatings and abuse, having uncovered a $230m fraud against the Russian state. His client Bill Browder, a London-based financier, has been campaigning to punish those responsible with visa bans and asset freezes. But the Russian authorities have retaliated and are trying to extradite him on fraud charges, using Interpol, the world police co-operation body.

No Western country is likely to send Mr Browder to Moscow. But his travel plans are stymied by the risk of arrest . He had to cancel a visit to Sweden last month to talk to a parliamentary committee. Only after weeks of lobbying did the country's police remove Mr Browder from their database. Germany, France and Britain have also publicly snubbed Russia's request.

Interpol notes that its constitution prohibits "activities of a political, military, religious or racial character"; governments are not supposed to use it to settle scores with their opponents. Nevertheless its "Red Notices", which seek the discovery and arrest of wanted persons for extradition, are open to abuse. Once issued, a Red Notice encourages—though it does not oblige—190 countries to detain the person named. 8,136 were given out last year, an increase of 160% since 2008. Interpol insists that it is not a judicial body: "queries" concerning allegations are "a matter for the relevant national authorities to address".

But Mr Browder's case is just one of many arousing controversy. Three years ago Algeria issued a Red Notice against Henk Tepper, a Canadian potato farmer, in a row involving export paperwork and suspect spuds. He was released in March after a year in a Lebanese jail and wants to sue the Canadian government for not protecting his rights. Interpol took 18 months to accept that the Red Notice issued against Patricia Poleo, a Venezuelan investigative journalist, by her government was politically motivated. Indonesia pursued Benny Wenda, a West Papuan tribal leader who ended up marooned in Britain; Belarus hounded an opposition leader, Ales Michalevic, when he fled to Poland.

Russia seems particularly fond of the tactic. It has targeted political refugees, such as Petr Silaev, an environmental protester, and Anastasia Rybachenko, a student activist now stranded in Estonia. She says Interpol is being used to "undermine democracy". During

recent elections in Estonia, Russia also reissued a Red Notice for Eerik-Niiles Kross, a politician and former spymaster who has long been a Kremlin bugbear.

Fair Trials International, a campaigning group, wants Interpol to have greater powers to vet "abusive, incomplete or inaccurate" arrest requests before they are sent to police forces around the globe. Though all Red Notices are issued to law-enforcement agencies, fewer than half are then made public. That makes it hard to challenge them in advance, or to prepare a defence in the event of a surprise arrest at a foreign airport. Fair Trials also wants an independent body to hear appeals instead of the Commission for the Control of Interpol's Files, which it says is too secretive.

Billy Hawkes, the commission's chairman, says its decisions in individual cases are formally only recommendations to Interpol's General Secretariat. He admits that aspects of its activities are "unsatisfactory", but argues that for a possible innocent person, having a Red Notice spread over the internet would be worse than issuing it in secret.

Dominic Raab, a British MP, worries that diplomatic expediency is compromising citizens' rights. Ken-Marti Vaher, Estonia's interior minister, decries requests of "a dubious nature" made to Interpol, and points out that Russia has failed to accept any of his country's offers to help investigations concerning Mr Kross. Mark Stephens, a British lawyer, says few governments are protesting about abuse because no one wants to be seen taking the side of criminals. At present, he says, challenging Red Notices is like a "game of battleships": the defence is shooting in the dark, unaware of the size and scope of the target.

 From the print edition: International

## Notices

INTERPOL Notices are international requests for cooperation or alerts allowing police in member countries to share critical crime-related information.

Notices are published by INTERPOL's General Secretariat at the request of National Central Bureaus (NCBs) and authorized entities, and can be published in any of the Organization's official languages: Arabic, English, French and Spanish.

In the case of Red Notices, the persons concerned are wanted by national jurisdictions for prosecution or to serve a sentence based on an arrest warrant or court decision. INTERPOL's role is to assist the national police forces in identifying and locating these persons with a view to their arrest and extradition or similar lawful action.

In addition, Notices are used by the United Nations, International Criminal Tribunals and the International Criminal Court to seek persons wanted for committing crimes within their jurisdiction, notably genocide, war crimes, and crimes against humanity.

### Types of Notice

 **Red Notice**
To seek the location and arrest of wanted persons with a view to extradition or similar lawful action.

 **Yellow Notice**
To help locate missing persons, often minors, or to help identify persons who are unable to identify themselves.

 **Blue Notice**
To collect additional information about a person's identity, location or activities in relation to a crime.

 **Black Notice**
To seek information on unidentified bodies.

 **Green Notice**
To provide warnings and intelligence about persons who have committed criminal offences and are likely to repeat these crimes in other countries.

 **Orange Notice**
To warn of an event, a person, an object or a process representing a serious and imminent threat to public safety.

 **INTERPOL–United Nations Security Council Special Notice**
Issued for groups and individuals who are the targets of UN Security Council Sanctions Committees.

 **Purple Notice**
To seek or provide information on modi operandi, objects, devices and concealment methods used by criminals.

### Publication

Only those notices approved for public dissemination appear on this website (the full list of Notices is available to authorized users via INTERPOL's Information System).

Any individual who is subject to an INTERPOL Notice should be considered innocent until proven guilty.

Any unauthorized alteration of any portion of any INTERPOL Notice is considered as a violation and subject to legal prosecution.

### Legal basis

A Notice is published only if it fulfils all conditions for processing the information. For example, a Notice will not be published if it violates Article 3 of the INTERPOL Constitution, which forbids the Organization from undertaking any intervention or activities of a political, military, religious or racial character.

Notices are processed in line with INTERPOL's Rules on the Processing of Data, which ensure the legality and quality of information, and the protection of personal data.

The legal basis for a Red Notice is an arrest warrant or court order issued by the judicial authorities in the country concerned. Many of INTERPOL's member countries consider a Red Notice to be a valid request for provisional arrest.

Furthermore, INTERPOL is recognized as an official channel for transmitting requests for provisional arrest in a number of bilateral and multilateral extradition treaties, including the European Convention on Extradition, the Economic Community of West African States (ECOWAS) Convention on Extradition, and the United Nations Model Treaty on Extradition.

### Diffusions

Similar to the Notice is another request for cooperation or alert mechanism known as a 'diffusion'. This is less formal than a notice but is also used to request the arrest or location of an individual or additional information in relation to a police investigation. A diffusion is circulated directly by an NCB to the member countries of their choice, or to the entire INTERPOL membership and is simultaneously recorded in INTERPOL's Information System.

© INTERPOL 2015. All rights reserved.

Case 2:14-cv-09764-RGK-PLA   Document 229-46   Filed 03/02/20   Page 26 of 106
Case 2:14-cv-09764-R-PLA   Document 219-3   Filed 03/11/19   Page 25 of 105   Page ID
Page ID #:6965
#:4717

# Declaration of Ashot Yegiazaryan Exhibit 3

**The New York Times** | https://nyti.ms/2umhfmj

EUROPE

# Soviet Veteran Who Met With Trump Jr. Is a Master of the Dark Arts

By ANDREW HIGGINS and ANDREW E. KRAMER    JULY 15, 2017

MOSCOW — Rinat Akhmetshin, the Russian-American lobbyist who met with Donald Trump Jr. at Trump Tower in June 2016, had one consistent message for the journalists who met him over the years at the luxury hotels where he stayed in Moscow, London and Paris, or at his home on a leafy street in Washington: Never use email to convey information that needed to be kept secret.

While not, he insisted, an expert in the technical aspects of hacking nor, a spy, Mr. Akhmetshin talked openly about how he had worked with a counterintelligence unit while serving with the Red Army after its 1979 invasion of Afghanistan and how easy it was to find tech-savvy professionals ready and able to plunder just about any email account.

A journalist who visited his home was given a thumb drive containing emails that had apparently been stolen by hackers working for one of his clients.

On another occasion, at a meeting with a New York Times reporter at the Ararat Park Hyatt hotel in Moscow, Mr. Akhmetshin, by then an American citizen, informed the journalist he had recently been reading one of his emails: a note sent by the reporter to a Russian-American defense lawyer who had once worked for Mikhail Khodorkovsky, the anti-Kremlin oligarch.

In that instance, the reporter's email had become public as part of a lawsuit. But the episode suggests Mr. Akhmetshin's professional focus in the decades since he immigrated to the United States — and the experience that he brought to a meeting last June in New York with President Trump's oldest son, Donald Trump Jr., his son-in-law, Jared Kushner, and the then-head of the Trump presidential campaign, Paul J. Manafort.

The meeting was arranged on the claim that a Russian lawyer, Natalia Veselnitskaya, would provide dirt on Hillary Clinton, though in the end, Mr. Trump and his son have insisted, neither Mr. Akhmetshin nor Ms. Veselnitskaya provided anything of value.

But Mr. Akhmetshin, a gregarious, fast-talking man with a sharp sense of humor, was a skilled practitioner in the muscular Russian version of what in American politics is known as opposition research. From his base in Washington, Mr. Akhmetshin has been hired by an ever-changing roster of clients, often Russians, to burnish their image and blacken those of their rivals. Some clients were close to the Kremlin. Others were its bitter foes.

Mr. Akhmetshin often warned his friends and contacts: "Nothing is secure." It was a conviction that emerged from the chaotic and often violent corporate battles that convulsed Russia in the 1990s, when "chyorny P.R." or "black public relations" based on stolen or fabricated documents became a powerful weapon for businessmen seeking to damage their rivals without resorting to physical threats, another frequently used tool.

The practice was rooted in the Soviet techniques of "kompromat," the collection of compromising information by the K.G.B. against foes of the Communist Party, but reached its full flowering after the 1991 collapse of Communism and the privatization of the dark arts formerly dominated by the K.G.B.

Instead of simply examining old media reports, court records and other public documents to try to dig up dirt or embarrassing gossip, Russian-style "chyorny P.R." has often focused on pilfering private information through hacking and physical intrusion into offices and filing cabinets.

In his own investigations over the years, Mr. Akhmetshin has acquired a reputation for obtaining email records, information from spyware and other data that appeared to be drawn from Russian hackers.

He has denied that, insisting that he conducted research for his clients and relayed accurate information to the press. A 2011 case illustrates his style.

Andrey Vavilov, a former Russian deputy finance minister and owner of an oil company, hired him to discredit a longtime adversary, a former Russian lawmaker named Ashot Egiazaryan. Mr. Vavilov had learned that Mr. Egiazaryan was seeking political asylum in the United States, and was "disgusted by this," Mr. Akhmetshin later said in a court deposition.

At the time, Mr. Akhmetshin was described as the Washington director of a pro-democracy think tank called the International Eurasian Institute, although United States corporation records show it had been dissolved two years earlier for failure to pay taxes. He was also lobbying against the Magnitsky Act, the law which bars Russian officials suspected of human rights abuses from entering the United States.

In a defamation lawsuit later brought by Mr. Egiazaryan in a New York federal court, Mr. Akhmetshin testified that Mr. Vavilov invited him to his home in Moscow to discuss how to derail his enemy's asylum application. "He had some cash around the house," Mr. Akhmetshin testified. "I remember there was money in like $100 bills bags."

He said Mr. Vavilov, who had been dogged for years in Russia by accusations of corruption, handed him a total of $70,000 to $80,000 in cash. That was the start of a concerted campaign to portray Mr. Egiazaryan as an anti-Semite in the news media and to Jewish organizations that then opposed his asylum application. "I met with people in Russia. I met with people in Washington D.C.," Mr. Akhmetshin testified. Mr. Egiazaryan remains in the United States, but his lawyer would not comment on his asylum status.

There is no evidence that Mr. Akhmetshin's efforts on behalf of any of his clients, whether they had close or hostile relations with the Kremlin, were illegal. Nor is there evidence that he personally engaged in the technical aspects of hacking

himself. But a 2015 lawsuit filed in a New York State court put forward detailed allegations.

An international mining company controlled by a trio of flamboyant millionaires from Kazakhstan sued in a New York State court, accusing Mr. Akhmetshin of orchestrating a hacking campaign against their company to benefit a rival Russian tycoon, Andrey Melnichenko. Each side of the dispute is known for aggressive business practices and lavish excesses.

Court papers filed in November 2015 on behalf of the Kazakhs' company, International Mineral Resources, or I.M.R., described Mr. Akhmetshin as "a former Soviet military counterintelligence officer who moved to Washington, D.C. to become a lobbyist" and "developed a special expertise in running negative public relations campaigns."

Mr. Akhmetshin has called this characterization misleading. He was, he said, drafted as a young man to serve in a military unit performing counterintelligence functions during the Soviet-Afghan war. As an enlisted man, he said, he never received any training in "negative public relations."

The suit alleged that Mr. Akhmetshin was retained by EuroChem VolgaKaliy, a Russian potassium mining company controlled by Mr. Melnichenko, which was involved in a $1 billion litigation with I.M.R. The suit also names as a defendant Salisbury & Ryan, a New York law firm representing EuroChem.

The lawsuit alleged that Mr. Akhmetshin was hired to hack into the computer systems of I.M.R. and had stolen about 28,000 files, or about 50 gigabytes of data. It said the sensitive material was then distributed to journalists and others in an effort to harm the company's reputation.

The suit claims that Mr. Akhmetshin stole passport information, emails and personal contact lists for executives within I.M.R., along with bank account information; loan agreements; business strategy documents; board meeting minutes; drafts of market-sensitive documents; and financial forecasts and projections for the company.

An investigator for I.M.R. reported personally witnessing and overhearing a conversation at a London coffee shop during which Mr. Akhmetshin handed someone an external hard drive that Mr. Akhmetshin described as containing files obtained from I.M.R. computers, according to the lawsuit.

The lawsuit was withdrawn in 2016, and Mr. Melnichenko denied all the allegations in it.

Mr. Akhmetshin has denied that he hacked the company's computers.

An early client of Mr. Akhmetshin's was an opposition leader from Kazakhstan who, from self-imposed exile in the West, was waging a lonely campaign against one of Mr. Putin's closest allies, the president of Kazakhstan, Nursultan Nazarbayev.

And in neighboring Kyrgyzstan, he helped to unravel a brazen corruption scheme by a former pro-Kremlin leader and his family that had been cheating the population, poor already, out of millions of dollars.

On other occasions, however, Mr. Akhmetshin worked on causes that clearly benefited the Kremlin, like a long-running campaign by Ms. Veselnitskaya to get Congress to repeal legislation imposing sanctions on Russian officials suspected of corruption and involvement in the death of Sergei L. Magnitsky, a Russian accountant who died in a Moscow jail in 2009.

Mr. Akhmetshin had also at times been in touch with Russian government officials, court records show.

In 2010, he submitted an op-ed column to The Washington Times on behalf of Viktor Ivanov, then the director of Russia's anti-narcotics police, according to one of Mr. Akhmetshin's own emails, subpoenaed as evidence in a case in the Southern District of New York. Mr. Ivanov is a longtime veteran of Russia's security services.

Mr. Akhmetshin has spoken openly about his service in the Soviet military in Afghanistan, and his current work throughout Russia and Central Asia.

Once, a reporter arrived for a meeting at a coffee shop in Moscow with Mr. Akhmetshin and peered around the room, trying to see where he was sitting.

Mr. Akhmetshin had come in with what amounted to a disguise: He sat smiling at a table, wearing a hat resembling a skull cap and his beard grown to an impressive length. He was headed next, he said, on an assignment to Afghanistan and had assumed the appearance of an Afghan elder.

David D. Kirkpatrick contributed reporting from Cambridge, Britain, Sharon LaFraniere from Washington and Bryant Rousseau from New York.

A version of this article appears in print on July 16, 2017, on Page A1 of the New York edition with the headline: In the Room, A Practitioner In Dark Arts.

© 2017 The New York Times Company

# Declaration of
# Ashot Yegiazaryan
# Exhibit 4

**The New York Times** | https://nyti.ms/2vgaNd2

**U.S.**

# Lobbyist at Trump Campaign Meeting Has a Web of Russian Connections

By SHARON LaFRANIERE, DAVID D. KIRKPATRICK and KENNETH P. VOGEL   AUG. 21, 2017

WASHINGTON — Rinat Akhmetshin, a Russian immigrant who met last summer with senior Trump campaign officials, has often struck colleagues as a classic Washington mercenary — loyal to his wife, his daughter and his bank account. He avoided work that would antagonize Moscow, they suggested, only because he profited from his reputation as a man with valuable connections there.

But interviews with his associates and documents reviewed by The New York Times indicate that Mr. Akhmetshin, who is under scrutiny by the special counsel Robert S. Mueller III, has much deeper ties to the Russian government and Kremlin-backed oligarchs than previously known.

He has an association with a former deputy head of a Russian spy service, the F.S.B., and a history of working for close allies of President Vladimir V. Putin. Twice, he has worked on legal battles for Russian tycoons whose opponents suffered sophisticated hacking attacks, arousing allegations of computer espionage. He helped federal prosecutors bring corruption charges against an American businessman in the former Soviet Union who turned out to be working for the C.I.A.

He also helped expose possible corruption in government contracting that complicated American efforts to keep troops at an air base in Kyrgyzstan — an American presence that the Russians fiercely opposed.

In short, Mr. Akhmetshin's projects over two decades in Washington routinely advanced the Kremlin's interests, especially after he became an American citizen in 2009. American counterintelligence agents took notice of his activities, but drew no conclusions about where his allegiances lay, according to a former law enforcement official who spoke on condition of anonymity, citing government secrecy rules.

Mr. Akhmetshin's meeting with Trump campaign officials is of keen interest to Mr. Mueller, who is investigating the Kremlin's efforts to interfere in the 2016 election. Of all the visitors who attended the June 2016 session at the Trump Tower, he appears to have the most direct ties to Russian intelligence. The session was arranged by a Russian businessman close to Mr. Putin whose emissary promised damaging information about Hillary Clinton as "part of Russia and its government's support for Mr. Trump."

Mr. Akhmetshin, who did not respond to repeated requests to be interviewed for this article, has said he was a last-minute guest at an inconsequential get-together. Trump campaign officials have dismissed the meeting as part of an effort to amend an American law that placed sanctions on Russians for human rights abuses. The 2012 law, known as the Magnitsky Act, infuriated Mr. Putin, whose government retaliated by restricting adoptions of Russian children by Americans.

Ronald J. McNamara, a former staff member of the United States Commission on Security and Cooperation in Europe who met with Mr. Akhmetshin about Central Asian issues, said Mr. Akhmetshin openly alluded to involvement with Russian intelligence. "My understanding was that he had come from the security agencies in the Soviet Union-Russian Federation," Mr. McNamara said. "He did not make it a secret."

Mr. Akhmetshin, 49, said he is no Russian spy. "I am the target of a well-coordinated and financed smear campaign," he said last month in a text message to The Times.

Keenly intelligent, relentlessly charming and assiduously opaque about his work, Mr. Akhmetshin sometimes referred to his contacts by pseudonyms and collected his salary in stacks of hundred-dollar bills. A trained biochemist who speaks four languages, he described himself on one official document as a "househusband. " He identified himself as the head of a Washington think tank for years after it was officially dissolved.

"I think he works for us. I don't think he works for them," said Lanny Wiles, a veteran Republican political operative who has worked with Mr. Akhmetshin for more than 15 years. "But I don't know what he really does."

## Rise of an Influence Peddler

Born in Kazan, Russia, about 500 miles east of Moscow, Rinat Rafkatovitch Akhmetshin was drafted at age 18 into the Soviet army's war against Afghanistan. He served from 1986 to 1988 and again in 1991. He described himself on his visa application for the United States as a sergeant who rose to the rank of lieutenant in the military police, specializing in communications. He told some journalists that he worked with a military counterintelligence unit, but said he never joined Russian intelligence services — unlike his father, sister and godfather.

In 1992 he graduated with honors from Kazan Federal University, and two years later arrived in Washington as a graduate student in chemistry at the Catholic University of America. He married a fellow Russian chemistry student and received his Ph.D. But he immediately abandoned his esoteric study of mechanistic enzymes and burrowed into Washington's foreign lobbying scene, promoting clients from Russia and former Soviet states.

He never formally studied English, he said, or owned a car: He pedaled about Washington on a bright orange bicycle. But he was witty and erudite, a lover of literature, opera and snowboarding. Matthew Bryza, a former staff member in charge of Central Asia issues at the National Security Council under President George W. Bush, remembers Mr. Akhmetshin as "very smart, slick guy" serving as "the paid drone of unsavory, out-of-fashion former Soviet leaders looking to launder their reputations."

"He would boast about ties and experience in Soviet intelligence and counterintelligence to give himself some cachet and make himself a mystery man," he said.

Mr. Akhmetshin's gateway to Washington was Edward Lieberman, a lawyer with corporate and political clients in former Soviet countries who was married to President Bill Clinton's former deputy chief of staff, Evelyn S. Lieberman, who died in 2015. He called Mr. Lieberman, who could not be reached for comment, a personal adviser.

Together the two started the Eurasian Institute for Economic and Political Research. Supposedly set up to promote democratic reforms in former Soviet states, it was essentially a vehicle to burnish the reputation of one client, Akezhan Kazhegeldin, an ex-K.G.B. officer and the former prime minister of Kazakhstan. Mr. Kazhegeldin had fled under a cloud of corruption charges and was seeking Washington's support to challenge his rival, Kazakhstan's president, Nursultan Nazarbayev.

Mr. Akhmetshin worked to undercut his client's rival by funneling information to American prosecutors pursuing bribery charges against James Giffen, an American businessman close to the Kazakh president, according to people involved with the case. The prosecutors discovered only belatedly that Mr. Giffen had worked for the C.I.A. in the former Soviet Union.

By 2005 the government of another former Soviet republic, Kyrgyzstan, had hired Mr. Akhmetshin to investigate whether Washington had bribed the family of the country's former president to keep an American air base there. The Manas base, established as a staging ground for American forces in Afghanistan, was a major source of friction with the Russians.

The Kyrgyz ambassador to Washington at the time, Zamira Sydykova, said Mr. Akhmetshin arranged an interview with a Times reporter and escorted her to it. The resulting article helped set off a Washington controversy and ultimately, a congressional investigation. Kyrgyzstan finally forced the United States to abandon the base in 2014.

In an affidavit that year, Mr. Akhmetshin said he worked closely with the American government about the location of the base. But Thomas Graham, the National Security Council's Russia specialist from 2002 to 2007, said the controversy put Washington on the defensive. "Looking into allegations of fraud or bribery — anything that would complicate our presence at that air base — was in Russia's interests," he said.

Mr. Akhmetshin's work took him back and forth to Europe more than once a month, on trips lasting a few days each. Senator Charles E. Grassley, the Iowa Republican who is now chairman of the Senate Judiciary Committee, has sought to determine whether his travel pattern raised concerns among immigration officials who approved Mr. Akhmetshin's application for American citizenship in 2009.

