# EXHIBIT 46



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales High Court (Commercial Court) Decisions

**You are here:** BAILII >> Databases >> England and Wales High Court (Commercial Court) Decisions >> A v B [2015] EWHC 1944 (Comm) (09 July 2015)
URL: *http://www.bailii.org/ew/cases/EWHC/Comm/2015/1944.html*
Cite as: [2015] EWHC 1944 (Comm)

[New search] [Printable RTF version] [Help]

**Neutral Citation Number: [2015] EWHC 1944 (Comm)**
Case No: 2014 FOLIO 1479

**IN THE HIGH COURT OF JUSTICE**
**QUEEN''S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, 7 Rolls Buildings
Fetter Lane, London EC4A 1NL
09/07/2015

B e f o r e :

**MR. JUSTICE TEARE**

---

**Between:**

| | |
|---|---|
| **A** | **Claimant** |
| **- and -** | |
| **B** | **Defendant** |

---

**Ricky Diwan QC and Jeremy Brier (instructed by Gibson Dunn & Crutcher LLP) for the Claimant**
**Alan Maclean QC and Andrew Scott (instructed by Baker & McKenzie LLP) for the Defendant**
**Hearing dates: 23 - 26 June 2015**

---

**HTML VERSION OF JUDGMENT**

---

Crown Copyright ©

A v B [2015] EWHC 1944 (Comm) (09 July 2015)                                   Page 2 of 13

**Mr. Justice Teare:**

1.  This is a challenge to an arbitration award pursuant to section 67 of the Arbitration Act 1996 by
    Mr. A, a Russian businessman now resident in California. It is said that the arbitral tribunal
    lacked jurisdiction to determine the claim brought against him by Mr. B, another Russian
    businessman still resident in Moscow. The challenge raises two points: (i) did Mr. A sign a
    document known as the 2008 Agreement and (ii) if he did, does the 2008 Agreement contain an
    arbitration agreement? The first is a question of fact. The second is a question of construction.
    Both points were determined by the tribunal against Mr. A after hearing evidence and
    argument. That does not avail Mr. B because, for better or for worse, a challenge pursuant to
    section 67 is a re-hearing for which no permission is required.

The background

2.  The background to this arbitration application appears from the evidence of Mr. B. (Mr. A did
    not address the background in his witness statements.) I shall summarise it as shortly as I can.

3.  In early 2000 Mr. B had an interest in land in Moscow which he hoped to develop as a retail
    complex (the ""Retail Complex""). He had two partners and the development was managed
    though CA, a limited liability company. His two partners wished to withdraw and in 2002 Mr.
    A and Mr. C agreed to take their place. On 25 December 2002 20% of the shares in CA were
    allocated to Mr. B and 80% of the shares were allocated to four companies controlled by Mr. A.
    Ultimately, 73% of the shares were owned by Mr. A''s nominee companies and 7% by Mr. C.
    The operation of the Retail Complex and the distribution of its profits were governed by what
    has been described as the 2003 Agreement to which Mr. B, Mr. C and the nominee companies
    were expressed to be parties. The Retail Complex was built and, after a false start in May 2005,
    was re-opened in January 2006.

4.  Meanwhile, Mr. A was experiencing difficulties with the financing of another project (the
    ""Hotel Project""). The Mayor of Moscow, who had an interest in the project, was unwilling to
    permit the project to stand as security for a loan. In September 2006 Mr. A approached Mr. B
    with a request that the Retail Complex be used as security for a loan that he was seeking from
    Deutsche Bank to finance the Hotel Project. The Mayor of Moscow did not have an interest in
    the Retail Complex and therefore would not oppose the Retail Complex standing as security.
    Although the loan was to be for 10 years the plan was that within a year a ""trade gallery"" in
    the Hotel Project would replace the Retail Complex as security. An interest in the Hotel Project
    and an increased shareholding in the Retail Complex were offered as incentives to agree. Mr. B
    agreed in principle.

5.  The owning structure of the Retail Complex had to be changed to meet the requirements of
    Deutsche Bank. On 4 and 5 December 2006, at a meeting attended by Mr. B, Mr. A and Mr. C
    it was proposed that a Cypriot company, DT, become the owner of CA, that DT be wholly
    owned by a BVI company, TI, and that Mr. B own 20% of TI, KH (a Cypriot company) own
    73% of TI and Mr. C own 7% of TI.

