# EXHIBIT 48

**ORIGINAL**

FL-300

| | FOR COURT USE ONLY |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* Ronald W. Anteau, Esq. - S.B.#37777 Matthew K. Skarin, Esq. - S.B. # 271183 FEINBERG, MINDEL, BRANDT & KLEIN, LLP 12424 Wilshire Blvd., Ninth Fl., Los Angeles, CA 90025 TELEPHONE NO.: (310) 447-8675  FAX NO. *(Optional):* (310) 447-8678 E-MAIL ADDRESS *(Optional):* ranteau@fmbklaw.com ATTORNEY FOR *(Name):* NATALIA TSAGOLOVA | **FILED** LOS ANGELES SUPERIOR COURT OCT 10 2014 JOHN A. CLARKE, CLERK BY M. HART, DEPUTY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: same
CITY AND ZIP CODE: Los Angeles, California 90012
BRANCH NAME: Central Judicial District

PETITIONER/PLAINTIFF: NATALIA TSAGOLOVA
RESPONDENT/DEFENDANT: ASHOT EGIAZARYAN
OTHER PARENT/PARTY:
~~EX PARTE~~

| REQUEST FOR ORDER | ☐ MODIFICATION | ☐ Temporary Emergency | CASE NUMBER: BD 595 136 |
|---|---|---|---|
| ☐ Child Custody | ☐ Visitation | Court Order | |
| ☐ Child Support | ☐ Spousal Support | ☒ Other *(specify):* Freeze All Accounts Associated with Clear Voice, Inc. | |
| ☐ Attorney Fees and Costs | | | |

1. TO *(name):* ASHOT EGIAZARYAN, through his counsel of record:

2. A hearing on this *Request for Order* will be held as follows: If child custody or visitation is an issue in this proceeding, Family Code section 3170 requires mediation before or at the same time as the hearing *(see item 7.)*

    a. Date: ~~10/30/2014~~ *(handwritten)*    Time: 8:30 A.M.   ☒ Dept.: 27    ☐ Room:

    b. Address of court ☒ same as noted above ☐ other *(specify):* Declaration of NO NOTICE does not comply with CRC 5.151.4

3. Attachments to be served with this *Request for Order:* ☒ PARTE APPLICATION DENIED
    a. ☐ A blank *Responsive Declaration* (form FL-320)
    b. ☐ Completed *Income and Expense Declaration* (form FL-150) and a blank *Income and Expense Declaration*
    c. ☐ Completed *Financial Statement (Simplified)* (form FL-155) and a blank *Financial Statement (Simplified)* 5.165
    d. ☒ Points and authorities 5.167
    e. ☒ Other *(specify):* Declarations of Natalia Tsagolova and Matthew K. Skarin

Date: 10/3/14
RONALD W. ANTEAU, ESQ.
(TYPE OR PRINT NAME) ▶ (SIGNATURE)
*good cause is not shown*

**COURT ORDER** *demonstrated in the facts stated within the Declaration to excuse Notice. The alleged funds in question are owned by a person*

4. ☒ YOU ARE ORDERED TO APPEAR IN COURT AT THE DATE AND TIME LISTED IN ITEM 2 TO GIVE ANY LEGAL REASON WHY THE ORDERS REQUESTED SHOULD NOT BE GRANTED. *per CCP 1005*

5. ☒ ☐ Time for ☐ service ☐ hearing is shortened. Service must be on or before *(date):* *per CCP 1005* *who is not a party to this action.*

6. Any responsive declaration must be served on or before *(date):* *per CCP 1005*

7. The parties are ordered to attend mandatory custody services as follows: *Insufficient showing of imminent or immediate*

8. ☐ You are ordered to comply with the *Temporary Emergency Court Orders* (form FL-305) attached.

9. ☒ Other *(specify):* Petitioner may file this RFO and it shall be set on regular notice.

Date: 10/10/14
OCT 10 2014
MICHAEL J. CONVEY

To the person who received this *Request for Order:* If you wish to respond to this *Request for Order* you must file a *Responsive Declaration to Request for Order* (form FL-320) and serve a copy on the other parties at least nine court days before the hearing date unless the court has ordered a shorter period of time. You do not have to pay a filing fee to file the *Responsive Declaration to Request for Order* (form FL-320) or any other declaration including an *Income and Expense Declaration (form FL-150)* or *Financial Statement (Simplified)* (form FL-155).

Page 1 of 4

Form Adopted for Mandatory Use
Judicial Council of California
FL-300 [Rev. July 1, 2012]
Martin Dean's ESSENTIAL FORMS™
**REQUEST FOR ORDER**
Family Code, §§ 2045, 2107, 6224, 6226, 6320–6326, 6380–6383
Government Code, § 26826
www.courts.ca.gov

FL-300

| | |
|---|---|
| PETITIONER/PLAINTIFF: NATALIA TSAGOLOVA<br>RESPONDENT/DEFENDANT: ASHOT EGIAZARYAN<br>OTHER PARENT/PARTY: | CASE NUMBER:<br>BD 595 136 |

## REQUEST FOR ORDER AND SUPPORTING DECLARATION

[X] Petitioner ☐ Respondent ☐ Other Parent/Party **requests the following orders:**

1. ☐ CHILD CUSTODY ☐ **To be ordered pending the hearing**
   a. Child's name and age
   b. Legal custody to (name of person who makes decisions about health, education, etc.)
   c. Physical custody to (name of person with whom child will live)

   d. ☐ As requested in form ☐ Child Custody and Visitation Application Attachment (form FL-311)
   ☐ Request for Child Abduction Prevention Orders (form FL-312)
   ☐ Children's Holiday Schedule Attachment (form FL-341(C))
   ☐ Additional Provisions—Physical Custody Attachment (form FL-341(D))
   ☐ Joint Legal Custody Attachment (form FL-341(E))
   ☐ Other (Attachment 1d)

   e. ☐ Modify existing order
   (1) filed on (date):
   (2) ordering (specify):

2. ☐ CHILD VISITATION (PARENTING TIME) ☐ **To be ordered pending the hearing**
   a. As requested in: (1) ☐ Attachment 2a (2) ☐ Child Custody and Visitation Application Attachment (form FL-311)
   (3) ☐ Other (specify):
   b. ☐ Modify existing order
   (1) filed on (date):
   (2) ordering (specify):

   c. ☐ One or more domestic violence restraining/protective orders are now in effect. (Attach a copy of the orders if you have one.) The orders are from the following court or courts (specify county and state):
   (1) ☐ Criminal: County/state: (3) ☐ Juvenile: County/state:
   Case No. (if known): Case No. (if known):
   (2) ☐ Family: County/state: (4) ☐ Other: County/state:
   Case No. (if known): Case No. (if known):

3. ☐ CHILD SUPPORT (An earnings assignment order may be issued.)
   a. Child's name and age
   b. ☐ I request support based on the child support guidelines
   c. Monthly amount requested (if not by guideline)
   $

   d. ☐ Modify existing order
   (1) filed on (date):
   (2) ordering (specify):

Notice: The court is required to order child support based on the income of both parents. It normally continues until the child is 18. You must supply the court with information about your finances by filing an *Income and Expense Declaration* (form FL-150) or a *Financial Statement (Simplified)* (form FL-155). Otherwise, the child support order will be based on information about your income that the court receives from other sources, including the other parent.

**REQUEST FOR ORDER**

Martin Dean's
ESSENTIAL FORMS™

FL-300

| | |
|---|---|
| PETITIONER/PLAINTIFF: NATALIA TSAGOLOVA | CASE NUMBER: |
| RESPONDENT/DEFENDANT: ASHOT EGIAZARYAN | BD 595 136 |
| OTHER PARENT/PARTY: | |

4. ☐ SPOUSAL OR PARTNER SUPPORT *(An earnings assignment order may be issued.)*
    a. ☐ Amount requested *(monthly):* $            c. ☐ Modify existing order
    b. ☐ Terminate existing order                    (1) filed on *(date):*
        (1) filed on *(date):*                     (2) ordering *(specify):*
        (2) ordering *(specify):*
    d. ☐ The *Spousal or Partner Support Declaration Attachment* (form FL-157) is attached *(for modification of spousal or partner support after judgment only)*
    e. An *Income and Expense Declaration* (form FL-150) must be attached

5. ☐ ATTORNEY FEES AND COSTS are requested on *Request for Attorney Fees and Costs Order Attachment* (form FL-319) or a declaration that addresses the factors covered in that form. An *Income and Expense Declaration* (form FL-150) must be attached. A *Supporting Declaration for Attorney Fees and Costs Order Attachment* (form FL-158) or a declaration that addresses the factors covered in that form must also be attached.

6. ☐ PROPERTY RESTRAINT ☐ To be ordered pending the hearing
    a. The ☐ petitioner ☐ respondent ☐ claimant    is restrained from transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, real or personal, whether community, quasi-community, or separate, except in the usual course of business or for the necessities of life.
       ☐ The applicant will be notified at least five business days before any proposed extraordinary expenditures, and an accounting of such will be made to the court.
    b. ☐ Both parties are restrained and enjoined from cashing, borrowing against, canceling, transferring, disposing of, or changing the beneficiaries of any insurance or other coverage, including life, health, automobile, and disability, held for the benefit of the parties or their minor children.
    c. ☐ Neither party may incur any debts or liabilities for which the other may be held responsible, other than in the ordinary course of business or for the necessities of life.

7. ☐ PROPERTY CONTROL ☐ To be ordered pending the hearing
    a. ☐ The petitioner ☐ respondent    is given the exclusive temporary use, possession, and control of the following property that we own or are buying *(specify):*

    b. ☐ The petitioner ☐ respondent    is ordered to make the following payments on liens and encumbrances coming due while the order is in effect:
       Debt                     Amount of payment       Pay to

8. ☒ OTHER RELIEF *(specify):*
    TO FREEZE ALL BANK ACCOUNTS ASSOCIATED WITH CLEAR VOICE, INC.

---

**NOTE: To obtain domestic violence restraining orders, you must use the forms *Request for Order (Domestic Violence Prevention)* (form DV-100), *Temporary Restraining Order (Domestic Violence)* (form DV-110), and *Notice of Court Hearing (Domestic Violence)* (form DV-109).**

---

FL-300 [Rev. July 1, 2012]               **REQUEST FOR ORDER**                  Page 3 of 4

Martin Dean's
ESSENTIAL FORMS™

| PETITIONER/PLAINTIFF: NATALIA TSAGOLOVA | CASE NUMBER: |
|---|---|
| RESPONDENT/DEFENDANT: ASHOT EGIAZARYAN | BD 595 136 |
| OTHER PARENT/PARTY: | |

9. ☐ **I request** that time for service of the *Request for Order* and accompanying papers be shortened so that these documents may be served no less than *(specify number):*                days before the time set for the hearing. I need to have this order shortening time because of the facts specified in item 10 or the attached declaration.

10. ☒ FACTS IN SUPPORT of orders requested and change of circumstances for any modification are *(specify):*

☒ Contained in the attached declaration. (*You may use* Attached Declaration *(form MC-031) for this purpose. The attached declaration must not exceed 10 pages in length unless permission to file a longer declaration has been obtained from the court.*)

Please see attached Declarations of Natalia Tsagalova and Matthew K. Skarin.

Please also see the accompanying Memorandum of Points and Authorities.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: *10.09.2014*

NATALIA TSAGALOVA

                    (TYPE OR PRINT NAME)

                                                                        (SIGNATURE OF APPLICANT)



**Requests for Accommodations**

Assistive listening systems, computer-assisted real-time captioning, or sign language interpreter services are available if you ask at least five days before the proceeding. Contact the clerk's office or go to *www.courts.ca.gov/forms* for *Request for Accommodations by Persons With Disabilities and Response* (form MC-410). (Civil Code, § 54.8.)

**REQUEST FOR ORDER**

Martin Dean's
ESSENTIAL FORMS™

1 | <u>Natalia Tsagolova v. Ashot Egiazaryan</u>                    Attachment to form FL-300
  | <u>LASC Case No.: BD 595136</u>
2

3 | **MEMORANDUM OF POINTS AND AUTHORITIES**

4 | **I.**

5 | **PRELIMINARY STATEMENT**

6 | Petitioner, NATALIA TSAGOLOVA ("Petitioner") hereby submits her Declaration and

7 | Memorandum of Points and Authorities in Support of Petitioner's No Notice *Ex Parte*

8 | Application, and requests the Court to issue an injunction, freezing all accounts associated with the

9 | company Clear Voice, Inc., a company that is controlled by Respondent's cousin, SUREN

10 | EGIAZARYAN ("Suren"), for the benefit of Respondent, ASHOT EGIAZARYAN

11 | ("Respondent"). Petitioner also requests that the Court confirm that she is not required to provide

12 | consumer notice regarding her deposition subpoenas for production of business records to the

13 | various financial institutions holding funds for Clear Voice, Inc. As stated in Petitioner's

14 | declaration, the funds being held in the name of Clear Voice, Inc. are community funds.

15 | Respondent has engaged in a very complicated and involved scheme to avoid the funds being

16 | attributed to him, or from Petitioner having access to said funds.

17 | The parties were married on August 20, 1987 and separated on January 15, 2014, for a

18 | marriage length of twenty-six (26) years and five (5) months. The parties have two (2) minor

19 | children of the marriage, Stefan Egiazaryan, born August 11, 1998, age 16; and Anthony

20 | Egiazaryan, born June 19, 2001, age 13. They also have two adult children of the marriage.

21 | Respondent was a member of the State Duma in Russia until 2010 when he moved to the United

22 | States. As a result of Respondent's membership in the Duma, all funds and real property outside

23 | of Russia had to be held in the name of his family members as members of the Duma are not

24 | permitted to own property outside of Russia.

25 | For example, the parties' family residence, located at 655 Endrino Place, Beverly Hills,

26 | California 90210 was purchased by Respondent in 1999, however, the property is held under the

27 | name, Endrino Corp. Despite Respondent's purchase of the residence, Suren is the sole

28

-1-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITIONER'S NO NOTICE *EX PARTE* APPLICATION**

1 || shareholder of Endrino Corp., creating the appearance that the parties do not own their family

2 || residence. Respondent's financial deception is deep-rooted and extremely complex. In his 2011

3 || and 2012 tax returns Respondent lists 15 foreign entities with principal places of business in the

4 || British Virgin Islands, Cyprus, Luxembourg and Russia. One of the entities located in Russia

5 || shows accumulated earnings of $439,111,000.

6   As detailed in the Declaration of Petitioner, the primary emergency, and the reason for this

7 || *ex parte* application, is that Petitioner has recently learned that Respondent has caused to be sold

8 || thirteen (13) rental properties owned by the community and situated in and around London,

9 || England. The funds from said sales are being transferred to the bank account of Clear Voice, Inc.

10 || As detailed in the Declaration of Petitioner, Clear Voice, Inc. in reality is owned by Respondent,

11 || and is holding community property of at least $20 million, not including the recent deposits from

12 || the sales of community property totaling $16,840,883.55. In another matter in which Respondent

13 || was involved, the Judge in that case came to the same conclusion, that Clear Voice, Inc. was a

14 || company held for the benefit of Respondent. See **Exhibit "E"** attached to the Declaration of

15 || Natalia Tsagolova.

16   Until August of 2014, Petitioner received funds from Clear Voice, Inc. on a monthly basis

17 || to pay for the household expenses. Between April of 2013 and December of 2013, Petitioner

18 || received at least $344,000 from Clear Voice, Inc. to pay community expenses. Since August,

19 || when Suren was served with a deposition notice, he has refused to provide Petitioner with the

20 || funds necessary to continue paying the household expenses.

21   The funds held by Clear Voice, Inc. are funds held for the benefit of Respondent. They are

22 || community funds that need to be properly divided in this matter. Petitioner reasonably fears that if

23 || Suren and/or Respondent are not prevented from accessing the accounts associated with Clear

24 || Voice, Inc., either Suren or Respondent will immediately transfer any funds held in those accounts

25 || to entities and accounts outside of the United States. As such, Petitioner is requesting that this

26 || Court freeze all financial accounts associated with Clear Voice, Inc. until a further hearing can be

27 || held on the character of these funds.

28

-2-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITIONER'S NO NOTICE *EX PARTE* APPLICATION**

1

2

3

**II.**

## THE COURT IS VESTED WITH THE POWER TO PROTECT COMMUNITY

## ASSETS TO AVOID DISSIPATION OF THE COMMUNITY ESTATE

4     Family Code §2100(a) provides that it is the policy of the State of California to "(1)

5 marshal, preserve, and protect community and quasi-community assets and liabilities that exist at

6 the date of separation so as to avoid dissipation of the community estate before distribution, (2) to

7 ensure fair and sufficient child and spousal support awards, and (3) to achieve a division of

8 community and quasi-community assets and liabilities on the dissolution or nullity of marriage or

9 legal separation of the parties as provided under California law." In a marital proceeding, the

10 court's power to restrain property transfers is not confined to orders between the spouses. In

11 appropriate cases, such orders may issue against third persons. Family Code §2045(a). The funds

12 held by Clear Voice, Inc. are community funds. Without Court intervention, those funds will be

13 transferred, just as many other of the community's assets have been.

14     The legal basis for preliminary injunctive relief in a marital dissolution is in Family Code

15 §2045(a), which provides authority for the trial court to issue *ex parte* orders restraining "any

16 person" from transferring, encumbering, hypothecating, concealing, or in any way disposing of any

17 property, real or personal, whether community, quasi-community, or separate. . ." Family Code

18 §2045(a); see *Schnabel v. Super. Ct. (Schnabel)* (1993) 21 Cal.App.4th 548, 552-553 (the Court

19 has power to protect against dissipation of an alleged community interest in property under the

20 control of a third party business entity); see also *Marriage of Van Hook* (1983) 147 Cal.App.3d

21 970, 981-982 (the Court has power to enjoin levy upon community property by a spouse's

22 judgment creditor).

23     In the case of *Schnabel v. Super. Ct.,* wife sought a dissolution of her marriage with

24 husband, who owned 30 percent of a close corporation. After informal attempts to obtain business

25 records from the corporation failed, wife sought to join the corporation as a party in order to obtain

26 discovery. The trial court denied the joinder, but on review, the court noted that wife could have

27 obtained injunctive relief against the corporation as a nonparty to a family law proceeding via

28

-3-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITIONER'S NO NOTICE *EX PARTE* APPLICATION

1  | former Cal. Civ. Code § 4359 (now Family Code §2045).

2  | Not only does this Court have the power to issue the requested injunction, but a joinder

3  | action is not required in order for it to do so. The Judicial Council Family Rules expressly

4  | authorize a direct injunction against a third person who is acting as "trustee, agent, custodian, or

5  | similar fiduciary" with respect to property subject to disposition in the marital action. Under this

6  | authority, the third person "fiduciary" may be enjoined without being joined as a party in the

7  | proceeding. California Rule of Court 5.18(a); see *Schnabel v. Super. Ct. (Schnabel)*, supra, 21

8  | Cal.App.4th at 552; see also *Glade v. Glade* (1995) 38 Cal.App.4th 1441, 1453.

9  | In the instant case, Petitioner has extensive evidence as detailed in her Declaration that

10 | Clear Voice, Inc. is simply a vehicle to disguise the parties' community property. While there is

11 | significant community property of the parties' throughout the world which Respondent has

12 | similarly transferred or hidden through various entities, the significant funds being held under

13 | Clear Voice, Inc. are very likely the only assets under this Court's direct jurisdiction. An

14 | injunction is a necessity in this matter. In the absence of an injunction, Respondent and/or Suren

15 | will abscond with Petitioner's interest in the community property being held by Clear Voice, Inc.

16 | and will simply transfer the funds to one of the fifteen (15) or more international entities that

17 | Respondent has at his disposal. Petitioner is at great risk for irreparable harm in the absence of a

18 | Court ordered injunction.

