1  Michael S. Adler, SBN 190119
      madler@ta-llp.com
2  Joel M. Tantalo, SBN 206096
      jtantalo@ta-llp.com
3  **TANTALO & ADLER LLP**
   1801 Century Park East, Ste. 2400
4  Los Angeles, CA 90067

5  Telephone:  (310) 734-8695
   Fax:        (310) 734-8696

6  Attorneys for Respondent
7  Ashot Yegiazaryan

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VITALY IVANOVICH SMAGIN<br><br>Petitioner,<br><br>v.<br><br>ASHOT YEGIAZARYAN,<br><br>Respondent. | **CASE NO. 14-cv-09764-RGK (PLAx)**<br><br>Before the Honorable R. Gary Klausner United States District Judge<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO PETITIONER'S TO CLARIFY INJUNCTION**<br><br>DECLARATIONS OF ASHOT YEGIAZARYAN, DR. PETER SCHIERSCHER, BASEL JAMRA, LOUCAS HAVIARAS, BENEDIKT JEHLE, CYRUS BENSON, and DMITRY STANISLAVOVICH BARANNIKOV, FILED CONCURRENTLY HEREWITH<br><br>Roybal Courtroom 850, 8th Floor<br><br>Date:   March 30, 2020<br>Time:   9:00 a.m. |

RESPONSE TO MOTION TO CLARIFY INJUNCTION

## TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................1

II. FACTUAL BACKGROUND ..............................................................................2

    A.    Ashot's Background and the Russian Asset Freeze...................................2

        1.    Ashot Was a Legislator in Russia Between 1999 and 2011 Who Fell Out of Favor with the Regime, Particularly After Disputes With Connected Individuals Trying to Strip Ashot of His Property. ........................................................................2

        2.    Ashot Escaped Russia in the Face of Death Threats. .....................3

        3.    After He Continued to Object to the Loss of his Investment, Corrupt Officials on the U.S. Sanctions List Sought Ashot's Arrest. ...............................................................................................3

        4.    Smagin Has Already Secured an Asset Freeze In Russia That Would More Than Satisfy the Arbitration Award Notwithstanding His False Denials in This Court and in the Ninth Circuit. ...................................................................................5

        5.    Smagin Has Attempted to Collect on His Arbitration Award in England, Liechtenstein, Cyprus, Monaco, and the United States, but **Not** in Russia..............................................................6

    B.    The Cyprus Courts Have Repeatedly Confirmed that Smagin Was Not Honest About the Russian Asset Freeze and That Smagin Needed No Further Security Beyond Those Assets to Collect.................7

    C.    Smagin Had No Interest in the Kerimov Arbitration Settlement Conducted and Paid in London, But Others -- Including Suren -- Did. ...........................................................................................................8

    D.    The Alpha Trust is a Liechtenstein Trust for the Kerimov Funds. ............9

    E.    Smagin Has Pending Litigation in Liechtenstein That Has Eliminated Any of Ashot's Rights in the Alpha Trust............................ 11

    F.    Suren's Claims Against Ashot and Ashot's Opposition to the Same. .... 12

        1.    Suren Has Sued Ashot After Ashot Failed to Deliver the Interest in the Kerimov Funds to Which Suren Was Entitled. ..... 12

        2.    Ashot Is **Opposing** Suren's Suit...................................................... 13

III. ARGUMENT .................................................................................................. 14

IV. CONCLUSION ............................................................................................... 14

RESPONSE TO MOTION TO CLARIFY INJUNCTION

## I. INTRODUCTION

While Petitioner Vitaly Smagin ("Smagin") makes bald accusations that Ashot Yegiazaryan ("Ashot") directed his cousin Suren Yegiazaryan ("Suren") to sue Ashot in Nevis, there is not a single shred of evidence that Ashot sought to be sued. In fact, Ashot is defending *against* Suren in the Nevis litigation.

