Michael S. Adler, SBN 190119
  madler@ta-llp.com
Joel M. Tantalo, SBN 206096
  jtantalo@ta-llp.com
**TANTALO & ADLER LLP**
1801 Century Park East, Ste. 2400
Los Angeles, CA 90067

Telephone: (310) 734-8695
Fax:          (310) 734-8696

Attorneys for respondent Ashot Yegiazaryan

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VITALY IVANOVICH SMAGIN,<br><br>    Petitioner,<br><br>    v.<br><br>ASHOT YEGIAZARYAN,<br><br>    Respondent. | **CASE NO. 14-cv-09764-RGK (PLAx)**<br><br>Before the Honorable R. Gary Klausner<br>United State District Judge<br><br>**DECLARATION OF ASHOT YEGIAZARYAN IN RESPONSE TO MOTION TO CLARIFY PRELIMINARY INJUNCTION**<br><br>**Hearing Place:**  Courtroom 850<br>**Hearing Date:**   March 30, 2020<br>**Hearing Time:**   9:00 a.m. |

# DECLARATION OF ASHOT YEGIAZARIAN

I, Ashot Yegiazaryan, do hereby declare as follows:

1. I am the named respondent in this action. Except as otherwise indicated, I have personal knowledge of the facts declared herein and could and would competently testify thereto in a Court of Law if required to do so. Although English is not my native language, I have had this declaration translated to me and I believe this to be an accurate statement of the facts set forth herein.

### Personal Background and Profession as a Legislator Until 2011

2. I became involved in Russian government and political activities in the second half of the 1990s. In 1996, I took part in organizing the financing of Boris Yeltsin's ("Yeltsin") presidential campaign. In 1997, I was an advisor for the Russian Central Bank (the Russian equivalent of the U.S. Federal Reserve).

3. At the time, I also served as an advisor on a pro bono basis for Yuri Maslyukov, the First Deputy Prime Minister.

4. In 1999, I was elected to the State Duma. I was reelected to the State Duma in 2003 and 2007. During my time as a Deputy of the State Duma, I was appointed to various positions including deputy chairman of the Committee on Budget and Taxes, deputy chairman of the Commission to Promote a Political Settlement and Adherence to Human Rights in the Chechen Republic and a member of the Commission on the State Debt of the Russian Federation.

5. I began to fall out of political favor around 2005, largely because I was allied with the former Prime Minister Mikhail Kasyanov and my association with him was perceived as a sign of disloyalty to Vladimir Putin.

### Investments in Russia and Disputes with Connected Individuals

6. Although I was a legislator by profession between 1999 and 2010, I did make some investments during that time. Those investments included at least two real estate projects: the Europark Shopping Center and the Moskva Hotel.

7. Other investors in the Moskva Hotel included the City of Moscow, Vladimir Putin's long-time judo partner Arkady Rotenberg and Vladimir Putin's former masseuse Konstantin Goloschapov.

8. After I fell out of political favor with the political authorities in Russia, certain partners pressured me to surrender my investment in the Moskva Hotel. When I refused to quietly give up my investment, I was subjected to various forms of official and unofficial harassment. Ultimately, I filed a request for arbitration in the London Court of International Arbitration against high-ranking individuals within the Russia government.

### Flight from Russia in the Face of Death Threats

9. I left Russia in the summer of 2010, in large part because I began receiving threats of reprisal to 'stay away' from the Moskva Hotel Project. I reported these threats to the Russian police but they took no serious action. This was long before I was named as a suspect in respect to any alleged charges and long before the Russian arrest warrant was issued. These threats included threats against myself and also my family, such as threats to behead my children. A family member of mine was killed in Russia in 2010 and I believe it was done to send me a message.

10. Attached hereto as Exhibit 1 are true and correct copies of reports I filed with the Russian police relating to the threats against myself and my family.

**Politically-Motivated Arrest Warrant and Trial**

11. While I was in the United States, and after I filed my affirmative claims in London against those close to Vladimir Putin, the Russian authorities in October 2010 took moves to strip me of my parliamentary immunity, summoned me for questioning and placed me on a wanted list. Placing me on the wanted list was improper, because this may be done only when a person's whereabouts are unknown, whereas I had promptly informed investigators of my address in the United States and my safety concerns about returning to Russia. The Russian regime's investigators dismissed my lawyers' objections out of hand and published a notice through INTERPOL.