Once naturalized, Mr. Akhmetshin began traveling regularly to Moscow and taking on more overtly pro-Russian projects. The new work led him into legal entanglements, the halls of Congress and eventually Trump Tower.

## The Hacking Campaigns

Few episodes from Mr. Akhmetshin's past seem more relevant to Mr. Mueller's investigation than his work for two Russian billionaires accused of infiltrating their adversaries' computers during nasty legal battles.

The Trump Tower meeting in June 2016 took place less than a week before revelations that hackers had penetrated the Democratic National Committee's computers and obtained a trove of emails. Investigators have traced digital espionage to Russian spy agencies. There is no public evidence that Mr. Akhmetshin played any role in the D.N.C. hack.

The first hacking case, which has not previously been reported, began when Mr. Akhmetshin served an alliance of businessmen led by Suleiman Kerimov — a financier close to Mr. Putin in a commercial and political dispute with a Russian competitor, Ashot Egiazaryan.

In early 2011, two London lawyers on Mr. Egiazaryan's team separately received suspicious emails and hired forensic experts to scrutinize them, according to people

involved in a Scotland Yard investigation. The experts found that the messages concealed spyware meant to infiltrate their computers, and they fed traceable documents into the spyware that were then opened by computers registered at the Moscow office park of one of Mr. Kerimov's companies.

After an inquiry of more than 18 months, Scotland Yard investigators concluded in January 2013 that they lacked sufficient evidence to bring any charges, a spokesman said. Representatives of the lawyers targeted declined to comment.

Mr. Akhmetshin has said in court papers that he was paid only by one businessman in the alliance with Mr. Kerimov, but coordinated with Mr. Kerimov's team.

Two years later, hacking accusations arose in another case, this time lodged directly against Mr. Akhmetshin. He worked as a consultant to a law firm representing EuroChem, a fertilizer and mining company controlled by another Russian billionaire close to Mr. Putin — Andrey Melnichenko. Mr. Akhmetshin's target was a rival mining company, International Mineral Resources.

Within months, documents stored in International Mineral Resources's computer systems began surfacing outside the company, leaked to journalists and others. The company concluded that its computers had been hacked, and replaced its servers. In lawsuits filed in federal court in Washington and state court in New York, the company accused EuroChem and Mr. Akhmetshin of computer espionage.

EuroChem's information technology chief, Vladimir Chibisov, previously worked in the Russian government. He had written a book promoted as "a hacker's Bible," which he described as a book "about us — about Russian programmers, men of the '80s and '90s" who "had done programming, and even a bit of hacking."

Mr. Akhmetshin personally handed a thumb drive containing stolen documents to a lawyer engaged in another matter potentially damaging to the rival company, according to a person familiar with the matter. The same thumb drive was later obtained by investigators, and someone using the initials "R.A." had gained access to its contents, according to court papers.

A spokesman for Mr. Melnichenko said in a statement that he has never condoned hacking or other illegal activity, nor had he ever met or known Mr. Akhmetshin. The spokesman said Mr. Chibisov's book was "tongue in cheek" and "cannot possibly be taken seriously."

An investigator for the targeted company also testified that he had followed Mr. Akhmetshin in January 2014 to a meeting at London's Cafe Royal and watched him hand over an external hard drive to another individual. He said he had overheard Mr. Akhmetshin claim that he had paid a team of Russian hackers "a lot of money" for the records.

Mr. Akhmetshin acknowledged in a deposition that he had turned over a hard drive with information about the firm's owners. But he said he had obtained the data from a Kazakh contact through a loose network he called the "London Information Bazaar." Asked about computer hacking, he replied, "I do not know a single person who could do that."

International Mineral Resources dropped the lawsuits without explanation in early 2016, withdrawing all allegations before they could be adjudicated. The company said in a statement Friday that it dropped the charges "after careful consideration."

## A Key Kremlin Contact

During the same period that Mr. Akhmetshin was accused of being involved in various hacking schemes, he appears to have been nurturing a relationship with Viktor Ivanov, once the deputy head of Russia's intelligence service, the F.S.B., and until last year a top aide to Mr. Putin.

From 2009 to 2014, Mr. Ivanov led the Russian side of a joint effort with the Americans to combat drug trafficking in Afghanistan, part of an early Obama administration initiative to improve relations between Moscow and Washington.

When Mr. Ivanov traveled to Washington to promote the effort in October 2010, Mr. Akhmetshin helped shepherd him around town. In a deposition filed in one of

the hacking cases, Mr. Akhmetshin testified that he helped facilitate the Washington visit with one of Mr. Ivanov's aides, with whom he had served in the Red Army.

In an affidavit in that same case, Mr. Akhmetshin said he had been in email contact with Mr. Ivanov on matters ranging "from narco-trafficking and terrorism in Afghanistan to surveillance of undercover agents, suspected undercover agents and their identities."

Reporters who encountered Mr. Akhmetshin during his travels to Afghanistan said he grew a beard and wore a skullcap to blend in with the local population. He never identified whom he worked for, but two former American officials involved with the counternarcotics program said the American side did not hire him.

Mr. Ivanov, who retired early last year, could not be reached for comment about whether Mr. Akhmetshin was on the Russian government's payroll.

Russia ended the counternarcotics cooperation in 2014 after the United States imposed sanctions on Mr. Ivanov and other Putin allies in retaliation for Russia's invasion and seizure of Ukraine's Crimea region.

There, too, Mr. Akhmetshin had tried to ally with Ukraine's pro-Moscow elements. Before the 2014 invasion, he told reporters, he unsuccessfully sought consulting work with the political party dominated by the nation's pro-Putin president, Viktor F. Yanukovych. A popular revolt forced Mr. Yanukovych to flee to Russia.

Mr. Akhmetshin told journalists that he was a longtime acquaintance of Paul J. Manafort, who served as a high-paid consultant to Mr. Yanukovych for years before becoming chairman of the Trump campaign. Jason Maloni, a spokesman for Mr. Manafort, said, "Paul doesn't know and hasn't worked with the man."

Last year, Mr. Akhmetshin took on a new project high on the Kremlin's agenda: a $240,000 lobbying campaign to amend the Magnitsky Act, which imposes sanctions on Russians for human rights abuses. The law was named after Sergei L. Magnitsky, a Russian tax lawyer who died in custody after he uncovered a $230 million tax fraud allegedly tied to Russian officials. Several wealthy Russian

businessmen financed a nonprofit group to spearhead the campaign, which was represented by Mr. Akhmetshin and a Russian lawyer named Natalia Veselnitskaya.

Donald J. Trump Jr. has said the promise of damaging information about Hillary Clinton was just an excuse for Ms. Veselnitskaya to get into Trump Tower to talk about why the law should be changed. Mr. Akhmetshin, a Washington resident, has told reporters that he just happened to be lunching with Ms. Veselnitskaya in Manhattan that day when she spontaneously invited him to the meeting with the president's son, son-in-law Jared Kushner and Mr. Manafort. He did not explain why she wanted him there.

After Mr. Akhmetshin's presence came to light, a spokesman for Mr. Putin, Dmitry Peskov, told reporters: "We don't know anything about this person."

### Correction: August 23, 2017

An article on Monday about a Russian immigrant who met last summer with senior Trump campaign officials referred incorrectly to the location of Kazan, Russia. It is 500 miles east of Moscow, not west.

Sharon LaFraniere and Kenneth P. Vogel reported from Washington, and David D. Kirkpatrick from London. Andrew E. Kramer and Sophia Kishkovsky contributed reporting from Moscow, and Michael S. Schmidt and Eileen Sullivan from Washington. Susan Beachy contributed research.

A version of this article appears in print on August 21, 2017, on Page A1 of the New York edition with the headline: Guest at Trump Tower Meeting Has Aided Close Allies of Putin.

© 2017 The New York Times Company

Case 2:14-cv-09764-RGK-PLA   Document 220-46   Filed 03/02/20   Page 43 of 106
Case 2:14-cv-09764-R-PLA   Document 219-3   Filed 03/11/19   Page 42 of 105   Page ID
Page ID #:5982
#:5454

# Declaration of
# Ashot Yegiazaryan
# Exhibit 5

Case 2:14-cv-09764-RGK-PLA   Document 229-46   Filed 03/02/20   Page 44 of 106
Case 2:14-cv-09764-R-PLA   Document 123-3 #:5923   Filed 03/11/19   Page 43 of 105   Page ID
#:5435

Следователю по особо важным делам
первого                отдела           управления
по расследованию особо важных дел о
преступлениях против государственной
власти и в сфере экономики
ГСУ СК при Прокуратуре РФ
советнику юстиции Габдулину Р.Р.

от Смагина Виталия Ивановича
проживающего: г.Москва, ул.
Берзарина, д.19, к.1, кв. 103.

по уголовному делу №201/355137-10

## ХОДАТАЙСТВО

Учитывая, что своими противоправными действиями Егиазарян А.Г., совершил хищение моего имущества – 20% акций ЗАО «Центурион Альянс», номинальной стоимостью 4 600 000 рублей, рыночная стоимость которых на сегодняшний момент составляет 1 575 500 000 рублей ( один миллиард пятьсот семьдесят пять миллионов пятьсот тысяч рублей), то есть своими противоправными деяниями причинил мне имущественный ущерб, прошу Вас принять и приобщить к материалам уголовного дела мой гражданский иск (исковое заявление).

Приложение: гражданский иск на 6 листах.

Смагин В.И.

12 ноября 2010 года

КОПИЯ ВЕРНА
ГЛАВНОЕ СЛЕДСТВЕННОЕ УПРАВЛЕНИЕ
Следственного комитета при
К ПРОКУРАТУРЕ РФ
СЛЕДОВАТЕЛЬ

Для
пакетов
№ 4

1

следователю по особо важным делам первого отдела управления по расследованию особо важных дел о преступлениях против государственной власти и в сфере экономики ГСУ СК при Прокуратуре РФ советнику юстиции Габдулин Р.Р.

от Смагина Виталия Ивановича проживающего: г.Москва, ул. Берзарина, д.19, к.1, кв. 103.

по уголовному делу №201/355137-10

## Гражданский иск
### о возмещении имущественного вреда, причиненного совершенным преступлением

Мне, Смагину Виталию Ивановичу в Закрытом акционерном обществе «Центурион Альянс» принадлежали на праве собственности 460 (четыреста шестьдесят) штук обыкновенных именных акций ЗАО «Центурион Альянс» номинальной стоимостью 10.000 (десять тысяч) рублей каждая, что составляет 20% акций. Подконтрольные Егиазаряну А.Г. структуры ЗАО «Титул», ТД «Уникомимпекс», ООО «Милеа», ООО «Мерхав» владели в ЗАО «Центурион Альянс» 73% акций. Еще 7% акций владел партнер Егиазаряна А.Г. по бизнесу Дмитрий Гаркуша, который в 2006 году являлся управляющим ООО «Даев Плаза», генеральным директором ООО «Декмос».

Мои акции были учтенные на лицевом счете № 013700 в реестре акционеров, ведение которого осуществлялось регистратором - ЗАО «Регистраторское общество «СТАТУС».

В 2006 году Егиазарян Ашот Геворкович также осуществлял реализацию других коммерческих проектов в иных сферах деятельности, в частности, через подконтрольные ему фирмы ЗАО «Декорум», ОАО «Декмос» осуществлял строительство гостиницы «Москва» и нуждался в средствах, для чего привлекал кредиты.

На одной из наших встреч в бизнес центре «Даев плаза», расположенном по адресу: г. Москва, Даев переулок, д.20 в ноябре 2006 года Егиазарян А.Г. предложил мне продать ему мои 20% акций. Я отказал, так как предложенная Егиазаряном А.Г. цена была на порядок ниже реальной. В этот период у нас были хорошие предложения от сторонних лиц о продаже акций, но Егиазарян А.Г. не хотел продавать свои акции, а наоборот хотел получить мой пакет. Егиазарян А.Г. сообщил мне, что ему нужны все акции ЗАО «Центурион Альянс» для залога в «Дойче банке», где, якобы, его фирма

1

Case 2:14-cv-09764-RGK-PLA Document 229-46 Filed 03/02/20 Page 46 of 106
Case 2:14-cv-09764-R-PLA Document 113-3 Filed 03/11/19 Page 45 of 105 Page ID
#:5437

113

должна получить кредит в размере 100 миллионов долларов США на реконструкцию гостиницы «Москва».

Впоследствии, Егиазарян А.Г. и Дмитрий Гаркуша на одной из встреч со мной, состоявшейся в г. Москве в «Даев Плаза», примерно в конце ноября - начале декабря 2006 года сообщили, что «Дойче банк» готов выдать кредит не строго на строительство гостиницы «Москва», но под поручительство «Европарка», как ликвидного объекта. Хотя эти деньги будут использованы ими именно на проект реконструкции гостиницы «Москва».

В процессе нашего общения Егиазарян А.Г. меня долго уговаривал поучаствовать в схеме, якобы предложенной «Дойче банком», путем хотя бы временной (на один год) передачи моих 20% акций в ЗАО «Центурион Альянс» в обеспечение возврата кредита, ни рубля из которого сам ЗАО «Центурион Альянс» не должен был получить. Я, естественно, отказался. Егиазарян А.Г. продолжал настаивать, говорил, что моему имуществу ничто не угрожает, что всем рискует лично он, и что я могу рассчитывать на участие в его бизнесе по строительству гостиницы «Москва» и на получение дополнительного пакета акций ЗАО «Центурион Альянс» и на получение временную передачу моих акций в депозитарий «Дойче банка» в обеспечение возврата кредита. Я после долгих уговоров выразил свое предварительное согласие, но настаивал на обязательном письменном оформлении всех документов и договоренностей с привлечением хороших юристов.

На очередной встрече между мной, Егиазаряном А.Г. и Дмитрием Гаркушей, состоявшейся примерно в ноябре 2006 года в г. Москве Егиазарян А.Г. сообщил, что его партнер Дмитрий Гаркуша является владельцем компании «Блиденсол Трейдинг энд Инвестментс Лтд (Кипр) – получателя кредита в размере 100 млн. долларов США от «Дойче банка». Егиазарян А.Г. сообщил, что по схеме, одобренной «Дойче банком», банк хочет получить в залог акции ЗАО «Центурион альянс» и все имущество «Европарка», где у меня были 20%, но банк, якобы, не желает, чтобы эти 20% на момент залога принадлежали лично мне или иным Российским юридическим или физическим лицам. Для чего Егиазарян А.Г. рассказал, что схема должна выглядеть следующим образом: я, как и остальные акционеры, должен был продать свои акции кипрской компании «Доралин Трейдинг энд Инвестментс» (далее – «Доралин») по номинальной стоимости. Данная компания также является акционерным обществом. Данную компанию создали граждане Кипра, а генеральной доверенностью на управление данной компанией до октября 2009 года владел Гаркуша. В свою очередь 100% акций самой компании «Доралин» приобретает компания «Тафтс Инвест энд Трейд Инк.» (Британские Виргинские острова, далее – «Тафтс»), а в самой компании «Тафтс» акции должны быть распределены также, как это было и в ЗАО «Центурион Альянс», то есть 73% у Егиазаряна А.Г., 7% у Дмитрия Гаркуши, а 20% у меня.

Егиазарян А.Г. сказал что он войдет в компанию «Тафтс» подконтрольной ему фирмой «Калкен Холдингс Лтд» (Кипр) (далее Калкен). Калкен также является кипрской компанией, директорами которой являются

2

граждане Кипра, но кто является учредителем я не знаю. Но генеральная доверенность на управление данной компанией выдана на Егиазаряна Артема.

Я, так как не участвовал никак в пользовании кредитом «Дойче банка», был против участия в какой-либо схеме, настаивал на жестком регулировании всех отношений в письменной форме.

В итоге после долгих переговоров Егиазарян А.Г. пообещал выполнить следующие обязательные условия – я передавал свои акции компании «Доралин» только с условием, что я смогу контролировать это имущество через участие в компании «Тафтс», и обязательно на срок не более года, чтобы все документы подписывались одновременно, и чтобы мы – акционеры подписали соглашение между собой с участием «Дойче банка», который смог бы явиться гарантом его исполнения. Егиазарян А.Г. сказал, что понимает мою обеспокоенность рисковать правом на мои 20% в проекте «Европарк», но заверил меня, что моему имуществу ничто не угрожает, что в любом случае 20% у меня остаются, так как в случае дефолта компании «Блиденсол» (заемщик по кредиту «Дойче банка») он – Егиазарян А.Г. предоставляет мне и только мне право продать его (Егиазаряна А.Г.) пакет акций 73%, стоимость которого согласно произведенной официальной оценке превышала стоимость кредитных обязательств. Кроме того, Егиазарян А.Г. заверил меня, что в компании «Тафтс» ни один документ не будет иметь юридической силы, без моей подписи, для чего мы оформим необходимые документы.

Также, Егиазарян А.Г. предложил мне принять участие в действенном контроле за деятельностью ЗАО «Центурион Альянс», чего я был лишен ранее и не мог рассчитывать на справедливое распределение дивидендов. Для чего Егиазарян А.Г. предложил изменить Устав ЗАО «Центурион Альянс», сделать меня Председателем Совета директоров, и ввести должность первого заместителя генерального директора, который будет назначаться не Генеральным директором, а Советом директоров, то есть фактически будет моим человеком. Также он согласился на мое предложение ограничить уставом право генерального директора на заключение сделок на сумму свыше 5 млн. рублей, введя обязательное наличие второй подписи первого заместителя генерального директора для одобрения таких сделок.

Достигнутые договоренности все акционеры закрепили 26 декабря 2006 года в подписанном Соглашении акционеров, оформление которого осуществлялось с участием «Дойче банка» на основании договора Эскроу, по которому «Дойче банк» должен был выступать гарантом исполнения обязательств акционерами друг перед другом.

По условиям договоров между акционерами в обеспечение возврата кредита, выданного «Дойче Банком» компании «Блиденсол», «Дойче банку» должны были быть переданы все обеспечительные документы для обращения внесудебного взыскания на акции «Доралин», ЗАО «Центурион Альянс» и имущественного комплекса «Европарк». В частности, «Дойче

3

115

банку» должны были быть переданы на хранение передаточные распоряжения на акции «Доралин» от компании «Тафтс».

Также по соглашению между акционерами от 26.12.2006 года и договору Эскроу, Егиазарян А.Г. должен был передать «Дойче банку» на временное хранение, как независимому агенту, акции «Тафтс», принадлежащие формально компании «Калкен» в размере 73%.

После оформления всех документов и получения кредита, Егиазарян А.Г. нарушил достигнутые договоренности и отказался передавать «Дойче банку» свои 73% акций в компании «Тафтс».

Примерно в марте-апреле 2008 года по моему настоянию, между мной и Егиазаряном А.Г. было подписано соглашение о выполнении с его стороны условий договоренностей 2006 года о передаче 73% акций «Тафтс» на хранение «Дойче банку», заключении нового договора Эскроу с «Дойче банком». Кроме того, Егиазарян А.Г. обещал, ввести в компании «Тафтс» и «Блиденсол» обязательную мою вторую подпись для распорядительных документов, а также обещал дать указание своим структурам и адвокатам оформить на меня по номиналу 50% акций в компании «Блиденсол». Из обещанного, на меня было оформлено право второй подписи от имени компании «Тафтс» по распоряжению имуществом (акциями) компании «Доралин» наряду с Артемом Егиазаряном. Остальные договоренности исполнены не были.

Свои обязательства по возврату кредита компания «Блиденсол» перед «Дойче банком» не исполнила, в связи с чем «Дойче банк» предложил мне выкупить этот кредит, найти покупателя на этот кредит и получить права, соответственно, на заложенное имущество, как было предусмотрено достигнутыми договоренностями. Но, поскольку из «Дойче банка» исчезла часть обеспечительной документации, дающей право «Дойче Банку» на наложение внесудебного взыскания на акции компании «Доралин», приобретатель прав по кредиту терял право на получение акций «Доралин» во внесудебном порядке в случае не возврата кредита фирмой «Блиденсол».

Также 08 декабря 2006 года между ЗАО «Центурион Альянс» и компанией «Блиденсол» был заключен договор займа на сумму около 1,5 миллиарда рублей, однако, кредитных денег «Дойче банка» там не было, это были аккумулированные займы прошлых периодов. Компания «Кхэкхем» (принадлежащая Дмитрию Гаркуше) и другие иностранные кредиторы ЗАО «Центурион Альянс» за 1 доллар продали право требования по договорам займа компании «Блиденсол», также принадлежащей Дмитрию Гаркуше. После чего, как указывалось выше, между ЗАО «Центурион Альянс» и компанией Бледенсоль был заключен договор займа (новации) на общую сумму по всем ранее заключенным договорам займа в размере 1,5 млрд. рублей. Сделано это было для того, чтобы ЗАО «Центурион Альянс» возвращал заем не компании «Кхэкхем», а компании «Блиденсол», которая являлась получателем кредита «Дойче банка», и полученные от ЗАО «Центурион Альянс» деньги должна была пускать на погашение процентов по этому кредиту.

4

Case 2:14-cv-09764-RGK-PLA Document 229-46 Filed 03/02/20 Page 49 of 106
Case 2:14-cv-09764-R-PLA Document 173-9 Filed 03/11/19 Page 48 of 105 Page ID
#:5440

116

В дальнейшем между Егиазаряном А.Г. и Гаркушей Д.В. произошел конфликт, после которого Егиазарян А.Г., пользуясь возможностью управлять компанией ЗАО «Центурион Альянс» и компанией «Блиденсол» через «подчиненных» ему людей, без моего согласия сменил валюту вышеуказанного договора займа с рублей на доллары и увеличил процентную ставку с 1% на 12%, а затем и до 22% годовых. Таким образом, была искусственно увеличена кредиторская задолженность ЗАО «Центурион Альянс» перед компанией «Блиденсол». Кроме того, ЗАО «Центурион Плаза» в мае 2009 года подало заявление о банкротстве ЗАО «Центурион компании ООО «Даев плаза» 160 миллионов рублей. Именно ООО «Даев Альянс» в Арбитражный суд г. Москвы, что, видимо, и повлияло на решение «Дойче банка» как можно быстрее уступить права по кредиту любому желающему лицу. Однако по состоянию на май 2009 года ТК «Европарк», принадлежащий ЗАО «Центурион Альянс» приносил прибыль, достаточной для погашения всей имеющейся кредиторской задолженности.

Поскольку Егиазаряном А.Г. передаточные распоряжения в отношении акций компании «Доралин» «Дойче банку» переданы не были, указанные передаточные распоряжения были подготовлены и мной направлены в сентябре 2009 года на электронную почту Егиазаряну А.Г. для подписания. Никакой реакции со стороны Егиазаряна А.Г. не последовало. Не подписал такие передаточные распоряжения и Артем Егиазарян, второй директор компании «Тафтс», чья подпись в соответствии с правилами управления компании «Тафтс» требовалась для легитимности передаточного распоряжения, поскольку не получил об этом указаний от своего брата – Егиазаряна А.Г.