6.  In his evidence before this court Mr. A said that his brother D was not only the legal owner of
    KH but also the beneficial owner of KH and that he, Mr. A, neither owned nor controlled it. I

was unable to accept this evidence, for these reasons. There was unchallenged evidence that the four Russian companies which owned 73% of the Retail Complex between 2003 and 2006 were his nominees. Indeed, when cross-examined Mr. A was asked whether the four companies were within his business, he replied ""yes"". When the owning structure of the Retail Complex was altered in 2006 so that the Retail Complex could stand as security for the financing of the Hotel Project that 73% interest was transferred to KH. There was no suggestion in the evidence that the beneficial ownership of that interest had altered. Mr. A accepted that his brother D acted as his nominee with regard to another company and it is, in my judgment, more probable than not that he acted as his nominee with regard to KH. There was no evidence of D being approached by Mr. A to consent to the Retail Complex being offered as security for the financing of the Hotel Project, which one would expect if he truly were the beneficial owner of KH. Thus Mr. A"'s evidence that he neither owned nor controlled KH was inconsistent with the probabilities. In a Framework Agreement dated 14 January 2010 Mr. A undertook to ensure the transfer of 92% of the shares in KH. That shows that he still controlled KH in 2010.

7.  On 4 and 5 December 2006 there was also discussion as to how Mr. B"'s interest in the Retail Complex was to be protected if the Retail Complex stood as security for the Deutsche Bank loan. The proposal was that if the security interest in favour of Deutsche Bank were not removed within the expiry of one year he would have the power to compel the transfer of KH"'s 73% shareholding in TI to himself so that he could sell it and pay off the loan.

8.  On 26 December 2006 Mr. B, Mr. C and KH entered into a Shareholders" Agreement. An Escrow Agreement (providing for KH"'s shares in TI to be placed in escrow) was also agreed to ensure that the transfer option was effective. Deutsche Bank was to be party to the Escrow Agreement but did not sign it until 13 November 2007. The shares were never placed in escrow.

Mr. B"'s case

9.  Mr. B says that throughout 2007 he asked Mr. A to transfer KH"'s shares in TI into escrow. He says that in January and February 2008 he pressed Mr. A for confirmation that Deutsche Bank"'s security interest in the Retail Complex would be removed. He instructed Herbert Smith to write to Deutsche Bank on 19 February 2008 informing the bank of KH"'s breaches of the Shareholders" and Escrow Agreements and suggesting that they might trigger an event of default under the loan agreement. This led, he said, to a meeting on 21 February 2008 in which Mr. A asked for the security to remain in force an additional 2-3 years. Mr. B was prepared to agree to that but on terms. It was his case that those terms were agreed in the 2008 Agreement. That Agreement was finally agreed and signed by Mr. A and Mr. B on 3 March 2008.

Mr. A"'s case

10.  He says that he has no recollection of Mr. B approaching him in 2007 for confirmation that KH"'s shares would be transferred into escrow. If he had been approached he says he would have told Mr. B to speak to Mr. A"'s brother D who was the beneficial owner of KH. He says that no meetings took place in 2008 as alleged by Mr. B. There was no meeting on 3 March 2008 and he did not sign the 2008 Agreement.

Subsequent events

11.  In 2009 TI transferred its shares in DT to two companies ML and FL which were unknown to Mr. B and which he neither owned nor controlled. Thus his shareholding in TI was rendered

valueless because it no longer owned the Retail Complex. The arbitration tribunal held that Mr.
A had breached the 2008 Agreement and that KH had breached the Shareholders'' and Escrow
Agreements. Both were jointly and severally liable for the loss thereby caused which the
tribunal assessed in the sum of US$72,243,000 plus interest and costs.

Did Mr. A sign the 2008 Agreement?

12. In order to resolve the question whether Mr. A signed the 2008 Agreement (as alleged by Mr.
B) or whether the signature purporting to be his was a forgery (as alleged by Mr. A) it is
necessary to consider all the evidence in the case but in particular (i) the probabilities, (ii) the
oral evidence, (iii) the documentary evidence and (iv) the evidence of handwriting experts.

13. The probabilities: The dispute between Mr. B and Mr. A is not only as to whether Mr. A signed
the 2008 Agreement on 3 March 2008 but is also as to whether in 2007 and early 2008 there
were discussions between them as to when the relevant shares would be placed in escrow so as
to afford protection for Mr. B. This is important because the probabilities are that there were
such discussions. From Mr. B''s point of view one would expect that he would be very
interested in knowing that the shares had been placed in escrow. As 26 January 2008
approached and passed (the date on which KH had agreed that the Retail Complex would cease
to stand as security) one would expect him to be very concerned that his interest in the Retail
Complex would be protected and one would expect Mr. A to wish to speak to Mr. B to make
further arrangements. Thus Mr. B''s evidence that he had discussions with Mr. A in 2007 and
early 2008 about these matters accords with the probabilities.

14. Once Herbert Smith, on Mr. B''s instructions, had informed Deutsche Bank by letter dated 19
February 2008 that there might be an event of default under Deutsche Bank''s loan agreement
and once, as accepted by Mr. A, he was made aware of that letter one would expect that Mr. A
would be anxious to speak to Mr. B. Thus Mr. B''s evidence that there was a meeting between
them on 21 February 2008 when Mr. A suggested that Mr. B agree that the Retail Complex
remain as security for another 2-3 years is consistent with the probabilities.