19 |

20 | **III.**

21 | **THE COURT SHOULD FREEZE THE ACCOUNTS HELD UNDER**

22 | **CLEAR VOICE, INC.'S NAME UNTIL FURTHER COURT ORDER**

23 | Petitioner requests this Court to issue an injunction upon the banks operating the accounts

24 | holding Petitioner's half of the community property contained within said accounts. This

25 | injunction will be an effective measure to prevent the imminent risk of Respondent and/or Suren

26 | completely absconding with Petitioner's interest in the community property held in said accounts.

27 | As stated above, pursuant to Family Code Section 2045, this Court has the authority to

28 |

-4-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITIONER'S NO NOTICE *EX PARTE* APPLICATION

1    issue restraining Orders, *ex parte*, to prevent Respondent from further dissipating community

2    funds. Because Respondent has shown complete disregard for the financial requirements of the

3    current proceeding, and has a history of transferring funds to alien bank accounts and entities, the

4    Court should issue restraints directly to the financial institutions in this case. By doing so,

5    Respondent and/or Suren will effectively be restrained from any further unauthorized transfers

6    and/or sales of community property at this time.

7         Petitioner and Respondent stand in a "fiduciary relationship" with regard to the

8    management and control of their community and quasi-community estate until the date of

9    distribution of the assets and liabilities in question. Family Code §721. Further, each party's

10    fiduciary obligations extend to all activities affecting the other party's property and support rights.

11    Family Code §§721, 1100(e), 2102. Here, Respondent is in breach of his fiduciary duties by

12    concealing large amounts of community property funds from Petitioner and disposing of said funds

13    through a variety of transfers to his various international entities.

14

15                              **IV.**

16                    **CONCLUSION**

17         Petitioner maintains a reasonable fear that her one-half community interest of substantially

18    large amounts of community property funds are being transferred, or at risk of being transferred, to

19    off-shore bank accounts and entities located internationally. Respondent's past behavior makes this

20    a very real possibility. An injunction to prevent Respondent and Suren's access to the accounts

21    held by Clear Voice, Inc. will stop any threat of loss to Petitioner and will allow this Court to come

22    to the proper determination with regard to those funds.

23    //

24    //

25    //

26    //

27    //

28

-5-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITIONER'S NO NOTICE *EX PARTE* APPLICATION**

1    For the foregoing reasons, Petitioner respectfully requests that the Court issue an injunction

2 to prevent Respondent and/or Suren from accessing the financial accounts held by Clear Voice, Inc.

3 until a hearing has been held to determine the proper character of those funds. Further, Petitioner is

4 seeking confirmation from this Court that consumer notice is not necessary for her to subpoena the

5 financial records associated with said accounts in preparation for trial.

6

7    DATED: October _10_, 2014          Respectfully submitted,

8                                        **FEINBERG, MINDEL, BRANDT & KLEIN, LLP**

9

10

11                                       By:_____
                                            RONALD W. ANTEAU, ESQ.
12                                          Attorney for Petitioner,
                                            NATALIA TSAGOLOVA
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                             -6-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITIONER'S NO NOTICE *EX PARTE* APPLICATION**

1    *Natalia Tsagalova v. Ashot Egiazaryan*                        Attachment to form FL-300
     LASC Case No.: BD 595136
2

3                        **DECLARATION OF NATALIA TSAGALOVA**

4          I, NATALIA TSAGALOVA, declare and state as follows:

5          1.      I am the Petitioner in the above-entitled action. If called upon to testify as a

6    witness, I could and would testify competently to the following facts, all of which are within my

7    own personal knowledge.

8          2.      This Declaration is prepared and submitted in lieu of personal testimony pursuant to

9    Code of Civil Procedure §§ 2009 and 2015.5, California Rules of Court, Rule 5.118(f), and Reifler

10   v. Superior Court (1974) 39 Cal.App.3d 479, 114 Cal.Rptr. 356.

11         3.      I submit this Declaration in support of my *ex parte* Request for Orders to Freeze All

12   Bank Accounts Associated with Clear Voice, Inc.

13         4.      Respondent, ASHOT EGIAZARYAN ("Respondent") and I were married on August

14   20, 1987. Our date of separation was January 15, 2014, for a marriage length of twenty-six (26)

15   years and five (5) months. We have two (2) minor children of the marriage, Stefan Egiazaryan, born

16   August 11, 1998, age 16; and Anthony Egiazaryan, born June 19, 2001, age 13. We also have two

17   adult children of the marriage.

18         5.      I am making this *ex parte* application, without notice to Respondent, because I have

19   information that shows that Respondent has been selling community assets, and transferring

20   community funds to a variety of companies held by his cousin, SUREN EGIAZARYAN ("Suren"),

21   specifically a Nevada Corporation by the name of Clear Voice, Inc. If I am not able to freeze the

22   bank accounts associated with Clear Voice, Inc. on an *ex parte* basis without notice, Respondent will

23   simply have Suren move the funds to another account.

24         6.      Respondent and Suren have engaged in a complicated and involved ploy to make it

25   appear as if Respondent has no assets outside of Russia. The main reason for this is that up until

26   2010 Respondent and I principally lived in Russia with our family, where Respondent was a well

27   known national figure, and a member of the State Duma.

28         7.      By way of background, in 1993, Respondent established and became the Chairman

     H:\FILES\TSAGOLOVA, NATALIA\DISSO .002\PLDG\Decl  of Natalia Tsagalova Re Ex Parte RFO.wpd
                        **DECLARATION OF NATALIA TSAGALOVA**
                                        – 1 –

1    of the Moscow National Bank (MNB). By 1995, the MNB had become one of the largest banks in

2    Russia, housing accounts of the Administration of Moscow region, The Ministry of Defense of the

3    Russian Federation, Russian State Arms Export Company, The Russian Space Agency and the

4    General Prosecutor's Office. In 1998, MNB's banking license was revoked due to involvement in

5    an embezzlement scheme, but no criminal charges were brought against Respondent. In 1999,

6    Respondent became a member of the State Duma and deputy chairman of the Committee on Budget

7    and Taxes. In October 2010, the State Duma's Credentials and Ethics Commission recommended

8    stripping Respondent of parliamentary immunity at the request of the Investigative Committee. On

9    November 3, 2010, Respondent was stripped of his immunity and subsequently fled to the United

10   States where he is seeking political asylum.

11       8.      Because of Respondent's involvement with the Moscow National Bank and his

12   membership in the State Duma, Respondent was not allowed to own property outside of Russia.

13   Because of this, it appears as if all of our community property is actually owned by his cousin, Suren,

14   or other members of Respondent's family.

15       9.      For example, our family residence, located at 655 Endrino Place, Beverly Hills,

16   California 90210 was purchased by Respondent in 1999, however, the property is held under the

17   name, Endrino Corp. Despite Respondent's purchase of the residence, Suren is the sole shareholder

18   of Endrino Corp., creating the appearance that Respondent and I do not own our family residence.

19   Attached hereto as **Exhibit "A"** is a true and correct copy of a share certificate indicating that Suren

20   owns 100% of Endrino Corp.

21       10.     Coincidentally, Endrino Corp. is owned by a Luxembourg corporation known as Sun

22   Side Holdings, S.A.

23       11.     As a result of Respondent's subversive actions, it can appear that there are no

24   community assets to speak of, however, that is simply not the case.

25       12.     The primary emergency, and the reason for this *ex parte* application, is that I have

26   recently learned that Respondent has caused to be sold thirteen (13) rental properties owned by the

27   community and situated in and around London, England. The funds from said sales are being

28   transferred to the bank account of Clear Voice, Inc. Clear Voice, Inc., on paper, is owned by Suren.

1 That being said, as discussed below, I have evidence that Clear Voice, Inc. in reality is owned by

2 Respondent, and is holding community property of at least \$20 million, not including the recent

3 deposits totaling \$16,840,883.55.

4      13.      Since 2010, all of the community expenses have been paid by the checking account

5 in the name of Clear Voice, Inc. Every month, I receive a check from Suren and I deposit the funds

6 into my personal bank account where I pay the community expenses from. At some point between

7 2010 and currently, Suren began to label the checks as loans in the memo notation. I asked

8 Respondent about this, and he simply responded that it was done for tax purposes. Attached hereto

9 as **Exhibit "B"** are true and correct copies of some of the checks that I have received from Clear

10 Voice, Inc. since December 2012. I can obtain all of the check copies if necessary. As you can see,

11 between April 2013 to December 2013, just from the check copies that I have Clear Voice, Inc.

12 distributed \$344,000 to me in just eight (8) months. All of these funds were used to pay the

13 community expenses.

14      14.      As of August, 2014 Suren has ceased making any payments to me for community

15 expenses. I believe this is because he was served with a deposition subpoena in early August 2014.

16 Suren has repeatedly avoided sitting for his deposition.

17      15.      In 2012 Respondent was involved in litigation with Peter Zalmayev in the United

18 States District Court of the Southern District of New York. As part of that litigation, Respondent

19 was deposed on January 18 and January 19, 2012. During his deposition, Respondent stated that he

20 had \$20 million that was his money (pg. 168), that he did not disclose that income in his Duma

21 reports (pg. 181), that he transferred the money to his cousin, Suren (pg. 181-182), that Suren needed

22 \$20 million to respond to an audit of a company named SP Capital (pg. 186-188), and that Suren

23 owns Clear Voice, Inc. (pg. 255-256). Attached hereto as **Exhibit "C"** are true and correct copies

24 of the relevant transcript pages from the deposition of ASHOT EGIAZARYAN in the United States

25 District Court of the Southern District of New York Case Number 11-CV-02670.

26      16.      It should be noted that SP Capital Partners, LP, is a partnership, of which Clear Voice,

27 Inc. is a member. Attached hereto as **Exhibit "D"** is a true and correct copy of the 2001 K-1 for

28 Clear Voice, Inc. from SP Capital Partners, LP.

17. On February 22, 2012, in the same matter with Peter Zalmayev, there was a hearing on Suren and Clear Voice, Inc.'s Motion to Quash the subpoena issued to Clear Voice, Inc. for bank records and other financial information. In ruling on the Motion to Quash, the Judge stated as follows:

This arises in the context of a motion quash a subpoenas. Subpoenas are subject to Rule 26's relevance requirement which we're all familiar with. Nonetheless, a court does have to weigh the relevance or probative value of the documents being sought against the privacy interests asserted.

As I've already mentioned, the issue of what -- whether and how Ashot Egiazaryan has given money to the LDPR is the critical issue in this case and there is evidence that's been obtained in discovery and otherwise that makes it clear that Ashot moves money around for no apparent reason, that the money has gone to his cousin, Seren, that the source of this money -- that this money ends up with Clear Voice and that we're talking about millions of dollars. So inquiry into what Clear Voice is doing is certainly important.

Now, there are some situations where we can go to a company and say you know what, give me the records that relate to this particular issue and we trust them to do that. I don't think this is such a situation because of these unexplained payments and the -- and the way Clear Voice and Ashot move money around as I say for no apparent reason and the clear evidence that Clear Voice is being used for Ashot's benefit.

So when Seren says that no payments were made for the benefit of LDPR, which is a conclusory statement, I don't even see how Seren could know that because of the evidence that exists that Clear Voice is being used by Ashot to move money around.

So, accordingly, I'm not going to quash the subpoena. I'm ready to talk about a limitation certainly that this material should be used only for purposes of this litigation but it becomes very unwieldy if I give a higher level of confidentiality designation because it prevents a party from presenting evidence to me that's available to the public which it should be regarding this case or presenting in a summary judgment motion or a trial. (Pg. 13, ln 9 - pg. 14, ln 18)

Attached hereto as **Exhibit "E"** is a true and correct copy of the hearing transcript dated February 22, 2012 in the matter of *Ashot Egiazaryan v. Peter Zalmayev*, United States District Court of the Southern District of New York Case number 11-CV-02670.

18. As detailed above and observed by the Judge in the prior litigation, there is significant evidence that Clear Voice, Inc. is simply a vehicle for Respondent to hide and shelter funds derived from other countries and through other entities owned by Respondent. I am able to provide further evidence regarding this connection at a later hearing if necessary.

19. Turning to the current emergency, on October 4, 2014, I discovered that Respondent

1   had recently sold thirteen (13) rental properties owned by the community and situated in and around
2   London, England (the "Silver Oak properties"). Respondent and I purchased those properties with
3   community funds in and around 1999. I was responsible for managing the properties before we
4   moved to the United States in 2010. The properties were initially purchased under the company
5   names Brightmoor Properties, Ltd., Dikama Holding, S.A., and Shenton Enterprises, Ltd. Originally
6   an individual by the name of Edward Lozansky was the nominee with respect to the properties,
7   however, in 2006 Respondent changed the nominee from Edward Lozansky to Suren Egiazaryan,
8   Respondent's cousin. Attached hereto as **Exhibit "F"** is a true and correct copy of payment
9   instructions from Suren dated August 10, 2008 directing the transfer of rental income earned by the
10  properties from Dikama Holding, S.A. to his bank account, presumably the account held by Clear
11  Voice, Inc.

12      20.     On October 4, 2014, I discovered that Respondent had caused the Silver Oak
13  properties to be sold, and that all of the proceeds from said sales were being transferred to the Clear
14  Voice, Inc. account held at Wells Fargo. Attached hereto as **Exhibit "G"** are true and correct copies
15  of payment instructions dated September 22, 2014 to Brightmoor Properties, Ltd., Dikama Holding,
16  S.A., and Shenton Enterprises, Ltd. from Suren, as the owner of the companies, to the Director of
17  the companies (also being Suren), ordering that GBP 10,470,874.62 (approximately $ 16,840,883.55)
18  be transferred to the Clear Voice, Inc. checking account held at Wells Fargo.

19      21.     I have come to discover that Clear Voice, Inc. has several banking accounts at various
20  financial institutions. There is a checking account at Wells Fargo, account number 7733839414.
21  Attached hereto as **Exhibit "H"** is a true and correct copy of the statement associated with said
22  account for October 31, 2009. There is a savings account at Wells Fargo, account number
23  3013040070. Attached hereto as **Exhibit "I"** is a true and correct copy of the statement associated
24  with said account for May 31, 2010. There is a checking account at Bank of America, account
25  number 0049 6484 4955. Attached hereto as **Exhibit "J"** is a true and correct copy of the statement
26  associated with said account for June 30, 2007. There are also investment accounts held at Merrill
27  Lynch, account numbers W91-142395 and 2SI-02031. Attached hereto as **Exhibit "K"** are true and
28  correct copies of the statement associated with account W91-142395 dated May 31, 2010, and letter

1   correspondence from Merrill Lynch dated August 2, 2010 indicating that a new account was opened,

2   account number 2SI-02031. In addition to the above referenced account, I am informed and believe

3   that Clear Voice, Inc. also holds accounts with TD Ameritrade.

4   22.    It is imperative that I obtain an order that the above accounts be frozen pending a

5   hearing on the character of the assets contained in those accounts. Additionally, I am requesting an

6   order that I be permitted to subpoena the records associated with said accounts without providing

7   consumer notice.

8   23.    Respondent's financial deception is deep-rooted and extremely complex. In his 2011

9   and 2012 tax returns Respondent lists 15 foreign entities with principal places of business in the

10  British Virgin Islands, Cyprus, Luxembourg and Russia. One of the entities located in Russia shows

11  accumulated earnings of $439,111,000.

12  24.    Respondent's behavior with respect to Clear Voice, Inc. is not an isolated incident.

13  We have a Villa that we purchased in the Cote D'Azur of France in March 2006, which I personally

14  oversaw the renovation of, that has a fair market value of $68,510,000, which Respondent claims

15  in his discovery responses is not owned by us. I have paid the salary of the house staff for that

16  property and the relevant taxes in the total sum of 88,000 Euros per year since 2010. Attached hereto

17  as **Exhibit "L"** is a true and correct copy of a Banque Populaire statement for May 2011 showing

18  payments to Monsieur Antoine and Madame Araceli, as well as the quarterly tax payment labeled

19  as Vir Urssaf.

20  25.    Additionally, our family residence located at 655 Endrino Place, Beverly Hills,

21  California 90210 Respondent claims in his discovery responses is not owned by us. The only piece

22  of property that Respondent acknowledges owning is the family residence that we were building

23  when we left Russia in 2010, 1 Barvicha, Rublevka, Russia. However, in his discovery responses

24  Respondent claims, "This real property was previously owned by Respondent and Petitioner. Both

25  Respondent and Petitioner executed documents that sold this property to a business entity. The

26  property located at 1 Barvicha, Rublevka, Russia is held by an entity for the benefit of Respondent.

27  The name of the entity holding this property is NGY Holdings Limited, Stasandrou, 20 Anna

28  Nicolaou Court, 1st Floor, P.C. 1060, Nicosia, Cyprus." We did execute documents transferring this

1   property to an entity, however, I was told that I had a 50% interest in the entity. Since 2010, and
2   currently, I manage all of the employees associated with that property which is a cleaning lady, four
3   (4) guards, and two (2) managers.

4       26.     There is significant community property related to this matter located throughout the
5   world, all of which Respondent has gone through significant efforts to avoid being tied to him. The
6   only assets that I have been able to tie back to Respondent are those currently being held under the
7   name of Clear Voice, Inc. It is imperative that this Court order that the accounts being held by Clear
8   Voice, Inc. be frozen pending a hearing on the character of those funds so as to preserve whatever
9   community property is located within the United States.

10      27.     As mentioned above, my counsel has served Suren Egiazaryan with a deposition
11  subpoena on August 10, 2014, however, Suren has repeatedly refused to sit for his deposition
12  claiming that he has had eye surgery and sitting under lights for more than an hour is not possible
13  for him. This is a repeated pattern of conduct for both Suren and Respondent. I believe that Suren
14  is attempting to delay his deposition until he has moved all community funds out of the country. On
15  or about September 23, 2014 I saw Suren driving his car with Respondent. It is clear that Suren does
16  not have a problem with his eyes and is simply avoiding his deposition to cause delays. Attached
17  hereto as **Exhibit "M"** is a true and correct copy of the picture of Suren driving his car with
18  Respondent.

19      28.     In addition to deposing Suren, my counsel will be preparing a Motion for Joinder, to
20  join Suren in this matter. That being said, the accounts associated with Clear Voice, Inc. must be
21  frozen in the interim, so as to avoid any movement of the community funds held therein.

22  //
23  //
24  //
25  //
26  //
27  //
28  //

**DECLARATION OF NATALIA TSAGALOVA**
-7-

**REQUESTED RELIEF**

29.     Taking all of the above into consideration, I respectfully request the following relief:

(A)     That all bank accounts held under the name of Clear Voice, Inc., EIN# 88-0503066 be frozen until a hearing can be held on the character of the funds contained therein, including but not limited to:

    (i)     Wells Fargo checking account number 7733839414;

    (ii)     Wells Fargo savings account number 3013040070;

    (iii)     Bank of America checking account number 0049 6484 4955;

    (iv)     Merrill Lynch investment account number W91-142395;

    (v)     Merrill Lynch investment account number 2SI-02031; and

    (vi)     All accounts held at TD Ameritrade.

(B)     That SUREN EGIAZARYAN be ordered not to withdraw, transfer, hypothecate or otherwise remove any funds held by him in the name Clear Voice, Inc., or for the benefit of Respondent.

(C)     That this Court order that my counsel may subpoena the above listed accounts without providing consumer notice.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this _29_ day of October, 2014, at Los Angeles, California.