More generally, Smagin attempts to broadly smear Ashot so as to suggest that anything or anyone connected to Ashot is necessarily covert or illicit.[1] However, Smagin omits to mention that most of the "evidence" relied upon ultimately derived from a politically-motivated Russian prosecution brought by Russian officials named under the Magnitsky Act for corrupt prosecutions.[2] Smagin also misrepresents the record in this case by suggesting that Ashot somehow "hid" the existence of the Liechtenstein trust from Smagin when, in fact, Ashot promptly identified that trust as soon as he had any obligation to do so.[3]

Ashot submits this response to clarify the record and to avoid any suggestion that he has behaved improperly with respect to the Nevis litigation or in violation of the

---

[1] On this apparent rationale, Smagin's Proposed Order seeks to bind not only Suren but also Ashot's brother Artem Yegiazaryan and the Trustees of the Alpha Trust despite the lack of any evidence that either of those persons have taken *any* action for Suren in Nevis. In fact, Artem has no connection with the Nevis lawsuit while the trustees of the Alpha Trust – like Ashot – are actively disputing Suren's claims in that jurisdiction. (The Court may also note that the Honorable Manuel Real found that there was no jurisdiction over the trustees of the Alpha Trust in a related case, Case No. 17-cv-06126-R-PLA, Order of January 31, 2018 at Dkt. #35.)

[2] Other alleged "evidence" was submitted in Ashot's contentious divorce proceeding and was appropriately rejected by the family law court as not being credible or supported.

[3] Smagin secured a preliminary injunction at the inception of this case in 2014 freezing all of Ashot's *California* assets, but Ashot was entitled to keep his other assets confidential at that time. [*See* Dkt. # 26 (February 4, 2015 Preliminary Injunction applying to "any property of Yegiazaryan located in California").] However, the Moscow Hotel litigation was unrelated to Smagin, it was located outside of the United States, and there is no general right to prejudgment asset discovery. Ashot provided discovery about the Kerimov Settlement as soon as the non-Europark, non-California assets became relevant in this litigation (i.e. the Court resolved the case in Smagin's favor.).

RESPONSE TO MOTION TO CLARIFY INJUNCTION

injunction in this case. Rather, Ashot believes this Court would benefit from a more complete background in this matter, which helps explain (i) why Ashot has been sued in Nevis and how that suit relates to (ii) a Russian freezing order freezing more than $180 million dollars of Ashot's assets in Russia, (ii) a pair of separate arbitration in London over two different and unrelated Moscow real estate ventures, (iv) a trust in Liechtenstein, (v) Suren's right to recover a share of the funds deposited into Liechtenstein, (v) prior Cyprus litigation finding Smagin to have been deceptive with the courts there with regard to litigation against Ashot, and (vi) various other judgments confirming Smagin's London arbitration award around the world (but notably <u>not</u> in Russia despite the asset freeze there). When the Court has reviewed the complete record on this motion, the Court will find not only that Ashot has complied with the injunction in this case, but that the matters at issue involve foreign assets and pending foreign litigations that should best be decided on a full evidentiary record, in the courts where such matters are pending.

## II.   FACTUAL BACKGROUND

**A.   Ashot's Background and the Russian Asset Freeze.**

1. <u>Ashot Was a Legislator in Russia Between 1999 and 2011 Who Fell Out of Favor with the Regime, Particularly After Disputes with Connected Individuals Trying to Strip Ashot of His Property.</u>

In the late 1990s, Ashot became involved in Russian government and political activities, serving among other things as an advisor to the Russian Central Bank (the Russian equivalent of the U.S. Federal Reserve). [Declaration of Ashot Yegiazaryan in Opposition to a Motion for a Turnover Order ("YD") ¶¶ 2-3.] In 1999, Ashot was elected to the Russian legislature known as the Duma. [*Id.* ¶ 4.] Ashot was twice re-elected to the Duma and served 12 years. [*Id.*]

During the time he served as a legislator, Ashot also had some investments which included at least two real estate projects. [YD ¶ 6.] One of the investments was in the Moskva Hotel renovation, where other investors included Vladimir Putin's long-time

judo partner, Arkady Rotenberg (an individual now subject to both U.S. and European Union sanctions). [YD ¶ 7.]