12. Unfortunately, it is my understanding that INTERPOL is little more than a clearing house for arrest and extradition requests from foreign countries, such that it is open to abuse. As noted in the Economist article attached hereto as Exhibit 2, Russia is particularly notorious for this practice. In any event, an INTERPOL notice is not evidence of guilt and INTERPOL itself emphasizes that persons subject to INTERPOL notices enjoy a presumption of innocence. I note that the United States has not acted on Russia's request.

13. I had no confidence in the Russian criminal investigation or my safety if I were to return to Russia. The Economist article mentioned above refers to the notorious Russian case of Sergei Magnitsky as a particularly acute example of the abuse of Russian criminal proceedings. That case involves allegations that the Russian officials investigating the case forged documents and stole money from the persons under investigation. After one of the accused's lawyers, Sergei Magnitsky, complained about these abuses, he was thrown in prison where he died; it is alleged that he was subjected to abuse in prison and that is why he died.

14. The Magnitsky case has been the subject of censure by the European Parliament and the United States Congress, the latter of which imposed sanctions on a number of Russian officials involved in the investigation.

15. **No less than seven of the Russian officials involved in my investigation also handled the Magnitsky case**, and five of the officials involved in my case (Aleksey Droganov, Victor Grin, Oleg Logunov, Andrei Krechetov and Andrei Strizhov) have been placed under sanctions by the U.S. State Department for their involvement in the Magnitsky case.

16. In addition to those individuals, other individuals involved in proceedings against me have been identified as connected with the Putin regime in news reports about approaches to the Trump election campaign. Attached hereto as Exhibit 3 is a true and correct copy of a July 15, 2017 article from the *New York Times* entitled "Soviet Veteran Who Met with Trump Jr. Is a Master of the Dark Arts" reporting on activities of Rinat Akhemtshin on behalf of those connected with the regime. As reflected in that article, Mr. Akhemtshin assisted others connected with the Putin regime against me. Likewise, attached hereto as Exhibit 4 is an August 21, 2017 article from the *New York Times* entitled "Lobbyist at Trump Campaign Meeting Has a Web of Russian Connections," explaining that, *inter alia,* Mr. Akhemtshin is suspected in the hacking of my counsel on behalf of Putin-connected parties.

17. Similarly, attached hereto as Exhibit 8 is an article from the Atlantic Counsel reflecting the Russian government's use of its proceedings to try to manipulate proceedings in the United States.

18. The passport I had at the time I fled from Russia has expired. Because of my conflict with the current regime in Russia, I have been unable to get a new passport or other similar travel documents.

19. Moreover, because of the politically-motivated arrest warrant, the listing on Interpol, and my lack of current documents, I am unable to obtain a personal banking account. For example, I have tried to open a simple bank account in Los Angeles and been refused on several occasions.

5

DECLARATION OF ASHOT YEGIAZARYAN
IN RESPONSE TO MOTION TO CLARIFY INJUNCTION

## Mr. Smagin Initiated a Freezing Order Against Me in Russia that Secures Hundreds of Millions in Assets

20. In connection with his claims against me, Mr. Smagin has filed a civil claim within the criminal case against me. A true and correct copy of that claim (along with an English translation) is attached hereto as Exhibit 5.

21. During the underlying arbitration in this matter, I was shown pleadings by Mr. Smagin's counsel wherein Mr. Smagin asserted that the purpose of the Russian freeze was to secure any possible recovery in the arbitration. I understand those pleadings have been previously submitted to this Court, and are being again submitted in this motion as part of the Declaration of Cyrus Benson.

22. The orders attach at least three significant sets of assets. The first and most significant set of assets relate to Europark, the Moscow shopping center at the heart of the underlying arbitration in this matter. In his claims, Mr. Smagin asserted that he had been wrongfully deprived of a 20% interest in Europark. However, with the Russian Freezing Order, Mr. Smagin has frozen 100% of the assets of Europark and of the company that owns Europark. In other words, Mr. Smagin has secured property worth 5 times the property underlying his original claim. Technically, my interest in those properties is only a 50% interest, but even just considering my interest in the Europark shopping center, Mr. Smagin has frozen assets in Russia worth 2.5 times his claim.