В середине 2009 года я стал обращать внимание, что в ЗАО «Центурион Альянс» заключаются сомнительные сделки, без моего ведома осуществляются платежи на суммы выше 5 миллионов рублей, происходит давление на персонал, лояльный ко мне. А после подачи в милицию заявления о хищении имущества ЗАО «Центурион Альянс» мне был запрещен доступ на территорию офисной части ТК «Европарк», и всему персоналу было объявлено, что я больше в компании «никто». Ни одного моего распоряжения и распоряжения первого заместителя генерального директора не выполнялось, а в последствии несколько человек были незаконно уволены, включая главного бухгалтера и первого заместителя генерального директора. Незаконно уволенные сотрудники были восстановлены на работе судом, но к работе допущены не были.

Заподозрив попытку хищения моего имущества, весной 2010 года я направил запрос на Кипр в Бюро регистрации независимых акционерных компаний Кипра с просьбой предоставить мне сведения, касающиеся акционеров и директоров компании «Доралин». Именно этой компании в декабре 2006 года я по настоянию Егиазаряна А.Г. номинально «продал» свои акции в ЗАО «Центурион Альянс», с тем чтобы владеть ими в том же соотношении через компанию «Тафтс».В 2006-2007 году мне передавались

5

117

подтверждающие документы, что компания «Тафтс» является акционером компании «Доралин» на 100%, соответственно, владея 20% акций компании «Тафтс» я опосредованно владел 20% акций в компании «Доралин», и как следствие, 20% акций ЗАО «Центурион Альянс», то есть я был владел 20% имущественным комплексом «Европарк», так как это был единственный актив указанных компаний.

Получив официальные ответы из Республики Кипр я обнаружил, что компанией «Доралин» владеет теперь не компания «Тафтс», как мы договаривались с Егиазаряном А.Г. в 2006 году и где я владел 20% акций, а две компании – «Мастеро Инвестмент Лимитед» (Кипр) и «Фамукатос Лимитед» (Кипр) в соотношении 50/50.

Также из представленного отчета следовало, что в компании «Доралин» были сменены директора компании – ими стали компания «Нью Дженерэйшн Сервисес Лтд» (Британские Виргинские острова) и гражданка России Елена Демина, зарегистрированная по адресу: г.Калуга, Грабцевское шоссе, д. 90, кв. 22.

Однако я никаких подписей на документах, касающихся продажи компанией «Тафтс» акций компании «Доралин» не ставил, своего согласия на распоряжение моим имуществом ни Ашоту Егиазаряну, ни Самвелу Карапетяну, ни их представителям или фирмам, не давал.

Таким образом, полагаю, что по вышеизложенной схеме, Егиазарян А.Г., совершил хищение моего имущества – 20% акций ЗАО «Центурион Альянс», номинальной стоимостью 4 600 000 рублей, рыночная стоимость которых на сегодняшний момент составляет 1 575 500 000 рублей ( один миллиард пятьсот семьдесят пять миллионов пятьсот тысяч рублей), то есть своими противоправными деяниями причинил мне имущественный ущерб.

На основании изложенного, руководствуясь ст. 44 УПК РФ, прошу взыскать с виновных лиц имущественный вред, причиненный непосредственно преступлением в мою пользу в размере 1 575 500 000 рублей ( одного миллиарда пятьсот семидесяти пяти миллионов пятьсот тысяч рублей).

12 ноября 2010 года ———————————— Смагин В.И.

*111*

To: R.R. Gabdulin, Counsellor in Justice,
Major Cases Investigator, First Section,
Major Economic Crimes Investigation
Department, Central Investigations
Department, RF Investigations
Committee

Fm: Vitaliy Ivanovich Smagin
19 Berzarin St., Bldg. 1, Apt. 103
Moscow

For Criminal Case No. 201/355137-10

APPLICATION

Considering that by his illegal actions A.G. Yegiazaryan committed a theft of my property – 20% of the shares in Centurion Alliance CJSC, with a nominal value of RUB 4,600,000, the market value of which is presently RUB 1,575,500,000 (one billion five hundred seventy five million five hundred thousand rubles), i.e., by his illegal acts inflicted property damage on me, I request that you accept and include my civil claim (statement of claim) in the criminal case file.

Attachment: Civil claim on 6 pages

_____[signature]_____  V.I. Smagin

12 November 2010

[signature]

[signature]  *R.V. Markaryan, Attorney*

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator

[signature]

1

To:
R.R. Gabdulin,
Counsellor in Justice,
Major Cases Investigator,
First Section,
Major Economic Crimes Investigation Department,
Central Investigations Department,
RF Investigations Committee

From:

Vitaliy Ivanovich Smagin,
Moscow, ul. Berzarina 19, Bldg. 1, Appt. 103

Criminal Case No. 201/355137-10

Civil Claim
for restitution of property
lost as a result of an offence

I, Vitaliy Ivanovich Smagin, was the owner of 460 (four hundred and sixty) ordinary registered shares in Centurion Alliance Closed Joint Stock Company, with a nominal value of RUB 10,000 (ten thousand) each, representing 20% of the company's stock. Entities controlled by A.G. Egiazaryan, Titul CJSC, TD Unikompleks, Milea LLC and Merkhav LLC held 73% of Centurion Alliance CJSC shares. A further 7% was owned by A.G. Egiazaryan's business partner, Dmitri Garkusha, who in 2006 was the manager of Daev Plaza LLC and the CEO of Dekmos LLC.

My shares were registered in Personal Account No. 013700 in the Shareholder Register maintained by the Registrars, STATUS Registration Company CJSC.

In 2006, Ashot Gevorkovich Egiazaryan was also involved in the implementation of commercial projects in other business areas, and in particular, acting through the companies under his control, Decorum CJSC and Dekmos OJSC, in the construction of the Hotel Moskva, and was therefore in need of funds, and consequently engaged in raising loans.

At one of our meetings held at the Daev Plaza Business Centre, Moscow, Daev Pereulok 20, in November 2006, A.G. Egiazaryan suggested that I sell him my 20% shareholding. I refused, because the price offered by A.G. Egiazaryan was a whole order of magnitude below a realistic price. At that time, we had good offers for the shares from third parties, but A.G. Egiazaryan did not want to sell his own shares, but wanted to acquire my shareholding instead. A.G. Egiazaryan told me that he needed all Centurion Alliance CJSC shares, to offer as security to Deutsche Bank from which his company was allegedly to obtain

[seal:] RF Investigations Committee; For Blocks No. 4
[stamp:] True Copy, Central Investigations Department, RF Investigations Committee,
Investigator [signature]

1

a loan of USD 100 million for the renovation of Hotel Moskva.

Subsequently A.G. Egiazaryan and Dmitri Garkusha told me at one of our meetings held at the Daev Plaza in Moscow around the end of November or early December 2006 that Deutsche Bank was willing to grant a loan not strictly for the construction of Hotel Moskva, but against a guarantee of Europark as a liquid asset. This was in spite of the fact that they would in reality use the money to renovate Hotel Moskva.

During our association, A.G. Egiazaryan spent a long time persuading me to join the scheme, allegedly proposed by Deutsche Bank, at least by transferring my 20% shareholding in Centurion Alliance CJSC temporarily (for one year) as security for the loan, none of which would be received by Centurion Alliance CJSC itself. I, naturally, refused. A.G. Egiazaryan continued to insist, saying that my property would not be endangered in any way, that he personally would be assuming all the risk and that I could count on participating in his Hotel Moskva project and on receiving an additional shareholding in Centurion Alliance CJSC if I agreed to transfer my shares on a temporary basis to the Deutsche Bank depository as security for the loan. After much persuasion, I expressed my tentative agreement, but insisted on all documents and agreements being made in writing, and on involving good lawyers.

At my next meeting with A.G. Egiazaryan and Dmitri Garkusha, which took place approximately in November 2006 in Moscow, A.G. Egiazaryan told me that his partner, Dmitri Garkusha, owned a Cypriot company, Blidensol Trading and Investment Ltd, which had obtained a loan of USD 100 million from Deutsche Bank. A.G. Egiazaryan said that under a scheme approved by Deutsche Bank the latter wanted to receive as security the shares of Centurion Alliance CJSC and all the assets of Europark, of which I held a 20% share, but that the bank allegedly did not want the 20% to be held either by me personally or by any Russian legal entity or individual at the time of their pledge. To achieve this, according to A.G. Egiazaryan, the package would be structured in the following way: I, as well as the other shareholders, would sell my shares to the Cypriot company, Doralin Trading and Investments ("Doralin") at their nominal value. This company too was a Joint Stock Company established by Cypriot citizens, with Garkusha holding an unlimited power of attorney to act as its manager until October 2009. 100% of Doralin shares would in turn be acquired by Tufts Invest and Trade Inc. (incorporated in British Virgin Islands, "Tufts"), whereupon shares in Tufts would be distributed exactly as in the case of Centurion Alliance CJSC, i.e. A.G. Egiazaryan would hold 73%, Dmitri Garkusha 7%, and I would hold 20%.

A.G. Egiazaryan said that he would inject a Cypriot company which he controlled, Kalken Holdings Ltd ("Kalken") into Tufts. Kalken too is a Cypriot company whose directors are Cypriot citizens, but I don't know who the founders are. However, unlimited

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

2

power of attorney to act as manager of this company has been issued in the name of Artem Egiazaryan.

Since I had in no way participated in the use of the Deutsche Bank loan, I was against participating in any scheme and insisted on all relationships being strictly regulated by written documents.

Ultimately, after protracted negotiations, A.G. Egiazaryan promised that he would comply with the following mandatory requirements:  I would transfer my shares to Doralin only on the condition that I would be able to control those assets through my participation in Tufts, and in any case would do so for not longer than one year, that all documents would be signed simultaneously and that we, the shareholders, would sign an agreement with one another and with the participation of Deutsche Bank, which would act as performance guarantor.  A.G. Egiazaryan said that he understood my concern about risking my right to my 20% holding in the Europark project, but assured me that nothing threatened my property, that in any case I would retain the 20%, since if Blidensol (the borrower under the Deutsche Bank loan) defaulted, he, A.G. Egiazaryan, granted me and me alone the right to sell his (A.G. Egiazaryan's) 73% shareholding, which, according to an official valuation, was worth more than the loan commitment.  In addition, A.G. Egiazaryan assured me that in Tufts no document would have legal validity without my signature, and that we would draw up the necessary documents to ensure that this would be the case.

In addition, A.G. Egiazaryan suggested that I should take part in the actual control of the operations of Centurion Alliance CJSC, which was something I did not have before, and could therefore not count on a fair distribution of dividends.  For this purpose, A.G. Egiazaryan proposed amending the Charter of Centurion Alliance CJSC, making me Chairman of the Board and introducing the position of a First Deputy CEO, who would be appointed not by the CEO but by the Board of Directors and would therefore in fact be my own man.  He also agreed to my suggestion that the Charter should limit the CEO's right to enter into transactions for amounts exceeding RUB 5 million, requiring a second signature, that of the First Deputy CEO, for transactions of this size.

The shareholders included the agreements they had reached in a Shareholder Agreement signed on 26 December 2006, executed with the participation of Deutsche Bank on the basis of an Escrow Agreement whereby Deutsche Bank acted as guarantor of the shareholders' performance of their obligations under the Agreement.

Under the terms of the shareholder agreements, the loan granted by Deutsche Bank to Blidensol was to be secured on all documents enabling the bank to have non-judicial recourse against the shares of Doralin, Centurion Alliance CJSC and the Europark property portfolio.

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

In particular, Deutsche Bank was to be given custody of Tufts transfer orders relating to Doralin shares.

Further, under the terms of the Shareholder Agreement of 26.12.2006 and of the Escrow Agreement, A.G. Egiazaryan was required to transfer to Deutsche Bank for temporary custody in its capacity as an independent agent the 73% of Tufts shares formally held by Kalken.

Having drawn up all the documents and obtained the loan, A.G. Egiazaryan violated the agreement and refused to transfer his 73% of Tufts shares to Deutsche Bank.

In approximately March or April 2008 at my insistence A.G. Egiazaryan and I signed an agreement concerning his compliance with the 2006 agreements on the transfer of 73% of the Tufts shares into the custody of Deutsche Bank and the signature of a new Escrow Agreement with Deutsche Bank. In addition, A.G. Egiazaryan promised to require Tufts and Blidensol to include my signature on all order documents as a second signature and to instruct his business units and lawyers to transfer 50% of Blidensol shares into my name at their nominal value. Of these promises, I was granted the right of second signature on behalf of Tufts on the disposal of the assets (shares) of Doralin, alongside Artem Egiazaryan. None of the other promises were kept.

Blidensol did not fulfil its obligation to repay the loan to Deutsche Bank, and the latter therefore suggested to me that I buy out the loan, find a buyer for it and obtain a claim on the pledged assets, as set out in the shareholder agreements. However, since Deutsche Bank lost some of the security documentation giving it the right to extrajudicial recourse against Doralin shares, the purchaser of the claim would lose the right to acquire Doralin shares in an extrajudicial procedure if Blidensol defaulted.

On 8 December 2006, Centurion Alliance CJSC also signed a loan agreement for approximately RUB 1.5 billion with Blidensol, but this sum did not involve Deutsche Bank money, instead representing the accumulated pre-existing loans. Chechem, a company owned by Dmitri Garkusha, and other foreign creditors of Centurion Alliance CJSC sold their right of recourse under loan agreements signed by Blidensol, also owned by Dmitri Garkusha, for 1 USD. Thereafter, as noted above, Centurion Alliance CJSC and Blidensol signed a loan (novation) agreement for the sum total of the existing loan agreements, amounting to RUB 1.5 billion. This was done to ensure that Centurion Alliance CJSC would repay the loan not to Chechem, but to Blidensol, which was the recipient of the Deutsche Bank loan and should have used the money received from Centurion Alliance CJSC to repay the interest on that loan.

[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

4

Subsequently, A.G. Egiazaryan and D.V. Garkusha came to blows, and A.G. Egiazaryan, taking advantage of the fact that he could manage Centurion Alliance CJSC and Blidensol through his own people, acted without my consent and changed the currency of the loan agreement from RUB to USD and the interest rate from 1% first to 12% and then to 22% p.a.  In this way, the debt owed by Centurion Alliance CJSC to Blidensol was artificially inflated.  In addition, according to the agreement Centurion Alliance CJSC owed RUB 160 million to Daev Plaza LLC, a company controlled by Egiazaryan.  It was Daev Plaza LLC which petitioned the Moscow Arbitration Court in May 2009 to declare Centurion Alliance CJSC bankrupt, which clearly influenced Deutsche Bank's decision to assign its rights under the loan agreement to any willing buyer as soon as possible.  However, in May 2009 the Europark Shopping Centre, owned by Centurion Alliance CJSC, was making a profit sufficient to repay all outstanding debt.

Since A.G. Egiazaryan did not hand over the Doralin share transfer orders to Deutsche Bank, I myself prepared the transfer orders and forwarded them in September 2009 to A.G. Egiazaryan's e-mail address for his signature. I received absolutely no response from A.G. Egiazaryan.  The transfer orders were also not signed by Artem Egiazaryan, who was the second director of Tufts and whose signature was required to ensure the validity of transfer orders under the Tufts management procedures. He did not sign, not having been instructed to do so by his brother, A.G. Egiazaryan.

In mid-2009, I began to notice that Centurion Alliance CJSC was involving itself in shady deals, that payments of over RUB 5 million were being made without my knowledge and that pressure was being exerted on personnel loyal to me.  After I had filed a report on the misappropriation of Centurion Alliance CJSC assets with the militia, I was forbidden access to the offices of the Europark Shopping Centre, and everyone was told that I no longer had any standing in the company.  None of my orders or the orders of the First Deputy CEO were carried out, and subsequently a number of people were wrongly dismissed, including the Chief Accountant and the First Deputy CEO.  The wrongly dismissed employees were reinstated by the court, but were not allowed to work.

Having suspected that an attempt was being made to misappropriate my property, in the spring of 2010 I sent an enquiry to the Cyprus Independent Joint Stock Companies Registration Office asking for information about the shareholders and directors of Doralin. This was the company to which I had nominally "sold" my shares in Centurion Alliance CJSC in December 2006 at the insistence of A.G. Egiazaryan, in order to own them in the same proportion through Tufts.  In 2006-2007 I received documents confirming that Tufts

[seal:] RF Investigations Committee; For Blocks No. 4
        [stamp:] True Copy, Central Investigations Department, RF Investigations Committee,
                                                                        Investigator [signature]

5

owned 100% of Doralin shares, so that as the owner of 20% of Tufts shares I was the indirect owner of 20% of Doralin shares, and thus of 20% of the shares of Centurion Alliance CJSC, i.e. of 20% of the property of Europark, which was the sole asset of these companies.

Having received official responses from Cyprus I discovered that Doralin was no longer owned by Tufts, as we had agreed with A.G. Egiazaryan in 2006, and in which I had a 20% shareholding, but by two other companies – Mastero Investment Limited of Cyprus and Famukatos Limited of Cyprus, each with a 50% holding.

It further followed from the report I received that Doralin now had different directors, which were New Generation Services Ltd, incorporated in the British Virgin Islands, and a Russian national, Elena Demina, registered in Kaluga at Grabtsevskoye shosse 90, Appt. 22.

However, I never signed any documents about the sale of Doralin shares by Tufts, and never gave my consent to the disposal of my assets either to Ashot Egiazaryan or to Samuel Karapetyan, to their representatives or companies.

I therefore believe that the above plan was devised by A.G. Egiazaryan to misappropriate my property consisting of 20% of the shares of Centurion Alliance CJSC with a nominal value of RUB 4,600,000 and a current market value of RUB 1,575,500,000 (one billion five hundred and seventy five million five hundred thousand) rubles, and that his unlawful actions have caused the loss of my property.

Based on the above and guided by Art. 44 of the RF Code of Criminal Procedure, I petition the Court to recover from the guilty parties the sum lost by me as a direct result of their offence and amounting to RUB 1,575,500,000 (one billion five hundred and seventy five million five hundred thousand) rubles.


_____[signature]_____   V.I. Smagin

12 November 2010


[signature]                 [illegible] *R.V.*
                                 *Attorney*


[seal:] RF Investigations Committee; For Blocks No. 4

[stamp:] True Copy, Central Investigations Department, RF Investigations Committee, Investigator [signature]

Case 2:14-cv-09764-RGK-PLA   Document 229-46   Filed 03/02/20   Page 58 of 106
Case 2:14-cv-09764-RGK-PLA   Document 219-3   Filed 03/11/19   Page 57 of 105   Page ID
Page ID #:6997
#:5445

# Declaration of

# Ashot Yegiazaryan

# Exhibit 6

February 20th, 2011

**AGREEMENT**

Party 1 – Ashot Yegiazaryan.
Party 2 – Artem Yegiazaryan.
Party 3 – Suren Yegiazaryan, hereinafter collectively referred to as "the Parties."

Party 1 is engaged in a litigation in LCIA and on Cyprus against Suleyman Karimov, Arkadiy Rotenberg, the government of Moscow (hereinafter "the Respondents") related to the illegal takeover of the Moscow Hotel (Okhotnyy Ryad, bldg 2). The Parties have agreed to take collective action in order to reclaim the "Asset." Party 2 assumes the obligations to finance the necessary legal procedures, as well as, if necessary, to provide any other financial assistance to Party 1. However, the obligations of Party 2 are not to exceed the amount equal to 20 million USD. The expenses already incurred by Party 2 in the amount of 550,000 Eur are to be considered part of total expenses.

Party 3 assumes the obligations to finance the operating costs related to the stay of Party 1 in the USA, as well as, if necessary, to finance the legal expenditures. However, the cumulative obligations of Party 3 are limited to the amount of 20 million USD.

Party 2 and Party 3 assume, if necessary, the obligations to appear at court hearings and to render Party 1 necessary assistance within their abilities.

Party 1 assumes the obligations, in the case of reclamation of the Asset, or any part thereof, or receipt of funds for the Asset, to transfer to Party 2 and Party 3, 33.3% each of the reclaimed Asset or the funds received. Thus, the Parties have agreed to the equal division of the Asset in case of reclamation of the same, and the equal division of any awarded monetary compensation for the Asset. Party 1 assumes the obligation to transfer to Party 2 and Party 3 the funds due them no later than one month from the reclamation of the funds for the Asset, or to divide up shares for the Asset due to Party 2 and Party 3, in case the Asset is returned to Party 1. Party 1 also assumes the obligation to compensate the losses incurred by Party 2 in the Sofiyskaya Naberezhnaya Project, and the losses incurred by Party 3 in the Northern Oil Project.

Ashot Yegiazaryan    *(signature)*

Artem Yegiazaryan    *(signature)*

Suren Yegiazaryan    *(signature)*

CERTIFICATE OF TRANSLATION

I, ALEKSANDR V. FESENKO, HEREBY CERTIFY THAT I TRULY, ACCURATELY AND COMPLETELY, TO THE BEST OF MY ABILITY, TRANSLATED THE ORIGINAL DOCUMENT PROVIDED TO ME FROM RUSSIAN INTO ENGLISH AND THAT AS A CERTIFIED RUSSIAN COURT INTERPRETER IN THE STATE OF CALIFORNIA(I.D. #301101), I AM COMPETENT IN THESE LANGUAGES TO RENDER SUCH TRANSLATION.

Date  11 / 04 / 14    Signature _____

Confidential Document, Produced to Steinberg, Mindel, Brandt & Klein

20 Февраля 2011   Соглашение.

Сторона _1_ — Ашот Егиазарян.

Сторона 2 — Артем Егиазарян.

Сторона 3 — Сурен Егиазарян, далее
совместно именуемые „Стороны".

Сторона 1 ведет судебное разбирательство в
LCIA и на Кипре против Сулеймана Керимова, Аркадия Ротенберга, правительства Москвы
(далее „ответчики") по вопросу рейдерского
захвата гостиницы „Москва" (Охотный
ряд д.2). Стороны пришли к соглашению
совместно участвовать в возврате „Актива"
Сторона 2 принимает на себя обязательства
финансировать необходимые юридические проце-
дуры, а также оказывать при необходимости
любую другую финансовую помощь Стороне 1
При этом обязательство стороны 2 ограничивается
суммой эквивалентной 20 млн. USD. Уже
произведенные стороной 2 затраты в размере
550 000 Eur рассматриваются как часть
общих затрат.

Сторона 3 берет на себя обязательство финансировать текущие затраты на проживание стороны 1 в США, а также, при необходимости, финансировать юридические расходы. При этом, общие обязательства стороны 3 ограничиваются суммой 20 млн. USD.