15. The oral evidence: Mr. A did not tell the court the truth when he said that he was not the
beneficial owner of KH. He must have known that was not the truth. It does not follow that he
lied with regard to the 2008 Agreement but it does follow that I must treat his evidence with
regard to the 2008 Agreement with caution and indeed scepticism. There is a further reason for
doing so. When he was being cross-examined I did not gain the impression that he was seeking
to assist the court by giving clear answers to the questions put. Rather, I gained the impression
that he was seeking to avoid saying anything which might damage his case. Thus he found it
very difficult to accept that in agreeing to the Retail Complex standing as security for the Hotel
Project loan Mr. B was taking a risk and would need something in return. Yet it was obvious
that Mr. B was taking a risk and would need something in return.

16. Mr. A also said that he was not concerned about the letter from Herbert Smith to Deutsche
Bank dated 19 February because he understood from Mr. C that he had explained to Mr. B that
the loan from Deutsche Bank would be repaid from the proceeds of a further loan which
required approval from the City of Moscow and that such approval was expected in June 2008.
The further loan was to be secured on the Hotel Project (as Mr. A accepted in cross-
examination). In view of the history of opposition to such security by the Mayor of Moscow
there was no reason why approval was to be expected in June 2008. It was therefore very
difficult to accept his evidence on this matter.

Case 2:14-cv-09764-RGK-PLA   Document 229-51   Filed 03/02/20   Page 6 of 14   Page ID
#:7159

17.  Mr. A chose not to give evidence before the arbitral tribunal. His explanation for making that choice is that Mr. B had brought a criminal complaint against him in Russia and he feared that Mr. B would not have complied with his duty of confidentiality and that any evidence given by him on the merits of the claims against him would have been transmitted to the Russian criminal investigators (some of whom were alleged themselves to have been complicit in a criminal fraud and in the death of the Russian lawyer Sergei Magnitsky who uncovered that fraud). Mr. A did not explain why he thought that Mr. B would break his duty of confidentiality in this way and he did not suggest that he had raised this fear at the arbitration or with those representing Mr. B at the arbitration. It is also to be noted that he gave evidence in another arbitration concerning the Hotel Project notwithstanding parallel criminal proceedings in Russia. His explanation therefore lacks cogency and is a further reason for viewing his evidence with scepticism; cf the observations of Gross J. in Electrosteel v Scan-Trans [2003] 1 Lloyd''s Rep. 190 at paragraph 23.

18.  These matters persuaded me that I was unable to conclude that Mr. A''s evidence that he did not sign the 2008 Agreement was worthy of belief.

19.  Reliance was placed by counsel for Mr. B on a statement from Mr. C to the effect that there were discussions in late February 2008 and that such evidence was not challenged in the arbitration by the lawyers acting for Mr. A. However, it is not clear why it was not challenged. It may be that the case had been fully put to Mr. B and that there was no need to take up time putting the same case to Mr. C. In the circumstances I do not place any reliance on Mr. C''s evidence. It was admitted under the Civil Evidence Act but there was no means of testing his reliability.

20.  Mr. B''s evidence was consistent with the probabilities. When he was cross-examined there were times when he gave long answers which strayed from the original question but I did not gain the impression that he was being obstructive. There were also some differences between his evidence before the tribunal and his evidence before the court. However, it has to be remembered that he was giving evidence about events in early 2008. His statement before the arbitral tribunal was dated August 2011 (some three years after the events) and his statement before the court was dated March 2015 (seven years after the events). It does not seem to me surprising that in such circumstances there are differences between his account in 2011 and his account in 2015. The differences were a very long way from being of such significance that they caused me to consider that he was, or might be, lying when saying that Mr. A had signed the 2008 Agreement. On the contrary, both when he finished his evidence and upon reflection after the trial, I formed the view that his evidence was worthy of belief. The manner in which he was able to answer, fluently and without hesitation, all questions concerning the 2008 Agreement and the manuscript additions to it and the working copy strongly suggested that he was an honest witness and had a good recollection, as one might expect, of the elements of the deal he had struck with Mr. A.

21.  Counsel for Mr. A submitted that Mr. B''s evidence was unreliable because its premise, that he was able to bring pressure to bear on Mr. A by suggesting that a breach of the Shareholders'' Agreement might give rise to an event of ""cross-default"" under the loan agreement with Deutsche Bank, was mistaken. In his evidence Mr. B referred to an event of ""cross-default"" but in the letter dated 19 February 2008 reference was made to an event of ""default"". I doubt that the reference in Mr. B''s evidence to ""cross-default"" was a reference to the technical definition of ""cross-default"" in the loan agreement because the letter dated 19 February 2008 referred to an event of default. Whilst counsel for Mr. A submitted that a breach of the

Case 2:14-cv-09764-RGK-PLA Document 229-51 Filed 03/02/20 Page 7 of 14 Page ID #:7160

Shareholders'' Agreement by KH could not amount to an event of ""cross-default"" under the loan agreement, counsel for Mr. B submitted that such a breach could amount to an event of ""default"" under the loan agreement because it was an event which would be likely to have a ""material adverse effect"" on the business of DT, TI or CA. In the result I did not consider that the criticism of Mr. B''s evidence based upon his reference to a cross-default was compelling.