NATALIA TSAGALOVA,
Declarant

*Natalia Tsagolova v. Ashot Egiazaryan*                                    Attachment to form FL-300
LASC Case No.: BD 595136

### DECLARATION OF MATTHEW K. SKARIN

I, MATTHEW K. SKARIN, declare as follows:

1.     I am an attorney duly licensed to practice before all of the courts in the State of California.  I am an associate with the Law Offices of Feinberg Mindel Brandt & Klein, LLP, attorneys of record for Petitioner, NATALIA TSAGOLOVA ("Petitioner") in the within action.

2.     This Declaration is prepared and submitted in lieu of personal testimony pursuant to Code of Civil Procedure §§ 2009 and 2015.5, California Rules of Court, Rule 5.118(f), and *Reifler v. Superior Court* (1974) 39 Cal.App.3d 479, 114 Cal.Rptr. 356.  If called upon to testify, I could and would competently testify to the following facts, as the same are personally known to me, except as to those matters that may be stated upon information and belief.

3.     I am making this Declaration in support of Petitioner's ex parte Request for Orders to Freeze All Bank Accounts Associated with Clear Voice, Inc.

4.     On October 8, 2014 I conducted an internet search to attempt to locate pleadings associated with the matter of *Ashot Egiazaryan v. Peter Zalmayev*, United States District Court of the Southern District of New York Case number 11-CV-02670. Online, via the website, PACER, I was able to locate an online copy of the Court file.  From there I was able to obtain a transcript of the hearing held in that matter on February 22, 2012.  A true and correct copy of the transcript that I obtained via PACER is attached hereto as **Exhibit "E"**.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this ___ day of October, 2014, at Los Angeles, California.

_____
MATTHEW K. SKARIN,
Declarant

# EXHIBIT "A"



NUMBER
3

SHARES

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA APRIL 27, 1989

ENDRINO CORP.

**TOTAL AUTHORIZED ISSUE**
100 SHARES PAR VALUE $1.00 EACH
COMMON STOCK

See Reverse for
Certain Definitions

This is to Certify that ___ Suren Egiazaryian ___ is the owner of

___ 100 One-Hundred ___ fully paid and non-assessable shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

Witness, the seal of the Corporation and the signatures of its duly authorized officers.

Dated

July 1 2005

© 1989 CORPEX BANKNOTE CO., BAY SHORE N.Y.

# EXHIBIT "B"

Print Images

Page 1 of 1

| Routing | Sequence # | Paid Date | Amount | Account | Serial | Capture Source |
|---------|-----------|-----------|--------|---------|--------|----------------|
| 32127074 | 486346627 | 06162014 | $30000.00 | 7733839414 | 2922 | 00010003 |



Print Images

| Routing | Sequence # | Paid Date | Amount | Account | Serial | Capture Source |
|---------|-----------|-----------|---------|---------|--------|----------------|
| 32127074 | 586963210 | 05192014 | $30000.00 | 7733839414 | 2905 | 00010003 |



| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | Ca |
|------|-----------|--------|---------|---------|-----|--------|------------|-----|
| VIEWPOINTE | 20131217 | 2638 | 32127074 | 7733839414 | 000060 | 30,000.00 | 483576502 | |

**CLEAR VOICE, INC**
5225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

2638

94-7074/3212 1714
7733839414

Pay To The Order of _Natalia Tsagolva_

Date _12/12/15_

$ _30,000.00_

_thirty thousand_ Dollars

WELLS FARGO
Wells Fargo bank, N.A.
Nevada
wellsfargo.com

For _____

⑈000000 2638⑈ ⑆32127074 2⑆ 7733839414⑈

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | Ca |
|------|-----------|--------|---------|---------|-----|--------|------------|-----|
| VIEWPOINTE | 20131210 | 2629 | 32127074 | 7733839414 | 000060 | 45,000.00 | 489519484 | |

CLEAR VOICE, INC
3225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

2629

94-7074/3212 1714
7733839414

Pay To The
Order of _Natalia Tsepo Love_

Date _12/6/13_

$ _45,000.00_

_Forty five thousand_ _____ ∞∞/₁₀₀ Dollars

Wells Fargo Bank, N.A.
Nevada
wellsfargo.com

For _coach_

⑈000000 2629⑈ ⑆ 3212 7074 26⑆ 7733839414⑈

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | Ca |
|------|-----------|--------|---------|---------|-----|--------|------------|-----|
| VIEWPOINTE | 20131204 | 2605 | 32127074 | 7733839414 | 000060 | 10,000.00 | 485977409 | |

2605

CLEAR VOICE, INC
3225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

94-7074/3212 1714
7703589414

Date  12 / 2 / 13

Pay To The
Order of  Nq†९ L'9  Trçpo Lovǫ                    $ 10,000.00

Ten      thousand                              Dollars    🏠

WELLS
FARGO  Wells Fargo Bank, N.A.
Nevada
wellsfargo.com

For

⑆000000260⑆⑈ ⑆3212707424⑆ 7733839414⑈

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | Ca |
|------|-----------|--------|---------|---------|-----|--------|------------|-----|
| VIEWPOINTE | 20131203 | 2600 | 32127074 | 7733839414 | 000060 | 10,000.00 | 585022133 | |

**CLEAR VOICE, INC**
3225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

2600

94-7074/3212 1714
7733839414

Date _11/26/13_

Pay To The Order of _Nat&Li e . Tsg golov q_ $ _10,000.00_

_Teu thrderend_ ☙ Dollars 🔒 

WELLS FARGO  Wells Fargo Bank N.A.
Nevada
wellsfargo.com

For _oar_

⑆000000 2600⑆ ⑆32127074⑆ ⑆7733839414⑆



Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | C: |
|------|-----------|--------|---------|---------|-----|--------|------------|----|
| VIEWPOINTE | 20131127 | 2602 | 32127074 | 7733839414 | 000060 | 3,000.00 | 582661449 | |

CLEAR VOICE, INC
3225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

2602

94-7074/3212 1714
7733839414

Date 11/19/13

Pay To The
Order of _Natalia Tsa po Long_    $ 3,000.00

_Three Thousand dollars 00/100_    Dollars

WELLS FARGO   Wells Fargo Bank, N.A.
Nevada
wellsfargo.com

For _____

⑈000000260 2⑈ ⑆32127074⑆ 7733839414⑈

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

Print Images                                                                Page 1 of 1

| Routing | Sequence # | Paid Date | Amount | Account | Serial | Capture Source |
|---------|-----------|-----------|--------|---------|--------|----------------|
| 32127074 | 2043583219 | 10312013 | $20000.00 | 7733839414 | 2557 | 00010004 |

CLEAR VOICE, INC
3225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

2557

94-7074/3212 1714
7733839414

Date _10 / 29 /13_

Pay To The
Order of _Natalia Tsegolova_                                    $ _20,000,00_

_Twenty_  _thousand_ _____ Dollars

Wells Fargo Bank, N.A.
Nevada
wellsfargo.com

For _____ _loan_ _____

i:000000 2557ii  i:3 2 1 2 7 0 7 4 2i:  7 7 3 3 8 3 9 4 1 4ii

| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | C |
|------|-----------|--------|---------|---------|-----|--------|-----------|---|
| VIEWPOINTE | 20131015 | 2553 | 32127074 | 7733839414 | 000060 | 30;000.00 | 2341192476 | |

**CLEAR VOICE, INC**
3225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

2553

94-7074/3212 1714
7733839414

Date _10/15/15_

Pay To The Order of _NqfsGig Tsqqp Cov_

$ 39,000.00

_Thirty_ _thousand_ Dollars

Wells Fargo Bank, N.A.
Nevada
wellsfargo.com

For _____

⑆000000 2553⑆ ⑉32127074 2⑉ 7733839414⑈

−2344192474

2341192476

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.



| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | Ca |
|------|-----------|--------|---------|---------|-----|--------|------------|-----|
| VIEWPOINTE | 20130916 | 2408 | 32127074 | 7733839414 | 000060 | 30,000.00 | 2043582913 | |

CLEAR VOICE, INC
3225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

2408

94-7074/3212 1714
7733839414

Date 9/15/13

Pay To The Order of    Natalis Tsgolovs

$ 30,000.00

Thirty — Thousand

Dollars

Wells Fargo Bank, N.A.
horseto
wellsfargo.com

For

⑆000000 2408⑆ ⑉3212707⑉ 7733839414⑈

2043582913

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.



| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | C |
|------|-----------|--------|---------|---------|-----|--------|-----------|---|
| VIEWPOINTE | 20130816 | 2874 | 32127074 | 7733839414 | 000060 | 30,000.00 | 3546754525 | |

CLEAR VOICE, INC
3225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

2874

04-7074/3212 1714
7733839414

Pay To The Order of  *Vsfslia Tssgolove*

$ 30,000.00

Thirty thousend ———— Dollars

Wells Fargo Bank, N.A.
Nevada
wellsfargo.com

For ____

⑆000000 2874⑆ ⑈321270742⑈ 7733839414⑈

CREDITED TO THE ACCOUNT OF
WITHIN NAMED PAYEE
LACK OF ENDORSEMENT GUARANTEED
WELLS FARGO BANK, N.A.
ALL 00645
ALL 00645

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | Ca |
|------|-----------|--------|---------|---------|-----|--------|------------|-----|
| VIEWPOINTE | 20130719 | 2830 | 32127074 | 7733839414 | 000060 | 30,000.00 | 2043589800 | |

CLEAR VOICE, INC
5225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

2830

94-7074/3212 1714
7733839414

Date 7/15/13

Pay To The
Order of   Ngtg Lig   Tsq golov?   $ 30,000.00

Thirty thousand   Dollars
100

Wells Fargo Bank, N.A.
Nevada
wellsfargo.com

For

⑈000000⑈2830⑈ ⑈32127074⑈ ⑈7733839414⑈

2043589800

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | C |
|------|-----------|--------|---------|---------|-----|--------|-----------|---|
| VIEWPOINTE | 20130715 | 2831 | 32127074 | 7733839414 | 000060 | 10,000.00 | 2222728667 | |



Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | C |
|------|-----------|--------|---------|---------|-----|--------|------------|---|
| VIEWPOINTE | 20130604 | 2763 | 32127074 | 7733839414 | 000060 | 30,000.00 | 2042894171 | |



Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | C: |
|------|-----------|--------|---------|---------|-----|--------|------------|-----|
| VIEWPOINTE | 20130514 | 2755 | 32127074 | 7733839414 | 000060 | 36,000.00 | 2043108710 | |

**CLEAR VOICE, INC**
5225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

2755

94-7074/3212 1714
7733839414

Date 5/13/13

Pay To The Order of _Natalia Tsapos_ $ 36,000.00

_Thirty six thousand_ Dollars

Wells Fargo Bank, N.A.
Nevada
wellsfargo.com

For _Loan_

⑈000000275⑈ ⑈321270742⑈ 7733839414⑈

2042108709

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | C: |
|------|-----------|--------|---------|---------|-----|--------|------------|-----|
| VIEWPOINTE | 20130422 | 2782 | 32127074 | 7733839414 | 000060 | 30,000.00 | 1420382577 | |

**CLEAR VOICE, INC**
3225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

2782

94-7074/3212 1714
7733839414

Date 4/15/13

Pay To The Order of _Netalia Tcagolova_ $ 30,000.00

_Thirty thousand_ ----- Dollars

co
feu

WELLS FARGO

For _Loan_

⑆000000 2782⑆ ⑆3 2127074 2⑆ 7733839414⑆

WELLS FARGO BANK NA EXT
20130422 125632 PRT 64
▶1221-8527 84.
1420382577.

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

Print Images

| Routing | Sequence # | Paid Date | Amount | Account | Serial | Capture Source |
|---------|-----------|-----------|--------|---------|--------|----------------|
| 32127074 | 2441466662 | 12182012 | $30000.00 | 7733839414 | 2431 | 00010004 |



CLEAR VOICE, INC
3225 MCLEOD DR STE 100
LAS VEGAS, NV 89121-2257

2431

94-7074/3212 1714
7733839414

Pay To The Order of    Natalia Tsao

Date 12/18/12

$ 30,000.00

Thirty thousand ————————————— Dollars

Wells Fargo Bank, N.A.
Nevada
wellsfargo.com

For ____ Coac ————

⑆000000 2431⑆ ⑆32127074 2⑆ 7733839414⑆

2441466662

CREDITED TO THE ACCOUNT OF
THE WITHIN NAMED PAYEE
LACK OF ENDORSEMENT GUARANTEED
WELLS FARGO BANK, N.A.
AU 63167
AU 63167

# EXHIBIT "C"

ASHOT EGIAZARYAN – 1/18/2012

Page 166

ASHOT EGIAZARYAN
1  
2  A.  Yes.
3  Q.  Why did you ask Mr. Gloriozov
4  to act as the named owner of offshore
5  companies when they were actually owned
6  by you?
7  A.  Because we needed a person who
8  would handle this, in this direction who
9  would handle international financial
10  consulting.  Andrey Gloriozov knows
11  English and French very well.  And in
12  practice he performed the functions of a
13  trustee which was not in contradiction
14  with the law and he possessed a certain
15  degree of trust on my part.  And that is
16  why he produced the impression of a well
17  educated and professional specialist on
18  me.
19  Before that he was the manager
20  of a large Russian bank, which was called
21  Imperial.  After that, he was the manager
22  of the state bank, Sovzagranbank,
23  S-o-v-z-a-g-r-a-n-b-a-n-k, which
24  testifies about his professionalism.
25  Q.  What is the company Gascony

Page 167

ASHOT EGIAZARYAN
1  
2  limited?
3  A.  I remember that company was
4  mentioned.  It was one of the companies.
5  I cannot tell you exactly how these
6  companies operated, but there was such a
7  company.
8  Q.  What is the company Cavali
9  Foundation?
10  A.  The same.
11  Q.  Did you arrange for Gascony
12  and Cavali to possess $20 million that
13  were yours?
14  MR. LUPKIN:  Hold on a second.
15  Can I have the question back again.
16  (Record read as requested.)
17  MR. LUPKIN:  Go ahead, you can
18  answer.
19  A.  I did not do that.
20  Q.  Do you know how Gascony and
21  Cavali got the $20 million that Mr.
22  Gloriozov is describing?
23  MR. LUPKIN:  Objection; lacks
24  foundation.  I would also ask if
25  you are going to be questioning the

Page 168

ASHOT EGIAZARYAN
1  
2  witness about this paragraph that
3  it be translated for him.
4  MR. GOLDEN:  Mr. Translator,
5  would you read paragraph 3, please.
6  (At this time, the requested
7  material was read to the witness.)
8  Q.  So do you see that Mr.
9  Gloriozov describes transferring $20
10  million?
11  MR. LUPKIN:  Objection to
12  form.  You may answer.
13  A.  Yes, I've heard it.
14  Q.  And he says in paragraph 3
15  that the $20 million was your money.  Was
16  it your money?
17  A.  Yes.
18  Q.  Was that part of the $60
19  million that you described a few minutes
20  ago?
21  A.  I'm finding it difficult today
22  to follow up and to see whether it was
23  part of that or what was part of this
24  after such time.  I think probably it is
25  much simpler to request this information

Page 169

ASHOT EGIAZARYAN
1  
2  from Gloriozov and get the response.
3  Because I cannot judge by the names of
4  the companies which companies he formed
5  and which companies he had kept the
6  money.  He did not furnish me accounts
7  thereof.
8  Q.  Did you keep track of the
9  money that you gave to Mr. Gloriozov to
10  handle?
11  A.  Yes, I counted the money of
12  course.
13  Q.  Where did you keep the records
14  of the money that you gave to Mr.
15  Gloriozov?
16  A.  At that time I had it, but now
17  I don't think I've kept it.
18  Q.  Where did you have it when you
19  had it?
20  A.  Well, I kept it in my archives
21  in Russia.
22  Q.  Do you think that's where it
23  is today?
24  A.  Maybe.
25  Q.  Did Mr. Gloriozov give you

36  (Pages 166 to 169)

Page 178

1    ASHOT EGIAZARYAN
2    no understanding of the beneficiary
3    ownership, beneficiary property.
4        Q.   Did you list --
5        A.   In other words, using just
6    simple words, if a person owns property
7    and it is registered directly in his
8    name, in this ease, he's supposed, he's
9    obligated to declare that.
10       Q.   In --
11       A.   Well this situation as far as
12   I understand differs from foreign laws.
13       Q.   Mr. Egiazaryan, you've
14   answered the question, thank you.
15           MR. LUPKIN:  Are you finished
16   with your answer?
17           THE WITNESS:  No.
18           MR. LUPKIN:  Please let him
19   finish answering.
20           MR. GOLDEN:  He stopped
21   answering this question five
22   minutes ago and he's just going on
23   to kill time.  I'm going to
24   interrupt him and ask a question.
25           MR. LUPKIN:  He's answering

Page 179

1    ASHOT EGIAZARYAN
2    the question to the best of his
3    ability.  I'm sorry that you're
4    dissatisfied with it, but the fact
5    remains that what he's doing.
6            MR. GOLDEN:  The question --
7            MR. LUPKIN:  Excuse me, I'd
8    like him -- let me finish, please.
9    I'd like him to be able to finish
10   the answer to his question and when
11   he's completed it, you may go on.
12           MR. GOLDEN:  Let me find what
13   the question was.
14           The question was were you
15   supposed to disclose annual income
16   or your assets, that was the
17   question.  Even if he had answered
18   it, it wouldn't have taken him ten
19   minutes to respond to that
20   question.  So whatever he's saying
21   now is not responsive and I want to
22   go on to another question.
23           MR. LUPKIN:  I'm not going to
24   engage in a colloquy with you on
25   the record, Mr. Golden.  The

Page 180

1    ASHOT EGIAZARYAN
2    witness is answering the question
3    as he sees appropriate to answer
4    the question and you'll either
5    accept the answer or you won't
6    accept the answer.  I am not
7    controlling the witness' questions,
8    you're not controlling -- the
9    witness' answers rather, you're not
10   controlling the witness' answers.
11   I'm sorry that you're unhappy with
12   it, let's please move on, I'd like
13   the witness to be able to finish
14   his answer.
15       Q.   Do you remember the question?
16       A.   Naturally.
17       Q.   Finish your answer.
18       A.   But if you dislike it, I can
19   keep mum.
20       Q.   Keep what?
21       A.   Keep mum.  I can keep silent.
22       Q.   Now the $20 million that's
23   referenced in Mr. Gloriozov's
24   description, was that disclosed in your
25   Duma reports?

Page 181

1    ASHOT EGIAZARYAN
2            MR. LUPKIN:  Objection to
3    form.  You may answer.
4        A.   I was not supposed to disclose
5    it in my declaration that I submitted to
6    The Duma according to the Russian laws.
7        Q.   Did you tell Mr. Gloriozov to
8    transfer that $20 million to someone or
9    some company in the United States?
10       A.   Mr. Gloriozov told me that he
11   had a man with whom he had worked before.
12   It was a professional regarding the
13   utilization of finances.  He had been a
14   banker prior to that.  On one hand I
15   wanted that the money would be handled by
16   my cousin Suren.  This is my elder
17   cousin.  He's an economist.  According
18   his education, he's a candidate of
19   economic sciences.
20           And naturally, as I trusted
21   Suren, agreed to the proposal of Mr.
22   Gloriozov for the money to be transferred
23   so that they would operate, grow in their
24   operations to the joint venture where my
25   cousin was and who could, of course,

Page 182

1 ASHOT EGIAZARYAN
2 monitor and control that money so that
3 money would not be stolen.
4 Q. Was the --
5 A. It's so just like with a
6 regular bank, when a man brings his money
7 to the bank which he trusts to keep the
8 money and to let this money grow, only
9 banks at that time they offered very
10 little interest, more interest. And here
11 there was a realistic opportunity that
12 money would be increased tremendously.
13 Q. Was that man in the United
14 States that Gloriozov knew, Sergei
15 Ponomarev?
16 A. Yes.
17 Q. Who was supposed to make the
18 money grow, Mr. Ponomarev or Suren?
19 A. As far as my understanding
20 was, mainly Sergei. So in reality, that
21 money was in the possession of Andrey
22 Gloriozov, although the money was with
23 Sergei because they were partners.
24 Q. How were they supposed to make
25 the money grow?