Around 2005, Ashot began to fall out of political favor, largely because he was allied with a former Prime Minster fired by Vladimir Putin. [YD ¶ 5.] After Ashot began to fall out of political favor, he was pressured by various individuals in the Russian government to give up his investment in the Moskva Hotel. [*Id.* ¶ 8.] When Ashot refused to voluntarily give up his interest, he was subjected to various forms of official and unofficial harassment. [*Id.*]

### 2. Ashot Escaped Russia in the Face of Death Threats.

Ashot left Russia in the summer of 2010, in large part because he began receiving threats of reprisal to 'stay away' from the Moskva Hotel Project**.** [YD ¶ 9.] Ashot reported the threats to the Russian police in February of 2010 but they took no serious action. [*Id.*] These threats were made against Ashot and his family, including threats to behead his children. [*Id.* and Ex. 1 thereto.] One of Ashot's family members was killed in Russia in 2010, and he understood that murder was intended to send him a message. [*Id.* ¶ 9.]

Ashot departed from Russia before the Russian regime decided to name him a "suspect" on alleged criminal charges. [YD ¶ 11.]

### 3. After He Continued to Object to the Loss of his Investment, Corrupt Officials on the U.S. Sanctions List Sought Ashot's Arrest.

In the fall of 2010, Ashot filed formal claims arising from the Moskva Hotel. [YD ¶ 11.] The Kremlin retaliated by seeking to arrest Ashot. [*Id.*] In that regard, they used a complaint filed by Smagin as a vehicle. [Declaration of Dmitry Stanislavovich Barannikov ("Barannikov Dec.") ¶ 3.] Discovery in other actions has demonstrated that Smagin collaborated with Russian officials to bring the claims in the arbitration (and the criminal complaint) against Ashot. [Declaration of Jason T. Cohen in Opposition to Writ of Attachment ¶¶ 5, 8-9 and Exs. 1-2 thereto (Dkt #21-3).]

While the Russian regime purported to conduct an independent "investigation" of

Ashot, the individuals assigned by the Kremlin to conduct the matter are specifically considered by the United States government to be politically motivated and corrupt. [Barannikov Dec. ¶¶ 7-10 and Exs. 4-7 (reflecting the involvement (a) Aleksey Droganov, (b) Viktor Grin, (c) Andrei Alexandrovich Krechetov, (d) Oleg Lugunov, and (e) Andrei Alexandrovich Strizhov in the Kremlin's "investigation" of Ashot); YD ¶ 15 (same); Request for Judicial Notice in Opposition to Summary Judgment ("RJN") [Dkt # 51][4] and Exhibits 1-3 thereto (reflecting U.S. identification of those individuals as subject to sanctions for involvement in the politically motivated Magnitsky prosecution).][5]

To further pressure Ashot, the Russian regime also submitted an arrest request to Interpol. Interpol merely acts as a clearinghouse for requests from various member nations (including Russia). [YD ¶ 12 and Ex. 2.] Whereas Interpol may "list" individuals because of member requests from governments like Russia as a matter of routine, the United States does not automatically arrest individuals merely because Russian political interests want an individual arrested. [YD ¶ 12.] Although the U.S. government will not publicly comment on extradition requests, it is clear the government has rejected Russia's request because Ashot has been living openly in the United States for more than six years without issue.

---

[4] As the Court may be aware, the United States government passed a special law in 2012 called the "Sergei Magnitsky Rule of Law Accountability Act of 2012" ("Magnitsky Act") after various politically-motivated prosecutions in Russia, including the jail-house death of a lawyer named Sergei Magnitsky who challenged corrupt individuals in the Russia government. [Pub. L. No. 112-208, 126 Stat. 1496, §§401-407, attached as RJN Exhibit 1.] Following the passage of the Magnitsky Act, the U.S. government identified 18 officials responsible for the detention, abuse, and death of Sergei Magnitsky who are specifically subject to U.S. sanctions. [RJN and Ex. 3.] At least five of those listed individuals played prominent roles in the "investigation" of Ashot Yegiazaryan. [Barannikov Dec. ¶¶ 7-10 and Exs. 4-7; YD ¶¶ 14-15.]

[5] Further evidence of the political nature of the efforts against Ashot is the fact that some of the same individuals working against Ashot have now been identified as individuals who approached the Trump campaign on behalf of the Russian regime. [YD ¶ 16 and Exs. 3-4 (July 15 and August 21, 2017 articles in the *New York Times*.); *see also* YD ¶ 17 and Ex.8.]