23. The most recent valuation of Europark, presented by Mr. Smagin himself, valued Europark at over $360 million dollars. As such, the most recent valuation of Europark places my 50% interest – frozen for Mr. Smagin under the Russian Freezing Orders – at over $180 million dollars.

24. In addition to Europark, I own at least two pieces of real estate in Moscow that have been frozen for Mr. Smagin by the Russian Freezing Orders. One of those pieces of real property is a sizable piece of property available for development in one

of the most expensive neighborhoods of Moscow on Rublevskoye Shosse. The property would be appropriate for an apartment complex. There has not been any recent valuation of this property, but it is certainly worth well over $10 million dollars and could be worth as much as $50 million dollars or more. This is in addition to the Europark assets mentioned before.

25. I understand that Mr. Smagin has repeatedly claimed that he no longer has any interest in the freezing order in Russia against me, but Mr. Smagin himself submitted a letter from the Russian prosecutor in another action where the Russian prosecutor stated that the freeze would be lifted in Mr. Smagin obtained sufficient recovery outside of Russia. That letter is attached to the Declaration of Basel Jamra.

26. I understand that I have been convicted in absentia by the Russian regime, but that conviction was secured as part of the same politically-motivated process described above. Moreover, because of the conviction, I have very little expectation that I will ever be able to recover the assets that Mr. Smagin has frozen in Russia. I fear that Mr. Smagin intends to collect abroad and then collect a second time with the collaboration of the Putin affiliates who brought the criminal charges against me.

**Mr. Smagin Has Sought to Collect on the Arbitration Award Around the World – Except in Russia Where My Assets are Frozen for Him.**

27. To the best of my knowledge (and I believe I would know), Mr. Smagin has not taken any efforts to confirm the Europark arbitration award in Russia despite or enforce it there, despite the fact that Russia is a signatory to the New York Convention on the Recognition and Enforcement of Foreign Arbitration Awards.

28. Instead, he has confirmed the arbitration award not only in the United States but also in *at least* England and Liechtenstein, and he has attempted to take further action to enforce the arbitration award against me in Monaco and Cyprus.

**Background on the Kerimov Settlement**

29. The funds referred to in this motion as the "Kerimov Settlement" arose out of an arbitration before the London Court of International Arbitration ("LCIA"). This LCIA claim related to the Moskva Hotel.

30. **Mr. Smagin had no involvement in the Moskva Hotel, and my claims against other parties in the Moskva Hotel were independent of Mr. Smagin**. At no time did Mr. Smagin have **any rights** with respect to the Moskva Hotel.

31. My LCIA claims relating to the Moskva Hotel were filed <u>before</u> Mr. Smagin filed the underlying arbitration demand in this matter.

32. I was not the only claimant in the specific arbitration that lead to the Kerimov Settlement. The May 26, 2015 cover letter reflected that there were in fact five separate claimants including my brother Artem Yegiazaryan.

33. That specific LCIA arbitration proceeded entirely in London, where myself and my co-claimants were represented by the <u>London</u> offices of Gibson, Dunn & Crutcher. That arbitration entirely involved matters that occurred in Russia and Europe.

34. Moreover, the specific arbitration that led to the Kerimov Settlement was actually one of three LCIA arbitrations that I initiated with various other co-claimants arising out of the Moskva Hotel. Those arbitrations were brought as separate proceedings because the various respondents were parties to different LCIA arbitration agreements and some of those respondents refused to agree to their consolidation in a single LCIA arbitration, which would have otherwise been possible under the LCIA arbitration rules. The different arbitrations also involved different claimants. However, from my perspective, all three arbitrations were a collective undertaking to recover the stolen interests in the Moskva Hotel.

35. I was the lead claimant in all three arbitrations, but I had co-claimants in those arbitrations including not only my brother Artem Yegiazaryan but an individual

8

named Vitaly Gogokhiya.

36. These three LCIA arbitrations over the Moskva Hotel were major undertakings, with legal fees well in excess of ten million dollars. Given that the Russian government (with the cooperation of Mr. Smagin) issued the Russian Freezing Orders soon after we initiated the LCIA arbitrations, almost the entire amount had to be financed through third-party funding.