Сторона 2 и Сторона 3 обязуются, при необходимости, лично принимать участие в судебных заседаниях и оказывать иную посильную помощь стороне 1.

Сторона 1 принимает на себя обязательство, в случае возврата Актива, либо его части, либо получение денежных средств за Актив, передать Стороне 2 и Стороне 3 по 33,3% Каждой от полученного Актива или получен-ных денежных средств. Таким образом, Стороны договорились о равном делении Актива в случае возврата Актива и равном делении в случае присуждения любых денежных компен-саций за Актив. Сторона 1 обязуется перечислить стороне 2 и стороне 3 причитающиеся денежные суммы не позднее одного месяца с даты возвра-

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Respondent 001944

Case 2:14-cv-09764-RGK-PLA    Document 229-46    Filed 03/02/20    Page 62 of 106
Case 2:14-cv-09764-R-PLA   Document 215-9  Filed 03/01/19  Page 61 of 105   Page ID
#:5453

изения денежных средств за Акоп, чтоб
распределить доли причитающиеся стороне 2
и Стороне 3 за Акоп, в случае возврата Акопа
стороне 1. Сторона 1 также берет на себя
обязательсво компенсировать потери Стороны
2 в проекте „Каспийской набережной" и потери
Стороны 3 в проекте „ Северная Нефть".

Ашот Егиазарян.

Артем Егиазарян.

Сурен Егиазарян

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Case 2:14-cv-09764-RGK-PLA Document 229-46 Filed 03/02/20 Page 63 of 106
Case 2:14-cv-09764-R-PLA Document 219-3 Filed 03/11/19 Page 62 of 105 Page ID
Page ID #:57002
#:4454

# Declaration of

# Ashot Yegiazaryan

# Exhibit 7

Case 2:14-cv-09764-RGK-PLA Document 220-46 Filed 03/02/20 Page 64 of 106
Case 2:14-cv-09764-R-PLA Document 219-3 Filed 03/11/19 Page 63 of 105 Page ID
Page ID #:57003

Date: 27th May 2015

# DECLARATION
# OF
# TRUST

made by

CTX Treuhand AG

(the Trustees)

Constituting

The

**ALPHA Trust**

# INDEX TO CLAUSES

**Clause**                                                                 **Page**

1.   Definitions                                                              6

2.   Proper Law, Forum of Administration, Jurisdiction
     and Change thereof                                                      7

3.   Power to Terminate                                                      8

4.   Trust for Sale                                                          8

5.   Trust of income and capital                                            8

6.   Payments to Minors                                                     10

7.   Interests not attachable                                              10

8.   Power to add and exclude Beneficiaries                                11

9.   Remuneration of Trustees                                              11

10.  Change of Trustees                                                     12

11.  Power to delegate                                                      13

12.  Power to alter and revoke                                             13

13.  Additional powers                                                      13

14.  The Protector                                                          13

15.  Duties of the Trustees, liability and indemnity                       14

16.  Accounts and Information                                              14

**THE FIRST SCHEDULE**                                                        15

        Administrative Powers                                        15

1.     Power of Investment                                              15

2.     Power to lend and to give guarantees                             16

3.     Power to permit occupation of property and
       enjoyment of chattels                                           16

4.     Power to borrow                                                  16

5.     Powers in relation to real property                              16

6.     Powers in relation to chattels                                   18

7.     Power to trade                                                   18

8.     Power to give indemnities                                        18

9.     Exclusion of apportionment                                       19

10.   Power to deal with insurance policies                            19

11.   Release of powers                                                20

12.   Power of appropriation                                           20

13.   Power to vote and to employ nominees and custodians             20

14.   Power to delegate management of investments                      20

15.   Power to receive remuneration                                    21

16.   Power to promote companies                                       21

17.   Trustees not bound to interfere in business of
       company in which the Trust is interested                         22

18.   Power to insure property                                         22

Case 2:14-cv-09764-RGK-PLA   Document 220-46   Filed 03/02/20   Page 67 of 106
Case 2:14-cv-09764-RGK-PLA   Document 21-3   Filed 03/11/19   Page 66 of 105   Page ID
Page ID #:7006
#:453
-4-

19.    Power to appoint agents                                    22

20.    Power to permit self-dealing                               22


**THE SECOND SCHEDULE**                                          23



**THE THIRD SCHEDULE**                                           24

**THIS DECLARATION** OF TRUST is made the 27th day of May Two thousand and fifteen.


<u>BY</u>

CTX Treuhand AG ("the Trustees" which expression shall where the context so admits include the trustees or trustee for the time being of this Trust)


<u>WHEREAS</u>

(A)     THE Trustees acknowledge having received the property specified in the Second Schedule to be held upon the trusts hereinafter contained concerning the same.


(B)     IT is intended that this Trust shall be irrevocable


(C)     THIS Trust may be referred to as


**" ALPHA TRUST"**

**NOW THIS DEED WITNESSETH** as follows:

1.        **Definitions**

1.1.        IN this Deed where the context so admits

1.1.1.        "the Trust Fund" means
- the sum specified in the Second Schedule and
- all money investments or other property paid or transferred by any person or persons to or so as to be under the control of and (in either case) accepted by the Trustees as additions and
- all accumulations (if any) of income directed to be held as an accretion to capital and
- the money investments and property from time to time representing the said money investments property additions and accumulations;

1.1.2.        "the Beneficiaries" means and includes the persons named or described in the Third Schedule hereto:

1.1.3.        "the Trust Period" means the period commencing on the date of this Deed and ending on the earlier of the last day of the period of 80 years from the date of this Deed or such earlier date as the Trustees shall by virtue of their power under clause 3 hereof specify;

1.1.4.        "the Proper Law" of this Trust means the law of the jurisdiction to which the rights of all parties and the construction of each and every provision of this Trust shall be subject;

1.1.5.        "Minor" means any individual who has not attained the age of 20 years notwithstanding that such individual may by the laws of his or her domicile be of full age and "full age" shall be construed accordingly;

1.1.6.        "Person" means any individual or body of persons corporate or incorporate;

1.1.7.        "Issue" means children and remoter issue whether legitimate, illegitimate, adopted or legitimated and step-children;

1.1.8.        "Protector" means the Person holding for the time being the office of Protector pursuant to any appointment made in accordance with Clause 14 hereof;

1.2.        Words importing the singular shall include the plural and the masculine gender shall include the feminine and vice versa.

2.        **Proper Law, Forum of Administration, Jurisdiction**

2.1.      THIS Trust is established under the laws of the Principality of Liechtenstein and in particular Articles 897 to 932 of the Personen- und Gesellschaftsrecht (statute number 4 of 20th January 1926) shall be applicable to this Trust.

2.2.      The forum of administration of this Trust shall be in the Principality of Liechtenstein and the rights of all parties and the construction and effect of each and every provision hereof shall be subject to the exclusive jurisdiction of and construed only according to the laws of the Principality of Liechtenstein.

2.3.      The Trustees may register this Trust with the Oeffentlichkeitsregister of the Principality of Liechtenstein or deposit this Deed and any amendments thereto with the Liechtenstein Princely Court as they think fit.

2.4.      The Trustees may at any time declare in writing that from the date of such declaration the Proper Law of this Trust shall be that of any specified jurisdiction (not being a jurisdiction under the law of which this Trust would be capable of revocation) and that all rights under this Trust and its construction and effect shall be subject to and construed according to the laws of that jurisdiction and so often as any such declaration shall be made the Trustees shall be free to make such alterations and/or additions in or to the trusts powers and provisions of this Trust as they may consider necessary or desirable so that the trusts powers and provisions hereof shall then (mutatis mutandis) be as valid and effective as they were immediately prior to the making of such declaration.

2.5.      In the case that in the country or state of the forum of administration any of the events referred to in sub-clause 2.5.2. hereof shall occur the trustee or trustees resident or having a place of business at the forum of administration shall with immediate effect and without the necessity of filing or signing any documents cease to be trustee or trustees hereof and be divested of the title to the Trust Fund and the trustee or trustees shall have no claim or claims against the Trust Fund in respect of charges or expenses whether or not such claim or claims have accrued at the time the events aforesaid have occurred.

2.5.1.    Immediately following the trustee or trustees ceasing to be trustee or trustees hereof the continuing trustee or continuing trustees shall change the forum of administration and the law applicable to this Trust and appoint a new trustee or new trustees and effect such changes, alterations and/or modifications to this Deed as they consider necessary to ensure that this Deed is as valid under the new law as under the law previously applicable.



# Atlantic Council

## EURASIA CENTER

# Russia's Interference in the US Judiciary

Anders Åslund



Case 2:14-cv-09764-RGK-PLA Document 229-46 Filed 03/02/20 Page 72 of 106
Case 2:14-cv-09764-R-PLA Document 219-3 Filed 03/11/19 Page 71 of 105 Page ID
Page ID #:3011
#:5463

Case 2:14-cv-09764-RGK-PLA   Document 229-46   Filed 03/02/20   Page 73 of 106
Case 2:14-cv-09764-RGK-PLA   Document 219-3   Filed 03/11/19   Page 72 of 105   Page ID
Page ID #:7012
#:5464

# Russia's Interference in the US Judiciary

Anders Åslund

ISBN-13: 978-1-61977-554-1

*Cover photo credit:* REUTERS/Sergei Karpukhin.

*This report is written and published in accordance with the Atlantic Council Policy on Intellectual Independence. The author is solely responsible for its analysis and recommendations. The Atlantic Council and its donors do not determine, nor do they necessarily endorse or advocate for, any of this report's conclusions.*

July 2018

Case 2:14-cv-09764-RGK-PLA   Document 229-16   Filed 03/02/20   Page 75 of 106
Case 2:14-cv-09764-RGK-PLA   Document 21-13   Filed 11/19   Page 74 of 105   Page ID
Page ID #:7014

# TABLE OF CONTENTS

Executive Summary                                                                                    2

Introduction                                                                                         3

Putin's Consolidation of Authoritarian State Control                                                 4

Corporate Raiding or Government Expropriation                                                        7
   *The Confiscation of the Yukos Oil Company*                                        7
   *The Magnitsky Affair*                                                             9
   *Other Examples of Corporate Raiding*                                              10

The Role of Russian Courts in Russia's Kleptocracy                                                  12

Russian Use of Interpol to Advance Its Kleptocracy                                                  14

Abuse of US Courts by the Russian Government,
   Its Representatives, and Proxies                                                   16

   *Actions Filed Under 28 U.S.C. § 1782*                                             16
      Yukos Applications                                               16
      FKP Sojuzplodimport vs. SPI Group                                17
      Application of Deposit Insurance Agency                          18

   *Actions Filed Under Chapter 15 of the US Bankruptcy Code*                         18
      The Poymanov Case                                                19

   *Actions for Recognition and/or Enforcement of Russian Judgments*                 20
      Sberbank v. Traisman                                             21
      Contents in Citibank Account                                     22

   *Misuse of US Courts by Kremlin Proxies*                                           23
      Smagin v. Yegiazaryan                                            24
      Avilon v. Leontiev                                               25

Conclusion and Recommendations                                                                      28

About the Author                                                                                    29

Case 2:14-cv-09764-RGK-PLA    Document 229-46    Filed 03/12/19    Page 76 of 106
Case 2:14-cv-09764-RGK-PLA    Document 219-3    Filed 03/11/19    Page 75 of 105    Page ID
Russia's Interference in the US Judiciary    Page #15467
#15015

# EXECUTIVE SUMMARY

Under President Vladimir Putin, lawlessness has taken over the Russian state, including its law enforcement branch. A multitude of Russian state agencies collude in criminal activities to the material benefit of the officials involved. These crimes are encouraged by the top echelons of the government, most notably by Putin himself; they involve state enterprises, the Central Bank of Russia, the Deposit Insurance Agency, and all law enforcement bodies, including the Investigative Committee, the Prosecutor General's Office, the Ministry of Interior, and the prison service. These state officials also cooperate with organized criminals and professional private lawyers.

Russian state power legitimizes this lawlessness and gives it an official state sanction. This makes it easier for these actors to successfully use the United States legal system, which tends to give foreign governments the benefit of the doubt in legal cases. Thus, the Kremlin has exploited the US judicial system to advance the Russian state's corrupt corporate raiding and expropriation schemes. The US Congress and Department of Justice need to address this exploitation of the US judiciary for nefarious purposes and act decisively to safeguard US democratic institutions.

More broadly, Russian state agencies and their proxies are using the international judicial system to their advantage. This report focuses on the United States, but Russian authorities pursue similar activities in many countries. Red Notices issued by Interpol on the basis of flawed Russian evidence are common and many countries have received requests from Russian legal authorities to enforce their judgments. In the US judiciary, three particular problems stand out: the generous provisions for opening a discovery case, the minimal statutory requirements for bankruptcy proceedings, and the enforcement of Russian court verdicts without considering the pervasiveness of corruption within the Russian judicial and law enforcement systems.

The United States has two important legal acts that can help it to target corrupt and lawless Russian officials. In December 2012, the US Congress adopted the *Sergei Magnitsky Rule of Law Accountability Act*, which sanctions forty-nine Russian officials.[1] In December 2016, the US Congress adopted the *Global Magnitsky Human Rights Accountability Act*, which sanctions violators of human rights around the globe. These are critical pieces of legislation, and the designation of additional sanctions targets is justified.

Additional measures are needed to stop the Russian state's misuse of the US judicial system. The House and Senate Judiciary Committees should hold hearings about these cases of malpractice and Congress should consider legislation on the basis of such hearings. The Department of Justice or the State Department should establish a coordination office that would liaise with US courts; it would be a central site where victims of abuse by corrupt governments could submit evidence. The Department of Justice needs to issue clear guidelines to the courts regarding how to assess the validity of foreign justice systems. Such guidelines could be based on the State Department's annual human rights report.[2]

---

[1]    Russia and Moldova Jackson-Vanik Repeal and Sergei Magnitsky Rule of Law Accountability Act of 2012, Pub. L. No. 112-208 (2012). https://www.treasury.gov/resource-center/sanctions/Programs/Documents/pl112_208.pdf.

[2]    US Department of State, *Human Rights Report*, 2017, https://www.state.gov/j/drl/rls/hrrpt/.

Case 2:14-cv-09764-RGK-PLA   Document 220-46   Filed 03/02/20   Page 77 of 106   Page ID #:7916

Case 2:14-cv-09764-RGK-PLA   Document 221-3   Filed 03/11/19   Page 76 of 105   Page ID #:5476   Russia's Interference in the US Judiciary

# INTRODUCTION

Recent revelations regarding Russia's influence on the 2016 United States presidential election are alarming, but it is important to understand that this was not an isolated incident. Russia's meddling in the election was merely the latest manifestation of its longstanding practice of infiltrating and exploiting Western institutions. The National Intelligence Council characterized Russia's actions as representative of a "longstanding desire to undermine the US-led liberal democratic order ... which Putin and other senior Russian leaders view as a threat to Russia and Putin's regime."[3] That regime—a kleptocracy in which money and power are inextricably intertwined, controlled, doled out, and stripped away by its leader, the newly reelected President Vladimir Putin—has never been more aggressive in its attempts to manipulate and misuse Western institutions.

Putin has systematically extended full control over the Russian state, all of its agencies, and its state-owned companies. He has expanded his power to the whole nation and economy, establishing an authoritarian kleptocracy or "mafia state." The combined aims of this system are to extend the influence of Putin and his close loyalists, which have become the ruling elite, and to maximize their wealth.

This system stands in sharp contrast to the Western rule of law, but it utilizes the Western financial and legal systems to its own benefit. Since the Russian authoritarian system cannot guarantee property rights, even its rulers export capital on an industrial scale, often by illegal means. Subsequently, this "mafia state," which itself abides by few laws, utilizes the international legal system not only to safeguard the wealth of its own elite, but also to repress and seize the property of its political opponents.

This process of expropriation and political repression has its own logic. It starts with Russian state officials or Putin's personal associates taking over a private enterprise in Russia illegally, often with the help of official

law enforcement agencies. Occasionally, the former owners are arrested and jailed, but many are let go in Russia and a number of them flee abroad. If the fleeing entrepreneurs protest too loudly, Russian state agents tend to go after them for their own enrichment. They may issue a Russian arrest order, which is sent bilaterally to many countries and to Interpol, which habitually issues an international arrest order, referred to as a Red Notice. Eventually, the Russian state may exploit the US judicial system to reach their targets, undermining the rule of law both in Russia and in the United States. The judicial agents of the Russian state are highly skilled. They use specific US legal instruments, such as discovery and bankruptcy, to reach their victims.

The goal of this report is to draw the attention of the US Department of Justice, the judiciary, and officers of US courts about these efforts to turn the US justice system into a tool of Russian government officials. Members of Congress and the Department of Justice should take measures to halt this insidious assault on the US judiciary and combat this threat to US democratic institutions.

This paper begins with an overview of how Putin seized authoritarian control of the Russian state and its main institutions. It continues with a discussion of the evolution of corporate raiding and government expropriation, followed by an assessment of how the Russian courts help Russia's kleptocracy and how Russia uses Interpol for its illicit aims. Then, the bulk of this paper outlines how the Kremlin and its proxies have misused and continue to exploit the US courts, with examples of the various tactics employed.

These examples corroborate a recent warning from a former high-level official within the Department for Homeland Security who argued that "[we] need to broaden the focus beyond elections. Our courts are at risk, too. ... The Kremlin playbook here is easy to envision, but our strategy to counter it has yet to be built."[4] Some policy recommendations are provided in the conclusion.

---

3   *Assessing Russian Activities and Intentions in Recent US Elections*, Intelligence Community Assessment 2017-01D, January 6, 2017, https://www.dni.gov/files/documents/ICA_2017_01.pdf.

4   Suzanne Spaulding, "Don't overlook the Kremlin's threats to our courts," *Washington Post*, October 30, 2017, https://www.washingtonpost.com/opinions/dont-overlook-the-kremlins-threats-to-our-courts/2017/10/30/f1e656aa-bd8e-11e7-959c-fe2b598d8c00_story.html?utm_term=.6a0d59f01752.

# PUTIN'S CONSOLIDATION OF AUTHORITARIAN STATE CONTROL

Russia is no law-abiding state. Since Vladimir Putin became president of Russia in 2000, he has developed the Russian state apparatus into a full-fledged authoritarian kleptocracy—that is, a state that steals money and private enterprises from its citizens, as late Professor Karen Dawisha analyzed in her book, *Putin's Kleptocracy*. Dawisha documented how Putin had been deeply involved in organized crime as early as 1991.[5] Needless to say, he has only grown more brazen as he has accumulated power.

Step by step, Putin seized control over the Russian state. As chairman of the Federal Security Service (FSB, formerly known as the KGB) in 1998-1999, he took firm control of the secret police. As prime minister from August 1999 until the end of that year, he gained significant control over the state administration. One of his first decisions after having been inaugurated as president in May 2000 was to alter Russia's federal institutions to be able to build up his "vertical of power" over the regions, which had been relatively autonomous. The regional governors would no longer sit on the Federal Council, Russia's senate, and in practice the senators became dependent on the Kremlin. In the fall of 2004, Putin fully subordinated the regions by abolishing elections of regional governors, making them subject to his indirect appointment.[6]

Another of Putin's early actions as president in 2000 was to have the leading oppositional media tycoon, Vladimir Gusinsky, prosecuted and arrested for his "misappropriation of funds." The obvious aim was to take over Gusinsky's outstanding television channel, NTV. Putin exploited the fact that Gusinsky had taken a loan from the state gas giant Gazprom, calling the loan and forcing Gusinsky to sell NTV for a pittance to Gazprom. Gusinsky was allowed to leave the country within a couple of days in July 2000. A few months later, the other big media tycoon, Boris Berezovsky, fled the country and was forced to relinquish control of his television company, ORT, for a trifle. By 2003, the last independent television channel was closed and the independent media landscape had significantly shrunk.[7]

Putin also endeavored to seize full control over law enforcement agencies. In April 2001, he appointed his own minister of interior, securing his command over the ordinary police. One of his early statements was to carry out a judicial reform that he called the "dictatorship of law." In December 2001, the Kremlin promulgated a package of laws on judicial reform. They improved the financing of the courts and the status of judges, but also ensured that judges became dependent on the central executive rather than on regional governors. Thus, Putin has had full executive control over the ordinary court system since 2002.[8]

> "Since Vladimir Putin became president of Russia in 2000, he has developed the Russian state apparatus into a full-fledged authoritarian kleptocracy."

In October 2003, Putin had the richest man in Russia, Mikhail Khodorkovsky, arrested for tax fraud. Rosneft, the state oil company, confiscated Khodorkovsky's Yukos Oil over the course of two years for its own benefit. Khodorkovsky served ten years in Russian prisons before he was allowed to leave Russia. In that one strike against the strongest and most daring tycoon, Putin secured his position of power over the rising entrepreneurial class.

At the same time, Putin ousted Prime Minister Mikhail Kasyanov and the head of the presidential administration, Aleksandr Voloshin, top officials whom he had inherited from President Boris Yeltsin's administration; they

---

5    Karen Dawisha, *Putin's Kleptocracy: Who Owns Russia?* (New York: Simon & Schuster, 2014).

6    Anders Åslund, *Russia's Capitalist Revolution: Why Market Reform Succeeded and Democracy Failed*, (Washington: Peterson Institute for International Economics, 2007).

7    Ibid.

8    Peter H. Solomon, Jr., "Putin's Judicial Reform: Making Judges Accountable as well as Independent," *East European Constitutional Review* 11, no. 1/2 (2002): 117-12; Brian D. Taylor, "Law Enforcement and Civil Society in Russia," *Europe-Asia Studies* 58, no. 2 (2006): 193-213.

Case 2:14-cv-09764-RGK-PLA   Document 229-46   Filed 03/02/20   Page 79 of 106
Page ID #:7018
Russia's Interference in the US Judiciary



Rosneft, the state oil company, confiscated Khodorkovsky's Yukos Oil over the course of two years for its own benefit. *Photo credit:* Wikipedia/Korovkin 84 (https://creativecommons.org/licenses/by-sa/4.0/deed.en).

were considered to have been sympathetic to the country's big businessmen. Thus, Putin successfully gained full control over the state administration. The proof of Putin's consolidation of political power was that the parliamentary elections in December 2003 and presidential elections in March 2004 were no longer competitive.

Gradually, Putin took direct personal control of the big state companies. His technique was to appoint his loyal assistants as powerful chief executives, beginning in May 2001 with the ousting of the management of Gazprom, the state gas monopoly. He appointed Aleksei Miller, one of his assistants from St. Petersburg, as Gazprom's chief executive, and Miller remains in this position to this day despite the company's disastrous financial development.