22. Mr. E was the General Director of CA from 2007 until 2010. CA operated the Retail Complex. He gave evidence that in early January and February 2008 he was aware that Ms. F, whom he described as head of legal at CA, was involved in negotiations between Mr. B and Mr. A. He also recalled that several days before the Women''s Day Holiday of 8 March 2008 Ms. F reported to him that Mr. B and Mr. A had signed an agreement. He recalled that on that day Mr. B was in a very good mood and showed him a document which he said he and Mr. A had signed that day. He remembered that it bore handwritten notes but could not identify it. Mr. B asked him to put it in the safety deposit box which he did. He subsequently made copies of it at the request of Mr. B. It was not suggested that he was lying about these matters and there did not appear to be any reason to think that he was. But he was first asked to recall these matters in 2015. That gives rise to the possibility that his recollection might have been mistaken. If his recollection was reliable and if the agreement to which he referred was the 2008 Agreement then, on Mr. A''s case, Mr. B and Ms. F must have been carrying on an elaborate charade of pretending to Mr. E that negotiations were underway and telling him several days before 8 March that agreement had been reached. I regard Mr. E''s evidence as supportive of Mr. B''s case but I do not place much reliance on it because it is difficult to judge how reliable his recollection was.

23. The contemporaneous documents: In any commercial case it is necessary to test the evidence which has been given against the contemporaneous documents. Usually there are many such documents. In this case there are surprisingly few.

24. On 3 March 2008 Ms. F, the Russian lawyer who, on Mr. B''s evidence, assisted with the drafting of the 2008 Agreement, sent Herbert Smith a letter from Mr. B (a copy of which has not been found) and, it appears, requested Herbert Smith to draft a letter to be sent to Deutsche Bank. A draft was provided on 4 March which was approved by Mr. B. The letter which was sent to Deutsche Bank referred to the earlier letter dated 19 February 2008, the Escrow Agreement and the Shareholders'' Agreement and said as follows:

> We have been informed by our client that since 19 February 2008 the parties to the Shareholders'' Agreement have negotiated and intend to perform actions and execute documents in relation to assets securing the obligations of the Borrower to the lender under the Loan Agreement. We understand from our client that the aforementioned actions and documents include the following :
>
> …………
>
> We understand from our client (and have been requested to mention to you) that our client considers that, if the above mentioned documents are agreed and executed and the above mentioned actions are performed by 11 March 2008, then our client will consider that the potential dispute referred to in our letter of 19 February 2008 will have been resolved.

Case 2:14-cv-09764-RGK-PLA   Document 229-51   Filed 03/02/20   Page 8 of 14   Page ID #:7161

25. Counsel for Mr. A observed that the letter says that the parties to the Shareholders'' Agreement had ""negotiated and intend to perform actions and execute documents"" rather than that the parties had ""agreed"" to perform certain actions and execute certain documents. I was not impressed by this. The words used in the letter are likely to have been the words used by Mr. B to Herbert Smith rather than Herbert Smith''s own choice of words (""we have been informed by our client""). I do not consider that they are necessarily inconsistent with an agreement having been reached, following negotiation, to perform certain actions and execute certain documents. But in any event Mr. A''s evidence is that he had no discussions in early 2008 with Mr. B concerning the Shareholders'' Agreement or the Escrow Agreement. The letter dated 4 March 2008 is a contemporaneous letter which says, at the very least, that there had been such discussions.

26. It seemed to me that Mr. A''s case therefore had to be that the instructions given by Mr. B to Herbert Smith on 3 March 2008 were untrue. Counsel for Mr. A did not accept that. He submitted that the reference to negotiations could have been a reference to negotiations with Mr. A''s brother D. However, there was no evidence that D was involved in any such negotiations and in any event he was, for the reasons I have already given, Mr. A''s nominee. If there were negotiations they would have to have involved Mr. A. So one is left with the possibility that Mr. B was misinforming Herbert Smith as to the existence of negotiations. But it is difficult to see why, having informed Deutsche Bank on 19 February 2008 that there was a dispute under the Shareholders'' Agreement which might trigger an event of default under the loan agreement, Mr. B would on 4 March 2008 inform Deutsche Bank that the potential dispute might be resolved, unless there had indeed been discussions between himself and Mr. A.