Page 183

1 ASHOT EGIAZARYAN
2 A. To make investments in either
3 profitable projects or bonds.
4 Q. Did they do that?
5 A. On my part, I made my
6 recommendations so that they would invest
7 in some development projects.
8 Q. What did they do with the
9 money?
10 A. But my recommendations could
11 be just recommendations.
12 Q. What did they do with the
13 money? What did they do with the money?
14 MR. LUPKIN: I think there's
15 an answer that's going to be coming
16 out in English.
17 A. Maybe because when I
18 transferred the money the responsibility
19 was also transferred to Gloriozov, to
20 Ponomarev, to Suren.
21 Q. What did they do with the
22 money?
23 A. When I found out, when I
24 learned later on Ponomarev, when he
25 consulted of course Gloriozov, they

Page 184

1 ASHOT EGIAZARYAN
2 invested money in bonds.
3 MR. VESLER: Securities.
4 A. Securities. When I learned
5 after that -- when I -- as I learned
6 later on, they managed to invest monies
7 in government organizations, and that was
8 Fannie Mae and Freddie Mac, which had a
9 negative effect on the monies.
10 Q. Where are the records of those
11 investments?
12 A. I never had records. They did
13 not furnish them to me.
14 Q. Did Mr. Ponomarev and Suren
15 file tax returns in the United States
16 about the handling of that money?
17 A. I think, and this is my
18 personal opinion, that they did file
19 because they couldn't, couldn't do
20 otherwise.
21 Q. Do you know what a promissory
22 note is?
23 A. Yes.
24 Q. Did you ask Gloriozov to sign
25 a promissory note in 2011 relating to

Page 185

1 ASHOT EGIAZARYAN
2 this $20 million?
3 MR. LUPKIN: Excuse me, can I
4 have the question back, please.
5 (Record read as requested.)
6 MR. LUPKIN: Please go ahead.
7 A. I remember I had asked
8 Gloriozov together with Suren to
9 originate or to process some documents if
10 there were not enough documents or if
11 some documents had been lost. Which
12 documents specifically I did not discuss
13 that with Andrey.
14 Q. When you said that you asked
15 Gloriozov and Suren to originate or to
16 process documents, when did you ask them
17 that?
18 A. Not with Suren, but at the
19 request of Suren. Because Suren tried to
20 find Andrey, reach him on the telephone,
21 he failed, and he asked me to call
22 Andrey. After that, they were in
23 telephone contact and they agreed which
24 documents they had to process.
25 Q. Did you ask them to prepare

40 (Pages 182 to 185)

Page 186

1       ASHOT EGIAZARYAN
2   those documents in 2011?
3       A.   I did not ask them.  I just
4   forwarded Suren's request to Andrey.
5       Q.   What was Suren's request?
6       A.   Suren's request was in view of
7   the, well, tax audit that was conducted.
8   As far as I can understand, some
9   documents were missing that were either
10  lost or were signed verbally.  Some
11  documents that were signed their
12  expiration date, they expired, and it was
13  necessary to prepare some more documents .
14  which a lot of time had elapsed, how many
15  years, 14 years or more than 15 years.
16      Q.   What tax audit are you
17  referring to?
18      A.   The tax audit that was
19  conducted of the, of Suren's company.
20      Q.   Which company?
21      A.   I cannot tell you which
22  company, I don't know.  I was not
23  interested in that.
24      Q.   Did you ever know the name of
25  the company?

Page 187

1       ASHOT EGIAZARYAN
2       A.   Which one?
3       Q.   The name of the company that
4   was being audited?
5       A.   No.
6       Q.   So Suren --
7       A.   I think it was not one
8   company, there was a group of companies.
9       Q.   And do you remember any of the
10  names?
11      A.   Yes, I do remember.  I do
12  remember all these companies, but which
13  questions, which questions were directed
14  to which company because I did not talk
15  to the auditing offices I cannot give you
16  a correct answer.  But there are no
17  secrets about it.
18      Q.   Did Suren tell you the name of
19  the company or companies that were being
20  audited?
21      A.   Well, I think it was the
22  company, I can tell you approximately.
23      Q.   Yes, tell me approximately.
24      A.   There was a company that was,
25  had the name SP Capital, but I can be

Page 188

1       ASHOT EGIAZARYAN  ·
2   wrong about it.
3       Q.   Was --
4           MR. LUPKIN:  Excuse me, don't
5   speculate.
6       Q.   Was a company --    .
7       A.   I cannot tell you exactly
8   because I can be mistaken.
9       Q.   Was the company involved named
10  Clear Voice?
11      A.   I do not know which companies
12  were audited.  Because I did not read the
13  auditing requests for these companies.  I
14  cannot state.  I really was not
15  interested in that.
16      Q.   Did Suren tell you that he
17  needed this $20 million note to respond
18  to the audit?
19      A.   You said $20 million --
20          MR. LUPKIN:  Whoa, whoa, too
21  many things going on.
22      A.   There was no such promissory
23  note of $20 million.
24      Q.   When you say there was no
25  promissory note with $20 million, you

Page 189

1       ASHOT EGIAZARYAN
2   mean when the money was first transferred
3   there was no note?
4       A.   No, I did not say that.  When
5   did I say that?
6       Q.   That was my question.
7       A.   No, I did not say it, you said
8   that.
9       Q.   Did Suren ask you or tell you
10  that he needed a $20 million promissory
11  note with regard to the audit?
12      A.   Well I can repeat what I said.
13  Suren said that some documents were
14  missing that could be lost with time,
15  part of the documents and that needed to
16  be reinstated.  I don't see anything
17  illegal there.  But he said a portion,
18  part of the documents.  He said some of
19  the documents were missing, part of the
20  documents.  He said please call Andrey so
21  that he would get in touch with me so
22  that we could reinstate the documents.
23      Q.   Was the $20 million note
24  signed when the first -- when the money
25  was transferred in 1996 or 1998?

41 (Pages 186 to 189)

Page 252

1   ASHOT EGIAZARYAN
2   Q. Did White & Case do the legal
3   work for the sale of that airplane?
4       MR. LUPKIN: Objection; asked
5   and answered. You may answer
6   again.
7   A. I've already responded. I
8   will answer once again.
9   Q. Is the answer yes?
10  A. Well, the answer is just the
11  way I can formulate that.
12  Q. Did White & Case handle the
13  sale of the airplane?
14  A. I did not handle the technical
15  transaction or the conversations with
16  White & Case about the sales of the
17  aircraft, of the airplane.
18  Q. Who made the decision to
19  sell —
20  A. I know that the owner of the
21  company Mogford, my brother, Artem,
22  handled that. That is why all the
23  negotiations with White & Case were
24  conducted by him. I did not communicate
25  with White & Case about the

Page 254

1   ASHOT EGIAZARYAN
2   A. I've heard — I've heard about
3   this company during my conversations with
4   my brother Artem or Suren. I think it
5   was Artem.
6   Q. What does Lulie International
7   do?
8   A. I don't know.
9   Q. Turn to page —
10  A. I could only guess.
11  Q. Turn to page 3740.
12      MR. GOLDEN: Mr. Translator,
13  would you please read to him the
14  second entry on the account sheet.
15      (At this time, the requested
16  material was read to the witness.)
17      THE INTERPRETER: May I,
18  interpreter's remark, may I ask you
19  a question? Payment is abbreviated
20  for payment, right, the second
21  line?
22      MR. GOLDEN: That's how I read
23  the statement.
24      THE INTERPRETER: Okay,
25  payment. And then Ord meaning

Page 253

1   ASHOT EGIAZARYAN
2   technicalities of the sales of the
3   airplane and that's why I'm not familiar
4   with them.
5   Q. Do you know of a company --
6       MR. LUPKIN: He's not finished
7   with his answer.
8       MR. GOLDEN: He's long
9   finished.
10      MR. LUPKIN: No, he's not.
11  A. That's why I cannot guess
12  about the negotiations with White & Case
13  regarding the technicalities of this
14  issue.
15  Q. Did you have in 2009 an
16  attorney/client relationship with White &
17  Case?
18      MR. LUPKIN: Objection; calls
19  for a legal conclusion, but you may
20  answer based on your understanding.
21  A. Yes.
22  Q. Do you know of a company named
23  Lulie International?
24  A. I've heard about this company.
25  Q. What is that company?

Page 255

1   ASHOT EGIAZARYAN
2   order?
3       MR. GOLDEN: That's how I read
4   it.
5       THE INTERPRETER: What is
6   favor, meaning in favor?
7       MR. GOLDEN: That's how I read
8   it.
9       THE INTERPRETER: Thank you,
10  it's for my --
11      (At this time, the requested
12  material was read to the witness.)
13  Q. Is Lulie International an
14  offshore company?
15      MR. LUPKIN: Objection; lacks
16  foundation. You may answer.
17  A. I've already responded that I
18  don't know the registration, the type of
19  business of this company, of Lulie
20  International. I did not own Lulie and I
21  don't own it.
22  Q. What is the -- do you know a
23  company named Clear Voice?
24      MR. LUPKIN: Objection; asked
25  and answered, but you may answer

7 (Pages 252 to 255)

Page 256

1    ASHOT EGIAZARYAN
2    again.
3        A. I've heard about that company.
4    If we are talking about the same company.
5    That my brother Suren has such a company.
6        Q. Mr. Translator, please --
7        A. My cousin.
8            MR. GOLDEN: Mr. Translator,
9    please read to the witness the two
10   lines in the approximate middle of
11   the page, both dated the 12th of
12   October 2009.
13           MR. LUPKIN: Excuse me, may I
14   just interrupt here, Jim, for a
15   second? I think you may have the
16   dates wrong. I think they're using
17   the European dates, in which case
18   the month would be in the middle
19   instead of the day. It says
20   12/10/09. That means October 12th,
21   2009.
22           MR. GOLDEN: That's what I
23   said, I said the 12th of October
24   2009.
25           MR. LUPKIN: Is that what you

Page 257

1    ASHOT EGIAZARYAN
2    said? I apologize. Forgive me.
3        (At this time, the requested
4    material was read to the witness.)
5        A. Okay.
6        Q. Do you know why Lulie
7    transferred $5 million to this Mogford
8    account on the 12th of October 2009?
9        A. Let me say once again. I'm
10   not handling either Lulie, the Lulie
11   company or Mogford company. The
12   companies Lulie and Mogford do not belong
13   to me. I'm not handling their financial
14   operations and do not know about them.
15   That is why I cannot comment on these
16   companies' operations.
17       Q. Please look at page 3759.
18           MR. GOLDEN: Mr. Translator,
19   please read the portion of this
20   page between the line "Opening of
21   bank account" and the number
22   information about four lines down.
23           (At this time, the requested
24   material was read to the witness.)
25           THE INTERPRETER: Okay, I've

Page 258

1    ASHOT EGIAZARYAN
2    read it.
3        Q. Were you aware that on the
4    18th of November 2009 Mogford Impex
5    Corporation opened an account at the Hypo
6    Investment Bank of Liechtenstein?
7        A. They could have done it.
8        Q. Please turn to page 3764.
9            MR. GOLDEN: Mr. Translator,
10   please read the portion of this
11   that begins at the top where it
12   says client and there's a number
13   and through the line that says to
14   Edward Lozansky.
15           (At this time, the requested
16   material was read to the witness.)
17       Q. Mr. Egiazaryan, who is Edward
18   Lozansky?
19       A. Edward Lozansky is a citizen
20   of the United States, a scientist. In
21   his time he came to America, he was
22   granted political asylum. His wife owns
23   the magazine -- he and his wife own the
24   magazine called Continent. He is the
25   president of the so-called Russia House

Page 259

1    ASHOT EGIAZARYAN
2    in Washington.
3        His wife was the daughter of a
4    general who brought the Russian, the
5    Soviet troops into Czechoslovakia when
6    they crushed the Czechoslovakian revolt
7    there.
8        Q. Are you referring to 1967?
9        A. Absolutely correct.
10       Q. When did Mr. Lozansky get
11   political asylum?
12       A. I don't know in what year he
13   got it.
14       Q. Was it in the last ten years,
15   or before that?
16       A. I know that it was still when
17   there was the Soviet Union.
18       Q. When did you first meet him?
19       A. I met him approximately in the
20   year 1990.
21       Q. What were the circumstances
22   when you met him?
23       A. Oh maybe it was in 1991. The
24   circumstances, when he was engaged in the
25   student exchange with I think Moscow

8  (Pages 256 to 259)

# EXHIBIT "D"

SP Capital Partners, LP
5574 Smoke Signal Avenue
Las Vegas, NV  89118

February  4, 2002

Clear Voice, Inc.
3885 S. Decatur Blvd. Ste. 2010
Las Vegas, NV  89103

Re: SP Capital Partners, LP

Dear Partner:

Enclosed is a copy of your Schedule K-1 of Form 1065 which has been
filed with the above named partnership's tax return.   Included
is your distributive share of income, deductions, credits and taxes.

This information is for your use in preparing your individual
income tax return.

Sincerely,

Dennis K. Maserry

02/04/02    SPP

**SCHEDULE K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

**Partner's Share of Income, Credits, Deductions, etc.**
▶ See separate instructions.

OMB No. 1545-0099

**2001**

For calendar year 2001 or tax year beg. _____ , 2001 & end. _____ , 20 _____

Partner's identifying number ▶ 88-0503066    Partnership's identifying number ▶ 88-0424696

| Partner's name, address, and ZIP code | Partnership's name, address, and ZIP code |
|---|---|
| Clear Voice, Inc. | SP Capital Partners, LP |
| 3885 S. Decatur Blvd. Ste. 2010 | 5574 Smoke Signal Avenue |
| Las Vegas NV 89103 | Las Vegas NV 89118 |

**A** This partner is a ☐ general partner ☒ limited partner
☐ limited liability company member

**F** Partner's share of liabilities (see instructions):
Nonrecourse . . . . . . . . . . . . . . . . . . . . $ _____

**B** What type of entity is this partner? ▶ Corporation
Qualified nonrecourse financing . . . . . . . $ _____

**C** Is this partner a ☒ domestic or a ☐ foreign partner?
Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____

**G** Tax shelter registration no. ▶ _____

**D** Enter partner's % of:    (i) Before change or termination    (ii) End of year
Profit sharing . . . . . . _____ %    15.9071%
Loss sharing . . . . . . _____ %    15.9071%
Ownership of capital _____ %    15.9071%

**H** Check here if this partnership is a publicly traded
partnership as defined in section 469(k)(2) . . . . . . . . . . . . . . . . ☐

**E** IRS Center where partnership filed return: Ogden, UT
**I** Check applicable boxes:    (1) ☐ Final K-1 (2) ☐ Amended K-1

**J** Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
|  | 9,793,612 | 38,125 ( ) |  | 9,831,737 |

| | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| **Income (Loss)** | 1 Ordinary income (loss) from trade or business activities . . . . . . . . . | 1 | -46,321 | See Partner's Instructions for Sch. K-1 (Form 1065). |
| | 2 Net income (loss) from rental real estate activities . . . . . . . . . . . . . | 2 | | |
| | 3 Net income (loss) from other rental activities . . . . . . . . . . . . . . . . . | 3 | | |
| | 4 Portfolio income (loss): | | | |
| | a Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4a | 75,825 | Sch. B, Part I, line 1 |
| | b Ordinary dividends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4b | 8,673 | Sch. B, Part II, line 5 |
| | c Royalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4c | | Sch. E, Part I, line 4 |
| | d Net short-term capital gain (loss) . . . . . . . . . . . . . . . . . . . . . . . . . | 4d | | Sch. D, line 5, col. (f) |
| | e (1) Net long-term capital gain (loss) . . . . . . . . . . . . . . . . . . . . . . . | 4e(1) | | Sch. D, line 12, col. (f) |
| | (2) 28% rate gain (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4e(2) | | Sch. D, line 12, col. (g) |
| | (3) Qualified 5-year gain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4e(3) | | Line 4 of worksheet for Sch. D, line 29 |
| | f Other portfolio income (loss) (attach schedule) . . . . . . . . . . . . . . . | 4f | | Enter on applicable line of your return. |
| | 5 Guaranteed payments to partner . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | | See Partner's Instructions for Sch. K-1 (Form 1065). |
| | 6 Net section 1231 gain (loss) (other than due to casualty or theft) . . . . | 6 | | Enter on applicable line of your return. |
| | 7 Other income (loss) (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . | 7 | | |
| **Deductions** | 8 Charitable contributions (see instructions) (attach schedule) . . . . . . . | 8 | | Sch. A, line 15 or 16 |
| | 9 Section 179 expense deduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | | See Partner's Instructions for Sch. K-1 (Form 1065). |
| | 10 Deductions related to portfolio income (attach schedule) . . . . . . . . . | 10 | | |
| | 11 Other deductions (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . . | 11 | | |
| **Credits** | 12 a Low-income housing credit: | | | |
| | (1) From section 42(j)(5) partnerships . . . . . . . . . . . . . . . . . . . . . . | 12a(1) | | Form 8586, line 5 |
| | (2) Other than on line 12a(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12a(2) | | |
| | b Qualified rehabilitation expenditures related to rental real estate activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12b | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | c Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12c | | |
| | d Credits related to other rental activities . . . . . . . . . . . . . . . . . . . . . | 12d | | |
| | 13 Other credits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 | | |

For Paperwork Reduction Act Notice, see Instructions for Form 1065.    **Schedule K-1 (Form 1065) 2001**

CAA    1 1065K112    NTF XXXXX    Copyright 2001 Greatland/Nelco LP – Forms Software Only    Copyright Accountware, Inc., Cincinnati, Ohio 2001

02/04/02　　SPP　　　　　　　　　　　　　　　　　　　　　　88-0424696 SP Capital Partners, LP

Schedule K-1 (Form 1065) 2001　　　　　　　　　　　　　　　　　　　　　　　　　Page 2

| (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|
| **Invest-ment Interest** | 14a Interest expense on investment debts . . . . . . . . . . . . . . . . . . . . . . . . . . **14a** | | Form 4952, line 1 |
| | b (1) Investment income included on lines 4a, 4b, 4c, and 4f . . . . . . . **14b(1)** | 84,499 | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | (2) Investment expenses included on line 10 . . . . . . . . . . . . . . . . **14b(2)** | | |
| **Self-employ-ment** | 15a Net earnings (loss) from self-employment . . . . . . . . . . . . . . . . . . . . . **15a** | | Sch. SE, Section A or B |
| | b Gross farming or fishing income . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15b** | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | c Gross nonfarm income. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15c** | | |
| **Adjust-ments and Tax Prefer-ence Items** | 16a Depreciation adjustment on property placed in service after 1986 . . . **16a** | | See Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| | b Adjusted gain or loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16b** | | |
| | c Depletion (other than oil and gas) . . . . . . . . . . . . . . . . . . . . . . . . . . . **16c** | | |
| | d (1) Gross income from oil, gas, and geothermal properties. . . . . . . . . **16d(1)** | | |
| | (2) Deductions allocable to oil, gas, and geothermal properties . . . . **16d(2)** | | |
| | e Other adjustments and tax preference items (attach schedule) . . . . . **16e** | | |
| **Foreign Taxes** | 17a Name of foreign country or U.S. possession . . . . . . . . . . . . . . . . ▶ | | |
| | b Gross income from all sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17b** | | |
| | c Gross income sourced at partner level . . . . . . . . . . . . . . . . . . . . . . . **17c** | | |
| | d Foreign gross income sourced at partnership level: | | |
| | (1) Passive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17d(1)** | | |
| | (2) Listed categories (attach schedule) . . . . . . . . . . . . . . . . . . . . . . **17d(2)** | | |
| | (3) General limitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17d(3)** | | Form 1116, Part I |
| | e Deductions allocated and apportioned at partner level: | | |
| | (1) Interest expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17e(1)** | | |
| | (2) Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17e(2)** | | |
| | f Deductions allocated and apportioned at partnership level to foreign source income: | | |
| | (1) Passive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17f(1)** | | |
| | (2) Listed categories (attach schedule) . . . . . . . . . . . . . . . . . . . . . . **17f(2)** | | |
| | (3) General limitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17f(3)** | | Form 1116, Part II |
| | g Total foreign taxes (check one): . . . ▶ ☐ Paid ☐ Accrued . . . . . . **17g** | | See Instructions for Form 1116. |
| | h Reduction in taxes available for credit (attach schedule) . . . . . . . . . . **17h** | | |
| **Other** | 18 Section 59(e)(2) expenditures: a Type ▶ | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | b Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18b** | | |
| | 19 Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19** | | Form 1040, line 8b |
| | 20 Other tax-exempt income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20** | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 21 Nondeductible expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21** | 53 | |
| | 22 Distributions of money (cash and marketable securities) . . . . . . . . . . **22** | | |
| | 23 Distributions of property other than money . . . . . . . . . . . . . . . . . . . . **23** | | |
| | 24 Recapture of low-income housing credit: | | |
| | a From section 42(j)(5) partnerships. . . . . . . . . . . . . . . . . . . . . . . . . . **24a** | | Form 8611, line 8 |
| | b Other than on line 24a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24b** | | |

25 . Supplemental information required to be reported separately to each partner (attach additional schedules if more space is needed):

**Supple-mental Infor-mation**

88-0503066　　　Clear Voice, Inc.