4
RESPONSE TO MOTION TO CLARIFY INJUNCTION

4. <u>Smagin Has Already Secured an Asset Freeze in Russia That Would More Than Satisfy the Arbitration Award Notwithstanding His False Denials in This Court and in the Ninth Circuit.</u>

In connection with the Russian criminal proceedings, Smagin filed a request for an asset freeze on various assets in Russia. [Barannikov Dec. ¶¶ 4-6 and Exs. 1-3.] Not surprisingly, the Russian regime issued a freeze order in Russia. [*Id.* and Ex. 2-3.] Among other assets, the Russian order froze the Europark Shopping Complex and the shares of the company that owns it (*i.e.* the development project at the heart of the arbitration). [Barannikov Dec. ¶5 and Ex. 2; Declaration of Cyrus Benson ("Benson Dec.") ¶ 7.] Smagin has valued those assets alone at approximately $360 million. [Benson Dec. ¶ 8 and Exhibit 2 (Relevant portions of Smagin's expert report valuating Europark at approximately $360 million dollars.)]

Moreover, Smagin's prior counsel previously admitted that the Russian asset freeze was undertaken to secure his recovery in the disputed arbitration. [Benson Dec. ¶ 5 and Ex. 1.] Specifically, Smagin's own counsel specifically represented that:

> The Russian Criminal Claim has therefore been commenced to enable freezing orders to be obtained from the Russian court. <u>These freezing orders protect assets that may satisfy an arbitral award</u>.

[Benson Dec. Ex. 1 (Brief from Smagin, ¶ 111) (emphasis added).][6]

While Smagin has repeatedly asserted that he is no longer protected by the Russian asset freeze in prior motions before this Court and the Ninth Circuit, Smagin filed a letter from a Russian government official in the California state court divorce proceedings between Ashot and his estranged wife which directly contradicts his assertions. [Declaration of Basel Jamra ("Jamra Dec.") ¶ 6 and Ex. 1.] The Russian official provided the letter to respond to Ashot's concerns that Smagin seeks a double recovery,

---

[6] Smagin has also disingenuously claimed that the asset freeze in Russia no longer secure him, but the letter from the Russian official submitted by Smagin himself (as discussed below) confirms two expert opinion that the Russian asset freeze was obtained on the application of Smagin and it continues benefits Smagin. [Expert Opinion of Galina Anatolyevna Krylova ¶¶ 8-11 (Dkt #85-14); *see also* Declaration of Drew Patrick Holiner ¶¶9-54 (Dkt #75-1)]

5
RESPONSE TO MOTION TO CLARIFY INJUNCTION

*i.e.* Smagin seeks assets outside of Russia and then Smagin will return to Russia to use corrupt officials to recover a second time on assets frozen in Russia. In his letter, the Russian official sought to reassure the California family law court that the Russian government would be required to release the asset freeze in Russia (except for procedural expenses of 1 million rubles)[7] if Smagin collected elsewhere. [Jamra Dec. Ex. 1 at page 8 ("In case of full compensation of you . . . of the amount awarded by the London Court of International Arbitration . . . the arrest of assets . . . must be cancelled").] While Ashot does not have any faith that Russian officials will live up to that promise, the statement unambiguously confirms that Smagin *is* secured in Russia despite his disingenuous denials to the contrary.[8]

In short, the Russian Freezing Orders secure property worth more than 2.5 times the property underlying Smagin's original claim. [YD ¶¶ 22-23.] In addition, there are tens of millions of additional dollars in property frozen in Russia as security for Smagin's award. [*Id.*¶ 24.]

> 5. Smagin Has Attempted to Collect on His Arbitration Award in England, Liechtenstein, Cyprus, Monaco, and the United States, but **Not** in Russia.

Despite (i) the Russian asset freeze, (ii) the confirmation from the Russian prosecutors that the freeze exists to secure Smagin's claims, and (iii) the fact that Russia is a signatory to the New York Convention on the Recognition and Enforcement of Foreign Arbitration Awards, Smagin has notably not attempted to enforce his arbitration award in Russia. [YD ¶ 27.]

Instead, he has confirmed the arbitration award not only in this country but also in *at least* England and Liechtenstein, and he has attempted to take further action to enforce the arbitration award in Monaco and Cyprus. [YD ¶ 28; *see also* Declaration of

---

[7] The Court may take judicial notice that one million rubles was less than $16,000 American dollars. [Jamra Dec. ¶ 6 (Footnote 3).]