37. As a result, in 2011, I reached agreements with various parties to assist me in funding and prosecuting those arbitrations (as well as paying my living expenses during the interim). Most significantly, I entered into agreements with two co-claimants (Artem Yegiazaryan and Vitaly Gogokhiya) to help prosecute those arbitrations, as well as an agreement with my cousin Suren Yegiazaryan.

38. The substance of those agreements was that those parties would assist me in prosecuting the arbitrations and would provide funding for such litigation and for my living expenses. In return, I would provide them with a share of any recovery from the Moskva Hotel arbitrations.

39. Attached hereto as Exhibit 6 is true and correct copy of the handwritten 2011 confirmation of the agreement between myself, Artem Yegiazaryan and Suren Yegiazaryan, as well as an English translation of the same.

40. Although Mr. Smagin suggests that this agreement is some sort of after-the-fact fiction created to try to interfere with his collection efforts in Liechtenstein, I have consistently explained the role of my brother Artem, my cousin Suren, and Mr. Gogokhiya and their rights with respect to the Moskva Hotel litigations over a number of years. That includes (but is not limited to) my providing the written agreement to this Court with an explanatory declaration in my August 28, 2017 Declaration ¶¶ 33-38 and Ex. 2 (filed at Dkt # 187-2).

41. Pursuant to the agreements with Artem, Suren, and Mr. Gogokhiya, I received significantly more than ten million dollars worth of funding for the

9
DECLARATION OF ASHOT YEGIAZARYAN
IN RESPONSE TO MOTION TO CLARIFY INJUNCTION

arbitrations at issue. As of June 2015, when we received the Kerimov Settlement, Suren alone had provided more than $11,491,000 dollars in support under our 2011 agreement, and Artem had provided more than $10,134,000 million dollars. Since then, they have paid many millions of additional dollars in reliance on our agreement that they would advance funds in return for an interest in any recovery from the Moskva Hotel.

42. This was entirely speculative on their part, and I would likely have been unable to repay them if we had not been successful in recovering any money in the arbitration.

43. Eventually, after an LCIA ruling in our favor, the co-claimants and I were able to negotiate a settlement in the Kerimov arbitration that led to the "Kerimov Settlement." However, while the payment was made in my name as I was the lead claimant, I was obligated at all times to share those funds with Artem, Suren, and Vitaly Gogokhiya.

44. As reflected in the settlement agreement itself, the Kerimov Settlement payment was made to the <u>London</u> offices of Gibson, Dunn & Crutcher in mid-2015. Those funds were never received in the United States, but were received by the UK client trust account of the UK office of Gibson, Dunn & Crutcher, the London-based counsel who prosecuted the arbitrations on our behalf.

45. That settlement was received in London *after* Mr. Smagin had secured his underlying arbitration award, but at a time when the English courts had enjoined any effort by Mr. Smagin to collect on the award in England or Wales. The settlement was also received before Mr. Smagin had any judgment in this Court, and it was received at a time (as now) when Mr. Smagin had already frozen Europark and other Russian assets sufficient to secure the arbitration award, assuming he was ultimately successful. As a result, there was no limitation on my ability to receive the award on behalf of myself and my co-claimants.

10

DECLARATION OF ASHOT YEGIAZARYAN
IN RESPONSE TO MOTION TO CLARIFY INJUNCTION

## The Liechtenstein Trust Was Created to House the Funds and Share with The Others Entitled to Share in Funds from the Moskva Hotel

46. At the time they received the initial settlement payment, our London arbitration counsel informed me that they could not keep it in their client trust account for any extended period of time. I was told that we needed to find a place to receive such funds within days or London counsel might be required to return the funds back to the respondents in the arbitration.

47. I tried very hard to find a bank account that would accept these funds in my own name. However, as noted above, my lack of a passport and the fact that Russia had published a red notice against me through Interpol prevented me from being able to open a bank account in the United States. I made various efforts to try to find a bank that would open an account for me, but these were rebuffed by numerous banks throughout the world.