As late as 2002, the Russian government made a failed attempt to privatize the state-owned oil company Rosneft, but everything changed with the Yukos affair and the arrest of Khodorkovsky in October 2003. Officially, however, Putin insisted on the need

for further privatization. Time and again during the Yukos affair, Putin publicly insisted that he opposed its nationalization and that he was detached from the legal process, although it was evident that the daily proceedings were dictated by the Kremlin.

In the fall of 2006, however, Putin abruptly changed his position. Without real public discussion, the Kremlin started merging entire industrial sectors into conglomerates with near monopolies. Although the government had successfully taxed the oil rents of private oil companies, the Kremlin preferred to channel these rents through state enterprises. Two vast military-industrial companies, the United Aircraftbuilding Corporation and the United Shipbuilding Corporation, were created.

Six state corporations were also established that were formally nongovernmental organizations. The three most important were the armaments company Russian Technologies (Rostec); Vnesheconombank (VEB), the former Soviet foreign trade bank; and Rosatom, the former Soviet ministry of atomic energy. Since these

corporations were technically private, this was the biggest privatization that Russia experienced. The Russian political scientist Vadim Volkov assessed that the assets transferred to these nongovernmental organizations amounted to $80 billion, and the government itself added $36 billion of fresh capital.[9]

State capitalism comes in many forms. It can be competitive or focused on development, but the Russian variety seems particularly economically inefficient and dysfunctional. Joshua Kurlantzick has eloquently summed up its peculiarities: "In Russia, state companies throttle any potential private-sector competitors. Under Putin, the Kremlin has allowed just one or two state firms to dominate nearly every leading industry, with each company staffed by Putin loyalists. Companies that have resisted state takeover have been sacked with enormous tax bills until they sell out. Many of the most promising young entrepreneurs in Russia simply have fled the country."[10]

This perverse state capitalism serves not the Russian nation but its top officials and their close associates. Russia has systematically developed the tool of confiscating private enterprises to the benefit of state officials and their friends on a massive scale, a process which in Russian is called *reiderstvo*. *Reiderstvo* literally means corporate raiding, but is actually the theft of enterprises, which differs from the Western meaning of corporate raiding.

This practice is carried out on an extraordinary scale in Russia. In December 2015, Putin himself confessed how dire the situation was in his annual address to the Russian Federal Assembly:

> "During 2014, the investigative authorities opened nearly 200,000 cases of so-called economic crimes. But only 46,000 of 200,000 cases were actually taken to court, and 15,000 cases were thrown out during the hearings. Simple math suggests that only 15 percent of all cases ended with a conviction. At the same time, the vast majority, over 80 percent, or specifically, 83 percent of entrepreneurs who faced criminal charges fully or partially lost their business—they got harassed, intimidated, robbed, and then released. This certainly isn't what we need in terms of a business climate. This is actually the opposite, the direct destruction of the business climate. I ask the investigative authorities and the prosecutor's office to pay special attention to this."[11]

Putin's words suggested that he intended to change policy and discipline the law enforcement agencies, but in fact he did nothing about them. In 2014, 212,316 criminal cases had been opened against businessmen, but that number surged to 255,250 in 2015. Putin clearly permitted the "law enforcers" to enrich themselves at the cost of Russia's private enterprises.[12]

As Jordan Gans-Morse concluded in his thorough empirical study of property rights in Russia, the country reversed itself, moving from enforcing a certain degree of the rule of law to engaging in "state predation." In the early 1990s, organized crime had ruled, but it was defeated in the mid-1990s and a relative rule of law took hold in the early 2000s. Since then, Russia's precarious rule of law has given way to state predation.[13] According to Gans-Morse, Russia's legal defense of property rights was at its best between 1999 and 2003.[14]

The essence of Putin's rule is that he is not working for the Russian state or nation, but for a relatively narrow circle of loyalists. He has gained control over the state, its enterprises, and its law enforcement. Putin and his allies tap the state and its companies for money, which they then transfer to multiple layers of shell companies in offshore havens around the world, as was outlined in the Panama Papers. These schemes do nothing to improve the Russian state; they purely benefit Putin and his loyalists.

---

9   Vadim Volkov, "Russia's New 'State Corporations': Locomotives of Modernization or Covert Privatization Schemes?" *PONARS Eurasia Policy Memo*, no. 25 (August 2008).

10  Joshua Kurlantzick, *State Capitalism: How the Return of Statism Is Transforming the World* (New York: Oxford University Press, 2016), 42.

11  Vladimir Putin, "Presidential Address to the Federal Assembly" (speech, Moscow, December 3, 2015). http://en.kremlin.ru/events/president/news/50864.

12  Elizaveta Bazanova et al., "Vladimir Putin vnov' poobeshchal biznesu zashchitu ot pravookhranitelei" ("Vladimir Putin Once Again Promised Business Defense against Law Enforcers"), *Vedomosti*, June 20, 2016.

13  Jordan.Gans-Morse, *Property Rights in Post-Soviet Russia: Violence, Corruption, and the Demand for Law* (New York: Cambridge University Press, 2017), 189.

14  Ibid, 191.

Case 2:14-cv-09764-RGK-PLA   Document 229-46   Filed 03/02/20   Page 81 of 106
Case 2:14-cv-09764-RGK-PLA   Document 219-3   Filed 01/11/19   Page 80 of 105   Page ID
Page ID #:7020                                    #:4772 Russia's Interference in the US Judiciary

# CORPORATE RAIDING OR GOVERNMENT EXPROPRIATION

Corporate raiding (*reiderstvo*), the unlawful seizure of private assets by the Kremlin, has been the norm in Russia since the beginning of Putin's reign. As Gans-Morse puts it: "If the 1990s were a period of lawlessness during which the state was too weak to protect honest businesspeople from criminals and unscrupulous competitors, then the threat in recent years often has emanated from within the state itself."[15]

Time after time, Putin has seized private companies under bogus pretexts, and, with the assistance of corrupt law enforcement officials and judges, redistributed the assets to the Russian state or to well-connected friends and associates. His many subordinates do the same. The Russian government has demonstrated a common course of conduct in its unlawful seizure of private businesses across all sectors for unjust political, financial, and personal gain. It is not that one or a few law enforcement agencies have gone awry; they are all engaging in the same practices, sometimes in competition over the loot, sometimes in collusion.

Two cases of Russian misuse of judicial powers stand out: the confiscation of Yukos oil company and the Magnitsky affair. Before the Yukos case began in 2003, many believed that Putin was genuinely interested in developing the rule of law. The persecution of Yukos highlighted his true intentions: to use the full spectrum of state judicial bodies to the benefit of the state and his cronies. The Yukos affair was followed by illustrative Russian state actions abroad. While the Magnitsky affair was carried out on a much smaller scale, it also clearly exemplifies the various criminal elements and the international scope that typically characterize *reiderstvo*. The Yukos and Magnitsky examples are also the most well-known and best researched cases of Russian miscarriages of justice.

## The Confiscation of Yukos Oil Company

In 2003, the Yukos Oil Company was Russia's largest oil producer. However, on October 25, 2003, the government arrested Yukos's then-chief executive officer, Mikhail Khodorkovsky. Khodorkovsky was prosecuted on charges of tax evasion and fraud, and ultimately convicted and sent to prison. The Kremlin-manufactured bankruptcy of Yukos followed, as well as the pre-meditated seizure of its assets by state-owned oil company Rosneft through rigged bankruptcy auctions.[16]

On February 19, 2003, Putin held his annual meeting with a group of oligarchs in the Kremlin. The Kremlin had chosen "corruption" as the theme, and Putin declared that he wanted "to liquidate the very basis of corruption."[17] Mikhail Khodorkovsky, chief executive officer of Yukos oil company, then Russia's largest oil producer, was present. He responded that the state-owned oil company Rosneft had bought the small oil company Severnaya Neft for $600 million, while a former deputy minister of finance had bought it for $7 million only two years earlier—implicitly accusing the Rosneft management of corruption. Enraged, Putin retorted that Khodorkovsky had no business to complain about corruption "having made their billions, they spend tens, hundreds of millions of dollars to save their billions. We know how this money is being spent—on what lawyers, PR campaigns, and politicians it is going, and on getting questions like these asked."[18]

In July 2003, Khodorkovsky's first deputy, Platon Lebedev, was arrested, and on October 25, Khodorkovsky himself was arrested. The original legal complaint was the privatization of one subordinate company, the fertilizer plant Apatity (now called Phosagro and owned by Putin cronies). Eventually, however, the prosecutor general prosecuted Khodorkovsky and Yukos for major

---

15   Jordan Gans-Morse, "Threats to Property Rights in Russia: From Private Coercion to State Aggression," *Post-Soviet Affairs* 28, no. 3 (2012): 278.

16   Stanley Reed, "$50 Billion Awarded in Breakup of Yukos," *New York Times*, July 28, 2014, www.nytimes.com/2014/07/29/business/international/yukos-shareholders-awarded-about-50-billion-in-court-ruling.html.

17   Vladimir V. Putin, "*Vstupitel'noe slovo na vstreche s predstavitelyami Rossiskogo soyuza promyshlennikov i predprinimatelei*" ("Introductory remarks at the meeting with representatives of the Russian Union of Industrialists and Entrepreneurs"), February 19, 2003. http://kremlin.ru/events/president/transcripts/21881.

18   Peter Baker and Susan Glasser, *Kremlin Rising: Vladimir Putin's Russia and the End of Revolution* (New York: Scribner, 2005), 282; Steven Lee Myers, *The New Tsar: The Rise and Reign of Vladimir Putin* (New York: Knopf, 2015), 220-1.



Mikhail Khodorkovsky, former CEO of YUKOS oil major, stands behind bars during his trial in Moscow's Meschansky district court, September 24, 2004. *Photo credit:* REUTERS/Viktor Korotayev.

tax crimes. Yukos had utilized domestic regional tax havens, but that was legal tax planning. In May 2005, Khodorkovsky was sentenced to nine years in prison for tax evasion. In 2007, new charges were brought against Khodorkovsky for embezzlement and money laundering, supposedly for having stolen oil for which they had not paid taxes, and his prison sentence was extended to

eleven years. Several other Yukos managers were sentenced to prison or fled abroad.[19]

Putin repeatedly claimed to stay outside of the judicial process and to oppose the nationalization of Yukos, but the obviously-rigged legal proceedings suggested that he plotted the company's confiscation from the outset.[20] The tax authorities seized the company and sold off its parts to Rosneft for a pittance, starting with its main oil field, Yuganskneftegaz, which was sold at a bargain price to a single unknown bidder in a farcical executive auction before Christmas on December 19, 2004.[21] The next day, Rosneft acquired the shell company.

In December 2013, Putin pardoned Khodorkovsky, as an apparent gesture of good will before the Sochi Winter Olympics. Khodorkovsky immediately departed from Russia. However, once he became politically active in the West, Russian prosecutors opened a new case against him, accusing Khodorkovsky of allegedly murdering the mayor of Nefteyugansk in June 2008.

On July 18, 2014, an arbitral tribunal in The Hague unanimously concluded that Russia had breached its international obligations under the Energy Charter Treaty by destroying Yukos and appropriating its assets. The Hague tribunal found that "the auction of Yuganskneftegaz, Yukos Oil's primary oil production subsidiary, was rigged" and amounted to "a devious and calculated expropriation" by Russia; the tribunal ordered Russia to pay more than $50 billion to Yukos's former shareholders.[22] A Dutch local court revoked this verdict, but the case continues in a higher Dutch court.

By jailing the biggest and most independent tycoon in Russia, Putin put all of the country's big businessmen in their place. Global condemnation of the injustice done to Yukos and its executives did not prevent the Putin regime from using the episode as a blueprint for seizing and nationalizing other Russian energy companies in subsequent years. "In 2000, majority state-owned companies produced 10 percent of oil output; by 2008, they produced 42 percent,"[23] according to Gans-Morse.

19   Stephen Fortescue, *Russia's Oil Barons and Metal Magnates* (New York: Palgrave McMillan, 2006), 121-148.

20   Vladimir V. Putin, "Remarks by President Vladimir Putin on Yukos Affair at Government Meeting," *RTR Vesti Program – Federal News Service*, October 27, 2003.

21   Thane Gustafson, *Wheel of Fortune: The Battle for Oil and Power in Russia* (Cambridge, MA: Belknap Press of Harvard University Press, 2012), 345.

22   *Hulley Enterprises Limited. v. The Russian Federation*, PCA Case No. AA 226, Final Award, ¶¶ 5, 757, 1037 1041 (Jul. 18, 2014), https://www.italaw.com/sites/default/files/case-documents/italaw3278.pdf. The arbitral panel's award subsequently was vacated for jurisdictional reasons: Russia never agreed to be bound by the arbitration regulations of the Energy Charter Treaty, under which Yukos brought suit.

23   Gans-Morse, *supra* note 3, 279.

## The Magnitsky Affair

One of the most well-known and best-investigated cases of Russian miscarriage of justice was that of the lawyer Sergei Magnitsky. Magnitsky accused Russian officials from various state agencies of having stolen $230 million from tax authorities through a fraudulent tax refund. Instead of investigating his claims, those officials charged Magnitsky for their own crime.[24] The Magnitsky affair illustrates Russia's lawlessness, the illusory nature of private rights, and Russian state officials' methods of embezzlement.

By the end of the 1990s, William Browder, founder and manager of the investment firm Hermitage Capital Management, was one of the largest foreign investors in Russia. Initially, Browder was an outspoken supporter of Putin, claiming that he wanted to develop the rule of law in Russia. Browder was an activist investor, advocating for improved corporate governance in state companies, including Gazprom. In late 2005, however, he fell out of favor and was refused an entry visa into Russia.[25]

In June 2007, dozens of police officers raided Hermitage's Moscow offices. They unlawfully seized documents and used them to transfer ownership of Hermitage's holding companies to another entity. They obtained sham judgments that became the basis for a scheme to defraud Russian taxpayers by pocketing $230 million of fraudulent tax refunds.[26] When one of Browder's Russian tax attorneys, Sergei Magnitsky, discovered this criminal scheme, he notified the Russian authorities. Rather than pursuing the criminal perpetrators, the Russian authorities charged Hermitage and its attorneys with tax fraud. They arrested Magnitsky, perversely charging him with the fraud that he had uncovered. In 2009, at the age of thirty-eight, he was beaten to death while in pre-trial detention in Moscow's Butyrka prison.[27]

Thanks to Browder's substantial research, we know more about the Magnitsky affair than about any other case, and it clearly illustrates how various Russian state agencies cooperated in the crime. The two lead agencies were the Russian tax authorities and the Ministry of Interior, but other agencies, including the Investigative Committee, the Prosecutor General's Office, and the prison authorities, working in tandem with an organized crime group and a couple of top-notch Russian private lawyers, were also closely involved. Their cooperation in this scheme amounted to a full-fledged state mafia.[28]

The Magnitsky affair drew heavy global criticism. In December 2012, the US Congress adopted the *Sergei Magnitsky Rule of Law Accountability Act* (the Magnitsky Act) to spotlight the absence of the rule of law in Russia and to sanction human rights violators. Its preamble recognizes that "Sergei Magnitsky's experience ... appears to be emblematic of a broader pattern of disregard for the numerous domestic and international human rights commitments of the Russian Federation and impunity for those who violate basic human rights and freedoms."[29]

The Magnitsky Act authorized sanctions imposed by the US Treasury on individuals involved in the original tax scheme uncovered by Magnitsky or linked to his detention, death, and cover-up, as well as those who are guilty of other human rights violations or complicit in the Russian government's repression of human rights. As of December 2017, a total of forty-nine Russian culprits have been sanctioned. One of them is the head of the Investigative Committee and Putin's law school friend from St. Petersburg, Alexander Bastrykin.[30] It is no secret that Putin is greatly upset over the Magnitsky Act.

In December 2016, the US Congress adopted the *Global Magnitsky Human Rights Accountability Act* (the Global Magnitsky Act), and one year later the US Treasury named the first targets of sanctions. The only Russian on that list was Artem Chaika, son of the Russian Prosecutor General Yuri Chaika.[31] In a film made by the anti-corruption activist Aleksey Navalny in December 2015, young Chaika had been exposed as a major organized criminal who used his father's subordinates to extort innocent victims and take their enterprises.[32]

24  Bill Browder, *Red Notice: A True Story of High Finance, Murder, and One Man's Fight for Justice* (New York: Simon & Schuster, 2015).

25  Clifford Levy, "An Investment Gets Trapped in Kremlin's Vise," *New York Times*, July 24, 2008, http://www.nytimes.com/2008/07/24/world/europe/24kremlin.html.

26  Ibid.

27  Browder, *Red Notice*.

28  US Department of the Treasury, "Treasury Targets Individuals Involved in the Sergei Magnitsky Case and Other Gross Violations of Human Rights in Russia," Press Release, December 20, 2017, https://home.treasury.gov/news/press-releases/sm0240.

29  Magnitsky Act § 402(a)(12).

30  US Department of the Treasury, "Treasury Targets Individuals Involved in the Sergei Magnitsky Case."

31  "United States Sanctions Human Rights Abusers and Corrupt Actors Across the Globe," US Department of the Treasury, December 21, 2017, https://home.treasury.gov/news/press-releases/sm0243.

32  "Chaika. An investigative documentary by the Anti-Corruption Foundation," YouTube video, posted by Aleksey Navalny, January 26, 2016, https://www.youtube.com/watch?v=3eO8ZHfV4fk.

Case 2:14-cv-09764-RGK-PLA   Document 228-46   Filed 03/02/20   Page 84 of 106
Page ID #:7023
Case 2:14-cv-09764-RGK-PLA   Document 219-3   Filed 03/11/19   Page 83 of 105   Page ID
#:5473

Russia's Interference in the US Judiciary



The Central Bank of Russia has been "destroying good banks" to accomplish illicit goals, namely political retribution, state-sanctioned extortion, and unlawful self-enrichment. Wikipedia/Ludvig14 (https://creativecommons.org/licenses/by-sa/4.0/deed.en).

In December 2017, the US adopted a novel stand. It sanctioned a couple of lawyers in the private sector, Yulia Mayorova and Andrei Pavlov, who have repeatedly represented Russian government agencies abroad to extract information and financial rewards.[33] While seemingly working for the Russian government, they participate in the Russian international extortion racket. Both of these highly-skilled lawyers have worked extensively on cases in US courts.

Meanwhile, it has become clear that the Magnitsky loot had been transferred to much higher levels in the Russian government than was initially understood.

With the help of the Panama Papers, the Organized Crime and Corruption Reporting Project (OCCRP) even traced a payment of $800,000 to Putin's cellist childhood friend, Sergey Roldugin, who clearly held offshore funds for Putin, as coming from an offshore company that was used to steal the Magnitsky loot.[34]

## Other Examples of Corporate Raiding

Corporate raiding is not a rarity; it has become standard procedure in Russia. This report focuses on big and well-documented cases that reached the US judicial system, but thousands of small and medium-sized

---

33  US Department of the Treasury, "Treasury Targets Individuals Involved in the Sergei Magnitsky Case."

34  Paul Radu, "Russia: The Cellist and the Lawyer," *OCCRP*, April 26, 2016, https://www.occrp.org/en/panamapapers/russia-the-cellist-and-the-lawyer/.

Case 2:14-cv-09764-RGK-PLA    Document 229-46    Filed 03/02/20    Page 85 of 106
Case 2:14-cv-09764-RGK-PLA    Document 219-3    Filed 11/19/19    Page 84 of 105    Page ID #:7024
Page ID #:7024                                                    Russia's Interference in the US Judiciary

enterprises have also been taken over by state authorities or their friends with the support of the Russian law enforcement system. Some of those smaller cases deserve mention.

For example, one of the early tycoons was Kakha Bendukidze, an ethnic Georgian. He developed Russia's largest heavy-engineering group, OMZ, with large privatized factories in Yekaterinburg and St. Petersburg. In 2004, after the Georgian Rose Revolution, Bendukidze became Minister of Economy to President Mikheil Saakashvili, who strongly opposed Putin.[35] Soon afterwards, Bendukidze was forced to sell OMZ to Gazprom at a price that he considered to be merely 40 percent of the market price.[36]

> "Putin's expropriation of many Russian banks appears to have furthered the financial interests of his cronies at the expense of those who do not enjoy his favor."

One of the biggest producers of titanium in the world is VSMPO-AVISMA. In 2006, after a highly successful privatization and revival of the company, its two dominant owners were compelled to sell their shares at a price they considered too low to then-Rosoboronexport, which later became a part of Rostec.[37] Rostec, or Russian Technologies, is a state corporation managed since its founding in 2007 by Sergei Chemezov, one of Putin's close KGB friends from the 1980s.

Another case involves the company Euroset, which in 2008 was Russia's biggest retail seller of mobile phones and accessories; it had a total of 5,000 outlets throughout the former Soviet Union. Euroset's main owner, Evgeny Chichvarkin, had built the company himself, but had become too well-known and lacked the necessary political protection for a businessman of his stature. He was forced to sell to the well-connected billionaire Alexander Mamut. When he refused to accept this fate and tried to engage in opposition politics against Putin, he was forced to flee the country for London within forty-eight hours.[38]

Since 2013, the Kremlin has also focused on consolidating and nationalizing the banking sector; at present, nearly 70 percent of Russian bank assets belong to banks under government control.[39] Moreover, about 500 banks have lost their licenses since the middle of 2013.[40] Most of the withdrawals of banking licenses by the Central Bank of Russia (Russia's primary bank regulator) might be justified due to a lack of capital or legal violations, but quite a few of these cases, especially those of medium-sized banks, have amounted to corporate raiding. Putin's expropriation of many Russian banks appears to have furthered the financial interests of his cronies at the expense of those who do not enjoy his favor.[41] In many cases, the Central Bank of Russia has been "destroying good banks" to accomplish illicit goals, namely political retribution, state-sanctioned extortion, and unlawful self-enrichment.[42]

The important point about corporate raiding is that the Russian state regularly targets companies that lack sufficient political cover. The aim is to enrich not the state but its leading servants, as often a state company is used as a conduit for the private enrichment of Russia's top officials.

---

35  David M. Herszenhorn, "Kakha Bendukidze Dies at 58; Pushed Post-Soviet Market Change," *New York Times*, November 15, 2014.

36  Kakha Bendukidze, personal communication, March 2014.

37  Neil Buckley and Arkady Ostrovsky, "Putin's Allies Turn Russia into a Corporate State," *Financial Times*, June 18, 2006. https://www.ft.com/content/138ae38e-fef1-11da-84f3-0000779e2340.

38  Gans-Morse, *Property Rights in Post-Soviet Russia*, 86; Maria Pils, "Russian banker Mamut buys phone retailer Euroset," Reuters, September 22, 2008.

39  "Rescues of Russian banks allow state to tighten its grip on sector," *Financial Times*, Sep. 27, 2017, https://www.ft.com/content/6c83034a-a2b4-11e7-9e4f-7f5e6a7c98a2.