27. Counsel for Mr. A noted that there were no other documents (such as notes of meeting, draft agreements etc.) evidencing the alleged meetings in February and March 2008. This is true. Mr. B said that Ms. F was unwilling to assist him with the provision of documents. I did not consider that the absence of further documents was such as to cause me to doubt the reliability of Mr. B''s evidence that there had been such meetings culminating in the 2008 Agreement.

28. Mr. B gave evidence that he requested Ms. F to draft the agreements necessary to give effect to what had been agreed on 3 March 2008. She sent two such drafts to Mr. B on 30 June and 1 July 2008. The preparation of such drafts is consistent with Mr. B''s case, notwithstanding the absence of a reference in the recitals to the 2008 Agreement or the suggested inconsistencies between the 2008 Agreement and the drafts. Mr. B gave evidence that he approved the drafts and asked Ms. F that they be forwarded to Mr. A''s brother D because he did not have an email address for Mr. A. No emails to D were in evidence because Ms. F was unable or unwilling to provide evidence to Mr. B. In the event there was no response either from Mr. A or his brother D and no further steps were taken to give effect to what had been agreed on 3 March 2008.

29. I was concerned that no further steps were taken. However, counsel submitted that that was because Mr. B and Mr. A eventually agreed that it was unnecessary to execute the new agreements and that Mr. B''s position was instead protected in September 2008 by his being appointed a director of TI and by his being granted a power of attorney from DT in February 2009. This was not precisely how it was put in Mr. B''s evidence but it went some way to alleviate my concerns (although in the event the further protection did not prove sufficient).

30. The handwriting evidence: The evidence of Dr. Giles as to whether the questioned signature was that of Mr. A was that she could not say. This was primarily because only a copy of the agreement was available, not the original. By contrast the evidence of Mr. Detwiler was that

Case 2:14-cv-09764-RGK-PLA  Document 229-51  Filed 03/02/20  Page 9 of 14  Page ID
#:7162

there were three dissimilarities between the questioned signature and a number of examples of Mr. A''s signature. He said there was a difference in the structure of the questioned signature, dissimilar signature placement and a dissimilar slant of writing. He said that each dissimilarity was strong evidence of a non-genuine signature but that when all three were considered collectively they overwhelmingly supported the conclusion that the questioned signature was not that of Mr. A.

31. The suggested difference in slant was acknowledged by Dr. Giles to be a dissimilarity. But the difference in slant could be explained by the respective position of the signer and the paper to be signed. Mr. B said that Mr. A was seated on an armchair at a table when he signed the 2008 Agreement. He said that Mr. A signed one copy first and threw it at him. He then signed the second copy. Whilst there is a slight suggestion of some bad temper there is no evidence that Mr. A did not position the copies to be signed in whatever was the usual way for him. But equally there is no evidence that he positioned the copies in the way that was usual for him. The difference in slant is therefore some evidence that the signature was not that of Mr. A but it is not particularly cogent.

32. I was not persuaded that there was a real difference in placement. The placement of the questioned signature was similar to at least one of the comparison signatures.

33. The suggested difference in structure was that ""the ending writing movements found in the question (""Q1"") signature are formed with two separate changes of direction before the writer completes the terminal stroke to the right of the signature. Furthermore the second change of direction is formed with ……a small close-looped writing movement."" The comparison signatures were said to have three or four movements not two, and none had the small close-looped writing movement. However, there was a dispute between the experts as to how one counted the number of movements. Dr. Giles said there were three in the questioned signature and I found it difficult to say she was wrong. She accepted that none of the comparison signatures had the small close-looped feature but pointed out that there were different forms of Mr. A''s comparison signatures; some were ""simple"" in that there was no ""pen lift"" and others were more ""complex"" in that there was a ""pen lift"". In these circumstances I considered that one should be very cautious in drawing conclusions from the suggested structural differences.

34. In the result I did not agree that the three suggested dissimilarities were, individually, strong evidence that the questioned signature was not genuine or that, collectively, they overwhelmingly showed that it was not genuine. The most that could be said was that the difference in slant was some, but not strong, evidence that the signature was not genuine. So overall I accepted Dr. Giles'' view that a firm view either way was not possible.

35. Thus the probabilities suggested that it was more likely than not that there were discussions between Mr. B and Mr. A in early 2008. Mr. B''s evidence was consistent with those probabilities. Mr. A''s evidence was not. Moreover, Mr. A had not been frank with the court about his interest in KH and the manner in which he gave his evidence did not suggest that he was seeking to assist the court. By contrast I considered that Mr. B was a witness of truth. His explanation of the structure of the 2008 Agreement was fluent which appeared to me to be the consequence of an honest recollection rather than that of a well-rehearsed act. It is true that there were differences between his recollection in 2011 and his recollection in 2015 but none of these caused me to consider that he was lying in his account of the 2008 Agreement or that his recollection that he and Mr. A had signed it was mistaken. There was, moreover, some

Case 2:14-cv-09764-RGK-PLA   Document 229-51   Filed 03/02/20   Page 10 of 14   Page ID #:7163

contemporary documentary evidence which supported Mr. B''s evidence. It is true that it was limited and some was missing. But, having considered and reflected upon the evidence of Mr. B and Mr. A I remained of the view that the former was essentially a reliable witness and that the latter was essentially an unreliable witness. The handwriting evidence was inconclusive. In the result I reached the firm conclusion that Mr. A had signed the 2008 Agreement.