Schedule K-1 (Form 1065) 2001
Copyright Accountware, Inc., Cincinnati, Ohio 2001

# EXHIBIT "E"

```
 1                         UNITED STATES DISTRICT COURT
                           SOUTHERN DISTRICT OF NEW YORK
 2

 3      ------------------------------------X
                                            :
 4      ASHOT EGIAZARYAN,                    :
                                            :    11-CV-02670 (GWG)
 5                          Plaintiff,       :
                                            :    500 Pearl Street
 6                   v.                      :    New York, New York
                                            :
 7      PETER ZALMAYEV,                      :
                                            :    February 22, 2012
 8                          Defendant.       :
        ------------------------------------X
 9
                      TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
10               BEFORE THE HONORABLE GABRIEL W. GORENSTEIN
                      UNITED STATES MAGISTRATE JUDGE
11
        APPEARANCES:
12
        For the Plaintiff:          JONATHAN DANIEL LUPKIN, ESQ.
13                                  Flemming Zulack Williamson
                                        Zauderer, LLP
14                                  One Liberty Plaza
                                    New York, New York  10006
15

16      For the Defendant:          JAMES P. GOLDEN, ESQ.
                                    THOMAS ROBERTS, ESQ.
17                                  Hamburg & Golden, P.C.
                                    1601 Market Street
18                                  Suite 3310
                                    Philadelphia, Pennsylvania  19103
19

20      For Clear Voice:            MICHAEL RAKOWER, ESQ.
                                    Law Office of Michael C. Rakower
21                                  747 Third Avenue
                                    32nd Floor
22                                  New York, New York 10017

23
        Court Transcriber:          SHARI RIEMER
24                                  TypeWrite Word Processing Service
                                    211 N. Milton Road
25                                  Saratoga Springs, New York  12866


        Proceedings recorded by electronic sound recording,
        transcript produced by transcription service
```

                                                                    2

1              THE COURT: <u>Ashot Egiazaryan v. Peter Zalmayev</u>.

2              Counsel, please state your name for the court.

3              MR. RAKOWER:  Good morning, Your Honor.  Michael

4    Rakower representing non party Clear Voice Inc. from the law

5    office of Michael C. Rakower.

6              MR. LUPKIN:  Jonathan Lupkin, firm of Flemming,

7    Zulack, Williamson, Zauderer, LLP, on behalf of the plaintiff

8    and non party Seren Egiazaryan [Ph.].  Good morning.

9              MR. GOLDEN:  James Golden from Hamburg & Golden for

10   the defendant Peter Zalmayev.

11             MR. ROBERTS: And Tom Roberts also from Hamburg &

12   Golden for Mr. Zalmayev.

13             THE COURT: You can be seated if you're not addressing

14   the court.

15             We're here primarily because of a motion from Clear

16   Voice and Seren Egiazaryan to quash the subpoenas.  I think I'm

17   also going to deal with the letter, the February 7th letter

18   since that seems to be done with.  I might mention a couple of

19   other issues.

20             So on the motion -- well, I mean I've read the

21   letters.  If there's something that hasn't been said that

22   someone wants to add feel free, I guess starting with the

23   movant.  Mr. Rakower, anything?

24             MR. RAKOWER: Yes, Your Honor.  Thank you.  I realize

25   that you're familiar with the papers that have been submitted.

3

1  I wanted to just stress the point that there is a very, very
2  real privacy concern here. I learned moments before today's
3  hearing that one of our fears has come true in that the
4  defendant is using information to publish in a negative light
5  about plaintiff Ashot Egiazaryan but we're certainly concerned
6  that in the event these documents are released the next in line
7  will be Clear Voice and Seren.

8          I printed out a copy of a cartoon that's published on
9  the web that's been published in conjunction with an article
10  that contains I believe the entire sur reply brief from
11  defendant Zalmayev in this motion including all of the exhibits
12  but for those that have been sealed for attorney-client -- that
13  have been sealed.

14         The purpose of their discovery purportedly is to
15  determine whether Clear Voice has made payments to the LDPR for
16  the benefit of Ashot Egiazaryan. It is not purportedly to
17  publish on the internet cartoons about Ashot Egiazaryan or to
18  publish transcripts of Ashot Egiazaryan's deposition or to
19  publish Clear Voice banking records on the web. This, in my
20  view, and in the movant's view, is quite problematic and it's
21  precisely the reason why we move to quash. We move to quash
22  only after I spoke with opposing counsel to see if we could
23  reach terms, agreement on some kind of limited scope of
24  discovery, limit their subpoena in some way. That request
25  which was issued on multiple occasions -- we talked about

4

1 | different possible permutations, all of them were flatly
2 | rejected. The position was that they're entitled to all of the
3 | discovery they seek notwithstanding the fact that they're
4 | seeking supposedly information concerning payments by Clear
5 | Voice after having received payments from Mogford [Ph.] onto
6 | the LDPR. They want bank -- account opening records. They
7 | want every document that Wells Fargo has concerning Clear
8 | Voice. Most of the documents they request couldn't have
9 | anything to do with transfers of payments. They just don't.
10 | Account opening records don't do that but they want them and
11 | they also want unredacted complete banking statements, not just
12 | entries that relate to transfers from Clear Voice to the LDPR
13 | or transfers --

14 |         THE COURT: Well, here's my problem. I have sympathy
15 | on the privacy front. We can talk about that. But the -- I'm
16 | not sure how to phrase this but the reds here is itself
17 | compromised, at least that's what the evidence shows so far.
18 | So we're not talking about IBM and we could have a narrow
19 | subpoena that relates only to the issues for which the person
20 | is suing IBM or vice-versa. We have an entity that gets money
21 | for no apparent reason whose existence is unexplained who Ashot
22 | has himself says he gives money to for no apparent reason.

23 |         So we're not in the realm of what -- the typical
24 | discovery situation. That's your big hurdle.

25 |         MR. RAKOWER: Well, in response to that hurdle -- let

5

1  me see if I can leap over it, Your Honor. You say the entity's
2  purpose has not been explained but I don't think the entity's
3  purpose has been properly questioned yet. There was a
4  deposition of Ashot Egiazaryan. I wasn't at that deposition
5  but I am certain because I've -- well, I'm certain with respect
6  to all aspects of that transcript but for that which has been
7  sealed that only two questions were asked concerning Clear
8  Voice. One was have you ever heard of the entity named Clear
9  Voice. The answer was yes. Another question was is Clear
10 Voice one of the entities that you know of that has been
11 audited. That's the only question --

12        THE COURT: This is not your problem but I wouldn't
13 put too much faith in the two question problem given for a
14 reason no one has mentioned which is that when he actually
15 asked directly about Clear Voice the question was objected to.

16        MR. RAKOWER: But not directed -- he wasn't directed
17 not to answer.

18        THE COURT: It doesn't matter. Once that objection is
19 made to me that waives any argument that there should have been
20 follow up questioning. So I wouldn't go there with that. What
21 else do you have?

22        MR. RAKOWER: Okay, Your Honor. I hear you. I'm not
23 sure why but okay.

24        The other point though is, Your Honor, that Seren
25 himself hasn't yet been deposed. Now, the plaintiffs deposed

6

1   Ashot Egiazaryan without the benefit of any financial
2   statements. They asked him questions and there's actually good
3   reason to that because the possibility, the possibilities of
4   what could be discovered here are virtually limitless. It's a
5   fact Your Honor essentially acknowledged back in November. So
6   in deposing Ashot they were able to ask him anything and
7   everything and now they tailor their questions and follow any
8   track, any line of inquiry they wanted. The same can be done
9   here with Clear Voice.

10          After having -- they have said repeatedly in their
11  papers and during this motion that the people in the know about
12  this issue, about what Clear Voice does and how it does it are
13  Ashot, Artami Egiazaryan and Seren Egiazaryan. They've deposed
14  Ashot without financial statements. Let them depose --

15          THE COURT: Again, the normal rule is you get the
16  documents and then you question the person. When I was being
17  presented with this these many months ago, I don't know that it
18  was in front of me that there was an affidavit from Gloriazoff
19  or whatever his name about millions of dollars being used by
20  Ashot and Clear Voice. That was one thing.

21          And the second thing I think as I was imagining the
22  elderly aunts and cousins being questioned for no reasons. So
23  this is not what I was thinking about back then when I said
24  let's do some other things first. Maybe it was in front of me
25  and I hadn't focused on it but it's certainly in front of me

                                                                            7

 1  now.  So I wouldn't put too much stake in that either.

 2           MR. RAKOWER: Understood.  The Gloriazoff statement

 3  doesn't say precisely what you just suggested, Your Honor.  I

 4  don't believe it identifies Clear Voice.  It does mention an

 5  entity controlled by Seren but it does not mention Clear Voice.

 6  One can make any inferences they want --

 7           THE COURT: Hold on.  Let's look.  If I'm wrong I'd

 8  like to know.

 9           MR. RAKOWER: I hope I'm right, Your Honor.

10           THE COURT: It mentions Seren.  I apologize.

11           MR. RAKOWER: But, Your Honor --

12           THE COURT: I could make it worse for Seren but

13  given -- we have this other entity that's -- that Ashot

14  controlled.  I forget is name that is giving money to Clear

15  Voice and that we have actual records on that.  I mean this is

16  just not a normal business.  This is not a business where

17  someone is giving something to someone for value.  This has to

18  be looked into.

19           MR. RAKOWER: I don't protest that it shouldn't be

20  looked into, Your Honor.  I just -- my position is that there

21  are privacy interests at stake and so we now need to think

22  about what less intrusive mechanisms are there.  There's no

23  prejudice to the defendants in requiring them to -- because

24  they won't limit their subpoena in any way in requiring them to

25  ask questions in the form of a deposition where they can be

8

1 counsel present who can object where they can ask narrowly
2 tailored questions before they just get the full Monty, Your
3 Honor, if you will, and get all the documents. Let them ask in
4 and then they can come back either to us or if necessary the
5 court and seek those records.

6          THE COURT: So what happens, they go to Seren, he says
7 what he says in his affidavit, I've never given money for --
8 Clear Voice has never transferred money for the benefit LDPR
9 and that's the end of it?

10          MR. RAKOWER: No. But, Your Honor --

11          THE COURT: It's clear that I don't think he has any
12 way of knowing where his money is going. I don't know. I mean
13 given the way -- what's his name? Ashot is moving stuff around
14 if he's giving money -- if Ashot tells him oh, give money to
15 corporation XYZ. For all we know that's the corporation that
16 gives money to LDPR. That's the problem when we have people
17 moving money for no apparent reason.

18          MR. RAKOWER: I appreciate --

19          THE COURT: And without consideration.

20          MR. RAKOWER: I appreciate the complexity, Your Honor,
21 I do. My only concern is in an effort to try to protect the
22 privacy interests we go forward with a less intrusive means
23 while preserving the possibility that the most intrusive means
24 can be used.

25          THE COURT: Anything else?

9

1          MR. RAKOWER: If you can just give me one moment, Your

2    Honor, to take a look?

3          THE COURT: Sure. Take your time.

4                [Pause in proceedings.]

5          MR. RAKOWER: I'll reserve an opportunity to rebut

6    what the defendant says but that's it for now. Thank you, Your

7    Honor.

8          THE COURT: Mr. Lupkin, were you going to speak or

9    should I go to the other side?

10          MR. LUPKIN: You can go to the other side.

11          THE COURT: You're representing the same parties;

12    correct?

13          MR. LUPKIN: Except for Clear Voice.

14          THE COURT: Got it. Mr. Golden, anything?

15          MR. GOLDEN: I think just two things, Your Honor. The

16    first is to put some names to what Your Honor recollected is

17    that in our responsive brief that included as an exhibit the

18    Gloriazoff declaration we also had bank records from one of the

19    companies controlled by Gloriazoff for Ashot. That company is

20    called Mogford Impacts. Mogford Impacts is the company that

21    had transferred huge amounts of money to Clear Voice.

22          The second comment I had about the real -- the

23    realistic probability that we will uncover money that went to

24    the LDPR relates to something that we discovered when we

25    reviewed the asylum records.

10

1        THE COURT: Now that you mention that, I was going to
2   get to this later, but my -- I don't like having secret
3   evidence in a public proceeding.  So the theory on my ruling on
4   the asylum application was that you were going to look at it
5   and if there was something obviously relevant you would make an
6   application that the designation be lifted.  So I noticed one
7   of the February 17th letters quotes from it.  It seems clearly
8   relevant.  I don't know what could be more relevant.  So right
9   now I want to keep this a public proceeding.  There's someone
10  in the audience.  I don't know who it is.  Maybe he's with one
11  of you but in any event the transcript is public as far as I'm
12  concerned.

13        So I don't want to reveal anything that I've ordered
14  to be held confidential.  However, you are entitled to make an
15  application to reveal it and in fact the presumption is if it's
16  going to be in papers given to me and for which I might be
17  issuing a decision, it shouldn't be confidential unless there's
18  very good reason to keep it confidential.  So before you say
19  anything on the asylum application, I thought I'd make that
20  point.  I don't know that I -- unless they want to say they're
21  not going to object to that piece being made public I don't
22  want to talk about it.  Are you going to be objecting?

23        MR. RAKOWER: Yes, I will be.

24        THE COURT: So I want to have a process for doing

25  that.  You should send me a letter and do it soon explaining

11

1  why it should be lifted and to what degree and for what purpose
2  and so forth and what piece of the application. Let them
3  respond and then we'll do it but otherwise let's not talk about
4  it here. This is public.

5          MR. GOLDEN: I understand. So that it's clear, what I
6  was about to do was to ask Your Honor how you wanted to handle
7  that. You answered my question before I asked it. So I have
8  nothing else to say.

9          THE COURT: Why don't you address the issue of things
10 being thrown up on the internet if you feel that's relevant?

11         MR. LUPKIN: I can say two things.

12         THE COURT: Specifically in the context of the Clear
13 Voice documents which if I were to rule that you were to get
14 them I think we should talk about whether there should be
15 restrictions because the fact is this is a non party. I don't
16 buy the arguments that there's no difference between corporate
17 interests and individual interests. I think the case law does
18 not address the question that's arising here. Totally
19 different contexts. I think these are -- right now these are
20 corporate documents, the conclusory statements to the contrary
21 notwithstanding, not to mention the fact that there -- again,
22 this business is not a corporation. As most human beings
23 normal understand a corporation which is receiving money for
24 things given for value. So there's that.

25         On the other hand, I don't know that I want this

12

1  stuff being thrown up on the internet.  So tell me what you
2  think we should do about that.

3          MR. GOLDEN: To answer what I think is your first
4  question, Mr. Egiazaryan's public relations firm, BGR Bagarra,
5  has been regularly providing members of the Russian press in
6  particular but also the United Kingdom press and the American
7  press with very detailed reports about this proceeding.  My
8  speculation is that someone among the many members of the press
9  who has been contacted by Mr. Egiazaryan has been accessing the
10  docket, the public docket in this case and somebody chose to
11  take something that was filed in the docket and either publish
12  the whole thing or be inspired to write a cartoon.

13          With regard to your second question, we certainly can
14  maintain some kind of confidentiality for the Clear Voice
15  records.

16          THE COURT: What's your proposal?  What's your
17  proposal on that?

18          MR. GOLDEN: Well, the first is because I prefer not
19  to have things filed under seal because it's burdensome and
20  it's also contrary to the idea of public proceedings.
21  Certainly we will agree to maintain its confidentiality and to
22  use it only for purposes of this.  That's a common level of
23  confidentiality.  Then we get to the problem of if we have to
24  make a motion we have those exhibits and if we want to use them
25  we make a motion then.  It otherwise becomes a public record.

13

1        THE COURT: Right. Well, obviously I would -- it
2   would be bad if things were put in the public record for the
3   purpose of making them public, a public record of this case.
4   You understand what I'm getting at.

5        MR. GOLDEN: Yes.

6        THE COURT: So I'm not sure how to solve that problem.
7   I cert -- let me go through my ruling and then we'll talk about
8   the level of confidentiality.

9        This arises in the context of a motion quash a
10  subpoenas. Subpoenas are subject to Rule 26's relevance
11  requirement which we're all familiar with. Nonetheless, a
12  court does have to weigh the relevance or probative value of
13  the documents being sought against the privacy interests
14  asserted.

15        As I've already mentioned, the issue of what --
16  whether and how Ashot Egiazaryan has given money to the LDPR is
17  the critical issue in this case and there is evidence that's
18  been obtained in discovery and otherwise that makes it clear
19  that Ashot moves money around for no apparent reason, that the
20  money has gone to his cousin, Seren, that the source of this
21  money -- that this money ends up with Clear Voice and that
22  we're talking about millions of dollars. So inquiry into what
23  Clear Voice is doing is certainly important.

24        Now, there are some situations where we can go to a
25  company and say you know what, give me the records that relate

14

1   to this particular issue and we trust them to do that. I don't
2   think this is such a situation because of these unexplained
3   payments and the -- and the way Clear Voice and Ashot move
4   money around as I say for no apparent reason and the clear
5   evidence that Clear Voice is being used for Ashot's benefit.

6          So when Seren says that no payments were made for the
7   benefit of LDPR, which is a conclusory statement, I don't even
8   see how Seren could know that because of th evidence that
9   exists that Clear Voice is being used by Ashot to move money
10  around.

11         So, accordingly, I'm not going to quash the subpoena.
12  I'm ready to talk about a limitation certainly that this
13  material should be used only for purposes of this litigation
14  but it becomes very unwieldy if I give a higher level of
15  confidentiality designation because it prevents a party from
16  presenting evidence to me that's available to the public which
17  it should be regarding this case or presenting in a summary
18  judgment motion or a trial.

19         So if someone -- since I didn't really hear argument
20  on this, I'm willing to give you one last shot, Mr. Rakower, as
21  to some additional restriction and to give me a basis for it
22  but right now that's the way I'm looking at it.

23         MR. RAKOWER: Thank you, Your Honor. If you don't
24  mind, may I just backtrack and ask Your Honor a question with
25  respect to your ruling?