[8] It also confirms that Smagin is working closely enough with the Russian officials to secure their cooperation in Smagin's litigation against Ashot Yegiazaryan.

6
RESPONSE TO MOTION TO CLARIFY INJUNCTION

Loucas Haviaras ("Havarias Dec.").] It appears that Smagin is trying to collect the full amount of his award from the Liechtenstein trust (at the expense of others with rights in the trust) and then will seek to collect again using the corrupt Russian prosecutors working with Smagin in Russia. [*Id.* ¶ 26.]

### B. The Cyprus Courts Have Repeatedly Confirmed that Smagin Was Not Honest About the Russian Asset Freeze and That Smagin Needed No Further Security Beyond Those Assets to Collect.

As reflected in the Declaration of Loucas Haviaras, Smagin has attempted to pursue Ashot not only in England, Liechtenstein, and the United States, but also in Cyprus. [Havarias Dec. ¶ 4.] Indeed, Smagin has filed no less than four separate *ex parte* (no notice) actions in Cyprus in support of his claims against Ashot. [*Id.* ¶¶ 4-12.] In those actions, the Cyprus courts found Smagin failed to be honest about the Russian freeze and that the freeze was material. [*Id.*]

Most relevant are two orders from Cyprus dated March 3, 2016 and March 10, 2016. The first, relating to General Application 1117/2014 in the District Court in Nicosia, Cyprus, involved Smagin's attempt to get a world-wide asset freeze against Ashot based upon the arbitration award at issue here. [Havarias Dec. ¶ 10.] In that case, Smagin initially received such a freeze on an *ex parte* (no notice) motion that failed to disclose the existence of the Russian asset freeze. [Havarias Dec. Ex. 3 at 11.] In that proceeding, Smagin argued that the failure to disclose the Russian asset freeze was irrelevant, because he contended that the Russian asset freeze did not provide security for collecting his award. [*Id.* at 7.]

After the matter was fully briefed and oral argument occurred, the Cyprus District Court found that the Russian asset freeze *was* relevant and rejected Smagin's claims that it provided no security. In particular, after full briefing, the Cyprus court found that:

> [Smagin's] failure to refer to the Russian proceeding is particularly of substantial concern. Considering that [Smagin] asked, and was granted permit to participate as Civil Plaintiff in the civil proceedings that commenced and is ongoing in Russia, he was obligated to inform the

> Court. This is particularly so since assets of Respondent and his interest in Europark had been frozen. . . .
>
> In view of all of the above, I conclude without hesitation that [Smagin] <u>failed to fulfill his duty as he should in terms of full and honest disclosure under the circumstances of this case</u>.

Havarias Dec. Ex. 3 at 11 (emphasis added).

The Cyprus District Court not only vacated the original *ex parte* freeze against Ashot based on this conduct, but further concluded that "there is no demonstrated risk that the arbitration award issued against [Ashot] by the LCIA might remain unsatisfied" and that "there is no objective likelihood of the arbitration award not being satisfied" after "[c]onsidering the freezing of Europark within the framework of the Russian proceedings." [Havarias Dec. Ex. 3 at 13.]

A second order confirmed the findings of the prior order. On March 10, 2016, the District Court in Cyprus issued an order in Action Number 6059/2015. [Havarias Dec. ¶ 11 and Ex. 4.] In that case, as in the prior case, the District Court in Cyprus found that the assets of Ashot and all of the shares of Europark have been frozen at the request of Smagin. [Havarias Dec. Ex. 4 at 9 ("[A]ssets of A.Y. in Russia and all of the shares in Europark have been frozen within the framework of the criminal proceedings taking place there. As mentioned earlier, in the Russian proceedings, the Applicant was allowed to be present as civil Plaintiff").] The District Court in Cyprus further went on to find:

> Under the circumstances of this case, **any further security** for the Applicant by way of the orders sought in this application **is deemed unnecessary**.

[LH Ex. 4 at 9 (emphasis added).]