48. Eventually, CTX Treuhand AG, a law firm in Liechtenstein that also provides professional trustees services, proposed a solution. Although they were unable to open a bank account in my name (as they initially sought to do at my request), they found a bank that was willing to take on the funds if the account was under the ultimate control of a trust that would own the funds.

49. At the time we set up the Alpha Trust, I explained to the trustees that I was not the only person with an interest in the funds. In particular, at that time, Artem, Suren, and Vitaly Gogokhiya all had participation interests in those funds.

50. The representatives of CTX Treuhand explained to me that, given the need to set up the documents immediately, we should use a standard form of trust agreement they already had on hand, but that they could promptly amend the trust agreement to reflect the interests of additional parties with interests in those funds.

51. Therefore, given the urgency of setting up the Alpha Trust to receive

11

funds from the Gibson, Dunn & Crutcher client trust account in London, that is what we did. First, we signed the basic document to set up the Alpha Trust and allow it to receive the funds from the London trust account, and shortly thereafter CTX Treuhand amended the Alpha Trust to reflect the fact that Artem, Suren, and Vitaly Gogokhiya were all intended beneficiaries.

52. This trust structure met two key goals for me. First, it allowed us to receive the funds from the London client-trust account so they could not be sent back to the respondents in the Kerimov arbitration. Second, it allowed the parties with an interest in the funds from the Moskva Hotel arbitrations to receive interests. In fact, payments were made to those parties from the trust in partial consideration of their assistance in the Kerimov litigation. While Mr. Smagin identifies a number of payments from the Alpha Trust, those payments were all made either (i) to lawyers on the Kerimov litigation, (ii) other counsel for myself in related litigations, (iii) the individuals like those discussed above who had an interest in the Kerimov Award, or (iv) to the trustees or their professionals (*e.g.* their lawyers) for trust expenses.

53. I did not set up the Alpha Trust to hide anything from Mr. Smagin. I fully disclosed the existence of the Alpha Trust to Mr. Smagin in my first set of responses to interrogatories as to assets outside of California.

**Facts About the Alpha Trust**

54. The Alpha Trust is a Liechtenstein Trust, which provides for administration of the trust in the country of Liechtenstein. True and correct copies of the relevant provisions of the Alpha Trust are attached hereto as Exhibit 7.

55. Even before Mr. Smagin secured his orders in Liechtenstein attaching my rights there, I did not possess or control the funds in the Alpha Trust. The terms of the Alpha Trust require the trustees to consider any request from myself or any of the other beneficiaries, but they do not require those trustees to grant such requests merely

because I seek them.

56.  Mr. Smagin previously referred to the fact that I and my wife signed a joint direction seeking a $3 million distribution from the Alpha Trust in the summer of 2016 as evidence that I could direct the trustees to do anything I want. That is incorrect. It was my wife's divorce attorneys who insisted on that text, and although I knew I could not compel the trustees, I agreed to sign it in that form to show that I was acting in good faith. The trustees refused to make the payment, however and the payment was not made. I have reviewed the trust statements from that period (and produced them to Mr. Smagin) and no such $3 million dollar payment was ever made.[1]

57.  Before my rights to the Alpha Trust were frozen by Mr. Smagin in Liechtenstein in November 2016, I was an investment advisor to the Alpha Trust. However, there was a difference between an investment advisor and the investment manager of the Trust. As an investment advisor, I was allowed to review and comment on the Trust's investments. In effect, I *advised* on it. However, I did not have control over any of the accounts, nor did I have final say about what investment decisions were actually made. Those rights and responsibilities belonged to the investment advisor to the trust, which I understand to be Alpenrose Wealth Management.

58.  At the moment, pursuant to Liechtenstein orders attaching those rights in favor of Mr. Smagin, I understand that I do not have any ability to receive funds from the Alpha Trust. I have not requested or received any funds since November 2016. Moreover, if I were to request a disbursement of nearly $93 million dollars, I understand that the Trustees would be forbidden by Liechtenstein court order from

---

[1] I have reviewed all trust statements through the late fall of 2016, at which time Mr. Smagin secured an order in Liechtenstein precluding the trustees from recognizing any right I might have with respect to the Alpha Trust. I have not seen any statements since that time because the trustees have refused to provide them to me in light of orders obtained by Mr. Smagin in Liechtenstein that originally froze my rights with respect to the Trust (and now allow Mr. Smagin to essentially use my rights for the Alpha Trust on his behalf).

even considering that request.