40  Andrey Ostroukh, Polina Nikolskaya and Tatiana Voronova, "Russian central bank head says banking cleanup more than half complete," Reuters, February 2, 2018, https://www.reuters.com/article/russia-banks-cbank/update-2-russian-central-bank-head-says-banking-cleanup-more-than-half-complete-idUSL8N1PS1UH.

41  "Russia's largest private bank is rescued by the central bank," Economist, Aug. 31, 2017, www.economist.com/news/finance-and-economics/21727915-run-deposits-sparked-fears-contagion-russias-largest-private-bank.

42  "Russia's largest private bank is rescued by the central bank."

# THE ROLE OF RUSSIAN COURTS IN RUSSIA'S KLEPTOCRACY

Russia's judiciary is complicit in and facilitates the entrenchment of authoritarianism and kleptocracy. As noted by Freedom House: "The judiciary lacks independence from the executive branch."[43] The State Department's 2017 Investment Climate Statement for Russia states that "Russia's judicial system remains heavily biased in favor of the state, leaving investors often with little recourse in the event of a legal dispute with the government. High levels of corruption among government officials compound this risk."[44] As a result, government authorities and insiders can rely on selective, baseless prosecutions to opportunistically attack political opponents and seize business interests.

Russian courts regularly aid and abet government-sanctioned seizures of private assets. As one recent report noted, "fraud charges [against business owners] … are a common tool of both politically motivated and non-political, corruption-driven prosecution in Russia," and "courts often issue guilty verdicts without establishing whether any party has suffered damages from the defendant's actions."[45] Even if a guilty verdict does not follow—a statistical improbability given that less than 0.5 percent of criminal trials resulted in acquittals in 2016—long-term imprisonment or house arrest typically occurs, leaving the business susceptible to bankruptcy, a hostile takeover, or raiding.[46]

Russian courts readily issue rulings that attempt to legitimize and justify naked government-sanctioned expropriation and misconduct. Russia's judiciary facilitated the government-led scheme to take over Yukos oil company, imprison Mikhail Khodorkovsky and his fellow executives, and claim that these actions were legitimate. Russian courts affirmed the goverment's claims of more than $20 billion in tax assessments against Yukos, thus manufacturing a justification for the seizure of its assets and the resulting transfer of Yukos's key asset, Yuganskneftegaz, to Rosneft. In May 2005, a show trial was initiated in which Khodorkovsky was tried, convicted, and sentenced. The Hague tribunal later found that the Russian courts "bent to the will of Russian executive authorities to bankrupt Yukos, assign its assets to a state-controlled company, and incarcerate a man who gave signs of becoming a political competitor."[47] Five years later, in December 2010, the government brought new charges against Khodorkovsky while he was still serving his first sentence, and obtained yet another conviction.

> "Russian courts regularly aid and abet government-sanctioned seizures of private assets."

The courts played a particularly callous role in the Magnitsky case. On July 11, 2013—four years after he died in jail—Sergey Magnitsky was found guilty of tax evasion in the first posthumous conviction in Russian history.[48] A Russian court also issued a guilty verdict against William Browder. By contrast, Russian courts have repeatedly rejected efforts by the Magnitsky family's lawyer, Nikolai Gorokhov, to bring those responsible for Magnitsky's death to justice. On March 21, 2017, the day before he was due to appeal a lower court's refusal to reopen the investigation into the cause of

---

43  *Russia – 2018*, Freedom House, https://freedomhouse.org/report/freedom-world/2018/russia.

44  "2017 Investment Climate Statements – Russia," Bureau of Economic and Business Affairs, US Department of State, http://www.state.gov/e/eb/rls/othr/ics/investmentclimatestatements/index.htm?year=2017&dlid=269946.

45  Leonid Ragozin, "When Russian Officials 'Nightmare' Your Business, You Can Lose Everything—Even Your Life," Bloomberg, January 29, 2018, https://www.bloomberg.com/news/features/2018-01-29/when-russian-officials-nightmare-your-business-you-can-lose-everything-even-your-life.

46  Ibid. See also David Satter, *Russia's Abuse of Interpol*, Russia Studies Centre Policy Paper no. 6 (2015), www.henryjacksonsociety.org/wp-content/uploads/2015/07/Russias-Abuse-of-Interpol.pdf; US Department of State, "2016 Investment Climate Statements – Russia," www.state.gov/e/eb/rls/othr/ics/investmentclimatestatements/index.htm?year=2016&dlid=254409 (showing that of 200,000 economic crime cases initiated in Russia in 2014, 75 percent never went to court, but over 80 percent of individuals who were cleared still lost their business, and concluding that "[t]here is little recourse for Russian businesses caught in the legal system.").

47  *Hulley Enterprises Limited, supra* note 5, ¶¶ 636, 639, 1583.

48  See US v. Prevezon Complaint at ¶¶ 64, 66, 72.

13    ATLANTIC COUNCIL

Magnitsky's death, Gorokhov mysteriously fell out of the fourth-story window of his apartment building.[49] He survived and denied that his fall was an accident. Two months later, he appeared in court, arguing for the reversal of the lower court's decision. The court denied his appeal, despite being presented with new evidence:

messages between Andrey Pavlov, the attorney who "orchestrat[ed] the false claims used in the $230 million tax fraud"[50] and Oleg Urzhumtsev, the investigator initially tasked with examining the crimes uncovered by Magnitsky, who then shifted the investigation to target Magnitsky.[51]



*Butyrka Prison, where Russian authorities beat Sergei Magnitsky to death during pre-trial detention in 2009. Photo credit: Wikipedia/Stanislav Kozlovskiy (https://creativecommons.org/licenses/by-sa/3.0/deed.en).*

49  Clare Sebastian, "Magnitsky lawyer: Will 'fight for justice' despite risk to life," *CNN*, Jul. 25, 2017, https://www.cnn.com/2017/07/25/politics/russia-lawyer-magnitsky-nikolai-gorokhov/index.html.

50  115th Congress, 1st sess. Congressional Record Volume 163, no. 208, S8170 (statement of Senator Cardin).

51  Michael Weiss, "Russian Lawyer Nikolai Gorokhov Thrown from Window Was a Witness for the US Government," *The Daily Beast*, Mar. 23, 2017, https://www.thedailybeast.com/russian-lawyer-nikolai-gorokhov-thrown-from-window-was-a-witness-for-the-us-government.

Case 2:14-cv-09764-RGK-PLA   Document 22-16   Filed 03/11/19   Page 88 of 106
Case 2:14-cv-09764-RGK-PLA   Document 2191-3   Filed 03/02/20   Page 87 of 105   Page ID
#:37027

Russia's Interference in the US Judiciary

# RUSSIAN USE OF INTERPOL TO ADVANCE ITS KLEPTOCRACY

Russia's efforts to advance its kleptocracy do not stop at its borders. Russia has repeatedly co-opted Interpol in its unjust pursuit of those individuals who were able to escape Russia. The long-time Moscow correspondent David Satter has written a telling paper with many examples of how the Russian government has pursued innocent refugees through Interpol.[52] Russia regularly requests that Interpol subject its targets to a Red Notice, which enables an individual's arrest, detention, and potential extradition. The consequences range from detention and asset seizures to travel bans. Interpol issues thousands of Red Notices each year, but with its small secretariat of 190 members, it does so with little scrutiny, circulating them to all member countries and ordering the arrest of identified wanted people purely on the basis of domestic warrants.

Interpol's constitution requires a domestic warrant to be issued first, and it strives to safeguard against misuse by "repressive regimes to persecute their political opponents. However, in practice, Interpol is dependent on the honesty of its member countries to make sure that it is pursuing only genuine criminals."[53] Russia abuses this trust. As a recent report by the Center for Strategic and International Studies, "The Kremlin Playbook," emphasizes, "Russia's strategy seeks to co-opt and suborn Western democratic institutions and governance" and "exploits the inherent weaknesses within [them]"[54]—in this instance, the general deference accorded to domestic criminal warrants.

Examples of misuse are many. When media tycoon Vladimir Gusinsky dared to complain about how he was being targeted, Russia issued an international arrest order, which Interpol dismissed as politically motivated.

Even so, Gusinsky was arrested, first in Spain in 2000 and then in Greece in 2003, on the basis of bilateral Russian orders for his arrest. This has become a standard Russian state trick. Numerous individuals who worked with Yukos Oil prior to its seizure have fallen victim to this practice; one of them had to endure two months of confinement in a maximum-security prison before being released.[55] Russian law enforcement authorities have repeatedly had Red Notices put out for Browder in various legal cases; the Kremlin has submitted five separate Red Notice requests[56] and Browder has been detained on six occasions, most recently in Spain in May 2018.[57]

> "Russia's brazen attempts to co-opt the broader institutions of Western democracies is exemplified by a recent scandal involving the judicial system in Cyprus."

Russia's brazen attempts to co-opt the broader institutions of Western democracies is exemplified by a recent scandal involving the judicial system in Cyprus. Though it is a European Union member state, Cyprus has increasingly fallen under Russian influence. In November 2017, the private emails of Eleni Loizidou, the deputy attorney general of Cyprus, were leaked to the public, exposing her zealous cooperation with Russian officials in their efforts to extradite Russian and Cypriot citizens.[58] Loizidou, who has since been

---

52   David Satter, *Russia's Abuse of Interpol*, Russia Studies Centre Policy Paper no. 6 (2015), available at http://www.henryjacksonsociety.org/wp-content/uploads/2015/07/Russias-Abuse-of-Interpol.pdf.

53   Ibid.

54   Heather A. Conley, James Mina, Ruslan Stefanov, and Martin Vladimirov, *The Kremlin Playbook*, CSIS, October 2016, https://csis-prod.s3.amazonaws.com/s3fs-public/publication/1601017_Conley_KremlinPlaybook_Web.pdf.

55   Ibid.

56   Sarah Wildman, "Bill Browder, Putin's loudest critic, just got his visa back," *Vox*, October 25, 2017, https://www.vox.com/world/2017/10/25/16543216/william-browder-putin-magnitsky-visa-interpol.

57   Hannah Strange, "British Putin Critic Bill Browder Released after Arrest in Spain," *Telegraph*, May 30, 2018, https://www.telegraph.co.uk/news/2018/05/30/british-putin-critic-bill-browder-tweets-has-arrested-spain/.

58   Stephanie Kirchgaessner, "Senior Cyprus prosecutor allegedly offered private advice to Russians," *Guardian*, Nov. 29, 2017, https://www.theguardian.com/world/2017/nov/29/cyprus-prosecutor-allegedly-offered-advice-russia-officials-eleni-loizidou.

Case 2:14-cv-09764-RGK-PLA    Document 229-46    Filed 03/02/20    Page 89 of 106
Case 2:14-cv-09764-RGK-PLA    Document 219-3    Filed 03/11/19    Page 88 of 105    Page ID
Page ID #:4730    #:7028

Russia's Interference in the US Judiciary



Natalia Veselnitskaya has lobbied for the repeal of the Magnitsky Act and in court defended the real estate company Prevezon, which laundered the proceeds of the tax fraud exposed by Magnitsky. *Photo credit:* REUTERS/Kommersant Photo/Yury Martyanov.

suspended from her position pending the conclusion of an investigation, requested Russia's support for her candidacy to the important European Court of Human Rights in exchange for her clandestine advice and assistance.[59] The emails show Loizidou's attempts to directly intervene on behalf of Russian interests in several cases. Rather than deny her complicity with Russian interference in the Cyprus courts, Loizidou has launched a smear campaign against Browder, claiming that he is responsible for leaking her emails as retaliation for her criticism of Interpol's decision to deny Russia's requests for a Red Notice targeting him.[60]

Recent coverage of Russian lawyer Natalia Veselnitskaya's activity in the United States offers another example of Russia utilizing Western institutions to advance the Kremlin's agenda. Veselnitskaya was thrust into the spotlight after she was reported to have offered incriminating information about Hillary Clinton as "part of Russia and its government's support for" then-presidential candidate Donald Trump.[61] At the same time, Veselnitskaya was also lobbying for the repeal of the Magnitsky Act, organizing screenings in Washington, DC, of a Russian documentary that attempts to discredit Browder and exonerate the perpetrators of the fraudulent scheme that resulted in Magnitsky's death.[62]

Veselnitskaya has also defended the real estate company Prevezon against the US Attorney's Office for the Southern District of New York in *US v. Prevezon Holdings Ltd.* The US government sought to seize proceeds of the tax fraud exposed by Magnitsky that had been laundered through various transactions before ending up in New York. Veselnitskaya represented Prevezon and Prevezon's owner, Russian citizen Denis Katsyv,[63] who were accused of receiving portions of the fraudulently obtained proceeds and investing them in New York real estate. The case was settled out of court after Prevezon agreed to pay a fine of $6 million, which Veselnitskaya celebrated as her triumph.[64]

59    Stelios Orphanides, "Leaked emails expose Cypriot attorney's links to Russia, Politis reports," *Cyprus Business Mail*, November 26, 2017, http://cyprusbusinessmail.com/?p=55407.

60    Ibid.

61    Max Greenwood, "Russian lawyer who met with Trump Jr. was in touch with top Russian prosecutor," *Hill*, July 14, 2017, http://thehill.com/policy/national-security/342109-russian-lawyer-who-met-with-trump-jr-was-in-touch-with-top-russian.

62    Ibid.

63    *See, e.g.,* Hearing Tr., *US v. Prevezon Holdings Ltd.*, no. 13-cv-06326 (S.D.N.Y. Dec. 23, 2015), Dkt. 515; Vesenitskaya Decl., *US v. Prevezon Holdings Ltd.*, no. 13-cv-06326 (S.D.N.Y. Jan. 5, 2016), Dkt. 508; Cymrot Decl., *US v. Prevezon Holdings Ltd.*, no. 13-cv-06326 (S.D.N.Y. Nov. 18, 2015), Dkt. 422-35.

64    Mike Eckel, "US Seeks Court Order To Enforce $6 Million Prevezon Settlement," *RFERL*, November 16, 2017.

Case 2:14-cv-09764-RGK-PLA    Document 229-46    Filed 03/02/20    Page 90 of 106
Page ID #:87029
Russia's Interference in the US Judiciary

# ABUSE OF US COURTS BY THE RUSSIAN GOVERNMENT, ITS REPRESENTATIVES, AND PROXIES

Russia has also found ways to exploit American judicial institutions, having developed systematic routines to manipulate US courts to unwittingly support the Kremlin's campaign of expropriation and political persecution. While Russia's efforts to "hack" the US electoral process and other democratic institutions have been well documented, its efforts to commandeer the US judiciary for nefarious purposes has received far less attention. In using American courts to achieve their ends, the Kremlin and its proxies have identified a number of specific legal claims and procedures that are most susceptible to abuse.

The Russian state entities vary from state companies to state agencies, but they tend to use the same methods to exploit the US judicial system, often employing the same lawyers. Three US laws are particularly popular among Russian state actors with regard to manipulating the system: Title 28 of the US Code § 1782 on judiciary and judicial procedure, Chapter 15 of the US Bankruptcy Code, and actions for recognition or enforcement of Russian judgments.

> "In using American courts to achieve their ends, the Kremlin and its proxies have identified a number of specific legal claims and procedures that are most susceptible to abuse."

## Actions Filed Under Title 28 of the US Code § 1782

Under Title 28 of the US Code § 1782 on judiciary and judicial procedure, a party interested in a foreign proceeding may apply for judicial assistance from a US federal district court to obtain discovery from any person found in the US. Given the generally liberal standards applicable to discovery in US courts, Section 1782 actions have become commonplace in support of legal actions overseas, and Russian entities have repeatedly made such filings during the last ten years. In essence, Section 1782 applications have been weaponized by the Kremlin and its proxies, having become their favorite tool in the illegal harassment, extortion, and expropriation of private companies and assets.

## Yukos Applications[65]

In 2009, Promneftstroy (PNS)—a subsidiary of state-owned Rosneft that was spun off to aid the illicit Yukos takeover—applied for Section 1782 discovery from Daniel Feldman, the former secretary of the Yukos Oil board of directors, for use in Dutch proceedings regarding the allegedly fraudulent auction of a Yukos Oil subsidiary. PNS filed its Section 1782 motion approximately one week after its attempt to receive discovery was rejected by the Dutch appeals court. PNS served "vast documentary requests" that did "not focus on Feldman's personal or business affairs, but focus[ed] almost exclusively on the business practices, litigation, financial statements, bank accounts, calendars, and even personnel changes of Yukos Finance, its subsidiaries, and related companies."[66]

The US court rejected PNS's application on technical grounds, arguing that it would "interfere[e] with Dutch discovery policy," "nearly all the documents that the subpoena seeks [were] also in the possession of parties to the foreign proceeding," and the subpoena was overly "broad by any standard."[67] The court, however, did not consider the underlying corrupt expropriation of Yukos or PNS's role in the unlawful seizure of the company when it made its decision.

After several years of further litigation, PNS submitted another Section 1782 application in connection with

---

65  *In re Application of OOO Promnefstroy*, No. M 19-99(RJS), 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) (Sullivan, J.), and In *re Application of OOO Promnefstroy*, 134 F. Supp. 3d 789 (S.D.N.Y. 2015) (Koetl, J.)

66  2009 WL 3335608 at *4.

67  Ibid at 7-10.

ATLANTIC COUNCIL

Case 2:14-cv-09764-RGK-PLA   Document 226-46   Filed 03/02/20   Page 91 of 106
Case 2:14-cv-09764-RGK-PLA   Document 210-3   Filed 11/19/19   Page 90 of 105   Page ID
#:18762   Russia's Interference in the US Judiciary
Page ID #:17080

the same Dutch proceedings in 2015, this time seeking discovery from Eric Wolf, an associate of former Yukos shareholder Leonid Nevzlin. The US court was given another opportunity to analyze the underlying illegal expropriation of Yukos's assets by the Russian government, which by this time was substantiated by the Hague tribunal's ruling and highlighted by Wolf in his filings to the court. However, because there were no technical grounds for dismissal, the court was not swayed by the evidence of rampant corruption by the Russian Federation and PNS's affiliates. The court thus authorized discovery against Wolf under Section 1782.

### FKP Sojuzplodimport vs. SPI Group

SPI Group is a multinational alcoholic beverage group active in the production, sale, and distribution of more than 380 brands sold across more than 170 markets. It is best known for producing Stolichnaya vodka. VZAO-SPI was formerly a state-owned company called VVO Sojuzplodoimport (VVO) that was privatized in 1992. The company's current shareholder, Yuri Shefler, acquired VZAO-SPI five years after it had been privatized while financially distressed. Shefler turned the company around, making SPI one of the most successful and largest spirits companies in the world.[68]

For nearly a decade, the Russian government maintained that the transformation of VVO-SPI and its subsequent acquisition by Shefler were entirely legal. The Moscow Registration Chamber had approved the charter of VZAO-SPI, which explicitly stated that VZAO-SPI was the successor of VVO-SPI. But it would up becoming one of the first cases of expropriation under Putin.

In 2000, just after he had taken power, Putin and his associates set their sights on SPI. Prior to 2000, the Russian government not only supported the company in protecting its trademark rights in Russia and abroad, but in 1994 restored the previously canceled Stolichnaya Russian trademarks in the name of the company. The company's success posed a challenge to its domestic competitors, some of which were linked to close Putin allies. To expropriate SPI, Putin signed a presidential order in March 2000 directing the Russian government to "take urgent measures to reinstate and protect the state's rights over the intellectual property in the area of production and circulation of vodka products, and to identify and bring legal actions against the persons involved in the infringement of those rights."

Consequently, a Russian court invalidated the provision of VZAO's charter that stated that it was the universal legal successor of VVO. Some ten days later, on October 26, 2001, the Deputy Minister of Agriculture sent a request to Rospatent (the Russian patent office) to deprive SPI Group of its Russian trademarks. Rospatent moved with unusual speed, transferring the trademarks to an agency of the Russian Federation on the same day as the request. Subsequently, the Kremlin gave control of Stolichnaya and other trademarks to a newly-created state-owned enterprise called FKP Sojuzplodoimport (FKP, also referred to as Federal Treasury Enterprise or FTE).

Since 2002, the Kremlin, acting through FTE, has embarked on a mission to seize the Stolichnaya and certain other SPI-owned trademarks throughout the world. To make its case more credible in Western courts, the Kremlin fabricated criminal charges against Shefler and sought his extradition from both the United Kingdom and Switzerland; both refused to grant extradition, finding that the Russian charges were baseless and politically motivated. In the process, Shefler was granted asylum in Switzerland. He has also been granted UK citizenship. To date, SPI has managed to successfully fend off Russia's legal attacks, with one exception, the Netherlands. SPI's most recent legal victory came on October 31, 2017, when a court in Brazil rejected Russia's claims and held SPI to be the lawful owner of the trademarks.

In 2004, FTE filed a case in the US District Court for the Southern District of New York, accusing SPI and its exclusive distributors of trademark infringement. The case was dismissed twice: in 2006 on legal grounds related to US trademark law, which was later reversed by the Second Circuit Court of Appeals, and again in 2011 on procedural grounds related to FTE's lack of standing, later affirmed by the Second Circuit and ending the case. A second case was then filed by FTE, and Moscow Distillery Cristall, in 2014, in which FTE claimed it had cured its standing problem through a new purported assignment of rights from the Russian Federation. This Case was also dismissed by the District Court in favor of SPI, only to be later reversed by the Second Circuit on a ruling that the act of state doctrine precluded review of the illegality of FTE's purported assignment from the Russian Federation under Russian law.

In early November 2017, SPI obtained an order from a discovery master that requires FTE to provide SPI

---

68   "Stirred and shaken: The Adventures of a Soviet Vodka Brand," *World Trade Mark Review*, November 2017, http://www.worldtrademarkreview.com/account/register/?ReturnUrl=http://www.worldtrademarkreview.com/Magazine/Issue/13/Features/Shaken-and-stirred-the-adventures-of-a-Soviet-vodka-brand; Ambrigio Visconit, "SPI Group v. FKP Sojuzplodoimport," *Global Legal Chronicle*, December 18, 2017.

Russia's Interference in the US Judiciary

with certain documents held by several agencies of the Russian Federation, which FTE has failed to provide. Discovery in the case is currently stayed until FTE complies with this order; the stay also stops other activity in the case. If and when the case comes to trial, the stakes will be high, as the US accounts for about 45 percent of all sales of Stolichnaya vodka.

> ## "Chapter 15 of the US Bankruptcy Code allows a representative of a foreign insolvency proceeding to bring an ancillary action in the United States."