<u>The construction of article 2.10 of the 2008 Agreement</u>

36.  The 2008 Agreement was between Mr. B as ""Partner 1"" and Mr. A as ""Partner 2"". Article 2 provided as follows:

> **Article 2. Arrangements Between the Partners with Respect to Shares and Governance**
>
> 2.1 Partners (shareholders'' designated by them) will enter into an amendment agreement to the [TI] Shareholders'' Agreement, no number, dated December 26, 2006, which shall govern the revenue distribution procedure of CJSC CA.
>
> 2.2 In connection with a default and termination of the Escrow Agreement, no number, dated November 13, 2007 the Partners will enter into a similar escrow agreement whereunder Deutsche Bank AG will act as an escrow agent, and will procure for its performance by all parties and when entering into such agreement they will remove all inconsistencies that existed before. Partner 2 (shareholders'' designated by him) will also execute and deliver to Deutsche Bank AG instruments of transfer with respect to all TI shares owned (controlled) by him.
>
> 2.3 The constituent documents of [BT], [DT] and [TI] will need to be amended to provide that any document of any such companies shall be considered to be duly executed and having legal force only upon its execution by two authorized persons, namely Partner 1 and Partner 2.
>
> 2.4 Partner 2 will appoint the General Director of CJSC CA, and Partner 1 will appoint Chief Accountant and control the Financial Director (any other senior finance positions)
>
> [*handwritten comment indicates a change of the sentence ""Partner 1 will appoint Chief Accountant and control the Financial Director"" to ""Partner 1 will appoint and control Chief Accountant and the Financial Director"". The word ""control"" is crossed-out in manuscript*]. [*Further handwritten comment: illegible*]
>
> 2.5 Actions specified in clauses 2.1 – 2.4 shall be taken by the Partners on or before _____. Partner 2 agrees to instruct its legal counsel White & Case to prepare the relevant documents and take necessary actions.
>
> 2.6 Partner 1 will purchase from [C] 2% of [TI] Shares at par value.

> [*handwritten comment: ""?""*] 2.7 Partner 1 will purchase 50% [*the number is handwritten*] of shares in [BT] [*handwritten comment: ""DT"" is inserted after the word ""[BT]""*] at par value.
>
> [*handwritten comment: ""-""*] 2.8 Partner 1 will purchase from Partner 2 (shareholder designated by him) 23% of [TI] Shares at $34.5 per share. [*the number is handwritten*]
>
> The amount of $5,000,000 will be deducted from the price specified in this clause which is necessary to Partner 2 to purchase from [C] 5% of [TI] Shares; such transaction to be initiated no later than the first quarter of 2009.
>
> 2.9 The payment procedure for [TI] Shares by Partner 1 shall be determined by the Partners in chapter 4 hereof.
>
> 2.10 If Partner 2 fails to perform his obligations set forth in clauses 2.1.-2.4, Partner 1 will seek to enforce his rights under the Shareholders'' Agreement by filing a claim against Partner 2 with the London Court of International Arbitration and require, among other things, enforcement of Clause 9.1.5 of the Shareholders'' Agreement, limitation of restrictions on use of his property (shares in [TI], MTC, [the Retail Complex]), and indemnification for losses.

37. I am not concerned with the question whether, if article 2.10 is a binding arbitration agreement, Mr. A is liable to Mr. B, as the tribunal found, for breach of the 2008 Agreement. I am concerned with the question whether article 2.10 contains an arbitration agreement pursuant to which Mr. B and Mr. A agreed that any claim by Mr. B that Mr. A had acted in breach of the 2008 Agreement, was to be referred to arbitration at the London Court of International Arbitration (the ""LCIA"").

38. Counsel for Mr. A submitted that all article 2.10 did was express Mr. B''s intention or aspiration, in the event that Mr. A failed to perform his obligations under articles 2.1-2.4, to enforce his rights under the Shareholders'' Agreement pursuant to the arbitration agreement in that agreement. Article 2.10 was, he submitted, incapable to being construed as a LCIA arbitration agreement permitting Mr. B to refer disputes arising out of the 2008 Agreement to arbitration.

39. Counsel for Mr. B submitted that article 2.10 was such an agreement because it referred in terms to Partner 1 (that is Mr. B) ""filing a claim against Partner 2 (that is Mr. A) with the London Court of International Arbitration"".