15

1          THE COURT: Yes.

2          MR. RAKOWER: I understand Your Honor's position with

3  respect to payments from Clear Voice and onward. What about

4  items like the account opening documents that wouldn't bear at

5  all on the question of payments?

6          THE COURT: Well, it might bear upon Ashot's

7  relationship to this account. So I'm overruling that objection

8  too.

9          MR. RAKOWER: With respect, Your Honor, to the

10  question of confidentiality, a designation of the documents is

11  confidential for the purpose of usage, utilization of the

12  documents is fine if --

13          THE COURT: I didn't say confidential. What I said is

14  they can be used only for purposes of this litigation which

15  means they can't be put on the internet or handed out. They

16  can be used only for the litigation. That means that if Mr.

17  Golden wants to show it to a witness at a deposition and say

18  what's this about, that's not going to -- that's not going to

19  be automatically confidential. If he wants to put in his brief

20  just the way he did in the briefs in this case, you know, I've

21  got a declaration from this guy, I've got this, and now I've

22  got an account document that says Clear Voice paid $1 million

23  to this entity and this entity then gave it to LDPR, that's not

24  going to be sealed off from the public.

25          MR. RAKOWER: So I was going to try to take it step by

16

1  step with respect to the question of -- the concept of using
2  the documents only for purposes of this litigation.  As a
3  corollary to that, I would ask that if they -- outside a
4  deposition for a moment, if they were to show the documents to
5  anyone that that person sign an undertaking acknowledging the
6  documents would be only used for the purposes of this
7  litigation.
8            THE COURT: Yes, absolutely.
9            MR. RAKOWER: Thank you, Your Honor.
10           Now, with respect to depositions, Your Honor, in my
11  view those depositions at the moment when documents produced by
12  Clear Voice -- I'm sorry, produced by Wells Fargo related to
13  Clear Voice, if those documents were going to be shown to the
14  witness at that moment those -- the pages of that transcript
15  could be designated as confidential.
16           THE COURT: So now you're making a very different
17  request.
18           MR. RAKOWER: I understand.  I'm moving on now.
19           THE COURT: It's not just -- I mean it seems to me
20  that it would -- you're not just going to limit this request to
21  depositions, are you?
22           MR. RAKOWER: No, no.  I was going to --
23           THE COURT: You're going to do the same thing for the
24  exhibit to the summary judgment motion.
25           MR. RAKOWER: Yes, but I was going to describe a

17

1  process whereby even prior to the deposition if they wanted to
2  approach counsel and see if an agreement can be worked out with
3  respect to certain documents. We haven't yet seen the
4  documents, Your Honor. So we don't really know what's in
5  there. We don't know -- and we had asked defense counsel if
6  they would allow us to review them actually in the context of
7  this motion because we might have been able to rescind the
8  motion.

9          THE COURT: Clear Voice can't get its own documents?
10          MR. RAKOWER: Theoretically we could but in the
11  process of this motion when we filed it there wasn't time to
12  get those documents and then review them. So I'm not trying to
13  cast dispersions on defense counsel. My only point is it may
14  be that if we see particular documents that they want to ask
15  questions about we will have no issue but in the event that
16  there is an issue I'm asking for some kind of mechanism to
17  provide.

18          THE COURT: The normal mechanism. Is there a
19  confidentiality order in this case?

20          MR. RAKOWER: There is not.

21          THE COURT: There is not, okay. The normal mechanism
22  and maybe it is what should be used, and I'll hear from Mr.
23  Golden, is if they want to look through those documents and
24  designate because they think they have a justification, certain
25  of them is confidential. Maybe they relate to -- maybe they

18

1   have a social security number in it, all kinds of things, but
2   they should be entitled to do so and then you can protest and
3   bring it to me rather than just being allowed to automatically
4   put it into a summary judgment motion or show it at a
5   deposition. So I think there's some fairness in that.

6          MR. RAKOWER: Your Honor, if I may since I'm wearing
7   two hats here.

8          THE COURT: Yes.

9          MR. LUPKIN: Your Honor, if I may since I'm wearing
10  two hats here.

11         THE COURT: Yes.

12         MR. LUPKIN: Both for the party and also for Seren
13  who's a non party. I think that that makes sense. My
14  suggestion -- it's not my goal to inhibit Mr. Golden from
15  putting in anything he thinks is appropriate in terms of
16  prosecuting or defending the case. I would imagine that with
17  respect to a submission to the court there is a process for
18  sealing certain documents. It's very common and it's discussed
19  at length in the Lugosh case out of the Second Circuit.

20         THE COURT: I'm quite familiar with it. I'm trying to
21  avoid that if necessary. The way to -- Mr. Golden, do you have
22  any basis for objecting to what I just said? I know this makes
23  it more cumbersome for you but given that we don't even know
24  what these are. The normal process is people get to designate
25  things as confidential and then there's a process where you can

19

1  challenge it and they have the burden of showing it's
2  confidential.

3         MR. GOLDEN: I do not object to that.

4         THE COURT: So that's what we should do here. We
5  should use the normal process which means you folks need a
6  confidentiality order. If you can't agree on one I can just
7  issue one on my own. It should allow for one side at any time
8  to designate as long as it's in good faith and a belief they
9  could make an argument under Rule 26(c) documents as
10  confidential and that says that if there's a disagreement by
11  the other side they -- the parties confer. If they can't reach
12  agreement then once side writes me and the burden is of course
13  always on the party that made the designation to justify the
14  level of restriction.

15         So once designated as confidential use only for
16  purpose of litigation and can't be shown to anyone except
17  attorneys and parties involved on the case or deponents or
18  other people -- the normal list, experts and so forth. This
19  can't be the first confidentiality order you folks have been
20  involved in. So let's have a standard order and the defendants
21  or rather Clear Voice will be allowed to designate under that
22  order as long as they agree to be bound by it.

23         MR. RAKOWER: Thank you, Your Honor.

24         THE COURT: I think that takes care of this motion
25  unless there's questions. Should I go onto the February 7th

20

1  letter?

2         MR. RAKOWER: Just for the sake of clarity then.  We

3  are -- we understand that number one, the documents will be

4  treated -- will be used only for this case and number two, we

5  can designate certain documents as confidential.

6         THE COURT: Yes, those go together.  So even if

7  there's no -- even if I overrule the confidentiality

8  designation -- let me think about this.  Now your question is

9  can it be used outside the case.  I don't know.  See how you

10 draft the order, if you want different levels but I don't think

11 I want to decide that right now.  Let the designation process

12 decide that and the confidentiality order work that out.  If

13 you can't I'll figure something out.

14        MR. RAKOWER: I see them as mutually exclusive.  I

15 think I have a good understanding.  Thank you, Your Honor.

16        MR. LUPKIN: I do actually have one point of

17 clarification.  I just want to make sure I understand. If

18 something under this sort of broad concept is designated as

19 confidential it may not be used in any -- not only may not used

20 outside of this litigation but it may only be used in the

21 submission to the court if we reached an understanding that it

22 is no longer confidential.

23        THE COURT: Say it again.

24        MR. LUPKIN: Let me try it again.  In lieu of a

25 sealing procedure which I gather you want to avoid at least at

21

1  this juncture, if something is designated confidential by these
2  Clear Voice records those documents may not be put into a
3  submission. Is that what --
4         THE COURT: Unless I remove that designation.
5         MR. LUPKIN: Yes, that's exactly right.
6         THE COURT: But if you win on that or if he doesn't
7  want to challenge it then we have confidential documents that
8  the protective order will itself tell us what can be done with
9  it and most protective orders say that those documents can't be
10 put into the public record. They have to be sealed and so
11 forth. So, yes.
12        MR. LUPKIN: So I just wanted to make sure that the
13 confidentiality order that you're contemplating does provide
14 for some sort of sealing mechanism.
15        THE COURT: Yes. Assuming that I uphold the
16 confidentiality designation if it's challenged.
17        MR. LUPKIN: Thank you.
18        THE COURT: So I'm ready to go on to the February 7th
19 matters. Hold on one moment.
20               [Pause in proceedings.]
21        THE COURT: I read the letters. Does anyone want to
22 add anything? I guess we would start with Mr. Golden.
23        MR. GOLDEN: I don't have anything to add. I would
24 just with the court's position summarize in two sentences what
25 this is about, that the bank records necessarily include all

22

1  kinds of things that are unrelated to the case and the most
2  important part is unlike our attempt to get financial records
3  from Mr. Egiazaryan. We have provided lots of specific
4  financial records, copies of checks, a few entries in bank
5  statements that are relevant to the case. We have provided
6  those things and the irony is is that it's because we provided
7  those things that Mr. Egiazaryan's counsel knew the identity of
8  the accounts so they could serve the subpoenas on the banks and
9  in particular no request in the normal request for documents
10 was made for the broader collection of financial records that
11 the would obtain in response to the subpoena to the banks.

12          THE COURT: Say that last thing again.

13          MR. GOLDEN: No request -- let me back up. There was
14 a request for what I'll call relevant financial records. In
15 response to that we provided things like checks and deposit
16 references, some money that Mr. Zalmayev has received to do the
17 work that he did, and some checks that he wrote to other people
18 who were helping them. We provided that. That's what
19 identified the bank accounts.

20          Then Mr. Egiazaryan instead of asking us by a request
21 for documents for all of the bank records to which we would
22 have objected they skipped that step and just went right --
23 went right to the bank. So we're in a situation now where the
24 things that have been -- that are relevant have been produced
25 and what's left is much broader irrelevant and in some cases

23

1  inherently confidential information.

2      THE COURT: You know what their argument is going to

3  be given my last ruling?

4      MR. GOLDEN: Yes.

5      THE COURT: I'm not saying there isn't an answer but

6  I'm not sure the answer is we produced the relevant stuff.

7  Shall I tell you what their argument is going to be?

8      MR. GOLDEN: Well, you and I agree. We have the same

9  expectation about what their argument is going to be.

10     THE COURT: Their argument is going to be my guy,

11 Clear Voice, has to produce all its records, you don't trust

12 him to find the LDPR things. Your guys should have to produce

13 all his records, we don't trust him to find the Egiazaryan

14 things.

15     MR. GOLDEN: That is the expectation. That is my

16 expectation also of what they're going to say and the

17 difference is we actually produce some information.

18     THE COURT: Well, you didn't actually give Clear Voice

19 or Seren -- even if you had given them a chance you're not

20 trusting them as to saying there's nothing in there anyway. So

21 the fact that you produced information doesn't seem to me to be

22 all and end all of your argument. Let me hear from them and

23 then you can get your rebuttal. Go ahead.

24     MR. RAKOWER: I'm not going to take time on the record

25 repeating the very same arguments that you made. I'm making

24

1  that argument that it's made but I think that there's an
2  additional consideration here that bears mentioning. This is
3  not in any way casting dispersions on counsel. I assume
4  counsel is acting professionally. But the reality is that the
5  way in which these documents came out was anything but normal.
6  We received a large chunk of documents that was produced.

7          THE COURT: Which was explained in his letter. If
8  there's something wrong with the explanation tell me.

9          MR. RAKOWER: There's nothing with the explanation but
10 the bottom line is that we didn't get an enormous number of
11 these financial related documents until we served the bank
12 records. So putting aside whether Mr. Golden is discharging
13 his duties, I have no reason to believe that he's not, I don't
14 trust that something that may not be self evident to Mr. Golden
15 will be produced because I frankly have doubts about the
16 defendant's reliability.

17          THE COURT: Anything else? I'm sorry.

18          MR. RAKOWER: Not at this time, Judge.

19          THE COURT: I believe this presents a different
20 situation and I'm going to try to explain it. Maybe it will
21 help future disputes. I don't know.

22          First --

23          MR. RAKOWER: I'm sorry, Judge. There is one thing I
24 wanted to mention. I apologize.

25          THE COURT: Sure.

25

1          MR. RAKOWER: The other difference is that Mr.
2   Zalmayev is a party to this case.  In light of the order that
3   you just issued pertaining to non parties, it would seem that
4   the production of these bank records almost flows [inaudible]
5   from the earlier ruling.

6          THE COURT: I'll see if the flow gets stopped or not.
7          First, one distinction between the subpoena to Clear
8   Voice and what is being sought here is the centrality of the
9   issue to the case.  The payments by Ashot to the LDPR are
10  absolutely central.  That's what plaintiff is suing about, one
11  of the two or three things that he's suing about and probably
12  the main thing which is his denial that that occurred and the
13  claim that this defamed him.

14         So that -- discovery on that I'm going to allow much
15  more leeway than I might in other areas that are less central.
16  Here, there's no question that the issue of the defendant's
17  truth -- knowledge of the truth or falsity of the statement
18  which is the actual malice defense is certainly central but the
19  relationship between the defendant and others as a way of
20  proving the defendant's knowledge is sort of an order of
21  removal from that central issue.  I'm not saying it's
22  irrelevant.  I accept the plaintiff's argument that motive,
23  intent can be relevant and for what it's worth I'll cite a
24  Second Circuit case, Celle v. Filipino Reporters, 209 F.3d 163,
25  183 (2d Cir. 2000).

26

1          So they make clear that it's possible in some
2   instances to use motive in conjunction with other evidence they
3   say or as they put it evidence of ill will combined with other
4   circumstantial evidence could go to this question of whether
5   the defendant acted with reckless disregard as to the truth or
6   falsity. But as I say, this is sort of removed from the
7   central issues which are payment and the defendant's knowledge.
8   So that puts a different light on this request.

9          Another -- but I'm not denying the relevance. So --
10  and, in fact, the defendant is offering to produce all the
11  material that's relevant to the question of his relationship
12  with others vis-a-vis his activities in regard to the
13  plaintiff. What we have is the defendant saying we're not
14  trusting the defendant to do this, we want to see the records.
15  The problem is is that sweeps in a whole -- necessarily sweeps
16  in a number of private and irrelevant records. While in some
17  instances I'm willing to let a party look through those,
18  instances where there seems to be unexplained and potentially
19  illegitimate corporate activity, transfers for no value and
20  things like that, there's no evidence of anything like that
21  here. So that casts an entirely different light on the
22  situation.

23         The normal rule in discovery -- think about the old
24  days when the defendant had a correspondence file and we say to
25  the defendant give me all letters to -- that you sent to the

27

1    XYZ Corporation and then the lawyer or somebody document
2    custodian would go through the correspondence file, pull out
3    all the letters to the XYZ Corporation. Well, the plaintiff
4    didn't get the entire correspondence file. There is a certain
5    level of trust in some situations. So that is a paradigm that
6    in some cases applies and some cases doesn't, and in this case
7    I think it does apply and that there's no reason not to use it
8    and if you accumulate some evidence down the road that
9    documents on this question were not produced then by all means
10   bring it to my attention and maybe the paradigm will shift but
11   I guess I'm overruling the defendant's objection that there's
12   no relevance to this information. So they are obligated to
13   produce it. Their answer is they produced it all and I'm
14   prepared to leave it at that until I get evidence that they in
15   fact didn't do what I'm now directing them to do if they
16   haven't already done it.

17            I don't know if it's going to matter for purposes of
18   some disputes I see floating in later letters but whether a
19   party received payment for attorney's fees I don't see any
20   reason why that's going to be relevant. The rule as far as I
21   understand it is that the attorney's -- the right to attorney's
22   fees belongs to a client, that they're entitled to receive it
23   even if an attorney was appearing pro bono on their behalf or
24   someone else was funding their attorney's fees or there was a
25   contingency arrangement. That's been the rule for statutory

28

1 attorney's fees for thirty years. So if they're entitled to

2 attorney's fees or damages they just get those attorney's fees

3 and while you're certainly entitled to know what they paid

4 their lawyer as attorney's fees if someone was advancing them

5 payments for that I don't see how that's going to be relevant

6 down the road.

7           THE COURT: Go ahead.

8           MR. LIPKIN: Since that application has not yet been

9 fully briefed --

10          THE COURT: It seemed like it was mentioned in this

11 one. Did I imagine that?

12          MR. LIPKIN: It was mentioned but it was a reference

13 to it in a later application where it's really sort of

14 distilled and presented further.

15          My point is really two-fold. I understand what

16 you're saying, Judge, about the identity of who's paying for it

17 for the purposes of damages. I don't necessarily agree with it

18 but I understand it. It does not change the fact that the

19 identity of who is paying Mr. Zalmayev's lawyers is relevant to

20 the first issue that we were just talking about, and that is --

21          THE COURT: Correct. I didn't mean to say otherwise.

22 I was thinking, specifically thinking about whether it was

23 relevant to the attorney's fees argument. It may be relevant

24 to this other point. I didn't intend to speak to that.

25          MR. LIPKIN: Okay. I wanted to just clarify that and

                                                                      29

 1  to the extent that Your Honor is ruling, I don't know whether

 2  you are or you're not, on the -- our entitlement to get

 3  redacted invoices from Mr. Golden --

 4          THE COURT: I wasn't really intending to rule on that

 5  although I kind of started talking about it but maybe it will

 6  forestall something. Can we perhaps deal it out now? What is

 7  it you want, invoices that Mr. Golden is charging the client

 8  for purposes of seeing what their attorney's fees claim is

 9  against you.

10          MR. LIPKIN: Whoever -- well, it's Mr. Golden and his

11  local counsel, Mr. Ryan, or whoever else they're going to be

12  claiming attorney's fees for.

13          THE COURT: Do you have a problem -- are you going to

14  have a problem with that?

15          MR. GOLDEN: Yes, for two reasons. Of course most of

16  the overwhelming content of the bills is privileged because it

17  shows exactly --

18          THE COURT: As to what you were doing for them.

19          MR. GOLDEN: What I did. The second --

20          THE COURT: Do you want that contents?

21          MR. LIPKIN: Not at this time, Judge.

22          THE COURT: So the --

23          MR. GOLDEN: The second is the other reason it's being

24  requested is to find out the identity if it's somebody other

25  than Mr. Zalmayev who's paying the bills and I think that Your

30

1   Honor just gave us your view that that part is not relevant.

2         THE COURT: Well, it's not relevant for the attorney's

3   fees claim but it may be relevant for the motive ill will

4   issue.  So I guess I'm a little confused.  Are you not sending

5   the bills to Zalmayev?  Is that the problem, or don't you want

6   to answer that question?

7         MR. GOLDEN: I prefer not to answer that question now

8   although I have a way -- I have a suggestion that I'll talk to

9   Mr. Lupkin about in light of Your Honor's comments where we

10  might be able to get to the central issue -- the central point

11  that is important to him without going into --

12         THE COURT: He needs to know how much is being paid.

13         MR. GOLDEN: That I have done.  I'm a month or two

14  behind --

15         THE COURT: For the damages thing.

16         MR. GOLDEN: Of course I'll update that.

17         THE COURT: And to the extent someone is advancing

18  money to your client for this case it has some relevance to

19  this ill will problem.  So you need to deal with that.

20         MR. GOLDEN: Yes, I understand.

21         MR. LUPKIN: Your Honor, it is true that Mr. Golden

22  has provided me in an email with the total amounts that were

23  billed as of -- I believe the last time he gave it to me was

24  December.  I believe I'm entitled to the actual evidence of

25  what it is that he rendered by way of invoices in a redacted

31

1   form. The bill, no description, the hours.

2        THE COURT: What is it you didn't get that you want?

3        MR. LUPKIN: All I received was an email from Mr.

4   Golden saying --

5        THE COURT: You want to see the bill redacted with --

6   you want to see the hours and the dates?

7        MR. LUPKIN: I want to see the hours, the dates, the

8   total, the expenses, and I want to -- and on this other issue

9   of ill will I want to see the source, who is paying for this.