**C.  Smagin Had No Interest in the Kerimov Arbitration Settlement Conducted and Paid in London, But Others -- Including Suren -- Did.**

The "Kerimov Settlement" funds derived from a London Court of International Arbitration ("LCIA") about the Moskva hotel. [YD ¶ 29.] Smagin had no involvement in the Moskva Hotel, and Ashot's claims were independent of Smagin. [*Id.* ¶ 30.] In fact, those claims predate Smagin's claims. [*Id.* ¶ 31.]

8
RESPONSE TO MOTION TO CLARIFY INJUNCTION

Ashot was not the only claimant in the arbitration (or in related arbitrations on the same underlying claim). [YD ¶¶ 32-35.] The original May 26, 2015 cover letter confirms that there were five separate claimants including Artem Egiazaryan. [*Id*.] The LCIA arbitration proceeded entirely in London, where Ashot and his co-claimants were represented by the London office of Gibson, Dunn & Crutcher. [YD ¶ 33.]

The LCIA arbitrations and related litigation were very expensive, costing well over $10 million dollars. [YD ¶ 36.] **Given that the Russian government (with the cooperation of Smagin) had frozen Ashot's assets in Russia soon after he started those arbitrations, almost the entire amount had to be financed through third-party funding.** [*Id.*] In 2011, he reached agreements with various parties including Suren to assist in funding and prosecuting the LCIA arbitrations, as well as his living expenses. [*Id.* ¶¶ 37-40.] Those involved offering two co-claimants (Artem Egiazaryan and Vitaly Gogokhiya) and Suren a share of any recovery. [*Id.* and Ex. 6.]

Ashot received more than $20 million dollars in support from these parties, who took a risk that the arbitrations would not be successful or that an award might not be collected. [YD ¶¶ 41-42; August 28, 2017 Declaration of Suren Egiazaryan (Dkt #__) ¶¶ 6-10.] As a result, although Ashot received the "Kerimov Settlement" in his name as lead plaintiff, he owed participation interests to Artem Egiazaryan, Vitaly Gogokhiya, and Suren Egiazaryan. [YD ¶ 43; Suren Egiazaryan Dec. at ¶¶ 11-12.][9]

Ashot has not only provided the written evidence dating back to 2011 of his obligation to Suren and Artem, but he has <u>**consistently**</u> identified these obligations to Suren in filings in this Court and elsewhere. [*See e.g*. ECF # 187-2 ¶¶ 32-38 and Ex. 6.]

**D.   The Alpha Trust is a Liechtenstein Trust for the Kerimov Funds.**

Because the settlement amount was too large for London counsel to maintain in their client trust account, Ashot was told that he needed to find a place within days for

---

[9] Payment was then made to the London office of Gibson, Dunn and Crutcher. [YD ¶ 44.] Those funds were never in the United States. [*Id.*]

9
RESPONSE TO MOTION TO CLARIFY INJUNCTION

such funds or counsel might return them to the respondents. [YD ¶ 46.] Ashot tried to find a bank account but was unable given his lack of a current passport and Russia's publication of the politically-motived Interpol "red notice." [*Id.* ¶ 47.] Eventually, CTX Treuhand AG (a law firm that also provides trust services) proposed a solution: although they could not open a bank account in Ashot's name, they found a bank that would take the funds if the account holder was a trust with ownership and control of the funds. [*Id.* ¶ 48.]

Ashot explained to CTX that the other parties had an interest in the funds. [YD ¶ 49.] As a result, the trustees added those parties as beneficiaries to the Trust. [*Id.* ¶¶ 50-51.]

Ashot did not set up the Alpha Trust to hide anything from Smagin. [YD ¶ 53.] Rather, he set up the Trust to receive the funds from the London client-trust account and to satisfy those third parties with interests in the Kerimov Settlement. [*Id.* ¶ 52.] He disclosed that Trust to Smagin when called to do so. [*Id.* ¶ 53.]