### Suren's Claims Against Me in Nevis Are Not at My Direction and I Am Opposing.

59.     As discussed above, I agreed with Suren that in return for millions upon millions of dollars in funding towards the group of speculative Moskva Hotel litigations, he would be entitled to a share of the net recovery (if any) in those litigations. As I have previously discussed in declarations and depositions (and as Suren confirmed), Suren agreed to accept the right to be a beneficiary in the Alpha Trust in lieu of his right to a specific sum.

60.     However, Suren has recently taken the position that I have effectively failed on my part to deliver him the rights of a beneficiary in the Alpha Trust. Suren has argued that he surrendered the right to receive a full third of the Kerimov settlement in return for being a beneficiary of the Alpha Trust. However, because of Mr. Smagin's litigation against me in Liechtenstein and the orders in favor of Mr. Smagin in that country against me, the trustees have refused to disburse any funds to any of the beneficiaries. As a result, almost five years after we successfully settled that litigation and Suren was entitled to share in those proceeds, Suren has received <u>nothing</u> from the recovery in the Moskva Hotel litigation and there is no immediate prospect of him being able to do so. Moreover, Suren has told me that he fears that Mr. Smagin may seize more than my initial share of the Kerimov Settlement, which could decimate the amount potentially available to him as a beneficiary. In plain terms, Suren has told me that his agreement to accept being a beneficiary was based on the understanding that fund would be available to trust beneficiaries that would be roughly equivalent to the amount available to him if it had been distributed up-front. If Mr. Smagin takes nearly 80% of the Alpha Trust assets to satisfy a claim having nothing to do with Mr. Smagin or the Moskva Hotel, Suren feels that he will have been deprived of the benefit

14

of the bargain for a full share in the recovery.

61. Mr. Smagin asserts that the Nevis lawsuit is an attempt by *me* to try to respond to unfavorable rulings in Liechtenstein. However, I did not direct my cousin to sue me in Nevis, and I filed opposition documents in that Nevis action on or about February 13, 2020. Attached hereto as Exhibit 9 is a true and correct copy of my opposition in that Nevis Action. As far as I am aware, those opposition documents were filed before Mr. Smagin was even aware of Suren's Nevis litigation and those opposition documents were filed because I disagree with the claims made by my cousin.

62. I continue to be on good terms generally with my cousin, and I very much understand his frustration with the fact that he has been unable to receive even so much as a dollar of the Moskva Hotel recovery in which he is entitled to share. I also understand his frustration with the possibility that Mr. Smagin will seize more than my share of the Kerimov Settlement, all the while keeping my other assets frozen in Russia. That said, I disagree that he should have brought the Nevis litigation and I am not directing or encouraging that litigation. Instead, as noted above, I am opposing that litigation to the best of my (now limited) means, and fully expect to continue to do so.

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct and that this declaration was executed on March 9, 2020 in Los Angeles County, California.

Ashot Yegiazaryan
(also spelled Ashot Egiazaryan)

hereto as Exhibit 9 is a true and correct copy of my opposition in that Nevis Action. As far as I am aware, those opposition documents were filed before Mr. Smagin was even aware of Suren's Nevis litigation and those opposition documents were filed because I disagree with the claims made by my cousin.

62. I continue to be on good terms generally with my cousin, and I very much understand his frustration with the fact that he has been unable to receive even so much as a dollar of the Moskva Hotel recovery in which he is entitled to share. I also understand his frustration with the possibility that Mr. Smagin will seize more than my share of the Kerimov Settlement, all the while keeping my other assets frozen in Russia. That said, I disagree that he should have brought the Nevis litigation and I am not directing or encouraging that litigation. Instead, as noted above, I am opposing that litigation to the best of my (now limited) means, and fully expect to continue to do so.

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct and that this declaration was executed on March 9, 2020 in Los Angeles County, California.

_____
Ashot Yegiazaryan
(also spelled Ashot Egiazaryan)

DECLARATION OF ASHOT YEGIAZARYAN
IN RESPONSE TO MOTION TO CLARIFY INJUNCTION