### Application of Deposit Insurance Agency

In late 2017, the Russian Deposit Insurance Agency (DIA) filed two nearly identical Section 1782 applications against former Probusinessbank co-owners Sergey Leontiev and Alexander Zheleznyak, who fled to the US following the revocation of their bank's license by the Central Bank of Russia and the seizure of its assets by the Russian government. Leontiev moved to quash the Section 1782 subpoena, arguing that the DIA's application was orchestrated by Andrey Pavlov of the Moscow law firm Quorum, the very same Russian lawyer who "played a central role orchestrating the false claims used in the $230 million tax fraud that Sergei Magnitsky uncovered" and who was placed on the Magnitsky list of sanctioned individuals.[69]

Leontiev further argued that because the DIA had retained and compensated Pavlov and his law firm

to choreograph the DIA's efforts to expropriate Pro-businessbank's assets and the personal assets of its shareholders, allowing the discovery the DIA sought would have the effect of enriching Pavlov, in violation of the Magnitsky Act. As is discussed in greater detail later in this report, the timing of the DIA's Section 1782 applications indicates that they were part of a coordinated effort to use the US courts to harass and further extort assets from the former Probusinessbank owners. Each of these 1782 actions is still pending.

### Actions Filed Under Chapter 15 of the US Bankruptcy Code

Chapter 15 of the US Bankruptcy Code allows a representative of a foreign insolvency proceeding to bring an ancillary action in the United States.[70] If the basic statutory requirements are met, the US bankruptcy court must recognize the foreign insolvency proceeding under Chapter 15.[71] The representative of the foreign proceeding can then ask the US bankruptcy court to be entitled to pursue broad discovery.

Chapter 15 proceedings can easily be abused, as the requirements for initiating a Chapter 15 case are minimal,[72] US jurisdiction can be established easily and gerrymandered,[73] and recognition of a foreign proceeding by the US bankruptcy court is mandatory once the minimal statutory requirements are met.[74] Once a foreign proceeding has been recognized under Chapter 15, the foreign representative can conduct wide-ranging discovery concerning the property and affairs of the debtor.[75]

Theoretically, courts can rein in abuses under Chapter 15, but they have been hesitant to do so. Although Chapter 15 enables courts to reject actions "manifestly contrary to [US] public policy,"[76] the "public policy exception has been narrowly construed."[77] Courts have been generally

---

69   Sen. Rep. no. 163-208, at S8170 (Dec. 20, 2017); *see also* 2012 Sergei Magnitsky Rule of Law and Accountability Act, Pub. L. no. 112-208, 126 Stat. 1496, 1504 (2012).

70   Jay Lawrence Westbrook, "Chapter 15 at Last," *American Bankruptcy Law Journal* 79, no. 3 (2005): 713, 726.

71   *See* 11 U.S.C. §§ 1502, 1517, 1520, 1521.

72   11 U.S.C. § 1515; *see also* In re Globo Comunicacoes E Participacoes S.A., 317 B.R. 235, 249 (S.D.N.Y. 2004).

73   See, e.g., In re Octaviar Admin. Pty Ltd, 511 B.R. 361, 372–74 (Bankr. S.D.N.Y. 2014) (finding "property in the form of claims and causes of action" and "property in the United States in the form of a retainer [held by counsel]" sufficient in Chapter 15 case); *In re Berau Capital Res. Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015) ("cases have identified bank accounts, … as satisfying the 'property in the United States' [] requirement.").

74   See 11 U.S.C. § 1517; *see also In re Millard*, 501 B.R. 644, 647, 652 (Bankr. S.D.N.Y. 2013) ("[T]he bad faith that is alleged to exist is not a legal basis for disregarding the statutory requirements for recognition.").

75   11 U.S.C. § 1521(a)(4); *see e.g., In re Octaviar Admin. Pty Ltd*, 511 B.R. 361, 365 (Bankr. S.D.N.Y. 2014).

76   11 U.S.C. § 1506.

77   H.R.Rep. no. 109–31(1), at 109 (2005) *reprinted in* U.S.C.C.A.N. 88, 172; *see also In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006) (explaining narrow public policy exception).

Case 2:14-cv-09764-R-PLA   Document 219-3   Filed 03/11/19   Page 92 of 105   Page ID #:5484   Russia's Interference in the US Judiciary

Case 2:14-cv-09764-RGK-PLA   Document 229-46   Filed 03/02/20   Page 93 of 106
Page ID #:7032



Sberbank, a major actor involved in unlawful activities carried out by Russian state entities. *Photo credit:* ©Alex Florstein Fedorov, Wikimedia Commons.

unwilling to find violations of US public policy in the Chapter 15 context.[78] Likewise, while Section 305 of the Bankruptcy Code allows courts to suspend or dismiss a Chapter 15 case if "the purposes of [C]hapter 15 … would be best served by such dismissal or suspension,"[79] no court seems to have used this provision to dismiss a case because of a debtor's bad faith.

### The Case of Sergey Poymanov

Until 2011, Sergey Poymanov was the majority shareholder of OJSC Pavlovskgranit (P-Granit), a company engaged in granite mining and production.[80] In 2008, Poymanov consolidated the ownership of P-Granit through his company Pavlovskgranit-Invest (PG-Invest) and, for this purpose, had PG-Invest obtain a RUB 5.1 billion ($215 million) loan from a branch of the Russian government-owned Sberbank. PG-Invest repaid part of this loan. However, due to the 2008 global financial crisis, P-Granit was forced to ask for a restructuring of the terms of its loan repayment.

Although P-Granit had been valued at 13 billion rubles, PG-Invest was told that its loan could be restructured only if 50 percent of P-Granit was transferred to an affiliate of Sberbank in exchange for a nominal fee. Poymanov rejected this extortive offer, as well as a similar one from his main competitor, Yuri Zhukov. As a result, Sberbank accelerated the loan and obtained a Russian court judgment for the entire amount outstanding under the loan. The creditor then obtained from an appraiser, partially owned by the son of the local Sberbank manager and an associate of Zhukov, an artificially low valuation of P-Granit, which enabled a Sberbank affiliate to acquire over 50 percent of P-Granit's shares. These shares were then transferred to entities purportedly linked to Zhukov.

The chain of events that followed resulted in the involuntary bankruptcies of PG-Invest and P-Granit. Ultimately, Poymanov was declared bankrupt in July 2016. Throughout this progression, Poymanov filed dozens of complaints in Russian courts seeking to

---

78   "Public policy objections to recognition are frequently made and almost always rejected[.] … Even demonstrable bad faith by the debtor, imputed to the liquidator, was not sufficient … in *In re Creative Finance Ltd.*, 543 B.R. 498, 515–516 (Bankr. S.D.N.Y. 2016)." 8 Collier on Bankruptcy ¶ 1517-4 n. 13 (16th ed. 2016).

79   11 U.S.C. § 305.

80   See Complaint, PPF Management LLC v. Sberbank, no. 16-cv-09139 (S.D.N.Y., Jan. 6, 2017), Dkt. 9. The factual account set out in this paragraph is based on the contents of this complaint.

Russia's Interference in the US Judiciary

protect his assets, but all were denied. Instead, multiple criminal investigations were initiated against Poymanov with help from Artem Chaika.[81]

In November 2016, Poymanov assigned his claims for damages arising out of this corporate raiding scheme to a newly-formed entity, PPF Management LLC (PPF). PPF filed a complaint in the Southern District of New York against Sberbank, Zhukov, and numerous other participants in this scheme, seeking $750 million in damages.[82] On March 3, 2017, the receiver in Poymanov's Russian bankruptcy proceedings, Aleksey Bazarnov (a defendant in the PPF action), commenced a Chapter 15 case in the bankruptcy court in the same federal district.[83] Bazarnov asked the court to recognize the Russian bankruptcy action and to enter an automatic stay in the PPF action. PPF objected on numerous grounds. PPF's overarching argument was that Bazarnov, the Russian bankruptcy proceedings, and the Chapter 15 action were all part of the *reiderstvo* to which Poymanov fell victim, and thus should not receive the benefits available in a US bankruptcy court.

With its objection to the petition for recognizing the Russian bankruptcy action, PPF submitted expert reports on the topic of corporate raiding in Russia. The expert testified that

> "bankruptcy and the abuse of the bankruptcy process in Russia [is] one of the fundamental elements of corporate raiding" (102:23-25);

> "most pervasive … are the problems of submitting fraudulent documents, of engaging in malicious prosecutions—prosecutions that are repeated and extended, where a case against an individual is started, then stopped, then another one begins" (103:14-20);

> "the criminals have been brought much more under the control of Putin and the oligarchs, and they now work primarily for them. So they are part of the raiding process, but they are not the ones that initiate the raids anymore" (104:5-9);

> "when citizens go to use the commercial courts, or to use arbitration, if there is a Russian governmental entity that is involved in the case, then they have basically no chance of satisfaction of their complaints" (105:3-7).[84]

Nevertheless, the court rejected the argument that recognizing the Russian bankruptcy action would violate US public policy and assigned minimal weight to this testimony.[85] PPF's counsel attempted to highlight the role of *reiderstvo* in the corrupt seizure of private assets in Russia, but to no avail. Instead, the judge responded: "If I accept that, doesn't that mean that the courts here should never grant recognition to a Russian proceeding because we don't know whether this corporate rating [sic] infects" particular proceedings; the judge refused "to second guess the conduct of the Russian bankruptcy proceeding."[86] Shortly thereafter, the court issued an order recognizing the Russian bankruptcy proceeding, and later stayed PPF's lawsuit.[87]

> ## "The principles of international comity require that the US enforce judgments by foreign courts, but there are exceptions."

The court's analysis in *Poymanov* exemplifies the American judiciary's hesitancy to recognize the endemic corruption of Russia's courts and illustrates that the Russian legal system plays an essential role in the Kremlin-orchestrated expropriation of private assets both for state and private gain.

## Actions for Recognition and/or Enforcement of Russian Judgments

American courts have "a long-standing tradition of permitting the enforcement of foreign country money judgments."[88] The principles of international comity require that the US enforce judgments by foreign courts,

---

81  "Global Magnitsky Act," US Department of the Treasury.

82  Complaint, PPF Management v. Sberbank, No. 16-cv-09139 (S.D.N.Y. Jan. 6, 2017), Dkt. 9.

83  Verified Petition, *In re Poymanov*, No. 17-10516 (Bankr. S.D.N.Y. Mar. 3, 2017), Dkt. 2.

84  Hearing Tr., *In re Poymanov*, No. 17-10516 (Bankr. S.D.N.Y. 2017), Dkt. 51.

85  *In re Poymanov*, 51 B.R. 24, 39 (Bankr. S.D.N.Y. 2017).

86  Hearing Tr. at 33:19-23, 38:12-14, *In re Poymanov*, No. 17-10516 (Bankr. S.D.N.Y. 2017), Dkt. 69.

87  *In re Poymanov*, 580 B.R. 55 (2017).

88  *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 285 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 134 (2d Cir. 2000) (internal citations and quotation marks omitted).

Case 2:14-cv-09764-RGK-PLA    Document 229-46    Filed 03/02/20    Page 95 of 106
Case 2:14-cv-09764-RGK-PLA    Document 218-3    Filed 03/11/19    Page 94 of 105    Page ID
Page ID #:8084                                                    #:5458 Russia's Interference in the US Judiciary



The Kremlin has weaponized elements of the US judicial system and process to further its own ambitions. *Photo credit:* Wikipedia/ Andrey Korzun (https://creativecommons.org/licenses/by-sa/4.0/).

but there are exceptions. In theory, a US court "must satisfy itself of the essential fairness of the judicial system under which the [foreign] judgment was rendered."[89] However, in practice, courts have usually given foreign justice systems the benefit of the doubt in deciding to enforce their judgments.[90] Nevertheless, in the past, courts have declined to enforce foreign judgments on due process grounds when presented with extensive evidence of a foreign judiciary's corruption.

Increasingly unanimous research about Russia paints a dismal picture of its courts. For instance, the US State Department's 2017 Report on Human Rights Practices states, "[Russian] law provides for an independent judiciary, but judges remained subject to influence from the executive branch, the armed forces, and other security forces, particularly in high-profile or politically sensitive cases, as well as corruption. The outcomes of some trials appear predetermined."[91] Moreover, the

"judge typically agrees with the investigator's position and dismisses defense referrals or complaints."[92]

Yet despite ample evidence that Russian courts are corrupted by and captive to the interests of the Kremlin and its cronies, US courts continue to take Russian judgments seriously, even when presented with evidence of due process violations and political persecution employed by Russian actors.

## Sberbank v. Traisman

Between 2007 and 2009, Sberbank issued three loans to a Russian company called Sealand, a shopping center developer and operator, whose board of directors included Yuri Traisman. Sealand defaulted in April 2013 and soon thereafter declared bankruptcy. Sberbank sued Traisman in Russian court, claiming that he had guaranteed the loans, and sought repayment from

---

89   Restatement (Third) of Foreign Relations Law of United States § 482, comment b (1987).

90   *See, e.g., PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998).

91   *Russia 2017 Human Rights Report*, US Department of State, 13, https://www.state.gov/documents/265678.pdf.

92   Ibid.

Case 2:14-cv-09764-RGK-PLA   Document 220-46   Filed 03/02/20   Page 96 of 106
Case 2:14-cv-09764-RGK-PLA   Document 219-3   Filed 03/11/19   Page 95 of 105   Page ID
Page #:47035
Russia's Interference in the US Judiciary

Traisman personally.[93] Traisman maintained that he had never signed personal guarantee agreements, and that his signatures on the guarantee agreements produced by Sberbank had been forged.

Simultaneously, Traisman's wife, Nelly, brought an action in the Koptevo District Court of Moscow seeking to invalidate the guarantees as forgeries. Upon Nelly's request, the court appointed an expert to examine the signatures on the guarantees submitted by Sberbank.[94] Traisman was in Connecticut and unable to provide in-person samples, so he mailed to the court notarized signatures and documents that he had signed around the time that the guarantees were purportedly executed. The court-appointed expert stated that half of the signatures displayed on the guarantees definitively were not Traisman's; the expert's opinion as to the other half was inconclusive. After Sberbank objected and appealed, the Moscow City Court reversed the lower court's grant of Nelly's request, at which point the presiding lower court judge was inexplicably replaced with another judge, who refused to consider Nelly's claims and dismissed them.[95]

Traisman's counsel challenged the validity of the three guarantees on his behalf in the Balashikha District Court of the Moscow region. Sberbank relied on three handwriting expert reports, all based on out-of-court examinations, in support of its position, as well as the appellate decision in Nelly's case. After reviewing the expert report from Nelly's case and travel records showing that Traisman was not in Russia when the guarantees were executed, the court ordered Traisman to appear in court to provide a handwriting sample. Traisman again did not appear in court, submitting a letter from his doctor, explaining that Traisman's health prevented him from traveling to Moscow, and a notarized and apostilled set of signatures. The court refused to order an examination of these signatures, despite the health-related justification for Traisman's absence. Instead, the court inferred that Traisman was evading an in-court examination, dismissed the expert conclusion from Nelly's action for its reliance on an out-of-court sample, and entered judgment for Sberbank. The appellate court upheld the "evasion" finding and

the negative inference against Traisman and affirmed the judgment for Sberbank.[96]

In February 2014, Sberbank sued Traisman in federal court in Connecticut, seeking a money judgment for the amount he purportedly owed under the three guarantees. Curiously, even after the Russian court ruled in favor of Sberbank, Sberbank did not explicitly seek recognition of the Russian judgment, but instead alleged Traisman's liability. When Traisman objected, Sberbank argued that Traisman was barred from re-litigating his defenses under claim and issue preclusion.[97]

Traisman countered with numerous arguments, including the fact that claim and issue preclusion were inapplicable under Russian law, and described in detail the sequence of events in the Russian actions involving him and his wife. He also provided the court with a declaration from the former Sberbank executive who purportedly executed the guarantees on Sberbank's behalf, in which the executive disclaimed any recollection of signing the guarantees and questioned the genuineness of the signatures attributed to him.[98]

Despite Traisman's argument that the Russian actions deprived him of an opportunity to fully and fairly litigate his claims and defenses, the district court sided with Sberbank, recognizing and affording preclusive effect to the Russian court's ruling on the validity of the guarantees.[99] The court acknowledged that there are exceptions to the general policy of recognizing and enforcing foreign judgments, such as "if the judgment was rendered under a system without impartial tribunals or procedures compatible with due process of law," but ignored the evidence of widespread corruption in the Russian judiciary and found such exceptions inapplicable in this case. On appeal, the Second Circuit upheld the lower court's ruling on this issue.[100]

## Yuri Stepanchenko and the Contents of his Citibank Account

Yuri Stepanchenko was a prominent real estate developer and, for a period of time, also a senator in the governing body for his home region of Primorsky Krai.[101]

---

93   Arkhipov Decl. ¶¶ 13-15, Sberbank v. Traisman, 14-cv-00216 (D. Conn. Apr. 22, 2015), Dkt. 138-2.

94   Ibid. ¶¶ 13-20, 54-58.

95   Ibid. ¶¶ 68-91.

96   Ibid. ¶¶ 104-138.

97   Def. Br., Sberbank v. Traisman, 14-cv-00216 (D. Conn. Apr. 22, 2015), Dkt. 138.

98   Status Report, at 1, Sberbank v. Traisman, 14-cv-00216 (D. Conn. Oct. 6, 2015), Dkt. 168.

99   Sberbank v. Traisman, 2015 WL 8712581, *4-5 (D. Conn. Dec. 17, 2015).

100  Sberbank v. Traisman, no. 16-1505 (2d Cir. Apr. 11, 2017) (summary order).

101  Grover Decl. ¶¶ 5-6, In re Contents in Citibank Account, no. M18-981 (S.D.N.Y. Aug. 3, 2010), Dkt. 31.

However, in 2007, he became the target of an investigation by Russian criminal authorities because of allegations of fraud, money laundering, and the misuse of government funds. Shortly before being indicted in December 2007, Stepanchenko fled Russia and settled in New York.[102]

Stepanchenko explained that he left the country because the allegations against him were politically motivated and he feared he would not receive a fair investigation or trial in Russia. According to press reports, efforts were made to pressure Stepanchenko's wife to return to Russia through threats to put their young daughter, who had remained in Russia with her grandmother, into an orphanage.[103] Sergei Darkin, the governor of Primorsky Krai with a reputed criminal background, visited Stepanchenko in New York. Darkin had ensured that Stepanchenko's six-year-old daughter could not leave Russia. He threatened Stepanchenko and demanded that Stepanchenko transfer hundreds of millions of dollars to him.[104]

The harassment of Stepanchenko also included a request for his extradition, submitted to the US Department of Justice in April 2008, but Stepanchenko was able to remain in New York. In December 2009, Stepanchenko was arrested on allegations that he had violated his immigration status, and four forfeiture seizure warrants were issued for approximately $2 million of his assets. Stepanchenko remained detained at the Immigration and Customs Enforcement Detention Center for fifty-one days before being released.[105]

Presented with the option to either charge Stepanchenko under US law or deport him, US law enforcement authorities investigated Stepanchenko and released him, thus enabling him to remain on US soil. After Russia had Stepanchenko flagged by Interpol as a fugitive from justice, Interpol reviewed the materials relating to the charges against him and removed him from its list.[106]

Russia's manipulation of the US justice system to further pursue Stepanchenko did not end there. In March 2010, a Russian court issued five restraining orders for assets belonging to Stepanchenko and his wife. The Department of Justice certified that they were in accordance with federal law and obtained a court order to restrain the property frozen by the Russian court.[107] The Stepanchenkos sought dissolution of the US court's asset freeze order. If not for a technicality based on the interpretation of the Civil Asset Forfeiture Reform Act, the US court would have recognized and upheld the restraining order, notwithstanding the crucial fact that Stepanchenko was exonerated by Interpol and US law enforcement agencies.[108]

"Under Putin's rule, power and wealth in Russia are distributed among a select group of loyal Kremlin insiders, not all of whom are officially affiliated with the Russian government."

## Misuse of US Courts by Kremlin Proxies

An expert at the European Council on Foreign Relations, Kadri Liik, recently wrote, "[f]or the Kremlin, corruption has been a reliable means of keeping control over all meaningful elites... It is the basis of much upward mobility in Russia ... and access to illicit wealth is the reward as well as a guarantee of continuing loyalty."[109] Under Putin's rule, power and wealth in Russia are distributed among a select group of loyal Kremlin insiders, not all of whom are officially affiliated with the Russian government. This form of "crony capitalism" rewards certain Russian businessmen, but only so long as they advance Putin's interests.[110]

In recent years, these Kremlin proxies have exploited US courts by pursuing superficially legitimate lawsuits with a

---

102  *In re Contents in Citibank Account*, 759 F. Supp. 2d 281 (S.D.N.Y. 2010).

103  Larisa Saenko, "Interpol said no to the deputy from Primorie," *Kommersant*, March 2, 2016, http://www.kommersant.ru/doc/29277447.

104  Grover Decl. ¶¶ 14, *In re Contents in Citibank Account No.*, Co. M18-981 (S.D.N.Y. Aug. 3, 2010), Dkt. 31.

105  Ibid. ¶¶ 12-17.

106  Saenko, "Interpol said no to the deputy from Primorie."

107  *In re Contents in Citibank Account*, 759 F. Supp. 2d at 283.

108  *In re Contents in Citibank Account*, 759 F. Supp. 2d at 288.

109  Kadri Liik, "Putin and the FIFA Scandal," *European Council on Foreign Relations*, May 29, 2015, http://www.ecfr.eu/article/commentary_putin_and_the_fifa_scandal3043.

110  *See* Anders Aslund, "Russia's Neo Feudal Capitalism," *Project Syndicate*, April 27, 2017, www.project-syndicate.org/commentary/russia-neofeudal-capitalism-putin-by-anders-aslund-2017-04?barrier=accessreg

two-part purpose: perpetrating global harassment campaigns against the Kremlin's enemies, while seeking to enrich themselves through bad faith claims made possible by the Russian state's abuse of disfavored individuals and their businesses. These lawsuits by Kremlin proxies are almost always part of a larger coordinated attack involving Russian government agencies, bogus criminal charges invented by Russian prosecutors, and judgments from sham trials overseen by corrupt Russian courts.

## Smagin v. Yegiazaryan

Ashot Yegiazaryan, a former Russian politician and member of the Russian Duma, fell out of favor with the Putin regime around 2005.[111] Shortly afterward, he came under pressure from his then-business partners, including Putin ally Suleiman Kerimov, to relinquish his financial interest in the Moskva Hotel. Yegiazaryan resisted and, due to continuing threats, ultimately fled Russia in 2010, fearing for his and his family's safety.[112]

On April 6, 2018, Kerimov was designated by the US Treasury "for being an official of the Government of the Russian Federation. Kerimov is a member of the Russian Federation Council." On November 20, 2017, Kerimov was detained in France and held for two days. He is alleged to have brought hundreds of millions of euros into France—transporting as much as 20 million euros at a time in suitcases, in addition to conducting more conventional funds transfers – without reporting the money to French tax authorities. Kerimov allegedly launders the funds through the purchase of villas and was also accused of failing to pay 400 million euros in taxes related to villas."[113] Kerimov stands out as a prime example of Putin's mixture of state and shady business.