40. The court''s task is to ascertain the meaning which article 2.10 would have conveyed to a reasonable person possessed of all relevant background reasonably available to both parties in March 2008. Where the words of the contract are clear effect must be given to them. The less clear the words are the more ready the court can properly be to depart from their natural meaning.

41. In the present case there is a problem with the words of article 2.10. The article provides that Mr. B will seek to enforce his rights under the Shareholders'' Agreement but then provides that

he will do so by filing a claim against Mr. A. Yet Mr. A was not expressed to be a party to the Shareholders'' Agreement. The meaning which the clause was intended to bear may therefore be said to be unclear.

42.   Counsel for Mr. A submitted that the meaning was clear. The clause expressed Mr. B''s intention or aspiration to enforce his rights under the Shareholders'' Agreement by filing a claim against Mr. A because he believed (wrongly) that Mr. A was party to the Shareholders'' Agreement and therefore he could file a claim against him. Thus clause 2.10 was not an agreement but a statement of intent. It did not contain an agreement by Mr. A that Mr. B could file a claim against him.

43.   This is an unusual role for a term of a contract. Terms usually embody agreements, not statements of intent. Each term of the 2008 Agreement is likely to have been carefully considered by the parties and to represent a compromise of their competing interests with regard to the subject matter of each term. I am concerned with article 2.10 which refers to one party being able to file a claim in arbitration against another. Where one party agrees that another may file an arbitration claim against him it is implied that the other party will submit to the jurisdiction of the agreed tribunal; otherwise the reference to arbitration would not work. But on the construction of article 2.10 advanced on behalf of Mr. A he would be free, once Mr. B had (mistakenly) filed a claim against him at the LCIA, to say that he had not agreed to the jurisdiction of the LCIA tribunal. In my judgment that is not the meaning of article 2.10 which would find favour with the reasonable man. He would understand article 2.10 to mean that if Mr. B filed a claim against Mr. A at the LCIA the latter would submit to the jurisdiction of the LCIA tribunal. The reasonable man would not consider article 2.10 was nothing more than a forlorn and mistaken aspiration by Mr. B.

44.   There is also, however, a difficulty with the submission of counsel for Mr. B that article 2.10 refers to LCIA arbitration claims by Mr. B for breach of the 2008 Agreement. For article 2.10 only refers in express terms to the enforcement of rights under the Shareholders'' Agreement. It does not refer in express terms to the enforcement of rights under the 2008 Agreement. Thus, Mr. B''s case requires words to be read into the article.

45.   At this point it is necessary to bear in mind the nature of the dispute which the tribunal determined and in respect of which it decided that it had jurisdiction pursuant to article 2.10 of the 2008 Agreement. The tribunal dealt with the liability of Mr. A between paragraphs 177 and 198 of the award. At paragraph 185 the tribunal held that Mr. A had agreed in the 2008 Agreement to abide by the terms of the Shareholders'' Agreement and the Escrow Agreement and to procure that the shares in KH be transferred into escrow pursuant to the Shareholders'' and Escrow Agreements. It reached this conclusion ""based upon its analysis of Article 2.1, 2.2 and 2.10 of the 2008 Agreement"". The tribunal also accepted the submission that it was an implied term of the 2008 Agreement that Mr. A would keep safe, protect and preserve at all times Mr. B''s shareholding interest and was under the obligation to ensure that the ownership structure of CA and the Retail Complex be maintained such that Mr. B would through his shareholding in TI retain the value of his interest in the Retail Complex; see paragraphs 187-190. The tribunal said:

> ""This follows from an analysis of the Preamble of the 2008
> Agreement – where the shareholding structure is described in detail –
> and Articles 2.1-2.5 and 2.10. The conclusion is also supported by the
> reference in Article 2.10 to Article 9.1.5 [1] of the Shareholders''

> Agreement, which in turn refers to Article 5 of that agreement which
> in turn depends on the ownership and shareholding structure described
> in the whereas clauses of the Shareholders'' Agreement.''"

46. The tribunal concluded that Mr. A had breached the 2008 Agreement (see paragraph 198). The tribunal''s rejection of Mr. A''s submissions on causation of loss indicate that the tribunal considered that he had breached the implied term and articles 2.3 and 2.4 of the 2008 Agreement (see paragraph 194) and articles 2.1 and 2.2 of the 2008 Agreement (see paragraph 195).

47. Thus the question for the court is whether article 2.10 conferred jurisdiction on the LCIA tribunal to determine disputes arising out of the express and implied terms of article 2 of the 2008 Agreement.

48. As I have said the meaning of article 2.10 is not clear. On the one hand it refers to enforcing rights under the Shareholders'' Agreement and on the other hand it refers to doing so by filing a claim against Mr. A at the LCIA notwithstanding that he was not named as a party to the Shareholders'' Agreement. Thus there is an apparent inconsistency in the language of the clause.