10       THE COURT: One thing at a time. So I'm just thinking

11  about what we require. It seems to me you should be giving

12  what one would normally give in an attorney's fees application,

13  statutory attorney's fee application, which would include

14  normally the dates and the hours and usually some description

15  which -- I have no problem with your altering but you have to -

16  - at some point a description will have to be provided briefing

17  on summary judgment motion, letter to the court, something like

18  that. I'm not saying that you need to do that now. If the

19  descriptions are revealing things they shouldn't, I don't have

20  a problem with your redacting it but the dates an the hours for

21  right now it seems to me would have to come out.

22       MR. GOLDEN: The dates and the hours can be provided.

23  That's a request that wasn't made before.

24       THE COURT: Let's not worry about what was made.

25       MR. GOLDEN: But with regard to Your Honor's question,

32

1   in attorney's fees cases that I've handled both seeking

2   attorney's fees and opposing them, the overwhelming custom is

3   at that point in the case the case is over, at least the trial

4   is over and normally the entire bills are provided.

5           THE COURT: Right.

6           MR. GOLDEN: Because identification of what witness

7   was being discussed, prepared, researched, it doesn't matter,

8   it doesn't matter at that point. During the case that matters

9   a lot.

10          THE COURT: Okay. I see the difference and I guess as

11   long as you're going to get them eventually. When you get them

12   may not matter so much. I don't know. I have a feeling that a

13   jury is not going to decide this issue because there is special

14   case law about damages claims for attorney's fees which says

15   that a judge is supposed to decide that. I'm pretty sure

16   that's out there unlike the normal claim for damages which have

17   to be brought before a jury. In fact, I feel like I may have

18   written on this once but I'm sure you can find the case law

19   yourself. So you'll be entitled to it at some point and we'll

20   figure out a way.

21          That was my agenda, I think. Let me just make sure.

22   Do we need to talk about when you're going to ask to lift the

23   designation on the asylum piece? I want to get things going a

24   little bit because I'm going to be a little bit unavailable for

25   parts of March.

33

1      MR. GOLDEN: I think we can get that in -- I'm away
2  next week but at the end of the following week I think we can
3  do that.

4      THE COURT: You two work out a schedule.  The sooner
5  things happen the better.

6      MR. LUPKIN:  With respect to -- since we started on
7  the subject, it seems to me that if there's some sort of way in
8  which we can reach a resolution about the source of payments
9  now --

10     THE COURT: So what's the position on the source of
11 payments?  Again, this is not for purposes of the attorney's
12 fees claim but for purposes of their ill will malice claim
13 which I've said is relevant.  So if someone is giving money to
14 your client for this litigation talk about whether -- why that
15 would not be relevant or you can say anything that might be
16 relevant.  I don't know.  Or do you want to think about it?

17     MR. GOLDEN: I'd like to think about it.  Your Honor
18 suggested that it might be relevant and what I'd like to do
19 because there are other people that I need to talk to about how
20 to do this, I would like to talk to them before directly
21 answering Your Honor's question and most particularly I also
22 want to talk to Mr. Lupkin about whether he'll be satisfied if
23 we tell him who it's not without telling him who it is or
24 whether he wants to know who it is because that means I have to
25 have more conversations.

34

1          THE COURT: I have a feeling I know the answer to the

2     question.

3          MR. LUPKIN: Judge, I didn't even have to be here

4     today.   You're making all of my arguments.

5          THE COURT: I think he wants to know who it is.

6          MR. LUPKIN: Right.

7          MR. GOLDEN: In that case I just have to talk to other

8     people and --

9          THE COURT: If you can't work it out then you know

10    what to do.  Send me a letter.

11         MR. GOLDEN: Thank you.

12         THE COURT: You folks can exit and my clerk will lock

13    up.

14                         *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

35

1     I certify that the foregoing is a court transcript from an

2   electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5

6                                     Shari Riemer

7   Dated:   February 24, 2012

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT "F"

TO COFIDOM-GESTMAN Sàrl
And Gestman S.A.

I, the undersigned, **Suren EGIAZARIYAN**, in my capacity as sole beneficial owner, hereby confirm my request to proceed to the following transfers in favour of Dikama Holding S.A. :

- GBP 100.000,- from Silver Oak Wimbledon
- GBP 60.000,- from Silver Oak Milton
- GBP 300.000,- from Brightmoor
- GBP 40.000,- from Silver Oak Edinburgh.

and further transfer from Dikama Holding S.A. the total amount of GBP 500.000,- to my bank account.

Date : august 10, 2008

**Suren EGIAZARIYAN**

# EXHIBIT "G"

I, the undersigned, Suren I-CHAZARYAN, residing at 655 Endrino Pl., Beverly Hills CA 90210, owner of the company DIKAMA HOLDING S.A., Société anonyme with registered office in Luxembourg L-1118 Luxembourg, Rue Aldringen 23 registered with RCS Luxembourg under number B 69767 (hereinafter the "Company").

In connection with the repayment of the Company's debt owed to Broadhouse Finance Ltd (BC Nº 410 231) of P.O. Box 3175 - Road Town - Tortola, British Virgin Islands (a company of which I am the ultimate beneficial owner, in the amount of GBP 8,724,214,92 (Eight million seven hundred twenty four thousand two hundred fourteen Pounds Sterling 92/100) (the « Debt »),

DOES HEREBY instruct the Board of Directors of the Company to make the repayment of the Debt in full directly to the bank account of the following entity fully controlled by me:

Name of Account: Clear Voice Inc.

Address: 3225 Meleod Dr. Ste 100, Las Vegas, NV 89121-2257

Name of Bank: Wells Fargo

Account Number: 7733839414

Address: 420 Montgomery, San Francisco, CA 94104

Swift Code: WFB1US6S

I acknowledge that I only am responsible for the analysis of the reporting requirements in terms of declarations made to the taxation authorities in my country of residence and for all jurisdictions in general, with regard to this payment order.

I hereby certify to be fully compliant with these reporting requirements.

I further confirm that the funds brought into the above named entity will never be used directly or indirectly for any unlawful activities, or for the purpose of supporting any activities which might fall under the criminal laws of my country of residence or of any other concerned country.

I hereby discharge and agree to indemnify the Directors of the Company in respect of any loss claim damage costs arising out of or in connection with my payment direction as described above.

I, the undersigned, [illegible] E[illegible]ARY[illegible], [illegible] holding [illegible] Ludwig [illegible] the sole owner of the company [illegible] LTD. [illegible] registered under number [illegible] the [illegible] Berkeley Street, London W1[illegible] ("the Company").

In connection with the [illegible] of the Company [illegible] to [illegible] company incorporated under the laws of the United States [illegible] McLeod Dr. Ste. [illegible] Las Vegas [illegible] 89121 [illegible] (GBP [illegible]) [illegible] one hundred forty-six thousand [illegible] hundred fifty [illegible] pounds [illegible] British [illegible].

DO HEREBY instruct the Director of the Company to [illegible] in full to the following bank account:

Name of Account: [illegible]

Address: [illegible] McLeod Dr. [illegible] Las Vegas, NV 89121-2257

Name of Bank: Wells Fargo

Account Number: [illegible]

Address: 420 Montgomery, San Francisco, CA 94104

Swift Code: [illegible]

I acknowledge that I [illegible] of the reporting requirements in terms of [illegible] in my country of residence and for all [illegible] payment order.

I hereby certify that I [illegible] with these reporting requirements.

I further confirm that the funds [illegible] into the above named account will not be used directly or indirectly for any [illegible] activities or for the purposes of [illegible] any action that would [illegible] the laws of my country of residence or of any other [illegible].

I hereby discharge and agree to indemnify the Director and officers of the Company in respect of any claim [illegible] arising out of or in connection with any payment [illegible] above.

[illegible] E[illegible]ARYAN

The undersigned, Suren EGIAZARYAN, residing at 655 Ledena St., Jan City ____
owner of the company DIKAMA HOLDING S.A., located in ____ Luxembourg, ____
Luxembourg L-1118 Luxembourg, Rue Aldringen 23 registered ____
under number B 69767 (hereinafter the " ____ "

connection with the repayment of the Company's debt ____ of P.O. Box 3175 - Road Town - Tortola, British Virgin Islands ____
company of which I am the ultimate beneficial owner, in the amount of USD 8,724,726.97 ____
million seven hundred twenty-four thousand two hundred fourteen ____
(the "Debt");

DOES HEREBY instruct the Board of Directors of the Company to transfer or pay ____
the Debt in full directly to the bank account of the following entity fully concerned by said

Name of Account: Clear Voice Inc.

Address: 3225 Meland Dr, Ste 100, Las Vegas, NV 89124-2217

Name of Bank: Wells Fargo

Account Number: 7733839414

Address: 420 Montgomery, San Francisco, CA 94104

Swift Code: WFBIUS6S

I acknowledge that I only am responsible for the analysis of the reporting requirements in ____
terms of declarations made to the taxation authorities in my country of residence and for all ____
jurisdictions in general, with regard to this payment order.

I hereby certify to be fully compliant with these reporting requirements.

I further confirm that the funds brought into the above named entity will never be used ____
directly or indirectly for any unlawful activities, or for the purpose of supporting any activities ____
which might fall under the criminal laws of my country of residence or of any other ____
concerned country.

I hereby discharge and agree to indemnify the Directors of the Company in respect of any ____
and all claim, damage, costs arising out of or in connection with my payment direction as ____
mentioned above

Suren EGIAZARYAN

The undersigned, Suren KHACHATRYAN, residing at 9555 Cashino Pl, Beverly Hills CA 90210, owner of the company BRIGHTMOON PROPERTIES LTD, an Isle of Man company registered under number 82621, with registered office at 9 Hope Street, Douglas, Isle of Man, IM1 1AQ, (hereinafter the "Company").

In connection with the repayment of the Company's debt owed to me pursuant to the Loan Agreement dated of 22 July 2011, in the amount of GBP 1,600,000. (One million six hundred thousand Pounds Sterling) (the "Debt").

DOES HEREBY instruct the Director of the Company to make the repayment of the Debt in full directly to the bank account of the following entity fully controlled by me:

Name of Account: Clear Voice Inc.

Address: 3225 Mcleod Dr, Ste 100, Las Vegas, NV 89121-2257

Name of Bank: Wells Fargo

Account Number: 7733839414

Address: 420 Montgomery, San Francisco, CA 94104

Swift Code: WFBIUS6S

I acknowledge that I only am responsible for the analysis of the reporting requirements in terms of declarations made to the taxation authorities in any country of residence and for all jurisdictions in general, with regard to this payment order.

I hereby certify to be fully compliant with those reporting requirements.

I further confirm that the funds brought into the above named entity will never be used directly or indirectly for any unlawful activities, or for the purpose of supporting any activities which might fall under the criminal laws of my country of residence or of any other concerned country.

I hereby discharge and agree to indemnify the Director and officers of the Company in respect of any loss claim damage costs arising out of or in connection with my payment direction as described above.

# EXHIBIT "H"

# Expanded Business Services® Package

Account number: **7733839414** ■ October 1, 2009 - October 31, 2009 ■ Page 1 of 3



**WELLS FARGO**

CLEAR VOICE, INC
3225 MCLEOD DR STE 100
LAS VEGAS NV 89121-2257

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
**1-800-CALL-WELLS** (1-800-225-5935)
*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (825)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

Discover Wells Fargo's online educational resources, including audio and video content, newsletters and articles that provide information, strategies and actionable tips to help your business navigate today's challenging environment. To find out more visit wellsfago.com/biz/education.

## Account options

*A check mark in the box indicates you have these convenient services with your account. Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ☐ |
| Rewards for Business Check Card | ☑ |
| Online Statements | ☐ |
| Business Bill Pay | ☐ |
| Business Spending Report | ☐ |
| Overdraft Protection | ☑ |

## Activity summary

| | |
|---|---|
| Beginning balance on 10/1 | $414,436.39 |
| Deposits/Credits | 4,999,950.00 |
| Withdrawals/Debits | - 2,178,333.67 |
| **Ending balance on 10/31** | **$3,236,052.72** |
| Average ledger balance this period | $2,391,286.31 |

Account number: **7733839414**

**CLEAR VOICE, INC**

*Nevada account terms and conditions apply*

For Direct Deposit and Automatic Payments use
Routing Number (RTN): 321270742

For Wire Transfers use
Routing Number (RTN): 121000248

### Overdraft Protection

Your account is linked to the following for Overdraft Protection:
■ Savings - 000003013040070

## Wells Fargo Rewards for Business Check Card

| | |
|---|---|
| Total points available as of 10/29/2009 | 2,792 |
| Points earned in the month of September | 0 |
| Points redeemed in the month of September | 0 |

*Get your most current point balance and redeem rewards at WellsFargoRewards.com or coll 1-888-246-1834.*





## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 10/6 | 1233 | Check | | 200,000.00 | 214,436.39 |
| 10/7 | 1235 | Check | | 830.00 | 213,606.39 |
| 10/14 | | WT Fed#03895 Banque Scs Allianc /Org=1/Mogford Impex Corporation Srf# S069286098E701 Trn#091014001771 Rfb# | 4,999,950.00 | | |
| 10/14 | 1242 | Check | | 3,100.00 | 5,210,456.39 |
| 10/15 | 1236 | Check | | 1,983.44 | |
| 10/15 | 1240 | Check | | 3,793.37 | 5,204,679.58 |
| 10/16 | 1243 | Check | | 512.00 | 5,204,167.58 |
| 10/19 | 1237 | Check | | 115.86 | |
| 10/19 | 1238 | Check | | 55.13 | |
| 10/19 | 1241 | Check | | 1,552.70 | |
| 10/19 | 1245 | Check | | 960,000.00 | 4,242,443.89 |
| 10/21 | 1246 | Check | | 961,000.00 | 3,281,443.89 |
| 10/26 | 1247 | Check | | 40,000.00 | 3,241,443.89 |
| 10/28 | 1307 | Check | | 4,223.17 | 3,237,220.72 |
| 10/29 | 1250 | Check | | 254.00 | |
| 10/29 | 1302 | Check | | 348.00 | |
| 10/29 | 1303 | Check | | 204.00 | |
| 10/29 | 1305 | Check | | 362.00 | 3,236,052.72 |
| **Ending balance on 10/31** | | | | | **3,236,052.72** |
| **Totals** | | | **$4,999,950.00** | **$2,178,333.67** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

**Summary of checks written** *(checks listed are also displayed in the preceding Transaction history)*

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|------|------|------|------|------|------|------|------|------|
| 1233 | 10/6 | 200,000.00 | 1241 | 10/19 | 1,552.70 | 1250 * | 10/29 | 254.00 |
| 1235 * | 10/7 | 830.00 | 1242 | 10/14 | 3,100.00 | 1302 * | 10/29 | 348.00 |
| 1236 | 10/15 | 1,983.44 | 1243 | 10/16 | 512.00 | 1303 | 10/29 | 204.00 |
| 1237 | 10/19 | 115.86 | 1245 * | 10/19 | 960,000.00 | 1305 * | 10/29 | 362.00 |
| 1238 | 10/19 | 55.13 | 1246 | 10/21 | 961,000.00 | 1307 * | 10/28 | 4,223.17 |
| 1240 * | 10/15 | 3,793.37 | 1247 | 10/26 | 40,000.00 | | | |

\* *Gap in check sequence.*

Help our environment! Turn off paper statements and go online.

If 20% of U.S. businesses & households switched to online statements & e-bills only, over 1.8 million trees would be saved each year. It's easy to change your statement preferences. Simply sign on to Wells Fargo Business Online at wellsfargo.com/biz, go to Account Services, select Change Delivery Options, and select Online Only.

# EXHIBIT "I"

# Business High Yield Savings

Account number: **3013040070** ■ May 1, 2010 - May 31, 2010 ■ Page 1 of 3


WELLS
FARGO

CLEAR VOICE, INC
655 ENDRINO PL
BEVERLY HILLS CA 90210-1919

## Questions?

Available by phone 24 hours a day, 7 days a week:
**1-800-CALL-WELLS** (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (825)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

As our way of saying thank you to our business customers, Wells Fargo is extending our best money-saving offers on many of our business products and services during the months of May and June. Stop by any Wells Fargo banking location during May and June for details. Or visit us online at wellsfargo.com/biz/sbw.

Wells Fargo is an Equal Housing Lender.

## Activity summary

| | |
|---|---|
| Beginning balance on 5/1 | $100,388.42 |
| Deposits/Credits | 29.84 |
| Withdrawals/Debits | - 0.00 |
| **Ending balance on 5/31** | **$100,418.26** |
| Average ledger balance this period | $100,388.42 |

Account number: **3013040070**

**CLEAR VOICE, INC**

*Nevada account terms and conditions apply*

For Direct Deposit and Automatic Payments use
Routing Number (RTN): 321270742

For Wire Transfers use
Routing Number (RTN): 121000248

## Interest summary

| | |
|---|---|
| Interest paid this statement | $29.84 |
| Average collected balance | $100,388.42 |
| Annual percentage yield earned | 0.35% |
| Interest earned this statement period | $29.84 |
| Interest paid this year | $160.95 |



.ccount number: **3013040070** ■ May 1, 2010 - May 31, 2010 ■ Page 2 of 3



**WELLS FARGO**

## Transaction history

| Date | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|-------------|-------------------|---------------------|----------------------|
| 5/28 | Interest Payment | 29.84 | | 100,418.26 |
| Ending balance on 5/31 | | | | 100,418.26 |
| **Totals** | | **$29.84** | **$0.00** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

Help our environment! Turn off paper statements and go online.

If 20% of U.S. businesses & households switched to online statements & e-bills only, over 1.8 million trees would be saved each year. It's easy to change your statement preferences. Simply sign on to Wells Fargo Business Online at wellsfargo.com/biz, go to Account Services, select Change Delivery Options, and select Online Only.

# EXHIBIT "J"



**Bank of America**

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

Page 1 of 9
Statement Period
06/01/07 through 06/30/07
E0   P PE   0E 45                    0030561
Enclosures 4
Account Number   0049 6484 4955

00004176 02 AT   0.459 23   · 30336 001 SCM999 I12
CLEAR VOICE, INC
3225 S MCLEOD DR
LAS VEGAS NV 89121-2257

Our free Online Banking service allows you to check balances, track account activity, pay bills and more.
With Online Banking you can also view up to 18 months of this statement online.
Enroll at www.bankofamerica.com/smallbusiness.

**Customer Service Information**
**www.bankofamerica.com**

For additional information or service, you may call:
1-888-BUSINESS (1-888-287-4637)

Or you may write to:
Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

## Important information regarding your debit card transactions

Effective 8/10/07, when we approve a request from a merchant to authorize a debit card transaction from your account, we may reduce the available balance in your account by the amount requested by the merchant. Your remaining available balance must be sufficient to cover checks, debits and other items that post to your account, or you may incur overdraft or returned item fees. This amends your debit card agreement with us. Questions: please call the number on your statement.

Not currently processing credit cards with Bank of America? Switch your Merchant Card Processing and save. We will Meet or Beat your current price or pay you $50. Visit www.bankofamerica.com/merchantservices to learn more and to obtain a customized solution for your business needs or call 1.800.955.8488 and reference offer code #157.