Smagin has argued that Ashot has full control over the Liechtenstein trust. That was not true initially, and it is certainly not true today. Specifically, in 2015 when the trust was formed, it was formed as a discretionary trust. [BJD ¶ 15 and Ex. 4 at 134.] That meant that the trustees must consider requests from the beneficiaries, but were not required to grant such requests. [*Id.*; YD ¶ 55.] Smagin has pointed in the past to a $3 million dollar direction to pay to the trustees as evidence that Ashot supposedly controls the trustees, but Smagin omitted to mention that the trustees refused to make such payment. [YD ¶ 56.] In fact, the Courts of Appeal in Liechtenstein have already found that the Alpha Trust is not obligated to make any payments sought by any beneficiary but exercises the rights granted to him in the trust deed. [BJD ¶ 15 and Ex. 4 at 134.][10]

---

[10] Ashot <u>was</u> the "Protector" of the trust and an investment advisor, but neither status gave Ashot the powers suggested by Smagin with respect to the trust. As protector, Ashot had the right to replace the trustees but Liechtenstein law would forbid him to do so merely to coerce a discretionary payment and any replacement trustees
[Footnote continued on next page]

E. **Smagin Has Pending Litigation in Liechtenstein That Has Eliminated any of Ashot's Rights in the Alpha Trust.**

Smagin has filed at least three actions in Liechtenstein against the Alpha Trust and its trustees. [BJD ¶¶ 3-10; Exs. 1-3.] Smagin has done so because the Liechtenstein courts not only have jurisdiction over the trustees and the trust, but because the trust documents themselves establish the Liechtenstein courts as the courts with jurisdiction over the administration of the trust. [BJD ¶¶ 4-5; YD Ex. 7.]

This includes an order on February 24, 2016, from the Princely Court of Justice in Liechtenstein, which expressly declared Smagin's arbitration award against Ashot to be "enforceable for the Principality of Liechtenstein." [BJD Ex. 1.] While Ashot appealed that decision, the decision was upheld on appeal and is now final. [BJD ¶ 6.] That order attached Ashot's right to receive any payment from the Alpha Trust. [*Id.*] As a result, Smagin is entitled under Liechtenstein law to levy upon assets belonging to Ashot up to an amount sufficient to settle the award. [*Id.*]

Additionally, in those actions, Smagin now obtained rulings from the Liechtenstein Trial Court, Liechtenstein Supreme Court and the Liechtenstein Constitutional Court that recognize that Smagin has effectively stepped into Ashot's shoes with respect to the trust and allowing Smagin to proceed to try to enforce his judgment against Ashot's rights in the trust. For example, pursuant to the November 14, 2016 Liechtenstein court order that "attached" any and all of Ashot's rights in the Alpha Trust, the Liechtenstein court expressly ordered Ashot not to take any action with respect to those rights. Specifically, in Paragraph 2, the Liechtenstein court ruled that:

---

would likewise have to be professional trustees who would also be bound to administer the Trust according to the terms of the Trust and the laws of Liechtenstein. [BJD ¶¶ 16-17.] As an investment advisor, Ashot had the right to comment on investments, but he does not have the right to direct or compel such investments or control them. [*Id.* ¶ 18; YD ¶ 57; *see also* BJD Ex. 4 at 134 (the trustee retains the ultimate rights as asset manager).] In fact, as the Court of Appeals in Liechtenstein previously confirmed, the trust property and the power to control the Trust sits with the professional trustee, and neither as settlor or protector did Ashot have the right to "make disposals of assets instead of the trustee." [BJD ¶ 11 and Ex.4 at 134.]

> The Obliged Party YEGIAZARYAN is ordered not to make any disposition in respect of the rights designated above.

[Jehle Dec. Ex. 2 (Nov.21, 2016 Liechtenstein Order) at Page 2.] Likewise, the Trustee of the Alpha Trust (CTX Treuhand) is specifically ordered not to comply with any instruction from Ashot as follows:

> CTX Treuhand Aktiengesellschaft as trustee of Alpha Trust . . . is ordered not to grant any benefit to the Obliged Party Ashot YEGIAZARYAN and/or a third party under these claims or in exercise of these rights (1.), **in particular not to comply with any instructions given by the Obliged Party Ashot YEGIAZARYAN** and/or not to accept any consents by the Obliged Party Ashot YEGIAZARYAN and not to base its decisions on them.