After leaving Russia, Yegiazaryan filed a claim in the London Court of International Arbitration (LCIA) against Kerimov. The Russian authorities then instituted a criminal action against Yegiazaryan based on a complaint submitted by Victor Smagin, a businessman characterized as a "government fixer" in the Russian media.[114]

Smagin alleged that Yegiazaryan engineered and put into action a scheme to misappropriate Smagin's interest in a shopping center, 50 percent of which belonged to Yegiazaryan. The group of Russian law enforcement officials charged with conducting this investigation included five individuals placed on the Magnitsky list: Aleksey Droganov, Viktor Grin, Andrei Krechetov, Oleg Lugunov, and Andrei Strizhov.[115]

In addition to initiating criminal proceedings, Smagin also managed to freeze Yegiazaryan's interest in the shopping center. He filed a claim against Yegiazaryan in the LCIA, seeking damages for Yegiazaryan's alleged misappropriation of Smagin's assets. Yegiazaryan denied that he had signed the underlying arbitration agreement, and his denial was corroborated by an expert who concluded that Yegiazaryan's signature was forged. Even so, the LCIA issued an order in Smagin's favor, which was upheld by UK courts over Yegiazaryan's challenges.[116]

In December 2014, Smagin asked a federal court in California to confirm the LCIA award and issue an order preventing Yegiazaryan from transferring any funds. After extensive motion practice, the district court ultimately granted Smagin's request in March 2016, thereby confirming the LCIA award, and entered a $93 million judgment in Smagin's favor.[117] Eight months later, in November 2016, Smagin requested and obtained an injunction that effectively froze $115 million held in the account of a Liechtenstein trust, which Yegiazaryan had settled with the funds he recovered in his arbitration with Kerimov. Finally, a year later, Smagin returned to the district court, seeking a turnover order that would require Yegiazaryan to direct the trustee to transfer the judgment in full to Smagin. The district court once again ruled in Smagin's favor, but the Ninth Circuit issued a stay pending appeal, which was recently briefed and is awaiting oral argument.[118]

Throughout the extensive trial and appellate-level briefing, Yegiazaryan put forth substantial evidence

---

111  Yegiazaryan Decl. ¶ 4-5, *Smagin v. Yegiazaryan*, 17-cv-06126 (C.D. Cal. Nov. 14, 2017), Dkt. 24.

112  These warnings included threats to behead his children, and one of Yegiazaryan's relatives was killed in 2010 in what he believes was a message directed to him. *Id.* ¶¶ 6-10.

113  "Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity," US Department of the Treasury, https://home.treasury.gov/news/press-releases/sm0338.

114  Alexander Kuzmin, "Construction just started," *Versia*, Oct. 5, 2017, https://versia.ru/kak-vitalij-smagin-vybival-iz-ashota-egiazaryana-dengi-sulejmana-kerimova-i-budut-li-realizovany-developerskie-proekty-centuriona [rus]. This report is corroborated by evidence of Smagin's cooperation with Kerimov, a Putin crony. *See* Cohen Decl. at 64-72, *Smagin v. Yegiazaryan*, 17-cv-09764 (C.D. Cal. Jan. 27, 2015), Dkt. 21-3.

115  Memo of Points, at 4, *Smagin v. Yegiazaryan*, 17-cv-09764 (C.D. Cal. Sep. 29, 2015), Dkt. 37.

116  Memo of Points, at 4, *Smagin v. Yegiazaryan*, 17-cv-09764 (C.D. Cal. Sep. 29, 2015), Dkt. 5-7.

117  See Opening Br., *Yegiazaryan v. Smagin*, 2017 WL 6001593, No. 17-56467 (9th Cir. Nov. 30, 2017).

118  Ibid.

Case 2:14-cv-09764-RGK-PLA   Document 229-46   Filed 03/02/20   Page 99 of 106
Case 2:14-cv-09764-R-PLA   Document 210-3   Filed 03/11/19   Page 98 of 105   Page ID
Page ID #:4508   #:7088

Russia's Interference in the US Judiciary

showing Smagin's role in the Russian government's persecution of Yegiazaryan and the bad faith tactics employed in pursuing his assets, but to no effect. Alarmingly, the fact that Smagin's initial criminal complaint was taken up by a group of government officials who had participated in the Magnitsky affair, which involved trumped-up and retaliatory criminal charges, appears not to have influenced the decision-making process of the California federal courts.

Similarly, Smagin's bad faith was manifested in his brazen attempts at double recovery against Yegiazaryan. Yegiazaryan has repeatedly referenced the freeze on his Russian assets—which was ordered by a Russian court at Smagin's request, applies to Yegiazaryan's interest in the shopping center at issue in the underlying dispute, and which Smagin himself has valued at over $300 million—as indicative of Smagin's plan to obtain a double recovery both in and outside of Russia.[119] When a Cypriot court that had also granted Smagin's asset freeze request learned that Smagin had failed to mention the existence of this Russian asset freeze, it vacated its prior order and reprimanded Smagin for lacking the "good faith and honesty which is expected of litigants."[120] In federal court in California, Smagin again failed to disclose this fact initially, yet his lack of candor never stopped the district court from ruling in his favor.[121]

### Avilon v. Leontiev

In August 2015, the Central Bank of Russia revoked the operating license of the privately-owned Probusinessbank, seized its assets, and forced it into bankruptcy. The scheme to deliver the bank's assets to the Kremlin's inner circle has been led by Andrey Pavlov.[122]

In the two years preceding Probusinessbank's seizure by the Kremlin, the bank's independent auditor issued clean audits stating that the bank complied with the central bank's rules and regulations and that its finances were stable.[123] The central bank itself, which was responsible for regularly monitoring Probusinessbank, issued a report stating that the bank was financially sound only two months before it was seized and the Russian Deposit Insurance Agency (DIA) was appointed as temporary administrator.



Suleiman Kerimov pressured Ashot Yegiazaryan to relinquish his financial interests. *Photo credit*: Wikipedia/Hlebushek (https://creativecommons.org/licenses/by-sa/4.0/deed.en).

Shortly after gaining control of Probusinessbank, the DIA began to divide up and redistribute the bank's assets to financial institutions favored by the Kremlin, including Binbank, which was handed assets from Probusinessbank valued at approximately 25 billion rubles (over $400 million). Even more egregious, assets from Probusinessbank were diverted into the DIA's own subsidiary bank, the Russian Capital Bank. In October 2015, a Russian bankruptcy court found only a minor shortfall between Probusinessbank's total assets and liabilities, nearly half of which could be accounted for by the unlawful transfer of the bank's assets to the DIA's own accounts.[124] Binbank collapsed in the fall of 2017 and left a financial hole of billions of dollars.

---

119  Memo of Points, at 5-6, 14, *Smagin v. Yegiazaryan*, 17-cv-09764 (C.D. Cal. Sep. 29, 2015), Dkt. 37.

120  Ibid. at 6.

121  *Vitaly Smagin V. Ashot Yegiazaryan*, No. 16-55502 (9th Cir. 2018). https://law.justia.com/cases/federal/appellate-courts/ca9/16-55502/16-55502-2018-05-18.html.

122  Resp. Br., *In re Application of Deposit Insurance Agency*, 17-mc-00414 (S.D.N.Y. Jan. 16, 2018), Dkt. 10.

123  Resp. Br., *In re Application of Deposit Insurance Agency*, 17-mc-00414 (S.D.N.Y. Jan. 16, 2018), Dkt. 8.

124  Ibid. at 9-10.



Clandestine financial transactions, facilitated by Kamo Avagumyan, benefited the family members of Russian Prosecutor General, Yuri Chaika (pictured). *Photo credit:* REUTERS/Sergei Karpukhin.

Despite the conclusion by the Investigative Committee of the Russian Federation in 2015 that there was no evidence that a crime had occurred and no basis for criminal charges against any of the shareholders or managers

of Probusinessbank, Russian authorities commenced criminal proceedings in 2016 against Probusinessbank's co-founders, Leontiev and Zheleznyak, along with other bank executives. Victor Grin, the deputy prosecutor general overseeing the criminal proceedings against former Probusinessbank executives in Russia, is also on the Magnitsky list and subject to US sanctions.[125]

In October 2016, the two responsible deputy governors of the central bank were sacked in a hushed-up scandal. One of the new deputy governors of the central bank was Alexander Torshin, who had previously been accused by the Spanish authorities of money laundering.[126] On April 6, 2018, he was targeted by the US Treasury.[127] It is rather extraordinary, and indicative of the Russian law enforcement system, that somebody could be appointed a deputy governor of any central bank after he has been accused by a foreign country of money laundering.

A second, related case is ongoing against Leontiev. Between 2008 and 2011, Russian investors with deep ties to the Russian government, Karen Avagumyan and Avilon Automotive Group—a luxury car company co-owned by Avagumyan's father, Kamo, and Alexander Varshavsky, Avilon's president—entered into loan agreements and promissory notes with Russian and Cypriot finance companies, many of which were guaranteed by Probusinessbank.[128]

After the unlawful seizure of Probusinessbank in 2015, Varshavsky sought repayment of the loaned funds from Leontiev in his personal capacity, leading a campaign of harassment against the bank's shareholders while the DIA plundered Probusinessbank's assets in the sham bankruptcy proceeding. Leontiev, who fled Russia in 2015 in fear for his family's safety, brought an action in federal court in New York in 2016, and obtained a declaration from the court that he did not owe a debt to Varshavsky. While this action was pending, Avilon and Karen Avagumyan sued Leontiev in a New York state court, seeking to recover $60 million from Leontiev in his personal capacity based on the same claims at issue in the federal court.[129]

Avilon reportedly has received at least $286 million worth of state contracts from Russian government agencies, including from the Russian Prosecutor General Yuri

125  Ibid. at 13.

126  Anna Nemtsova, "What's the Truth About the NRA's Man in Moscow?" *The Daily Beast*, February 23, 2018.

127  "Treasury Designates Russian Oligarchs," US Department of the Treasury.

128  *Avilon Automotive Group v. Leontiev*, Index No. 656007/16.

129  Def. Br. at 13-20, *Avilon Automotive Group v. Leontiev*, no. 656007/16 (Sup. Ct. N.Y. Cty. May 16, 2017), Dkt. 110.

Chaika's office.[130] Kamo Avagumyan has been involved in clandestine financial transactions with members of Putin's inner circle, such as a hotel development, which investigative journalists discovered is co-owned by Artem Chaika and the wife of a former Russian deputy general.[131] Furthermore, Avagumyan's other son, George, works under Prosecutor General Chaika as the deputy head of the division charged with "supervision of compliance with laws protecting the interests of the state and society."[132]

In October 2017, the state court case was dismissed.[133] In his opinion, the judge chastised Avilon and Avagumyan for their "blatant misuse of the federal forum," declaring that "[t]his court will not continue to countenance the misallocation of judicial resources plaintiffs seek by transporting [this] ... dispute from federal court to state court."[134] The decision in the Avilon case is a rare instance in which a US court has recognized the potential abuse of the US judicial system by Russian actors with ties to the Kremlin. As discussed above,

## "The Kremlin will continue its unrelenting assault on its targets, including its attempts to directly manipulate and exploit the US justice system."

however, attacks by Kremlin proxies are often part of a larger coordinated effort by the Russian state. In this instance, following the court's dismissal of Avilon's and Avagumyan's claims, the DIA filed its Section 1782 applications, in which it requested discovery that echoes the requests made in both the Varshavsky and Avilon cases.[135] Even when the efforts of proxies like Varshavsky and Avagumyan fail, the Kremlin will continue its unrelenting assault on its targets, including its attempts to directly manipulate and exploit the US justice system.

130  "Commissioners Call on Administration to Add Two Putin Cronies to Russia Report," *Helsinki Commission Chair*, CSCE, January 17, 2018, www.csce.gov/international-impact/press-and-media/press-releases/.
131  Shaun Walker, "The Luxury Hotel, the Family of the Top Moscow Prosecutor and Russia's Most Notorious Gang," *Guardian*, December 12, 2015, https://www.theguardian.com/world/2015/dec/13/alexei-navalny-yuri-chaika.
132  Dmitry Velikovsky, "Cars, Connections, and Contracts in Putin's Russia," *OCCRP*, July 27, 2017, https://www.occrp.org/en/investigations/6773-cars-connections-and-contracts-in-putin-s-russia.
133  *Avilon Automotive Group v. Leontiev*, no. 656007/16, 2017 WL 4422593 (Sup. Ct. N.Y. Cty. 2017).
134  Ibid. at *3-5.
135  Resp. Rep. Br. at 13-14, *In re Application of Deposit Insurance Agency*, 17-mc-00414 (S.D.N.Y. Mar. 13, 2018), Dkt. 23.

# CONCLUSION AND RECOMMENDATIONS

The aim of this report is not to litigate specific cases, but to show a pattern of high-level lawlessness in Russian state agencies and how these lawless actors exploit the US judiciary. The Kremlin has taken advantage of US courts to advance its corrupt corporate raiding and expropriation schemes. This began long before Russia insinuated itself into the US electoral process and revelations of Russia's sophisticated cyber-attacks became public.

The whole array of Russian state agencies colludes in criminal activities to the detriment of private Russian companies and to the material benefit of the officials involved. These crimes are supported at the highest levels of government, notably by Putin himself, as is evident from his vociferous criticism of the Magnitsky Act, which is specifically designed to support the rule of law in Russia.

In the cases above, unlawful or legally-dubious activities carried out by various Russian state entities have been presented. The actors involved include Sberbank and other state enterprises, the Central Bank of Russia, and the Deposit Insurance Agency, as well as all law enforcement bodies like the Investigative Committee, the Prosecutor General's Office, the Ministry of Interior, and the prison service. These state officials are also cooperating with organized criminals as well as skillful private lawyers.

Russian state agencies and their proxies are exploiting the international judicial system to their advantage. Although this report focuses on the United States, Russian authorities pursue similar activities in many countries. Cyprus is a favorite Russian playground. Red Notices issued by Interpol on the basis of flawed Russian evidence are incredibly common and many countries have received requests from Russian legal authorities to enforce their judgments. The SPI Group that holds the Stolichnaya trademarks had similar cases initiated against them in relation to more than 22 countries.

In the US judiciary, three particular problems stand out: the generous provisions for opening a discovery case, the minimal statutory requirements for bankruptcy proceedings, and the enforcement of Russian court verdicts without considering the pervasiveness of corruption within the Russian judicial and law enforcement systems.

The US Congress and Department of Justice need to address this exploitation of the US judiciary for nefarious purposes and act decisively to safeguard US democratic institutions. Interpol Red Notices do not appear to raise any problems in the US, but they do negatively affect US citizens and residents when traveling abroad. David Satter has sensibly suggested that "Interpol should enhance the transparency of the provision of information about a subject of a Red Notice" and that Red Notices should be automatically deleted for people given asylum.[136]

The US has two useful legal acts already in place, the Magnitsky Act and the Global Magnitsky Act. In the future, the designation of additional sanctions targets through these acts is both necessary and justified. However, further measures are needed to stop the Russian state's misuse of the US judicial system. The House and Senate Judiciary Committees should hold hearings about these malpractices and Congress should consider legislation on the basis of such hearings.

Additionally, the Department of Justice or the State Department should establish a coordination office that would liaise with US courts. The office would be a central site where victims of abuse by corrupt governments could submit their evidence. The Department of Justice needs to issue clear guidance to the courts with assessments of the validity of foreign justice systems, which could be based on the State Department's annual human rights report.[137]

Putin has turned Russia into an authoritarian kleptocracy that aims to enrich his privileged circle. In this system, crime is not an aberration, but the standard. The best understanding is that an organized crime gang led by Putin has taken over the commanding heights of the Russian state.[138] The US and other Western governments and institutions may not be able to stop this takeover, but they must avoid colluding with it, whether intentionally or unintentionally.

---

136  Satter, *Russia's Abuse of Interpol*.

137  *Human Rights Report*, US Department of State.

138  Dawisha, *Putin's Kleptocracy*.

Case 2:14-cv-09764-RGK-PLA   Document 229-46   Filed 03/02/20   Page 103 of 106
Case 2:14-cv-09764-R-PLA   Document 219-3   Filed 03/11/19   Page 102 of 105   Page ID
#:7042

Russia's Interference in the US Judiciary

# ABOUT THE AUTHOR



**Anders Åslund** is a resident senior fellow in the Eurasia Center at the Atlantic Council. He also teaches at Georgetown University. He is a leading specialist on economic policy in Russia, Ukraine, and East Europe.

Dr. Åslund has served as an economic adviser to several governments, notably the governments of Russia (199-94) and Ukraine (1994-97). He is chairman of the Advisory Council of the Center for Social and Economic Research, Warsaw, and of the Scientific Council of the Bank of Finland Institute for Economies in Transition. He has published widely and is the author of fourteen books, most recently with Simeon Djankov, *Europe's Growth Challenge* (OUP, 2017) and *Ukraine: What Went Wrong and How to Fix It* (2015). Other books of his are *How Capitalism Was Built* (CUP, 2013) and *Russia's Capitalist Revolution* (2007). He has also edited sixteen books.

Previously, he worked at the Peterson Institute for International Economics, the Carnegie Endowment for International Peace, the Brookings Institution, and the Kennan Institute for Advanced Russian Studies at the Woodrow Wilson Center. He was a professor at the Stockholm School of Economics and the founding director of the Stockholm Institute of East European Economics. He served as a Swedish diplomat in Kuwait, Poland, Geneva, and Moscow. He earned his PhD from Oxford University.

Case 2:14-cv-09764-RGK-PLA   Document 229-46   Filed 03/02/20   Page 104 of 106
Case 2:14-cv-09764-R-PLA   Document 21-5   Filed 03/15/19   Page 103 of 105   Page ID
Page ID #:57043
#:457
Russia's Interference in the US Judiciary

# Atlantic Council Board of Directors

**INTERIM CHAIRMAN**
*James L. Jones

**CHAIRMAN EMERITUS**
Brent Scowcroft

**PRESIDENT AND CEO**
*Frederick Kempe

**EXECUTIVE VICE CHAIRS**
*Adrienne Arsht
*Stephen J. Hadley

**VICE CHAIRS**
*Robert J. Abernethy
*Richard W. Edelman
*C. Boyden Gray
*George Lund
*Virginia A. Mulberger
*W. DeVier Pierson
*John J. Studzinski

**TREASURER**
*Brian C. McK. Henderson

**SECRETARY**
*Walter B. Slocombe

**DIRECTORS**
Stéphane Abrial
Odeh Aburdene
*Peter Ackerman
Timothy D. Adams
Bertrand-Marc Allen
*Michael Andersson
David D. Aufhauser
Matthew C. Bernstein
*Rafic A. Bizri
Dennis C. Blair
Thomas L. Blair
Philip M. Breedlove
Reuben E. Brigety II
Myron Brilliant
*Esther Brimmer
Reza Bundy
R. Nicholas Burns
Richard R. Burt
Michael Calvey
James E. Cartwright
John E. Chapoton

Ahmed Charai
Melanie Chen
Michael Chertoff
George Chopivsky
Wesley K. Clark
David W. Craig
Helima Croft
*Ralph D. Crosby, Jr.
Nelson W. Cunningham
Ivo H. Daalder
*Ankit N. Desai
*Paula J. Dobriansky
Christopher J. Dodd
Thomas J. Egan, Jr.
*Stuart E. Eizenstat
Thomas R. Eldridge
Julie Finley
*Alan H. Fleischmann
Jendayi E. Frazer
Ronald M. Freeman
Courtney Geduldig
*Robert S. Gelbard
Gianni Di Giovanni
Thomas H. Glocer
Murathan Günal
John B. Goodman
*Sherri W. Goodman
Amir A. Handjani
John D. Harris, II
Frank Haun
Michael V. Hayden
Annette Heuser
Amos Hochstein
Ed Holland
*Karl V. Hopkins
Robert D. Hormats
Mary L. Howell
Wolfgang F. Ischinger
Deborah Lee James
Reuben Jeffery, III
Joia M. Johnson
Stephen R. Kappes
*Maria Pica Karp
Andre Kelleners
Sean Kevelighan

*Zalmay M. Khalilzad
Robert M. Kimmitt
Henry A. Kissinger
C. Jeffrey Knittel
Franklin D. Kramer
Laura Lane
Richard L. Lawson
*Jan M. Lodal
Douglas Lute
*Jane Holl Lute
William J. Lynn
Wendy W. Makins
Zaza Mamulaishvili
Mian M. Mansha
Gerardo Mato
William E. Mayer
Timothy McBride
John M. McHugh
Eric D.K. Melby
Franklin C. Miller
Judith A. Miller
*Alexander V. Mirtchev
Susan Molinari
Michael J. Morell
Richard Morningstar
Edward J. Newberry
Thomas R. Nides
Franco Nuschese
Joseph S. Nye
Hilda Ochoa-Brillembourg
Ahmet M. Oren
Sally A. Painter
*Ana I. Palacio
Carlos Pascual
Alan Pellegrini
David H. Petraeus
Thomas R. Pickering
Daniel B. Poneman
Dina H. Powell
Arnold L. Punaro
Robert Rangel
Thomas J. Ridge
Michael J. Rogers
Charles O. Rossotti

Robert O. Rowland
Harry Sachinis
Rajiv Shah
Stephen Shapiro
Wendy Sherman
Kris Singh
James G. Stavridis
Richard J.A. Steele
Paula Stern
Robert J. Stevens
Robert L. Stout, Jr.
*Ellen O. Tauscher
Nathan D. Tibbits
Frances M. Townsend
Clyde C. Tuggle
Melanne Verveer
Charles F. Wald
Michael F. Walsh
Maciej Witucki
Neal S. Wolin
Guang Yang
Mary C. Yates
Dov S. Zakheim

**HONORARY DIRECTORS**
David C. Acheson
James A. Baker, III
Harold Brown
Frank C. Carlucci, III
Ashton B. Carter
Robert M. Gates
Michael G. Mullen
Leon E. Panetta
William J. Perry
Colin L. Powell
Condoleezza Rice
George P. Shultz
Horst Teltschik
John W. Warner
William H. Webster

*Executive Committee Members*

*List as of June 28, 2018*



The Atlantic Council is a nonpartisan organization that promotes constructive US leadership and engagement in international affairs based on the central role of the Atlantic community in meeting today's global challenges.

© 2018 The Atlantic Council of the United States. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means without permission in writing from the Atlantic Council, except in the case of brief quotations in news articles, critical articles, or reviews. Please direct inquiries to:

Atlantic Council

1030 15th Street, NW, 12th Floor,
Washington, DC 20005

(202) 463-7226, www.AtlanticCouncil.org