49. Much of the background to the 2008 Agreement is set out in the Preamble to the 2008 Agreement which is found in Article 1. Mr. B, Mr. A and Mr. C were shareholders'' in TI and thereby in the Retail Complex. Mr. B and Mr. A knew that Mr. B had agreed to the Retail Complex being used as security for the Hotel Project but on the terms of the Shareholders'' Agreement and Escrow Agreement which were designed to protect Mr. B''s interest in the Retail Complex. They were also aware that notwithstanding the expiry of a year and a month from the date of the Shareholders'' Agreement the steps necessary to protect that interest had not been implemented. Mr. B had warned Deutsche Bank that there might be an event of default under its Hotel Project loan and Mr. A was aware of that warning. Thus both Mr. B and Mr. A had their own interests to pursue; the one to protect his interest in the Retail Complex, the other to protect his interest in the Hotel Project.

50. Articles 2.1-2.2 concerned the Shareholders'' Agreement and the Escrow Agreement and articles 2.3-2.4 concerned the governance of TI, DT and CA and also the governance of BT (the borrower of money from Deutsche Bank for the Hotel Project). All these provisions would appear to be designed to protect Mr. B''s position.

51. Article 2.10 contemplates the event of a breach of articles 2.1-2.4 by Mr. A and makes provision for the filing of a claim against him by Mr. B at the LCIA. The natural meaning of such a clause is that the parties intended that any claim by Mr. B against Mr. A for breach of the express or implied terms of articles 2.1-2.4 would be referred to arbitration at the LCIA. But article 2.10 refers to the enforcement of rights under the Shareholders'' Agreement, which would appear to be inconsistent with such meaning. This difficulty is emphasised by the final words of the clause which envisage Mr. B enforcing particular terms of the Shareholders'' Agreement.

52. I consider that the answer to this difficulty is that by articles 2.1-2.2 Mr. A assumed the obligations of KH under the Shareholders'' Agreement and the Escrow Agreement (and undertook the related obligations under articles 2.3-2.4). I have reached that decision myself but it is also the decision of the tribunal on liability (see above). In that context the reference in

Case 2:14-cv-09764-RGK-PLA   Document 229-51   Filed 03/02/20   Page 14 of 14   Page ID
#:7167

article 2.10 to enforcement of rights under the Shareholders'' Agreement is reasonably to be understood as a reference to the enforcement of the obligations in the Shareholders'' Agreement and Escrow Agreement which Mr. A assumed under clauses 2.1 and 2.2 (together with related obligations under clauses 2.3-2.4) and of the implied obligation found in those articles. The reference to enforcement of rights under the Shareholders'' Agreement is thus a compendious reference to the bundle of obligations assumed by Mr. A pursuant to the express and implied terms of articles 2.1-2.4.

53. In Dallah Real Estate v The Ministry of Religious Affairs [2010] UKSC 46 at paragraph 31 Lord Mance said that the court may examine carefully and with interest the reasoning and conclusion of the tribunal on the question of jurisdiction. The court is not bound by the reasoning or conclusion of the tribunal but may find it helpful. I have therefore examined the approach of the tribunal to the question of jurisdiction. In paragraph 172 the tribunal held that clause 2.10 referred certain disputes to arbitration. In paragraph 173 the tribunal considered the scope of the arbitration clause. The tribunal set out clauses 2.1-2.4 and then noted that clause 2.10 referred to Mr. B''s ""rights under the Shareholders'' Agreement"". In paragraph 174 the tribunal said:

> ""The Tribunal finds that the language of Article 2.10 and of Articles 2.1-2.4, as well as of the Shareholders'' Agreement, to which reference is made, is broad enough to give the Tribunal jurisdiction over the claims raised by the Claimant, insofar as they are based on the Shareholders'' Agreement, the Escrow Agreement and the 2008 Agreement. ""

54. I consider that this approach to the construction of article 2.10 is essentially the same as mine, though it has the advantage of being shorter. I find the tribunal''s approach helpful because it is supportive of the construction of article 2.10 which I consider to be correct.

55. For the reasons which I have endeavoured to express I have concluded that the reasonable man, with knowledge of the background reasonably available to both parties in March 2008, would understand article 2.10 as an arbitration clause which referred to LCIA arbitration claims by Mr. B against Mr. A for breach of the obligations in the Shareholders'' Agreement and Escrow Agreement which he assumed in articles 2.1-2.2 of the 2008 Agreement, of the related obligations in articles 2.3-2.4 and of the implied term within them.

56. Conclusion: Mr. A signed the 2008 Agreement. Article 2.10 of that agreement contained an arbitration clause which bound Mr. A and conferred jurisdiction on the LCIA tribunal. The application under section 67 of the Arbitration Act 1996 must therefore be dismissed.

Note 1   The award refers to article 2.1.5 but this must be an error.   [Back]

---

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/ew/cases/EWHC/Comm/2015/1944.html*