CLEAR VOICE, INC

Page 2 of 9
Statement Period
06/01/07 through 06/30/07
E0  P PE  0E 45
Enclosures 4
Account Number  0049 6484 4955

## Deposit Accounts

## Business Economy Checking

CLEAR VOICE, INC

### Your Account at a Glance

| | | | |
|---|---|---|---|
| Account Number | 0049 6484 4955 | Statement Beginning Balance | $21,646.40 |
| Statement Period | 06/01/07 through 06/30/07 | Amount of Deposits/Credits | $20,000.00 |
| Number of Deposits/Credits | 1 | Amount of Withdrawals/Debits | $17,260.16 |
| Number of Withdrawals/Debits | 32 | Statement Ending Balance | $24,386.24 |
| Number of Deposited Items | 1 | | |
| | | Average Ledger Balance | $19,420.48 |
| Number of Days in Cycle | 30 | Service Charge | $3.00 |

### Deposits and Credits

| Date Posted | Amount ($) Description | Bank Reference |
|---|---|---|
| 06/22 | 20,000.00 Deposit | 813005660956254 |

### Withdrawals and Debits
#### Checks

| Check Number | Amount ($) | Date Posted | Bank Reference | Check Number | Amount ($) | Date Posted | Bank Reference |
|---|---|---|---|---|---|---|---|
| 1716 | 300.00 | 06/01 | 813005092034254 | 1769 | 5,372.00 | 06/22 | 813001492259438 |
| 1752* | 500.00 | 06/01 | 813005092034253 | 1770 | 600.00 | 06/25 | 813004592096744 |
| 1754* | 300.00 | 06/01 | 813002250646684 | 1771 | 820.00 | 06/19 | 813004992360799 |
| 1757* | 255.43 | 06/04 | 813000492602308 | 1772 | 55.00 | 06/21 | 813005092135034 |
| 1758 | 900.83 | 06/01 | 813002250643670 | 1773 | 384.52 | 06/27 | 813000392614421 |
| 1759 | 178.49 | 06/01 | 813002250649746 | 1775* | 1,000.00 | 06/25 | 813004592454545 |
| 1760 | 306.00 | 06/05 | 813002350113546 | 1776 | 1,577.37 | 06/29 | 813000992060726 |
| 1763* | 280.50 | 06/05 | 813004592220451 | 1778* | 341.91 | 06/28 | 813004692478894 |
| 1766* | 310.43 | 06/06 | 813000392662182 | 1780* | 297.40 | 06/28 | 813004692495568 |
| 1767 | 2,729.65 | 06/06 | 813000292478465 | 1781 | 104.78 | 06/28 | 813004692511831 |
| 1768 | 71.00 | 06/18 | 813004892829221 | | | | |

* Gap in sequential check numbers.

### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 06/29 | 3.00 | Check Enclosure Fee | |
| Card Account # 4635 8900 0117 3425: | | | |
| 06/11 | 201.95 | JC 76        06/10 #000003548 Withdrwl | 917806100003548 |
| 06/11 | 2.00 | JC 76        06/10 #000003548 Withdrwl | 917806100003548 |
| 06/18 | 33.61 | Sunset Oil & M  06/17 #000171721 Purchase | 917806170171721 |
| 06/18 | 69.28 | CheckCard  0614 Jon'S Beauty | 917406140158677 |
| 06/21 | 58.32 | Exxonmobil POS  06/21 #000363319 Purchase | 917806210363319 |
| 06/25 | 122.25 | Beverly Hills  06/24 #000000053 Withdrwl | 917806240000053 |

**Bank of America**

CLEAR VOICE, INC

Page 3 of 9
Statement Period
06/01/07 through 06/30/07
EO  P PE  0E 45                    0030563
Enclosures 4
Account Number  0049 6484 4955

## Withdrawals and Debits - Continued
### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 06/25 | 2.00 | Beverly Hills    06/24 #000000053 Withdrwl | 917806240000053 |
| 06/27 | 16.99 | CheckCard  0625 Madison Hand Car Wash | 917406250131258 |
| 06/27 | 60.00 | CheckCard  0625 Russian Universal Servi | 917406250280977 |
| 06/29 | 5.45 | 096351           06/29 #000265817 Purchase | 917806290265817 |
| **Subtotal** | **571.85** | | |

## Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 06/01 | 19,467.08 | 06/18 | 15,207.23 | 06/27 | 26,716.15 |
| 06/04 | 19,211.65 | 06/19 | 14,387.23 | 06/28 | 25,972.06 |
| 06/05 | 18,625.15 | 06/21 | 14,273.91 | 06/29 | 24,386.24 |
| 06/06 | 15,585.07 | 06/22 | 28,901.91 | | |
| 06/11 | 15,381.12 | 06/25 | 27,177.66 | | |

## How To Balance Your Bank of America Account

**FIRST, start with your Account Register/Checkbook:**

1. List your Account Register/Checkbook Balance here ........................................................................... $ _____

2. Subtract any service charges or other deductions not previously recorded that are listed on this statement ........................ $ _____

3. Add any credits not previously recorded that are listed on this statement (for example interest) ................................... $ _____

4. This is your NEW ACCOUNT REGISTER BALANCE ...................................................................................... $ _____

**NOW, with your Account Statement:**

1. List your Statement Ending Balance here ................................................................................................... $ _____

2. Add any deposits not shown on this statement ........................................................................................... $ _____

_____

_____

SUBTOTAL .............................. $ _____

3. List and total all outstanding checks, ATM, Check Card and other electronic withdrawals

| Checks, ATM, Check Card, Electronic Withdrawals | | Checks, ATM, Check Card, Electronic Withdrawals | | Checks, ATM, Check Card, Electronic Withdrawals | |
|---|---|---|---|---|---|
| Date/Check # | Amount | Date/Check # | Amount | Date/Check # | Amount |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

4. TOTAL OF OUTSTANDING CHECKS, ATM, Check Card and other electronic withdrawals ............................... $ _____

5. Subtract total outstanding checks, ATM, Check Card and other electronic withdrawals from Subtotal
   This Balance should match your new Account Register Balance ................................................................. $ _____

Upon receipt of your statement, differences, if any, should be reported to the bank promptly in writing and in accordance with provisions in your deposit agreement.

### IMPORTANT INFORMATION FOR BANK DEPOSIT ACCOUNTS

**Change of Address.** Please call us at the telephone number listed on the front of this statement to tell us about a change of address.

**Deposit Agreement.** When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule, which contain the current version of the terms and conditions of your account relationship, may be obtained at our banking centers.

**Electronic Transfers: In case of errors or questions about your electronic transfers**
If you think your statement or receipt is wrong or if you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

* Tell us your name and account number.
* Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
* Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calender days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

**Reporting Other Problems.** You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or unauthorized transactions within the time periods specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree not to make a claim against us for the problems or unauthorized transactions.

**Direct Deposits.** If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled.

Bank of America, N.A. Member FDIC and  Equal Housing Lender

Bank of America

0030565

## Check Image

Account Number: 0049 6484 4955

f. No: 813005092034254 Amount: 300.00

f. No: 813005092034253 Amount: 500.00

f. No: 813002250646684 Amount: 300.00

f. No: 813000492602308 Amount: 255.43

f. No: 813002250643670 Amount: 900.83

Check Image Continues on Next Page

Recycled Paper

## Check Image - Continued

Account Number: 0049 6484 4955



Ref. No: 813002250649746   Amount: 178.49





Ref. No: 813002350113546   Amount: 306.00





Ref. No: 813004592220451   Amount: 280.50





Ref. No: 813000392662182   Amount: 310.43





Ref. No: 813000292478465   Amount: 2,729.65



Check Image Continues on Next Page

Bank of America

0030567

## Check Image - Continued

Account Number: 0049 6484 4955

No: 813004892829221 Amount: 71.00

No: 813001492259438 Amount: 5,372.00

No: 813004592096744 Amount: 600.00

No: 813004992360799 Amount: 820.00

No: 813005092135034 Amount: 55.00

Check Image Continues on Next Page

Recycled Paper

## Check Image - Continued

**Account Number: 0049 6484 4955**



Ref. No: 813000392614421   Amount: 384.52



Ref. No: 813004592454545   Amount: 1,000.00



Ref. No: 813000992060726   Amount: 1,577.37



Ref. No: 813004692478894   Amount: 341.91



Ref. No: 813004692495568   Amount: 297.40

**Check Image Continues on Next Page**

**Bank of America**

H

0030569

## Check Image - Continued

:count Number: 0049 6484 4955





f. No: 813004692511831   Amount: 104.78

END OF CHECK IMAGE

# EXHIBIT "K"

100528  300  001217899  C  1
MERRILL LYNCH. PIERCE.
FENNER & SMITH INCORPORATED
900 WEST TRADE STREET
NC1-026-05-01
CHARLOTTE, NC 28255

Account Number: W91-142395



**Merrill Lynch**
**Wealth Management**

CLEAR VOICE INC
3225 MCLEOD DR STE 100
LAS VEGAS NV 89121

FINANCIAL ADVISOR
MARK GRUENINGER
RR#: 2DB

FOR QUESTIONS OR UP-TO-DATE ACCOUNT INFORMATION:
Financial Advisor         310 785 6060
Call Center               800 822 2222

Investment products provided by Merrill Lynch, Pierce, Fenner & Smith Inc.

| ARE NOT FDIC INSURED | MAY LOSE VALUE | ARE NOT BANK GUARANTEED |
|---|---|---|

Merrill Lynch, Pierce, Fenner & Smith Incorporated is a registered broker-dealer,
member of FINRA and SIPC and a wholly owned subsidiary of Bank of America.

**Statement Date: 12/01/09 to 05/31/10**

# SNAPSHOT

TOTAL PORTFOLIO
## $42.56

| PORTFOLIO VALUE | This Period | Prior Period |
|---|---|---|
| Cash and Cash Equivalents | $42.56 | $0.00 |
| TOTAL PORTFOLIO VALUE | $42.56 | $0.00 |

Portfolio Value
(in dollars)



■ September 2009   ▓ March 2010
▓ December 2009   ■ This Period

A portfolio value less than $100.00 may not be displayed.

| ACCOUNT ACTIVITY | This Period | Year-To-Date |
|---|---|---|
| Net Core Fund Activity | ($42.56) | ($42.56) |
| Net Miscellaneous Activity | $42.56 | $42.56 |

**LEGEND**
() Numbers in parenthesis
are debits or subtractions
NFS - National Financial
Services LLC

Account carried with National Financial Services LLC, Member NYSE, SIPC

**Account Number: W91-142395**
**Account Name: &CLEAR VOI**

**Statement Date:   12/01/2009 to 05/31/2010**



# SUMMARY

| PORTFOLIO VALUE | This Period | Prior Period |
|---|---|---|
| Cash and Cash Equivalents | | |
| Money Markets | $42.56 | $0.00 |
| **TOTAL PORTFOLIO VALUE** | **$42.56** | **$0.00** |

| ACCOUNT ACTIVITY | This Period | Year-To-Date |
|---|---|---|
| BEGINNING BALANCE | $0.00 | |
| Core Fund Activity | | |
| Core Funds Purchased | ( $42.56) | ( $42.56) |
| NET CORE FUND ACTIVITY | ( $42.56) | ( $42.56) |
| NET MISCELLANEOUS ACTIVITY | $42.56 | $42.56 |
| ENDING BALANCE | $0.00 | |

# DETAIL

## PORTFOLIO VALUE

NFS-provided estimated cost basis (including cost basis and short sale proceeds information provided to NFS by customers), realized gain and loss, and holding period information may not reflect all adjustments necessary for tax reporting purposes. Taxpayers should verify such information against their own records when calculating reportable gain or loss resulting from a sale, redemption, or exchange. NFS does not report such information to the IRS or other taxing authorities and is not responsible for the accuracy of such information taxpayers may be required to report to federal, state, and other taxing authorities. NFS makes no warranties with respect to, and specifically disclaims any liability arising out of a customer's use of, or any tax position taken in reliance upon, such information. Unless otherwise specified, NFS determines cost basis at the time of sale based on the average cost-single category (ACSC) method for open-end mutual funds and based on the first-in, first-out (FIFO) method for all other securities.

Amortization, accretion and similar adjustments to cost basis have been provided for many fixed income securities (and some bond-like equities); however, they are not provided for certain types, such as short-term instruments, Unit Investment Trusts, foreign fixed income securities, or those that are subject to early prepayment of principal (pay downs). Where current year premium or acquisition premium amortization is provided, the prior years' cumulative amortization is reflected in the adjusted cost basis, but we cannot provide a breakdown or the total of such prior amortization amounts.

LIMITATION ON COST BASIS INFORMATION: NFS's cost basis information system has a cumulative lifetime limit on how much activity it can track for each individual security position in an account. For this purpose, each buy, sell, dividend, wash sale disallowed loss, stock split, stock merger, etc, is an event. For some customers, this limit can be reached with approximately 1500 events. Upon reaching the limit, the system no longer displays or tracks cost basis information for the affected position, and such information will usually show as not available or unknown. Once the limit is reached, all cost basis information for the affected position will need to be tracked and updated by you, the investor.

Mutual Funds, Annuities, and other investment products are not insured by the FDIC or any other government agency, are not deposits or obligations of, or guaranteed by, Merrill Lynch or any affiliate, and are subject to investment risks, including possible loss of principal invested.

See last page for important information about your brokerage account and this statement.

Account carried with National Financial Services LLC, Member NYSE, SIPC





**Merrill Lynch**
**Wealth Management**

Bank of America Corporation

August 2, 2010

**Here is your account number:**
Existing account number ending in - 2395
New account number - 2S1-02031

\*\*\*\*\*\*\*\*\*\*\*\*AUTO\*\*3-DIGIT 891
0158-FS 0158-FS 775048 155268 II M02



CLEAR VOICE INC
3225 MCLEOD DR
STE 100
LAS VEGAS, NV 89121-2257
Hulhluullublulllubluhlblhluulubldlulllul

We are writing to you today to make you aware of changes and new features of your brokerage relationship as we reach the final weeks of the transition of our current clearing firm to Merrill Lynch, Pierce, Fenner & Smith Incorporated (Merrill Lynch).

## What is happening:

- Over the past few months, we have been working to bring together our vast array of resources and financial strategies to help you meet your combined banking and investment needs.
- Your account will have a new account number (noted above) beginning **Aug. 15, 2010.** Certain other changes, including some new features and benefits are described on the following pages.
- **We have marked any items that may require action or special attention on your part with an arrow (➡). However, you should review this entire communication carefully.**

## What it means to you:

- Your new account number for your brokerage account is noted above.
- You have access to a comprehensive suite of cash management, credit and lending solutions, with competitive rates and secure and convenient access to funds.
- Through your Financial Advisor, you have the support of a Wealth Management Banker to provide guidance and support to help meet your short-term cash needs, without disrupting your long-term financial strategy.
- Account information can be accessed online at *MyMerrill.com* and you will continue to sign in as you do today.

---

| HELPFUL INFORMATION |
| --- |
| Please use your new brokerage account number, shown above, beginning Aug. 15, 2010. |
| Continue to use your existing account number until that date. |
| Review your new online features in the enclosed *Welcome to MyMerrill.com™* brochure or visit us at *www.TotalMerrill.com/Welcome* for an online demonstration. |
| Contact your Financial Advisor with any questions. |

*Over, please*

Merrill Lynch Wealth Management makes available products and services offered by Merrill Lynch, Pierce, Fenner & Smith Incorporated (Merrill Lynch) and other subsidiaries of Bank of America Corporation.

Banking products are provided by Bank of America, N.A. and affiliated banks, FDIC members and wholly owned subsidiaries of Bank of America Corporation.

Investment products:

| Are Not FDIC Insured | Are Not Bank Guaranteed | May Lose Value |
| --- | --- | --- |

Merrill Lynch is a registered broker-dealer, a registered investment advisor and SIPC member.

Merrill Lynch makes available certain investment products sponsored, managed, distributed or provided by companies that are affiliates of Bank of America Corporation or in which Bank of America Corporation has a substantial economic interest, including BofA™ Global Capital Management, BlackRock and Nuveen Investments.

© 2010 Bank of America Corporation. All rights reserved.

0158-FS

0158-FS

# EXHIBIT "L"

**BANQUE POPULAIRE**
COTE D'AZUR

RELEVE N° 5 AU 08/06/2011

**Votre conseiller :**
**REVERDITO Marc**

Tel : 04 89 86 92 40

**CANNES LA BOCCA**
28 AV MICHEL JOURDAN
06150 CANNES
Fax : 04 89 86 92 38
Tel : 04 89 86 92 37

PHONAZUR : 0 892 890 006
International 01 41 86 42 35
Code : 569366
SMS+6 11 10 : 569366

I/09/N
00230
0015

MME NATALIA EGIAZARIAN

BEVERLY HILLS
655 ENDRINO PLACE
0000090210 CALIFORNIA
ETATS UNIS D AMERIQUE

www.cotedazur.banquepopulaire.fr

LA SECURITE DES ACHATS EN LIGNE SUR INTERNET EVOLUE - DES LE 6 JUIN IL VOUS SERA DEMANDE
DE SAISIR UN CODE ENVOYE SUR VOTRE TELEPHONE MOBILE - TOUTES LES INFORMATIONS SUR :
WWW.COTEDAZUR.BANQUEPOPULAIRE.FR/MAGAZINE/BPCA/3DSECURE.HTML

VOTRE COMPTE CHEQUES N/R N° 60027541027
IBAN FR76 1560 7000 1560 0275 4102 741

MME NATALIA EGIAZARIAN
BIC CCBPFRPPNGE

| DATE COMPTA | LIBELLE/REFERENCE | | DATE OPERATION | DATE VALEUR | DEBIT EUROS | CREDIT EUROS |
|---|---|---|---|---|---|---|
| | **SOLDE CREDITEUR AU 09/05/2011** | | | | | **1 016,24** |
| 23/05 | PRLV FRANCE TELECOM DRAG 492191404 921914041D483E N.EMETTEUR: 002305 | 6AN0KPN | 23/05 | 23/05 | 43,06 | |
| 30/05 | VIR DE  20 000,00EUR SERVICES RENDERED BLIDENSOL TRADING AND INVESTMENT | A5UFUUH | 30/05 | 30/05 | | 20 000,00 |
| 31/05 | PRLV AUTOROUTE E.S.C.O.T TSAGO06035177910411FQD177023 N.EMETTEUR: 156612 | 6NVBJ7Z | 31/05 | 31/05 | 125,34 | |
| 31/05 | VIR M ALVAREZ ANTOINE SALAIRE | 0178589 | 30/05 | 30/05 | 2 000,00 | |
| 31/05 | VIR MME ALVAREZ ARACELI SALAIRE | 0178606 | 30/05 | 30/05 | 2 000,00 | |
| 31/05 | ☞ FRAIS VIREMENT 1 OPERATION | 0178589 | 30/05 | 30/05 | 1,38 | |
| 31/05 | ☞ FRAIS VIREMENT 1 OPERATION | 0178606 | 30/05 | 30/05 | 1,38 | |
| | **SOLDE CREDITEUR AU 31/05/2011** | | | | | **16 845,08** |
| 01/06 | VIR URSSAF DES AM 99S1011194400164724 | 3486654 | 01/06 | 01/06 | 10 418,00 | |
| 01/06 | ☞ FRAIS VIREMENT 00001 OPERATION | 3486654 | 01/06 | 01/06 | 2,95 | |
| 02/06 | ☞ FR. SUR ECARTES 1 EC FACTUREE(S) A  9,50 | EC01061 | 31/05 | 31/05 | 9,50 | |
| | **TOTAL DES MOUVEMENTS** **SOLDE CREDITEUR AU 08/06/2011** | | | | **14 601,61** | **20 000,00** **6 414,63** |

| | RECAPITULATIF DES FRAIS ET SERVICES BANCAIRES | | | | | |
|---|---|---|---|---|---|---|
| 31/05 | ☞ FRAIS VIREMENT | 0178589 | 30/05 | 30/05 | 1,38 | |
| 31/05 | ☞ FRAIS VIREMENT | 0178606 | 30/05 | 30/05 | 1,38 | |
| 01/06 | ☞ FRAIS VIREMENT | 3486654 | 01/06 | 01/06 | 2,95 | |
| 02/06 | ☞ FR. SUR ECARTES | EC01061 | 31/05 | 31/05 | 9,50 | |

SAUF ERREUR OU OMISSION          - Ce document ne justifie pas la déduction de la TVA ou de la charge en matière d'impôt direct -

# EXHIBIT "M"