[BJD Dec. Ex. 2 (Nov.21, 2016 Liechtenstein Order) (emphasis added) at Page 2.] As a result, Ashot is currently precluded from taking any action with respect to the Alpha Trust, and the trustees are precluded from acting on any action that Ashot might take. [*Id.*; *see generally* Declaration of Dr. Peter Schierscher ("Schierscher Dec.") ¶¶ 38-43.] Indeed, since the rights have been "attached" in Liechtenstein, Ashot and/or the trustees could be at risk of a criminal prosecution if Ashot attempts any direction and/or the trustees follow any direction without approval of the Liechtenstein courts. [*Id.* ¶43.]

In sum, pursuant to those Liechtenstein rulings, Ashot has *no rights* with respect to the Liechtenstein trust available to him at this point. [BJD Ex. 2 at Page 2.]

**F.   Suren's Claims Against Ashot and Ashot's Opposition to the Same.**

1.   <u>Suren Has Sued Ashot After Ashot Failed to Deliver the Interest in the Kerimov Funds to Which Suren Was Entitled.</u>

As noted above, since Ashot's own assets were effectively frozen, Ashot agreed to give Suren a share in the recovery from the Moskva Hotel litigations in return for assisting in the funding of that litigation and other related matters. As also noted

above, after the funds were moved to the Alpha Trust, Ashot and Suren agreed that Suren would accept being a beneficiary of that trust in lieu of a cash payout.

However, Suren has recently taken the position that Ashot effectively failed to deliver Suren the rights of a beneficiary in the Alpha Trust. [YD ¶ 60.] Suren has argued that he surrendered the right to receive a full third of the Kerimov settlement in return for being a beneficiary of the Alpha Trust. [*Id.*] However, because of Smagin's litigation against Ashot in Liechtenstein and the orders in favor of Smagin in that country against Ashot, the trustees have refused to disburse any funds to <u>any</u> of the beneficiaries. [*Id.*] As a result, almost five years after Ashot and the other claimants successfully settled that litigation and Suren was entitled to share in those proceeds, Suren has received <u>nothing</u> from the recovery in the Moskva Hotel litigation and there is no immediate prospect of him being able to do so. [*Id.*] Moreover, Suren has told Ashot that he fears that Smagin may seize more than Ashot's initial share of the Kerimov Settlement, which could decimate the amount potentially available to Suren as a beneficiary. [*Id.*] In plain terms, Suren has told Ashot that his agreement to accept being a beneficiary was based on the understanding that funds would be available from the Trust that would be roughly equivalent to the amount available if it had been distributed to him up-front. [*Id.*] If Smagin takes nearly 80% of the Alpha Trust/Kermiov Settlement funds to satisfy a claim having nothing to do with Suren or the Moskva Hotel, Suren apparently feels that he will have been deprived of the benefit of the bargain for a full share in the Moskva Hotel recovery. [*Id.*]

    2.    <u>Ashot Is **Opposing** Suren's Suit.</u>

Ashot has not directed or encouraged Suren to sue him in Nevis. [YD ¶ 61.] To the contrary, Ashot has opposed that action in Nevis. [YD ¶ 61 and Ex. 9.] While it is certainly true that Ashot and Suren have worked together in the past to maximize the value of the Moskva Hotel and to defend the proceeds of the same, Ashot does not

agree with Suren having brought the Nevis litigation against Ashot. [*Id.* ¶ 62] To the extent of his (now limited) means, Ashot is continuing to oppose the litigation. [*Id.*]

### III.     ARGUMENT

At the end of the day, this motion boils down to an effort by Vitaly Smagin to try to keep Suren Yegiazaryan from even asserting claims in Nevis to the assets in the Liechtenstein-based Alpha Trust, which Smagin wants to use to satisfy Smagin's judgment despite any rights that Suren may have in those funds.

And at the end of the day, while Ashot is opposing Suren's efforts in Nevis, this is not ultimately Ashot's fight. Ashot understands that Suren will be filing his own opposition to the present motion, and Ashot joins Suren's opposition *only* to the extent that any grant of Smagin's motion could somehow suggest that Ashot has violated the terms of the injunction in this case. Ashot has not done so and requests that the motion be denied on that ground.

### IV.     CONCLUSION

For the reasons discussed above, Ashot respectfully submits that this Court should deny Smagin's motion in its entirety.

DATED: March 3, 2020

                                             Tantalo & Adler LLP

                                             By: __/s/ Michael S. Adler_____
                                             Michael S. Adler
                                             Attorneys for Respondent